No. 01-542C
(Judge Lawrence J. Block)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

L.W. MATTESON, INC.

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

PATRICIA M. McCARTHY
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 307–0164
Fax: (202) 514-8624

Attorneys for Defendant

OF COUNSEL:
EDWIN C. BANKSTON
District Counsel
Army Corps of Engineers
Saint Paul, MN 55101

JULY 16, 2003

# TABLE OF CONTENTS


STATEMENT OF THE ISSUES ........ 1

STATEMENT OF THE CASE ........ 2

I. Nature of the Case ........ 2

II Statement of Facts ........ 3

SUMMARY OF ARGUMENT ........ 9

ARGUMENT ........ 11

I. Legal Standards ........ 11

II. Matteson Cannot Establish A Breach Of Contract As A Matter Of Law ........ 12

A. Count I Must Be Dismissed Because It Is Undisputed That The Corps Paid Matteson The Contract Price ........ 13

B. Count V Must Be Dismissed Because Matteson Cannot Establish A Superior Knowledge Claim As A Matter Of Law ........ 14

C. The Plain Language Of The Contract Defeats Counts VI And VII ........ 17

III. Matteson Cannot Establish A Differing Site Condition As A Matter Of Law ..... 20

IV. Matteson Cannot Establish A Cardinal Change In The Contract ........ 22

V. Matteson Cannot Establish Its Claims Of Impossibility Or Commercial Impracticability ........ 23

A. The Specifications Were Not Impossible To Perform, As Matteson, In Fact, Successfully Performed The Contract ........ 23

B. Matteson Cannot Establish Its Claim Of Commercial Impracticability ... 24

VI. Matteson Cannot Establish Its Claim Of Mutual Mistake As A Matter Of Law .. 27

CONCLUSION ........ 28

## TABLE OF AUTHORITIES

### FEDERAL CASES

AT&T Communics., Inc. v. Perry,
296 F.3d 1307 (Fed. Cir. 2002) ........ 15

Ambrose-Augusterfer Corp. v. United States,
394 F.2d 536 (Ct. Cl. 1968) ........ 25

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) ........ 11

Campbell v. United States,
2 Cl. Ct. 247 (1983) ........ 12

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) ........ 11

Coast Federal Bank, FSB v. United States,
323 F.3d 1035 (Fed. Cir. 2003) ........ 18,19,20

Comtrol, Inc. v. United States,
294 F.3d 1357 (Fed. Cir. 2002) ........ 21

Dairyland Power Cooperative v. United States,
16 F.3d 1197 (Fed. Cir. 1994) ........ 27

Forman v. United States,
329 F.3d 837 (Fed. Cir. 2003) ........ 17,18

GAF Corp. v. United States,
932 F.3d 947 (Fed. Cir. 1991) ........ 15

Giesler v. United States,
232 F.3d 864 (Fed. Cir. 2000) ........ 15,16

H.B. Mac, Inc. v. United States,
153 F.3d 1338 (Fed. Cir. 1998) ........ 21

H.N. Bailey & Associates v. United States,
449 F.2d 376 (Ct. Cl. 1971) ........ 15,16

Hercules Inc. v. United States,
24 F.3d 188 (Fed. Cir. 1994) ........ 15

Jennie-O Foods, Inc. v. United States,
580 F.2d 400 (Ct. Cl. 1979) ........................................ 23

John Massman Contracting Co. v. United States,
23 Cl. Ct. 24 (1991) ........................................ 16

Krygoski Constr. Co. v. United States,
94 F.3d 1537 (Fed. Cir. 1996) ........................................ 23

McAbee Constr., Inc. v. United States,
97 F.3d 1431 (Fed. Cir. 1996) ........................................ 18

McNamara Construction of Manitoba, Ltd. v. United States,
509 F.2d 1166 (Ct. Cl. 1975) ........................................ 28

Mingus Constructors, Inc. v. United States,
812 F.2d 1387 (Fed. Cir. 1987) ........................................ 11

National Presto Indus., Inc. v. United States,
338 F.2d 99 (Ct. Cl. 1965) ........................................ 28

Natus Corp. v. United States.,
371 F.2d 450 (Ct. Cl. 1967) ........................................ 26

Numax Electrics, Inc.,
90-1 B.C.A. ¶ 22,280 (1989) ........................................ 26

P.J. Maffei Building Wrecking Corp. v. United States,
732 F.2d 913 (Fed. Cir. 1984) ........................................ 21

Raytheon Co. v. White,
305 F.3d 1354 (Fed. Cir. 2002) ........................................ 26,27

Rumsfeld v. Freedom NY, Inc.,
329 F.3d 1320 (Fed. Cir. 2003) ........................................ 22,23

Seaboard Lumber Co. v. United States,
308 F.3d 1283 (Fed. Cir. 2002) ........................................ 23,24,25

Soletanche Rodio Nicholson (JV),
94-1 B.C.A. ¶ 26,472, and 131,774 (1993) ........................................ 26

Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.,
833 F.2d 1560 (Fed. Cir. 1987) ........................................ 11,12

United States v. Winstar Corp..
518 U.S. 839 (1996) .......... 25

WDC West Carthage Associates v. United States,
324 F.3d 1359 (Fed. Cir. 2003) .......... 18

Western Empire Constructors, Inc. v. United States,
20 Cl. Ct. 668 (1990) .......... 25

Whittaker Crop., Power Sources Division,
79-1 B.C.A. ¶ 13,805 (1979) .......... 26

**FEDERAL STATUTES**

48 C.F.R. § 52.236-2 .......... 21

**L.W. Matteson, Inc. v. United States**
**01-542C (Fed. Cl.)**

## INDEX TO DEFENDANT'S APPENDIX


| Document | Def. App. Pages |
|---|---|
| Ex. 1 (Solicitation No. DACW37-96-B-0022 Construction Project Documents for Grand Encampment Excavation) (excerpts) | 1-166 |
| Ex. 2 (Handwritten notes dated Aug. 29, 1996) | 204 |
| Ex. 3 (Memorandum for Record, dated Nov. 8, 2000 by Daniel J. Krumholz) | 205-208 |
| Ex. 10 (Excerpts from Steve Tapp's 1996 calendar) | 219-222 |
| Ex. 11 (Matteson's Application for Land Use/Land Alteration Permit dated Oct. 2, 1996) | 230-237 |
| Ex. 12 (Memorandum for Record, dated Nov. 6, 2000 by Dean J. Peterson) | 238-239 |
| Ex. 26 (Draft Environmental Assessment and Finding of No Significant Impact for Grand Encampment Excavation, dated May 31, 1996) | 274-301 |
| Ex. 32 (Letter dated Aug. 29, 1996 to Matteson from Marilyn Aird, Contracting Officer) | 329-330 |
| Ex. 33 (Letter dated Sep. 4, 1996 to Marilyn Aird from Matteson) | 331 |
| Ex. 34 (Matteson's certified claim dated July 31, 2000) | 332-338 |
| Ex. 41 (Matteson's supplemental letter supporting claim dated Sep. 20, 2000) | 349-357 |
| Ex. 42 (Plaintiff's Answers to Defendant's First Set of Interrogatories, verified Feb. 27, 2000) | 377-384 |

