**L.W. Matteson, Inc.**
#1 South Point, Burlington, Iowa 52601 - Phone 319-754-6705
Fax# 319-753-6740







COPY

July 31, 2000

Mr. Frederick Mitchell
Contracting Officer
Department of the Army
St. Paul District, Army Corps of Engineers Centre
180 Fifth Street East
St. Paul, Minnesota 56101

Re: Claim Pursuant to FAR §52.233-1
Grand Encampment Excavation
Contract No. BACW37-96-C-0030
Mississippi River
Near Alma, Wisconsin

Dear Mr. Mitchell:

This letter shall constitute the claim of L. W. Matteson, Inc. ("Matteson"), pursuant to FAR §52.233-1, on the above-referenced Project for the payment of $1,111,227.51 under the terms of the above-referenced contract. Matteson requests a prompt determination by the Contracting Officer on its claim.

**Claim**

Matteson makes claim for the payment of $1,111,227.51 for costs incurred and damages suffered as a result of a cardinal change in Matteson's contract, which required Matteson to obtain an alternative disposal site. Matteson is entitled to an equitable adjustment because (a) the Corps authorized, invited and encouraged the hydraulic removal of certain stockpiles of dredged materials; (b) the contract documents indicated the absence of any shoreland restriction; (c) the Corps represented that certain property in the vicinity of the job site was acceptable for the disposal of dredged materials; and (d) Matteson reasonably relied on the Corps' assurances that Matteson's original disposal site was acceptable.

MATTESON JR
EXHIBIT
34

**Facts**

By an invitation dated July 10, 1996, Matteson was invited to competitively bid a dredging job on the Mississippi River with the St. Paul, Minnesota District of the U. S. Army Corps of Engineers for a fixed-price contract to furnish all labor, material and equipment necessary to excavate and transport existing dredged material from two areas: (1) the Alma Marina in Alma, Wisconsin; and (2) an island in the Mississippi River, located upstream from Alma, Wisconsin (a/k/a the Grand Encampment Dredged Material Pile). The invitation indicated that the dredged material already stockpiled could be disposed of in five potential on-land placement sites, all located in Buffalo County, Wisconsin. The disposal sites, furnished by the Corps, would require the excavation and transportation of the dredged materials by mechanical means (i.e. backhoes, loaders and trucks). The government estimate for this work was $3,307,700.00.

During the bid period, Matteson called the Corps of Engineers and advised the Corps that it might receive much better pricing if it allowed contractors to bid the Project using hydraulic dredges. This would require the contractor to obtain its own disposal site within the vicinity of the two designated areas. Matteson asked the Corps whether this was permitted under the invitation. The Corps advised Matteson not only that hydraulic dredging was responsive to the solicitation but encouraged Matteson to submit a bid on such a basis. The Corps was well aware of the substantial savings which the Corps would realize if the material was transported by hydraulic means instead of mechanical means.

Following its communications with the Corps, Matteson devoted significant time to locating potential disposal sites in the Wabasha area. Matteson was able to locate two viable disposal sites. One was the "Saunderson" Property and the other was the "Braun" Property. At the request of Matteson and prior to the bid date, the Corps, the Minnesota Department of Natural Resources and the U.S. Fish & Wildlife walked both of Matteson's sites. Neither the Corps nor the other agencies advised Matteson of any problem with the proposed disposal sites.

To further confirm the suitability of these disposal sites, Matteson contacted Mr. Dan Krumholtz at the Corps, shortly before bid time to further assure itself that the disposal sites were acceptable to the Corps. Mr. Krumholtz, on behalf of the Corps, assured Matteson that it could use either of the disposal sites. Matteson proceeded forward and in exchange for payment obtained an option from each of the property owners to purchase the land for use as disposal sites.

Matteson had previously performed two projects in the same vicinity very similar to this Project: Crats Island in 1987 and Reads Landing in 1995. Both projects were for the Corps. In both instances, the work required Matteson to lay pipeline over significant distances inland to reach the disposal areas. Matteson encountered no difficulties and was never made aware of any legal restrictions on its activities. The projects were successfully completed and the Corps realized substantial savings on the projects over the other bids which were submitted. Matteson, therefore, had no reason to believe that this Project was any different than the previous projects it had performed.

