DEPARTMENT OF THE ARMY
ST. PAUL DISTRICT, CORPS OF ENGINEERS
ARMY CORPS OF ENGINEERS CENTRE
190 FIFTH STREET EAST
ST. PAUL, MN 55101-1638

REPLY TO ATTENTION OF

17 Nov 00
Certified Mail
P 947 775 960

Office of Counsel

Mr. Larry W. Matteson
L.W. Matteson, Inc.
#1 South Point
Burlington, Iowa 52601

Dear Mr. Matteson:

Reference is made to Contract No. Dacw37-96-C-0030, Grand Encampment Excavation, and to your certified claim dated July 31, 2000 in the amount of $1,111,227.51.

## SUMMARY OF THE CLAIM

L.W. Matteson, Inc. (Hereinafter, "Matteson" or "the Contractor") submitted a claim for $1,111,227.51 on July 31, 2000. (Tab E-1) By Fax sent on September 29, 2000 the Contractor, as requested by the Contracting Officer submitted additional information. The Contractor also submitted "a legal memorandum" from its legal counsel that outlined "the various legal grounds" that the Contractor contends entitles it "to receive this equitable adjustment." (Tab E-2)

> Matteson, in its July 31, 2000 claim letter alleged that it was entitled to an equitable adjustment of $1,111,227.51 for costs incurred and damages suffered as a result of a cardinal change in Matteson's contract, which required Matteson to obtain an alternative disposal site. Matteson is entitled to an equitable adjustment because (a) the Corps authorized, invited and encouraged the hydraulic removal of certain stockpiles of dredged materials; (b) the contract documents indicated the absence of any shoreland restriction; (c) the Corps represented that certain property in the vicinity of the job site was acceptable for the disposal of dredge materials; and (d) Matteson reasonably relied on the Corps' assurances that Matteson's original disposal site was acceptable. (Tab E-1)

Matteson, in its "Legal Memorandum" submitted on September 29, 2000 advanced the following legal theories of recovery: "Changed Conditions or Differing Site Condition, Cardinal Change", "Superior Knowledge/Implied Duty to Cooperate/Warranty", "Warranty That Performance is Possible", "Defective Specifications", "Specific Omission", "Commercial Impracticability", and "Mutual Mistake". The "Changed Conditions or Differing Site Condition" theory is based on the contractor's allegation that "Matteson's inability to obtain local approval for use of the

MATTESON JR
EXHIBIT
7/24/02 45 cm

Saunderson site, and the subsequent necessity of purchasing Fish & Wildlife property constituted a changed condition under the contract". (Tab E-2)

The "Cardinal Change" theory is based on the Contractor's allegation that

> "the change necessitated by the opposition to the Matteson's proposed sites may also be properly characterized as a cardinal change, as it materially altered Matteson's obligations under the contract and prevented Matteson from performing as it had planned to do, and on which its bid was based". (Tab E-2)

Matteson's "Superior Knowledge/Implied duty to Cooperate/Warranty" theory is based on the contractor's allegation that

> "The Corps clearly had superior knowledge which it did not provide to bidders on the project. The Corps knew or should have known of the local opposition to this project, which was predicated on residents' prior experience with Corps projects which were not topsoiled and created large areas of blowing sand. Also ... the Corps knew or should have known that the Shoreland Protection Act authorized local counties to approve or disapprove filing of more than 10 cubic yards within shore impact zones. Given the local opposition to Corps projects, the Corps should have anticipated that the county would oppose the dredging contractor's operation and, at a minimum, the Corps had an affirmative duty to alert bidders to this likelihood." (Tab E-2)

The "Warranty That Performance is Possible" theory is based upon Matteson's allegations that

> "Matteson received oral assurances from the Corps that performance of the job by hydraulic means was not only feasible, but encouraged. The Corps also assured Matteson that there were no impediments to such performance, and Matteson relied upon the Corps' assurances in making its bid." (Tab E-2)

The "Defective Specifications" theory is based upon the allegations that

> "In this case, the Corps' specifications contained Section 01130, a provision entitled 'Environmental Protection.' In that section, the Corps stated that 'Environmental protection shall be as stated herein.' The section thus clearly represented to all bidders the requirements for implementing a proper environmental protection plan, approval of which was represented to rest with the Corps. Section 01130 ¶ 2.3. Nothing in the Section alerts contractors to any provision of the Shoreland Protection Act which would authorize a local county to block access to a contractor after approval of the contract. Matteson had the right to rely on the

> specifications as conforming to the government's affirmative duty to provide any information which would impact the feasibility of an approved method of performing the work."

Matteson's "Specific Omission" theory is predicated on the assertion that

> "In its Construction Project Documents for the Grand Encampment Excavation, the Corps detailed and enumerated 'Construction Restrictions," Section 01000 ¶ 12, 'Special Contract Requirements,' Section 00800, compliance requirements with numerous laws, Section 07000-11, Special Use Permit for Dredged Material Placement, Section 0100-8, and attached letters between the Corps and the Department of Fish and Wildlife, 01000-9 through 01000-13 regarding applicable environmental issues. ... By undertaking to incorporate, list and attach applicable regulations and compliance requirements in the manner in which it did, the Corps thereby represented that all applicable restrictions which would impact the accepted option of hydraulic dredging were included." (Tab E-2)

The "Commercial Impracticability" theory is based on the Contractor's assertions that

> "A necessary element of the contract between Matteson and the Corps was Matteson's understanding that its proposed methods were suitable and viable options, as represented by the Corps. This necessary element was based upon the Corps' verbal representations that hydraulic dredging was suitable and encouraged, and its representations and assurances that there were no impediments to Matteson's use of the Saunderson property. The subsequent local opposition to use of the Saunderson site, of which the Corps had superior knowledge both through prior complaints, and the county's' right to exercise of authority under its local ordinances to block Matteson's efforts to perform, was clearly unanticipated by Matteson, not provided for in the contract, and negated the Corps' permission for Matteson to utilize its proposed sites. Matteson incurred an additional $1,111,227.51 as a result of changes due to its inability to use the Saunderson site as planned. The Corps may not benefit from a contract in which it failed to properly inform its contractor of potential impediments, rendering the contractor's performance commercially impracticable."

