ORIGINAL



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

*************************************************

L. W. Matteson, Inc.,

Plaintiff,

v. No. 01-5420 (Judge Wilson)

The United States,

Defendant.

*************************************************

**DEPOSITION OF**

**DAVID A. GUILLOT**

Taken July 25, 2002
Commencing at 10:40 a.m.

Reported By: Lori L. Morrow, RPR
PARADIGM REPORTING & CAPTIONING INC.
1400 Rand Tower, 527 Marquette Avenue South
Minneapolis, Minnesota 55402 * (612)339-0545
1(800)545-9668 * Fax (612)337-5575

Deposition of DAVID A. GUILLOT, taken on the 25th day of July, 2002, commencing at 10:40 a.m., at the Offices of the US Army Corps of Engineers, St. Paul District, Army Corps of Engineers Centre, 190 Fifth Street East, St. Paul, Minnesota, before Lori L. Morrow, RPR, Notary Public in and for the State of Minnesota.

**APPEARANCES:**

On Behalf of the Plaintiff:

STEPHEN R. MILLER, ESQUIRE
DIANE MILLS, ESQUIRE
Miller Law Firm
4310 Madison Avenue
Kansas City, Missouri 64111
(816) 531-0755

On Behalf of the Defendant:

PATRICIA M. MCCARTHY, ESQUIRE
Department of Justice
Commercial Litigation Branch
Civil Division
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0164

OF COUNSEL:

EDWIN C. BANKSTON, ESQUIRE
District Counsel
U.S. Army Corps of Engineers
Army Corps of Engineers Centre
190 Fifth Street East
St. Paul, Minnesota 55101-1638
(651) 290-5500

ALSO PRESENT: Lawrence W. Matteson

NOTE: The original transcript will be delivered to Patricia M. McCarthy, Esquire, pursuant to the applicable Rules of Civil Procedure.

**INDEX**

**WITNESS:**

David A. Guillot

**EXAMINATION BY:** **PAGE:**

Ms. McCarthy................5, 53

Mr. Miller..................48, 54

**OBJECTIONS BY:**

Mr. Miller,.................15, 16

Ms. McCarthy................51, 56

**EXHIBITS MARKED AND REFERRED TO:** **PAGE:**

50..Application for a Conditional Use Permit for Saunderson Property........................14

51..Fax 9/20/96 fax from Shar to David at L. W. Matteson Forwarding Application for Conditional Use Permit........................21, 26, 50

52..April 1985 Corps of Engineers Report on a 1984 Ground-Water Monitoring Program for the Read's Landing Project...........32-33

53..1989 Corps of Engineers document "Groundwater Monitoring for the Crats Island Dredged Material Relocation Project."..............32-33

54..Letter of intent dated 9/3/96........34-35, 52

55..Agency Disclosure to Customer dated 8/23/96....................36

**(EXHIBITS, CONTINUED:)**

56..Handwritten Document.................38

57..Handwritten Outline re: Sanderson....40-41

58..Application for Conditional Use Permit signed by Sandra Saunderson and Roland Saunderson dated 10/2/96....42, 48, 53-54

59..Document with Handwritten Notes......44

60..Township Minutes....................45-46

61..Letter of Intent.....................53

(NOTE: The Original Exhibits are in the possession of Counsel for the Plaintiff, Stephen Miller at the Miller Law Firm.)

**PREVIOUSLY MARKED EXHIBITS REFERRED TO HEREIN:**

Tapp Exh. 11
Application for Land Use and Land Alteration Permit.....18, 20, 26, 55

Matteson Sr. Exh. 48:
Purchase Agreement for Saunderson Property............14, 31

Matteson Sr. Exh. 49:
Letter from Ms. Kruger Dated 9/24/96 which is a Blank Application for a Land Use/Land Alteration Permit.....20, 55

DAVID A. GUILLOT,

duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. MCCARTHY:

Q Good morning, Mr. Guillot. My name is Patricia McCarthy with the Department of Justice. With me here is Ed Bankston with the Army Corps of Engineers. We appreciate you taking the time to join us here. Would you please state your name and address for the record?

A My name is David Alan Guillot. My mailing address is P.O. Box 5674, Victoria, Texas, 77903.

Q Mr. Guillot, are you currently employed?

A Yes.

Q By whom are you employed?

A King Fisher Marine Service.

Q And what's your position with King Fisher Marine Service?

A I'm a project manager.

Q For how long have you been with King Fisher Marine Service?

A Approximately three years.

Q By whom were you employed prior to joining King Fisher Marine Service?

A River Road Construction Company, I think.

Q Where is King Fisher Marine Service located?

A Port Lavaca, Texas.
Q And where is River Road Construction Company located?
A Mandeville, Louisiana.
Q And what was your position with River Road Construction Company?
A Project manager.
Q For how long were you with River Road Construction Company?
A A few months.
Q And by whom were you employed prior to River Road Construction Company?
A Weeks Marine, Incorporated.
Q What was your position with Weeks Marine, Incorporated?
A Project manager.
Q I'm seeing a pattern here. Where is Weeks Marine located?
A At the time I worked for them, their corporate office was in Cranford, New Jersey.
Q And where did you work?
A I was on sites.
Q On sites -- on marine sites or --
A Construction sites.
Q Construction sites? By whom were you employed

prior to Weeks Marine, Inc.?
A L. W. Matteson.
Q And what was your position with L. W. Matteson?
A Project manager.
Q When did you leave L. W. Matteson?
A That time there -- there's two -- was --
Q The most recent stint with L. W. Matteson.
A That's what I mean by that one there because we're going backwards. Was the winter or spring of -- let me look at it. I got to get the calendar straight, the years, because I worked for Matteson twice.
Q Okay. Just trying to get a time line.
A Yeah, I understand. I was there in '95 briefly. Then it was '96 August when I came back, I believe, and then I left in '97 in the winter or spring or something like that in '97. Okay. So the last time -- when I went to work for Weeks Marine, that was in the spring of '97.
Q Spring of '97?
A I believe. I'm not exactly sure about the month, but let me get the time line right.
Q And you had joined L. W. Matteson, or rejoined them, I guess you would say, in 1995 or '96?
A The first time I worked for Matteson was '95.
Q Let's do it this way. Then when you joined Matteson in 1995, what was your position then?

