ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**********************************************

L. W. Matteson, Inc.,

Plaintiff,

v.

No. 01-5420
(Judge Wilson)

The United States,

Defendant.

**********************************************

**DEPOSITION OF**

**LARRY W. MATTESON**

Taken July 24, 2002
Scheduled for 9:00 a.m.

Reported By: Lori L. Morrow, RPR
PARADIGM REPORTING & CAPTIONING INC.
1400 Rand Tower, 527 Marquette Avenue South
Minneapolis, Minnesota 55402 * (612)339-0545
1(800)545-9668 * Fax (612)337-5575

Deposition of LARRY W. MATTESON, taken on the 24th day of July, 2002, commencing at 9:12 a.m., at the Offices of the US Army Corps of Engineers, St. Paul District, Army Corps of Engineers Centre, 190 Fifth Street East, St. Paul, Minnesota, before Lori L. Morrow, RPR, Notary Public in and for the State of Minnesota.

**APPEARANCES:**

On Behalf of the Plaintiff:

STEPHEN R. MILLER, ESQUIRE
DIANE MILLS, ESQUIRE
Miller Law Firm
4310 Madison Avenue
Kansas City, Missouri 64111
(816) 531-0755

On Behalf of the Defendant:

PATRICIA M. MCCARTHY, ESQUIRE
Department of Justice
Commercial Litigation Branch
Civil Division
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0164

OF COUNSEL:

EDWIN C. BANKSTON, ESQUIRE
District Counsel
U.S. Army Corps of Engineers
Army Corps of Engineers Centre
190 Fifth Street East
St. Paul, Minnesota 55101-1638
(651) 290-5500

ALSO PRESENT: Lawrence W. Matteson

NOTE: The original transcript will be delivered to Patricia M. McCarthy, Esquire, pursuant to the applicable Rules of Civil Procedure.

**INDEX**

**WITNESS:**

Larry W. Matteson

**EXAMINATION BY:** **PAGE:**

Ms. McCarthy...............6

**OBJECTIONS BY:**

Mr. Miller.................13, 14, 18, 22, 26, 31, 33, 36, 38, 48, 59, 60, 61, 63, 64, 67-68, 69, 73, 74, 76, 84, 98, 107 109, 111, 112, 115, 120, 137, 138, 140, 141, 144, 146, 153, 161, 162, 163, 164, 165, 167, 188, 189, 217, 219, 221, 226, 227, 230

**EXHIBITS MARKED AND REFERRED TO:** **PAGE:**

31..7/18/96 Letter to Tony Foster from Larry Matteson re: Grand Encampment Excavation and Fax Cover Sheet.............90

32..8/29/96 Letter to Larry Matteson from Contracting Officer re: Grand Encampment Excavation.....99

33..9/4/96 Letter to Contracting Officer from Larry Matteson ............102

34..7/31/00 Letter to Frederick Mitchell from Larry Matteson....102

35..10/2/87 Letter to Larry Matteson from Mark Jarstad............158-160, 161

36..Agreement Between L.W. Matteson and Clifford Wilson and John Danckwart.......................160

37..Purchase Agreement dated 8/16/96....172-176

**(EXHIBITS, CONTINUED:)**

38..Saunderson Property Land Purchase...176

39..9/19/96 Letter to Tony Foster from Lawrence Matteson..........177

40..10/3/96 Letter to Melissa Gulan from Larry Matteson.............180

41..9/00 Letter to Frederick Mitchell from Larry Matteson with Attachments.....................199

42..Plaintiff's Answers to Defendant's First Set of Interrogatories and Defendant's First Request for Production of Documents..203-204, 210

43..Complaint...........................204

44..Fax Cover Letter dated 3/17/97 to Melissa Gulan from Larry Matteson........................212

45..Undated Letter to Larry Matteson from F.J. Mitchell Denying Matteson's Claim with Summary of Claim and attachments........216-224

46..8/8/97 Letter to Cpt. Randy Glaeser from Larry Matteson.............225

47..6/5/98 Fax Cover Letter to Melissa Gulan from Bruce Stephenson forward copies of 6/98 Letter to Larry Matteson from Tom Koopmeiners and 5/13/98 Letter to Larry Matteson from Randall Fisher.........................229

(NOTE: The Original Exhibits are in the possession of Counsel for the Plaintiff Stephen Miller at the Miller Law Firm.)

**EXHIBITS PREVIOUSLY MARKED AND REFERRED TO HEREIN:**

1...Construction Project Documents for Grand Encampment Excavation, dated July 1996 ......8-15, 28, 82, 92, 97, 108, 118, 219

Gulan Exh. 22:
7/25/97 Memo for Office of Counsel...28

Tapp Exh. 10:
Daily Record of Events...............215

**INDEX TO CERTIFIED QUESTIONS:**

Page 70, Line 6 through Line 23:

BY MS. MCCARTHY:
Q. When you filed your bid, did you understand the provisions of this contract?
A. I believe so.
Q. Did you have an understanding as to what subsection (b) meant?
A. I believe so.
Q. And did you believe that it would be inoperative if a dispute would arise under the contract?
A. I believe that if there was a conflict between what I was told and what I used and what I took faith in when the people came out and made the representation of those site investigations, I believe that those people and their word and their encouragement would be, you know, I would be treated fairly in light of those representations. Yes.
Q. But so your understanding was aside from what the contract actually says?

LARRY W. MATTESON,

duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. MCCARTHY:

Q Good morning, Mr. Matteson.

A Good morning.

