Q Section (a) reads, "The Contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its costs, including but not limited to (1) conditions bearing upon transportation, disposal, handling, and storage of materials; (2) the availability of labor, water, electric power, and roads; (3) uncertainties of weather, river stages, tides, or similar physical conditions at the site; (4) the confirmation and conditions of the ground; and (5) the character of equipment and facilities needed preliminary to and during work performance." At the time you submitted your bid, did you believe that you had taken steps reasonably necessary to ascertain the nature or location of the work?

A Yes.

Q And did you investigate and satisfy yourself as to the general local conditions which can affect the work or its cost?

A Yes.

Q Tell me all the things that you did to satisfy yourself as to the general and local conditions which could affect the work or its cost?

A If I remember right, there was some pipeline

from Grand Encampment Island to where we hit the shore of the Minnesota shore. There was some pipeline route, peculiarities, and we investigated those thoroughly to see that we could, indeed, get a pipeline. I think we had to go underneath the channel and then come through a shallow area. We did a lot of investigation as to whether that was possible and then looked at the potential pipeline routes to the proposed disposal sites along with it. And then we investigated the Grand Encampment pile to see if it was, you know, debris laden or that type of thing.

Q Did you investigate all the general local conditions which can affect the work or the cost of your proposed disposal sites?

A I believe those would have been the local conditions that we investigated, yes.

Q But I think you just testified previously you didn't contact any local authorities about permitting requirements.

A That would not be, in my opinion, that would not be covered under this section.

Q And why is that, sir?

A Because these are physical conditions.

Q Is the word physical used in this clause?

A Yes.

Q Where is the word physical used?
A Right here. Uncertainties as to weather, river, stages or similar physical conditions. And then under all these are labor or physical conditions.
Q Now, the material that you just pointed to occurs after the words "including but not limited to." Is that correct?
A Say that again.
Q There's a clause in section (a) which says "including but not limited to." Did you see that there?
A Okay.
Q And the first appearance of any word physical occurs after the clause "including but not limited to." Is that correct?
A Yes, it is.
Q And there is no modifier of physical in the phrase the general and local conditions which can affect the workman's cost, is there? There's no modifier?
A No.
Q Is availability of a site a physical condition?
A Yes.
Q And just to clarify. Although you feel like you investigated and satisfied yourself as to the general and local conditions which could affect the work or the cost of your disposal sites, you hadn't contacted any

municipalities about permitting requirements?
A I don't believe so.
Q And you hadn't contacted any county officials regarding permitting requirements?
A No, I don't believe so.
Q Is the availability of labor a physical condition?
A I would determine it, yeah, it's the same as equipment or anything. It's a physical input to the project.
Q And obtaining permits for the availability of sites, would that be a physical requirement?
A I believe so.
Q How would the physical presence and availability of a site not be a physical part of the contract?
A The availability of the site when getting the permits to use it I don't consider would be a physical characteristic.
Q So having the availability of the site is not a physical condition?
A Availability of the site is, yes.
Q But you can't have the site be available without the permits. Isn't that correct, Mr. Matteson?
A I would disagree with that statement.
Q How?

A Because the site could be available for purchase or for use as it was in our case and not be able to get permits to use it. I mean, if there were no sites within proximity, none available for sale, then we wouldn't need a permit.

Q So you understood that this contract takes into -- it would contemplate available sites, they wouldn't necessarily be available under the contract; they would just be available generally?

A I didn't understand the question.

Q You don't understand limitation of this clause to apply to available sites under the contract?

A I still don't -- I don't understand what you're asking.

Q If the availability of a site is a physical condition, then how is the unavailability of a site due to a permitting problem not a physical condition under this contract?

A I don't consider it to be a physical condition. I mean, how it's not, I don't know that I can adequately explain that to you.

Q So the availability of a site is not a physical condition in your opinion?

A Yes. The availability of a -- the ability to get the permit for that site is not a physical -- that's

more of a legal condition in my opinion, for lack of a better description.

Q But the legal position prevents you from having the physical condition, does it not, sir?

MR. MILLER: Objection, argumentative, also asked and answered several times.

THE WITNESS: I don't know.

BY MS. MCCARTHY:

Q Is the sale of property a physical condition?

A I would consider that a legal transaction.

Q Section (a), the end of section (a) provides, "Any failure of the Contractor to take the actions described and acknowledged in this paragraph will not relieve the Contractor from responsibility for estimating properly the difficulty and cost of successfully performing the work or for proceeding to successfully perform the work without additional expense to the Government." How did you interpret that provision at the time you submitted your bid?

A I interpret it to mean that the contractor is responsible for doing the site investigation and determining what's necessary for him to -- what labor and equipment, that type of thing, he needs to bring to the job to adequately do the job.

Q If I could draw your attention back up to

subparagraph 2, "the availability of labor, water, electric power, and roads."

A Uh-huh.

Q If electric power became unavailable due to a legal transaction, would that remove the reference to electric power from the scope of this contractual provision?

MR. MILLER: Objection, vague and ambiguous.

