Exhibit 33.

(Deposition Exhibit Number 33 was marked for identification and is attached herewith.)

BY MS. MCCARTHY:

Q Mr. Matteson, I've handed you Exhibit 33, which is a letter from Larry W. Matteson to the contracting officer dated September 4, 1996. Do you recognize this document?

A It seems to be our bid confirmation letter.

Q And is that your signature there?

A Yes, it is.

Q And it states, "After reviewing all of the requirements of the above referenced solicitation, including Amendments 0001 through 0004, L. W. Matteson, Inc. has determined the bid price $1,693,000 to be accurate."

A That's correct.

Q And did you in fact review all the requirements of the above solicitation including the amendments?

A I believe so.

MS. MCCARTHY: Mark this Exhibit 34, please.

(Deposition Exhibit Number 34 was marked for identification and is

attached herewith.)

BY MS. MCCARTHY:

Q Mr. Matteson, we've handed you Exhibit 34, which is a claim by L. W. Matteson dated July 31, 2000, to the contracting officer of this contract. Is that correct, sir?

A Yes, I believe it is.

Q That is a portion of the claim. We don't have all the attachments. It's a portion of the claim that goes up to the certification on page 7 and a mailing slip at the end. Do you see that, sir? There's a mailing slip at the end and then we go through page 7?

A Yes.

Q Is that your signature certifying this claim?

A Yes.

Q Okay. If we can just go to page one of the claim. I assume that it's because you certified it that you reviewed this claim carefully before you certified it?

A Yes, I did.

Q The claim, beginning under "Claim," it states, "Matteson makes claim for the payment of $1,111,227.51 for costs incurred and damages suffered as a result of a cardinal change in Matteson's contract, which required Matteson to obtain an alternative disposal site." What

provision of the contract required Matteson to obtain an alternative disposal site?

A I think what we're referring to here is the fact that we were not able to use the Saunderson site. I think without reading further, I can't verify that, but --

Q I don't want to -- did you want to take a few minutes to read the claim? Maybe you haven't read it in a while. I don't want to ask you questions if you're not familiar with the document. I want you to be familiar with the document.

A Okay. I'll read it to determine if that's my correct interpretation. (Perusing document.)

(Lunch recess, 12:15 p.m. until 1:30 p.m.)

BY MS. MCCARTHY:

Q Mr. Matteson, before the lunch break, we were looking at Exhibit 34, which is Matteson's claim to the contracting officer dated July 31, 2000, arising out of this contract. And over the lunch break, did you have an opportunity to review the claim?

A Yes.

Q And I think before the lunch break I said that I wanted you to be familiar with the document. I meant to say you were familiar with the document, it's just that you probably hadn't seen it in a while.

A Right.

Q So you were refamiliarizing yourself with the document.

A Yes.

Q I just wanted to be clear about that. If I could draw your attention to page one of the claim, it states that a cardinal change in Matteson's contract required Matteson to obtain an alternative disposal site. And before the lunch break, my question to you was what change in the contract required Matteson to obtain an alternative disposal site.

A This statement refers to the inability of us to get a permit to place the material in the Saunderson property as we had originally bid the site and required us to acquire the use of the site known as the Fish & Wildlife site.

Q Now, the solicitation set forth five different disposal sites. Is that correct?

A I believe so.

Q And one of them was mandatory. Is that correct?

A I believe so, yes.

Q And you actually deposited -- you actually used the mandatory site to perform the contract.

A Yes.

Q Is that right?

A Yes.
Q And the other four disposal sites, do you know if it was possible to use those disposal sites to complete the statement of work under the contract?
A Yes, it was possible.
Q And the reason why you didn't use those four other potential disposal sites is because you didn't think they were compatible with hydraulic dredging. Is that correct?
A That's true.
Q But as far as you know, those sites were compatible with mechanical dredging. Is that correct?
A Yes.
Q Why in your view did Matteson not attempt to use the other four disposal sites by mechanical means?
A It would have been cost prohibitive.
Q The plan continues on page one, "Matteson is entitled to an equitable adjustment because (a) the Corps authorized, invited and encouraged the hydraulic removal of certain stockpiles of dredged materials; (b) the contract documents indicated the absence of any shoreland restriction." What does (b) mean, that contract documents indicated the absence of any shoreland restriction?
A I'm of the opinion that (b) indicates that the

contract documents did not specifically alert the contractor to the existence of a shoreline restriction.

Q I gather from your testimony, then, you relied upon the contract documents to advise you of all possible restrictions, and that applies to your proposed disposal sites?

A No, I don't think that's a correct statement.

Q Well, correct my statement because I want to make sure your testimony is accurate.

A I don't believe we relied solely on the contract documents. I also relied on the input of the people at the site visitations at the proposed disposal sites.

Q Is it fair to say that you relied in part upon the contract documents to detail every restriction that could possibly apply to a potential disposal site?

