ORIGINAL



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**********************************************

L. W. Matteson, Inc.,

Plaintiff,

v. No. 01-5420
(Judge Wilson)

The United States,

Defendant.

**********************************************

**DEPOSITION OF**

**LAWRENCE W. MATTESON**

Taken July 25, 2002
Scheduled for 9:00 a.m.

Reported By: Lori L. Morrow, RPR
PARADIGM REPORTING & CAPTIONING INC.
1400 Rand Tower, 527 Marquette Avenue South
Minneapolis, Minnesota 55402 * (612)339-0545
1(800)545-9668 * Fax (612)337-5575

Deposition of LAWRENCE W. MATTESON, taken on the 25th day of July, 2002, commencing at 9:15 a.m., at the Offices of the US Army Corps of Engineers, St. Paul District, Army Corps of Engineers Centre, 190 Fifth Street East, St. Paul, Minnesota, before Lori L. Morrow, RPR, Notary Public in and for the State of Minnesota.

**APPEARANCES**:

On Behalf of the Plaintiff:

STEPHEN R. MILLER, ESQUIRE
DIANE MILLS, ESQUIRE
Miller Law Firm
4310 Madison Avenue
Kansas City, Missouri 64111
(816) 531-0755

On Behalf of the Defendant:

PATRICIA M. MCCARTHY, ESQUIRE
Department of Justice
Commercial Litigation Branch
Civil Division
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0164

OF COUNSEL:

EDWIN C. BANKSTON, ESQUIRE
District Counsel
U.S. Army Corps of Engineers
Army Corps of Engineers Centre
190 Fifth Street East
St. Paul, Minnesota 55101-1638
(651) 290-5500

ALSO PRESENT: David Guillot

NOTE: The original transcript will be delivered to Patricia M. McCarthy, Esquire, pursuant to the applicable Rules of Civil Procedure.

**INDEX**

**WITNESS:**

Lawrence W. Matteson

**EXAMINATION BY:** **PAGE:**

Ms. McCarthy...............6

**OBJECTIONS BY:**

Mr. Miller.................42-43, 63, 64, 76, 78, 79, 84

**EXHIBITS MARKED AND REFERRED TO:** **PAGE:**

48..Saunderson Purchase Agreement........25

49..September 24, 1996, letter from Judy Kruger faxed to Matteson's office on September 26...........39

62..Letter dated 4/27/98, to Melissa Gulan from Lawrence W. Matteson..49

63..Document from Lawrence W. Matteson to Melissa Gulan dated 4/22/98..................51-55, 59-61, 87

64..Summary of the Saunderson Property...57-60

65..1/15/98 Letter from Randy Glaeser to L. W. Matteson Re: Braun letter...........................61-64

66..2/25/97 Letter from Larry W. Matteson to Melissa Gulan .......67-68

67..5/9/97 Letter from Randy Glaeser to L. W. Matteson................70-71

68..5/13/97 Letter from Larry W. Matteson to Captain Glaeser......71-72

69..5/16/97 Letter from Captain Glaeser to L. W. Matteson........73

**(EXHIBITS, CONTINUED:)**

70..9/5/97 Letter from Major Glaeser
to L. W. Matteson, Inc..........77

71..6/4/98 Memorandum by Melissa Gulan..78-79

(Reporter's Note: The Original Exhibits are in the possession of Counsel for the Plaintiff, Stephen Miller, at Miller Law Firm.)

**PREVIOUSLY MARKED EXHIBITS REFERRED TO HEREIN:**

1...Construction Project Documents
(Solicitation)...................19, 30

2...Daily Record of Events Dated
8/29/96 by Dan Kromholtz.......28, 30, 32

Tapp Exh. 10:
Daily Record of Events of
Steve Tapp.......................37

Gulan Exh. 23:
7/31/97 Memorandum Re: 7/97
Meeting Between the Corps and
Matteson.........................75

Matteson Jr. Exh. 31:
Letter from Larry Matteson to
Tony Foster with Fax Cover
Sheet dated 7/18/96..............20

Matteson Jr. Exh. 35:
10/2/87 Letter from Mark Jarstad
to Larry W. Matteson.............14, 18

Matteson Jr. Exh. 36:
Agreement Between L.W. Matteson
and Clifford Wilsons and John
Danckwarts....................14, 17-18

Matteson Jr. Exh. 37:
Purchase Agreement dated August
16, 1996.........................23

Matteson Jr. Exh. 39:
9/19/96 Letter from Lawrence
Matteson to Tony Foster..........47

**(EXHIBITS, CONTINUED:)**

Matteson Jr. Exh. 46:
5/8/97 Letter from Larry W.
Matteson to Captain Glaeser......69

**REQUESTS FOR PRODUCTION OF DOCUMENTS BY:**

Ms. McCarthy.............................61

**********

LAWRENCE W. MATTESON,

duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. MCCARTHY:

Q Good morning, Mr. Matteson. Would you please state your name and address for the record?

A Lawrence Wesley Matteson, address, Number 1 Southpoint, Burlington, Iowa.

Q Mr. Matteson, are you currently the president of L. W. Matteson, Inc.?

A Yes, I am.

Q For how long have you been president?

A Since we started it back in the late '70s.

Q What did you do prior to starting your business in the late 1970s?

