IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| L.W. MATTESON, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 01-542C |
| | ) | (Judge Lawrence J. Block) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56(h)(1) of the Court's rules, defendant, the United States, respectfully requests the Court to enter summary judgment in its favor based upon the following proposed uncontroverted facts:

1. Plaintiff, L.W. Matteson, Inc. ("Matteson") is an experienced Government contractor and established hydraulic dredging company. Def. App. 962-63, 989.

2. Matteson seeks a $1.1 million equitable adjustment in the price of its fixed-price contract with the United States Army Corps of Engineers (the "Corps") to excavate and transport existing dredged material from two specified areas located upstream from Alma, Wisconsin (the "Grand Encampment Excavation"). First Am. Compl. ¶¶ 1, 15, 22.

3. In its contract, Matteson expressly assumed responsibility for obtaining any necessary licenses or permits, and for complying with any Federal, state, and municipal laws, codes, and regulations that may apply to the contract work. Def. App. 88, 1033-35.

4. In performing the contract, Matteson made business decisions: (1) to reject, in large part, use of the potential disposal sites identified in the Corps' invitation for bids; (2) to

select different disposal sites; and (3) to attempt to use those sites instead of the Corps' sites to perform the contract work. First Am. Compl. ¶¶ 2, 7, 16.

5. In Matteson's view, the Corps' sites were incompatible with Matteson's choice of hydraulic dredging, and that the "use of hydraulic dredging would require the contractor to obtain its own disposal site within the vicinity of the two designated areas, . . . . Id. ¶ 5; see also id. ¶¶ 2, 4.

6. After Matteson failed to obtain necessary state and local approval for the alternative private disposal sites it had chosen, id. ¶18, the Corps assisted Matteson in locating yet another alternative disposal site on property owned by the Fish & Wildlife Service. Id. ¶ 19.

7. **The Invitation For Bids.** On July 10, 1996, the Corps issued an invitation for bids for a contract whose work would include, without limitation:

> furnishing all plant, labor, material and equipment necessary to excavate and transport existing dredged material from two borrow/stockpile areas: (1) the Alma Marina in Alma, Wisconsin; and (2) an island in the Mississippi River located upstream from Alma, Wisconsin. Such removed existing dredged material is to be disposed of in various potential on-land placement sites located in Buffalo County, Wisconsin.

First Am. Compl. ¶ 1; Def. App. 15.

8. The invitation for bids for the "Grand Encampment Excavation," Def. App. 15, stated that the awarded contract would contain the standard contract clauses for fixed priced construction contracts inside the United States prescribed by the Corps. Def. App. 18-20, 24, 55-60.

9. These standard Federal Acquisition Regulation ("FAR") contract clauses included: 52.233-1, DISPUTES; 52.236-2, DIFFERING SITE CONDITIONS; 52.236-3, SITE

INVESTIGATION AND CONDITIONS AFFECTING THE WORK; 52.214-6 EXPLANATION TO PROSPECTIVE BIDDERS; and 52.236-7, PERMITS AND RESPONSIBILITIES. Id.

10. The invitation for bids also made clear that the awarded contract would contain clauses that are specific to the Grand Encampment Excavation contract, including, without limitation, Section 01000, ¶ 6.1.1, Grounds Availability; Section 01000, ¶ 7.3, Contractor Selected Final Disposal Areas (Placement Sites); Section 01000, ¶ 12, CONSTRUCTION RESTRICTIONS; Section 01130, ¶ 2.1(5); Section 01130, ¶ 2.3, Compliance; Section 01130, ¶ 4, SUBCONTRACTORS; and Section 1130, ¶ 5, NOTIFICATION. Def. App. 148-51, 166.

11. The Corps had selected five disposal sites for use in performing the contract work, First Am. Compl. ¶ 2; Def. App. 296-98, but only one site was to be mandatory. Def. App. 149, 151-52 ("After this mandatory site has been . . . filled . . ., the Contractor may utilize one or more of the other indicated non-mandatory final placement sites and/or the Contractor's own selected disposal areas (placement sites), as approved.").

12. The invitation for bids made plain that any alternative site that an awardee might select would be subject to approval of the contracting officer, and may require preparation of an environmental assessment. Def. App. 149.

13. The invitation for bids repeatedly advised bidders that the awardee would be responsible for compliance with local environmental laws and regulations.

14. It notified bidders that the awardee would be required to prepare an Environmental Protection Plan that set forth, among other things, the "[p]rocedures to be implemented to provide the required environmental protection and to comply with the applicable laws and regulations." Def. App. 165 (emphasis supplied). However, it also warned bidders that

the Corps' approval of the Environmental Protection Plan would not relieve the contractor of responsibility for compliance with local environmental laws and regulations. Def. App. 166 (" Not withstanding [sic] the requirements of this section and not withstanding [sic] approval by the Contracting Officer of the Contractor's Environmental Protection Plan, nothing herein shall be construed as relieving the Contractor of all applicable Federal, State, and local environmental protection laws and regulations.") (emphasis supplied).

