Senior.

Q. Was this conference you had with him in person or over the phone?

A. This was over the telephone.

Q. You made a very detailed entry of a telephone conference. Do you also anticipate at this time that you would have made written notations of any on site-meetings with the Mattesons?

A. If I was the primary point of contact with the Corps. If someone else was actually preparing a memo or documenting a meeting, then I may just have a made a note on my calendar that I was at the meeting.

Q. This is the only page of your daytimer that we have been furnished. Do you still use a daytimer like this? Still maintain one?

A. Do I still --

Q. Do you still have your daytimer from 1996?

A. From 1996 I believe I do, yes.

Q. Could you make that available to us? We'd like it for the duration of this project?

A. Okay. Just entries that would involve this project?

Q. Yes.

MS. McCARTHY: I would ask you to memorialize that.

MR. BANKSTON: Is that the entries pre-bid?

MR. MILLER: Anything that concerned this project; pre, during or post.

BY MR. MILLER:

Q. To your knowledge, did you have any reason to believe that Matteson would be unable to obtain Federal and State permits for the sites they needed to discuss with the Corps?

MS. McCARTHY: Objection.

THE WITNESS: I personally did not have any reason to believe that they would not.

BY MR. MILLER:

Q. I take it from the conversations you and I have already had, that the reason that the Corps went to this effort of facilitating the meetings and being involved, was that it wanted to be able to obtain bids from each contractor?

A. I think that's a fair statement, yes.

Q. And it wanted the contractors to be able to get the permits necessary to do the work?

A. That's correct.

Q. And it wanted to obtain the best pricing possible from the bidders on this project?
A. Yes.
Q. And, from your experience, in order to obtain the best pricing, the Corps was interested in the contractors having feedback as they prepared their bid as to whether or not they could get their disposal site approved?
MS. McCARTHY: Objection. Foundation.
THE WITNESS: Yes. That they could get the State and Federal permits as necessary, yes.
BY MR. MILLER:
Q. I take it, from your experience, you knew when contractors were placed completely at risk that they would bid the job and not be able to get disposal sites, that that would tend to increase the amount of the bid?
MS. McCARTHY: Objection. Calls for speculation.
THE WITNESS: I can't answer it the way you stated it.
BY MR. MILLER:
Q. What part of the question gives you

concern and I'll try to rephrase it.

A. Well, could you just rephrase the whole question then or repeat it?

Q. Has it been your general experience that the greater risk that you thrust on the contractor, the higher the bid might be?

MS. McCARTHY: Objection.

THE WITNESS: I personally don't have enough experience with that that I don't know.

BY MR. MILLER:

Q. Was it the Corps' intent on the Grand Encampment Project to place the risk on the contractors that they would not get approval for their sites?

MS. McCARTHY: Objection.

THE WITNESS: As I stated earlier, it was our intention to place the responsibility of getting a site on them and that they would do that, and that we were interested in tapping into their resources and knowledge of demands for material and use of material.

BY MR. MILLER:

Q. I understand that logistically the contractor was going to have to be the person who

walked through the process. But was it the Corps' intent to place the risk on the contractor that it would not be possible to get a permit?

A. It was our intent to place the obligation of getting the permit on the contractor.

Q. But was the Corps asking the contractor to assume the risk that it could not be possible?

MS. McCARTHY: Objection.

THE WITNESS: No.

BY MR. MILLER:

Q. Was there anything -- are you aware of anything where a local government has blocked the ability of either the Corps or a contractor to obtain a permit for a dredge disposal project?

A. Now or at that time?

Q. Well, that's a good question. Were you at times prior to Grand Encampment aware at any time of that occurring?

A. No, I can't think of any at that time, no. I am not personally knowledgeable of where that occurred.

Q. Since then are you aware of any?

A. No. I'm aware of the instance at the Grand Encampment where the Mattesons were attempting to get a permit from the county and were

not successful.

Q. Tell me from your perspective what happened?

MS. McCARTHY: Objection. Calls for speculation. Answer if you can.

THE WITNESS: I was aware that the Mattesons submitted a request -- and I don't know if it was a variance or whatever was necessary -- to Wabasha County to get the necessary approvals to use a placement site within Wabasha County. I was aware that they were going through a some type of a regulatory process with the County of Wabasha. Whether it was a permit or a variance or waiver, I don't know exactly.

BY MR. MILLER:

Q. Okay. And what happened?

A. Ultimately they were denied that action.

Q. What involvement, if any, did you have with that process?

A. I sat in on a meeting, the review meeting with the county. Or it might have been a subcommittee of the county that reviewed the proposal. I attended the meeting.

