areas within those two sites.

Q Now, to what two sites are you referring?

A The Braun and the Guza site.

Q What about the Saunderson site? Had there been a determination that an environmental assessment would not be necessary for the Saunderson site?

A At some point in time, there was a determination to that effect, yes.

Q Was that determination made before you submitted your bid or after you submitted your bid?

A I believe that may have been made after we submitted our bid.

Q If I could draw your attention, sir, to page 01000-4, please, the section of paragraph 12.5, "Special Use Permit." It states, "The Contractor shall comply with the requirements of the "permit for dredge material placement" included at the end of this section regarding the Contractor's final disposal (placement) and transfer of dredge film material to the identified sites owned by Buffalo County, Wisconsin." Did you read that provision at the time that you submitted your bid?

A I believe so, yes.

Q What did you understand the permit for dredge material placement to be?

A I don't recall.

this section of the contract?

A I'm aware of its existence.

Q Did you read this provision of the contract before you submitted your bid?

A I've read -- this is a standard section in most contracts of the government, and I've read these before, yes.

Q Did Matteson prepare an environmental protection plan for this contract?

A I believe so.

Q Before the time it submitted its bid, did Matteson undertake any efforts to prepare a tentative environmental protection plan?

A Prior to placing this bid you say?

Q Yes.

A Typically, we do not write down an environmental plan prior to bid. We look at the conditions that exist and try to establish what meeting environmental requirements of the project will entail.

Q Prior to submitting your bid, did you undertake to familiarize yourself with procedures to be implemented to provide the required environmental protection and to comply with applicable laws and regulations?

A I believe so.

Q And what did you do?

A Yes.

Q If I could turn your attention to page two of the statement of facts. It says, "By an invitation dated July 10, 1996, Matteson was invited to competitively bid a dredging job on the Mississippi River with the St. Paul, Minnesota District of the U.S. Army Corps of Engineers for a fixed-price contract to furnish all labor, material and equipment necessary to excavate and transport existing dredged material from two areas." Were you invited in writing to submit a bid for this project?

A That's a common terminology that -- yes. I mean, the Corps sends out invitations for bid. I mean, they send out a notice for bid. And that's what it's referred to. It's not like an invitation like you and I might normally think of an invitation. It's nothing special. If you're registered as a dredging contractor, you get one. We're not selected -- it doesn't make us special.

Q Was the extent of your invitation the written invitation?

A Yes.

Q If I could draw your attention to the third paragraph, it states, "Following its communications with the Corps, Matteson devoted significant time to locating

potential disposal sites in the Wabasha area. Matteson was able to locate two viable disposal sites. One was the "Saunderson" Property and the other was the "Braun" Property." Now, are these the two sites that you contend that the Corps visited prior to the bid?

A Actually, after listening to the testimony of Dan Kromholtz and Steve Tapp, I believe there were three sites involved at that time. And their testimony states that they only visited -- they meaning Steve Tapp and Dan Kromholtz and others, Dennis Anderson, the list -- the Guza site and the Braun site were visited, and the Saunderson site -- I still contend that the Saunderson site was if you're standing on, I believe it's I-24 or Highway 24 looking at the Guza site, the Saunderson site is like to your back. And I contend that they were informed of that site as well. But I may be wrong. So the answer to the question at that time, I believe there were three sites involved. But if there were two sites involved, it would have probably been the Guza site and the Braun site.

Q There's no mention made to the Guza site in this paragraph. Do you know why?

A Because at the time, I believe that they had -- that I had taken them to the Saunderson site, that they were talking about the Saunderson site and the Braun

site.

Q So at the time you submitted this claim, your recollection was that you had taken them to the Saunderson site and the Braun site?

A Yes. I knew that we had taken them to the Guza site, too.

Q So at the time, why didn't you mention the Guza site?

A I don't know.

Q Do you have a specific recollection sitting here today of actually physically walking on the Saunderson property with any representatives of the Corps or any other federal agency prior to the submission of the bid?

A What I recall is that we didn't walk on the Guza site, nor did we walk on the Saunderson site. The only site that we actually physically walked on was the Braun site. The Guza site and the Saunderson site were clearly visible from the roadway.

