IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**********************************************************

L. W. Matteson, Inc.,

Plaintiff,

v.

No. 01-5420
(Judge Wilson)

The United States,

Defendant.

**********************************************************

**DEPOSITION OF**

**LAWRENCE W. MATTESON**

Taken July 25, 2002
Scheduled for 9:00 a.m.

Reported By: Lori L. Morrow, RPR
PARADIGM REPORTING & CAPTIONING INC.
1400 Rand Tower, 527 Marquette Avenue South
Minneapolis, Minnesota 55402 * (612)339-0545
1(800)545-9668 * Fax (612)337-5575

in potentially using the Martin site in connection with this --

A I think this letter was written before we looked at the sites. These sites were listed in your solicitation as possible sites. And when we looked at it, we were wondering -- listed as trucking sites. We were wondering if they would change them and let us pump hydraulic fill into those sites.

Q How were the sites that were set forth in the Corps' solicitation listed as trucking sites?

A I think that's what it was stated in there. Now I can't remember the exact wording, but maybe the job was set up pretty much strictly for a mechanical dredging type job.

Q And how, in your view, was the job set up for mechanical dredging? What about the --

A Because, actually, when we looked at these jobs, when we finally went and looked at these sites, there was no method for getting the water back to the river, as I recall. I don't remember ever getting a response to this letter back from the Corps of Engineers.

Q You're ahead of me, Mr. Matteson. I was going to ask you that. Do you know why at this particular stage Matteson, Inc., was singling out the Martin placement site versus the other sites that were set forth

in the solicitation?

A Which other sites are you referring to?

Q Well, how many sites do you recall being set forth in the solicitation?

A Either three or -- there were two real small trucking sites, half acre or something like that, which we had ended up trucking material to, and then there was this Martin site and a Regman [phonetic] site. Now, which of these two sites I'm visualizing that I went and looked at I don't know. And as I recall, when we visited with the owner, the Corps did not have any permit or any agreement with him to let material be put on the site, which surprised us.

Q But in particular, in terms of this fax of July 18, do you know why Matteson just singled out one site among other potential sites?

A No. Of course, I'm sure where I looked, the half acre sites would not be dredge sites. They were clear up in the hills.

Q And did you determine that the other sites were half acre sites based on the solicitation or based on your physical observation of the sites?

A You have that statement right in the solicitation.

Q So it's based on your reading of the

solicitation?
A (Nods head.)
Q And was it based on your reading of the solicitation that the Martin site might at least potentially be a site that could be used for hydraulic dredging?
A You state in the solicitation that it would hold all the material that needs to be moved, right?
Q The letter asked that the plans and specs be changed to allow direct placement of material on the Martin site using a hydraulic pipeline dredge. And I'll give you an opportunity, sir, if you want to look through the solicitation. But what in your view at this point in time needed to be changed in the plans and specs to allow the use of the hydraulic pipeline dredge?
A I don't know what that would entail.
Q So you don't know specifically what would need to be changed in the plans and specs to permit use of the Martin site as a hydraulic --
A No. That's correct.
Q -- site? I'll also ask you, Mr. Matteson, if you would pull out Exhibit 37. Now, Exhibit 37 appears to be a purchase agreement dated August 16, 1996, involving L. W. Matteson and a piece of property located at 53 Pioneer Drive in Wabasha, Minnesota. Do you

recognize this purchase agreement?

A Yes.

Q What property does this purchase agreement pertain to?

A It's a piece of property that we got an option on to run a pipeline across to get to the Braun property down in that area.

Q So this piece of property was not for the Saunderson property. It was for the Braun property?

A Yeah. This isn't the address of the Saunderson property.

Q And at some point, did Matteson enter into a purchase agreement for the Saunderson property?

A Yes.

Q Do you know if the terms and conditions of that purchase agreement were different than the terms and conditions of the purchase agreement set forth in Exhibit 37 but for perhaps the location and the amount of the sale price?

MR. MILLER: This might be helpful to you. And I told you before we went on the record that with Mr. Guillot no longer employed by Matteson, we were trying to find some files that he may have kept. And we found a couple of those files; and we did locate the

Saunderson purchase agreement in there, and I think I can lay my hands on that for you.

MS. MCCARTHY: Okay. Can we put an exhibit sticker -- we don't have any copies of this. If we can mark this as Exhibit 48.

