you're referring, the letter from Ms. Kruger?
A Correct.
Q The letter from Ms. Kruger refers to a recent conversation.
A Correct.
Q What prompted that? Do you know what she's referring to in that recent conversation?
A At that time, I was talking to her, you know, off and on about what was going on up there and about us putting the sand on the property and getting the land use permit papers and stuff through.
Q When did you first have contact with Ms. Kruger?
A It looks like 9/12 is the first entry I have in here on County Permit, Wabasha Zoning Administration, Judy Kruger, (612) 565-3242. All I say is that she will send permit app.
Q And this is on September 12, 1996?
A Yes.
Q And do your notes indicate that you contacted her or she contacted you?
A Doesn't say.
Q What caused you to get in contact with Ms. Kruger?
A The Saundersons were getting a permit renewed or something on the land use permit, and they asked me to

call her, and I called her or something. Like I say, I was talking to her at that time after the bid opening.

Q Were you aware that the Saundersons had a land use permit at the time you submitted your bid?

A I'm not sure that we -- we just had an option on the land is all we had at that time.

Q Were you aware at the time you submitted your bid that you might be required to obtain a land use permit?

A I don't think that had come up at that time.

Q Upon receiving Ms. Kruger's letter dated September 24 -- I guess, it looks like you received it perhaps the 26th. But upon receipt of Ms. Kruger's letter sometime in September, do you recall what your reaction was to the letter?

A I don't think we -- at that time we still did not have any real big concerns that we couldn't get the necessary permits to get to the land.

Q Ms. Kruger refers to the shoreland and the shoreland management ordinance in this letter.

A Uh-huh.

Q Did you know what she was talking about when you received this letter?

A I'm not sure. I knew that at that time when she called me, and I think we had discussed it some to some

extent. But at that time, I don't think Judy felt that it was going to be all that big a problem.

Q Did you have any communications with the Corps about this shoreland ordinance after you received this letter from Ms. Kruger?

A I think that it was being discussed both between us and the Corps, yes. Exactly when exact dates are I don't know.

Q In terms your knowledge of the ordinance, what -- strike that.

Upon learning of the existence of this ordinance sometime in September 1996, what did you do after that in connection with the ordinance?

A Well, there was continuous conversations back and forth. We were trying to find out what it consisted of, and, like I say, when we first heard about it, I thought that it still could be dealt with.

MR. MILLER: I want to interpose an objection. I don't want the question where counsel said that Matteson learned sometime in September to suggest anything contrary to the witness' testimony, which was that he did not become aware of it until sometime after September 26 when he received Judy Kruger's letter. I don't know that it was intentional.

I don't want the question to be mischaracterized as the witness is in agreement, which was sometime in September.

BY MS. MCCARTHY:

Q And when you say you had continuous conversations, who were the parties to these continuous conversations?

A Other than Judy, I don't know who -- at that time, I don't know who we were talking to other than Judy.

Q When did you first have discussions with anyone from the Corps regarding the county shoreline ordinance?

A That I don't know. I have --

Q At some point --

A Go ahead.

Q I'm sorry. Did you have --

A See, I have just telephone numbers of Melissa and another party here. But I don't say that I called or anything. I just have their phone numbers down and stuff here.

Q At some point, did you become concerned about the shoreline ordinance?

A I guess our concerns started when we started having the public meetings, and they were so violent.

Q I don't want to mischaracterize your testimony,

Mr. Matteson, but if I understand your testimony, learning of the simple fact of the existence of the shoreline ordinance did not cause you any particular concern?

A You know, any of these things cause you concern. That's why we're pursuing it. It had to be dealt with.

Q But the simple existence of the shoreland protection ordinance did not cause you to believe that you wouldn't be able to use the property?

A As I previously stated, when we first found out about it, I thought it was something that we could live with and something we could work with.

Q When was the first public meeting? When did that occur, to your knowledge?

A Exact date I do not know.

Q Do you have an approximate understanding when it occurred in relationship to this letter that you received from Ms. Kruger?