**L.W. Matteson, Inc. v. United States**
**01-542C (Fed. Cl.)**

# INDEX TO DEFENDANT'S APPENDIX


| Document | Def. App. Pages |
|---|---|
| Ex. 44 (Facsimile cover sheet from Matteson to Melissa Gulan, dated 3/17/97) | 398 |
| Ex. 45 (Contracting Officer's Final Decision, dated Nov. 17, 2000) | 399-419 |
| Ex. 51 (Facsimile from Shar to David Guillot, received Sep. 16, 1996) | 431-433 |
| Deposition of David A. Guillot (excerpts) | 898-932 |
| Deposition of Larry W. Matteson (excerpts) | 957-1084 |
| Deposition of Lawrence W. Matteson (excerpts) | 1189-1207 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| L.W. MATTESON, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 01-542C |
| | ) | (Judge Lawrence J. Block) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56(b) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully requests that this Court grant judgment for defendant as a matter of law and dismiss the complaint. In support of our motion, we rely upon the First Amended Complaint, filed by leave of this Court on March 15, 2002 ("First Am. Compl."), the following brief, our proposed findings of uncontroverted fact (“DPFUF”), and the attached appendix ("Def. App.").

**STATEMENT OF THE ISSUES**

1. Whether plaintiff, L.W. Matteson, Inc. ("Matteson"), can establish any of its breach of contract claims as a matter of law.

2. Whether Matteson can establish a differing site condition as a matter of law.

3. Whether Matteson can establish a cardinal change in its contract as a matter of law.

4. Whether Matteson can establish its impossibility and commercial impracticability claims as a matter of law.

5. Whether Matteson can establish any of its mistake claim as a matter of law.

## STATEMENT OF THE CASE

### I. Nature of the Case

Matteson, an experienced Government contractor and established hydraulic dredging company, Def. App. 962-63, 989, seeks a $1.1 million equitable adjustment in the price of its fixed-price contract with the United States Army Corps of Engineers (the "Corps") to excavate and transport existing dredged material from two specified areas located upstream from Alma, Wisconsin (the "Grand Encampment Excavation"). First Am. Compl. ¶¶ 1, 15, 22. In its contract, Matteson expressly assumed responsibility for obtaining any necessary licenses or permits, and for complying with any Federal, state, and municipal laws, codes, and regulations that may apply to the contract work. Def. App. 88, 1033-35.

In performing the contract, Matteson made business decisions: (1) to reject, in large part, use of the potential disposal sites identified in the Corps' invitation for bids; (2) to select different disposal sites; and (3) to attempt to use those sites instead of the Corps' sites to perform the contract work. First Am. Compl. ¶¶ 2, 7, 16. In Matteson's view, the Corps' sites were incompatible with Matteson's choice of hydraulic dredging, and that the "use of hydraulic dredging would require the contractor to obtain its own disposal site within the vicinity of the two designated areas, . . . . Id. ¶ 5; see also id. ¶¶ 2, 4.

After Matteson failed to obtain necessary state and local approval for the alternative private disposal sites it had chosen, id. ¶18, the Corps assisted Matteson in locating yet another alternative disposal site on property owned by the Fish & Wildlife Service. Id. ¶ 19. Matteson alleges that use of the Fish & Wildlife disposal site caused it to incur more costs than it would

have incurred had it successfully obtained permits to use private Matteson-selected disposal sites. Id. ¶¶ 19-20.

Matteson blames the Corps for not advising it of municipal laws, codes, and regulations that potentially applied to the Matteson-selected disposal sites. Id. ¶¶ 55-59. Matteson, an experienced dredger who had performed work on other Corps projects, also blames the Corps for not warning it of the possibility of "local opposition" to use of the Matteson-proposed disposal sites. Id. Matteson contends that the United States should be held liable for its alleged increased costs.

As we demonstrate below, all of Matteson's claims fail as a matter of law. Accordingly, we seek summary judgment in favor of the United States.

## II. Statement of Facts

**The Invitation For Bids.** On July 10, 1996, the Corps issued an invitation for bids for a contract whose work would include, without limitation:

> furnishing all plant, labor, material and equipment necessary to excavate and transport existing dredged material from two borrow/stockpile areas: (1) the Alma Marina in Alma, Wisconsin; and (2) an island in the Mississippi River located upstream from Alma, Wisconsin. Such removed existing dredged material is to be disposed of in various potential on-land placement sites located in Buffalo County, Wisconsin.

First Am. Compl. ¶ 1; Def. App. 15. The invitation for bids for the "Grand Encampment Excavation," Def. App. 15, stated that the awarded contract would contain the standard contract clauses for fixed priced construction contracts inside the United States prescribed by the Corps. Def. App. 18-20, 24, 55-60. These standard Federal Acquisition Regulation ("FAR") contract clauses included: 52.233-1, DISPUTES; 52.236-2, DIFFERING SITE CONDITIONS; 52.236-3,

SITE INVESTIGATION AND CONDITIONS AFFECTING THE WORK; 52.214-6 EXPLANATION TO PROSPECTIVE BIDDERS; and 52.236-7, PERMITS AND RESPONSIBILITIES. Id.

The invitation for bids also made clear that the awarded contract would contain clauses that are specific to the Grand Encampment Excavation contract, including, without limitation, Section 01000, ¶ 6.1.1, Grounds Availability; Section 01000, ¶ 7.3, Contractor Selected Final Disposal Areas (Placement Sites); Section 01000, ¶ 12, CONSTRUCTION RESTRICTIONS; Section 01130, ¶ 2.1(5); Section 01130, ¶ 2.3, Compliance; Section 01130, ¶ 4, SUBCONTRACTORS; and Section 1130, ¶ 5, NOTIFICATION. Def. App. 148-51, 166.