Six contractors submitted bids on the Project:

| | |
|---|---|
| L.W. Matteson, Inc. | $1,693,000.00 |
| J.F. Brennan Co., Inc. | $2,195,000.00 |
| Luedtke Engineering Company | $2,829,000.00 |
| Wilber Lime Products | $3,488,500.00 |
| L&S Industrial Marine, Inc. | $3,595,000.00 |
| River Road Construction, Inc. | $5,200,000.00 |

The bids of Matteson and J.F. Brennan Co., Inc. were based on hydraulic dredging; the other bids were based on mechanical dredging. The lowest mechanical dredging bid was $2,829,000.00. The Corps elected to take advantage of the savings offered by hydraulic dredging and awarded the Contract to Matteson.

After bidding the Project and before starting the work, the County of Waubasha advised Matteson that pursuant to Minn.Stat.§103G.005 et seq. the County controlled the use of any property within a "shoreland protection zone" which emanates "1,000 feet from the ordinary high water level" of the Mississippi River. Approximately 25% of Matteson's proposed operation was in this zone and 75% was outside of this zone. Because the County controls the use along the river within 1,000 feet, the County determines whether or not Matteson's operation will be allowed along the river. The County refused both the laying of pipe across the land and the granting of a temporary easement.

Only after award of the contract did Matteson learn that the local citizens were opposed to Matteson's use of the Saunderson property. During a series of public and private meetings attended by Matteson, the citizenry and the public officials indicated that the source of their discontent was treatment they had received from the Corps on two prior projects. Rather than topsoiling the disposal areas, as Matteson intended for this project, the Corps has left the disposal areas on the earlier projects as bare piles of blowing sand. This had alienated a significant and very vocal segment of the local population.

Matteson made substantial and exhaustive efforts to obtain approval from the local zoning board for the County of Wabasha for the Saunderson site. At one meeting, however, more than 120 citizens showed up to oppose the Project. It was a public relations nightmare. The citizenry and local officials could not be convinced that this Corps dredging project would be any different than their earlier experience.

The contract documents outlined in detail any restrictions on Matteson's dredging operations, but made no reference to a shoreland protection zone running 1,000 feet on either side of the Mississippi River. Extensive review of the Saunderson property was made not only by various representatives from the Corps but also by the Minnesota Department of National Resources and the U.S. Fish & Wildlife Service. None of these agencies advised Matteson of the existence of a state shoreland protection act nor the fact that the County of Wabasha had the right and ability to preclude dredging operations previously approved by these agencies. Matteson's

previous dredging operations for the Corps in this same vicinity had been performed without any knowledge of a state shoreland protection act and without any problems with local units.

Matteson had no way to anticipate or predict that the local governing authorities would take steps to prohibit the placement of dredging pipe across the shoreland protection zone to areas outside the zone. When the local authorities prohibited the use of the Saunderson property after the award of the contract, Matteson took extensive efforts to locate another disposal site. Matteson also obtained rights to place the material on property owned by the Braun family. This was at a much greater distance and this effort was also blunted by local authorities.

As a result of the action taken by the local authorities, it has made it economically infeasible and virtually impossible for Matteson to perform the work.

Although disposal at various sites in the vicinity of the Project was blocked at every turn by the local authorities, the Corps was ultimately able to locate land owned by the Fish & Wildlife Service that could be used as a disposal site, without applying to the local authorities. The use of this site, however, was far beyond what the Corps or any of the bidders could have possibly anticipated. It created an entirely different project for Matteson and nearly doubled Matteson's costs.

For instance, without interference from the local authorities Matteson would have pumped the dredged material only 9,000 feet. The use of the Fish & Wildlife property as the disposal site required Matteson to pump the material over 26,000 feet, approximately three times further. As originally planned, Matteson would have been able to pump the dredge materials without the use of any booster pumps. The Fish & Wildlife property required two boosters. In short, Matteson's equipment needs increased substantially and Matteson's production levels decreased dramatically.