Matteson "Mutual Mistake" theory is based on its argument that

> "Even if we were to assume, *arguendo*, that the Corps made the complained-of affirmative representations in good faith and did not have superior knowledge of any potential impediments to the use of the Sanderson (sic) property or the use of hydraulic dredging on this project, then the resulting changes in the contract constitute a mutual mistake."

## FINDINGS OF FACT

1. Pursuant to an Invitation for Bids, Contract No. DACW37-96-C-0030 was awarded to L.W. Matteson, Inc. on September 20, 1996 in the approximate amount of $1,693,000.00. (Tab C-1) Work under the contract included, but was not limited to:

> furnishing all plant, labor, material and equipment necessary to excavate and transport existing dredged material from two borrow/stockpile areas: (1) the Alma Marina in Alma, Wisconsin; and (2) an island in the Mississippi River located upstream from Alma, Wisconsin. Such removed existing dredged material is to be disposed of in various potential on-land placement sites located in Buffalo County, Wisconsin.

2. Included in the contract are the standard contract clauses for fixed priced construction contracts inside the United States prescribed by the Department of the Army, Corps of Engineers. Standard contract clauses particularly pertinent to this claim include: 52.233-1, DISPUTES; 52.236-2, DIFFERING SITE CONDITION; 52.236-3, SITE INVESTIGATION AND CONDITIONS AFFECTING THE WORK; 52.214-6 EXPLANATION TO PERSPECTIVE BIDDERS; and 52.236-7, PERMITS AND RESPONSIBILITY. (Tab C-2)

3. Included in the contract are clauses that are specific to this contract. Clauses that are specific to this contract and which are particularly pertinent to this claim are: Section 01000, ¶ 6.1.1, Grounds Availability; Section 01000, ¶ 7.3, Contractor Selected Final Disposal Areas (Placement Sites); Section 01000, ¶ 12, CONSTRUCTION RESTRICTIONS; Section 01130, ¶ 2.1(5); Section 01130, ¶ 2.3, Compliance; Section 01130, ¶ 4, SUBCONTRACTORS; and Section 1130, ¶ 5, NOTIFICATION. (Tab C-3)

4. Section 01000, ¶ 7.3, Contractor Selected Final Disposal Areas (Placement Sites) provides, *inter alia*, that:

> The Contractor may dispose of the transferred existing dredge material fill upon private property provided a copy of the agreement between the landowner(s) and the Contractor is submitted to and approved by the Contracting Officer. ... the use of an optional final disposal area (placement site) may require the Government to prepare an environmental assessment (including cultural resource survey). Preparation of a survey would entail additional cost to the Government and may result in additional requirements to offset environmental impacts associated with the use of the area (site). (Tab C-3)

5. Note (a), Section 01000, ¶ 12 provides, *inter alia*, that:

After this mandatory site has been ... filled ... the Contractor may utilize one or more of the other indicated non-mandatory final placement sites and/or the Contractor's own selected disposal areas (placement sites), as approved. (Tab C-3)

6. Section 01130, ¶ 2.1(5) provides, *inter alia,* that:

The Environmental Protection Plan shall include but not be limited to the following:

(5) Procedures to be implemented to provide the required environmental protection **and to comply with the applicable laws and regulations.** (Emphasis supplied) (Tab C-3)

7. Section 01130, ¶ 2.3 provides that:

Compliance. Not withstanding the requirements of this section and not withstanding approval by the Contracting Officer of the Contractor's Environmental Protection Plan, **nothing herein shall be construed as relieving the Contractor of all applicable Federal, State, and local environmental protection laws and regulations.** (Emphasis supplied) (Tab C-3)

8. Section 01130, ¶ 4, provides, *inter alia*, that:

... **The Contractor shall insure that its subcontractor(s) comply** with the requirements of this section **along with all appropriate Federal, State, and local laws, regulations, and requirements.** (Emphasis supplied) (Tab C-3)

9. Section 01130, ¶ 5, NOTIFICATION provides, *inter alia*, that:

The Contracting Officer will notify the contractor in writing of observed noncompliance with the Federal, State, or Local laws, regulations, permits and elements of the Contractor's Environmental Protection Plan. ... **Failure of the Contracting Officer to notify the Contractor of any noncompliance with Federal, State, or local laws or regulations does not relieve the contractor of the obligation to be in conformance with those requirements.** (Emphasis supplied) (Tab C-3)

10. The Contractor, in formulating its bid, availed itself of the option in the Contract to provide its own disposal (placement) site for the dredge material. The Contractor's bid was based on its assumption that it would be able to acquire and use the Saunderson property as a dredge disposal (placement site. (Section 01000, ¶ 7.3 and Note a, ¶ 12; and Tabs E-1 & E-2)

11. Prior to submitting its bid the Contractor (Larry Matteson, Jr.) on August 5, 1996, met with Corps personnel (Dan Krumholz, Steve Tapp and Dennis Anderson), Bob Drieslein (Fish and Wildlife Service), and Nick Gulden (Minnesota Department of Natural Resources) to inspect two sites proposed by the Contractor for permanent placement of dredge material. The two sites were the Braun and the Guza properties. (Tabs E-1, E-2, E-3, & E-4)