A Project manager.
Q And then you left Matteson --
A Right.
Q -- at some point? When did you leave Matteson?
A It was in '95.
Q Okay. And where did you go after leaving Matteson?
A Willbros International.
Q What was your position -- first of all, where is that located?
A Willbros is a U.S. company out of Tulsa, Oklahoma.
Q And what was your position with Willbros?
A Project manager.
Q And you left Willbros at some point to rejoin Matteson, or is that incorrect?
A It's incorrect to say that. I left Willbros, and I rejoined Matteson.
Q Okay. When did you leave Willbros?
A I want to say May of it, would be '96? So that means I left work for Matteson in '96 the second time. Is that what we said before? Does that all make sense now?
Q I think we filled in the gaps. Okay.
A Yeah. I bounced around a little bit there after

'95.

Q When you rejoined Matteson as project manager, what projects did you work? This is in the 1996 time frame.

A Ninety-six, we were bidding some work. I don't recall any projects ongoing at the time that I initially started.

Q What projects were you bidding on? Do you recall?

A Initially, I think it was in August of that year, maybe even July, I can't remember exactly when I started, we were looking to work down in Florida and then the work there in Wabasha.

Q So is it fair to say that your work consisted of putting the bids together?

A No. I assisted with it. I did prebid site investigations is mainly what I did. I did a lot of traveling.

Q Between the project in Florida and this Grand Encampment excavation project, could you describe approximately how you split your time or apportioned your time?

A Not really. I don't recall. I remember being in Florida twice, once probably in July or something and then going up to Wabasha later on. I don't remember

exactly day counts, no.
Q What did you do in terms of prebid site investigation in connection with the Grand Encampment excavation project?
A The primary thing there was, of course, the acquisition of some land for a placement area.
Q And what was your role in the acquisition of the land?
A I went up and met with a realtor to learn the area and put together purchase agreements on properties that seemed feasible.
Q Who is the realtor with whom you dealt?
A I don't recall her name. I've seen the documents this morning. The name Shar is on there, but it doesn't really ring a bell.
Q How did you select this realtor?
A If I recall, some of the properties were for sale, and they had a sign on them, a realtor sign, so I just called the realtor sign.
Q What did this realtor tell you about the area -- strike that.
What did you learn from the realtor about the area?
A I learned my way around, and that was about it. I don't recall anything specific she had to say about it.

Q Approximately how many sites did you identify as far as these prebid site investigation?
A Only two sites that I can recollect.
Q What sites were those? Do you know the names of them?
A The site we made an agreement on was referred to as the Sanderson or Saunderson property as a placement area, and then there was a gentleman down in Kellogg that had a property. I want to say Brown or Braun or something like that.
Q And there were agreements executed for two of those --
A I don't think anything was ever done for Brown or Braun.
Q Do you recall looking at any other sites in addition to those two sites?
A For placement area, no. For access to the placement area right-of-ways we looked at.
Q And how did you go about identifying rights-of-way?
A Well, the right-of-way had to start at the river, the river bank, on the edge and then go inland into a particular piece of property. Once on site, because of location of houses or trees or whatever landmarks were there, then you chose a route that would

be a reasonable route, routing. And then from that, you found out who the landowner was and made contacts that way in order to see if you could get the access.

Q Did you have any role in reviewing the Guza site? Does that ring a bell?

A I don't know which one is the Guza site, not offhand.

Q Did you look at some property owned by Peterson? Does that ring a bell?

A Peterson doesn't ring a bell.

Q When you were dealing with the realtor, did you tell the realtor what your purpose was for seeking property?

A Yes.

Q What was her reaction when you told her what your purpose was?

A I don't recall.

Q Do you recall any negative reaction?

A No. I don't recall any negative reaction. She was happy to show me property and understood my objective and she assisted me, you know, with the right-of-way through the entire process. She was very energetic. I remember that.

Q Did she tell you about any permits that might be required for use of the property?

A Something came out, I believe, about the Saundersons were harvesting pulp wood, which required a permit, you know, to cut down a tree, I guess.

Q And so she told you that the -- what did she tell you about the Saundersons harvesting pulp wood and how that affected a permit?

A Well, that it required some type of permit and that we would proceed with that permit.

Q Did she tell you about any other permits that may be involved?

A Not to my knowledge, no.

Q At what point in your relationship with this realtor did she advise you about the -- is the harvesting pulp permit, is that the land use permit?

A I don't know what it's called.

Q Okay.

A I don't know if it's land use or -- I don't know.

Q At what point in your relationship with this realtor did she advise you about the issue of a permit in connection with the Saundersons harvesting pulp?

A I want to recall that there's something in the agreement, that the man was cutting wood there or something. That's my recollect. We could review that agreement and see.

Q Yeah, that might make sense. I'm going to hand you Exhibit 48, which was marked in Mr. Matteson, and why don't you take a look at that agreement.

A I don't see it on that page. I don't see anything in that agreement. Maybe it came later about the harvesting.

MR. MILLER: Again, referring to some files that Mr. Guillot kept, you're welcome to look through any of them. I've looked through them, so I remember there being something on this condition of use permit that he's talking about. There are some blank forms that may help you and the witness.

MS. MCCARTHY: If we could mark this as Exhibit 50.

(Deposition Exhibit Number 50 was marked for identification and is attached herewith.)

BY MS. MCCARTHY:

Q Mr. Guillot, I've just marked as Exhibit 50 what appears to be an application for a conditional use permit. Do you recognize those papers?

A I recognize it. It's not dated, though. Seemed like there's something somewhere that establishes that date or when it came in the picture.

MR. MILLER: Off the record.
(Discussion off the record)
BY MS. MCCARTHY:
Q Were the Saundersons in the process of harvesting pulp trees at the time you were looking at the property?
A Right.
Q At what stage of that process were they when you first started looking at the property?
A It was an ongoing site where they would replant and harvest some little areas and replant those areas and let them grow back. I remember the trees were all planted in little rows.
Q As part of the transaction, were the Saundersons supposed to remove all the remaining trees prior to Matteson acquiring the property? What was the arrangement?
A I don't remember that.
Q Was Matteson intending to remove trees upon acquiring the land?
A We would have to remove trees, yes.
Q So is your understanding that Matteson would be obtaining a permit to harvest the pulp trees?
MR. MILLER: That misstates his testimony.
BY MS. MCCARTHY:

Q Mr. Miller will object, but if you can answer the question, then please answer it. If you want me to rephrase it, I will. If you don't understand it, I'll rephrase the question. But Mr. Miller is just making an objection for the record.