Q As you probably know, I'm Patricia McCarthy with the Department of Justice. And as I know you know, with me here is Ed Bankston from the U.S. Army Corps of Engineers. Would you please state your name and address for the record?

A Larry Wayne Matteson, M-A-T-T-E-S-O-N, 9332 Lakeview Circle, Burlington, Iowa.

Q And, Mr. Matteson, are you for ease of reference in comparison to your father, are you sometimes called, albeit incorrectly, Larry Junior?

A Yes.

Q Are you currently employed, Mr. Matteson?

A Yes, with L. W. Matteson, Incorporated, as vice president and secretary.

Q For how long have you held those positions?

A Since probably 1975.

Q What is L. W. Matteson's principal line of business?

A Marine construction and dredging.

Q Have you entered into government contracts?
A Yes.
Q Approximately how many government contracts have you entered into?
A All kinds of governments?
Q (Nods head.)
MR. MILLER: Was the question how many with the federal government?
BY MS. MCCARTHY:
Q Yes. Thank you. Approximately how many federal government contracts has L. W. Matteson entered into?
A I would say probably 30 to 35.
Q When was the first government contract? What was the name of the first federal government contract?
A The first federal government contract that I can remember would probably have been a guide wall repair job for the Rock Island Corps District, and I believe that would have probably been somewhere around '77, something like that, '75 to '77, in that range.
Q With how many federal agencies have you entered into contract? By you, I mean L. W. Matteson.
A Right. I believe it would just be two. I'm not sure if we've ever worked for the Fish & Wildlife directly. But we've worked for the Corps of Engineers and the Bureau of Reclamation. But we may have worked

for the Fish & Wildlife.

Q Mr. Matteson, I'm going to ask you to take a look at what's been marked as Exhibit 1. Are you familiar with the document that's been marked as Exhibit 1, Mr. Matteson?

A I recognize it, yes.

Q What is it?

A It's a specification book, I believe, for the Grand Encampment project.

Q When did you first become aware of the Grand Encampment project?

A I would assume sometime around in July of 1996.

Q And how did you become aware of the project?

A I would have received a solicitation notice.

Q Tell me the process that you received the solicitation notice.

A I think back then solicitation notices came out to prospective contractors in the mail.

Q And do you have any understanding as to how you came to receive notices as a prospective contractor?

A It's a registration process with the federal government.

Q Upon receipt of this notice, what was your reaction?

A I believe we sent it back and requested to be

sent back plans and specifications.
Q And what were you sent in response to your request?
A Probably something similar to this and a set of plans.
Q Drawings or plans?
A Uh-huh.
Q And they are not included in Exhibit 1. Is that correct?
A No.
Q Why did you request the specifications and plans and drawings?
A It's necessary if you wish to place a bid to get information about the projects.
Q And why did you wish to place a bid?
A Because it involved dredging, and it involved dredging of the island disposal areas -- or an island disposal area, a project similar to two projects that we had done previously.
Q And what were those two projects to which you're referring?
A Crat's Island and Reed's Landing.
Q With regard to Crat's Island, did you enter into a contract with the Army Corps of Engineers?
A Yes.

Q And what year did you enter into that contract?
A I believe it was 1987.
Q What was the scope of work for that contract?
A It was removing I don't know how many -- I can't recall how many yards, cubic yards of sand from the Crat's Island temporary disposal site and transporting them to a disposal site on the southwest edge of Wabasha, Minnesota.
Q Did the 1987 contract call for removal to one disposal site or more than one disposal site?
A One.
Q What was --
A No, no, I'm sorry. It had two. Actually, it ended up there was three. There were two designated by the government in the initial contract, and then subsequently, there was another site developed. There was a site at the marina that held the minimum amount of yardage, not a great amount of yardage. And then there was a site out by Highway 61 that held the vast majority of the material. And then after receiving the contract, there were some issues with a local landowner, and I'm not real clear on how this transpired, but if I remember correctly, he had some control over the pipeline, and in order to settle the differences that he and the Corps of Engineers had over the pipeline route, there was some

material placed on his property.

Q So of these three sites that you mentioned, the one at the marina, was that the government designated site?

A The marina and the one out by Highway 61. I believe it's Bob Konner who owned that site.

Q Did you understand the first two sites designated by the government to be mandatory sites or optional sites?

A Mandatory.

Q Did you obtain any permits in connection with using those sites?

A No.

Q What about the third site, how was that site designated?

A I'm not sure what you mean there.

Q You mentioned the third site --

A Right.

Q -- involving issues with a local landowner.

A Uh-huh.

Q Do you have a name for that site that you use?

A We could call it the Wilson property.

Q Okay. How did the Wilson property come to be a disposal site within this 1987 contract?

A As I stated earlier, there was a conflict

between the Corps and Mr. Wilson about a pipeline route, and he claimed -- now, this is all -- I'm not real clear on what transpired. But I know that he and the Corps worked on an arrangement that he wasn't going to allow the pipeline route to go adjacent to his property or on his property unless he got this sand. And there was some issues there, and the Corps did whatever the Corps does and got the material placed on his property.

Q Did you have any involvement in obtaining permits for disposal on the Wilson property?

A No.

Q There was a second project that you mentioned, the Reed's Landing project. Did you enter into a contract with the Army Corps of Engineers on that project?

A Yes.

Q What year did you enter into that contract?

A I believe it was 1995.

Q And what was the scope of work for the Reed's Landing contract?