THE WITNESS: I don't understand. What did you just ask?

BY MS. MCCARTHY:

Q If electric power were to become unavailable due to a legal transaction, would that mean that the contractor is no longer obliged to investigate the availability of water or electric power or roads, at least as to electric power?

A So you're saying if electric power was not available?

Q Because of a legal transaction.

A Okay.

MR. MILLER: Objection, vague and ambiguous.

THE WITNESS: I don't understand your question.

BY MS. MCCARTHY:

Q Well, let me make sure that I'm not misunderstanding your testimony. Your testimony is not that your duty to investigate and satisfy yourself as to the general local conditions which can affect the work or its cost, that it is not limited by any legal transactions that might affect all the items set forth in this clause?

MR. MILLER: Objection, vague and ambiguous.

THE WITNESS: I'm not understanding your question.

BY MS. MCCARTHY:

Q Well, did you understand that your duty to investigate and satisfy yourself as to the general local conditions which can affect the work or its costs that that included permitting issues?

A No, I did not think that -- well, the permitting, yes, I guess I did.

Q And you feel like you had investigated and satisfied yourself as to the general local conditions which can affect the work and its cost as to local permitting issues?

A Yes.

Q And how did you do that?

A By having the Corps of Engineers do a site investigation and bring all of the people that they felt necessary to get a permit with them the day of the site investigation or the days of the site investigation.

Q Did they bring any local officials with them?

A Yes.

Q Did they bring any --

A They brought the Minnesota DNR, the Minnesota Pollution Control Board people. Those are all local agencies.

Q Who work for the state?

A Right.

Q Did they bring any officials from a municipality?

A Not that I'm aware of.

Q Did they bring any officials from the county?

A Not that I'm aware of.

Q Did you express any concern about the absence of county and municipal officials?

A No, I did not.

Q But you feel that you had adequately investigated any requirements of a municipality and the county?

A Again, as I stated, I felt that the people on-site the day of the site investigations were the

people that the Corps of Engineers felt needed to be there to obtain permits to use those disposal sites.

Q If you were going to buy a house, would you want to investigate local -- by local, I mean municipal and county restrictions that may affect the purchase of the property?

A I've only bought two houses, and I don't know that any other case I did an investigation other than the title search. So I guess the answer to your question is, if I was going to buy a house, would I go to the county courthouse and investigate all of the different rules and regulations within the county that might affect buying a house? I doubt that that would happen.

Q But you performed the title search, did you not?

A The title search, yes. I had it done.

Q If I understand, you never satisfied yourself prior to submitting your bid that there would be no county or municipal requirements? You never affirmatively satisfied yourself?

MR. MILLER: Objection, asked and answered several times.

THE WITNESS: In my opinion, the people that were there the days of the site investigations were the people who were necessary for L. W. Matteson, Incorporated, to

obtain permits to use those disposal sites.

BY MS. MCCARTHY:

Q And that was an assumption you made based upon the presence or absence of certain people?

MR. MILLER: Objection, vague and ambiguous.

THE WITNESS: That was an assumption I made based on the presence of Dan Kromholtz and Steve Tapp, the people involved in going through this process on a regular basis.

BY MS. MCCARTHY:

Q If I could turn your attention to page 00700-28. This is 52.236-3, section (b), it states, "The Government assumes no responsibility for any conclusions or interpretations made by the Contractor based on the information made available by the Government. Nor does the Government assume responsibility for any understanding reached or representation made concerning conditions which can affect the work by any of its officers or agents before the execution of this contract, unless that understanding or representation is expressly stated in this contract." How did you interpret that provision -- first of all, did you read that provision before you submitted your bid?

A At some point prior to the bid, I'm sure I've

read that clause.
Q And how did you interpret that clause in the context of your reliance upon the meeting that you had with Mr. Kromholtz and others?
A Did I specifically -- you're asking me if I specifically thought of this, how did my -- when I -- my meeting with Dan Kromholtz and Steve Tapp and others, if I thought, well, how does what they are telling me relate to this paragraph?
Q Yes. That's exactly my question.
A Okay. I'm not sure that this specific paragraph came to mind.
Q Now, you feel you have reached an understanding with Mr. Kromholtz and others prior to submitting your bids. Would that be fair to say?
A Prior to bidding, it was my understanding through the site visitation by Dan Kromholtz, Steve Tapp and others that the disposal sites were going to be permittable.
Q Do you know if you believe it was their understanding?
A Yes.
Q Did you undertake any effort to have that understanding expressly stated in the contract?
A No.

Q Why not?
A I'm not sure.
Q Were you concerned about submitting a bid for a contract which expressly stated that, "The Government assumes no responsibility for any conclusions or interpretations made by the Contractor based on the information made available by the Government. Nor does the Government assume responsibility for any understanding reached or representation made concerning conditions which can affect the work by any of its officers or agents before the execution of this contract, unless that understanding or representation is expressly stated in this contract." Did you ascribe any risk from the presence of that provision in the contract when submitting your bid?
A No.
Q Why not?
A As I earlier stated, I was of the opinion that the people on-site had the ability to assure us that the sites would be permittable. They brought the people on-site that were -- that's their business, to investigate dredge disposal sites.
Q But did you understand that if they were incorrect that they would be assuming responsibility for that mistake? Did you understand that?