MR. MILLER: Object to the form of the question as vague and ambiguous.

THE WITNESS: You said is it fair to assume that we have relied in part on the specifications to inform us of the shoreline -- yes.

BY MS. MCCARTHY:

Q Was there a provision of the contract that set forth possible restrictions that would apply specifically to contractor proposed sites?

A I don't recall.
Q You don't recall one way or the other?
A Right.
Q As you sit here today, you have no reason to believe that there was a specific part of the contract that specified restrictions that would apply specifically to contractor supplied sites?
A There was a clause in the contract documents that referred to contractor supplied disposal sites, yes.
Q And did that specific clause set forth all possible restrictions that would apply to those sites?
A I don't know. I would have to read that clause.
Q You're welcome to look at it. Do you want to go to Exhibit 1? It's page 01000-2. It's section 7.3. Is that the section you had in mind?
A Uh-huh. (Perusing document.)
Q In your view, did this contract set forth all possible restrictions that might apply in that contractor selected disposal sites?
A I believe this along with the site investigation comments is what I would have relied on as what would have been required for us to obtain a permit for our disposal sites.
Q Now, to your knowledge, are there any permits or requirements that are specified in paragraph 7.3 that

apply to any entity other than the Corps?

A I would assume the environmental issues would have to be addressed to the local environmental agencies. But it says government to prepare an environmental assessment. Usually that involves other agencies other than the Corps of Engineers. I mean, when Dennis goes out to a site, he invites the other agencies' input. Dennis Anderson.

Q Right. So the reference there to the environmental assessment in your view encapsulated all the requirements that might apply to disposal sites selected by the contractor?

MR. MILLER: The question has been asked and answered previously.

THE WITNESS: As I said earlier, this in combination with the comments and parties that attended our proposed site investigations.

BY MS. MCCARTHY:

Q Going back to Exhibit 34, on page one, it continues to read, "(c) the Corps represented that certain property in the vicinity of the job site was acceptable for the disposal of dredge materials." What do you mean by certain property in that clause?

A At the time that this was submitted, that would have meant the Saunderson property.

Q And what does acceptable mean in the context of that clause?
A My interpretation of the word acceptable in this context would be that it would be an area that would be acceptable to the agencies involved to the point that it would be permitted.
Q Well, is it your understanding that the Corps made a representation on behalf of all affected agencies in your view?
A It's my interpretation that during those site visits that the people whose agency's approval was needed to obtain a permit were involved.
Q But the clause refers specifically to the Corps. It doesn't say the Corps and other agencies. It says the Corps represented certain property --
A Right.
Q Does the Corps' representation extend to -- is it made on behalf of all the agencies that are present, in your view, or was it made just on behalf of the Corps, as far as the Corps was concerned, this particular property might be acceptable?
A Typically, the Corps would not promote a disposal site that was objectionable to the other agencies involved. Like, for instance, the Braun site, you know, we weren't there probably 15 minutes, and it

was determined that, yeah, that lowland is probably a wetlands, and we'll need to avoid that in order to get a permit.

Q But you understood that the Corps was making representations on behalf of the other agencies that the property was acceptable?

MR. MILLER: The question was just asked and was just answered.

BY MS. MCCARTHY:

Q I don't think it was answered.

A It is my contention that the Corps' support of our use of the Saunderson property represented that they were in favor of the project and that the agencies involved in obtaining permits for this project were in favor of issuing the permit.

Q If I understand, and correct me if I'm wrong, you assume that the Corps was speaking for the other agencies because it normally doesn't promote a site that it understands that other agencies would reject. Is that correct?

A Yes, I think that's correct.

Q But in the case of the Saunderson property, it actually promoted the Saunderson property for approval by the local authorities, did it not?

A Yes.

Q And the local authorities did not agree with the Corps. Is that fair to say?
A That's fair to say.
Q Had it occurred to you prior to bid that perhaps the Corps and certain agencies may not see eye to eye on a given piece of property?
A I don't believe so.
Q And why not, sir?
A Again, I didn't believe that the Corps would promote our use of a site as a disposal area if they knew that there were other agencies that strongly objected to it.
Q So it's your understanding that the Corps -- you assumed that the Corps was not aware that other agencies strongly objected to it. Did the Corps have the ability to know that the agencies would actually approve use of the site?
MR. MILLER: Object to the form of the question as compound.
THE WITNESS: I don't know.
BY MS. MCCARTHY:
Q What was the purpose of having the other agencies present if the Corps was able to make a representation on their behalf?
A I didn't say that the Corps was able to make a

representation on their behalf.

Q Okay. Well, tell me then what (c) means in terms of the Corps represented that certain property in the vicinity of the job site was acceptable for the disposal of the dredge materials. Does that mean that--

A As I've stated earlier, the Corps invited the agencies that I believe the Corps needed approval from to the site visits. That was the interpretation when I showed up at the meeting on I believe it was early August, the only people that I had spoken to about that meeting were Dan Kromholtz and Steve Tapp. The other people that showed up were people that came at the request or direction of the Corps of Engineers, so I assumed that those people were invited because these are the people that the Corps of Engineers sought approval, whose approval they sought in obtaining a permit.