A I farmed for about 30 years.

Q So you first became a contractor in the late 1970s in terms of a business manager --

A I started working for myself without a company basically for a while.

Q Did you have any familiarity with government contracts before you started your company in the late 1970s?

A No.

Q Mr. Matteson, when did you first become aware of

the project, the Grand Embankment Excavation Project that's the subject of this dispute?

A When we received the solicitation, and we had been -- we knew about the job for several months ahead of time, knew it was coming up.

MR. MILLER: Before the solicitation was formally issued?

THE WITNESS: I'm sorry?

MR. MILLER: Before the solicitation was issued?

THE WITNESS: Yes. We were aware of it.

BY MS. MCCARTHY:

Q How did you become aware of the solicitation before it was issued?

A Those piles are all along the Mississippi up there, and usually, they are talked about ahead of time as to when they are going to come up for bid.

Q Talked about among whom?

A Corps people and different contractors.

Q Upon receipt of the notice of the solicitation, what did you do?

A Tried to see whether we could put a bid together and get set up to where we could dredge the material with a hydraulic dredge rather than mechanical.

Q And specifically what did you do in connection

with the bid?

A Specifically --

Q Yeah. What was your role in connection with the bid, if any?

A Mostly figuring -- or trying to decide how we were going to do it and then horsepower, and they had requirements and that type of thing.

Q In terms of your responsibilities versus those of your son's, Larry W. Matteson, was there any difference in those responsibilities in terms of putting the bid together for this contract?

A We put it together jointly.

Q Did you participate in the effort to select sites, alternative sites for the disposal?

A Yes, I did.

Q Can you describe your participation, please?

A I made some visits up there and visited with the local people and looked at different sites, talked to the owners.

Q How did you go about identifying sites?

A Past experience.

Q And how did your past experience assist you in identifying sites?

A Basically, it's got to be a place where you can deposit sand on and get the water back to the river.

Q And did you approach landowners? Can you just tell me the process you went about in selecting --
A Drove around the area and looked for different sites that we might be able to use and then started talking to owners.
Q During the course of this investigation, did you speak with any local people other than the actual property owners?
A Yeah.
Q With whom did you speak?
A Yeah. We talked to different landowners. Some of them were acceptable, and some of them -- because you never know who owns the land or the field until you talk to somebody and find out who owns the specific ground.
Q Do you recall the different landowners with whom you spoke?
A We spoke to Mr. Brown and Barton and Guza, Saunderson.
Q Did you speak with anyone else?
A No names come to mind right now.
Q Did you speak with any realtors in the course of this investigation?
A I did not personally, no.
Q Do you know if anyone at Matteson did?
A Yes.

Q Who?
A David Guillot.
Q Other than various landowners or, I gather, potential landowners, did you speak with any other local people in the course of your site investigation?
A As I was driving around up there, yeah, I talked to different people. Their names, I can't recall anymore now what all their names were.
Q When you spoke to different people, did you tell them the purpose of your investigation, what you were looking for?
A Yes.
Q Did you receive any negative reaction during the course of these conversations?
A There was some concern as far as wells and septic tanks and stuff was concerned.
Q Can you recall any individual who had expressed a concern about a well?
A Specifically, I can't because I don't remember the names of all the people that I talked to anymore.
Q What did you understand the nature of their concerns to be regarding the wells and septic tanks?
A Same as they had been on the other, the Read's Landing and those up there where the government had put in monitors and stuff and monitored the impact on the

water around there and had found no impact on the other jobs that had been done. We were intending to put monitors in on this job.

Q As to Read's Landing, what do you recall the concerns being expressed by landowners or local individuals in connection with that project?

A What was that question again?

Q As to Read's Landing, what do you recall about the concerns being expressed by local individuals?

A There was some concern about blowing sand on the Read's Landing job, and they were monitoring the wells, the well water.

Q And who is they?

A Corps of Engineers.

Q When did you become knowledgeable about the concerns about blowing sand?

A You just asked me about the Read's Landing?

Q Right.

A On the Read's Landing?

Q Right. When did you become knowledgeable about the concerns about blowing sand on the Read's Landing project?

A When we were doing the job.

Q And do you recall approximately when that was?

A Just, like I say, when we were doing the job.

Exactly what day or what time, I don't have an idea.

Q Would that have been in 1995?

A If that's when the job was done, yeah. I can't recall all those dates.

Q Do you know, to your knowledge, were the concerns about the blowing sand in connection with the Read's Landing project, were those ever addressed?

A Not that I know of. It wasn't part of our contract.

Q What about the monitoring of the wells in connection with the Read's Landing project. What do you know, if any, of the effect that had on the local concern?

A We were not the ones that were monitoring. But as far as I know from what I was told by the Corps that there was no negative impact found in the water quality or as such.

Q Other than your communications with the Corps, did you have any other understandings regarding the issue with the wells in connection with the Read's Landing project?

A No.

Q And how did you learn of the concerns of the blowing sand regarding the Read's Landing project? Did you hear that from the Corps or from someone outside of

the Corps?

A As I recall, most of it, there was a truck stop restaurant within about 300 feet of where we were putting the sand, and the locals congregated there, and as I remember, I probably heard it from the locals in there.