15. The invitation for bidders made it plain that the awardee would warrant its subcontractors' compliance with local environmental requirements. Def. App. 166 ("4. SUBCONTRACTORS. . . . The Contractor shall insure that its subcontractor's [sic] comply with the requirements of this section along with all appropriate Federal, State, and local laws, regulations, and requirements.") (emphasis supplied).

16. The invitation for bids expressly warned bidders that they could not rely upon the Corps to advise them of noncompliance with local environmental requirements:

> The Contracting Officer will notify the Contractor in writing of observed noncompliance with the Federal, State, or local laws, regulations, permits and elements of the Contractor's Environmental Protection Plan. . . . Failure of the Contracting Officer to notify the Contractor of any noncompliance with Federal, State, or local laws or regulations does not relieve the contractor of the obligation to be in conformance with those requirements.

Def. App. 166 (emphasis supplied).

17. **Matteson's Bid.** In formulating its bid, Matteson decided that the Corps' proposed disposal sites were incompatible with the use of Matteson's choice of hydraulic dredging to perform the work. First Am. Compl. ¶¶ 4-7.

18. Matteson chose to select its own disposal or placement site for the dredged material. Id.

19. Matteson based its bid upon the assumption that it would be able to acquire and use the Saunderson property as a dredge disposal or placement site. Id. ¶¶ 8-13; Def. App. 204, 206-08, 219, 221-22, 230-39.

20. Prior to bid submission, on August 5, 1996, Larry W. Matteson ("Matteson Jr.") met with Dan Krumholz, Steve Tapp, and Dennis Anderson, all of the Corps, Bob Drieslein of the Fish & Wildlife Service, and Nick Gulden of the Minnesota Department of Natural Resources, to inspect "two potential disposal sites" Matteson had proposed for permanent placement of dredge material. First Am. Compl. ¶¶ 7-8.

21. Mr. Matteson Jr. and various Government officials physically inspected the Braun and the Guza properties, Def. App. 204, 206-07, 219-20.

22. Mr. Matteson Jr. asserts that Mr. Krumholz also could see the adjacent Saunderson property. Def. App. 377, 381, 384, 1079-84.

23. In exploring the possibility of acquiring the Saunderson property, Matteson learned from its realtor that the Saundersons were using the property to harvest pulp wood and that related permits were required. Def. App. 907-10.

24. At some point, Matteson further learned that it would be required to obtain a conditional use permit if it were to use the Saunderson property as a disposal site. Def. App. 914.

25. However, prior to submitting its bid, Matteson failed to investigate all potential local restrictions upon its own intended use of the Saunderson property, such as the Shoreland Zoning Act. First Am. Compl. ¶ 16; Def. App. 928-29, 1005.

26. Immediately before bid submission, on either August 29 or August 30, 1996, Lawrence Matteson ("Matteson Sr.") telephoned Mr. Krumholz to discuss use of the Saunderson property as a potential disposal site. First Am. Compl. ¶ 10; Def. App. 204, 381.

27. Matteson understood that any alleged Corps "approval" of its proposed disposal sites was "tentative" at best. Def. App. 398 ("WE ARE PRESENTLY NEGOTIATING WITH JOHN BROWN TO GET PERMISSION TO PLACE SAND ON HIS PROPERTY. THIS PROPERTY HAS ALREADY HAD TENTATIVE APPROVAL FROM THE CORPS PRIOR TO THE BID DATE. ONCE AN AGREEMENT HAS BEEN MADE WITH MR. & MRS. BROWN, WE WILL ENDEAVOR TO GET A PIPELINE RIGHT-OF-WAY AND APPROVAL FROM THE LOCAL BOARD. I SHOULD KNOW SOMETHING FROM THE BROWN'S THIS WEEK.") (emphasis supplied); 1076.

28. Matteson concedes that it failed to build into its bid any factor for the risk that it ultimately might not be able to obtain all necessary permits for its proposed alternative disposal sites. Def. App. 982.

29. **The Corps' Bid Verification Request.** On August 29, 1996, the Corps notified Matteson that Matteson had emerged as the apparent low bidder following bid opening and requested that Matteson verify that its bid price was accurate and complete. Def. App. 329-30, 1055-57.

30. By letter dated September 4, 1996, Matteson advised the Corps that it had reviewed the requirements of the invitation for bids, as amended, and had determined that its "bid price of $1,693,000 to be accurate." Def. App. 331, 1058.

31. **Contract Award.** On September 20, 1996, the Corps awarded Contract No. DACW37-96-C-0030 to Matteson in the approximate amount of $1,693,000 (the "contract"). First Am. Compl. ¶ 15.

32. The County of Wabasha, Minnesota subsequently notified Matteson that the Matteson-selected disposal sites were subject to the Shoreland Zoning Act, pursuant to which the county exercised control over areas within 1,000 feet of the river. Id. ¶ 16.