Q. How did you happen to attend?

A. I became aware of it either directly from Matteson or the contract administrator at our Winona office.

Q. What was your purpose in attending?

A. General interest to see what the outcome was going to be as it related to the project we had.

Q. Did you participate in the meeting at all?

A. I believe I may have responded to a question addressed to me. It was pretty minimal, my involvement.

Q. Do you recall what it was that you said, what you responded to?

A. I believe it related to the nature of the material, whether it was clean or contaminated material. There was some comments made to that effect. I had to express concern about the nature of the material.

Q. How did you respond to that question?

A. That it was considered to be clean sand and that we did not have concerns related to contamination. And related to that, that it would not require a special handling of the material.

Q. What did you observe during the course of

this meeting?

A. As I recall, there were a number of people that were opposed to it; local residents who had opposed it.

Q. And do you recall the reason for their opposition?

A. I think it varied. They were concerned about the aesthetics, the appearance; what the site would like look like after. How it would be placed. Again some of the concerns about noise levels. You know, I'm recalling some of the general things. I don't recall the real specifics.

Q. Were there any concerns about the wells? You mentioned earlier with the City of Wabasha that you had to address that concern.

A. I don't know if any came up at that meeting.

Q. Did it come up at any other time?

A. Well, it came up later on in the project when the actual site that was used, when that was being reviewed, that became a significant concern.

Q. We'll talk about that a little bit later. I want to focus on this review meeting that you said you attended. What else may have happened at the review meeting?

A. J. F. Brennan Company had a representative there. He spoke in favor of the project. He was at least one supporter for it.

Q. Was this review meeting before or after the bid opening?

A. After bid opening. After contract award.

Q. Do you know why J. F. Brennan was there and why they were speaking on behalf of the project?

A. I think it was just that they -- I can't speak to the why they were there. I think they just supported, they were trying to support a colleague and a fellow contractor.

Q. What else happened at the meeting?

A. I don't recall if the decision was made to deny the action at that meeting or if it came later on. I don't recall. But in general just --

Q. When you left that meeting, did you have any doubt as to the outcome?

A. I probably had some doubts. I don't think it was unequivocally stated that they weren't going to get the permit. It seemed like the county officials that were representing the county, that they were open minded; were considering the action.

Q. Was there anything else that the Corps

should have done to facilitate the process of the permit or review or waiver?

MS. McCARTHY: Objection. Lack of foundation.

THE WITNESS: I don't believe so.

BY MR. MILLER:

Q. Anything else that the Corps could have done?

MS. McCARTHY: Same objection.

THE WITNESS: I don't think so, no. Contractually I think it was clearly a contractor requirement that we were not directly involved in it.

BY MR. MILLER:

Q. Was there, from your knowledge of the situation, was there anything else that the Mattesons at that review meeting could have done?

MS. McCARTHY: Objection. No foundation.

THE WITNESS: Nothing that I'm aware of, no.

BY MR. MILLER:

Q. You were ultimately involved in providing assistance to facilitate the Mattesons to obtain disposal sites with the Fish and Wildlife, is that

correct?

A. Correct.

Q. Prior to exploring that option, did you believe that Matteson had exhausted the measures to get these privately owned properties at Braun and Sanderson through the county?

A. I don't know what legal avenues were available to them.

Q. Are you aware of anything else that Matteson could have done?

A. I have no other ideas or suggestions for them, no.

Q. From your review, were Lawrence and Larry Matteson diligent about trying to get the disposal sites approved by the county?

A. I guess I can't comment on whether -- if you are asking whether they did everything they could do, I don't know. I can't say.

Q. But asking it in reverse, you are not aware of anything else that they should have done?

A. Not specifically, no. I don't know if they had any other legal avenues to pursue. I don't know.

Q. Since the Grand Encampment Project, has the Corps attempted to obtain any disposal

facilities in Wabasha County?

A. New sites, we are in the process right now of doing a dredge material management plan for the Lower Pool 4 Region. And that includes evaluating sites. I believe there are some sites that have been identified in Wabasha County, so we are investigating alternatives at this time.

Q. Do you have a dredge material placement plan prepared?

A. It's in the process now.

Q. Who is responsible for that?

A. Steve Tapp.

Q. Do you know when he expects to have it finished?

A. It's probably about a year from completion.

Q. All right. In the situations where the Corps is obtaining the disposal site, is it the Corps' position -- does the Corps have a position as to whether or not the Corps has to go through the local waiver or approval or permitting process?

MS. McCARTHY: Objection. Foundation. Answer the question, if you can.

THE WITNESS: It's our legal

position that we do not have to obtain local approval. We do involve locals in the process. And the players obviously participate in the process.

BY MR. MILLER:

Q. For disposal purposes, does the Corps lease or purchase private land for disposal sites?

A. Yes, we do.

Q. So the Corps, for instance, could lease or purchase the Sanderson or Braun properties for purposes of disposing of materials?

MS. McCARTHY: Objection.

THE WITNESS: Theoretically.