Q Was there any reason why you did not walk the Saunderson property and the Guza property when you brought the Corps folks out to the Braun property?

A Say that again.

Q Was there any reason why you didn't walk the Saunderson site and the Guza site with the Corps officials?

A Yes, because they were very visible from the roadway, and I guess they -- I wasn't the one determining whether they walked or didn't walk. It wasn't like, okay, I didn't take -- the reason we walked the Braun site is that the area for disposal was some distance from the highway or from the -- not the highway, but a county road. So we had to drive back in there and actually get into the site to see the site. The Saunderson site and the Guza site were both fairly flat areas that were visible from the roadways.

Q The paragraph continues, "At the request of Matteson and prior to the bid date, the Corps, the Minnesota Department of Natural Resources and the U.S. Fish & Wildlife walked both of Matteson's sites." So is it your testimony that that statement is inaccurate?

A It is my testimony that the only site that they actually walked prior to bid date would have been the Braun site.

Q So to the extent that this statement in the claim says that they walked both of Matteson's sites, that statement is inaccurate. Is that correct?

A That's correct.

Q Was the Saunderson site wooded at the time that you brought the --

A It was partially wooded, yes.

Q Was there a way that the Corps officials visibly standing in the road could ascertain that there were no wetlands on the Saunderson site without walking it given the fact that it was wooded?

A The Saunderson site was accessible both on the east side, you could drive by the east side, so it was kind of a corner lot if I remember right, so you could drive on two sides of it and see what it was. You could see what kind of vegetation it was. And it would be my opinion that someone familiar with the area could tell by looking at the type of vegetation that was growing on it from the road if there would be likely any wetlands on-site, yes.

Q Do you know whether the Corps officials drove on both sides to ascertain whether there were wetlands?

A They would have driven on both sides. When we came from the Braun side, they would have driven up the east side and then turned, and we parked on the north side.

Q Did you advise them that they should be looking to see if there are any wetlands on the Saunderson property while they're driving to the Braun site?

A No, I did not.

Q So you don't know for a fact whether they made an effort to ascertain whether there were wetlands --

option of rejecting your responsive low bid?"
THE WITNESS: Could you read that for me just slowly, please?
COURT REPORTER: "I gather then you're unable to certify the statement in your claim and marked in Exhibit 34 that the Corps had the option of rejecting your responsive low bid?"
THE WITNESS: I believe I've answered that question to the best of my ability already.
BY MS. MCCARTHY:
Q It's a yes or no question.
A I don't see where I stated in this that the Corps had the option of rejecting my bid.
Q So you don't believe that to be the case then?
A Yes, I do.
Q You do believe that the Corps had the option of rejecting your responsive low bid?
A Yes, I do.
Q Okay. If we could continue further on paragraph three -- I'm sorry, paragraph -- well, I guess it's the second paragraph. "After bidding the Project and before starting the work, the County of Waubasha [sic] advised Matteson that pursuant to Minnesota Statutes Section 103G.005 et seq. the County controlled the use of any property within a "shoreland protection zone" which

emanates "1,000 feet from the ordinary high water level" of the Mississippi River." Could you tell me, Mr. Matteson, the circumstances under which the county of Wabasha advised you of this?

A I believe it was either by fax or by phone.

Q And do you know what precipitated the fax or the phone call?

A I think it was some kind of zoning permit that we had applied for, or a land use permit.

Q And when did you apply for the land use permit?

A I would assume sometime in September of '96.

Q And who was the individual at the county who advised you of this matter?

A I believe it would have been Judy Kruger.

Q And what did Ms. Kruger advise you?

A She advised us of the existence of the shoreland protection zone. That's my recollection of the situation.

Q And what caused you to make a filing with the county?

A Judy Kruger instructed us that we needed to do so.

Q When did Mr. Kruger instruct you that you needed to file something with the county?