(Deposition Exhibit Number 48 was marked for identification and is attached herewith.)

BY MS. MCCARTHY:

Q Mr. Matteson, we've handed you what's been marked as Exhibit 48, which your counsel just provided to us, which we're appreciative for, and ask you if you recognize what's been marked as Exhibit 48.

A Do I recognize it?

Q Yeah. Do you recognize it?

A That is the purchase agreement we had for the Saunderson property.

Q And what is the purchase price listed?

A It started out at $78,750 and then at some point during that period of time increased to 90,000.

Q Okay. Do you know at what point in time -- strike that. What's the date of this purchase agreement?

A August the 23rd of '96.

Q Okay. And what point in time, to your knowledge, did the purchase price increase to 90,000 from

78,750?

A I don't think that's apparent.

Q Do you know independent of this document?

A I'm sorry?

Q Do you know independent of the document when that change occurred?

A I have no idea.

Q If I could just draw your attention to the middle of this agreement, it states, "Subject to performance by the buyer the seller agrees to execute and deliver a General Warranty Deed (to be joined in by spouse, if any) conveying marketable title to said property subject only to the following exceptions:" "Building and zoning laws, ordinances, State and Federal regulations." "Restrictions relating to use or improvement of property without effective forfeiture provision." "Reservation of any minerals or mineral rights to the State of Minnesota." And "Utility and drainage easements which do not interfere with improvements." And "Rights of tenants as follows: (unless specified, notsubject to tenancies)." Were you familiar that that provision pertained to the purchase agreement of the Saunderson property?

A Pretty much standard, yeah.

Q And it's pretty much standard to have a

reference to building and zoning laws, ordinances and state and federal regulations and conveying a general warranty deed?
A Yes, I believe so.
Q Is the issue of a right-of-way to the Saunderson property reflected in this purchase agreement? Do you know?
A Well, that was a separate -- will you run that by me again?
Q Was the right-of-way for the Saunderson property, was that reflected in this purchase agreement?
A No.
Q Was there a separate agreement for the right-of-way?
A We had an option with an individual right across the road from here, Wooldridge or something like that was the name, to run the pipeline across their property.
Q And was that reflected in a written agreement as well?
A I haven't been able to find it yet, and I'm not sure whether we had a written agreement or just a verbal.
Q And what was the option price for that, if you recall?
A As near as I can figure it out, it looks like it was $20,000.

Q Okay. Mr. Matteson, if I could turn your attention to Exhibit 2, which are notes Mr. Kromholtz took on August 29, 1996. Do you recall having a conversation with Mr. Kromholtz on August 29, 1996?
A Yes.
Q What do you recall about that conversation?
A My son was up here waiting to turn the bid in, and he called me, and I was in the Atlanta airport, and we had put the bid together over the telephone, finalized it and stuff. And I called Dan Kromholtz to get a little more assurance or -- I have a lot of respect for Dan Kromholtz, and I feel that he has respect for me, and I respect his opinion, and I called him to ask him about this site.
Q And when your son was waiting up here, does that mean your son was in St. Paul?
A Yes. He was sitting outside here waiting. This phone call happened about two hours before bid opening, I think.
Q And to clarify, you were in an airport in Atlanta?
A I'm sorry?
Q On August 29 --
A I was in Atlanta airport.
Q -- you were in Atlanta airport? Had you visited

the Saunderson property prior to making this telephone call to Mr. Kromholtz?

A Yes.

Q How many occasions had you visited the Saunderson property?

A I think I had been there a couple of times.

Q Who if anyone else was with you when you visited the sites prior to August -- strike that.

Who if anyone was with you when you visited the Saunderson property prior to August 29, 1996?

A I'm not sure anyone was there with me when I visited.

Q Do you know if you visited the site with any officials from the Corps?

A As I just stated, I don't think anybody was there with me when I visited the site.

Q I'm sorry. I didn't hear you. Prior to making this telephone call, what was your understanding as to the contact, if any, that the Corps had had with the Saunderson property?

A I was not there when they made the site visit with my son and drove around the property and looked at the Braun property and the Guza property. As far as we were concerned, all three properties were usable and permittable from what the observation of the site visit

had been that day that my son drove around there with them.