A I did not attend the first public meeting they had up there. I think the Corps' testimony indicated that they were there. Exactly what the date was, I don't know what the date was on it. I can't --

Q Did you have any information as to what occurred at the first meeting that caused you increased concern?

A Yes. It was the local opposition due to Corps

performance in the past was, I guess you would call them very violent and very outspoken.

Q How did you learn about the local opposition expressed at the meeting? Just tell me mechanically.

A We had a representative at that meeting.

Q And who was the representative?

A David Guillot. And I can't remember. I think my son was at that meeting, too. I can't remember for sure.

Q And Mr. Guillot and maybe your son told you about what occurred at the meeting?

A Yes.

Q And was that the first time that you became concerned that you might not be able to use the Saunderson property as a disposal site?

A That was the start of it, yes.

Q At any time prior to this first public meeting, were you concerned that you may not be able to use the Saunderson property as a disposal site?

A We were getting feedback from different conversations and stuff that it was from Judy Kruger and from other people that the opposition was building, yes.

Q Do you recall when Ms. Kruger first advised you of the opposition?

A Exactly, I can't remember the days and the dates

that many years back. My memory is not that good anymore.

Q Did Ms. Kruger advise you that opposition was building at the time she sent you this letter enclosing copies of the ordinance?

A My conversations with Judy at that time, I don't think she was that concerned. Judy is also a landowner in that vicinity, lives out in that vicinity. She had the same concerns that everybody else does. But she had an office here, and she was fulfilling her office duties for the most part when she was talking to me.

Q Based on your conversations with Mr. Guillot about what happened at the first public meeting, did you have an understanding as to what prior Corps projects the local concern was being expressed?

A The placement of sand in the county there. All the projects where they had placed sand in the --

Q Do you know specifically where?

A The Read's and Crat's placement sites.

Q Okay. Mr. Matteson, if I could turn your attention to Exhibit 39. Could we go off the record for a second?

(Discussion off the record)

(REPORTER'S NOTE: At this time, 10:30 a.m., we recessed Mr. Matteson's

property. We had to go across several other properties to get to his.

Q Were you able to get all the rights-of-way that were necessary for the Braun property?

A I believe that we could have gotten all the -- we were coming up the county road ditches, and I think we might have had one other property to go across. Whether we had them all in place or not at that time --

Q And if I could refer you back to Exhibit 46 from yesterday, this is a letter dated May 8, 1997, from your son to Captain Glaeser. And he indicates, "My father and I met with Mr. and Mrs. Brown yesterday, May 7th. We have reached an agreement with them to use their property to dispose of the sand for the above referenced project. We still need to acquire right-of-way and permits for a pipeline route to their property. We were unable to pursue those issues yesterday, but will be addressing them as our schedule allows." Do you recall that as of May 1997 that the Braun property was still a possibility?

A Yes, I think we were still working on trying to work something out there.

Q And then the letter concludes, "I would like to suggest a meeting between the Corps of Engineers and L. W. Matteson, Inc. to discuss this project, the difficulties we have encountered and what, if any,

direction the Corps of Engineers feels we should take." Why at this point did L. W. Matteson feel the need to obtain direction from the Corps of Engineers?

A We were trying to get a right-of-way into the property. And at that point, I would think that it was a good assumption that we were not going to be able to use the right-of-way that we were planning on using because it was on county roads and that had blocked us from getting to the Saunderson property. And at that time, we were talking to the Fish & Wildlife and the Corps of Engineers about first coming off the end of the dam and trying to get across to another property there off the end of the dam and getting to the Braun property. And that didn't work. And then they were talking about coming up to that one slough there and across the Fish & Wildlife property. But we still had to either cross a county road or some private property, and we were trying to get those things worked out.

MS. MCCARTHY: If I could just mark this as Exhibit 67.

(Deposition Exhibit Number 67 was marked for identification and is attached herewith.)

BY MS. MCCARTHY:

Q Mr. Matteson, I've marked as Exhibit 67 a letter