The Corps had selected five disposal sites for use in performing the contract work, First Am. Compl. ¶ 2; Def. App. 296-98, but only one site was to be mandatory. Def. App. 149, 151-52 ("After this mandatory site has been . . . filled . . ., the Contractor may utilize one or more of the other indicated non-mandatory final placement sites and/or the Contractor's own selected disposal areas (placement sites), as approved."). Further, the invitation for bids made plain that any alternative site that an awardee might select would be subject to approval of the contracting officer, and may require preparation of an environmental assessment. Def. App. 149.

The invitation for bids repeatedly advised bidders that the awardee would be responsible for compliance with local environmental laws and regulations. First, it notified bidders that the awardee would be required to prepare an Environmental Protection Plan that set forth, among other things, the "[p]rocedures to be implemented to provide the required environmental protection and to comply with the applicable laws and regulations." Def. App. 165 (emphasis supplied). However, it also warned bidders that the Corps' approval of the Environmental

Protection Plan would not relieve the contractor of responsibility for compliance with local environmental laws and regulations. Def. App. 166 (" Not withstanding [sic] the requirements of this section and not withstanding [sic] approval by the Contracting Officer of the Contractor's Environmental Protection Plan, <u>nothing herein shall be construed as relieving the Contractor of all applicable</u> Federal, State, and <u>local environmental protection laws and regulations.</u>") (emphasis supplied). Second, the invitation for bidders made it plain that the awardee would warrant its subcontractors' compliance with local environmental requirements. Def. App. 166 ("4. SUBCONTRACTORS. . . . The Contractor shall insure that its subcontractor's [sic] comply with the requirements of this section <u>along with all appropriate</u> Federal, State, and <u>local laws, regulations, and requirements.</u>") (emphasis supplied). Third, the invitation for bids expressly warned bidders that they could not rely upon the Corps to advise them of noncompliance with local environmental requirements:

> The Contracting Officer will notify the Contractor in writing of observed noncompliance with the Federal, State, or local laws, regulations, permits and elements of the Contractor's Environmental Protection Plan. . . . <u>Failure of the Contracting Officer to notify the Contractor of any noncompliance with Federal, State, or local laws or regulations does not relieve the contractor of the obligation to be in conformance with those requirements.</u>

Def. App. 166 (emphasis supplied).

**<u>Matteson's Bid.</u>** In formulating its bid, Matteson decided that the Corps' proposed disposal sites were incompatible with the use of Matteson's choice of hydraulic dredging to perform the work. First Am. Compl. ¶¶ 4-7. Accordingly, Matteson chose to select its own disposal or placement site for the dredged material. <u>Id.</u> Matteson based its bid upon the

assumption that it would be able to acquire and use the Saunderson property as a dredge disposal or placement site. Id. ¶¶ 8-13; Def. App. 204, 206-08, 219, 221-22, 230-39.

Prior to bid submission, on August 5, 1996, Larry W. Matteson ("Matteson Jr.") met with Dan Krumholz, Steve Tapp, and Dennis Anderson, all of the Corps, Bob Drieslein of the Fish & Wildlife Service, and Nick Gulden of the Minnesota Department of Natural Resources, to inspect "two potential disposal sites" Matteson had proposed for permanent placement of dredge material. First Am. Compl. ¶¶ 7-8. Although it is undisputed that Mr. Matteson Jr. and various Government officials physically inspected the Braun and the Guza properties, Def. App. 204, 206-07, 219-20 , Mr. Matteson Jr. asserts that Mr. Krumholz also could see the adjacent Saunderson property. Def. App. 377, 381, 384, 1079-84.

In exploring the possibility of acquiring the Saunderson property, Matteson learned from its realtor that the Saundersons were using the property to harvest pulp wood and that related permits were required. Def. App. 907-10. At some point, Matteson further learned that it would be required to obtain a conditional use permit if it were to use the Saunderson property as a disposal site. Def. App. 914. However, prior to submitting its bid, Matteson failed to investigate all potential local restrictions upon its own intended use of the Saunderson property, such as the Shoreland Zoning Act. First Am. Compl. ¶ 16; Def. App. 928-29, 1005.

Immediately before bid submission, on either August 29 or August 30, 1996, Lawrence Matteson ("Matteson Sr.") telephoned Mr. Krumholz to discuss use of the Saunderson property as a potential disposal site. First Am. Compl. ¶ 10; Def. App. 204, 381. Matteson understood that any alleged Corps "approval" of its proposed disposal sites was "tentative" at best. Def. App. 398 ("WE ARE PRESENTLY NEGOTIATING WITH JOHN BROWN TO GET

PERMISSION TO PLACE SAND ON HIS PROPERTY. THIS PROPERTY HAS ALREADY HAD TENTATIVE APPROVAL FROM THE CORPS PRIOR TO THE BID DATE. ONCE AN AGREEMENT HAS BEEN MADE WITH MR. & MRS. BROWN, WE WILL ENDEAVOR TO GET A PIPELINE RIGHT-OF-WAY AND APPROVAL FROM THE LOCAL BOARD. I SHOULD KNOW SOMETHING FROM THE BROWN'S THIS WEEK.") (emphasis supplied); 1076. Nonetheless, Matteson concedes that it failed to build into its bid any factor for the risk that it ultimately might not be able to obtain all necessary permits for its proposed alternative disposal sites. Def. App. 982.

**The Corps' Bid Verification Request.** On August 29, 1996, the Corps notified Matteson that Matteson had emerged as the apparent low bidder following bid opening and requested that Matteson verify that its bid price was accurate and complete. Def. App. 329-30, 1055-57. By letter dated September 4, 1996, Matteson advised the Corps that it had reviewed the requirements of the invitation for bids, as amended, and had determined that its "bid price of $1,693,000 to be accurate." Def. App. 331, 1058.

**Contract Award.** On September 20, 1996, the Corps awarded Contract No. DACW37-96-C-0030 to Matteson in the approximate amount of $1,693,000 (the "contract"). First Am. Compl. ¶ 15. The County of Wabasha, Minnesota subsequently notified Matteson that the Matteson-selected disposal sites were subject to the Shoreland Zoning Act, pursuant to which the county exercised control over areas within 1,000 feet of the river. Id. ¶ 16. Matteson had failed to investigate this local ordinance prior to submitting its bid. Id.