Also, in order to obtain the land owned by the Fish & Wildlife Service, Matteson was required to purchase at a cost of $120,427 another piece of property that the Fish & Wildlife Service desired and to donate that property to the Service in exchange for the right to use the land owned by the Fish & Wildlife Service for the disposal site. Matteson had a contract to purchase the Saunderson property for $78,750. Following completion of the Project, Matteson would have retained ownership of the Saunderson property and would have had the right to sell it.

**<u>Basis For The Claim</u>**

The Corps should have advised Matteson of any restrictions on disposal of dredged material. Throughout the contract documents, the Corps alerts bidders to restrictions on the dredging operation. For example, § 01000, ¶ 7.3 stipulates that no disposal will be allowed in a wetland or a wooded area. Also, consider Article 12 concerning construction restrictions which apply to material that was stockpiled on the Wisconsin side of the river. This was also an appropriate place for the Corps to indicate any restrictions on the dredging operations.

Since no restrictions were indicated, it was reasonable to assume that none existed except those that were set forth in the governmental permits attached as exhibits. For instance, the permit for dredged material placement found on page 01000-8 as well as an April 17, 1996 letter from the Department of the Army (pages 01000-9 thru -11) and a May 2, 1996 letter from the United States Department of the Interior (page 01000-12 thru -13) advise the bidders of restrictions to their operations. It was reasonable for the bidders to assume that the Corps would also alert them to any limitations imposed by a shoreland protection zone either in the solicitation itself or in subsequent meetings where the Corps specifically addressed the use of hydraulic dredging and, in particular, the intended disposal site. No limitations of this kind appear in the solicitation, nor were they ever disclosed by the Corps; therefore, there is no reason for a bidder to assume that such a limitation existed.

Furthermore, § 01000, ¶ 6.1.1, "Availability" provides that the "boundary limits of the grounds made available for the Contractor's use during the life of the contract are shown on the drawings." The plans that accompanied the specifications did not contain any designation indicating any boundary in the form of the shoreland wetland protection zone that would restrict or limit disposal of dredged material.

The contract documents also indicate a specific intent to advise bidders of any restrictions to their dredging operators. For instance, § 01130, ¶ 5 dealing with the contractor's Environmental Protection Plan states in part that:

> [t]he contracting officer shall notify the contractor in writing of observed non-compliance with the federal, *state or local* regulations, permits and elements of the Contractor's Environmental Protection Plan. [emphasis added]

This clause reinforces an expectation on the part of bidders that the Corps would notify bidders during any prebid visits to the site of any potential limitation to the bidders' dredging operation.

In addition to the representations contained in the bid documents, the forced change in the disposal area is a change in existing conditions, entitling Matteson to relief under the "changes" clause in the contract (see page 00700-33, ¶ 52.243-4). Decisions by the Board of Contract Appeals and the U.S. Court of Federal Claims have recognized that a "changed condition may be imposed by artificial means, i.e., acts of the Government." In addition, a changed condition article comes into play when a contractor encounters a condition not contemplated when the contract obligation was undertaken. The shoreland restriction was a condition not contemplated when the contract obligation was undertaken; therefore, the "changes" clause applies.

Relief is also available to Matteson on the grounds that the contract Matteson bid (not the different contract that we were required to perform) was economically infeasible. Decisions by the Board of Contract Appeals and the U.S. Court of Federal Claims have explained that the doctrine of practical impossibility "justifies relief to a contractor if it can be shown that contract requirements are impracticable because of extreme and unreasonable difficulty, *expense*, injury

or loss in meeting them." Indeed, impracticability becomes legal impossibility when "it bespeaks economic senselessness to require continued attempts to perform."

**Damages**

As a result of the cardinal change to the Contract, Matteson suffered damages in the amount of $1,111,227.51. Matteson is entitled to the benefit of its bargain. Matteson successfully completed the Project on time and to the satisfaction of the Corps. The Project has been fully accepted. The final closeout is awaiting resolution of this claim. Matteson is entitled to the benefit of its bargain; that is, the compensation it would have been entitled to receive if the shoreland protection act had been disclosed and known to Matteson and the Fish & Wildlife Property had been the disposal site, from the outset, for the performance of hydraulic dredging.