12. Although the Contractor alleges that:

> Following its communications with the Corps, Matteson devoted significant time to locating potential disposal sites in the Wabasha area. Matteson was able to locate two viable disposal sites. One was the "Saunderson" Property and the other was the "Braun" Property. At the request of Matteson and prior to the bid date, the Corps, the Minnesota Department of Natural Resources and the U.S. Fish & Wildlife walked both of Matteson's sites. Neither the Corps nor the other agencies advised Matteson of any problem with the proposed disposal sites. (Tab E-1)

And that:

> As discussed in our previous communications, in our claim and in our meeting on the 18th, we made several visits to the Saunderson property and nearby properties awarded by the Gusas, the Brauns and the Pattersons. Matteson toured these sites with Corps representatives. This visit to the Saunderson property included representatives from the Minnesota Department of Natural Resources and from the Fish & Wildlife Department. We were assured during these visits that the Saunderson site was acceptable as a disposal site in all respects. No indication was ever made to us that there might be any problem with the use of the Saunderson property as the disposal site. Our Conversations with members of the Corps, Minnesota Natural Resources and Fish & Wildlife were not limited merely to physical issues but also included issues such as the right of access, permits, etc. (Tab E-2)

It appears that the Contractor was mistaken both with respect to the sites that were visited and to and with respect to the allegation that "We were assured during these visits that the Saunderson site was acceptable as a disposal site in all respects". Mr. Steve Tapp's, (Channel Maintenance Coordinator, Corps of Engineers, St. Paul District) memorandum for record dated November 3, 2000 evidences that the Saunderson property was not visited prior to bid opening and that Matteson was not assured "that the Saunderson site was acceptable as a disposal site in all respects". Mr. Tapp's Memorandum states, *inter alia,* that:

> 2. During the bidding process, L.W. Matteson, Inc. (LWM) contacted Dan Krumholz to set up a meeting in the Kellogg, MN area. On August 5, 1996, I met with Dan Krumholz and Dennis Anderson (Corps of Engineers), Bob Drieslein (Fish and Wildlife Service), Nick Gulden (Minnesota DNR), and Larry

Drieslein (Fish and Wildlife Service), Nick Gulden (Minnesota DNR), and Larry Matteson Jr. (LWM) to inspect two sites proposed by LWM for permanent placement of material. The two sites were the Braun and Guza properties. The purpose for inspecting the sites was to get input from resource agencies regarding potential concerns. Our common business practice at these on-site inspection meetings is to discuss environmental, social, cultural, recreational, and operational concerns. This is done to call attention to potential problems associated with using a site and to identify further actions required for use.

3. While at the Guza site, I recall discussing the fact that environmental concerns were not likely. I also recall discussing the fact that a cultural resources survey would be required and that there could be social concerns because of the close proximity to several private residents. Any time we have placement operations near private wells, we discuss monitoring for the wells. I am certain that this was discussed. Larry Matteson Jr. was informed that it was LWM's responsibility to acquire all permits and approvals required for use. (Tab E-3)

Mr. Daniel J. Krumholz (Operations Manager, Channels & Harbors Project, St. Paul District, Corps of Engineers) memorandum for the record dated November 8, 2000, provides, *inter alia,* that:

2. The subject of the 29 August [1996] call related to Mr. Matteson investigating the use of a site near Teepeeota Point. I am not familiar with the specific site but believe it to be the location, which later became known as the Sanderson (sic) site. I expressed concern about whether the area was wooded and indicated that we would not accept a wooded area. I indicated that the Corps would have to investigate the site and in particular the potential for cultural resource impacts. I also indicated that if the site was determined acceptable by the Corps we could pursue state water quality certification through our existing permit with the Minnesota Pollution Control Agency. At no time in the conversation did I indicate or imply to Mr. Matteson that the site was approved by the Corps of Engineers. The entire conversation was from the perspective that further evaluation would be necessary before the Corps could approve use of this site or any other contractor furnished site.

4. I find it difficult to believe that Mr. Matteson submitted his bid with the understanding that the Corps of Engineers already approved the Sanderson or the Braun site. My belief is based on the following:

a. The Corps of Engineers facilitated an interagency pre-bid onsite meeting with Lawrence Matteson, Jr. of the Matteson Company as documented in Steve Tapp's memo dated 3 November 2000. Similar meetings were held with other prospective contractors. It was explained that the purpose of these meetings were to allow a contractor an opportunity to have a potential site reviewed by state and federal resource

> understanding as to the state and federal approval process and to also give the contractor a preliminary impression as to specific concerns associated with a particular site. It was made clear at this meeting that sites were only being inspected informally as a courtesy to the contractor and that no sites were approved based on this review. These meetings were intended to expedite the state permit and Corps approval process once a contractor submitted an official site approval request. I attended the Matteson meeting, which was held on 5 August 1996. I was not familiar with county permit or approval requirements and they were not discussed at this meeting. I was not aware at this meeting of any strong local opposition to dredge material placement. The Sanderson site was never reviewed or even suggested as a potential site by Mr. Matteson, Jr. at this meeting. From this meeting the Matteson Company was exposed to the site approval process. It should have been obvious to them that this was not a simple process and that it would require a site specific evaluation by a number of people and agencies, and that it would take time to conduct this evaluation before a site could be approved. Contract Paragraph 7.3 of Section 01000 requires a minimum 30-day review period for a contractor furnished site and describes the potential for an environmental assessment. I find it difficult to believe that Mr. Matteson, Sr. would have the impression that a short phone call to myself, minutes before bid opening, to discuss a site that I was not even familiar with, would constitute site approval. (Tab E-4)

The August 5, 1996 entry in Steve Tapp's daily planner evidences two possible disposal sites were visited with Larry Matteson, Jr. Those sites were identified as the Braun site and the Guza property. As stated in that entry:

> - Looked at 2 sites. Both looked good.
> √ * - Need to put all sites (including Brennan site on a map and send w/ request to Sissel to do a cultural review of the them.
> -Braun Site - Everyone said looked good. There was one corner of the site that should be avoided. It is probably Floodplain & wetland. Matteson would strip topsoil & use as dike, fill the area & put the topsoil back and seed. Site is currently used to raise melons. Very sandy soil.
> - Guza property - no environmental concerns noted. Could be social concerns. (Tab E-5)

The August 29, 1996 entry in Dan Krumholz's daily planner evidences that he was contacted by Lawrence Matteson about a wooded site at Teepeeota Point. (Later identified as the Saunderson property. The note reads as follows:

> He asked about use of a wooded site at Teepeeota Point. He said that the site was being cleared by the landowner. I told him that we could not control what the landowner did. We did not want heavily wooded areas cleared just to dispose of dredged material. From talking to Mr. Matteson it sounded like that

dispose of dredged material. From talking to Mr. Matteson it sounded like that was not the case. I told him that we would need to do a cultural resources investigation of the site and that we would obtain water quality certification from the MPCA for the effluent. (Tab E-6)

A FAX from the Contractor dated March 17, 1997 to Melisa Gulan, of the Corps, provides:

RE: GRAND ENCAMPMENT EXCAVATION- DACW37-96-C-0030

WE ARE PRESENTLY NEGOTIATING WITH JOHN BROWN TO GET PERMISSION TO PLACE SAND ON HIS PROPERTY. THIS PROPERTY **HAS ALREADY HAD TENTATIVE APPROVAL FROM THE CORPS PRIOR TO THE BID DATE.** ONCE AN AGREEMENT HAS BEEN MADE WITH MR. & MRS. BROWN, WE WILL ENDEAVOR TO GET A PIPELINE RIGHT-OF-WAY AND APPROVAL FROM THE LOCAL BOARD. I SHOULD KNOW SOMETHING FROM THE BROWN'S THIS WEEK. (Emphasis supplied) (Tab E-7)

Based upon the foregoing I find that Mr. Tapp's and Mr. Krumholz's summaries of the facts concerning site visits prior to bid opening are more credible than the Contractor's version. I base this finding on the following: (1) Mr. Tapp's and Mr. Krumholz's memorandums are supported by contemporaneous notes, the Contractor's version is not; (2) It is apparent from Mr. Tapp's and Mr. Krumholz's contemporaneous notes that the Saunderson property was not walked prior to bid opening as the Contractor alleges. This casts considerable doubts on the recollections of the Contractor, not only as to the properties that were walked prior to bid opening but as to what was said by the parties and the tenor of the conversations. (3) The contemporaneous notes supports Mr. Tapp's assertion that "I also recall discussing the fact that a cultural resources survey would be required" and Mr. Krumholz's assertions that "I indicated that the Corps would have to investigate the site and in particular the potential for cultural resources impacts."; "At no time in the conversation did I indicate or imply to Mr. Matteson that the site was approved by the Corps of Engineers." And "It was explained that the purpose of these meetings were [sic] to allow a contractor an opportunity to have a potential site reviewed by state and federal resource management agencies so that the contractor would have a better understanding as to the state and federal approval process and to also give the contractor a preliminary impression as to specific concerns associated with a particular site. It was made clear at this meeting that the sites were only being inspected informally as a courtesy to the contractor and that no sites were approved based on this review." And (4) The Contractor's March 17, 1997 FAX makes it clear that the Contractor, despite its current assertion that "We were assured during these visits that the Saunderson site was acceptable as a disposal site in all respects." knew that, at best, the "approval" from the Corps was no more than "TENTATIVE".

Accordingly, I find that the Government did not assure the Contractor that either the Saunderson or Braun properties were acceptable as a disposal site and that the Government advised that the "sites were only being inspected informally as a courtesy to the contractor and that no sites were approved based on this review".

13. The Contractor alleges that:

> Here, the corps clearly had superior knowledge which it did not provide to bidders on the project. The Corps knew or should have known of the local opposition to this project, which was predicated on residents' prior experience with Corps projects which were not topsoiled and created large areas of blowing sand. Also, given its numerous jobs along the Mississippi River in Wisconsin and Minnesota, the Corps knew or should have known that the Shoreland Protection Act authorized local communities to approve or disapprove filling of more than 10 cubic yards within shore impact zones. Given the local opposition to Corps projects, the Corps should have anticipated that the county would oppose the dredging contractor's operation and, at minimum, the Corps had an affirmative duty to alert bidders to this likelihood. (Tab E-2)

The Contractor's allegation of Corps knowledge is based on pure speculation. As such, it is not entitled to any evidentiary weight. Moreover, memorandums for the record from Mr. Tapp and Mr. Krumholz refute the allegations. (Tabs E-3 and E-4) Accordingly, I find that the record does not support a finding that the Corps had superior knowledge. Moreover, it is apparent, that had the Contractor made reasonable inquiries, as it is required to do under Contract Clause 52.236-3, Site Investigation and Conditions Affecting the Work[1] it would have been aware of both the Shoreland Protection Act[2] and the local opposition to dredge disposal sites. Accordingly, I find that the Contractor failed to make reasonable inquiries with respect to requirements for local permits and with respect to the likelihood of obtaining those permits.