A Do something, because I forgot what you said now.

MR. MILLER: She's referring to the conditional use permit.

THE WITNESS: Uh-huh.

BY MS. MCCARTHY:

Q At the time you were looking at the Saunderson property, did you have any understanding about any permits that Matteson may be required to obtain in connection with the property?

MR. MILLER: I'm going to interpose an objection because you're confusing two things. What's been the subject of conversation is the conditional use permit, which is in the name of Braun and Sanderson, not Matteson.

THE WITNESS: Right. The initial purchase agreement did not say anything about the harvest of the trees.

BY MS. MCCARTHY:

Q But my question is, did you understand that

Matteson would have to obtain a permit if it were going to remove the trees?
A Not in the initial purchase agreement, no. There's nothing said in there about that. I knew nothing at the time. This conditional use permit came into play later.
Q Well, how did you come to learn of the conditional use permit?
A I don't remember exactly who brought it out.
Q At some point, did you consider the possibility that Matteson would be applying for a permit to remove the remainder of the trees?
A At some point --
Q Yes.
A -- in time?
Q Yes.
A Yes, it obviously came out at some point that we would have to do that.
Q Do you recall when that came out, whether it was before Matteson submitted its bid or after Matteson submitted its bid?
A I don't recall exactly when it is. I think there's a permit in these papers somewhere here that would tell us that though.
Q Okay.

A Or this paper here was --
Q Why don't I show you Tapp Exhibit 11.
A -- put in, wasn't it?
Q Mr. Guillot, I've shown you what was marked as Tapp Exhibit 11 in a previous deposition. Do you recognize this document?
A Yes.
Q And what is it?
A It says it's an Application for Land Use and Land Alteration Permit, which is different from what we've been talking about.
Q How is it different?
A The name of it is different.
Q Okay. Do you know if the substance of the permit is different?
A The substance is different. It doesn't say anything -- I don't think this one says anything about cutting down trees, does it?
Q Do you know what the purpose of this permit application was?
A It's a permit for grading and filling.
Q And you signed this application on behalf of L. W. Matteson. Is that correct?
A Yes, ma'am.
Q And is the date 2 October 1996?

A That's what it says.

Q What caused you to submit this application for land use/land alteration permit that's marked as Exhibit 11?

A I was probably instructed to do so. I don't remember exactly who brought it to our attention it had to be done, but I did it as part of my work.

Q Did you have any contact with Judy Kruger?

A We had some meetings that I attended in Wabasha.

Q And can you describe those meetings?

A I don't recall them specifically. I know we discussed different locations for placement.

MR. MILLER: Can we go off the record for a second?

(Discussion off the record)

MR. MILLER: We're looking through Mr. Guillot's files here and noticed that there is a page that apparently was the second page that was transmitted with Exhibit 49. Exhibit 49 was a September 24, 1996 letter. That letter references, "enclosed please find an application for Land Use/Land Alteration Permit," and then it bears a fax designation at the top. We've located an identical fax designation that does in fact contain a land

use form. And I think in our conversation off the record, we're just going to stipulate to include the second page, which would be the enclosure to that September 24 letter.

MS. MCCARTHY: That's right. I'm going to attach them right now with a paper clip.

BY MS. MCCARTHY:

Q Mr. Guillot, just to clarify the record on this because I think there's a little bit of confusion. We have marked as Exhibit 50 an application for conditional use permit in the name of "Roland & Sandra Sanderson." Then we have marked as Exhibit 49 a letter from Ms. Kruger, which we've just attached, which appears to be, according to the record, a blank application for a land use/land alteration permit. And then we actually have marked as Exhibit 11 an application for a land use/land alteration permit that is signed by you. And the date is October 2, 1996. Can you look at these three exhibits and tell me if the substance of the permits is different, and, if so, how?

A The two permits?

Q Well, the permit applications.

A Permit applications? The conditional use says for harvesting pulp trees, whereas the land use says for grading and fill.

Q Do you know if Matteson ever applied for a conditional use permit to harvest pulp trees?
A I don't think so. I don't remember. I don't recall.
MR. MILLER: Let's go off the record.
(Discussion off the record)
MR. MILLER: In Mr. Guillot's file here, we noted a telefax shown as sent on September 20, 1996, at 4:40 p.m. to L. W. Matteson. It's a three-page document that forwards an application for conditional use permit.
MS. MCCARTHY: We'll mark this as Exhibit 51.
(Deposition Exhibit Number 51 was marked for identification and is attached herewith.)
BY MS. MCCARTHY:
Q Mr. Guillot, we've marked as Exhibit 51 the fax to which Mr. Miller just alluded. Do you recognize this document?
A I don't recall it other than seeing it again this morning.
Q And this suggests that you received a fax from Shar addressed to David. And you are David?

A Oh, I believe it happened. It's just one of the things I don't remember from a long time ago.

Q And the date of the fax is September 20, 1996?

A Yes.

Q The fax reads, "David - Roland & Sandy Sanderson received this application and do not want to pay for it. The zoning lady is also giving them alot of flak about what I have hi-lighted and of course the neighbors are upset. What I have hi-lighted, will we have any problem? Can we over-ride it? Sandersons do want this to close as soon as possible so it's a done deal. Please call me. Thanks, Shar." Do you know to whom she's referring to as the zoning lady?

A The only zoning lady up there would be -- it was a Judy.

Q Judy Kruger?

A Kruger, yeah. She was the -- I think that's her title, isn't it, something to do with zoning?

Q And did you have an understanding as to what this -- what's Shar's last name? Do you know?

A No.

Q Do you know what Shar is referring to when she says that of course the neighbors are upset. Do you know what the neighbors were upset about?

A They were vocal amongst themselves mostly about

that they didn't want the sand stockpiled in the Prairie.

Q When did you first learn that the neighbors were vocal about not wanting the sand?

A I don't recall that.

Q Do you know if it was prior to Matteson submitting the bid?

A Oh, no. I'm sure it wasn't prior to it. I wouldn't think so.

Q Do you know when Matteson received notice of the contract award?

A I don't remember the date, no.

Q Do you recall learning that the neighbors were upset before Matteson received notice of the contract award?

A No.

Q Was this fax the first time you had learned that the neighbors were upset?