A There's a temporary disposal site for hydraulic dredging on Reed's Landing, on the island, and we transported that material to a disposal site at the north end of Wabasha. It's an old abandoned gravel pit.

Q Did you dispose of any material on any other

sites under that contract?

A I don't believe so.

Q And did you understand that site to be a mandatory site or an optional site?

A Mandatory.

Q Were you involved in obtaining any permits for that site?

A No. Let me say that I'm not sure whether those contracts included the clause where if the contractor finds a beneficial use that he has the option of taking the material. They may have.

Q To the extent that those contracts did not include that clause, would you regard that as being different or similar to the solicitation that's marked as Exhibit 1?

MR. MILLER: Object to the form of the question as vague and ambiguous. If you understand it, you can answer it.

THE WITNESS: You're saying if we assume that it didn't have that clause in it?

BY MS. MCCARTHY:

Q Assuming that the clause did not appear in either one of those contracts, in your view would those contracts be similar or different than the solicitation that's marked as Exhibit 1?

MR. MILLER: Same objection, vague and ambiguous.

THE WITNESS: This clause had an option. I'm certain of that.

BY MS. MCCARTHY:

Q I think you mentioned in your earlier testimony -- you're pointing to Exhibit 1. Is that right?

A Right.

Q I may be mistaken, but I believe you testified earlier that this project that you received the solicitation that's been marked as Exhibit 1 describes a project that's similar to the two prior projects.

A Yes.

Q In what sense did you mean that they were similar?

A Well, all three of them involve removing material from a temporary island hydraulic dredge disposal sites or mechanical -- channel maintenance disposal sites and transporting that material to its final resting spot.

Q Did you perceive any differences between the project which the solicitation marked as Exhibit 1 described and the prior two contracts that you had?

A Yes.

Q What were the differences that you perceived?

A This particular project was set up much more in line to be a mechanical dredging project given the distance involved and the character of the disposal sites specified or made available to the contract.

Q And what's the basis for your determination that this was set up as a mechanical dredging project?

A Like I said, the size and character and location of the disposal sites.

Q Is there anything else that causes you to conclude that this was a mechanical dredging project?

A I don't know.

Q If I could ask you, Mr. Matteson, if you would turn your attention to Exhibit 1. Now, the beginning of Exhibit 1 has some amendments, does it not, sir?

A Yes.

Q What do you understand these amendments to be?

A After the specifications are delivered to contractors, sometimes there are changes made between the time the specifications are delivered and the time of bid date, and these are the changes that are made.

Q And if I could turn your attention to page 30-105. I believe it's Amendment 4, which it probably should be -- I think they go in reverse order, so it should probably be at the top. Amendment 1, number 4.

Do you see that number in the bottom is 30-105?
A Yes.
Q Could you read the notation that appears in the description, the section 14 description, the bid opening date? Do you see that there, sir?
A The bid opening date for the solicitation remains at 11:00 a.m. 29 August '96.
Q Was that your understanding of the bid opening date?
A Yes.
Q And to your knowledge, did the bid opening date change after this modification?
A Not to my knowledge.
Q Did you in fact make a bid on August 29?
A I believe so.
Q Can you tell me the process by which you made your bid?
A I think I hand delivered it.
Q On what day?
A On August 29.
Q Do you recall the time of day that you --
A Prior to 11 a.m. For some reason, I thought it was an afternoon bid time. But it says 11 a.m., so.
Q If I could turn your attention, sir, to page, if you look at the bottom of this exhibit, 00100-1. If I

could draw your attention to the top. It says, section 00100, Instructions, Conditions and Notices to Bidder. Do you see that there, sir?

A Yes.

Q Now, prior to submitting your bid on August 29, did you read this page in the solicitation?

A Yes, I believe I did.

Q And the first section is 52.252-1, Solicitation Provisions Incorporated by Reference. Do you know what that number 52.252-1 means? Do you know what that refers to?

A No, I do not.

Q Are you familiar with the federal acquisition regulation?

A No.

Q Could you read into the record the first provision that's listed under 52.252-1?

A This paragraph right here?

Q Yes.

A "The solicitation incorporates one or more solicitation provisions by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available."

Q When you read that provision, how did you

interpret that provision?

A That the standard rules in the F.A.R. regulations would apply.

Q So you're familiar with F.A.R. then, the term F.A.R.?

A I'm familiar with the term F.A.R., yes.

Q Do you recall during the course of preparing your bid for this contract ever looking up F.A.R. provisions?

A No.

Q Did you have an understanding of the F.A.R. provisions that were incorporated by reference in the solicitation?

MR. MILLER: Objection to the question as vague and ambiguous, also lack of foundation.

THE WITNESS: Would you repeat that question, please?

BY MS. MCCARTHY:

Q Well, I'll establish the foundation. Do you know if there are any F.A.R. provisions that are incorporated by reference in the solicitation?

A Isn't that what this sentence says?

Q I'm asking you.

A I believe that's what this sentence says, that they are incorporated.

Q Did you have an occasion prior to submitting your bid to go and refer to any F.A.R. provisions that are incorporated by reference in the solicitation?

A No, I did not.

Q Were you familiar with the contents of the F.A.R. provisions that are incorporated by reference?

A I'm not sure I would say I'm familiar, but I -- I guess I would say I'm not familiar with them.

Q But you did in fact read this paragraph that you just read into the record?

A Yes.

Q And did you understand what it meant when you read it?

A Yes.

Q If I could draw your attention down to the bottom half of the page under the heading Inquiries. Subparagraph A says, "Technical questions on plans and specifications should be directed to the St. Paul District to Anthony Foster," and there's a telephone number listed. Did you have any technical questions on plans or specifications?