A That's kind of like having the cake and eating it, too. You know, they come out, and they tell you, yeah, you've got a good disposal site, we want you to bid it, we encourage you to bid it using that, but if it blows up in your face, we don't have any responsibility.

Q Well, Mr. Matteson, can you give me a circumstance under which you envision this clause applying that would not be the government having its cake and eating it, too?

A Let me restate an earlier statement that I made. The government makes verbal statements in site visits, mandatory and nonmandatory site visits, on a lot of projects. And the contractors use those statements in preparing their bids and rely on those statements.

Q With the understanding the government assumes no responsibility for that, correct?

A No, not with that understanding.

Q Well, what is the meaning that you ascribe to this provision?

MR. MILLER: Quit arguing with the witness on this issue.

MS. MCCARTHY: It's quite important, Mr. Miller. It's quite important. We need to know the witness' contemporaneous state of mind in submitting a bid for the contract.

MR. MILLER: I just want to note for the record I think this has been argumentative, it's been asked and answered numerous times. The record will reflect that. And this form of inquiry is just harassing the witness. It's calling for a legal conclusion the Court is going to draw anyway.

BY MS. MCCARTHY:

Q Mr. Matteson, did you authorize Mr. Miller to file a complaint in this action?

A What action? You mean our --

Q To institute this litigation, did you authorize Mr. Miller to file the complaint?

A The claim for equitable adjustment --

Q No. The complaint in the Federal Court of Claims. Did you authorize Mr. Miller to file the Complaint?

A Yes.

Q Did you authorize Mr. Miller to file his Amended Complaint?

A I believe so, yes.

Q How did you interpret the provision being at the time you submitted your bid?

A It says what it says. It says that the government is not responsible.

Q Did you believe that to be a possibility in this particular case, that the government would be assuming no responsibility?

A No, I didn't.

Q Did you ask the government to remove that provision from the contract?

A No, I did not.

Q Why not?

A I don't know why not.

Q Did you ascribe any risk to going forward with the bid with that provision in the contract?

A As earlier stated, I did not.

Q Did you assume that a court, if a dispute would arise that a court would review this provision as inoperative?

MR. MILLER: Objection, calls for speculation, beyond the witness' capacity to answer.

THE WITNESS: Would you restate that question, please?

BY MS. MCCARTHY:

Q Mr. Miller seems to be suggesting that you didn't understand the provisions of your contract. Was that your view when you submitted your bid, that you didn't understand the provisions of the contract?

MR. MILLER: Object to the form of the question. That's not what I said. The question is improper.

THE WITNESS: Can you restate your question?

BY MS. MCCARTHY:

Q When you filed your bid, did you understand the provisions of this contract?

A I believe so.

Q Did you have an understanding as to what subsection (b) meant?

A I believe so.

Q And did you believe that it would be inoperative if a dispute would arise under the contract?

A I believe that if there was a conflict between what I was told and what I used and what I took faith in when the people came out and made the representation of those site investigations, I believe that those people and their word and their encouragement would be, you know, I would be treated fairly in light of those representations. Yes.

Q But so your understanding was aside from what the contract actually says?

MR. MILLER: Let's move on.

THE WITNESS: So you're saying the

contract is not --

MR. MILLER: This is nothing but argumentative and harassing. The witness has now answered this ten times. I would like you to certify the transcript so that I can identify it for the Court if necessary. The Court will determine whether or not this provision bars recovery. And all the arguing by the Department of Justice isn't going to make any difference. The witness has answered the question to the best of his ability. He does not have to continue to sit and listen to badgering simply because the justice department doesn't receive an answer that it wants. Please certify that, beginning with the portion where this question was first asked to the witness.

BY MS. MCCARTHY:

Q Would you please answer the question, Mr. Matteson?

MR. MILLER: You may in answering the question, if it is the same answer you have previously given to the justice department, you may simply tell her that.

THE WITNESS: Yes.

MS. MCCARTHY: Mr. Miller, are you instructing him not to answer my question?

MR. MILLER: Absolutely not. I am not instructing him not to answer.

MS. MCCARTHY: I'm glad. We wouldn't want to have an instruction like that.

MR. MILLER: If he has already given you the answer, it is an appropriate answer for him to tell you that.

THE WITNESS: I believe I've already given you the answer.

BY MS. MCCARTHY:

Q Could you tell me what the answer is, because I don't recall what it was.

MR. MILLER: Could the court reporter read back the answer that was given by the witness?

COURT REPORTER: "I believe that if there was a conflict between what I was told and what I used and what I took faith in when the people came out and made the representation of those site investigations, I believe that those people and their word and their encouragement would be, you know, I would be treated fairly in light of those representations. Yes."