Q For this particular piece of property or for other pieces of property in the past?

A Both.

Q You understood that the Corps was seeking approval of permits for the use of the Saunderson property? Did you understand that the Corps was seeking permits for use of the Saunderson property in connection with this contract?

A Yes.

Q Now, the Corps had issued a solicitation with five proposed sites, one of which was mandatory. And it's your understanding that the Corps in addition to the five additional sites sought permits for use of an additional site that was not provided to other bidders in the solicitation?

A What are you referring to?

Q The Saunderson property.

A Okay.

Q Is it your understanding that the Corps in addition sought permits for use of another site that it did not provide in the solicitation and did not make available for use to other bidders?

A Yes.

Q Do you have any written documentation of the Corps seeking permits for use of the Saunderson property?

A No.

Q I just want to be clear, Mr. Matteson. You understood that the Corps was seeking permits for use of another site that it did not provide to other bidders?

MR. MILLER: At what time?

BY MS. MCCARTHY:

Q Prior to the submission of the bid.

MR. MILLER: Prebid.

THE WITNESS: At the time of the site

investigation, okay, there was no formal permit application process initiated.

BY MS. MCCARTHY:

Q Prior to the bid, was the Corps seeking permits for use of the Saunderson property prior to the solicitation of the bid without advising other bidders under the solicitation? Is that your understanding of what occurred?

A To my knowledge, there was no permit application initiated prior to bid date.

Q So when did the Corps' representations referenced in (c), when did these representations occur? Did they occur prior to submission of your bid or --

A Yes.

Q -- after submission of your bid?

A Prior to bid.

Q And what was the scope of the representations that the Corps made? Were the Corps representations made on behalf of the other agencies?

MR. MILLER: That question has been asked and answered as well.

THE WITNESS: The Corps of Engineers facilitated a meeting at which time the other agencies attended and at which time the other agencies inspected the proposed sites and made

comments to the Corps of Engineers as to whether they had objections to the two proposed sites.

BY MS. MCCARTHY:

Q Okay. So the Corps facilitated and received comments during these meetings. What was the scope of the representation that the Corps made prior to bid?

A The other agencies had expressed that it looked like the disposal areas that we had proposed were permittable areas.

Q And these expressions by the other agencies became Corps representations?

A Yes, I guess so.

Q Section (d) states, "Matteson reasonably relied on the Corps' assurances that Matteson's original disposal site was acceptable." What is the original disposal site?

A I believe at the time of this filing, that would have been the Saunderson property.

Q At the time of the filing, the original disposal site, was the Saunderson property -- was at some point in time the original disposal site of the property other than the Saunderson site?

A I'm not sure.

Q You don't know what the disposal site was at the

time of your bid?

A At the time of our bid, the disposal site that we intended to use was the Saunderson site, yes.

Q At what point in time did your disposal site become the Saunderson site in the course of your developing your bid?

A Probably shortly before bid day.

Q At what point in time vis-a-vis the site visit are you referring to?

A It would have been either shortly -- probably shortly after the site visit, but I'm not sure, or shortly before.

Q And what are the Corps' assurances that you're referring to there?

A I think this may refer to when the Corps was helping us try to get permits to use that site. I'm not sure exactly what it would mean other than that.

Q How would the Corps' assistance in giving you help in obtaining permits -- strike that.

How would the Corps' assistance and your effort to obtain permits for your proposed site produce a cardinal change in the contract?

A I think anything that led to our inability to not use our intended site would be a cardinal change in the contract.

Q Is there a specific contract provision that provides for use of the Saunderson property?
A No, ma'am.
Q Section (d) also says that "Matteson reasonably relied on the Corps' assurances." At the time you submitted your bid, you were cognizant of the contractual provision that states that the Corps' precontract oral statements were not binding. Is that correct?
A Yes. I'm cognizant that there's a statement in there to that effect.
Q And what's the basis for your statement that Matteson reasonably relied on the Corps' assurance?
A The basis is the meetings and the review of those proposed disposal sites.
Q If I give you Exhibit 1, can you show me what part of the contract was changed in your view?
A To my knowledge, there wasn't any part of this document that was changed prior to bid date.
Q So what is the change in the contract to which you're referring on the first page?
A The change that I was referring to, as I stated earlier, is the change in our contract where when we bid the contract, the Corps knew that we were going to use one of those disposal sites and awarded the contract based on us using the disposal sites, and they

subsequently became unavailable. So we had to go find another disposal site. And that's the change in the contract.

Q Did your bid include a condition that your performance be conditioned on use of the Saunderson property?

A No.