Q Now, sir, you also mentioned Crat's Island. What do you recall regarding local concerns expressed regarding Crat's Island?

A We had to modify the booster station in order to get the noise level acceptable. And I know they had some monitoring wells there, too, at the same time. So other than that, that's the only thing that I know of.

Q And was L. W. Matteson, Inc., directly involved in the modification of the booster stations?

A We put a shield around the booster stations to try to limit the noise level, yes.

Q Do you recall how the noise issue arose with regard to Crat's Island?

A There was a motel several hundred feet from the booster station, and he started complaining, and we brought a sound expert in out of Minneapolis-St. Paul, and had him monitor it, and we were well within the limits that the Corps had set for the noise level.

Q And even though you were within the limits set by the Corps, you nonetheless undertook an effort to

modify the booster station to address the noise?

A I think whether we had done anything after we found out we were within the limits or whether that was before I don't know. Once we satisfied the fact that we were within the limits, why, we were well within the limits.

Q What about with wells; was there any concern expressed by local individuals in connection with wells for the Crat's Island project?

A As I said, the Corps monitored the wells. We had nothing to do with that.

Q And in terms of your understanding about any issue with wells, that was based on communications with people in the Corps?

A I don't know. All I know is they had monitoring wells set up around the disposal area.

Q Mr. Matteson, I would like to have you fish out, if you would, Exhibit 35, which we addressed with your son yesterday. Take out 36; we'll address that in a minute.

A Thirty-six, too?

Q Yes, 35 and 36. Now, Exhibit 35 is a letter dated October 2, 1987, from Mark A. Jorstad, who is an attorney, to Mr. Larry W. Matteson. Do you recall ever seeing this letter?

A We were involved in this, yes.

Q Can you describe generally what Matteson's involvement was in the issue that's described in this letter?

A With the Corps, as Kromholtz I think stated the other day, we had two disposal areas on this project. One was --

Q Excuse me. I'm sorry, sir. I don't mean to interrupt you. What's this project just for the record?

A Crat's Island.

Q Okay. Thank you.

A And the one down there by the marina. Part of the job was to fill that area in on the bluff there, and they did not have a method of returning the water back to the river. There had been some oversight or something, and the marina would not let us dump it back into the marina, and we had to find another outlet. And Mr. Wilson's was the only way to get it back to the river. And the relationship between Mr. Wilson and the Corps of Engineers and Melissa was not favorable by any means. And I got Mr. Wilson to let us put the pipeline across there and put the return water across his land in return for us putting some sand on his property and onto the Danckwarts' property, too.

Q Do you recall having an understanding of this

incident in which the Danckwarts allege that they were not advised by the Corps that there was an apparent absence of a permit? Do you recall anything about this issue that's alleged in this letter?

A That was Melissa's doings dealing with basically the same thing that caused the trouble between the Corps and her before, that she assured --

MR. MILLER: I thought you said between the Corps and her.

THE WITNESS: Melissa. I don't remember whether it was Shortridge or Moore was her name at that time. Now her name is --

BY MS. MCCARTHY:

Q Gulan?

A Gulan.

Q Right. I think you were trying to clarify that there was an issue between Melissa of the Corps and whom?

A Mr. Wilson.

Q Okay.

A Anyway, we got the water returned across his property and the pipeline across his property, and then we filled in Wilson's property and put a pile of sand on the Danckwart property. But we were never able to push it off where she wanted it and had to just level it off and leave it on the property.

Q Do you have any understanding as to why Mr. Jorstad was advising the Matteson company about this issue about a lack of permit? Do you know why?

A The Corps could not participate in this contract here, putting this here water back across here. They asked us to or asked me to arrange for it, and they would do it that way, and that's what happened. And my name was on the thing so we were the ones that had to come back up and level the sand off.

Q Okay. And by the contract, you're referring to Exhibit 36?

A I'm sorry?

Q When you said the contract --

A Yes.

Q -- are you referring to Exhibit 36? Based upon your understanding, why was it that the Corps could not be a party to the agreement that's reflected in Exhibit 36?

A I think probably part of it was a time issue. We had already arrived on the job, had our equipment sitting there on the job when this issue arose, and it would have probably taken the Corps a year to get it straightened out. And we couldn't sit there for that long. The fastest way to get it settled was to go ahead and do it.

Q Now, the Exhibit 35, which is the letter dated October 2, that postdates the agreement that's reflected in Exhibit 36, which is dated March 7, 1987. Is that correct, sir?
A Repeat that again.
Q I'm sorry. I made it overly complicated. The agreement was executed before Mr. Jorstad sent this letter in October. Is that correct?
A You're talking about this agreement here that's dated March 7, 1987, right?
Q Is it? I'm asking for your -- is that your understanding that the agreement is dated March 7, 1987?
A That's what it says right there. Am I --
Q And you signed this agreement?
A That's my signature.
Q And March 1987 occurred before October 1987, which is the letter that's in Exhibit 35. I'm sorry. I'm being overly formalistic about this.
A I don't understand what you're --
Q I'm just trying to establish that the letter was sent after you entered into the agreement.
A It had to be because it concerned me.
Q Okay. What did Matteson do, if anything, in response to Mr. Jorstad's letter?
A That's why I stated before we sent a dozer up

there to level the sand out.