33. Matteson had failed to investigate this local ordinance prior to submitting its bid. Id.

34. Matteson concedes that it failed to discover "significant local opposition to its use of [its] proposed sites" until after the contract was awarded. Id. ¶ 17.

35. Based upon its role in prior Corps projects it regarded as "similar," Def. App. 970, Matteson knew that there was a heated conflict between the Corps and at least one property owner. Id. 967-68.

36. Although Matteson's realtor had told Matteson that "of course the neighbors are upset," Def. App. (**Ex. 51**), 919, 922, and Matteson had heard "talk about" opposition, it ultimately was "shocked at the strength . . . and the volume of" the local opposition to Matteson's use of the Saunderson property as an alternative disposal site in performing the contract work. Def. App. 927.

37. Notwithstanding Matteson's "shock," based upon prior projects, Matteson understood that issues such as groundwater would "of course" be discussed "on any [Corps] project . . . [b]ecause the groundwater is where people get their drinking water and their potable water." Id. 930-31. Indeed, in negotiating to purchase the Saunderson property, Matteson negotiated contingencies, including a contingency that "the permits were granted by local and federal agencies." Id. 932.

38. **Matteson's Certified Claim.** On July 31, 2000, Matteson submitted a certified claim to the contracting officer. Def. App. 332.

39. Matteson alleged that it was entitled to an equitable adjustment of $1,111,227.51:

> for costs incurred and damages suffered as a result of a cardinal change in Matteson's contract, which required Matteson to obtain an alternative disposal site. Matteson is entitled to an equitable adjustment because (a) the Corps authorized, invited and encouraged the hydraulic removal of certain stockpiles of dredged materials; (b) the contract documents indicated the absence of any shoreland restriction; (c) the Corps represented that certain property in the vicinity of the job site was acceptable for the disposal of dredge materials; and (d) Matteson reasonably relied on the Corps' assurances that Matteson's original disposal site was acceptable.

Id.

40. On September 29, 2000, in response to a request by the contracting officer, Matteson submitted additional information in the form of "a legal memorandum" from its counsel that outlined "the various legal grounds" that Matteson contended entitles it "to receive this equitable adjustment." Def. App. 349-57.

41. By letter dated November 17, 2000, the contracting officer denied Matteson's claim. Def. App. 399-419. Matteson commenced this lawsuit on September 25, 2001.

42. Matteson bid an estimated price of $1,693,000 for the projected contract quantities (which bid price was subject to change based upon actual quantities). Def. App. 331.

43. The contract was fixed price. Def. App. 24, 994-95.

44. The Corps paid Matteson in full for the final contract price of $1,581,067.41, which is based upon the actual contract work performed. Def. App. at 337.

45. Matteson, an experienced Government contractor, was familiar with the FAR when it submitted its bid. Def. App. 974-75, 983-84.

46. The contract had only five modifications. Def. App. 408.

47. Modification P00001 extended the time "to complete disposing of transferred dredge material at the mandatory 'Buffalo County No. 1 Placement Site.'" Id.

48. Modification P00002 changed Block #24 of the SF 1442 to read "Contracting Officer's Representative" and changed Block 27 of the SF 1442 to read "USACE, Finance Center, Millington, Tennessee." Id.

49. Modifications P00003 and P00004 obligated additional funds and Modification P0005 deobligated some excess funds. Id.

50. None of these modifications affected either the method of performing the work or non-mandatory disposal sites, and none increased the fixed contract price. Id.

51. No local officials were present at Matteson's meetings with state and Federal officials to discuss Matteson's proposed sites. Def. App. 1001-02, 1018-19.

52. Matteson admits that the Corps never mentioned local authorities to it. Id. 1004.

53. The Corps did not become aware of a shoreline ordinance that would potentially affect Matteson's use of its proposed sites until September 18, 1996, when a Wabasha County attorney called a Corps official. Def. App. 221.

54. The Corps official appropriately gave the county attorney Matteson's telephone number. Id.

55. Matteson itself was well aware of local opposition to prior Corps projects when it submitted its bid for the Grand Encampment Excavation contract. Def. App. 1198-1207.

56. The Explanation to Prospective Bidders specifically stated: "Oral explanations or instructions given before the award of a contract will not be binding." Def. App. 985; id. 18-20, 24, 55-60.

57. Matteson admits that it rejected this plain language. Id. 985, 987.

58. Matteson rejected the contract's express language providing that the Government "assume[d] no responsibility for any conclusions or interpretations made by the Contractor based on the information made available to the Government," and regarded that language to be inoperative. Id. 1020-26.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Patricia M. McCarthy
PATRICIA M. McCARTHY
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 307–0164
Fax: (202) 514-8624

Attorneys for Defendant

OF COUNSEL:
EDWIN C. BANKSTON
District Counsel
Army Corps of Engineers
Saint Paul, MN 55101

JULY 16, 2003