BY MR. MILLER:

Q. And the Corps' position is that if it's the Corps, as opposed to the contractor, if it's the Corps that is leasing or purchasing the Sanderson or Braun properties, as an example, that the Corps does not have to go through local approval process?

MS. McCARTHY: Objection.

THE WITNESS: With respect to our legal position, we would involve locals in the process and we would consider their concerns in any ultimate decision in whether to use a site and that

would be factored into the decision.

BY MR. MILLER:

Q. I take it during the Grand Encampment Project, Matteson -- and you are probably aware by them alerting you and you are aware by attending the meetings -- that it did not get approval by the county?

A. I became aware of that at some point after the meeting.

Q. After that, did you give consideration to other alternatives or to assisting the contractor with other alternatives?

A. We gave consideration to again becoming a facilitator and in this case we facilitated a get-together between Matteson and Fish and Wildlife Service. But I don't know that we looked at other options besides that one.

Q. Did the Corps give any consideration to issuing a changeover order in the contract whereby it would purchase or lease the Sanderson or Braun properties?

A. Not that I'm aware of, no.

Q. And did the Corps advise Matteson at the time that it was the Corps' position that it was not bound by local laws or ordinances?

A. I don't recall advising them of that, no.

Q. Did the Corps give any suggestions or give any ideas to Matteson in terms of ways to deal with the problem regarding the approval of the disposal site?

MS. McCARTHY: Objection. Vague.

THE WITNESS: Local approval?

BY MR. MILLER:

Q. Yes. They couldn't get a disposal site; the Corps wanted the project to go forward. Did the Corps in cooperation throw out any ideas?

MS. McCARTHY: Same objection.

THE WITNESS: I don't think we -- we didn't advise them how to go about getting approval.

BY MR. MILLER:

Q. I understand that. I'm asking did you throw out any ideas?

MS. McCARTHY: Objection. Lack of foundation.

THE WITNESS: Ideas of how to get approval or ideas of how to pursue other sites?

BY MR. MILLER:

Q. Either of those?

MS. McCARTHY: Same objection.

THE WITNESS: We did not provide any ideas for how to go about obtaining local approval, that I'm aware of. At least I did not.

BY MR. MILLER:

Q. Okay.

A. And then our involvement as far as trying to locate other acceptable sites was to facilitate a get-together with the Fish and Wildlife Service and met. I'm not aware that we, the Corps of Engineers employees, suggesting any other sites.

Q. Do you know whose idea it was to approach Fish and Wildlife?

A. I'm not sure if that was initiated by the Fish and Wildlife or ourselves and myself. I was in touch with the district refuge manager and I don't know who initiated it, myself or him, but anyway, together we discussed the ultimate site and decided that that would be a potential option that we would toss out to the contractor and see if they were interested in pursuing it.

Q. The contractor explored both the Sanderson property first with the county and then later the Braun property, is that your understanding?

A. I'm not sure of the sequence.

Q. Do you recall that the contractor attempted to gain approval for both of those sites?

A. I'm aware that -- well, I believe that it was the Sanderson site that they actually submitted requests for the county approval.

Q. Okay. And did you -- what was the status of the Federal and State permits on the Sanderson property?

A. As far as I know, they were not being pursued. I don't know if they had officially been submitted to us for further review process.

Q. Did you have any reason to believe that it would not be possible to obtain State and Federal permits for Sanderson absent the issue with the county?

MS. McCARTHY: Objection to the form of the question. Go ahead and answer, if you can.

THE WITNESS: I had no specific reason to believe that they would not meet State and Federal requirements.

BY MR. MILLER:

Q. So, in your mind, the only thing that prevented the Sanderson property from being a disposal site was the opposition from the county?

some wildlife habitat similar to the way Grand Encampment was left, then we are considering that strongly on future jobs.

(Discussion held off the record.)

MR. MILLER: Give me a second. I want to look to see if I have anything else.

I will follow up with requests for things that we do not have. We will confirm that in writing. We would ask for those things and confirm it in writing.

I don't have any other questions at this time.

MS. McCARTHY: I have a few questions to clarify a point.

EXAMINATION:

BY MS. McCARTHY:

Q. Regarding the Corps' contention during the Grand Encampment Project, upon which party, the Corps or the eventual contractor did the Corps intend to place responsibility for finding or obtaining permits and all required approvals

disposal sites?

MR. MILLER: I object to the form of the question.

THE WITNESS: The contractor.

BY MS. McCARTHY:

Q. And in the event that the contractor was unable to obtain any necessary permits or approvals for the use of the site, which party did the Corps intend to bear the risk of that not being approved?

MR. MILLER: Objection to the form of the question.

THE WITNESS: The contractor.

MS. McCARTHY: Thank you, Mr. Krumholz.

MR. MILLER: I don't have any other follow-up at this time.

(Deposition concluded at approximately 5:00 p.m.)