A Sometime in September --

Q And how were the --
A -- I believe.
Q How were the circumstances that Ms. Kruger came to advise you that you needed to make a filing with the county?
A I don't recall.
Q Do you know how you came into contact with Ms. Kruger?
A No, I don't.
Q Did Ms. Kruger contact you, or did you contact Ms. Kruger?
A I don't recall.
Q What was your reaction when Ms. Kruger told you you needed to file something with the county?
A I don't recall.
Q Were you surprised that you needed to file something with the county?
A I would suspect that I was.
Q Why would you suspect that you were surprised?
A I'm not used to dealing with the county, so I don't know. I just assume that I would have been surprised.
Q Do you know if you had contact with Ms. Kruger prior to submitting your bid?
A I guess I don't believe I had contact with her

prior to submitting my bid.

Q And as you sit here today, you have no recollection as to how you came into contact with Ms. Kruger, whether she initiated contact with you or you initiated contact with her?

A That's correct.

Q Were you surprised to be dealing with county officials in any way in connection with this proposed disposal site?

MR. MILLER: Object to the form of the question as vague and ambiguous.

THE WITNESS: I suspect that I was, yes.

BY MS. MCCARTHY:

Q Did someone advise you of the need to contact the county in connection with your proposed disposal sites?

A I don't recall.

Q Is there anyone at Matteson who would recall how the relationship with the county commenced in connection with the proposed disposal site?

A At the time, I think David Guillot was an employee of ours that was -- and I believe he'll be deposed later on this week. He would have been more involved with that situation at the time than I was.

Q The next paragraph begins, "Only after award of

the contract did Matteson learn that the local citizens were opposed to Matteson's use of the Saunderson property. During a series of public and private meetings attended by Matteson, the citizenry and the public officials indicated that the source of their discontent was treatment they had received from the Corps on two prior projects." What are those two prior projects?

A I believe those projects are the Read's Island and the Crat's Island projects.

Q Now, Mr. Matteson, you've testified that L. W. Matteson had contracts with the Corps in connection with Read's Island and with Crat's Island. Are those the projects which had provided the local community with a source of discontent?

A Yes.

Q At the time that you were the contractor on those projects, were you aware of the public discontent?

A I was aware that Cliff Wilson had a problem with the Crat's Island project. It's my understanding that that was subsequently resolved when we gave him -- or when the Corps agreed to give him some sand.

Q That was the only source of discontent you had understanding of?

A There had been rumblings at, you know, cafes, and I was not directly aware of them, no. But I had

heard that some people had expressed concern about some blowing sand.

Q Had you heard of the rumblings about the blowing sand prior to the submission of your bid?

A Yes.

Q Did you take those rumblings into consideration when you proposed your disposal sites in connection with the bid?

A I don't believe so.

Q Why did you not take those rumblings into consideration?

A I mean, somebody always has a complaint about something, you know, I mean, in that situation, and I didn't believe that the discontent was that wide or that powerful, widespread, widely spread.

Q At the time you submitted your bid, do you have any reason to believe that anybody at the Corps had a different understanding as to the breadth and nature of the public opposition than you did at the time?

A Yes, I do.

Q And what's the basis for your understanding?

A Well, I had subsequently after getting involved in this situation become aware that the Corps had stated, I believe, in Steve Tapp's testimony, there was some perceived well contamination on the Read's Landing job

that I was not aware of. I believe that the Corps had also addressed some issues regarding the Read's Landing job as far as doing some plantings. See, on the Read's Landing job that we were involved in, the Corps instructed us to cut down and remove the only viable windbreak on the west side of the disposal area. And subsequently, after we had left, I guess, I heard some testimony that they had instructed someone to do some plantings.

Q When the Corps instructed you to remove the only viable windbreak, did you have any understanding as to what the consequences of that might be at the time?

A Well, it wouldn't have been something I would have done.

Q So you understood there were possibly negative repercussions from removing the only viable windbreak?

A Yes.

Q Was there any way that you believe you could have learned about these complaints about the Corps' performance in these projects prior to submitting your bid?

A Maybe through the Freedom of Information Act, the Corps documents.

Q What about the local community members? Could you have spoken with local community members?

THE WITNESS: Well, if I would have wanted to ascertain existence of the shoreland protections, that means I would have known about it. And if I had known about it, well, then we wouldn't be here.