Q Okay. If you could turn to Exhibit 2, Mr. Kromholtz' notes, it states, "Lawrence Matteson. He asked about use of a wooded site at Teepeeota Point." When you spoke with Mr. Kromholtz, did you specifically use the term Saunderson property, or did you refer to a wooded site at Teepeeota Point? Do you recall?

A I was talking about -- I'm sure I said the Saunderson area and then described to him that it was the wooded area and where it's located at.

Q And at this time that you made the telephone call on August 29, was the Saunderson property a wooded site?

A Yes. That's what I was talking -- that was the Saunderson site here that I'm talking about here in the conversation that I had with him.

Q Now, Mr. Matteson, if I could turn your attention briefly to Exhibit 1, which is the solicitation. I make you juggle exhibits. I apologize.

A Okay.

Q If you could turn to page 01000-2, which is section 7.3 in the solicitation.

A 0001 what?

Q It's 1000-2, if you prefer to do it that way.

It's towards the end. It's more towards the end of the solicitation. It's solicitation 01000. Okay. Do you see 7.3 on the top half of the page?

A Okay.

Q Prior to this phone call to Mr. Kromholtz, did you know if you had read this particular provision of the solicitation, 7.3?

A I'm familiar with the section.

Q And this section pertains to contractor's selected final disposal areas and placement sites. Is that correct?

A I'm sorry?

Q This particular provision, 7.3, this pertains to contractor's selected final disposal areas and placement sites. Is that correct?

A Yes.

Q And if I could just draw your attention to, I believe it's the third sentence. It reads, "No disposal (placement) will be allowed in a wetland or wooded area."

A Correct.

Q Now, at the time you had the telephone conference with Mr. Kromholtz, were you aware of this provision in the solicitation?

A Yes. The landowner was already cutting the wood off. He was harvesting the pulp wood off of it.

Q Do you know at what point in time the landowner had started that process of clearing the land?

A It was an ongoing process for -- he worked someplace and just did this as a part-time job.

Q Like a weekend activity or --

A Yeah.

Q So Mr. Kromholtz's notes reflect you as indicating that the site was being cleared by the landowner. Is that accurate?

A Yeah. That's right.

Q I'm sorry.

A Yeah.

Q I don't want to confuse you. I want to direct you back to Exhibit 2. You can put the solicitation aside, if you wish. Then the notes continue, "I told him that we could not control what the landowner did." Now, do you recall Mr. Kromholtz making a statement to that effect?

A I don't remember the exact wording that was used. That's when I assured him that the landowner was already in the process. And from what I had talked to him, he was going to continue cutting down. I didn't think that that would be an issue.

Q Then the notes continue, "We did not want heavily wooded areas cleared just to dispose of dredged

material." Do you recall Mr. Kromholtz making a statement to that effect in this conversation?

A No. I don't remember -- like I say, I don't remember the exact wording that was said, but the trees were not a problem because they were going to be cut anyway. And they were not being cut for the purpose of putting the sand on. They were being cut for the landowner's use of selling the pulp wood off of them.

Q But would it be fair to say that you recall that there generally was a discussion with Mr. Kromholtz about the fact that the site was wooded and that it was in the process of being cleared and that the landowner was clearing it for a purpose unrelated to this project?

A Right. And that was one of the positive aspects of this property was the fact that it was wooded, and we were planning on leaving, and this is reflected in the Corps' letters later on in this whole process was the leaving that 40 or 50, 60-foot trees around the outside would limit the visibility of it and also limit the sand blowing or the noise when we were placing it on that stuff, so the trees were a positive aspect as far as we were concerned.

Q The notes continue, "From talking to Mr. Matteson, it sounded like that was not the case." So would it be fair to say that you gave the impression to

Mr. Kromholtz during this conversation that the wooded area was not being cleared just to dispose of the dredged material; that you had given him that impression?

A That's right.

Q The notes continue, "I told him that we would need to do a cultural resources investigation of the site and that we would obtain water quality certification from the MPCA for the effluent." Do you recall Mr. Kromholtz making a statement to that effect?

A This would be the general things that we would be talking about in this conversation, yes.

Q And it was your understanding from this conversation that the cultural resources investigation would occur after the telephone conversation, would occur in the future?

A Yes.

Q And also you understood that as of August 29, the water quality certification had not yet been obtained from the MPCA for the effluent?

A Yes.

Q Was there anything else that you can recall regarding this conversation with Mr. Kromholtz that is not reflected in these notes?