In addition, Matteson concedes that it failed to discover "significant local opposition to its use of [its] proposed sites" until after the contract was awarded. Id. ¶ 17. Yet, based upon its

role in prior Corps projects it regarded as "similar," Def. App. 970, Matteson knew that there was a heated conflict between the Corps and at least one property owner. Id. 967-68. Further, although Matteson's realtor had told Matteson that "of course the neighbors are upset," Def. App. 431, 919, 922, and Matteson had heard "talk about" opposition, it ultimately was "shocked at the strength . . . and the volume of" the local opposition to Matteson's use of the Saunderson property as an alternative disposal site in performing the contract work. Def. App. 927.

Notwithstanding Matteson's "shock," based upon prior projects, Matteson understood that issues such as groundwater would "of course" be discussed "on any [Corps] project . . . [b]ecause the groundwater is where people get their drinking water and their potable water." Id. 930-31. Indeed, in negotiating to purchase the Saunderson property, Matteson negotiated contingencies, including a contingency that "the permits were granted by local and federal agencies." Id. 932.

At bottom, Matteson alleges that it "was unable to obtain approval from the County to [sic] any proposed site in the project area." Id. ¶¶ 18 (emphasis supplied). Although Matteson does not define its term "project area," it does admit in its amended complaint that it was able to perform the contract work, via hydraulic dredging means, by using a disposal site "located by the Corps, which was owned the Fish & Wildlife Service . . . ." Id. ¶ 19.

**Matteson's Certified Claim.** On July 31, 2000, Matteson submitted a certified claim to the contracting officer. Def. App. 332. Matteson alleged that it was entitled to an equitable adjustment of $1,111,227.51:

> for costs incurred and damages suffered as a result of a cardinal change in Matteson's contract, which required Matteson to obtain an alternative disposal site. Matteson is entitled to an equitable adjustment because (a) the Corps authorized, invited and encouraged the hydraulic removal of certain stockpiles of dredged

> materials; (b) the contract documents indicated the absence of any shoreland restriction; (c) the Corps represented that certain property in the vicinity of the job site was acceptable for the disposal of dredge materials; and (d) Matteson reasonably relied on the Corps' assurances that Matteson's original disposal site was acceptable.

Id.

On September 29, 2000, in response to a request by the contracting officer, Matteson submitted additional information in the form of "a legal memorandum" from its counsel that outlined "the various legal grounds" that Matteson contended entitles it "to receive this equitable adjustment." Def. App. 349-57.

By letter dated November 17, 2000, the contracting officer denied Matteson's claim. Def. App. 399-419. Matteson commenced this lawsuit on September 25, 2001.

## SUMMARY OF ARGUMENT

All of the counts in Matteson's complaint, as amended, fail as a matter of law. Accordingly, the United States is entitled to summary judgment in its favor dismissing the entire complaint.

First, Matteson cannot demonstrate the existence of a breach of contract. Matteson concedes that the contract price did not include the alleged extra costs it supposedly incurred. Matteson concedes the Corps paid the contract price. Thus, Matteson cannot demonstrate even a theoretical breach of the contract by the Corps.

Further, Matteson's superior knowledge claim is invalid upon its face. Superior knowledge requires the existence of vital information that is not easily accessible to the contractor. Here, neither public local ordinances, nor the activities of local opposition groups,

were unknowable. None was a secret. For this reason alone, Matteson cannot establish its superior knowledge claim as a matter of law.

In any event, Matteson's breach claims are at odds with the plain language of numerous contract provisions that assigned the risk in this case to Matteson.

Second, Matteson cannot demonstrate a differing site condition as a matter of law because the alleged "change" was not a physical condition as required by the contract's differing site condition clause. Further, Matteson's inability to use the Matteson-selected sites to perform the contract was foreseeable, for the reasons set forth in Matteson's superior knowledge argument.

Third, Matteson's cardinal change claim is unsupportable. A cardinal change requires some affirmative action by the Government to change the scope of the contract. Here, the Government did not reject use of the Matteson-selected sites; rather, third parties rejected use of these sites. Accordingly, Matteson cannot establish that the Government materially altered the scope of the contract.

Fourth, Matteson cannot establish its claims of impossibility and commercial impracticability. As an initial matter, the specifications were not objectively impossible because Matteson, in fact, successfully performed them. Further, Matteson cannot establish that its overrun was so extraordinary as to invoke the application of the doctrine of commercial impracticability. A 70 percent overrun, such as that experienced by Matteson, is not sufficiently drastic to support a claim of commercial impracticability.

Finally, Matteson cannot establish its claim of mistake. For its part, the Government was not mistaken regarding any material fact. Further, even accepting as true Matteson's allegations

of the Government's supposed "approval" of the Matteson-selected sites, Matteson still could not demonstrate that the Government guaranteed that Matteson that it would be able to obtain timely permits, or that the Government had assumed the risk. The plain language of the contract repeatedly provides otherwise.

## ARGUMENT

### I. Legal Standards

Summary disposition pursuant to RCFC 56 is appropriate where no genuine issue of material fact exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387 (Fed. Cir. 1987). It is "a salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action." Sweats Fashions, Inc. v. Pannill Knitting Co., Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317 (1986)) (other citation omitted). As the court emphasized in Sweats Fashions, the moving party need "not . . . produce evidence showing the absence of a genuine issue of material fact." 833 F.2d at 1563 (emphasis in original). Rather, the moving party may discharge its burden by "'showing' -- that is, pointing out to the [Court] -- that there is an absence of evidence to support the non-moving party's case." Id. (emphasis in original) (quoting Celotex, 477 U.S. at 325).

Once the moving party has met its burden, the non-movant "must proffer countering evidence sufficient to create a genuine factual dispute." Sweats Fashions, 833 F.2d at 1562. A dispute is genuine only if the trier of fact could reasonably find in favor of the non-movant. See Anderson, 477 U.S. at 249-50. The non-moving party's burden is as follows:

> The non-movant may not rest on its conclusory pleadings, but

> under Rule 56, must set out, usually in an affidavit by one with knowledge of specific facts, what specific evidence could be offered at trial.

Sweats Fashions, 833 F.2d at 1562-63 (citation omitted). The non-movant "may not discharge his burden by cryptic, conclusory or generalized responses, . . . or by remaining silent." Campbell v. United States, 2 Cl. Ct. 247, 249 (1983) (citations omitted).

Here, as we demonstrate below, there are no genuine issues of material fact in dispute, and the United States is entitled to judgment as a matter of law.

## II. Matteson Cannot Establish A Breach Of Contract As A Matter Of Law

Four of the nine counts set forth in the First Amended Complaint allege breach of contract.

First, in Count I, entitled "Breach of Contract," Matteson alleges that the Corps "has failed and refused to pay Matteson for the work completed on the Project," and alleges damages in the amount of $1,111,227.51. First Am. Compl. ¶¶ 23-27.