The calculation of Matteson's damages are summarized below:

**DAMAGE SUMMARY**

| | |
|---|---|
| 1,581,0678.41 | Final Contract Amount |
| 968,119.45 | Costs for Original Project (Saunderson Property)[1] |
| 612,947.96 | Overhead & Profit for Original Project |
| 612,947.96 | Overhead and Profit for Original Project |
| ÷1,581,067.41 | Amount Actually Paid |
| .39 | % of Overhead and Profit for Original Project |
| 1,642,299.90 | Actual Cost for New Project (Fish & Wildlife Property) |
| ÷ .61 | % of Overhead and Profit |
| 2,692,294.92 | Appropriate Contract Amount for New Project |
| 2,692,294.92 | Appropriate Contract Amount for New Project |
| -1,581,067.41 | Amount Actually Paid |
| 1,111,227.51 | Loss/Equitable Adjustment Requested |

After all adjustments for final quantities, the final contract amount for this Project and the amount actually paid to Matteson was $1,581,067.41. Matteson sought to determine the percent of overhead and profit (i.e. margin) that it would have realized if it had been permitted to perform its work as originally planned. To accomplish this, Matteson determined the actual

1 Based on the production rates, equipment spread and costs actually experienced using the Fish & Wildlife Property.

costs and actual historical production rates achieved on the Fish & Wildlife Property. A detailed itemization together with supporting documentation is attached hereto as Exhibit A.

Matteson then made certain adjustments to account for the different equipment spread that would have been used on the Saunderson Property to obtain an accurate determination based on historical records what it would have cost if Matteson had been permitted to use the Saunderson Property for the disposal site. This amounts to $968,119.45. A detailed itemization together with supporting documentation is attached hereto as Exhibit B. Therefore, Matteson should have realized overhead and profit in the amount of $612,947.96. ($1,581,067.41 – 968,119.45) if the Saunderson property had been used as originally intended. From this, the percent margin for the Project as originally bid can be determined ($612,947.96 ÷ 1,581,067.41 = 0.39).

But for the changes to the Project, Matteson would have realized a 39% overhead and profit on its direct costs. In order to adequately compensate Matteson for the change, it is necessary to compensate Matteson for all of its direct costs in the amount of $1,642,299.90, together with overhead and profit at a rate of 39% for a total of $2,692,294.92. (Once the 39% overhead and profit rate is calculated, an appropriate contract amount for the different project that Matteson was forced to perform can be calculated by dividing the actual costs for disposing the materials on the Fish & Wildlife site by 0.61 (the inverse of 39%). This yields $2,692,294.92, which constitutes the contract amount necessary to compensate Matteson for its costs and appropriate overhead and profit for the risk assumed.)

To date, Matteson has been paid only $1,581,067.41, leaving an amount of $1,111,227.51 unpaid, for which Matteson seeks an equitable adjustment.

**Conclusion**

Matteson is entitled to recover from the Corps' additional monies on this Project in the amount of $1,111,227.51 as a result of a cardinal change to the Project.

**Certification**

I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the Contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

L.W. Matteson, Inc.

By: [signature]
Larry W. Matteson, Vice President

From: KELE A. HARRIS (319)754-6705
L.W. MATTESON, INC
#1 SOUTH POINT
P.O. BOX 667
BURLINGTON, IA, 52601

SHIPPER'S FEDEX ACCOUNT #

FedEx.

Aug 2 10 33 AM '00

To: Frederick Mitchell (651)290-5763
U.S. Army Corps of Engineers
190 Fifth Street East
St. Paul, MN, 55101
Ref: Grand Encampment Claim

SHIP DATE: 01AUG00
WEIGHT: 7 LBS

DELIVERY ADDRESS
TRK # 7926 2769 5959 0201 PRIORITY OVERNIGHT

WED
A1
Deliver by:
02AUG00

MSP

55101-MN-US NU STPA

## Shipping Label

1. Use the "Print" feature from your browser to send this page to your laser printer.
2. Fold the printed page along the horizontal line.
3. Place label in air waybill pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.
4. To print a receipt of your shipment, please click on "Shipping History."

## Ship a New Package

Ship to Same Recipient

Use of this system constitutes your agreement to the service conditions in the current FedEx service Guide, available upon request.

FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinisic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.