14. The Contract has only 5 modifications. Modification P00001 pertains to a time extension "to complete disposing of transferred dredge material at the mandatory 'Buffalo County No. 1 Placement Site". Modification P00002 changed Block #24 of the SF 1442 to read "Contracting Officer's Representative and changed Block 27 of the SF 1442 to read "USACE, Finance Center, Millington, Tennessee. Modifications P00003 and P00004 obligated additional funds and Modification P0005 deobilgated some excess funds. Those modifications did not make any significant change(s) to the Contract and did not relate to either the method of performing the work or to disposal sites. (Tab C-1)

15. The Contract did not limit the Contractor in the method to be used to accomplish the required excavation. It was free to use either mechanical or hydraulic dredging, or a combination of the two. (Tab C-1)

---

[1] "The Contractor acknowledges ... that it has taken investigated and satisfied itself as to the general and local conditions which can affect the work or its cost, including but not limited to (1) conditions bearing upon transportation, disposal, handling, and storage of materials.

[2] An inquiry at Local Government Offices would have alerted the Contractor to this requirement.

## ANALYSIS

**CHANGED CONDITION:** The Contractor argues that "Matteson's inability to obtain local approval for use of the Saunderson site, and the subsequent necessity of purchasing the Fish & Wildlife property constituted a changed condition under the contract ..." The Contractor also refers to "Changed Condition" as being synonymous with a Differing Site Condition". The Contract, as previously explained to the Contractor,[3] does not contain "the old changed conditions clause"; thus, the Contractor's "Changed Condition/differing site condition theory should be analyzed under the Differing Site Condition clause, which is in the contract".

One of the fundamental errors in the Contractor's differing site condition theory is that the Differing Site Condition Clause pertains only to physical conditions. The Contractor's theory is predicated upon its "inability to obtain local approval for use of the Saunderson site". Such "inability" to "obtain approval" is not a physical condition. Thus the Contractor's differing site theory is inappropriate.[4]

**CARDINAL CHANGE:** The Contractor argues that "The totality of the circumstances, including the subsequent necessity of procuring the Fish & Wildlife site, at a drastically greater expense, constitutes a cardinal change to the essence of the contract ..." (Tab E-2) However, the Contractor has failed to describe any change to the contract. The Contract has only 5 modifications. Modification P00001 pertains to a time extension "to complete disposing of transferred dredge material at the mandatory 'Buffalo County No. 1 Placement Site". (Tab C-1) Modification P00002 changed Block #24 of the SF 1442 to read "Contracting Officer's Representative and changed Block 27 of the SF 1442 to read "USACE, Finance Center, Millington, Tennessee. (Tab C-1) Modifications P00003 and P00004 obligated additional funds and Modification P0005 deobilgated some excess funds. (Tab C-1) Those modifications did not make any significant change(s) to the Contract and did not relate to either the method of performing the work or to disposal sites.

A condition precedent for the existence of a cardinal change is a change to the contract by the Government. As stated in *Amertex Enterprises, Ltd v. United States*, 108 F.3d 1392, 1392:

A cardinal change:

> Occurs when the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those bargained for.

---

[3] The Government's reply dated May 13, 1998 (Tab E-8) to the Contractor's April 27, 1998 letter.

[4] The fact that the Contractor's differing site condition claim was not based on a physical condition is not the only shortcoming in its theory, (example the inability to obtain the permit occurred after award) however, for the sake of brevity all possible shortcomings will not be enumerated herein.

The instant contract was not changed[5] by the Government. Therefore, a cardinal change does not exist.

**SUPERIOR KNOWLEDGE/IMPLIED DUTY TO COOPERATE/WARRANTY:** The Contractor argues that that the "Corps had superior knowledge which it did not provide to the bidders". Matteson asserts that the Corps knew or should have known of the local opposition to the project and knew or should have known of the Shoreland Protection Act. As discussed in Finding 13, the Corps did not know of the Shoreland Protection Act and did not know of the extent of local opposition.[6]

A condition precedent to a successful superior knowledge claim is actual knowledge of the undisclosed information. As stated in *Program Resources, Inc.*, ASBCA No. 21,656, 78-1 BCA 12,867, "The Key ... is actual knowledge by the Government of the causative factor. We know of no case which requires the Government to disclose knowledge it does not have." Therefore, the Contractor's superior knowledge claim is not well founded.

Moreover, even if the Government did have actual knowledge of the Shoreland Protection Act and the extent of the local opposition, the Contractor's superior knowledge claim would not be well founded. As stated in *John Massman Contracting Co. v. United States*, 23 Cl.Ct. 24, 33 "The Government must disclose superior knowledge which is vital to performance of the contract, but which is unknown and reasonably not available to the contractor. ... But there is no duty to disclose where the information reasonably is available." The information that the Contractor complains it did not receive from the Government was reasonably available to the Contractor. (See Finding 13) All it had to do was inquire.

**WARRANTY THAT PERFORMANCE IS POSSIBLE** The Contractor argues that "in providing specifications to bidders, the government warrants that performance is possible and within the state of the art". ... "It is an implied warranty that if the specifications of the contract are followed it will product [sic] a satisfactory result." The predicate for this argument is that the contract cannot be performed by following the contract specifications. This is a bizarre argument. The Contract did not limit the manner in which the work could be performed and allowed both mechanical and hydraulic dredging. The Contractor has never alleged the contract could not have been performed via mechanical dredging techniques and, in fact, essentially admits that it could have been performed using mechanical techniques ("indicating a likelihood that it was aware of the necessity of utilizing mechanical means"). Moreover, with respect to hydraulic techniques, the work was performed using hydraulic dredging and produced a satisfactory result. The Contractor's arguments that performance was not possible within the state of the art or could not have been performed satisfactorily by adhering to the specifications are without merit.

[5] Except for some minor, primarily administrative changes that did not significantly affect the work.
[6] As noted by Mr. Tapp "Local opposition is always present".