(Long pause.)

Q Mr. Guillot, do you know or can you answer the question or --

A Do I know what?

MR. MILLER: I don't think that he understood there was a question.

THE WITNESS: I didn't know there was a question. I wasn't going to --

MS. MCCARTHY: Okay. I'm sorry.

MR. MILLER: I thought there was one. You were each looking at one another.

MS. MCCARTHY: Can you read the question back, please? I've forgotten it.

COURT REPORTER: "Was this fax the first time you had learned that the neighbors were upset?"

THE WITNESS: I answered no to that earlier. It's still no. I don't know. I don't remember exactly when I learned about the neighbors being upset.

BY MS. MCCARTHY:

Q Shar sent you this fax on September 20 indicating that of course the neighbors are upset. Does that suggest that you knew that the neighbors were upset prior to this fax?

A I don't remember when I first heard about it. I don't believe -- this might help you clarify why I don't remember all these things. I wasn't necessarily in the office just because she sent that fax to the office. Okay? I was in the field on other projects. I would hear about things. I would go to Wabasha, look at a piece of property, try to find a right-of-way, make an

agreement because I was instructed to do so. The office was where the information flowed to, but I was not there that much. I believe most of the month of September I was not even in the state. I was off on a project on the West Coast. And this information flowed through the office, and it gets the dates mixed up because the communications -- it's hard for me to remember because I was not specifically just doing that. I don't mean to be vague. I honestly just don't recall the time line. It was not a concern at that time. I was not on that site.

Q Okay. Shar indicates that she has highlighted a section of the application, and she indicates that the zoning lady is also giving them a lot of flak about what I've hi-lighted and of course the neighbors are upset. And there's a circle around the section under "Shoreland Alterations," and it's 5.31, which is "Vegetation Alterations," and she circled, it appears, specifically paragraph (1), which is "intensive vegetation clearing within the shore and bluff impact zones and on steep slopes is not allowed. Intensive vegetation clearing for forest land conversion to another use outside of these areas is allowable as a conditional use if an erosion control and sedimentation plan is developed and approved by the soil and water conservation district." Is that what she highlighted in this fax, to your knowledge?

A From what I see looking at it right this moment, yes, with an additional underlining of conditional use.

Q And was what she highlighted a problem, to your recollection?

A Not to my recollection. I just figured we had to submit some papers for a permit or something. Once again, I wasn't the one that made that decision. As I recall, when I came back from the West Coast or wherever and Lawrence or Larry told me put together a permit, and I did. That was my part in it. It wasn't my decision or even my care if it was a problem. My job was to put together this permit, make these little drawings.

Q And by this permit --

MR. MILLER: For purposes of clarification -- okay. Go ahead.

BY MS. MCCARTHY:

Q By this permit, you mean Exhibit 11?

A Yes, I did that. That's my work. The decision or the concern about it, I wasn't that involved with that part of the project.

MR. MILLER: For purposes of clarification, the witness has been making a distinction between Exhibit 51, which concerns a conditional use permit, and Exhibit 11, which concerns an application for land use or land

alteration permit. Is that correct?

THE WITNESS: That's correct. Yes, it is.

BY MS. MCCARTHY:

Q Do you recall responding to Shar after receiving this fax?

A This fax, your Exhibit 51 --

Q Exhibit 51.

A -- is about giving the Saundersons some money to pay for their conditional use permit, and I believe we said sure. I think the figure was $150 it says here, and I said no problem. If that will keep things moving along, that's not a problem. And the property was still in their name, their property at that time, and the permit needed to be applied for and maintained.

Q Is it your recollection that Matteson agreed to pay the $150 fee for the Saundersons?

A I don't know if they paid it or not.

Q A while back, we were discussing meetings that you had attended with Ms. Kruger, Judy Kruger. Do you recall the first meeting that you attended with Ms. Kruger?

A No, not in detail.

Q Do you recall any of the meetings that you attended with Ms. Kruger?

A Vaguely.

Q What do you vaguely recall regarding those meetings?
A I remember her office. I think it was her office. When I think of her, I think of parking downtown Wabasha and walking several blocks to try to find her office in the old courthouse. It seems like we all got together and went riding around and looking at sites, looking at different pieces of property that were considerable as placement areas.
Q Do you know what caused you to become in contact with Ms. Kruger?
A No, I do not, not exactly, no.
Q Do you know if you met her for the first time before Matteson submitted its bid or after Matteson submitted its bid?
A I believe there's some notes in those files that would answer that question. I think the meetings with her were later on.
Q In connection with the use of these proposed disposal sites, do you recall attending any public meetings?
A Public meetings for what now?
Q For use of the proposed disposal sites.
A I remember going to one meeting in Wabasha County Courthouse or whatever they call it.

Q Do you recall when that meeting was?

A No, not offhand.

Q What do you recall regarding the meeting?

A I remember everybody in the county was there, and there was standing room only in the courthouse and the street, and their purpose there was opposition to stockpiling sand in the Prairie.

Q Did you speak at the meeting?

A No, I did not. I was a little bit afraid.

Q Do you know who called the public meeting?

A No, I do not, not offhand. It was announced in the newspaper. I remember that. Somebody called me -- somebody told me that they saw it in the newspaper, probably Larry or Lawrence or somebody. I don't know how word got to me, but I attended.

Q Had you ever attended such a public meeting before?

A I don't understand such a public meeting. I've been to a few public meetings. I've never been to one that was an opposition. Usually public meetings are to get together and do something, not stop something.

Q So this was the first public meeting you had been to in which opposition was expressed to the project?

A Yes.

Q What other circumstances had you attended public

meetings before?
A Public meetings put on by the Corps of Engineers with respect to channel development, you know, and the economical impacts of proposed projects.
Q Do you recall anything else about this public meeting in which opposition was expressed?
A No, not really.
Q Was this public meeting the first time you had learned that the neighbors were upset as Shar says in that fax?
A No, of course not. I mean, we knew about it. There was talk about it, but nothing -- we didn't know that it was that strong. I was shocked at the strength of it and the volume of it.
Q Generally speaking, when you go about looking for disposal sites, what is your usual practice?
A As I discussed earlier, the size is in consideration, the accessibility, the return water back to the source is an issue as you all spoke of earlier with the other project. I basically looked at it as what would it take to do the project, to get the job done is what I was looking at. That's the first thing I look at.
Q Prior to looking for disposal sites in connection with the Grand Encampment excavation project, had you ever been involved in a project to which you were

looking for disposal sites?