A Yes.

Q Did you direct them to Mr. Foster?

A Yes.

Q And what were the technical questions that you

had?

A The initial question upon receiving the plans and specifications, I believe it was I who called Anthony and asked him if it would be possible that -- the project appeared to be a distinctly mechanical dredging project or mechanical transfer project and asked him if the Corps would be interested in a hydraulic alternative.

Q And what was Mr. Foster's response, if any?

A Well, Anthony said he would look into it and either he or someone else would get back with us.

Q Did anyone from the Corps ever get back to you?

A Yes.

Q Who got back to you?

A I'm not sure. It was either Anthony or Dan Kromholtz.

Q And when they got back to you, what did they communicate to you?

A They encouraged us to pursue a disposal site and bid the job hydraulically, an alternate disposal site.

Q When you read the solicitation, did you understand there to be any prohibition against the use of hydraulic dredging as the solicitation is written?

A I don't recall whether there were any distinct prohibitions against hydraulic dredging.

Q So what caused you to make the inquiry to

Mr. Foster?

A As I stated earlier, the characteristics of the job as it was initially designed were much more conducive to a mechanical transfer of the material. The number of disposal sites, the location of the disposal sites, the distance of the disposal sites from the Grand Encampment site, you had to go through a lock or dam. There was a dam between the Grand Encampment site and the Alma disposal sites. All of these things were big impediments to a hydraulic dredging site.

Q So in what manner did either Mr. Foster or Mr. Kromholtz encourage you to get a disposal at this site?

A I don't understand that question. I mean, in what manner do you mean?

Q Well, I think you testified that they encouraged you --

A Right.

Q -- when the Corps got back to you that they encouraged you to --

A Right.

Q -- obtain a site and bid on the project. Is that correct?

A Right.

Q And how did they do that?

A They said locate a disposal site or multiple disposal sites, and they would come out and do prebid site investigations and let us know in their opinion if it would work.

Q Now, upon reading the solicitation, did you understand there to be any provision for you to do that, the solicitation as written?

MR. MILLER: Object to the form of the question as vague and ambiguous.

THE WITNESS: If I recall, there was a provision in here for alternative disposal sites.

BY MS. MCCARTHY:

Q If there was a provision for alternative disposal sites, what prompted your call to Mr. Foster?

A As I said, the project was distinctively set up as a mechanical project. I mean, anyone that looked at it that was in the dredging business knew what the project involved. And if they didn't want it to be a hydraulic job and saw some big impediment, the character of the material that was going to be excavated would not lend itself to hydraulic, that type of thing, then I didn't want to pursue it.

Q Were you concerned that if you had bid the project as a hydraulic project without contacting them

that your bid might be potentially unresponsive?
A I'm not sure.
Q When you submitted your bid on August 29, did you regard your bid as nonresponsive?
A No.
Q Were there any modifications made to the solicitation, to your knowledge, following your inquiry to Mr. Foster?
A I don't believe so.
Q How would the character of the material affect whether it could be disposed of hydraulically or mechanically?
A Well, several things. If there were fine grain materials in there, it doesn't lend itself to meeting water quality standards and that type of thing on your affluent coming out of your disposal site. If there's a lot of debris, a lot of rocks. If the Corps had knowledge that the island had not been cleared prior to the placement of the material in that site, then you encounter a lot of roots, stumps, bent over trees, that type of thing that do not lend itself to hydraulic dredging.
Q Did you speak to either Mr. Foster or Mr. Kromholtz about the character of the material?
A No. I was primarily concerned with the disposal

sites.

Q Can you tell me the substance of your communication generally with Mr. Kromholtz or Mr. Foster?

A Well, what I stated when I talked to Dan was, you know, historically, mechanical transfer of these disposal sites is considerably more expensive than hydraulic transfer. We have records to prove it. Dan knew it. And when I talked to Dan, I said, if we can find a disposal site within reasonable proximity of the Grand Encampment site -- the Alma site, that was going to be mechanically -- there was no way to deal with that on a hydraulic basis -- that we could save the government money.

Q And what was Mr. Kromholtz's response to this --

A He encouraged that. I mean, his goal was to do it in the most efficient manner and the least expensive manner possible.

Q Did Mr. Kromholtz express any concern about having to modify the solicitation in order to accommodate that?

A No.

Q In your experience as a federal government contractor, had you ever submitted a bid in which you have proposed disposal sites?

A I don't believe so.

Q So this was the first time Matteson had ever submitted a bid in which there was proposal of disposal sites?

A I believe so.

Q The fact that you were proposing disposal sites for the first time, did that cause you to have any sort of apprehension?

A Once we had the Corps come out and inspect the sites, yeah. I mean, you have apprehension every time -- I mean, any time you -- yes, it did.

Q What did you do to address your apprehension?

A We had the Corps of Engineers come out and inspect the sites along with various agencies that they brought with them. U.S. Fish & Wildlife, I believe was there. The Minnesota DNR was there. The typical agencies that are involved in a permit of this type.

Q Did you, after having these meetings with the Corps, did you perceive any risks associated with submitting a bid in which you were proposing disposal sites?

A At that time, we thought we had all our bases covered as far as the permitting process.

Q So could you describe the level of risk, if any, that you ascribed to the disposal sites that you were proposing?

A We were comfortable enough with the situation to go ahead and submit a bid. We thought that at that time that we had the people that had done the site investigations necessary to achieve a successful permit application.