BY MS. MCCARTHY:

Q Was your understanding that you had not reflected in this contract?

MR. MILLER: Do you understand the question?

THE WITNESS: Let me explain my understanding of the question. Are you saying was the understanding that I was given by the people that made the on-site investigation not reflected in this document?

BY MS. MCCARTHY:

Q No. My question was, is the understanding, the interpretation that you reached regarding the meaning of your meetings with the Corps officials, was that something that is other than what's provided in this contract?

MR. MILLER: Objection, vague and ambiguous. It's also asked and answered. I mean, the witness has been asked in a variety of ways to tell counsel how he understood this clause to function. And he's attempted to do so to his best ability.

If you believe that you've already answered that question, you may answer the question by saying that.

THE WITNESS: I believe I've already

answered the question.

BY MS. MCCARTHY:

Q So you understood that the agreement that you reached, your impression of how the government would act is something that's separate and apart from this contract?

MR. MILLER: That misstates his testimony. The witness has already answered to the best of his ability. Let me ask you, Mr. Matteson, have you already answered Ms. McCarthy's question to the best of your ability?

THE WITNESS: I believe so, yes.

MS. MCCARTHY: Would you please answer my question? Although Mr. Miller is instructing him not to answer my question, would you please read the question back?

COURT REPORTER: "So you understood that the agreement that you reached, your impression of how the government would act is something that's separate and apart from this contract?"

MR. MILLER: Objection, argumentative, vague and ambiguous, continuing harassment of the witness.

THE WITNESS: It is my understanding that the on-site investigation and those assurances,

if you will, that the sites would be permittable, while not part of this written document, that I would be able to rely on those representations in submitting my bid.

BY MS. MCCARTHY:

Q What was the basis for your belief that you could rely on those representations if they weren't part of this document?

MR. MILLER: That question has been asked and answered as well. He has said that that was based --

MS. MCCARTHY: Stop testifying for the witness.

MR. MILLER: I'm going to repeat what he has said. He said it was based on the presence of Dan Kromholtz and Steve Tapp. He has responded three or four times to that question.

MS. MCCARTHY: If that were his answer --

MR. MILLER: Counsel, let's move on.

MS. MCCARTHY: If that were his answer, it would be entirely nonresponsive. Would you please respond to my question? Would you please read it back to the witness?

COURT REPORTER: "What was the basis for your belief that you could rely on those

representations if they weren't part of this document?"

THE WITNESS: You're asking me what is the basis of my belief that the representations can be relied on if they are not --

BY MS. MCCARTHY:

Q Yes.

A My basis for that is, as I've stated several times earlier, that prebid site investigations, site visits, representations are made by government representatives about site specific items that aren't involved in the written documents on a regular basis. And contractors rely on them and bid accordingly.

Q Are you aware of any circumstances in which oral representations have affected a modification of a contract?

MR. MILLER: Objection, vague and ambiguous.

THE WITNESS: I'm not aware of any.

BY MS. MCCARTHY:

Q And you've been involved in a lot of federal contracts, have you not, Mr. Matteson?

A I've been involved, as I stated earlier, in somewhere around 30 to 35 projects.

Q And to the extent that those contracts have had

modifications, those modifications have been in writing, have they not, sir?

A Ultimately, yes.

Q If I could turn your attention to page 00700-29, item 64, and it's section 52.236-7, "Permits and Responsibilities." Do you see that, sir?

A Yes.

Q Did you read this provision of the solicitation before submitting your bid?

A At some point in time prior to the bidding date. Maybe not specifically involved in this project, but yes.

Q And the time you submitted your bid, did you understand that you would "be responsible for obtaining any necessary licenses and permits and for complying with any Federal, State and municipal laws, codes and regulations applicable to the performance of the work"?

A Yes.

Q And you understood that that responsibility would be without additional expense to the Government?

A Yes.

Q Now, there's a reference there to municipal laws, codes and regulations applicable to the performance of the work. At the time you submitted your bid, what was your understanding as to your responsibility for complying with any applicable municipal laws, codes, and

regulations?

A Can you restate that question, please?

MS. MCCARTHY: Will you read it back, please?

COURT REPORTER: "Now, there's a reference there to municipal laws, codes and regulations applicable to the performance of the work. At the time you submitted your bid, what was your understanding as to your responsibility for complying with any applicable municipal laws, codes, and regulations?"

THE WITNESS: My understanding as far as municipal laws, codes and regulations would have been in local road restrictions, that type of thing. Typically, up there in Wisconsin, you have road restrictions certain times of the year and that type of thing. We have encountered those in the past and had to deal with them.

BY MS. MCCARTHY:

Q But did you understand that the contractor was assigning you with all responsibility for complying with municipal laws, codes and regulations that would be applicable to the performance of the work?

A Yes.

Q Is there any question in your mind that you bore that responsibility for complying with municipal laws, codes and regulations applicable for performance of the work?

A Was there any question?

Q That you're responsible?

A No.