Q Did your bid include a condition that your performance of the contract be subject to any of the proposed sites that you --

A No.

Q So if there's no condition in your bid for use of a particular site, then what part of the contract was changed?

A As I've stated earlier, there was no part of the contract that was changed in writing.

Q If I could turn your attention back to page one, is there any difference between the term certain property and original disposal site?

A I don't know.

Q Did you know at the time that you wrote the claim?

A I don't know if I knew or not. As I said, I've reviewed this. I did not write this claim up.

Q Who wrote the claim?

A I believe our attorney did.

Q But you reviewed the claim before you certified it?

A Yes.

Q Did you have any confusion as to what certain property meant versus original disposal site?

A Not that I remember, no.

Q If I could turn your attention to -- in your mind, has the meaning of those terms changed over time?

MR. MILLER: Objection to the form of the question, vague and ambiguous.

THE WITNESS: I don't think so.

BY MS. MCCARTHY:

Q Is it possible that certain property refers to more than one site?

A It could.

Q But you don't know one way or the other?

A There were more than one site investigated as potential disposal sites not only by L. W. Matteson but by J. F. Brennan.

Q Is it your understanding that the Corps gave approval to all of those sites?

A It's my understanding that all those sites were deemed as permittable disposal sites.

Q Subject to final approval?

A Yes.

Q If I could turn your attention to page two of the statement of facts. It says, "By an invitation dated July 10, 1996, Matteson was invited to competitively bid a dredging job on the Mississippi River with the St. Paul, Minnesota District of the U.S. Army Corps of Engineers for a fixed-price contract to furnish all labor, material and equipment necessary to excavate and transport existing dredged material from two areas." Were you invited in writing to submit a bid for this project?

A That's a common terminology that -- yes. I mean, the Corps sends out invitations for bid. I mean, they send out a notice for bid. And that's what it's referred to. It's not like an invitation like you and I might normally think of an invitation. It's nothing special. If you're registered as a dredging contractor, you get one. We're not selected -- it doesn't make us special.

Q Was the extent of your invitation the written invitation?

A Yes.

Q If I could draw your attention to the third paragraph, it states, "Following its communications with the Corps, Matteson devoted significant time to locating

potential disposal sites in the Wabasha area. Matteson was able to locate two viable disposal sites. One was the "Saunderson" Property and the other was the "Braun" Property." Now, are these the two sites that you contend that the Corps visited prior to the bid?

A Actually, after listening to the testimony of Dan Kromholtz and Steve Tapp, I believe there were three sites involved at that time. And their testimony states that they only visited -- they meaning Steve Tapp and Dan Kromholtz and others, Dennis Anderson, the list -- the Guza site and the Braun site were visited, and the Saunderson site -- I still contend that the Saunderson site was if you're standing on, I believe it's I-24 or Highway 24 looking at the Guza site, the Saunderson site is like to your back. And I contend that they were informed of that site as well. But I may be wrong. So the answer to the question at that time, I believe there were three sites involved. But if there were two sites involved, it would have probably been the Guza site and the Braun site.

Q There's no mention made to the Guza site in this paragraph. Do you know why?

A Because at the time, I believe that they had -- that I had taken them to the Saunderson site, that they were talking about the Saunderson site and the Braun

site.

Q So at the time you submitted this claim, your recollection was that you had taken them to the Saunderson site and the Braun site?

A Yes. I knew that we had taken them to the Guza site, too.

Q So at the time, why didn't you mention the Guza site?

A I don't know.

Q Do you have a specific recollection sitting here today of actually physically walking on the Saunderson property with any representatives of the Corps or any other federal agency prior to the submission of the bid?

A What I recall is that we didn't walk on the Guza site, nor did we walk on the Saunderson site. The only site that we actually physically walked on was the Braun site. The Guza site and the Saunderson site were clearly visible from the roadway.

Q Was there any reason why you did not walk the Saunderson property and the Guza property when you brought the Corps folks out to the Braun property?

A Say that again.

Q Was there any reason why you didn't walk the Saunderson site and the Guza site with the Corps officials?

A Yes, because they were very visible from the roadway, and I guess they -- I wasn't the one determining whether they walked or didn't walk. It wasn't like, okay, I didn't take -- the reason we walked the Braun site is that the area for disposal was some distance from the highway or from the -- not the highway, but a county road. So we had to drive back in there and actually get into the site to see the site. The Saunderson site and the Guza site were both fairly flat areas that were visible from the roadways.

Q The paragraph continues, "At the request of Matteson and prior to the bid date, the Corps, the Minnesota Department of Natural Resources and the U.S. Fish & Wildlife walked both of Matteson's sites." So is it your testimony that that statement is inaccurate?

A It is my testimony that the only site that they actually walked prior to bid date would have been the Braun site.

Q So to the extent that this statement in the claim says that they walked both of Matteson's sites, that statement is inaccurate. Is that correct?

A That's correct.