Q What about the issue of the lack of permit? How was that addressed?

A As far as I know, it was never addressed.

Q How would you characterize your relationship with the Wilsons?

A Excellent.

Q And how would you characterize your relationship with the Danckwarts?

A Fine.

Q And was that a continuous state throughout the duration of your relationship with them? Did it change at any point?

A No, because we did what we said we would do.

Q If I could turn your attention, Mr. Matteson, to Exhibit 1. And prior to submitting Matteson's bid, did you have occasion to review the solicitation?

A Yes.

Q Did you read every page of it?

A Word for word probably not. Over the years, we've, you know, don't read all the stuff every time.

Q By the time you received the solicitation, were you familiar with at least some provisions of the Federal Acquisition Regulation?

A As I say, we've looked these through on previous

jobs and this job.

Q And when you read the solicitation, which is marked as Exhibit 1, did you understand that certain provisions of the F.A.R. would be incorporated by reference?

A It's stated in there.

Q And did you have an understanding as to the contents of the F.A.R. provisions that were incorporated by reference?

A Do I know all of them? Probably not.

Q Did you undertake to review the F.A.R. provisions that are incorporated by reference?

A No.

Q Mr. Matteson, if I could draw your attention to Exhibit 31, which we discussed with your son yesterday. Exhibit 31 is a fax dated July 18, 1996, to Mr. Tony Foster of the Army Corps of Engineers, and it was signed by your son.

A Uh-huh.

Q Are you familiar with the reference to the James Martin placement site in this letter?

A I looked at the -- I think there was a Martin and a Regman [phonetic] or something like that. There was two places there.

Q And do you recall that Matteson was interested

in potentially using the Martin site in connection with this --

A I think this letter was written before we looked at the sites. These sites were listed in your solicitation as possible sites. And when we looked at it, we were wondering -- listed as trucking sites. We were wondering if they would change them and let us pump hydraulic fill into those sites.

Q How were the sites that were set forth in the Corps' solicitation listed as trucking sites?

A I think that's what it was stated in there. Now I can't remember the exact wording, but maybe the job was set up pretty much strictly for a mechanical dredging type job.

Q And how, in your view, was the job set up for mechanical dredging? What about the --

A Because, actually, when we looked at these jobs, when we finally went and looked at these sites, there was no method for getting the water back to the river, as I recall. I don't remember ever getting a response to this letter back from the Corps of Engineers.

Q You're ahead of me, Mr. Matteson. I was going to ask you that. Do you know why at this particular stage Matteson, Inc., was singling out the Martin placement site versus the other sites that were set forth

in the solicitation?

A Which other sites are you referring to?

Q Well, how many sites do you recall being set forth in the solicitation?

A Either three or -- there were two real small trucking sites, half acre or something like that, which we had ended up trucking material to, and then there was this Martin site and a Regman [phonetic] site. Now, which of these two sites I'm visualizing that I went and looked at I don't know. And as I recall, when we visited with the owner, the Corps did not have any permit or any agreement with him to let material be put on the site, which surprised us.

Q But in particular, in terms of this fax of July 18, do you know why Matteson just singled out one site among other potential sites?

A No. Of course, I'm sure where I looked, the half acre sites would not be dredge sites. They were clear up in the hills.

Q And did you determine that the other sites were half acre sites based on the solicitation or based on your physical observation of the sites?

A You have that statement right in the solicitation.

Q So it's based on your reading of the

solicitation?

A (Nods head.)

Q And was it based on your reading of the solicitation that the Martin site might at least potentially be a site that could be used for hydraulic dredging?

A You state in the solicitation that it would hold all the material that needs to be moved, right?

Q The letter asked that the plans and specs be changed to allow direct placement of material on the Martin site using a hydraulic pipeline dredge. And I'll give you an opportunity, sir, if you want to look through the solicitation. But what in your view at this point in time needed to be changed in the plans and specs to allow the use of the hydraulic pipeline dredge?

A I don't know what that would entail.

Q So you don't know specifically what would need to be changed in the plans and specs to permit use of the Martin site as a hydraulic --

A No. That's correct.

Q -- site? I'll also ask you, Mr. Matteson, if you would pull out Exhibit 37. Now, Exhibit 37 appears to be a purchase agreement dated August 16, 1996, involving L. W. Matteson and a piece of property located at 53 Pioneer Drive in Wabasha, Minnesota. Do you

recognize this purchase agreement?

A Yes.

Q What property does this purchase agreement pertain to?

A It's a piece of property that we got an option on to run a pipeline across to get to the Braun property down in that area.

Q So this piece of property was not for the Saunderson property. It was for the Braun property?

A Yeah. This isn't the address of the Saunderson property.

Q And at some point, did Matteson enter into a purchase agreement for the Saunderson property?

A Yes.

Q Do you know if the terms and conditions of that purchase agreement were different than the terms and conditions of the purchase agreement set forth in Exhibit 37 but for perhaps the location and the amount of the sale price?

MR. MILLER: This might be helpful to you. And I told you before we went on the record that with Mr. Guillot no longer employed by Matteson, we were trying to find some files that he may have kept. And we found a couple of those files, and we did locate the

Saunderson purchase agreement in there, and I think I can lay my hands on that for you.