BY MS. MCCARTHY:

Q The next paragraph on page four continues, in the first full paragraph, "Matteson had no way to anticipate or predict that the local governing authorities would take steps to prohibit the placement of dredging pipe across the shoreland protection zone to areas outside the zone." What is the basis for the statement that Matteson had no way to anticipate or predict that the local governing authorities would take steps to prohibit the placement of the dredging pipe across the shoreland protection zone to areas outside the zone?

A Well, I interpret this sentence to indicate that if Mattesons didn't know about a shoreland protection zone, then we would have no way of knowing that enforcement of that zone would prohibit us from placing dredge pipe across it.

Q But the existence of the shoreland protection zone wasn't a secret, was it?

A I don't think it was a well-known situation. I

think, in my opinion, the shoreland protection zone law came about as a last ditch effort for those in the county opposed to the project, because there's a letter like around to some effect that states that they didn't see how they could keep us from going forth with the project without that.

Q But prior to submitting the bid, could you have made inquiries to county officials and ascertained the existence of the shoreland protection zone?

A Again, if I inquired about the existence of the shoreland protection zone, that indicates that I would have already known about the shoreland protection zone.

Q Could you have made inquiries to county officials?

A I could have made inquiries to county officials.

Q And you could have made inquiries to county officials prior to submission of the bid?

A That's correct.

Q Did you in fact make any inquiries to county officials about any applicable regulations that might apply to the sites that you were proposing to use?

A No.

Q The next paragraph of your claim reads, "As a result of the action taken by the local authorities, it has made it economically infeasible and virtually

attached herewith.)

BY MS. MCCARTHY:

Q Mr. Matteson, we've marked as Exhibit 44 a fax cover letter from Larry Matteson to Melissa Gulan, and it's dated March 17, 1997. And the text of the fax reads, "We are presently negotiating with John Brown to get permission to place sand on his property." Is John Brown John Braun?

A Yes.

Q Saunderson, Sanderson, Brown, Braun. It's very confusing.

A Yes.

Q First of all, is this a fax that you sent to Ms. Gulan?

MR. MILLER: He personally or his company?

THE WITNESS: I believe our company sent this fax, yes.

BY MS. MCCARTHY:

Q It says it's from Larry Matteson. Is that --

A Yeah, that would be --

Q Is that you or your father?

A Yeah, that would be me.

Q Do you have any recollection of this fax?

A Some.

Q The fax continues, "This property has already

had tentative approval from the Corps prior to the bid date." This tentative approval, is that your term?

A I'm not sure.

Q Do you know who else at Matteson would have used the term tentative approval in connection with the Braun site?

A I do not.

Q What does tentative approval mean to you?

A Approval based on not finding anything significantly wrong environmentally or archaeologically with the site.

Q Why did you choose to use the modifier tentative? Why didn't you say the property already has had approval from the Corps prior to the bid date?

A I'm not sure.

Q In your view as you sit here today, is there any difference in the nature of the approval that the Corps gave to the Braun site prior to the bid date or the approval that you believe the Corps gave to the Saunderson site prior to the bid date?

A No.

Q As you sit here today, do you still regard the approval that you received from the Corps prior to the bid date for the Braun property as tentative?

A Using my definition of tentative, yes.

Q And as you sit here today, do you still regard the approval that you believe you received from the Corps prior to the bid date for use of the Saunderson property as tentative?

A Yes. I believe if we would have found an archaeologically significant site on the Saunderson property or a buried oil field or something like that that would have been environmentally objectionable, we would not have been able to use the site.

Q If I could turn your attention back to Tapp Exhibit 10, if I can turn your attention, Mr. Matteson, to the entry that Mr. Tapp put in for September 18 of his daily record of events, it says September 18, 1996 up at the top of Mr. Tapp's daily record of events. There's an entry that says, "(1) Grand E. - I spoke to Jim Nordstrom (Wabasha County attorney) at (612) 565-2487, and he said homeowners downstream of Wabasha are concerned about dredged material to be placed in the vicinity. I explained our contract and that it was not awarded yet, but low bidder wants to use a site downstream from Teepeeota Point. I also said his use (not sure of contract award) is contingent upon him getting all permits and approvals. Jim thinks it falls under their shoreline ordinance. I gave Jim Larry Matteson's phone number and told him to call me if he had further