A No. Like I say, I just called him up to get a positive feeling or a negative feeling from him as to

whether the site could be used or not.

Q And what was your impression after speaking to Mr. Kromholtz? How did you feel?

A I felt that he felt that it was a site that could be used for this purpose.

Q Did he express any specific familiarity with the site during this conversation?

A He knew the site that I was talking about.

Q And how --

A I mean, you know, it's very obvious when you drive around the area out there. It's the site right across the road from the Guza property, and, like I say, it's no secret. When he drove around out there he knew what site. It's right next to the site that he had looked at with J. F. Brennan. This site is right next to that.

Q Before you had placed a phone call to Mr. Kromholtz, what concerns, if any, did you have about the site that prompted this phone call?

A Same concerns a person always has when you submit a bid of that size and agree to do a job.

Q And what concerns were those?

A Just trying to be real sure that you can pull it off.

Q Did you have any specific concerns about the

site though?

A Just the general concerns that a contractor in our position when you're submitting a bid on a job of that size would have.

Q And, Mr. Matteson, you brought your phone records or some records here?

A Yes.

Q Do you have any memorialization of this particular --

A I don't know whether that phone call was listed in there or not. I don't think it is.

Q I understand, sir, that you were calling presumably from a pay phone or a cellular phone at the airport and that --

A Yes. I was calling from a pay phone.

Q -- you weren't sitting at your desk.

A I don't think I opened my briefcase. I think we found the phone record of that call being made. There was a charge to my credit card.

Q Right. We have the billing records. I was just wondering if you had any notes --

A No.

Q -- or a record of the conversation --

A No.

Q -- other than obviously the mechanical fact that

it occurred.

A No.

Q I think there's no dispute that the call occurred. If I can turn your attention, sir, to Exhibit 10. I'll give you a few minutes if you want to put those documents back. Exhibit 10, now, these are notes that were used during Mr. Tapp's deposition. And the entry for September 18, 1996, reflects a conversation, a telephone call that Mr. Tapp received from Jim Nordstrom, the Wabasha County Attorney. Do you recall ever receiving a phone call from Mr. Nordstrom regarding the shoreline ordinance?

A No.

Q Have you had any dealings with Mr. Nordstrom?

MR. MILLER: I didn't hear. What was your answer?

THE WITNESS: No.

BY MS. MCCARTHY:

Q Have you had any dealings with Mr. Nordstrom?

A The name doesn't ring a bell with me.

Q So as you sit here today, you don't recall ever meeting with Mr. Nordstrom or speaking with him on the telephone?

A What's his position?

Q It appears that he's the Wabasha County

attorney.

A No. That isn't the guy I talked to.

Q Now, at some point in time, did you become aware of the issue of a shoreline ordinance and its potential effect upon the Saunderson property?

A Sometime after award we became aware that there was a shoreline protection issue. I don't know exactly what it's called.

Q Do you recall how long after award you became aware of the shoreline protection issue?

A As near as I can find out, it was a letter that I received from Judy Kruger. The exact date I can't -- I looked at this morning, and I can't remember what the exact date was. But it was sometime after we had been in the process of getting a permit for the Saunderson's -- we were getting a permit for continued clearing and stuff on their land, and that's where the land use permit we were aware of just shortly after the, I guess shortly after the award and then after the land use permit. The land use permit did not cover the shoreline. It was a separate thing.

MR. MILLER: You mentioned earlier that you located Mr. Guillot's file. The letter that he's referring to -- a copy of that is located in that file. You're welcome to look

at the file any time.

MS. MCCARTHY: Oh, thank you. That will speed things along. Thank you.

THE WITNESS: This conversation here on the 18th --

MR. MILLER: Just for the record, I handed counsel a September 24, 1996, letter from Judy Kruger that apparently was faxed to Matteson's office on September 26.

THE WITNESS: I think you were asking me about this conversation here with Steve Tapp -- or about his conversation with Mr. Nordstrom, I guess.

BY MS. MCCARTHY:

Q Right.

A This letter here would indicate that the Corps of Engineers knew about the problem here before the award, right?

MS. MCCARTHY: It suggests what it suggests. If we could mark this as Exhibit 49.

(Deposition Exhibit Number 49 was marked for identification and is attached herewith.)

BY MS. MCCARTHY:

Q Now, Mr. Matteson, is this the letter to which