Second, in Count V, entitled "Breach of Implied Duty of Cooperation," Matteson alleges that the Corps "failed and refused to provide Matteson critical information regarding the local opposition to the Project and environmental restrictions, of which it has superior knowledge as a result of its previous projects in the area." Id. ¶ 57. Matteson alleges damages in the amount of $1,111,227.51 as a result of this alleged breach of the Government's implied duty of cooperation. Id. ¶ 60.

Third, in Count VI, entitled "Breach of Implied Warranty of Specifications," and in Count VII, entitled "Specific Omission," Matteson alleges, in essence, that "the Corps' specifications purported to detail 'Environmental Protection' issues, [but] the specifications omitted local

restrictions of which the Corps was aware that were applicable to this Project . . . ." Id. ¶ 64; see also id. ¶ 74 ("The contract documents did not, in fact, contain all restrictions and requirements applicable to performance of the work governed therein."). Both counts alleged that Matteson incurred increased costs in the amount of $1,111,227.51 as a result of the alleged omissions. Id. ¶¶ 68, 74. As we demonstrate below, the United States is entitled to summary judgment dismissing all of these counts as a matter of law.

### A. Count I Must Be Dismissed Because It Is Undisputed That The Corps Paid Matteson The Contract Price

Count I, entitled "Breach of Contract," must be dismissed on its face. There is no dispute that Matteson bid an estimated price of $1,693,000 for the projected contract quantities (which bid price was subject to change based upon actual quantities), Def. App. 331, that the contract was fixed price, id. at 24, 994-95, and that the Corps paid Matteson in full for the final contract price of $1,581,067.41, which is based upon the actual contract work performed. Def. App. 337. Matteson, an experienced Government contractor, was familiar with the FAR when it submitted its bid. Def. App. 974-75, 983-84.

The contract had only five modifications. Def. App. 408. Modification P00001 extended the time "to complete disposing of transferred dredge material at the mandatory 'Buffalo County No. 1 Placement Site.'" Id. Modification P00002 changed Block #24 of the SF 1442 to read "Contracting Officer's Representative" and changed Block 27 of the SF 1442 to read "USACE, Finance Center, Millington, Tennessee." Id. Modifications P00003 and P00004 obligated additional funds and Modification P0005 deobligated some excess funds. Id. None of these modifications affected either the method of performing the work or non-mandatory disposal sites,

and none increased the fixed contract price. Id.

There is no dispute that the Corps paid Matteson the contract price. Def. App. 337. Because Matteson can point to no contract modification that increased the contract price by $1,111,227.51, or any other amount, summary judgment must be granted in favor of the United States on Count I for breach of contract.

**B. Count V Must Be Dismissed Because Matteson Cannot Establish A Superior Knowledge Claim As A Matter Of Law**

In Count V, entitled "Breach of Implied Duty of Cooperation," Matteson alleges that the Corps possessed superior knowledge that it did not share with Matteson. First Am. Compl. ¶¶ 52-60. According to Matteson, the Corps possessed "an affirmative duty to alert bidders to the likelihood of opposition and obstacles that could be anticipated on the Project," and, further, that the Corps possessed "a duty, in response to Matteson's inquiries, to share its superior knowledge of potential obstacles to Matteson's use of hydraulic means and its proposed sites." Id. ¶ 56. Matteson alleges that the Corps "failed and refused to provide Matteson critical information regarding the local opposition to the Project and environmental restrictions, of which it had superior knowledge as a result of its previous projects in the area." Id. ¶ 57. Matteson maintains that the allegedly "critical information withheld by the Corps was unknown and not reasonably available to Matteson, in that it was particularly within the knowledge of the Corps, and Matteson reasonably relied upon the affirmative representations, project plans and specifications, and contract documents to disclose all necessary information." Id. ¶ 59. Matteson claims that it suffered damages in the amount of $1,111,227.51 due to the Corps'

alleged failure to share superior knowledge of supposed local opposition and local ordinances. Id. ¶ 60.

To establish a breach under the superior knowledge doctrine, Matteson must produce "specific evidence that it (1) undertook to perform without vital knowledge of a fact that affects performance costs or direction, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire, and (4) the government failed to provide the relevant information." AT&T Communics., Inc. v. Perry, 296 F.3d 1307, 1312 (Fed. Cir. 2002) (quoting GAF Corp. v. United States, 932 F.3d 947, 949 (Fed. Cir. 1991)); see also Giesler v. United States, 232 F.3d 864, 876 (Fed. Cir. 2000); Hercules Inc. v. United States, 24 F.3d 188, 196 (Fed. Cir. 1994).

In Giesler, the court held that the superior knowledge doctrine did not apply where the contractor was alleging that the Government possessed superior knowledge of the fact that a subcontractor did not understand the specifications. 232 F.3d at 876-77. The court noted that the specification was publicly available, and that the contractor or its agent possessed equal, if not greater, access to the same information that the Government eventually obtained from the subcontractor. Id. at 877. "Because [the contractor] could have readily obtained this information," the court held, "the government was not obliged to volunteer it." Id. (citing H.N. Bailey & Assocs. v. United States, 449 F.2d 376, 383 (Ct. Cl. 1971) ("[T]he government is under no duty to volunteer information in its files if the contractor can reasonably be expected to seek and obtain the facts elsewhere.")). Here, the Shoreland Zoning Act was publicly available. Further, the contract affirmatively assigned Matteson responsibility for obtaining all necessary

permits and licenses. Def. App. 88. As a practical matter, this responsibility is even more stark where, as here, Matteson selected its own disposal sites rather than relying upon the ones identified by the Corps in the invitation for bids. First Am. Compl. ¶¶ 2, 7, 16. Under settled law, the Corps was under no duty to volunteer publicly-available information regarding the Shoreland Zoning Act, even assuming, for argument's sake, the Corps was aware of local county laws and ordinances.[1] See Giesler, 232 F.3d at 877; H.N. Bailey, 449 F.2d at 383; John Massman Contracting Co. v. United States, 23 Cl. Ct. 24, 31 (1991) ("The government must disclose superior knowledge which is vital to performance of the contract, but which is unknown and reasonably not available to the contractor. … But there is no duty to disclose where the information reasonably is available.") (citations omitted). The allegedly withheld information of which Matteson complains was reasonably available to Matteson.

Further, there is no evidence to support Matteson's claim that the Corps possessed any knowledge of specific opposition to use of Matteson-selected disposal sites. Indeed, Matteson itself was well aware of local opposition to prior Corps projects when it submitted its bid for the Grand Encampment Excavation contract. Def. App. 1198-1207.