**DEFECTIVE SPECIFICATIONS** The Contractor asserts that the Government specifications were defective because the specifications did not alert "contractors to any provision of the Shoreland Protection Act". The Contractor's factual argument was as follows:

> In this case, the Corps' specifications contained Section 01130, a provision entitled 'Environmental Protection.' In that section, the Corps stated that 'Environmental protection shall be as stated herein.' The section thus clearly represented to all bidders the requirements for implementing a proper environmental protection plan, approval of which was represented to rest with the Corps. Section 01130 ¶ 2.3. Nothing in the Section alerts contractors to any provision of the Shoreland Protection Act which would authorize a local county to block access to a contractor after approval of the contract. Matteson had the right to rely on the specifications as conforming to the government's affirmative duty to provide any information which would impact the feasibility of an approved method of performing the work.

And

> Furthermore, language purporting to relieve the Corps of its affirmative duty, *see* Section 01130 ¶ 2.3-3.0, is not binding. The contractor is not bound by exculpatory and caveatory provisions in the contract, and the government is not relieved of liability for changed conditions as the language would indicate. *Fehlhaber Corp.*, 151 F. Supp, at 825. The Corps' affirmative duty to inform bidders of impediments to performance of which it was aware is not vitiated by its disclaimers.

The Contractor, in advancing this argument, ignores a fundamental rule of contract interpretation; the Contract must be read as a whole. As stated in *New Valley Corporation v United States*, 199 F.3d 1576, 1580 (Fed. Cir. 1997):

> These are all issues of contract interpretation, which begins with the plain language. *United Int'l Investigative Servs. V. United States*, 109 F.3d 734, 737 (Fed. Cir. 1997). We must interpret the LSA as a whole and in a manner that gives meaning to all of its provisions and makes sense. *McAbee Constr. Inc. v. United States*, 97 f.3d 1431, 1435 (Fed. Cir. 1996). An interpretation that gives a reasonable meaning to all of its parts is preferred to one which leaves a portion of the LSA inoperative, void, meaningless, or superfluous. *Julius Goldman's Egg City v. United States*, 697 F.2d 1051, 1058 (Fed.Cir. 1983)

The Contractor, in advancing this argument also ignores pertinent provisions of Section 01130 and the Permits and Responsibility Clause of the Contract. The Contractor's argument is essentially that the Corps undertook to delineate all possible environmental requirements (and all permits needed) in Section 01130 and that any environmental requirement not specifically set out in Section 01130 is inapplicable to the

Contractor. This argument is directly contradicted by no less than 4 clauses in Section 01130 alone. Section 01130 ¶ 2.3 provides:

> Compliance. Not withstanding the requirements of this section and not withstanding approval by the Contracting Officer of the Contractor's Environmental Protection Plan, **nothing herein shall be construed as relieving the Contractor of all applicable Federal, State, and local environmental protection laws and regulations.** (Emphasis supplied)[7] (Tab C-3)

Section 01130 ¶ 2.1 (5) requires the Contractor to include in its Environmental Protection Plan "Procedures to be implemented to" [not only] "provide the required environmental protection" [but also to] "**and comply with applicable laws and regulations.**"[8] (Emphasis supplied) (Tab C-3)

Section 01130 ¶ 4 provides in part that "The Contractor shall insure that its subcontractor's [sic] comply with the requirements of this section **along with all appropriate Federal, State, and local laws, regulations, and requirements.** (Emphasis supplied) (Tab C-3)

Section 01130 ¶ 5 provides, *inter alia*, that " Failure of the Contracting Officer to notify the Contractor of any noncompliance with Federal, State, or local laws or regulations **does not relieve the contractor of the obligation to be in conformance with those requirements.** (Emphasis supplied) (Tab C-3)

The Contractor's interpretation would leave ¶s 2.3, 2.1 (5), 4, and 5 of Section 01130 inoperative, void, and meaningless and is contrary to a fundamental rule of contract interpretation.

Additionally, the Contractor's interpretation would render void the requirement in the Permits and Responsibility clause that:

> The Contractor shall, without additional expense to the Government, be responsible for obtaining any necessary licenses and permits, and for complying with Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work. (Tab C-2)

The Contractor's defective specification argument is devoid of merit.

[7] The Contractor's argument would change this clause to read "Not withstanding the requirements of the 'Permits and Responsibility' clause this Section shall be construed as relieving the Contractor of the obligation to comply with any applicable Federal, State or local law or regulation that is not specifically set forth in this Section"; a ludicrous interpretation.

[8] At a minimum, this clause compels the contractor to include in its Environmental Protection Plan the procedures it will implement to comply with the applicable laws and regulations. Thus, even under the Contractor's very strained interpretation of Section 01130 (it delineates all possible environmental requirements) the Contractor is required to delineate procedures it will employ to comply with the Shoreland Protection Act, an applicable law or regulation.

**SPECIFIC OMISSION** this argument by the Contractor appears to be an attempt to combine its superior knowledge and defective specifications theories. The superior knowledge and defective specifications theories have already been analyzed and that analysis shall not be repeated but is incorporated by reference. This argument is without merit.

**COMMERCIAL IMPRACTICABILITY** The Contractor's argument is essentially that since it spent $1,111,227.51 more than it thought it would when it bid the contract performance was commercially impracticable. *Natus Corp. v. U.S.*, 371 F.2d 450 at 456 (1967) was cited by the Contractor for the proposition that "Commercial impracticability assumes that something can only be done at an excessive or unreasonable cost." *Natus*, at 458 went on to explain:

> The law excuses performance (or, in the case of Government contracts, grants relief through a change order) where the attendant costs of performance bespeak commercial senselessness; it does not grant relief merely because performance cannot be achieved under the most economical means.

*Natus* did not set out a bright line test or detailed guidelines as to when "the attendant costs of performance bespeak[s] commercial senseless". However, the Armed Services Board of Contract Appeals in *Jalaprathan Cement Company, Ltd.*, ASBCA No. 21248, 79-2 BCA 13,827 at 46020 noted:

> The hard question is when does performance of a contract become "commercially senseless" or economically impracticable to perform.