A No, I don't believe.

Q When you were investigating possible disposal sites, did you investigate any permit requirements that might apply to disposal sites?

A I don't recall, no.

Q When you were investigating potential sites, did you investigate what potential land restrictions could apply to the use of the disposal sites?

A I don't recall that.

Q If I could draw your attention to Exhibit 48, is this the purchase agreement for the Saunderson property that you signed?

A Yes, it is.

Q There's language in there that says that, "Subject to performance by the Buyer, the Seller agrees to execute and deliver a General Warranty Deed to be joined in by spouse, if any, conveying marketable title to said property subject only to the following exceptions:" and (a), they have "building and zoning laws, ordinances, State and Federal regulations." Did you in the course of your site investigation undertake to find what building and zoning laws, ordinances and State and Federal regulations might affect the transfer of the warranty deed in this case?

A No, I did not.

Q It also mentions (b) would be "Restrictions relating to use or improvement of property without effective forfeiture provision," and "Reservation of any minerals or mineral rights to the State of Minnesota" and "Utility and drainage easements which do not interfere with improvements." Did you undertake any investigation to the possible application of any of these exceptions to the Saunderson property?

A No, I did not. I don't recall any.

Q You don't recall that any applied, or you don't recall that you looked to ascertain if there were any --

A I did not look into that at that time.

MS. MCCARTHY: Do you want to take a quick break?

THE WITNESS: No.

MS. MCCARTHY: Well, you can sit here, and I'll take a quick break.

(Recess, 11:30 a.m. until 11:35 a.m.)

MS. MCCARTHY: I would like to mark these as exhibits.

(Deposition Exhibit Numbers 52 and 53 were marked for identification and are attached herewith.)

BY MS. MCCARTHY:

Q Mr. Guillot, we've marked as Exhibits 52 and 53 two documents that we have just taken from your files. And the first, Exhibit 52, is an April 1985 Corps of Engineers report on a 1984 Ground-Water Monitoring Program for the Read's Landing Project; and Exhibit 53 is a 1989 document from the Corps of Engineers entitled "Groundwater Monitoring for the Crats Island Dredged Material Relocation Project." Can you tell me why these two documents are contained in your files that you have today?

A Only the fact that they're similar projects is the only thing that comes to mind that happened prior to -- what's the name of this project? Grand Encampment? And they're just there as reference. I don't recall these reports. I don't recall if I had them then or when they were put in the file. I'm looking through them now to see if there's any notes that I personally might have made which might help my memory.

Q Do you recall there being any groundwater issues in connection with your site investigation for the Grand Encampment project?

A At some point, there was discussion of that. I don't remember the time it took place. But that is an issue, of course.

Q Why do you say of course?

A To be discussed. It was an issue on these projects. It would be an issue on any project done. It is an issue on any placement area that the Corps of Engineers uses or contractor uses for the Corps of Engineers.

Q Why is it an issue? How does it become an issue?

A Because the groundwater is where people get their drinking water and their potable water. And when you flood an area with dredge affluent, there's always a possibility in my mind that that groundwater could become contaminated. Therefore, it has to be studied and monitored -- studied prior to the process and monitored during the process is normally what's done on all projects at this time.

MS. MCCARTHY: Mark this as Exhibit 54, please.

(Deposition Exhibit Number 54 was marked for identification and is attached herewith.)

BY MS. MCCARTHY:

Q Mr. Guillot, we've marked as Exhibit 54 a letter of intent dated September 3, 1996, that was taken from your files. Can you look at this document and tell me what it is specifically?

A It's a letter of intent with the Saundersons following the purchase agreement, and the purchase agreement was contingent upon L. W. Matteson Incorporated being the low bidder on the Grand Encampment project. Once Matteson was low bidder, then in order to keep that purchase agreement alive, we wrote a letter of intent, which carried us through, I suppose, a specific time period, probably a few months. Yeah, it says two months further to help us. And of course the letter of intent had its contingencies.

Q Could you read those contingencies, please?

A Well, number one was the award of the contract, and number two is that the permits were granted by local and federal agencies. And that's my handwriting.

Q Why did you make that notation for the contingencies for local and federal agencies?

A I don't recall why. Apparently, someone told me, maybe the real estate agent or maybe the Mattesons. I'm not sure. But apparently, I found out about something at that time.

Q And this letter of intent is dated what? What's the date?

A Third of September.

Q And do you know specifically what local permit you're referring to in that notation?

A Say that again.
Q Do you know specifically to what local permit you're referring to in that notation or permits?
A No, I do not. I don't recall that.
MS. MCCARTHY: Okay. If we could mark this as Exhibit 55, please.
(Deposition Exhibit Number 55 was marked for identification and is attached herewith.)
BY MS. MCCARTHY:
Q Mr. Guillot, we've marked as Exhibit 55 another document taken from your files, and it's entitled "Agency Disclosure to Customer." And can you tell me what this is?
(Pause)
Q Do you know there's a question pending or?
A Yeah. I was reading it.
Q I'm sorry.
A You asked me what was this document agency disclosure. It appears to be where the salesperson, Shar from Coldwell Banker, is stating that she is an agent for the seller is what it appears to be and that she's not my agent. She's the seller's agent and that anything I tell her could be -- she's obligated to go back to the seller with, and she's not obligated to tell me anything that

the seller says. That's what I'm reading there. Do you read something else?

Q What's the date of this document?

A The date is the 23rd.

Q Of?

A August '96.

Q And the first provision of this disclosure says, "Broker will disclose to you all material facts about the property of which Broker is aware, that could adversely and significantly affect your use and enjoyment of the property. Broker will also assist you with the mechanics of the transaction." Did you understand that Shar Beisell -- is that her last name?

A It's B-E-I-S-E-L-L.

Q That she was obliged to disclose to you all material facts about the property of which she was aware?

A You would have to ask her that.

Q Well, how did you interpret this?

A I interpreted it as she did. That's what it says.

Q Do you believe today that she disclosed to you all material facts about the property of which she was aware?

A I don't know.

Q And could adversely and significantly affect

your use and enjoyment of the property. Now, by August 23, 1996, had you disclosed to Ms. Beisell the purpose of your looking at the Saunderson property?