Q Did you feel that all risk had been eliminated by the time you had submitted your bid?

MR. MILLER: Objection. The question was asked and answered previously.

THE WITNESS: I don't know.

BY MS. MCCARTHY:

Q Did you build into your bid any account for risk?

A For the risk of not getting a permit?

Q Yes.

A No.

Q If I could turn your attention, sir, to page 00100-3, and there's an item listed 12, and it says 52.2416, "Explanation to Prospective Bidders (April 1984)." And then underneath in parentheses, it says, in reference 14.201-6C, end of parentheses. Do you see that there, sir?

A Yes.

Q Do you know what that means?

MR. MILLER: Object to the form of the

question. It's vague.

THE WITNESS: I assume it's referring to a F.A.R. regulation.

BY MS. MCCARTHY:

Q Prior to submitting a bid, did you read this page of the solicitation?

A No.

Q Did you not read this page of the solicitation?

A No.

Q At the time --

MR. MILLER: You're talking about the page of the solicitation where the F.A.R. regulation itself --

BY MS. MCCARTHY:

Q The page 00100-3, did you read this page of the solicitation?

A I'm not sure.

Q You don't have any specific recollection today that you read this page of the solicitation?

A Right.

Q Do you have any specific recollection that you read 52.214-6, Explanation to Prospective Bidders?

A I'm reasonably certain that I didn't read that.

Q Do you have any general familiarity with the contents of Explanation to Prospective Bidders that is

set forth in 52.214-6? Did you have any general familiarity with the contents at the time you submitted the bid?

A As my understanding, that refers to the site investigations and that type of thing.

Q Mr. Matteson, if I can have you turn to the Gulan Exhibit 22, the third page of this exhibit. Do you see there's 52.214-6, "Explanation to Prospective Bidders" there?

A Yes.

Q And it reads under there, the first wording that appears underneath that is "As prescribed in 14.201-6(c)(2)" --

A Yes.

Q -- "insert the following provision."

A Yes.

Q And do you see, turning your attention back to Exhibit 1, page 00100-3, there's a reference there to 14.201-6(c). Do you see that?

A Yes.

Q And do you see that also the reference on that page, 00100-3, says, "Explanation to Bidders," and then there's in parentheses "April 1984." Do you see that?

A Yes.

Q And then on this page here, it says,

"Explanation to Prospective Bidders," and it also has in parentheses "April 1984." Do you see that there, sir?

A Yes.

Q Now, this provision states, "Any prospective bidder desiring an explanation or interpretation of the solicitation, drawings, specifications, et cetera, must request it in writing soon enough to allow a reply to reach all prospective bidders before the submission of their bids." Did you ever submit an explanation in writing to -- or did you ever seek an explanation in writing to Mr. Foster?

A An explanation of what?

Q Of the solicitation, drawings or specifications, et cetera.

A I did not submit any questions in writing.

Q That provision goes on, quote, "Oral explanations or instructions given before the award of a contract will not be binding." Did you have an understanding that prior to submitting your bid that oral explanations or instructions given before the award of the contract will not be binding?

A If you're asking that the affirmation or encouragement and the oral approval of the site investigation was not binding, no, I did not consider that not binding.

Q Had you read the explanation to prospective bidders by the time you submitted your bid?
A I'm familiar with this. This used to be all -- these all used to be printed out in the old specifications, and we used to read through them. Yes. I've seen this paragraph before.
Q Were you mindful of this paragraph when you submitted your bid?
A Yes.
Q What interpretation did you give this paragraph in the context of submitting your bid?
A The people that came out on site made their investigation and told me that they understood that -- or in their opinion, our disposal sites were permittable.
Q Permittable to whom?
A To their individual agencies.
Q Did you understand that any agency was representing that the site should be permittable to other agencies?
A I believe that there was one agency that was not on site, that it was indicated that we shouldn't have a problem with them, and that was the MPC. I believe it's Minnesota Pollution Control or something.
Q So you understood that each agency was speaking for itself?

MR. MILLER: Objection, misstates his testimony.

THE WITNESS: No. I believe that there was an indication given by the people on site that, in their experience, the site would be acceptable to all the necessary permittable agencies, permit agencies.

BY MS. MCCARTHY:

Q But did you understand that their oral explanations or instructions would not be binding?

A No, I did not understand that their opinions would not be binding.

Q How could you reconcile that understanding with your general familiarity in the context of 52.214-6?

A Because I was aware that there was another contractor doing the same thing we were doing and that the Corps was encouraging us to do so.

Q And by doing that, that made the oral explanations binding under 52.214-6?

A I believe so, yes.

Q Can you tell me the thought process that you underwent to reach that conclusion?

A Let's just say that there have been a lot of questions over the years asked prior to bid date and answered orally, that answering questions in writing to

all prospective bidders is not the standard operating procedure regardless of what that F.A.R. regulation says. Those prebid meetings, site investigations, mandatory site investigations are made all the time, and oral instructions are made to prospective bidders at those site investigations. And written detail of those explanations are not issued.

Q If I understand your testimony, the historical course of dealing in practice has rendered this provision inoperative, 52.214-6, in your view?

A I'm saying that it's common practice that that paragraph is ignored, yes, in the bidding process.

Q In submitting your bid, did you factor in any risk for the possibility that this provision would not be ignored at some future point, perhaps in litigation?

A Well, the only way to factor in that provision is not to have bid on it. I mean, you either take the people that came out and made the site visit and encouraged you to bid on it at their word, at their -- or you don't bid on it. There's no middle ground here, in my opinion.