Q If I could turn your attention, sir, to page 00800-2, please. This is item 4 in this particular section of the contract 52.211-10I. It's "Commencement, Prosecution, and Completion of Work. Alternate I." Do you see that there, sir?

A Yes.

Q And it states, "The Contractor shall be required to (a) commence work under this contract within 10 calendar days after the date the Contractor receives the notice to proceed, (b) prosecute the work diligently, and (c) complete the entire work ready for use not later than 30 August 1998." At the time that you received contract award, what was your schedule to complete the work, if you had one?

A I believe at that time, our schedule was to initially commence moving the Alma pile, and that would have been on the commencement part of the project. And then as soon as we could get the permits -- of course,

this thing was bid in late August, if I remember right. We had probably anticipated doing the dredging, the hydraulic dredging and the excavation of Grand Encampment in the spring or summer of 1997, because we would not have been able to start the project that late in the year and successfully complete it.

Q So what date did you envision completing the entire contract?

A I would at this time assume that we would have completed it by sometime mid to -- in the second or third quarter of 1997.

Q Now, did you submit a schedule to the government?

A I assume so.

Q Do you have a recollection one way or the other?

A No.

Q On what date did you actually finish?

A I believe it was like October of '98. I'm uncertain. But it was fall of '98.

Q If I could turn your attention to page 00800-12, "Physical Data." It's 52.236-4, "Physical Data." Do you see that there, sir?

A Yes.

Q Did you read this provision of the solicitation before you submitted your bid?

A Yes. I believe I've read that clause before.

Q And the clause provides, "Data and information furnished or referred to below is for the Contractor's information. The Government shall not be responsible for any interpretation of or conclusion drawn from the data or information by the Contractor." And (a) includes, "The indications of physical conditions on the drawings and in the specifications are the result of site investigations by Surveys." Do you see that there, sir?

A Yes.

Q And are you familiar with that clause? Have you seen that in your prior contracts?

A I believe so.

Q And how at the time you submitted your bid did you interpret that particular clause?

A How did I interpret it?

Q Yes.

A As confusing.

Q Is it just in this particular contract or in all the other contracts?

A I mean, I guess I'm not sure what they're saying. They're saying that they have provided the drawings and the specifications, but the representations within those is not the government's responsibility? Is that what they're saying?

Q Well, I'm asking you for your interpretation.
A That's the way I would interpret it.
Q It is what it is. Would you like to take a break, sir?
A If you wish.
MS. MCCARTHY: We'll take ten minutes.
(Recess, 11:16 a.m. until 11:33 a.m.)
BY MS. MCCARTHY:
Q Mr. Matteson, still on Exhibit 1, if I could turn your attention to page 01000-1. If I could draw your attention to paragraph 6.1.1, "Availability" under "Grounds and Roadways," do you see that there, sir? It's specifically under "Grounds." It reads, "Availability. The boundary limits of the grounds made available for the Contractor's use during the life of the contract are shown on the drawings. Any additional rights-of-way or grounds desired by the Contractor shall be obtained by the Contractor at its own expense, and copies of agreements for the use of such rights-of-way shall be submitted to the Contracting Officer before entering thereon. Such agreements shall clearly relieve the Government of any responsibility for damages resulting from the use of the grounds." Were you familiar with that provision at the time you submitted your bid?
A I was aware of this provision, yes.

Q If I could draw your attention now to 6.2.2, "Haul Route." It reads, "The Contractor shall be responsible for securing all permits required along haul routes. A copy of each permit shall be submitted to each respective route owner (city, county, state) through Contracting Officer, for review and approval by the route owner. As between the Government and the Contractor, the Contractor shall be responsible for the cost of restoration of haul routes to preconstruction conditions. Dust control shall be provided in accordance with Section - Environmental Protection." Were you familiar with that provision at the time you submitted your bid?

A I believe so.

Q If I could turn your attention, sir, to the following page, section 7.3. "Contractor Selected Final Disposal Areas (Placement Sites)." It says, "The Contractor may dispose the transferred existing dredge material fill upon private property provided a copy of each agreement between the landowner(s) and the Contractor is submitted to and approved by the Contracting Officer." At the time you submitted a bid, had you submitted an agreement between the landowner and the contractor for the approval of the contracting officer?

A It was my understanding that those would be

submitted for approval after award.

Q So the answer is no?

A The answer is no.

Q "The agreement shall give the Contractor explicit permission for such disposal and shall clearly define the terms under which disposal is allowed such as types of material, site grading, and drainage provisions. No disposal (placement) will be allowed in a wetland or wooded area. Approval or disapproval of each proposed final disposed area (placement site) will require a minimum of 30 calendar days for review." To your knowledge, had the 30 days elapsed for approval or disapproval of the final disposal area when you had submitted your bid?

MR. MILLER: Object the form of the question as vague and ambiguous.

THE WITNESS: Are you asking me if I had formally submitted our disposal site for approval prior to bid?

BY MS. MCCARTHY:.

Q Yes.

A No. The answer to that question is no.

Q So the minimum of 30 calendar days for review had not elapsed by the time you submitted your bid. Is that correct?