Q Was the Saunderson site wooded at the time that you brought the --

A It was partially wooded, yes.

Q Was there a way that the Corps officials visibly standing in the road could ascertain that there were no wetlands on the Saunderson site without walking it given the fact that it was wooded?

A The Saunderson site was accessible both on the east side, you could drive by the east side, so it was kind of a corner lot if I remember right, so you could drive on two sides of it and see what it was. You could see what kind of vegetation it was. And it would be my opinion that someone familiar with the area could tell by looking at the type of vegetation that was growing on it from the road if there would be likely any wetlands on-site, yes.

Q Do you know whether the Corps officials drove on both sides to ascertain whether there were wetlands?

A They would have driven on both sides. When we came from the Braun side, they would have driven up the east side and then turned, and we parked on the north side.

Q Did you advise them that they should be looking to see if there are any wetlands on the Saunderson property while they're driving to the Braun site?

A No, I did not.

Q So you don't know for a fact whether they made an effort to ascertain whether there were wetlands --

A No, I did not.
Q -- on the Saunderson property?
A Not prior to bid. I know that that was done post bid.
Q Specifically, what representations do you recall Mr. Kromholtz making regarding the Saunderson property prior to bid?
A I recall Mr. Kromholtz -- as I recall, Mr. Kromholtz was in favor of the Saunderson property.
Q How did he communicate that, that he was favorable to you prior to the --
A I believe it was verbal.
Q Where did --
A Because we had no written communications with --
Q When did this verbal communication take place?
A I believe it was in a conversation with my father.
Q Were you a party to that conversation?
A No.
Q So this would be based on what your father told you?
A That's right.
Q When you were actually at the site visiting with Corps officials and the other state and federal officials, did Mr. Kromholtz make any specific

representations to you about the Saunderson property?

A No.

Q Did he make any specific representations to you about the Braun property?

A The Braun property, as I stated earlier, the group as a whole seemed to conclude that in order for the site to get permitted, certain areas would have to be avoided. And the Guza property, it was stated that that property looked like an acceptable property.

Q The Guza property?

A Yes. Well, both were acceptable. It's just that the Braun property had some lowland areas that we would have to avoid.

Q And Mr. Kromholtz didn't make any representations at all regarding the Saunderson property. Is that correct?

A At that point, no.

Q What about Mr. Tapp, did Mr. Tapp make any representations to you at any time prior to your bid about the acceptability of the Saunderson property?

A I don't recall.

Q You don't have any specific recollection that he did make a representation to you?

A No, not in regards to the Saunderson property.

Q Do you recall Mr. Tapp making any specific

representations to you about the acceptability of the Braun property prior to your bid?

A As I've stated earlier, it was a group site investigation, and I came away from that group site investigation with the opinion that the Corps of Engineers and its agencies that helped it investigate those sites found no reason why those sites could not be permitted.

Q And those sites would be the Braun site and the Guza site?

A As I've stated earlier, I thought we looked at the Saunderson site also, but I will not say with certainty that that's the case.

Q Do you have any written notes or documents memorializing what happened during the site visit?

A I'm not aware of any.

Q Do you keep a diary?

A No.

Q Do you keep notes, a notebook?

A Typically, I have a phone ledger, a phone log.

Q Do you keep any substantive notes in the phone ledger?

A Typically, record conversations, that type of thing, dates, time. I have my things-to-do list on a daily basis in that.

Q Do you know if your phone ledger has any memorialization of this site visit that we've been talking about?

A I don't know if it does.

Q Have you looked to see if it does?

A I've looked. There's some comments about Dan Kromholtz in there. There's some comments. So I suspect that it does.

MS. MCCARTHY: Do you know, Mr. Miller, if those notes have been produced to us?

MR. MILLER: I don't know whether they have or not. I know we saw those last night, and I asked Larry to bring them in case you would want to look at them.

MS. MCCARTHY: Do you have them with you?

MR. MILLER: No. I think I did ask Diane to bring those.

THE WITNESS: Yeah, you did.

MR. MILLER: Yeah, just your phone log. Yeah.

MS. MCCARTHY: Do you have that?

MR. MILLER: Yeah.

MS. MCCARTHY: Can we take a look at it during the break?

MR. MILLER: Sure.

BY MS. MCCARTHY:

Q And then the claim continues, "To further confirm the suitability of these disposal sites, Matteson contacted Mr. Dan Kromholtz at the Corps, shortly before bid time to further assure itself that the disposal sites were acceptable to the Corps." Does this refer to the telephone conference that your father had with Mr. Kromholtz?

A Yes.

Q "Mr. Kromholtz, on behalf of the Corps, assured Matteson that it could use either of the disposal sites." Do you know what is meant by either of the disposal sites?

A No, I do not.

Q "Matteson proceeded forward and in exchange for payment obtained an option from each of the property owners to purchase the land for use as disposal sites." Do you know what -- do you know the identity --

A I believe that to be incorrect. It's my recollection that we only obtained an option on one site.