MS. MCCARTHY: Okay. Can we put an exhibit sticker -- we don't have any copies of this. If we can mark this as Exhibit 48.

(Deposition Exhibit Number 48 was marked for identification and is attached herewith.)

BY MS. MCCARTHY:

Q Mr. Matteson, we've handed you what's been marked as Exhibit 48, which your counsel just provided to us, which we're appreciative for, and ask you if you recognize what's been marked as Exhibit 48.

A Do I recognize it?

Q Yeah. Do you recognize it?

A That is the purchase agreement we had for the Saunderson property.

Q And what is the purchase price listed?

A It started out at $78,750 and then at some point during that period of time increased to 90,000.

Q Okay. Do you know at what point in time -- strike that. What's the date of this purchase agreement?

A August the 23rd of '96.

Q Okay. And what point in time, to your knowledge, did the purchase price increase to 90,000 from

78,750?

A I don't think that's apparent.

Q Do you know independent of this document?

A I'm sorry?

Q Do you know independent of the document when that change occurred?

A I have no idea.

Q If I could just draw your attention to the middle of this agreement, it states, "Subject to performance by the buyer the seller agrees to execute and deliver a General Warranty Deed (to be joined in by spouse, if any) conveying marketable title to said property subject only to the following exceptions:" "Building and zoning laws, ordinances, State and Federal regulations." "Restrictions relating to use or improvement of property without effective forfeiture provision." "Reservation of any minerals or mineral rights to the State of Minnesota." And "Utility and drainage easements which do not interfere with improvements." And "Rights of tenants as follows: (unless specified, notsubject to tenancies)." Were you familiar that that provision pertained to the purchase agreement of the Saunderson property?

A Pretty much standard, yeah.

Q And it's pretty much standard to have a

reference to building and zoning laws, ordinances and state and federal regulations and conveying a general warranty deed?

A Yes, I believe so.

Q Is the issue of a right-of-way to the Saunderson property reflected in this purchase agreement? Do you know?

A Well, that was a separate -- will you run that by me again?

Q Was the right-of-way for the Saunderson property, was that reflected in this purchase agreement?

A No.

Q Was there a separate agreement for the right-of-way?

A We had an option with an individual right across the road from here, Wooldridge or something like that was the name, to run the pipeline across their property.

Q And was that reflected in a written agreement as well?

A I haven't been able to find it yet, and I'm not sure whether we had a written agreement or just a verbal.

Q And what was the option price for that, if you recall?

A As near as I can figure it out, it looks like it was $20,000.

Q Okay. Mr. Matteson, if I could turn your attention to Exhibit 2, which are notes Mr. Kromholtz took on August 29, 1996. Do you recall having a conversation with Mr. Kromholtz on August 29, 1996?
A Yes.
Q What do you recall about that conversation?
A My son was up here waiting to turn the bid in, and he called me, and I was in the Atlanta airport, and we had put the bid together over the telephone, finalized it and stuff. And I called Dan Kromholtz to get a little more assurance or -- I have a lot of respect for Dan Kromholtz, and I feel that he has respect for me, and I respect his opinion, and I called him to ask him about this site.
Q And when your son was waiting up here, does that mean your son was in St. Paul?
A Yes. He was sitting outside here waiting. This phone call happened about two hours before bid opening, I think.
Q And to clarify, you were in an airport in Atlanta?
A I'm sorry?
Q On August 29 --
A I was in Atlanta airport.
Q -- you were in Atlanta airport? Had you visited

the Saunderson property prior to making this telephone call to Mr. Kromholtz?

A Yes.

Q How many occasions had you visited the Saunderson property?

A I think I had been there a couple of times.

Q Who if anyone else was with you when you visited the sites prior to August -- strike that.

Who if anyone was with you when you visited the Saunderson property prior to August 29, 1996?

A I'm not sure anyone was there with me when I visited.

Q Do you know if you visited the site with any officials from the Corps?

A As I just stated, I don't think anybody was there with me when I visited the site.

Q I'm sorry. I didn't hear you. Prior to making this telephone call, what was your understanding as to the contact, if any, that the Corps had had with the Saunderson property?

A I was not there when they made the site visit with my son and drove around the property and looked at the Braun property and the Guza property. As far as we were concerned, all three properties were usable and permittable from what the observation of the site visit

had been that day that my son drove around there with them.

Q Okay. If you could turn to Exhibit 2, Mr. Kromholtz' notes, it states, "Lawrence Matteson. He asked about use of a wooded site at Teepeeota Point." When you spoke with Mr. Kromholtz, did you specifically use the term Saunderson property, or did you refer to a wooded site at Teepeeota Point? Do you recall?

A I was talking about -- I'm sure I said the Saunderson area and then described to him that it was the wooded area and where it's located at.

Q And at this time that you made the telephone call on August 29, was the Saunderson property a wooded site?

A Yes. That's what I was talking -- that was the Saunderson site here that I'm talking about here in the conversation that I had with him.

Q Now, Mr. Matteson, if I could turn your attention briefly to Exhibit 1, which is the solicitation. I make you juggle exhibits. I apologize.

A Okay.

Q If you could turn to page 01000-2, which is section 7.3 in the solicitation.

A 0001 what?

Q It's 1000-2, if you prefer to do it that way.