[1] In fact, there is no evidence in the record to suggest that the Corps was even aware of the existence of the Shoreland Zoning Act prior to Matteson's bid submission. No local officials were present at Matteson's meetings with state and Federal officials to discuss Matteson's proposed sites. Def. App. 1001-02, 1018-19. Matteson admits that the Corps never mentioned local authorities to it. Id. 1004. Here, the record suggests that the Corps did not become aware of a shoreline ordinance that would potentially affect Matteson's use of its proposed sites until September 18, 1996, when a Wabasha County attorney called a Corps official. Def. App. 221. The Corps official appropriately gave the county attorney Matteson's telephone number. Id.

**C. The Plain Language Of The Contract Defeats Counts VI And VII**

In Count VI, entitled "Breach of Implied Warranty of Specifications," Matteson alleges that the Corps' "specifications . . . contained requirements for implementing a proper environmental protection plan, . . . . purported to detail 'Environmental Protection' issues, [but] omitted local restrictions of which the Corps was aware that were applicable to this Project . . . ." First Am. Compl. ¶¶ 63-64. Matteson further alleges that it "reasonably relied upon the Corps' specifications as conforming to the government's affirmative duty to provide Matteson with any and all information impacting the feasibility of an approved method of performing the work." Id. ¶ 66. According to Matteson, it suffered damages in the amount of $1,111,227.51 for this alleged breach. Id. ¶ 68.

In Count VII, Matteson alleges that the Corps' "Construction Project Documents for the Grand Encampment Excavation . . . detailed and enumerated 'construction restrictions,' 'special contract requirements,'and attached letters between the Corps and the Department of Fish and Wildlife regarding applicable environmental issues." First Am. Compl. ¶ 70. In Matteson's view, "[b]y undertaking to list, incorporate and attach applicable regulations and compliance requirements, the Corps affirmatively represented that it informed Matteson of all potential applicable restrictions to its performance of the work as bid." Id. ¶ 72. Again, Matteson alleges that it reasonably relied upon the Corps' alleged representations, and, as a result, suffered damages in the amount of $1,111,227.51 for the Corps' alleged "specific omission." Id. ¶ 73-75.

Counts VI and VII contradict settled and binding rules of contract interpretation. In interpreting a contract, the court begins with the plain language. Forman v. United States, 329 F.3d 837, 842 (Fed. Cir. 2003); WDC West Carthage Assocs. v. United States, 324 F.3d 1359,

1363 (Fed. Cir. 2003). Further, the contract must be read as a whole. Forman, 329 F.3d at 842 (citing McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996) ("We must interpret the contract in a manner that gives meaning to all of its provisions and makes sense.")); Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc) ("The Agreement must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts.") (citing McAbee, 97 F.3d at 1435).

Here, Matteson ignores pertinent provisions of Section 01130 and the Permits and Responsibility Clause of the contract. Matteson argues that the Corps undertook to delineate all possible environmental requirements (and all permits needed) in Section 01130 and that any environmental requirement not specifically identified in Section 01130 is inapplicable to the contractor. But no fewer than four clauses in Section 01130 alone directly contradict this argument.

First, section 01130 ¶ 2.3 provides:

> Compliance. Not withstanding [sic] the requirements of this section and not withstanding [sic] approval by the Contracting Officer of the Contractor's Environmental Protection Plan, nothing herein shall be construed as relieving the Contractor of all applicable Federal, State, and local environmental protection laws and regulations.

Def. App. 166 (emphasis supplied). Matteson impliedly argues that this clause was limited to those requirements actually identified in the contract, thus suggesting that "all applicable Federal, State, and local environmental protection laws and regulations" actually meant fewer than "all" environmental laws and regulations. This argument is untenable.

Second, section 01130 ¶ 2.1 (5) required Matteson to include in its Environmental Protection Plan "Procedures to be implemented to" [not only] "provide the required

environmental protection" [but also to] "comply with the applicable laws and regulations." Def. App. 165 (emphasis supplied). At a minimum, this clause obligated Matteson include in its Environmental Protection Plan the procedures it would have implemented to comply with the applicable laws and regulations. See id. Accordingly, even under Matteson's interpretation of Section 01130 as dilineating all possible environmental requirements, Matteson was still required to describe procedures it was to employ to comply with the Shoreland Zoning Act, an applicable law or regulation. Id. 1051-52.

Third, section 01130 ¶ 4 provided in part that "[t]he Contractor shall insure that its subcontractor's [sic] comply with the requirements of this section along with all appropriate Federal, State, and local laws, regulations, and requirements. Def. App. 166 (emphasis supplied).

Fourth, section 01130 ¶ 5 provided, among other things, that "[f]ailure of the Contracting Officer to notify the Contractor of any noncompliance with Federal, State, or local laws or regulations does not relieve the Contractor of the obligation to be in conformance with those requirements." Def. App. 166 (emphasis supplied).

Matteson's interpretation of the contract renders paragraphs 2.3, 2.1 (5), 4, and 5 of Section 01130 inoperative, void, and meaningless. In addition, Matteson's interpretation would render meaningless the requirement in the Permits and Responsibility clause that:

> The Contractor shall, without additional expense to the Government, be responsible for obtaining any necessary licenses and permits, and for complying with Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work.

Def. App. 88.

Finally, Matteson's claimed reliance upon alleged oral statements by Corps officials

cannot be reconciled with the plain meaning of the contract. The Explanation to Prospective Bidders specifically stated: "Oral explanations or instructions given before the award of a contract will not be binding." Def. App. 985; id. 18-20, 24, 55-60. Matteson admits that it rejects this plain language. Id. 985, 987. Similarly, Matteson rejected the contract's express language providing that the Government "assume[d] no responsibility for any conclusions or interpretations made by the Contractor based on the information made available to the Government," and regarded that language to be inoperative. Id. 1020-26.

Matteson's defective specification and "specific omission" arguments directly contradict the plain language of the contract. Accordingly, the United States is entitled to judgment upon Counts VI and VII as a matter of law.

## III. Matteson Cannot Establish A Differing Site Condition As A Matter Of Law

In Count II, entitled "Changed Contract Condition," Matteson contends that "[t]he result, after contracting, that Matteson's contracted-for and approved means and sites were unsuitable and unusuable for the Project constituted a changed condition or differing site condition under the contract, for which Matteson is entitled to an equitable adjustment of the contract price in the amount of its increased costs." First Am. Compl. ¶ 34. According to Matteson, its increased costs were $1,111,227.51. Id. ¶ 33. However, Matteson cannot establish a differing site condition as a matter of law.