And at 46022 stated:

> What we said in Canadian Commercial Corporation, ASBCA No. 17187, 76-2 BCA ¶ 12,145 at p. 58,410 is appropriate here:
>
> > 'That Bowser may have incurred costs twice the contract price in performing the contract in itself is not sufficient to prove 'commercial senselessness' or even excessive unreasonable costs.

The Contractor's increase in costs are not of such magnitude to constitute commercial impracticability. Even if we were to assume that the contractor is correct in its assertion that it "incurred an additional $1,111,227.51" in the performance of this contract that increase would be insufficient to establish commercial impracticability. The Contractor reported that the "Final Contract Amount" was $1,581,067.41 and that the "Appropriate Contract Amount for New Project" was $2,692,294.92.[9] (Tab E-1) Even if

---

[9] It is noted that Matteson in computing its "Appropriate Contract Amount for New Project" made a mathematical error. Matteson claimed that the "Actual Cost for New Project (Fish & Wildlife) excluding overhead and profit was $1,642,299.90 and that a 39% combined overhead and profit rate was applicable. Even if we were to accept these numbers as appropriate this would result in a total cost of only

we were to accept the Contractor's contention that the "Appropriate Contract Amount for New Project" is $2,692,294.92 the Contractor would have incurred costs only 1.7 times the contract price in performing the contract; significantly below that percentage increase which was found to be insufficient to prove commercial senselessness in Bowser.

However, the Contractor did not incur costs that were 1.7 times the amount of the Contract Price. The Contractor reported that its "Actual Cost for New Project (Fish& Wildlife Property)" (not including overhead) was $1,642,299.90. (Tab E-1) Matteson admitted that its overhead rate in 1998 was only 14.66%. (Tab E-2) The work in question was performed in 1998. Applying Matteson's actual overhead rate to the $1,642,299.90 that the Contractor alleges was his actual cost (not including overhead rate) yields a total cost of performing the work of $1,883,061.00. Thus Matteson incurred costs only 1.19 times more than the contract price, or a 19% increase. This increase is insufficient to demonstrate "commercial impracticability".

**MUTUAL MISTAKE** The Contractor cites *National Presto Ind., Inc. v. United States*, 338 F.2d 99 (1964) for the proposition that "the resulting changes in the contract constitute a mutual mistake".[10] While the Contractor does not clearly state what the alleged mutual mistake is, it did refer to "potential obstacles to its performance", and this analysis will assume that the alleged mutual mistake consists of the Contractor's inability to obtain a Shoreland Protection Act permit or an assumption that all required permits[11] for the Contractor selected disposal site[12] could be obtained.

The Court in *Dairyland Power Cooperative v. United States*, 16 F.3d 1197. 1202 (Fed. Cir. 1994) stated:

> To establish a mutual mistake of fact, Dairyland must show that:
>
> (1) the parties to the contract were mistaken in their belief regarding a fact;
>
> (2) that mistaken belief constituted a basic assumption underlying the contract;
>
> (3) the mistake had a material effect on the bargain; and
>
> (4) the contract did not put the risk of mistake on the party seeking reformation.

The Court noted, at pages 1202 &1203, that with respect to the first criteria:

---

$2,282,796.80 (1.39 x $1,642,299.90 = $2,282,796.80, or $409,498.12 less than the Contractor's alleged "Appropriate Contract Amount for New Project.

[10] Presumably the "changes" the Contractor is referring to is its inability to obtain a Shoreland Protection Act permit.

[11] The Contract placed the obligation and risk of obtaining all applicable permits on the contractor.

[12] A site whose existence or location was not known at the time of bid opening.

> To establish a mutual mistake of fact, however, the party seeking reformation must show that the parties to the contract held an erroneous belief as to an *existing* fact. ...The availability of commercial reprocessing in the future cannot constitute an existing fact at the time of the 1973 sale contract. "A party's prediction or judgment as to events to occur in the future, even if erroneous, is not a 'mistake' as that word is defined [under the doctrine of mutual mistake of fact]." Restatement (Second) of Contracts § 151 cmt. a (1981)

Whether Matteson would be able to obtain all required permits and approvals for a disposal site chosen by Matteson was an event to occur in the future[13]. Therefore, even if the parties thought all required permits could be obtained, that belief was no more than a "prediction or judgment as to events to occur in the future" and "is not a 'mistake' as that word is defined under the doctrine of mutual mistake of fact." Hence, Matteson is not entitled to recover under its mutual mistake theory.[14]

One final word with respect to Matteson's mutual mistake theory is in order. Matteson cited *National Presto Ind. Inc. v United States,* 338 F.2d 99 (1964) in support of its argument. However, as noted in *Natus Corporation v. United States,* 371 F.2d 450,[15] at 458:

> Similarly, we find inapposite the 'mutual mistake' doctrine set forth in *National Presto Indus., Inc. v. United States*, 338 F.2d 99, ...
>
> The linchpin of our decision in that case is to be found in the Government's active participation in the precontract negotiations wherein the parties mutually agreed to the exclusion of certain equipment later found to be indispensable to satisfactory production. ...
>
> Apart from the fact that the landing mat was a new product, we find nothing in the present factual pattern which would support our finding that the mistake made here was a mutual one. As pointed out, plaintiff's decision to use a rolling machine was wholly unilateral -- the Government at no time expressing any views as to how production should proceed.

Similarly, the Corps, in this case, did not, at any time express a view as to how the Contractor should proceed. The decision to employ hydraulic dredging methods and to obtain a private site was wholly unilateral.