A My recollection, if I had contact with her, then she knew what I was doing. I never hid the fact what I was doing there from anyone. If I had contact with her, she knew I was looking for a place to stockpile dredge material.

Q Did she disclose to you anything that could adversely and significantly affect Matteson's use and enjoyment of the property, to your knowledge?

A To my knowledge, no.

MS. MCCARTHY: Could we mark this as Exhibit 56?

(Deposition Exhibit Number 56 was marked for identification and is attached herewith.)

BY MS. MCCARTHY:

Q Mr. Guillot, this is Exhibit 56. Could you identify this document for me?

A Looks to me like Exhibit 56.

Q Is it your handwriting?

A No, ma'am, that's not mine.

Q Do you recognize whose handwriting it might be?

A No, ma'am. I can look at it, and I don't know

what it is.

Q Okay. Can you just take a look at it for a minute and tell me if you recognize the document at all?

A Here's my handwriting on the back.

Q And what does your handwriting on the back say?

A It says, "All present were asked to sign-in at meeting and to sign a petition." The petition was blank.

Q Do you know what the petition was?

A It was blank. It was a blank piece of paper, and everybody was asked to sign it, and they were going to fill it in later. And I don't know if what was written on the back has anything to do with what's written on the front.

Q Okay. Do you have any recollection of -- these notes apparently refer to a meeting on October 3. Do you have any --

MR. MILLER: I think it's 23.

THE WITNESS: Twenty-third. It was a meeting of October.

BY MS. MCCARTHY:

Q October 23?

A It doesn't say a year.

Q Do these notes have any meaning to you whatsoever?

A Meaning to me, yes. They have meaning to me.

They're obviously speaking of the stockpiling of sand in the Prairie. It is the city attorney, Jim Nordstrom, some man named Harold Hoffman. They elected officers for the concerned citizens at Upper Sand Prairie, and they were going to stop any dredging in Wabasha County. So this apparently was where they formed a committee to organize the county against the dredging and stockpiling of material in the county.

Q Do you know Mr. Nordstrom?

A I don't believe.

Q Do you recall ever meeting Mr. Nordstrom?

A I don't recall, no.

Q There's a reference there to a moratorium attributed to Mr. Nordstrom. It says something to the effect that it's too late to get a moratorium. Do you see that there? Do you recall during this time period any discussion regarding a moratorium?

A No, I do not. I don't know what a moratorium is. Somebody tell me.

MS. MCCARTHY: Could we mark this as Exhibit 57, please?

(Deposition Exhibit Number 57 was marked for identification and is attached herewith.)

THE WITNESS: You don't have to answer my

question. Maybe later somebody can tell me what a moratorium is.

BY MS. MCCARTHY:

Q Mr. Guillot, we've marked as Exhibit 57 another exhibit that was taken from your files. Do you recognize this document?

A Only as my handwriting. I don't recall necessarily doing it.

Q There's certain reference to phases there. Do you know what those references to phases are?

A Phases are just like order of work, scope of work, activities that would be taken -- that would fall into place. I assume -- it says Sanderson's property, so I would assume it's for the use of Sanderson's property, what would we do on that site.

Q There's a reference there to Phase One, Complete Harvest of Tree Length Pulp Trees. What does that phase mean to you?

A Clear the land.

Q Was that to be undertaken by Matteson?

A I don't have any idea.

Q Do you know when you prepared this document?

A No.

Q These phases?

A No, I do not. It would apparently be later on

in the time line because of the detail of it, you know. There's several five, six phases with a few items under each phase, so some thought was put into it, which reasonably considerable time had gone by, and I had been on location. But as far as when I did it, I don't know.

Q So because it reflects a fair amount of thought, you think that it was prepared after the bid was submitted?

A I would think so, yeah. I would take that, yeah.

MS. MCCARTHY: Can we mark this as Exhibit 58, please?

(Deposition Exhibit Number 58 was marked for identification and is attached herewith.)

BY MS. MCCARTHY:

Q Mr. Guillot, we've marked as Exhibit 58 a document that's entitled Application for Conditional Use Permit and appears to be signed by Sandra Saunderson and Roland Saunderson. It's dated October 2, 1996. Do you recognize this document?

A The attachment to the document was prepared by me. That's my handwriting. I don't know where the third page came from.

MR. MILLER: The attachment the witness is

referring to is the second page of the document.

BY MS. MCCARTHY:

Q Does this indicate that the Saundersons, in fact, did apply for a conditional use permit?

A I would say so, yes.

Q The document that you indicated --

A Is it dated? Excuse me, I'm sorry. Is it dated?

Q At the bottom --

A Oh, October 2. Okay. I was looking at this date here, because this is where she asked us about paying that fee for them on that Exhibit 51, and apparently, something happened. Somebody paid the fee because they're filing for it on October 2.

Q How did you go about preparing this second page of the exhibit, which you say has your handwriting? There's a reference there to 20 acres within shoreland zone. What does the reference to shoreland zone mean?

A Looking at this, I can't answer. I don't know how that was written on there or why that's written on there. It says there's 20 acres within shoreland zone. But it's not very clear as to how that was established.

MS. MCCARTHY: Okay. If we could just -- I have two more exhibits, and then we'll let

you out, Mr. Guillot. We'll mark Exhibit 59, and this is a two-page -- two-sided exhibit.

(Deposition Exhibit Number 59 was marked for identification and is attached herewith.)

BY MS. MCCARTHY:

Q Mr. Guillot, do you recognize, is your handwriting reflected on this page?

A Scribbled all over it. Well, not all of it, but most of it on this page, yes.

Q Okay. What's the part that's not your handwriting?

A This blue up here "Dan Crummels with Corps, line 3." That's not my handwriting. This right here, "Judy Kruger" is mine. This isn't my handwriting. Yeah.

Q Okay. There's a reference at the bottom that says "Dan Kromholtz." Can you read that handwriting? Is that your handwriting, first of all?

A That's my handwriting. It says "Dan Kromholtz."

Q Can you read it, please?

A Underneath it, it says, "letter to Melissa," and then it says "site approval."

Q Okay. Do you know what that note refers to?

A No, not at this time, no.

Q There's also a reference here to Dave Brodick of

the Buffalo County. Do you know who Mr. Brodick is?

A That name doesn't ring a bell now. It says "Buffalo County Highway Commission." It has his phone number.