Q Was your decision to bid, would you characterize that as a business judgment?

A No.

Q What kind of judgment would you characterize it

as?

A I'm not sure I understand the different kinds of judgments that you're referring to.

Q Well, why did you submit a bid on the contract?

A We bid on the contract because we're a hydraulic dredger, and it was presented to us that hydraulic dredging was a viable alternative to the original plan.

Q Did you perceive that bidding on the contract would benefit your business?

A Yes.

Q You weren't compelled to submit a bid, were you?

A No.

Q You made a decision to submit a bid on your own free will. Is that correct?

A Yes.

Q Did you make a judgment to submit a bid in the course of your business?

A We made a decision to bid, yes.

Q So how is your judgment to submit a bid not a business judgment?

MR. MILLER: Objection, argumentative. Also, the question is vague and ambiguous.

THE WITNESS: I'm not sure how it's not a business judgment.

BY MS. MCCARTHY:

Q You don't like the term business judgment?
A I'm ambivalent about that term.
Q Now, Mr. Matteson, you previously testified that the fact that other bidders were bidding for the contract affected your interpretation of 52.214-6. Could you explain that, how the presence of other bidders affected your interpretation?
A I was aware that the Corps made site investigations on behalf of another contractor that intended to bid the job hydraulically as well.
Q And how did you become aware of that information?
A The landowner of that particular site, I believe, informed us of that.
Q And how specifically did that affect your interpretation of this provision?
A Of which provision?
Q 52.214-6.
A How did it change my interpretation of it?
Q Yes.
A I don't think it changed my interpretation.
Q Okay. Just wanted to clarify that. This provision 52.214-6 goes on to state, "Any information given any prospective bidder concerning a solicitation will be furnished promptly to all other prospective

bidders as an amendment to the solicitation if that information is necessary in submitting bids or if the lack of it would be prejudicial to other prospective bidders." Do you have any interpretation, or did you have interpretation at the time you submitted your bid as to what that phrase "prejudicial to other prospective bidders" means?

A I assume it would mean put them at a disadvantage.

Q Did you understand generally that the Corps was subject to procurement laws and regulations?

A Yes. In the specifications for the standard project, it says that the contractor may obtain alternate disposal sites. It doesn't say that those disposal sites need to be made available -- or pardon me. In most instances, it wouldn't be required that the contractor make other contractors aware of those other disposal sites.

Q You're way ahead of me, Mr. Matteson. Just a simple question. Did you understand that the Corps was subject to federal procurement laws and regulations?

A Yes.

Q And that part of those laws and regulations provide that the Corps treat all bidders fairly?

A Yes.

Q And that those procurement regulations also required the Corps to award the contract to the lowest responsive bidder. Is that correct?
A I believe so.
Q And if the Corps did not issue the contract or award the contract to the lowest responsive bidder, then it could be subject to a bid protest by disappointed bidders. Is that correct?
A I believe so.
Q And as the low bidder, if the Corps had not awarded you the contract, would you have contemplated filing a bid protest?
MR. MILLER: Objection, calls for speculation. Those facts never occurred, therefore, calls for the witness to speculate.
THE WITNESS: I don't know.
BY MS. MCCARTHY:
Q If the Corps had decided to award the contract to the lowest bidder whom you perceive as using mechanical means, would you have filed a protest under those circumstances?
MR. MILLER: Same objection. Those facts never occurred and the question asked for the witness to speculate on what he might have done five years ago under a different set of facts.

It's impossible for him to answer.

THE WITNESS: I don't know.

BY MS. MCCARTHY:

Q Have you ever filed a bid protest?

A Yes.

Q What were the circumstances under which you filed a bid protest?

A It had to do with a job that was set aside for small business, and the contractor that was the low bidder was not a small business.

Q So you perceived in that particular instance that you were not being treated fairly under the applicable procurement laws and regulations. Is that correct?

A I'm not sure that that's correct. I just felt that it wasn't fairly -- it's just that the party that was the low bidder was not a small business. There's no fair or not fair. It was just the job was reserved for small businesses.

Q So the awardee did not receive the award and --

A Yes, he did.

Q In compliance -- excuse me. Let me finish the question. In compliance with, in your view, with the applicable laws and regulations?

A The contractor awarded the job was not a small

business. He was deemed not a small business. The award was made and upheld to him, to that contractor.

Q And you took issue as to whether the awardee was a small business?

A Yes, we protested his not being a small business.

Q Is that the only bid protest you've ever filed?

A I believe so.

Q Nonetheless, Mr. Matteson, you're familiar with the rights and remedies of protesting bidders based on your experience, are you not?

MR. MILLER: Objection, vague and ambiguous.

THE WITNESS: I'm not sure that would be accurate.

BY MS. MCCARTHY:

Q Have you filed any other protest with the GAO?

A Not that I can remember.

Q You haven't filed one against the Corps in the past couple of months?

A I don't recall.