A That's correct.

Q It says, "The use of an optional final disposal area (placement site) may require the Government to prepare an environmental assessment (including a cultural resource survey)." Do you know if that determination had been made by the time you submitted a bid as to whether the Government had to prepare an environmental assessment for any proposed site by Matteson?

A I believe the site investigations done prior to bid date indicated to me that environmental assessment would not be necessary on the two sites that were investigated as long as we stayed out of the wetland areas that were involved.

Q And you understood that a cultural resource survey would not be necessary at the time you submitted your bid?

A The investigation of the Guza site -- define cultural resource investigation. Will you please?

Q I meant to say cultural resource survey.

A Is that like an archaeological study?

Q Did you understand what it meant when you read the --

A I believe it to be an archaeological study. And it was my understanding that the investigation of two sites, there were no known archaeological significant

areas within those two sites.

Q Now, to what two sites are you referring?

A The Braun and the Guza site.

Q What about the Saunderson site? Had there been a determination that an environmental assessment would not be necessary for the Saunderson site?

A At some point in time, there was a determination to that effect, yes.

Q Was that determination made before you submitted your bid or after you submitted your bid?

A I believe that may have been made after we submitted our bid.

Q If I could draw your attention, sir, to page 01000-4, please, the section of paragraph 12.5, "Special Use Permit." It states, "The Contractor shall comply with the requirements of the "permit for dredge material placement" included at the end of this section regarding the Contractor's final disposal (placement) and transfer of dredge film material to the identified sites owned by Buffalo County, Wisconsin." Did you read that provision at the time that you submitted your bid?

A I believe so, yes.

Q What did you understand the permit for dredge material placement to be?

A I don't recall.

Q Did you understand there was a permit that had been issued in connection with sites owned by Buffalo County, Wisconsin?

A I don't recall what I understood, but that seems like a logical conclusion.

Q But you're aware of the existence of this permit?

A I was -- if I read this paragraph, I would assume that I was aware that there was a permit, yes.

Q And you were aware that the contractor was required to comply with the requirements of the permit?

A Yes.

Q Did you undertake to see if any similar permits would be required for sites in Wabasha, Minnesota?

A I would have to see what those permits were to determine whether I did or not.

Q Okay. If I can turn your attention to page 01000-8. Does that permit look familiar to you, sir?

A I'm not sure familiar is the right terminology, but it looks like a permit that may have been included in the original specifications.

Q This is a permit involving a county, is it not?

A Yes.

Q Were you concerned that there might be similar permits that would be required by the county in which

your proposed sites were located?

A No.

Q Why not?

A As I had stated earlier, the site investigation team that investigated our sites, my interpretation that the people that were there representing the Corps of Engineers were the people necessary for me to achieve permits to use the sites that were being investigated.

Q Did you understand that all of the agencies that were present at those site visits prior to award had given the approval of their respective agencies for use of the site?

A Would you restate that, please?

Q Did you understand that all the agencies that were present at those site visits that occurred prior to contract award, prior to submission of your bid I should say, that they had given their approval for their respective agencies?

A That the people on-site had gone back and given their approval to their respective agencies?

Q No. To you. Had they given you approval on behalf of their respective agencies?

A On behalf of their -- it was my interpretation that the people on-site with the exception of the wetlands and any similar situation -- yes. I guess the

answer to that question is yes.

Q Did you understand that the approval was final on behalf of all of those agencies?

A No.

Q What did you understand had to be done in addition to obtaining final approval?

A We had to get permits. They had to be applied for.

Q Did you contemplate the possibility that the final approval would not occur for any of the state and federal agencies present?

A I believed that we would get approval.

Q And by the state, you meant federal agencies present?

A Yes.

Q If I could turn your attention, sir, to page 01000-10. And this is the second page of a letter from Robert J. Whiting, Chief of the Environmental Researchers section of the Army Corps of Engineers to Ms. Lynn Lewis, who is in the Twin Cities Field Office of the Fish & Wildlife Service. On the second page, there's a reference to the Martin site. Do you see that there, sir?

A On page 01000-10?

Q Yes. In the middle of the first paragraph at

the top, it's actually a continuing paragraph, there's a reference to the Martin site. It states, "The Martin site is a privately owned site located south of Alma off of County 00 near its junction with the Burlington Northern Railroad (T.21 North --"

A Yes, I'm reading it.

Q "-- North.12W.Section 30) approximately six miles from the transfer site." Do you see that?

A Yes.

Q Did Matteson have any interest in the Martin site for purposes of this contract?

A There were sites used to move the pile at Alma. I don't recall what sites were used to dispose of that material, and I have no recollection of the names of the -- I remember going to the site -- one of the sites, but I don't recall who owned it.

Q Did you ever contemplate using the Martin site for hydraulic dredging?

A I don't believe so.

(Deposition Exhibit Number 31 was marked for identification and is attached herewith.)