Q And which site was that?

A The Saunderson site.

Q Now, to the extent that this last sentence of the fourth paragraph refers to "each of the property owners." Now, that is incorrect. Property owners should

be singular.

A I believe that to be right, yes.

Q At the time you certified this claim, did you know what was meant by either of the disposal sites?

A Where does it say --

Q I'm sorry. The preceding sentence of this fourth paragraph, "Mr. Kromholtz, on behalf of the Corps, assured Matteson that it could use either of the disposal sites." At the time you certified this claim, did you have any understanding as to what that meant?

A I guess at the time I certified this claim, I would have thought it would have meant either the Guza site and the Saunderson site or the Saunderson site and the Braun site.

Q But in this claim, there's no reference to the Guza site, so --

A I would assume that -- I don't know.

Q The final paragraph at the bottom of this page says, "Matteson had previously performed two projects in the same vicinity very similar to this Project: Crats Island in 1987 and Reads Landing in 1995." To what extent were these two projects, quote, very similar, end of quote, to the contract at issue in this case?

A I believe the Read's Island site was similar in pipeline distance. They both involved emptying temporary

island dredge spoil sites and pumping them into landward disposal sites. They both involved river crossings. They were very similar in nature.

Q Now, would it be fair to say that the contracts were similar for these two projects to the contracts that's at issue in this case?

A I don't know. I can't recall those contracts.

Q In the case of the contracts for Crat's Island and Read's Landing, did Matteson obtain any of the disposal sites in those cases?

A The only site that I'm aware of that Matteson was involved in obtaining would have been the -- we dealt with Clifford Wilson.

Q Did you officially obtain that site, or did the Corps obtain that site with regard to Mr. Wilson?

A I'm not sure if there was anything in writing about that disposal site.

Q But for the other disposal sites, exclusive of the Wilson site, under those two contracts, Matteson did not obtain those sites?

A That's correct.

Q So to that extent, the contracts for Crat's Island and Read's Landing would not be very similar to the contract at issue in this case?

A To that extent, you're right.

Q The paragraph continues, "Both projects were for the Corps. In both instances, the work required Matteson to lay pipeline over significant distances inland to reach the disposal areas. Matteson encountered no difficulties and was never made aware of any legal restrictions on its activities." That's referring to the Crat's Island contract and the Read's Landing contract?

A Yes.

Q Are you aware to this day that there are any legal restrictions on your activities of which you were not made aware with regard to those two contracts?

A The Crat's Island and Read's Landing sites contracts? Is that what you're referring --

Q Yes.

A To my knowledge, they're done, and there would be no reason for me to be made aware of any restrictions.

Q To what extent were you involved personally in those contracts?

A In the Crat's Island project, I was up there off and on early on the project getting the pipeline delivered and unloaded. The Read's Island job, I was up there at the site investigation that my father and I would have done, and I was up there for the precon walk-through of the disposal site. Then I was just up there sporadically. So I wasn't up there very much after

that.

Q But as far as you know, there were not legal restrictions or activities that the Corps failed to disclose to you with regard to either one of those projects. Is that correct?

A As far as I know, no. That's correct.

Q It continues, "The projects were successfully completed and the Corps realized substantial savings on the projects over the other bids which were submitted. Matteson, therefore, had no reason to believe that this project was any different than the previous projects it had performed." Matteson knew at the time it submitted its bid that it would be seeking the disposal sites itself unlike in those other two contracts. Is that correct?

A That's correct.

Q So to some extent, it was different than the other site?

A Well, if you look at the jobs as a whole, they had more similarities than dissimilarities, but yes. In the previous two, the disposal sites were provided by the government; in this Grand Encampment they were provided by the contractor.

Q Did that difference have any meaning to you at the time you submitted your bid?

A I'm not sure.

Q I'm going to ask you this way. In terms of ascertaining the permits and requirements that would be needed in obtaining approval for the disposal sites in proposing the Grand Encampment excavation contract, to what extent did you rely on your prior experience in the Crat's Island and Read's Landing contracts?

A Well, typically, the material involved in rehandling the material that you're rehandling, if you will, is fairly clean material, so your water quality problems usually don't exist. So that part of the permitting process I thought was pretty easy. Other than that, the projects were very similar. The disposal sites that we had lined up had been investigated, visited.

Q Did you have any personal knowledge as to the process that the Corps went through in obtaining approval to use the sites in the Crat's Island and Read's Landing contracts?

A No.

Q So I gather you didn't rely upon the approval process for site selection that was used in those two contracts?

A That's true.

Q So to what extent did you rely on your experience in these two prior contracts in obtaining

permits for the Grand excavation?