It's towards the end. It's more towards the end of the solicitation. It's solicitation 01000. Okay. Do you see 7.3 on the top half of the page?

A Okay.

Q Prior to this phone call to Mr. Kromholtz, did you know if you had read this particular provision of the solicitation, 7.3?

A I'm familiar with the section.

Q And this section pertains to contractor's selected final disposal areas and placement sites. Is that correct?

A I'm sorry?

Q This particular provision, 7.3, this pertains to contractor's selected final disposal areas and placement sites. Is that correct?

A Yes.

Q And if I could just draw your attention to, I believe it's the third sentence. It reads, "No disposal (placement) will be allowed in a wetland or wooded area."

A Correct.

Q Now, at the time you had the telephone conference with Mr. Kromholtz, were you aware of this provision in the solicitation?

A Yes. The landowner was already cutting the wood off. He was harvesting the pulp wood off of it.

Q Do you know at what point in time the landowner had started that process of clearing the land?

A It was an ongoing process for -- he worked someplace and just did this as a part-time job.

Q Like a weekend activity or --

A Yeah.

Q So Mr. Kromholtz's notes reflect you as indicating that the site was being cleared by the landowner. Is that accurate?

A Yeah. That's right.

Q I'm sorry.

A Yeah.

Q I don't want to confuse you. I want to direct you back to Exhibit 2. You can put the solicitation aside, if you wish. Then the notes continue, "I told him that we could not control what the landowner did." Now, do you recall Mr. Kromholtz making a statement to that effect?

A I don't remember the exact wording that was used. That's when I assured him that the landowner was already in the process. And from what I had talked to him, he was going to continue cutting down. I didn't think that that would be an issue.

Q Then the notes continue, "We did not want heavily wooded areas cleared just to dispose of dredged

material." Do you recall Mr. Kromholtz making a statement to that effect in this conversation?

A No. I don't remember -- like I say, I don't remember the exact wording that was said, but the trees were not a problem because they were going to be cut anyway. And they were not being cut for the purpose of putting the sand on. They were being cut for the landowner's use of selling the pulp wood off of them.

Q But would it be fair to say that you recall that there generally was a discussion with Mr. Kromholtz about the fact that the site was wooded and that it was in the process of being cleared and that the landowner was clearing it for a purpose unrelated to this project?

A Right. And that was one of the positive aspects of this property was the fact that it was wooded, and we were planning on leaving, and this is reflected in the Corps' letters later on in this whole process was the leaving that 40 or 50, 60-foot trees around the outside would limit the visibility of it and also limit the sand blowing or the noise when we were placing it on that stuff, so the trees were a positive aspect as far as we were concerned.

Q The notes continue, "From talking to Mr. Matteson, it sounded like that was not the case." So would it be fair to say that you gave the impression to

Mr. Kromholtz during this conversation that the wooded area was not being cleared just to dispose of the dredged material; that you had given him that impression?

A That's right.

Q The notes continue, "I told him that we would need to do a cultural resources investigation of the site and that we would obtain water quality certification from the MPCA for the effluent." Do you recall Mr. Kromholtz making a statement to that effect?

A This would be the general things that we would be talking about in this conversation, yes.

Q And it was your understanding from this conversation that the cultural resources investigation would occur after the telephone conversation, would occur in the future?

A Yes.

Q And also you understood that as of August 29, the water quality certification had not yet been obtained from the MPCA for the effluent?

A Yes.

Q Was there anything else that you can recall regarding this conversation with Mr. Kromholtz that is not reflected in these notes?

A No. Like I say, I just called him up to get a positive feeling or a negative feeling from him as to

whether the site could be used or not.

Q And what was your impression after speaking to Mr. Kromholtz? How did you feel?

A I felt that he felt that it was a site that could be used for this purpose.

Q Did he express any specific familiarity with the site during this conversation?

A He knew the site that I was talking about.

Q And how --

A I mean, you know, it's very obvious when you drive around the area out there. It's the site right across the road from the Guza property, and, like I say, it's no secret. When he drove around out there he knew what site. It's right next to the site that he had looked at with J. F. Brennan. This site is right next to that.

Q Before you had placed a phone call to Mr. Kromholtz, what concerns, if any, did you have about the site that prompted this phone call?

A Same concerns a person always has when you submit a bid of that size and agree to do a job.

Q And what concerns were those?

A Just trying to be real sure that you can pull it off.

Q Did you have any specific concerns about the

site though?
A Just the general concerns that a contractor in our position when you're submitting a bid on a job of that size would have.
Q And, Mr. Matteson, you brought your phone records or some records here?
A Yes.
Q Do you have any memorialization of this particular --
A I don't know whether that phone call was listed in there or not. I don't think it is.
Q I understand, sir, that you were calling presumably from a pay phone or a cellular phone at the airport and that --
A Yes. I was calling from a pay phone.
Q -- you weren't sitting at your desk.
A I don't think I opened my briefcase. I think we found the phone record of that call being made. There was a charge to my credit card.
Q Right. We have the billing records. I was just wondering if you had any notes --
A No.
Q -- or a record of the conversation --
A No.
Q -- other than obviously the mechanical fact that

it occurred.

A No.