As the Corps has repeatedly explained to Matteson, the contract did not contain "the old changed conditions clause." Def. App. 409. Rather, it contained the standard Differing Site Conditions clause, 48 C.F.R. § 52.236-2. Def. App. 86.

At a minimum, Matteson's differing site condition theory fails because the Differing Site

Conditions clause expressly pertains to "physical" conditions. Id. To establish an equitable adjustment due to a Type I differing site condition,

> a contractor must prove, by preponderant evidence, that: the conditions indicated in the contract differ materially from those actually encountered during performance; the conditions actually encountered were reasonably unforeseeable based on all information available to the contractor at the time of bidding; the contractor reasonably relied upon its interpretation of the contract and contract-related documents; and the contractor was damaged as a result of the material variation between expected and encountered conditions.

Comtrol, Inc. v. United States, 294 F.3d 1357, 1362 (Fed. Cir. 2002) (citing H.B. Mac, Inc. v. United States, 153 F.3d 1338, 1345 (Fed. Cir. 1998)). A contractor is not eligible for an equitable adjustment for a Type I differing site condition "unless the contract indicated what that condition would be." Id. at 1363 (citing P.J. Maffei Bldg. Wrecking Corp. v. United States, 732 F.2d 913, 916 (Fed. Cir. 1984)). Here, as in Comtrol, the specification "did not affirmatively represent" that Matteson would be able to use its own proposed disposal sites. See id.

Moreover, Count II is predicated upon Matteson's inability "to obtain approval from the County to [sic] any proposed site in the project area." First Am. Compl. ¶ 18. Matteson's failure to "obtain approval from the County" was not a physical condition. Indeed, Matteson concedes that it never encountered any unknown physical conditions. Def. App. 1009.

Further, as Matteson admits in Count V, Matteson's inability to use its proposed sites was reasonably foreseeable. Id. ¶ 57 (deeming "critical information regarding the local opposition to the Project and environmental restrictions."). Further still, nothing in the contract assured Matteson that it would be able to obtain approval to use its proposed alternative sites. To the contrary, the contract explicitly assigned this risk to Matteson. E.g., Def. App. 88, 165-66. As

Matteson cannot establish a changed contract condition or differing site condition, Count II must be dismissed.

**IV. Matteson Cannot Establish A Cardinal Change In The Contract**

In Count III, entitled "Cardinal Change in the Contract," Matteson alleges that "the entire essence of [its] bid proposal and contract with the Corps rested upon use of hydraulic dredging and its proposed disposal sites on private property in close proximity to the project." First Am. Compl. ¶ 36 (emphasis supplied). Matteson further contends that "[t]he forced use of distant public lands as a disposal site and the resulting increased cost to Matteson constituted a drastic modification of its duties under the contract, were outside the anticipated scope of its obligations under the contract, and outside the scope of the work for which Matteson bargained." Id. ¶ 38 (emphasis supplied). According to Matteson, these circumstances "constituted a cardinal change in the essence of the contract, entitling Matteson to compensation for its increased cost to perform the contract." Id. ¶ 40.

Notably, Matteson alleges no change to the terms of the contract. As discussed above, the contract had only five modifications. Def. App. 408. None of these modifications affected either the method of performing the work or non-mandatory disposal sites, and none increased the fixed contract price. Id.

A cardinal change occurs only when the Government effects the change. As recently stated in Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320 (Fed. Cir. 2003):

> A cardinal change "occurs when the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those bargained for."

329 F.3d at 1332 (quoting Krygoski Constr. Co. v. United States, 94 F.3d 1537, 1543 (Fed. Cir.

1996) (other citations omitted)).

Other than some minor, primarily administrative changes that did not significantly affect the work, Def. App. 408, the Government effected no changes in the contract. Nothing in Count III constitutes an allegation that the Government changed the contract. To the contrary, Matteson failed to obtain permission from third parties to use private property to perform the contract work. Therefore, a cardinal change cannot exist as a matter of law, and the United States is entitled to summary judgment upon Count III.

## V. Matteson Cannot Establish Its Claims Of Impossibility Or Commercial Impracticability

### A. The Specifications Were Not Impossible To Perform, As Matteson, In Fact, Successfully Performed The Contract

In Count IV, entitled "Breach of Warranty," Matteson alleges what is, in essence an impossibility claim. First Am. Compl. ¶¶ 41-51. According to Matteson, "[t]he Corps breached its warranties, since performance within the specifications was impossible, infeasible or unreasonable, and a satisfactory result could not result from Matteson's bid in spite of the Corps' assurances." Id. ¶ 50. Matteson alleges that it was damaged in the amount of $1,111,227.51 due to the alleged impossibility of the specifications. Id. ¶ 51.

Performance is excused under the doctrine of impossibility when it is objectively impossible. Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1294 (Fed. Cir. 2002) (citing Jennie-O Foods, Inc. v. United States, 580 F.2d 400, 409 (Ct. Cl. 1979)). Matteson must demonstrate that neither it, nor any similarly-situated contractor, could have performed the contract's specifications. Id.

Matteson alleges that "in providing the project specifications to bidders, the Corps

warranted that performance was possible within those specifications," and "impliedly warranted that a satisfactory result would be obtained if the specifications of the contract were followed." First Am. Compl. ¶¶ 42-43. Matteson thus argues that the contract cannot be satisfactorily performed by following the contract specifications. However, as conceded in the amended complaint, Matteson did, in fact, successfully perform the contract by following the specifications. Id. ¶ 25.

The contract did not limit the manner in which the work could be performed and allowed both mechanical and hydraulic dredging. Matteson has never alleged the contract could not have been performed via mechanical dredging techniques, and, in fact, Matteson performed the contract work using hydraulic dredging and produced a satisfactory result. Matteson's contention that the contract specifications were objectively impossible is unsupportable.

**B. Matteson Cannot Establish Its Claim Of Commercial Impracticability**

In Count VIII, entitled "Commercial Impracticability," Matteson alleges that "[t]he Corps failed and refused to properly inform Matteson of potential impediments to Matteson's performance, of which the Corps was aware, resulting in an exorbitant difference in Matteson's cost to perform the amount for which it had contracted." First Am. Compl. ¶ 78. Matteson thus alleges that, because it spent $1,111,227.51 more than it thought it would spend when it bid the contract, performance was, by necessity, commercially impracticable. See id. ¶¶ 76-83.