---

[13] It is noted that all required permits for Corps' obtained disposal sites had been obtained and that Matteson, under the Contract, was free to use those sites. Matteson chose not to do so and, as permitted by but not required by the Contract, chose to obtain its own disposal site.

[14] Matteson also does not meet criteria 2, 3, and 4.

[15] A case cited by Matteson in its "legal memorandum".

**DECISION**

Based upon the foregoing, it is my decision that L.W. Matteson, Inc. is not entitled to an equitable adjustment or any additional compensation under the Contract.

This is the final decision of the contracting officer. This decision may be appealed to the Armed Services Board of Contract Appeals Skyline 6, 7th Floor, 5109 Leesburg Pike, Falls Church, VA. 22041-3208. If you decide to appeal, you must mail or otherwise furnish written notice thereof to the Armed Services Board of Contract Appeals within 90 days from the date you receive this decision. A copy thereof shall be furnished to the contracting officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended and identify the contract by number. The notice shall also include a copy of this decision. With regard to appeals to the Armed Services Board of Contract Appeals you may, solely at your election, proceed under the Board's small claims procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. In lieu of appealing to the Armed Services Board of Contract Appeals, you may bring an action directly in the U.S. Court of Federal Claims (except as provided in the Contract Disputes Act, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

F. J. Mitchell
Contracting Officer

**PROPOSED APPEALS INDEX**

A. Reserved

B. Contracting Officer's Decision

C-1. Contract DACW37-96-C0030

C-2. FAR 52.233-1, Disputes
FAR 52.236-2, Differing Site Conditions
FAR 52.236-3, Site Investigation and Conditions Affecting the Work
FAR 52.214-6, Explanation to Perspective Bidders
FAR 52.236-7, Permits and Responsibility

C-3. Clauses specific to this contract

D. Reserved

E-1. Claim for Equitable Adjustment dated 7/31/00

E-2. Legal memorandum from Contractor

E-3. Discussion on Guza site on August 5, 1996

E-4. Discussion on Braun site on August 5, 1996

E-5. Steve Tapp's August 5, 1996 entry in daily planner

E-6. Dan Krumholz's August 29, entry in daily planner

E-7. March 17, 1997 fax from contractor to Melisa Gulan

E-8. Governmment's reply dated May 13, 1998 to the Contractor's Letter dated April 27, 1998

E-9. Letter dated April 27, 1998 from Contractor to M. Gulan

E-10. Memorandum for Record dated 21 February 1996 by L. Hoff

E-11. Letter from M. Aird to Contractor dated August 29, 1996

E-12. FAX dated 4 September 1996 from Contractor to M. Aird

E-13. FAX dated 23 September 1996 from M. Morris with attachments

E-14. Permit Application

E-15. FAX from Contractor dated 3 October 1996 to M. Gulan with attachments.

E-16. FAX dated 23 October 1996 from S. Tapp including maps

E-17.Memorandum from S. Tapp dated 17 October 1996 to S. Johannessen

E-18.FAX dated 7 November 1996 from S. Tapp to M. Gulan

E-19.Memorandum for the Record from S. tapp dated 7 November 17, 1996

E-20.Letter from Contractor dated 25 February 1997 to M. Gulan

E-21.Letter from Contractor dated 8 May 1997 to Cpt. Glaeser

E-22.Letter from Cpt. Glaeser dated 9 May 1997 to Contractor

E-23.Letter from Contractor dated 13 May 1997 to Cpt. Glaeser

E-24.Letter from Cpt. Glaeser dated 16 May 1997 to Contractor

E-25.Letter from Contractor dated 23 July 1997 to Cpt. Glaeser

E-26.Memorandum for Record dated 25 July 1997 by M. Gulan

E-27.Memorandum for Record dated 31 July 1997 by Cpt. Glaeser

E-28.Conversation Record dated 6 August 1997

E-29.Letter from Contractor dated 2 September 1997 to Cpt. Glaeser

E-30.Letter from Cpt. Glaeser dated 5 September 1997 to Contractor

E-31.Letter from Cpt. Glaeser dated 15 January 1997 to Contractor

E-32.FAX dated 26 January 1998 from S. Tapp to Cpt. Glaeser

E-33.Memorandum for Record dated 30 January 1997 by Cpt. Glaeser

E-34.Memorandum for Record dated 3 February 1998 by S. Tapp

E-35.Email dated 23 February 1998 from S. Tapp

E-36.Letter from Contractor dated 22 April 1998 to M. Gulan

E-37.Memorandum for the Record dated 27 April 1998 from M. Gulan

E-38.Email dated 29 April 1998 from D. Krumholz

E-39.Email dated 13 May 1998 from D. Krumholz to M. Gulan

E-40.Email dated 29 May 1998 from Cpt. Glaeser to M. Gulan

E-41.Memorandum for Record dated 4 June 1998 by M. Gulan

E-42. FAX dated 5 June 1998 from B. Stephenson to M. Gulan

E-43. Fax dated 22 June 1998 from D. Krumholz to M. Gulan

E-44. Letter dated 2 July 1998 from Minnesota Historical Society to U.S. Fish & Wildlife

E-45. Letter dated 9 July 1998 from Wabasha County Attorney to n Zoning Administrator

E-46. FAX dated 16 July 1998 from S. Tapp to M. Gulan

E-47. Memorandum for Record dated 16 July 1998 by S. Tapp

E-48. Letter dated 23 July 1998 from John Connors to M. Gulan

E-49. FAX dated 3 August 1998 from D. Thompson to Kevin Burke

E-50. U.S. Fish & Wildlife Special Use Permit by Contractor dated 6 August 1998

E-51. Record of Environmental Considerations dated 12 August 1998

E-52. MPCA letter to Col. Kasprisin dated 17 August 1998

E-53. EMAIL from S. Tapp dated 9 August 2000 to M. Gulan