Q Do you know why you would have had contact with Mr. Brodick at this time?

A I don't even know where Buffalo County is at.

MS. MCCARTHY: Okay. If you could mark this as Exhibit 60, please?

THE WITNESS: It might have, you know, my notes could be from other projects or something. There's no telling. Here's a note. This guy here, I know him. He's in Lafayette, Louisiana. This guy right here lives in Slidell, Louisiana. He's working in Houston, Texas. Black Bayou is in South Louisiana. Calcasieu is in South Louisiana. There's notes on any page just the way people take notes. I don't know why.

(Deposition Exhibit Number 60 was marked for identification and is attached herewith.)

BY MS. MCCARTHY:

Q We've marked as Exhibit 60, it's an oddly stapled document. It's entitled Township Minutes. And

can you just tell me what this refers to, please?

A It has a stamp on it that says Keith Larson. I guess it's from him or from his desk or whatever.

Q Do you know who Mr. Larson is?

A No. I've heard his -- I've heard his name here today, and he kind of rings a bell, but I can't really place him. I don't know where he's at.

Q Do you know what these minutes refer to, the township minutes?

A Well, it says, State of Minnesota, County of Wabasha, Town of Greenfield. And I don't know exactly where Greenfield is. It says it was in the Kellogg American Legion Hall. I've been there before, Kellogg, Minnesota. I know where that's at. That's just down the river from Wabasha.

Q Did you attend this meeting, or does this --

A It doesn't ring a bell. I looked for my name on there because maybe I did, but I don't think I did.

Q Do you have any understanding as to why these minutes would be in your file?

A No. No. I mean, there's notes in here. I see -- there's reference in here about the well water, and there's reference of L. W. Matteson, Incorporated. But I don't know -- someone must have sent it to us.

Q But you don't recall that you attended this

meeting?

A I don't recall, no. I don't know who would have sent that to us. Certainly, you don't get minutes from a meeting by attending a meeting. They come later. So I don't know who sent those to us or who got them or, you know. Somebody must have.

Q If I could just draw your attention -- I don't know if this is -- yeah, I'm sorry. The minutes reflect that Mr. Keith Larson, spokesperson for the delegation, approached the board concerning the Corps of Engineers pumping sand on Sand Prairie land located just off Upper County Road 24. Mr. Larson requested that the Greenfield town board put a moratorium on the pumping. Do you recall any discussion about putting a stop to the pumping of sand on the Sand Prairie Land?

A Is that what moratorium means now? Are you telling me now?

Q Just a subtle way.

A I don't know. I mean, obviously, we know that there was objection to it. I don't know the date of that document. I don't know the time that that meeting was held, and that people were making it public what their wishes were. I don't know that.

Q What is the Sand Prairie Land? What is that?

A To my definition and from the time I spent

there, that's the area between the city of Wabasha and the city of Kellogg and actually down all around Kellogg. It's very flat down through there, and there's nothing there but sand anyway. I guess that's what they always said they had enough damn sand over there, they didn't want anymore.

MS. MCCARTHY: All right. Thank you very, very much, Mr. Guillot. I know that this was an inconvenience to you, and I appreciate it.

MR. MILLER: I need to ask you just a couple of questions to clarify a few things.

THE WITNESS: You bet.

EXAMINATION

BY MR. MILLER:

Q I wanted to look at the map that Ms. McCarthy showed you that was attached as page two to Exhibit 58. That was a conditional use permit. Do you recall that?

A Yes.

Q And you were shown earlier today Exhibit 11, which was the application for land use/land alteration permit?

A Which one was this?

Q Exhibit 2.

A This was conditional use, this one is land alteration.

Q Okay. And remember you made the distinction that there were two different permit applications?

A Right.

Q And there's a similar map that's attached as disclosure number five to the application for land use/land alteration permit. And there's underlying information on here that appears to be common to both of them. There's the county road shown, and then to the east of that there are various property lines that are shown, and there's certain properties shown to the south and west of Highway 24. And that same information appears on the attachment to the conditional use permit. What I want to clarify is that you had said earlier in your testimony that the handwriting on this exhibit was your handwriting. But I take it that the handwriting that's yours is what appears as a little bit darker that's kind of been overlaid on something else?

A That's correct. Yes. I understand now. There's a lot of handwriting on the page. This is a -- I forget what they call it book you buy at the courthouse. A plat? Is that what it's called? You can buy them at the courthouse. And that's where I made these copies from, and I expanded them on the copier, and then I drew onto a copy of the plat whatever I was trying to demonstrate and achieve with the permit. So yes, the

darker handwriting with the notations as to with the hash marks is my work, and the lot descriptions, ownerships, are part of courthouse record, right.

Q The other thing that I want to clarify concerns Exhibit 51.

A I understand this now if you want to know what it means.

Q Sure. Go ahead.

A I'm sitting here looking at it, and then you helped me by something you said finally made it click. This was a permit for conditional use, Exhibit 58. The sketch on this page two -- when we requested the conditional use is the harvest of trees. The sketch on page two has two different types of hash marks. Okay? The hash marks going from left to right, down to right are the area of permit requests, which apparently have not been harvested. The hash marks which proceed from top right to bottom left angle are previously harvested areas. So obviously, this area here was all clear already. This needed harvesting, and this needed harvesting. Thus, the permit to harvest the trees. Now I understand what I did here. Is that making sense?

Q That helps to clarify it, yes.

And then Exhibit 51, I just wanted to clarify on this. This is the telefax that's from Shar to you that

shows that the telefax machine received it at 4:40 p.m. on September 20, 1996. But I understand from your testimony that it may have been some period of time before you ever saw this after it came in?

A True. I have no way of saying right now where I was at on that date.

Q So you're not certain when you received it?

A Right.

Q And you're not certain when you reviewed it?

A Correct.

Q But we know it's obviously sometime after 4:40 p.m. on September 20, right?

A That's correct.

Q Okay. And I just want to be clear on this. I think you told Ms. McCarthy that there's a reference in this letter that says, of course the neighbors are upset. I want to be clear. I think you told Ms. McCarthy that you have no recollection of having any knowledge about the neighbors being upset prior to whenever you reviewed this telefax?

MS. MCCARTHY: Objection, misstates his testimony. But you can answer.

BY MR. MILLER:

Q Do I need to repeat the question?

A Yeah.