Q Mr. Matteson, if I could turn your attention to page 00100-4. Let me draw your attention to item 21, which is 52.216-1, "Type of Contract." Did you understand that the solicitation called for firm

fixed-price contract?
A It was unit priced if that's what you mean, yes.
Q What do you understand a firm fixed-price contract to mean?
A That means you bid a -- the total at the bottom of the page is within so many percent of the ways as what the contract will end up.
Q And what is your understanding -- do you know what a cost reimbursement contract is?
A I assume by its terminology or its name, it would be what I would call cost plus, a contractor's cost plus overhead and allowable profit.
Q And what in your view is the difference between a firm fixed-price contract and a cost plus contract?
A One is a known contract value, and one is not.
Q What's the significance of that difference between having a known contract value and not having a known contract value? What's the difference in your view?
A One is fixed price, and one is not.
Q From the perspective of the contractor, how does the presence of a fixed price affect your bid, if any?
A I don't understand the question.
Q Well, if your costs, if you're bidding a fixed-price contract, and your contract performance costs

should exceed the amount of the ceiling price of the contract price, who in your view assumes the risk of that overrun, the contractor or the government, under a fixed-price contract?

A That depends on the cause of those overruns.

Q Assuming that there is no equitable adjustment in the ceiling price.

A It's probably the contractor's.

Q In submitting your bid, did you take into consideration any risk of cost overruns to come up with your bid price?

A We took into consideration our historical production and cost rates for this type of work, yes.

Q Did you take into consideration any risk that you may not be able to achieve your historical performance?

A I don't recall.

Q Is there any reason why you would not take into consideration any risk that you may not be able to achieve your historical cost performance?

A Would you repeat that, please?

MS. MCCARTHY: Would you read that question back, please?

COURT REPORTER: "Is there any reason why you would not take into consideration any risk

that you may not be able to achieve your historical cost performance?"

THE WITNESS: The project as we bid it was a simpler project as far as distance involved than the previous two projects we had performed before in Wabasha County. If you're asking me if there's reason we didn't, I don't know that, or why I wouldn't have.

BY MS. MCCARTHY:

Q In your view, the statement of work for the Grand Embankment contract was simpler than the statements of work for the prior two contracts that you referred to?

A As we had the project laid out, it was shorter distance.

Q And that would lead to lower costs?

A There were time intervals and that type of thing. It would have led to comparable production in our estimation.

Q Now, the prior two contracts you're referring to, the Crat's Landing contract and the Reed's Landing contract, you had not obtained disposal sites for those two contracts. Is that correct?

A That's correct.

Q And you testified that you had met with government officials prior to submitting your bid, and

you were hopeful that you could obtain the site that you were proposing. What amount of time, if any, did you assign to the permitting process in the process that would be necessary to obtain approval for use of that site?

A I'm not sure that we assigned a definite time. The project as it was laid out or the time allotted for the project was more than adequate for the hydraulic dredging operation and the creation of the disposal area. So the permitting process we have -- we have some experience in that permitting process in that we're aware of the timetables that it can be done in, and 60 to 90 days would have been a reasonable assumption. And with the Corps' support, projects like this could have been permitted in less than that.

Q What time did you actually build in in your bid for the permitting process?

A I'm not sure.

Q Did you build in any time?

A I would have to check my records.

Q But as you sit here today you don't know that you actually built in any time?

A I would suspect that we did, yes. It would have been reasonable to assume so.

Q You said you had some experience with permitting

processes. Can you tell me about that experience that you had?

A Well, not in achieving permits ourselves but in getting permits and being involved in customers' permit process.

Q Did any of those processes involve local permitting?

A Not that I'm aware of.

Q Prior to submitting your bid, had L. W. Matteson ever obtained a local permit for any project?

A I don't believe so.

Q When you submitted your bid for this contract, what percentage of profit did you assume in your fixed price?

A I don't recall.

Q Do you have any idea?

A Not without checking my records, no.

Q Do you have your records?

A No, I do not.

Q Do you know what happened to them?

A I assume they are back at the office.

Q But they can be obtained?

A I would think so.

Q In terms of assisting the customer obtaining permits, tell me exactly what did you do in the past.

You mentioned that you had some experience in assisting the customer. What did you do --

A No, I didn't say assisting. But I'm aware of customers getting permits, yes.

Q And by customers, you mean the Corps?

A No. Private customers.

Q Okay. And none of those private customers ever obtained a local permit?

A I know that the timetable involved was -- I know that some of them had achieved them in 90 days or less. We were discussing the timetable at that time.

Q Right. Do you know if there's any specific timetable for local permitting processes?

A No.

Q And did you factor a time factor for local permitting issues when you factored your bid in this contract?

A I'm not quite clear on what you mean by local permitting.

Q Well, I think you testified previously you had federal and state agencies visit the site?

A Right.

Q Did you have any local agencies visit the site?

A I interpreted those people as being the local agencies.

Q What caused you to interpret the federal and state agents --
A Because they're local. They're the Minnesota and the, you know, they're local area people.
Q Did you invite any county officials to visit the site?
A No.
Q Did you invite any --
A I didn't do the inviting.
Q Did you contemplate inviting any county officials to visit the site?
A When the site visits were set up, the Corps of Engineers representative, in my opinion, brought the people with him that were necessary to get the necessary permits to do the project.
Q Did you ask him if he had brought everyone necessary to --
A No, I did not.
Q Did he ever tell you he had brought everyone necessary?
A I'm not sure.
Q Did you ever invite any officials from any municipality to visit the site?
A No.
Q Is there any reason why you did not?

A Again, I thought the people necessary to get permits for this project were on-site at those site investigations.

Q And can you describe for me every single basis for that belief that you had?

A Because the Corps of Engineers brought them. They are the people that are involved in these projects on a daily -- the people that came to that project, Dan Kromholtz and Steve Tapp, are people that make arrangements for the dredge disposal sites. That's their business. And I assume that when they brought a team out to investigate a site that that team would consist of the people necessary to get a site approved.