BY MS. MCCARTHY:

Q Mr. Matteson, I've marked as Exhibit 31 a two-page document, which appears to be a facsimile from

yourself to Mr. Tony Foster at the Corps of Engineers. And there's no date on it -- well, actually, there is a date on the fax sheet. It appears to be dated July 18, 1996. Do you recognize this fax?

A No, I do not.

Q I'll give you a few minutes to look at it.

A I've read it.

Q Okay. Is that your signature?

A Yes.

Q And do you know who Mr. Foster is?

A Yes. That's the Tony Foster that's referred to up here in the solicitation.

Q And the letter states, "L. W. Matteson, Inc. is hereby requesting that the plans and specs for the above referenced project be changed to allow direct placement of material into the James Martin placement site, using a hydraulic pipeline dredge."

A Right.

Q What did you mean by that?

A Well, obviously, at some point in time, we considered using -- I don't know when this is in relation to our getting the plans and specs, but I assume that at some point in time we actually considered laying the pipeline to that site.

Q And do you know why Matteson believed use of the

Martin site for hydraulic purposes would require a change in the plans and specs?

A No, I do not.

Q Did Mr. Foster ever respond to your request?

A I don't recall.

Q Did Matteson eventually lose interest in using the Martin site?

A I believe so, yes.

Q Do you know why?

A I believe it was just deemed not suitable. As I stated earlier, I was not even -- I didn't even recall writing this letter or that we had ever anticipated attempting to dredge it directly to the Alma disposal sites by hydraulic dredging.

Q But as you sit here today, you don't know why it would require a change in the plans and specs to use the Martin site for hydraulic purposes. Is that correct?

A As I sit here today, I don't even recall where the Martin site is. It's been a while.

Q It's been a while. I understand, sir.

A I think in that part of the project, I think I may have made one site visit to that part of the project.

Q If I could turn your attention back to Exhibit 1, sir, please, section, page 01130-1. This is a section 01130 "Environmental Protection." Are you familiar with

this section of the contract?
A I'm aware of its existence.
Q Did you read this provision of the contract before you submitted your bid?
A I've read -- this is a standard section in most contracts of the government, and I've read these before, yes.
Q Did Matteson prepare an environmental protection plan for this contract?
A I believe so.
Q Before the time it submitted its bid, did Matteson undertake any efforts to prepare a tentative environmental protection plan?
A Prior to placing this bid you say?
Q Yes.
A Typically, we do not write down an environmental plan prior to bid. We look at the conditions that exist and try to establish what meeting environmental requirements of the project will entail.
Q Prior to submitting your bid, did you undertake to familiarize yourself with procedures to be implemented to provide the required environmental protection and to comply with applicable laws and regulations?
A I believe so.
Q And what did you do?

A Typically, on dredge jobs and dredge site disposal jobs, I mean, you've got the dredging operation out there excavating material out of the site, and those types of things involve air pollution and noise pollution and, you know, spill containment, spill type environmental precautions that need to be taken, you know, making sure your pipeline is not leaking so you don't put material in a lowland area or wetland area. And then on the fill area, you have the noise and runoff, those types of situations that need to be addressed.

Q So at the time you submitted your bid, you felt you were in a position to prepare an environmental protection plan in a timely fashion at least with regards to the procedures to implement and to provide the required environmental protection and to comply with the applicable laws and regulations?

A I believe so.

Q With regard to number 6, permits or licenses for and the locations of solid waste disposal areas. Prior to submitting your bid, had you become familiar with all the permits or licenses that would have to be included in the environmental protection plan?

A This has to do with the solid waste disposal?

Q Yes.

A Okay. Typically, we don't generate a lot of

solid waste on a dredging job.

Q So this was a moot characteristic?

A We hire someone to license solid waste disposal contracted to dispose of our solid waste.

Q And was that subcontractor responsible for identifying any permits or licenses that may be required?

A It would be more of a service, not a subcontractor, you know, like garbage collection service, that type of thing.

Q And did your environmental protection plan that you submitted under the contract, did it have any provision for this paragraph 6?

A I don't recall.

Q If I could turn your attention to the following page, 01130-2, paragraph or Section 2.3, "Compliance," it states, "Notwithstanding the requirements of this section and notwithstanding approval by the Contracting Officer of the Contractors Environmental Protection Plan, nothing herein shall be construed as relieving the Contractor of all applicable federal, state and local environmental protection laws and regulations." Did you read that provision prior to submitting your bid?

A At some point prior to submitting the bid, yes.

Q Did you understand that the Corps' approval of your environmental protection plan would not relieve

Matteson of all applicable federal, state and local environmental protection laws and regulations?

A Yes.

Q Paragraph 3, "Permits," it states, "The Contractor shall comply with all requirements under the terms and conditions set out in permits obtained by the Contracting Officer for this contract." Did you read that provision before you submitted your bid?

A Probably.

Q And in terms of this contract, what permits did the contracting officer obtain, to your knowledge?

A At the time that this was bid, the permits that the contracting officer had obtained would have been the ones listed in the contract documents.