A As I stated, the experience as far as from a -- I mean, the character of the material, I didn't believe that it should lead to any water quality problems. The material stays in place, so I didn't have to worry about the stability of the piled sand. When you pump it, it stays there. It doesn't ooze out all over everything and create a problem that way. That would be the -- I guess, the extent of my experience as far as the character of the material would be my only experience, benefit.

Q If I could turn your attention to page three of the claim. Below the listing of the six contractors who submitted bids, it states, "The bids of Matteson and J.F. Brennan Co., Inc. were based on hydraulic dredging; the other bids were based on mechanical dredging." What's the basis for that statement?

A I didn't understand the question.

Q How did you know that the -- well, I guess you know the basis for your bid. But how did you know that the basis for J. F. Brennan Company's bid was based on hydraulic dredging and that the other bids were based on mechanical dredging? How did you know that?

A Because I had spoken with the other contractors.

Q The last sentence in that paragraph reads, "The Corps elected to take advantage of the savings offered by

hydraulic dredging and awarded the Contract to Matteson." What did you mean by the Corps elected to take advantage of the savings?

A I guess what I would have meant by that statement was that the Corps had an option of -- the Corps always has an option of rejecting bids. And if they chose to -- they could have chosen to reject bids. If L. W. Matteson said, you know, you're going to use a hydraulic dredge method and you're going to put it here, we don't want you to do that, we're going to go with someone who is going to do it mechanically, they have that option.

Q Is it your understanding that the Corps has the option of rejecting a responsive low bid?

A Yes.

Q What is the basis of your understanding that the Corps has the option of rejecting a responsive low bid without incurring a bid protest?

A Well, they might incur a bid protest, but that doesn't mean they don't have the option.

Q In your view, what would be the basis for the Corps to reject your responsive low bid without incurring liability in a bid protest?

MR. MILLER: Objection, calls for speculation.

THE WITNESS: Could you restate that, please?

MS. MCCARTHY: Can you read that back, please?

COURT REPORTER: "In your view, what would be the basis for the Corps to reject your responsive low bid without incurring liability in a bid protest?"

MR. MILLER: Same objection; calls for speculation as to the state of mind of the Corps, asking him to speculate on the state of law.

If you can answer the question, go ahead. If you're unable to answer it, simply advise counsel of that.

THE WITNESS: I'm unable to answer the question.

BY MS. MCCARTHY:

Q So do you have a basis for the statement that the Corps elected to take advantage of the savings offered by the hydraulic dredging and awarded the contract to Matteson?

A Yes. They took advantage of the price difference.

Q But you have no basis -- you don't know that the

Corps had no option under the applicable procurement laws and regulations?

A That's correct.

Q So you don't really have a basis for that?

A No. I said I know that they -- I thought I was agreeing with it, but I'm not sure I am now.

Q Do you have a basis for the statement, "The Corps elected to take advantage of the savings offered by hydraulic dredging and awarded the Contract to Matteson" in light of applicable procurement laws and regulations?

MR. MILLER: Do you seek a legal opinion about procurement laws --

MS. MCCARTHY: Well, he's making a statement in a certified claim. I have a right to --

MR. MILLER: He isn't making any statement here about applicable law and regulations.

MS. MCCARTHY: He's saying that the verb elected has a specific meaning.

MR. MILLER: That's a meaning you're attributing to the witness.

BY MS. MCCARTHY:

Q How would you define elected? What's your definition of elected, Mr. Matteson?

A Chose to award.

Q So in your view, the Corps had a choice to award?
A Yes.
Q And are you aware that under applicable laws, procurement laws and regulations, the Corps is required to award the contract to the lowest responsive bidder?
A It is my opinion that the Corps has other regulations available to them to not award projects to contractors if they choose not to.
Q Where in the contract does it provide the Corps with the right to reject a bid because it's based on hydraulic dredging?
MR. MILLER: Well, that question is a different question than what you asked him before. You asked him a general question. And you should know that the Corps does have the right under the law to reject bids. I don't understand what the argumentation from a lawyer of the justice department with a lay witness or her opinion of the law has to do with this case.
MS. MCCARTHY: Could you read back the question? I don't think Mr. Matteson can remember it.
COURT REPORTER: "Where in the contract

does it provide the Corps with the right to reject a bid because it's based on hydraulic dredging?"

THE WITNESS: I don't know that there's anything in the contract that specifically addresses that the Corps has a right to reject a bid for being submitted using hydraulic dredging.

BY MS. MCCARTHY:

Q Nonetheless, you certified a claim based upon your belief that the Corps had the option to reject your responsive bid. Is that correct?

A That's right.

Q And I take it you don't know whether or not you would have filed a bid protest had the Corps rejected your response of low bid.

MR. MILLER: Calls for speculation, also already asked and answered.

THE WITNESS: Restate that question, please.

BY MS. MCCARTHY:

Q Do you know whether or not you would have filed a bid protest had the Corps rejected your responsive low bid?

MR. MILLER: Objection, calls for

speculation, also not reasonably calculated to lead to the discovery of any admissible evidence.