Q I think there's no dispute that the call occurred. If I can turn your attention, sir, to Exhibit 10. I'll give you a few minutes if you want to put those documents back. Exhibit 10, now, these are notes that were used during Mr. Tapp's deposition. And the entry for September 18, 1996, reflects a conversation, a telephone call that Mr. Tapp received from Jim Nordstrom, the Wabasha County Attorney. Do you recall ever receiving a phone call from Mr. Nordstrom regarding the shoreline ordinance?

A No.

Q Have you had any dealings with Mr. Nordstrom?

MR. MILLER: I didn't hear. What was your answer?

THE WITNESS: No.

BY MS. MCCARTHY:

Q Have you had any dealings with Mr. Nordstrom?

A The name doesn't ring a bell with me.

Q So as you sit here today, you don't recall ever meeting with Mr. Nordstrom or speaking with him on the telephone?

A What's his position?

Q It appears that he's the Wabasha County

attorney.

A No. That isn't the guy I talked to.

Q Now, at some point in time, did you become aware of the issue of a shoreline ordinance and its potential effect upon the Saunderson property?

A Sometime after award we became aware that there was a shoreline protection issue. I don't know exactly what it's called.

Q Do you recall how long after award you became aware of the shoreline protection issue?

A As near as I can find out, it was a letter that I received from Judy Kruger. The exact date I can't -- I looked at this morning, and I can't remember what the exact date was. But it was sometime after we had been in the process of getting a permit for the Saunderson's -- we were getting a permit for continued clearing and stuff on their land, and that's where the land use permit we were aware of just shortly after the, I guess shortly after the award and then after the land use permit. The land use permit did not cover the shoreline. It was a separate thing.

MR. MILLER: You mentioned earlier that you located Mr. Guillot's file. The letter that he's referring to -- a copy of that is located in that file. You're welcome to look

at the file any time.

MS. MCCARTHY: Oh, thank you. That will speed things along. Thank you.

THE WITNESS: This conversation here on the 18th --

MR. MILLER: Just for the record, I handed counsel a September 24, 1996, letter from Judy Kruger that apparently was faxed to Matteson's office on September 26.

THE WITNESS: I think you were asking me about this conversation here with Steve Tapp -- or about his conversation with Mr. Nordstrom, I guess.

BY MS. MCCARTHY:

Q Right.

A This letter here would indicate that the Corps of Engineers knew about the problem here before the award, right?

MS. MCCARTHY: It suggests what it suggests. If we could mark this as Exhibit 49.

(Deposition Exhibit Number 49 was marked for identification and is attached herewith.)

BY MS. MCCARTHY:

Q Now, Mr. Matteson, is this the letter to which

you're referring, the letter from Ms. Kruger?
A Correct.
Q The letter from Ms. Kruger refers to a recent conversation.
A Correct.
Q What prompted that? Do you know what she's referring to in that recent conversation?
A At that time, I was talking to her, you know, off and on about what was going on up there and about us putting the sand on the property and getting the land use permit papers and stuff through.
Q When did you first have contact with Ms. Kruger?
A It looks like 9/12 is the first entry I have in here on County Permit, Wabasha Zoning Administration, Judy Kruger, (612) 565-3242. All I say is that she will send permit app.
Q And this is on September 12, 1996?
A Yes.
Q And do your notes indicate that you contacted her or she contacted you?
A Doesn't say.
Q What caused you to get in contact with Ms. Kruger?
A The Saundersons were getting a permit renewed or something on the land use permit, and they asked me to

call her, and I called her or something. Like I say, I was talking to her at that time after the bid opening.

Q Were you aware that the Saundersons had a land use permit at the time you submitted your bid?

A I'm not sure that we -- we just had an option on the land is all we had at that time.

Q Were you aware at the time you submitted your bid that you might be required to obtain a land use permit?

A I don't think that had come up at that time.

Q Upon receiving Ms. Kruger's letter dated September 24 -- I guess, it looks like you received it perhaps the 26th. But upon receipt of Ms. Kruger's letter sometime in September, do you recall what your reaction was to the letter?

A I don't think we -- at that time we still did not have any real big concerns that we couldn't get the necessary permits to get to the land.

Q Ms. Kruger refers to the shoreland and the shoreland management ordinance in this letter.

A Uh-huh.

Q Did you know what she was talking about when you received this letter?

A I'm not sure. I knew that at that time when she called me, and I think we had discussed it some to some

extent. But at that time, I don't think Judy felt that it was going to be all that big a problem.

Q Did you have any communications with the Corps about this shoreland ordinance after you received this letter from Ms. Kruger?

A I think that it was being discussed both between us and the Corps, yes. Exactly when exact dates are I don't know.

Q In terms your knowledge of the ordinance, what -- strike that.

Upon learning of the existence of this ordinance sometime in September 1996, what did you do after that in connection with the ordinance?

A Well, there was continuous conversations back and forth. We were trying to find out what it consisted of, and, like I say, when we first heard about it, I thought that it still could be dealt with.

MR. MILLER: I want to interpose an objection. I don't want the question where counsel said that Matteson learned sometime in September to suggest anything contrary to the witness' testimony, which was that he did not become aware of it until sometime after September 26 when he received Judy Kruger's letter. I don't know that it was intentional.