In 1996, the Supreme Court reformulated the common law doctrine of impossibility as follows:

> [W]here, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is

> discharged, unless the language and circumstances indicate the contrary.

Seaboard, 308 F.3d at 1294 (quoting United States v. Winstar Corp.. 518 U.S. 839, 904 (1996) (other citations omitted)) (emphasis supplied).

Here, Matteson must demonstrate that its admitted ignorance of local ordinances -- which it claims, led to its inability to use its proposed alternative disposal sites -- was not its fault. As a matter of law, Matteson cannot demonstrate lack of fault in this case. In fact, Matteson was aware of the provision in its contract that required it to conduct a thorough site investigation. Def. App. 1009-17. The Corps was entitled to assume that Matteson had conducted rudimentary due diligence as to local permitting requirements before making the business decision to submit its bid. See Ambrose-Augusterfer Corp. v. United States, 394 F.2d 536, 546 (Ct. Cl. 1968) ("no claim arises where a contractor sustains a loss through its own negligence in not examining the site and has failed to take into consideration conditions which actually existed and which had been called to its attention by a warning to visit the site."); Western Empire Constructors, Inc. v. United States, 20 Cl. Ct. 668, 674 (1990) ("Plaintiff . . . had a duty to inquire before entering into the contract with the VA."). Matteson possessed no reasonable basis for assuming that the Corps would ignore the contract's plain language and instead assume responsibility for obtaining Matteson's permits for Matteson. See Def. App. 88.

Moreover, it is settled that "no impossibility defense will lie where the 'language or the circumstances' indicate allocation of risk to the party seeking discharge." Seaboard, 308 F.3d at 1295 (citing Winstar, 518 U.S. at 908). Here, the contract repeatedly and plainly allocated risk of

noncompliance with local laws to Matteson. Def. App. 88, 165-66. Accordingly, Matteson assumed the risk of its alleged losses.

Finally, even assuming, for argument's sake, that Matteson could meet the elements of commercial impracticability, it still could not demonstrate an overrun of the size that would establish commercial impracticability. Raytheon Co. v. White, 305 F.3d 1354, 1367 (Fed. Cir. 2002). "A contractor is not entitled to relief 'merely because he cannot obtain a productive level sufficient to sustain his anticipated profit margin.'" Id. (quoting Natus Corp. v. United States. 371 F.2d 450, 457 (Ct. Cl. 1967)).

Here, assuming the truth of Matteson's allegations, it suffered, at most, a 70 percent overrun (alleged additional costs of $1,111,227.51 divided by the final contract price of $1,581,067.41), which has been held to be insufficient to establish commercial impracticability. See Raytheon, 305 F.3d at 1368 (57 percent overrun insufficient to establish commercial impracticability) (citing Gulf & W. Indus., Inc., 87-2 BCA ¶ 19,881 at 100,575 (1987) (contract with claimed 70 percent overrun not commercially impractical)). Rather, commercial impracticability involves extreme scenarios. For example, as the court in Raytheon observed, commercial impracticability occurs where compliance with the specification would have consumed more than 17 years at a cost of more than $400 million, rather than only 720 days and $16.92 million as bid. Id. (citing Soletanche Rodio Nicholson (JV), 94-1 BCA ¶ 26,472, and 131,774 (1993)); see also id. (citing Numax Elecs., Inc., 90-1 BCA ¶ 22,280, at 111,916 (1989) (commercial impracticability found where contractor obtained yield of only 3.75 percent); Whittaker Crop., Power Sources Div., 79-1 BCA ¶ 13,805 at 67,688-89 (1979) (seven-month

production contract was commercially impractical after turning into an unsuccessful four-year development effort with a 148 percent cost overrun)).

Matteson's overrun is simply not "so extraordinary as to demonstrate impracticability of performance." Raytheon, 305 F.3d at 1368 (citations omitted). Had Matteson bid the true costs, then the Government would have paid them. Accordingly, the United States is entitled to summary judgment upon Counts IV and VIII.

## VI. Matteson Cannot Establish Its Claim Of Mutual Mistake As A Matter Of Law

Finally, Count IX, entitled "Mutual Mistake," alleges that "[t]he Corps' failure to provide crucial and necessary information of which it was aware, that ultimately impeded and prevented Matteson from performing the contract as bid, and Matteson's reliance on the Corps representations in good faith constituted a mutual mistake of the parties." First Am. Compl. ¶ 86.

To establish a mutual mistake of fact, Matteson must show that: (1) the parties to the contract were mistaken in their belief regarding a fact; (2) that mistaken belief constituted a basic assumption underlying the contract; (3) the mistake had a material effect on the bargain; and (4) the contract did not put the risk of mistake on the party seeking reformation. Dairyland Power Cooperative v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994). To establish a mutual mistake of fact, however, "the party seeking reformation must show that the parties to the contract held an erroneous belief as to an existing fact." Id. (emphasis in original). "A party's prediction or judgment as to events to occur in the future, even if erroneous, is not a 'mistake' as that word is defined [under the doctrine of mutual mistake of fact]." Id. at 1203 (citing Restatement (Second) of Contracts § 151 cmt. a (1981)).

Whether Matteson would have been able to obtain all required permits and approvals for a disposal site chosen by Matteson was an event to occur in the future. Therefore, even if the parties had thought all required permits could be obtained, that belief was no more than a "prediction or judgment as to events to occur in the future" and "is not a 'mistake' as that word is defined under the doctrine of mutual mistake of fact." Id.

In any event, reformation cannot be granted if the contract puts the risk on the mistake on the party seeking reformation. McNamara Constr. of Manitoba, Ltd. v. United States, 509 F.2d 1166, 1168-69 (Ct. Cl. 1975) (citing National Presto Indus., Inc. v. United States, 338 F.2d 99, 108 (Ct. Cl. 1965)). Here, with the exception of using one mandatory disposal site, the contract left it up to the contractor to decide how best to perform the contract work. Def. App. 149, 151-52, 1061-62. Accordingly, Matteson is not entitled to reformation as a matter of law.

**CONCLUSION**

For these reasons, we respectfully request that this Court grant our motion for summary judgment, enter judgment in favor of the United States, dismiss the First Amended Complaint, and grant such further relief as this Court deems just and proper.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Patricia M. McCarthy
PATRICIA M. McCARTHY
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 307–0164
Fax: (202) 514-8624

OF COUNSEL:
EDWIN C. BANKSTON
District Counsel
Army Corps of Engineers
Saint Paul, MN 55101

JULY 16, 2003

Attorneys for Defendant