Q Okay. I'm just trying to figure out what you can remember and know. But I want to make clear that as far as you can remember, you don't remember having any information about the neighbors being upset prior to this. This would have been the first --

A I don't have any recollection of that. But on the other hand, I don't have any recollection that I got this one and then went, oh, my God, we have a problem. Okay? As I look back on it, it's all one event. It's not a series of events. Okay? I can't look back and say at a specific time I had this -- the neighbors were upset. You know, it wasn't before this; it wasn't after this. It was my memory that has this all lumped together. We went up there, we tried to buy some property, we tried to do a job, and there were difficulties.

Q And one final thing. I also noted in your file that there's a document that appears to be the copy of the letter of intent that was previously marked as Exhibit 54. The first page of that was copied, and then under paragraph two, term of agreement, there was handwritten in language that states plus one week, and then there are initials by that?

A Yes, there is.

Q Okay. Do you know whose initials those are?

A Those are my initials, but that's not my handwriting.

Q The plus one week is someone else's handwriting?

A That's correct.

Q Okay. And then you initialed it?

A That is my initials.

Q Do you have any recollection that the letter of intent was subsequently modified at some time to add another week to it?

A I don't recall that it was done. Obviously, it was. But it doesn't mean anything to me at this time.

MR. MILLER: Okay. I'm going to go ahead and mark that as the next exhibit. This is the one-page letter of intent.

(Deposition Exhibit Number 61 was marked for identification and is attached herewith.)

MR. MILLER: Those are all the questions I had. I just wanted to clarify those documents.

EXAMINATION

BY MS. MCCARTHY:

Q Mr. Guillot, one final point of clarification, and I promise you I'll be done.

A Okay.

Q I just want to clarify that the handwriting that

Mr. Miller established was yours. There's two different sets of handwriting on Exhibit 58 some of which is yours and some which is not. The handwriting that is yours is the handwriting that indicates 100 feet from shoreline. Is that your handwriting?

A It says 1,000 feet from shoreline.

Q I'm sorry. 1,000 feet from shoreline. Is that your handwriting?

A That's correct.

Q And the 20 plus or minus, is it acres within shoreland zone?

A Correct.

Q Is that your handwriting as well?

A Yes.

MS. MCCARTHY: Thank you.

EXAMINATION

BY MR. MILLER:

Q So obviously, by October 2 of '96, you had some knowledge about a thousand foot shoreline?

A Obviously. I don't know exactly when it came in, but obviously also by October 2, we were still applying for permits and thought everything was going to be okay. That is what's in the rest of the meeting. I just don't recall all this.

Q What I would like to do is kind of pin down what

your best recollection is when you became aware of that thousand foot line that you marked on October 2 of '96.

A Yeah.

Q And I'm showing you Exhibit 49. And that is the letter from Judy Kruger. It's dated September 24. It was received on September 26 of 1996. Do you see the reference in the second paragraph where she states, Shoreland means land located within 1,000 feet of the ordinary high water level of a lake, pond or flowage"?

A Yes, I do.

Q And then she has attached an application for land use/alteration permit, a form?

A Yes, she did.

Q Okay. Is it your best recollection now that the -- I'm looking for Exhibit 11. That's your land use application.

A I don't know. Here's 12. Here's 11. What's the date on that thing? 2 October.

Q Correct. Do you see on the application for land use/land alteration permit that you actually signed that's Exhibit 11 that it's essentially just a copy of what Mr. -- because it bears the same September 26, 1996, fax designation at the top?

A Yes, it does.

Q Okay. Is it your best judgment that Lawrence

Matteson to whom the September 24, 1996, letter was sent, directed the application for land use/land alteration permit form to you to complete?

A Correct.

MS. MCCARTHY: Objection, but.

BY MR. MILLER:

Q Is it also your best recollection that that's probably the first time that you became aware of a thousand foot shoreline limit?

MS. MCCARTHY: Objection.

THE WITNESS: I wouldn't know that.

BY MR. MILLER:

Q Do you have any --

A Don't have any reason to not believe it.

Q Do you recall being aware of a thousand foot shoreline limit at any time prior to receiving this application for land use/land alteration permit sometime after September 26?

A I do not recall receiving that, no, not prior.

Q Don't recall having any knowledge of a thousand foot shoreline limit prior to September 26?

MS. MCCARTHY: Asked and answered.

BY MR. MILLER:

Q Go ahead.

A No, I do not.

MR. MILLER: Okay. That's all the questions I have. Thanks.

MS. MCCARTHY: I think finally you're free.

THE WITNESS: Thanks.

(Deposition concluded at 12:20 p.m.)

**********

ORIGINAL



REPORTER'S CERTIFICATE

STATE OF MINNESOTA)
) ss.
COUNTY OF HENNEPIN)

I hereby certify that I reported the deposition of DAVID A. GUILLOT, on the 25th day of July, 2002, in St. Paul, Minnesota, and that the witness was by me first duly sworn to tell the whole truth;

That the testimony was transcribed by me and is a true record of the testimony of the witness;

That the cost of the original has been charged to the party who noticed the deposition, and that all parties who ordered copies have been charged at the same rate for such copies;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel;

That I am not financially interested in the action and have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect my impartiality;

That the right to read and sign the deposition by the witness was reserved.

WITNESS MY HAND AND SEAL, this 7th day of July, 2002.

Lori L. Morrow, RPR
Notary Public, Hennepin County, Minnesota
My commission expires: January 31, 2005.

LORI L. MORROW
NOTARY PUBLIC-MINNESOTA
MY COMMISSION EXPIRES 1-31-2005

ORIGINAL

AUG 13 2002



TRANSCRIPT CORRECTION SHEET/SIGNATURE PAGE:

TITLE: L.W. Matteson, Inc. v. The United States

WITNESS: DAVID A. GUILLOT

| PAGE | LINE | CORRECTION | REASON |
|---|---|---|---|
| 5 | 10 | From: ALAN<br>To: ALLAN | |
| | | From:<br>To: | |
| | | From:<br>To: | |
| | | From:<br>To: | |
| | | From:<br>To: | |
| | | From:<br>To: | |
| | | From:<br>To: | |
| | | From:<br>To: | |
| | | From:<br>To: | |
| | | From:<br>To: | |
| | | From:<br>To: | |

Signature of Witness

Dated: 8·17·02

Lori L. Morrow, RPR