Q Were you concerned that when selecting a site that you were dissimilarly situated from a governmental agency?

MR. MILLER: I don't understand the question.

THE WITNESS: I don't understand the question.

BY MS. MCCARTHY:

Q Well, was L. W. Matteson a governmental agency?

A No.

Q Were you concerned that maybe rules and regulations might apply to governmental agencies that

wouldn't apply to a private contractor?

A I'm not sure.

Q You may have been concerned, but you don't recall, or --

A We had done two other projects very similar to this project in Wabasha County for the Corps of Engineers. This was a Corps of Engineers project. The site that we had chosen or sites we had chosen were investigated by the Corps of Engineers and various agencies that they chose to bring to investigate those sites, and they were given verbal approval. In my opinion, we were good to go.

Q So you didn't take into account -- in those prior projects, the Corps had obtained those sites, had they not?

A Yes.

Q Did you perceive any distinction in your mind between the fact that you, L. W. Matteson, were obtaining the sites for the Grand Embankment contract and that the Corps had obtained the sites in the prior contracts? Did you ascribe any difference in your mind at that time?

A Well, the difference was we were acquiring the site. We had gone out and acquired the site, yes.

Q And did you consider that to be a material difference?

A Well, I mean, we were going to provide the site. That's different, yes.

Q Were you concerned that the purchase of this -- that the fundamental nature of the purchaser was different?

MR. MILLER: Object to the form of the question as vague and ambiguous.

THE WITNESS: Say that again, please.

BY MS. MCCARTHY:

Q Were you concerned that you as a contractor were acquiring the site and that different rules and regulations might apply to you?

A I don't know.

Q You don't know whether you were concerned? Is it possible you were concerned?

A I believe that the Corps of Engineers had given me reason to believe that I had their support and their approval for those disposal sites.

Q Well, what reasons did they -- what were the reasons that they gave you to believe that?

A By the comments they made during their site investigations and prior to bid date.

Q And did they tell you that they had verified the acceptability of these sites with the local authorities?

A No, they did not mention local authorities.

Q Did you make any contacts with local authorities to assure that there were no permitting requirements?
A I don't believe so.
Q Is there any reason why you did not do that?
A I'm not aware of any.
Q Did you contact local authorities to ensure that there were not any local permitting requirements?
A No.
Q Why did you not do that?
A As I've stated earlier, I thought that we had met all the permitting requirements by having the Corps of Engineers do a site investigation and invite the necessary people to get a permit.
Q That's an assumption that you made?
A Yes.
Q If I could turn your attention, sir, to page 00700-23. Do you have page 23?
A Yes.
Q Do you recognize this as the contracts disputes clause?
A At the bottom of the paragraph, the 52.233-1?
Q Yes.
A Yes.
Q And it continues on to page 00700-24 and then finishes on page 00700-25. Do you see that?

A Yes.
Q Are you familiar with the contracts disputes clause?
A I believe so.
Q Did you read the contracts disputes clause before you submitted the bid?
A I'm not sure reading would be an accurate terminology. It's a standard clause that's in all -- I believe it to be in all government contracts. I'm not sure whether I read it this particular time, but I have read it on occasion.
Q And the disputes clause indicates that this contract is subject to the contracts disputes act of 1978. Do you see that --
A Yes.
Q -- at the beginning? And have your prior federal government contracts been subject to the contracts disputes act, to your knowledge?
A I would suspect so, yes.
Q If I could turn your attention, sir, to the very last provision of the disputes class, section (i). It reads, "The Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the

Contracting Officer." Do you see that there, sir?
A Yes.
Q At the time you submitted your bid, how did you interpret that provision of the disputes clause?
A Again, at the time I submitted my bid, I cannot specifically say that I read this clause immediately prior to bidding.
Q Did you understand at the time you submitted your bid that you had a right to stop work on the project if a dispute should arise between you and the Government?
MR. MILLER: Are you suggesting there is such a right?
BY MS. MCCARTHY:
Q No. I'm asking if he interpreted there was such a right.
A My understanding of stopping work on a government project is that you run the risk of being deemed in default of the contract.
Q And you understood that at the time you submitted your bid?
A Yes.
Q If I could turn your attention to page 00700-27. If I could turn your attention to item 60, which is 52.236-2, which is a Differing Sites Conditions clause.

Did you read this clause before you submitted your bid on this contract?

A I have read this clause before. I wouldn't say that I've read it in detail. Typically, I scan these and look for anything that's significantly different than what I've encountered before.

Q Section (a) of the Differing Sites Conditions clause provides, "The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract." Did you in the course of performing this contract encounter any subsurface or latent physical conditions that differ materially from those indicated in the contract?

A In our claim for equitable adjustment, we have termed a problem in achieving disposal sites as a differing site condition. If you're asking did we encounter any subsurface or difference in the material which we were to excavate on Grand Encampment Island, no.

Q But this is the differing sites condition clause

that you understood to be in your contract. Is that correct?

A Yes.

Q Did you encounter any unknown physical conditions at the site of an unusual nature which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract?

A Which site are you referring to?

Q In any site.

A Any site?

Q Did you encounter any unknown physical conditions?

A Physical conditions, I don't believe so.

Q If I could turn your attention, sir, down to item 61, which is 52.236-3, it's entitled "Site Investigation and Conditions Affecting the Work." Are you familiar with this provision?

A Yes.

Q Did you read this provision prior to submitting your bid?

A Yes -- I read similar.

Q But you had actual knowledge of this provision at the time you submitted your bid?

A Yes.