Q If I could draw your attention, sir, to paragraph 5, "Notification," the paragraph reads, "The Contracting Officer will notify the Contractor in writing of observed noncompliance with the federal, state or local laws, regulations, permits and elements of the Contractors Environmental Protection Plan. The Contractor shall after receipt of such notice inform the Contracting Officer of proposed corrective action and take such action as may be approved. If the Contractor fails to comply promptly, the Contracting Officer may issue an award stopping (suspending) all or part of the

work until satisfactory or corrective action has been taken. No time extension shall be granted or costs of damages allotted to the contractor for any such suspension. Failure of the Contracting Officer to notify the Contractor of any noncompliance with federal, state or local laws or regulations does not relieve the Contractor of the obligation to be in conformance with those requirements." Did you read that last sentence of paragraph 5, the paragraph entitled "Notification," prior to submitting your bid of this contract?

A I've read that clause before, yes.

Q How do you interpret that last sentence in that paragraph?

A Well, similar to other clauses, just the same as the one that involved our environmental protection plan. Just because the contracting officer doesn't specifically tell us about it doesn't mean that we're not responsible for it.

Q If I could turn your attention to the very last page of this Exhibit 1. It's paragraph 3.5. It's on page 00201-4. Paragraph 3.5 says, "Finished Excavation, Fills and Embankments. Unless specifically required otherwise in the contract documents, applicable use permits or otherwise approved by the Contracting Officer, the Contractor shall finish excavation, fills and

embankments in accordance with the following: Smooth grade all areas covered by the contract project documents, including adjacent transition areas and provide a finished surface, reasonably smooth, compacted and free from irregular surface changes (the degree of finish required is that ordinarily obtainable from blade dozer operations)." Did you read that provision of the contract prior to submitting your bid?

A I believe so.

Q How do you interpret that provision of the contract?

MR. MILLER: Overly broad and ambiguous.

THE WITNESS: Well, as I interpret it, it primarily addresses the type of finish that the disposal area is to be left with.

BY MS. MCCARTHY:

Q And in layman's terms, can you describe the type of finish that the disposal area is supposed to be left with under the contract provision?

A Well, that would be achievable by a bulldozer.

Q And what would the appearance be upon completion of the work by the bulldozer?

A Well, a somewhat smooth surface.

Q Smooth grade surface? It would be reasonably smooth, compacted and free from irregular surface

changes. Is that correct?

A That's what it says, yes.

MS. MCCARTHY: Mark this Exhibit 32, please.

(Deposition Exhibit Number 32 was marked for identification and is attached herewith.)

BY MS. MCCARTHY:

Q Mr. Matteson, I've marked as Exhibit 32 a letter from the contracting officer dated August 29, 1996, and it is addressed to Mr. Larry W. Matteson, President. So I don't know if that's you or your father, but do you recognize this document?

A I think they have got two different people.

Q They combined you. They morphed you.

A Yes, they did.

Q And do you recognize this document?

A I believe it to be the standard bid verification notification letter issued by the Corps of Engineers.

Q And what is your understanding of a standard bid verification notification?

A It's my understanding that a bid verification letter has to verify your bid as read at bid opening and to check for any mathematical errors.

Q Do you have any understanding as to the purpose

of a bid verification request?
A To confirm that the government read the right bid, the bid you intended to submit is my understanding.
Q And do you know to whom the government sends the bid verification request?
A Typically, I believe it's sent to the low bidder or the one that was read low bidder at the bid opening.
Q It's your understanding that the government wants you to review your bid to make sure that it's not low due to a mathematical error?
A That's my understanding.
Q At the bottom of this page, it requests "that you accomplish the following actions concerning the bid submitted by your firm. (1) Review all of the requirements of the solicitation. Ensure that you clearly understand all of the services/materials that are to be provided by your firm under terms of any resulting contract. This includes all changes that were incorporated into the solicitation via amendments 0001 and 0004." And then it continues, "Please review your bid submitted in particular, for Contract Line Item Numbers (CLINS) 0001AA, 0001AB, 0002, 0003AA, 0003AB as our evaluation reveals a disparity between your bid and certain other bidders." Did you upon receipt of this letter review your bid as requested in this letter?

A I believe so.
Q And can you tell me what you did in the course of that review?
A Well, first of all, the other bidders, the disparity they refer to here, this particular bid was -- our project was bid by, it says here, six bidders. To my knowledge, there were two of us that bid the job hydraulically, that being J. F. Brennan and L. W. Matteson, Incorporated. J. F. Brennan, to my understanding, was intending to use the Barton property, which lies immediately to the west of the Saunderson site that we had intended to use. To my understanding, my recollection that they were a lot closer to our bid than the average bid or the next bid that didn't use hydraulic methods. And to answer your question, did I reevaluate our bid, probably.
Q If I understand your testimony, you attributed the disparity with four of these other bidders to the fact that they were proposing to use a different method?
A Yes.
Q And you don't recall whether or not you actually reviewed your bid for mathematical errors?
A I probably would have evaluated it as far as mathematical errors, yes.
MS. MCCARTHY: If we could mark this