THE WITNESS: I don't know.

BY MS. MCCARTHY:

Q You don't know, but you certified the claim nonetheless stating that the Corps had the option to reject your responsive low bid.

A Yes.

Q And can you provide for me one more time since I don't think I've heard your basis in procurement laws and regulations for your position that the Corps had the option to reject your responsive low bid.

A I'm not a scholar on the Corps regulations, but I believe there's enough language in the Corps specs and F.A.R. regulations to allow the Corps of Engineers the latitude to get out of a contract if they don't wish to award it to the contractor.

Q And specifically where in this particular case did the Corps have the latitude to get out of the contract?

A I can't specifically say.

Q So you don't have any basis for your statement that you certify in your claim that the Corps elected to take advantage --

MR. MILLER: Let's move on, counsel. I'm not going to allow you to badger the witness further.

THE WITNESS: I would not agree with that statement.

BY MS. MCCARTHY:

Q Can you identify for me the specific --

A No, I cannot.

MR. MILLER: Let's move on.

BY MS. MCCARTHY:

Q Did you have one at the time you certified the claim?

A That statement was made in regards to the -- that statement was made to direct attention to the difference in the hydraulic bids versus the mechanical bids. That's my interpretation of why that statement is in there, that originally the project was designed around a mechanical method of transportation and mechanical disposal sites. You know, when the project was bid and there were hydraulic dredging options given to the Corps of Engineers, and those options saved the Corps of Engineers money, the Corps of Engineers elected to allow those options to take place and awarded the contract to someone who used one of those options. That's my interpretation of what that sentence is about.

Q So it's not that the Corps elected to accept your bid. The Corps elected to submit the -- put out the solicitation it did. Is that what you're referring to?

MR. MILLER: Let's move on. This is argumentative.

THE WITNESS: No.

MR. MILLER: It's argumentative and harassing.

BY MS. MCCARTHY:

Q No?

A No.

Q Could you read back Mr. Matteson's last answer?

COURT REPORTER: "That statement was made in regards to the -- that statement was made to direct attention to the difference in the hydraulic bids versus the mechanical bids. That's my interpretation of why that statement is in there, that originally the project was designed around a mechanical method of transportation and mechanical disposal sites. You know, when the project was bid and there were hydraulic dredging options given to the Corps of Engineers, and those options saved the Corps of Engineers money, the Corps of Engineers elected to allow those options to

take place and awarded the contract to someone who used one of those options. That's my interpretation of what that sentence is about."

BY MS. MCCARTHY:

Q The solicitation that the Corps issued for this job did not specify mechanical dredging, did it?

A No.

Q And you have no reason to believe as you sit here today that your offer in response, your bid in response to the solicitation was not responsive, do you?

A I have no what now?

Q You have no reason to believe that your bid in response to the invitation for bids was not responsive, do you?

A No.

Q Has Matteson ever filed a bid protest when the Corps rejected your low bid?

A As I stated earlier, yes.

Q And was it your position in that bid protest that the Corps had the option to reject your low bid?

A We were not low bid then.

Q So have you ever filed a bid protest when the Corps has rejected your low bid?

A I believe there was a situation where the Corps of Engineers deemed our bid imbalanced and tried to award

it to the second bidder, and at that point we filed a protest because we didn't agree that our bid was materially unbalanced.

Q And if you are correct about that, did the Corps have the option of rejecting your low bid in that case?

A Yes, they did.

Q Did you succeed in that bid protest?

A No. I was proven wrong.

Q But if you had prevailed in challenging the finding of the balance, do you still believe that the Corps could have rejected your low bid?

MR. MILLER: Counsel, that is a ridiculous question. Object to it as being speculative, beyond the scope of discovery. It's not intended to lead to the discovery of any possibly admissible evidence.

MS. MCCARTHY: Do you need the question read back, Mr. Matteson?

MR. MILLER: No, because I'm not going to allow him to give any testimony regarding any attorney-client privilege with respect to any prior case.

MS. MCCARTHY: I haven't asked for anything covered by attorney-client privilege. Will you please read back the question?

By the way, Mr. Matteson, in responding to my questions, you don't have to reveal any privileged information that you may have received in discussions with your attorney.

COURT REPORTER: "But if you had prevailed in challenging the finding of the balance, do you still believe that the Corps could have rejected your low bid?"

MR. MILLER: If you are simply unable based on your qualifications to answer that question or if it calls for speculation that you're simply unable to make, you can tell her that you simply aren't able to answer that question.

THE WITNESS: I'm unable to answer that question.

BY MS. MCCARTHY:

Q I gather then you're unable to certify the statement in your claim and marked in Exhibit 34 that the Corps had the option of rejecting your responsive low bid?

MR. MILLER: Stop it and move on. We're going to take a break because I'm going to let you cool down, Ms. McCarthy. We're going to