I don't want the question to be mischaracterized as the witness is in agreement, which was sometime in September.

BY MS. MCCARTHY:

Q And when you say you had continuous conversations, who were the parties to these continuous conversations?

A Other than Judy, I don't know who -- at that time, I don't know who we were talking to other than Judy.

Q When did you first have discussions with anyone from the Corps regarding the county shoreline ordinance?

A That I don't know. I have --

Q At some point --

A Go ahead.

Q I'm sorry. Did you have --

A See, I have just telephone numbers of Melissa and another party here. But I don't say that I called or anything. I just have their phone numbers down and stuff here.

Q At some point, did you become concerned about the shoreline ordinance?

A I guess our concerns started when we started having the public meetings, and they were so violent.

Q I don't want to mischaracterize your testimony,

Mr. Matteson, but if I understand your testimony, learning of the simple fact of the existence of the shoreline ordinance did not cause you any particular concern?

A You know, any of these things cause you concern. That's why we're pursuing it. It had to be dealt with.

Q But the simple existence of the shoreland protection ordinance did not cause you to believe that you wouldn't be able to use the property?

A As I previously stated, when we first found out about it, I thought it was something that we could live with and something we could work with.

Q When was the first public meeting? When did that occur, to your knowledge?

A Exact date I do not know.

Q Do you have an approximate understanding when it occurred in relationship to this letter that you received from Ms. Kruger?

A I did not attend the first public meeting they had up there. I think the Corps' testimony indicated that they were there. Exactly what the date was, I don't know what the date was on it. I can't --

Q Did you have any information as to what occurred at the first meeting that caused you increased concern?

A Yes. It was the local opposition due to Corps

performance in the past was, I guess you would call them very violent and very outspoken.

Q How did you learn about the local opposition expressed at the meeting? Just tell me mechanically.

A We had a representative at that meeting.

Q And who was the representative?

A David Guillot. And I can't remember. I think my son was at that meeting, too. I can't remember for sure.

Q And Mr. Guillot and maybe your son told you about what occurred at the meeting?

A Yes.

Q And was that the first time that you became concerned that you might not be able to use the Saunderson property as a disposal site?

A That was the start of it, yes.

Q At any time prior to this first public meeting, were you concerned that you may not be able to use the Saunderson property as a disposal site?

A We were getting feedback from different conversations and stuff that it was from Judy Kruger and from other people that the opposition was building, yes.

Q Do you recall when Ms. Kruger first advised you of the opposition?

A Exactly, I can't remember the days and the dates

that many years back. My memory is not that good anymore.

Q Did Ms. Kruger advise you that opposition was building at the time she sent you this letter enclosing copies of the ordinance?

A My conversations with Judy at that time, I don't think she was that concerned. Judy is also a landowner in that vicinity, lives out in that vicinity. She had the same concerns that everybody else does. But she had an office here, and she was fulfilling her office duties for the most part when she was talking to me.

Q Based on your conversations with Mr. Guillot about what happened at the first public meeting, did you have an understanding as to what prior Corps projects the local concern was being expressed?

A The placement of sand in the county there. All the projects where they had placed sand in the --

Q Do you know specifically where?

A The Read's and Crat's placement sites.

Q Okay. Mr. Matteson, if I could turn your attention to Exhibit 39. Could we go off the record for a second?

(Discussion off the record)

(REPORTER'S NOTE: At this time, 10:30 a.m., we recessed Mr. Matteson's

deposition in order to proceed with Mr. Guillot's deposition to accommodate Mr. Guillot's flight schedule.
Mr. Matteson's deposition resumed at 1:15 p.m.)

BY MS. MCCARTHY:

Q Good afternoon, Mr. Matteson. Thank you for being patient in the brief hiatus during your deposition. We're back. If I could ask you, sir, to fish out Exhibit 39. Mr. Matteson, do you recognize Exhibit 39?

A Yes, I do.

Q And this is a letter dated September 19, 1996, from you to Anthony Foster of the Corps of Engineers. Is that correct, sir?

A Correct.

Q What was the purpose of this letter to Mr. Foster?

A Verify our mobilization bid.

Q And to your knowledge, why were you verifying your mobilization bid?

A It's not untypical on dredge jobs because dredge jobs typically have a high mobilization cost.

Q And what's the significance of the mobilization and demobilization bid at this point in time, September 1996?

A I would assume that they thought it was too high a portion of the bid, I would assume.

Q And did this portion of the bid, did this result in payment earlier in time for Matteson?

A Well, it would be part of the mobilization price.

Q And you would be paid for the mobilization prior to being paid for the entire contract. Is that correct?

A Typically, on most dredge contracts, 60 percent of the mobilization is paid up front and 40 percent is paid on the end.

Q The amount that's ascribed to land acquisition on Exhibit 39 is $140,000. What does that reflect, that $140,000 figure?

A I would think that that represents $90,000, which is the price of the land, and $50,000 for grubbing stumps and clearing it. That would be a reasonable -- most clearing and grubbing runs, you know, from $1,200 to $1,600, so $1,000 an acre would be a reasonable price for that.

Q And you were planning on clearing 50 acres? Is that --

A If I remember correctly, I think we were buying 55 acres and whatever that 40 or 50 foot strip on the outside would have been -- everything else would have