COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - -

L.W. MATTESON, INC.,

Plaintiff,

v. No. 01-542C

THE UNITED STATES,

Defendant.

\- - - - - - - - - - - - - - - - - -

DEPOSITION OF

JAMES C. NORDSTROM

Taken February 20th, 2003

Commencing at 9:00 a.m.

REPORTED BY: Kay Lynn Hinsch, RPR
PARADIGM REPORTING & CAPTIONING INC.
1400 RAND TOWER
527 MARQUETTE AVENUE SOUTH
MINNEAPOLIS, MINNESOTA 55402
(612) 339-0545

other one -- the other dealing I had -- and that would have been as City Attorney, for the City of Wabasha, and I don't remember the sequence.

Q. In '83?

A. Well, that one was in '83.

Q. And that was as City Attorney?

A. Right. That was the reason -- the reason I got involved as City Attorney was because there were some questions about whether or not the Army Corps had to comply with the Shoreland Ordinance, which was in effect in Wabasha, in order to be able to deposit the dredge spoil there.

Q. Okay. We'll go back to the second one in a minute, but -- so you'd just become a partner in Gartner in 1983; correct?

A. '82 or '83 I said, I believe.

Q. But in '83, when you had this interaction with the Corps, you were a partner at this time?

A. I believe I was, yes.

Q. And I guess I don't understand how you could be a partner in a law firm and also doing City Attorney work?

A. Let me explain that. Most small municipalities in Minnesota retain law firms to handle their City Attorney work, both criminal

prosecution and any civil work that's done for the City. And when I worked for that firm, we were city attorneys for the City of Lake City, City of Wabasha, City of Plainview, and a small town that's also in Wabasha County called Mazeppa, M-a-z-e-p-p-a, so we -- we provided advice to the City of Wabasha in reference to the proposed project that the Corps had, to put the dredge spoil within the City limits.

Q. So the City of Wabasha went from contracting the work out to having a part-time job to having a full-time job, is that how that worked?

A. No, I worked for the County of Wabasha.

Q. The County of Wabasha, I'm sorry.

A. The City of Wabasha still has a private attorney, in fact, it's Peter Ekstrand, who provides City Attorney services to them by contract, just as we did back when I was doing it.

Q. Okay. During what period were you acting as City Attorney for Wabasha as opposed to County Attorney of Wabasha County?

A. Well, I would have been -- the other unique thing about it was, various members of our firm would operate in City Attorney capacity. For instance, I did all of the prosecution for those

four cities. Peter Ekstrand did -- primarily was the City Attorney for the City of Wabasha. Phil Gartner did most of the civil work for Lake City. Peter Burkhardt did most of the civil work for Plainview. And I also did civil work for Mazeppa. So we sort of transferred our responsibilities.

Q. And during what period of time were you talking about here where you had --

A. Well, from the time I began working for that firm, which was in '78 or '79, until I went to the Klampe firm in, I believe it was '86, I would have worked as City Attorney for all of those communities from time to time.

Q. Okay.

A. Those contracts were continuous through that time period.

Q. And you just said that you would handle most of the prosecution, if not all of the prosecution, for all of the four cities; is that correct?

A. Right.

Q. So how did you get involved in this particular dispute involving dredge material over -- being hydraulically removed?

A. You know, I don't recall. I would say -- I

also did civil work. If there were some specific projects, for instance, I might -- I might be involved in a contract the city was entering into with somebody providing services. I might take a particular civil case. And I don't know if Peter Ekstrand, who normally did it, may have been on vacation or something, but it just came up and I was asked to -- to contact the Corps.

Q. I guess I got to ask you, June of '87 was almost 20 years ago. You seem to have a pretty good recollection of what happened 20 years ago. I'm just curious as to why?

A. Well, in some respects I do. I have a particular interest about what the Corps does in the river in our area, personally. I'm a real active outdoors person. I use the river a lot for fishing and hunting. And so I have a particular interest in that. But that project that the Corps was doing at that time, and I don't remember if they were using a private contractor or not, was of particular interest to everybody in the community. Because they were talking about bringing in millions of yards of dredge spoil, depositing it in an area which was close to city wells. And there was concern, whether it was legitimate or not, that

there could be possible contamination of the groundwater in that area. So that's why I remember that project. The specific details, I can't tell you I remember all the details.

Q. So just to follow up on that. What's your, if you have one, what's your opinion about how the Corps handles its business in the Mississippi?

A. It's negative.

Q. I guess on a scale of 1 to 10, if 10 is they do the best job possible and 1 is the worst job possible, where are you on that scale?

A. Three.

Q. And why do you say that?

A. Well, a couple of reasons. No. 1, I think that the Corps does a terrible job of keeping people informed in the area. They meet -- they have always met the requirements of posting meetings and giving notice, but they do it minimally, in my opinion. I and others have always questioned their frequent use of eminent closure declarations, because that allows them to, as I understand it, get around some permitting requirements. I think that many more resources should be used to attack the source of sedimentation in the river, rather than just continually removing it. And I think the Corps has

some responsibility in that. So for those reasons, I've always felt that the Corps had one goal and that was to keep the channel open no matter what.

Q. Do you know who Steve Tapp is?

A. I believe he's someone that worked for the Army Corps. I think he was a Colonel. He called himself a Colonel. I don't know if that's a civilian title or a military title. Worked for the Corps back in the 1980s anyway. I don't know if he still works there.

Q. That was, I think, Colonel Rapp.

A. Oh, I'm sorry. I thought that was who you were talking about.

Q. Steve Tapp had some -- I'll just go ahead and proffer that Steve Tapp worked on this particular contract.

A. Which one, the Matteson contract?

Q. The contract we're talking about here today, the contract with L.W. Matteson.

A. Oh, no, I don't believe I ever met him.

Q. Have you spoken to him on the telephone? You can go ahead and refer to your Affidavit.

A. Maybe I'm getting him confused.

Q. Take your time. I'm not trying to trick you here.

Q. Okay. I'll go back to my question, and Mr. Metcalf's objection is noted, but do you know how widely known this is? Is this -- you know, is it as widely known as Dunken Donuts or is it sort of a --
A. It would probably -- I'm sorry, go ahead.
Q. Yeah.
A. It depends upon what part of the county you're talking about. I would say that it's very well-known in the area of Wabasha, Lake City, and what's called Greenfield Township, and those are all communities or areas that are adjacent to the Mississippi River. As you go inland, then I don't think it's as widely known.
Q. Okay. By letter dated July 9th, '98, did you ultimately inform Ms. Krueger that in your opinion the Shoreland Protection Act could not prevent the Corps from using federal land to deposit this material, the dredge material?
A. I'd have to see the letter. I do recall writing her a letter, and I've seen it recently, but I don't remember the date, where ultimately it was my understanding the Army Corps, U.S. Fish & Wildlife Service, and Mr. Matteson, or some combination of those three entities, had reached

some sort of an agreement which allowed for the dredge spoil to be transported out of the river, across federal land, and deposited on federal land. And based on that, it was my opinion that the Flood Plain Shoreland Ordinance, that was in effect at that time, could not prevent that and really had no jurisdiction over it.

Q. And why is that?

A. We don't have -- it's my opinion that we don't have any jurisdiction over federal land in Wabasha County.

Q. And what's the basis of that? What's the grounds for you saying that? Is it sovereign immunity?

A. Yeah, I believe that's it.

Q. Okay. So you believe that the Federal Government does possess sovereign immunity over federal lands?

A. Yes.

Q. Do you know who Dennis Anderson is?

A. I know of a Dennis Anderson -- know of a Dennis Anderson that writes a column for the Minneapolis Star Tribune. Is that who you're referencing?

Q. No. He's a Corps fisheries biologist.

A. No.
Q. Okay.
A. He may have been in a meeting I've been at, but I don't know him.
Q. Do you know who David Guillot, G-u-i-l-l-o-t, is?
A. No.
Q. Do you recall -- when was the first -- I'll back up a second. We're talking about the September time frame is when you had the conversation with Mr. Tapp that you don't really recall. So just to get you oriented in terms of time.
A. September of -- what year was that?
Q. '96.
A. Okay.
Q. Do you know when the first time you heard of this actual contract and the fact that a contractor planned to hydraulically transport dredge material onto the Saunderson property?
A. No. It would have been close to that time, but I can't tell you when.
Q. Do you know how you first heard about it? Was it Ms. Krueger bringing it to your attention?
A. That would -- normally, when anything came up that she had issues about, she would come to see

me or call me on an interoffice phone, but I believe that would probably be how I became aware of it.

Q. Do you know where the Saunderson property is?

A. Yes.

Q. Is it safe to say she lives right next door to it?

A. I know she lives near there. I don't know how close. But I know generally where it is. And I know generally where she lives. But I've never been to her house.

Q. Okay.

A. It's down on an area called Sand Prairie, which is down below the Wabasha/Kellogg area.

Q. But it's pretty close; right?

A. To where she lives?

Q. Yeah.

A. I think so. I think so. Within a mile, for sure.

Q. And folks are pretty -- if you're going to have tons and tons of sludge being pumped onto land next to you, you might be a little more concerned about it than other folks down --

A. There were -- sure. And there were a lot of people that were concerned. And I think most of

them either owned land in that area or lived in that area.

Q. Why were they concerned, to the best of your knowledge?

A. Well, there was a number of different issues raised. The one I recall, probably the strongest, was concern about contamination of water. The wells down there are very shallow, apparently some of them are 60 to 80 feet. A lot of them are sand point wells, they're not cased wells. That was one concern.

There was another concern that there would be blowing sand. I don't know how strong that was. There were concerns about dredge spoil being deposited on land as it was being transported from the water, because they -- well, I've seen the pipes they use, and for some reason, I don't know, they're not very tight, so the hydraulically -- the sand is being moved with water, tends to shoot out along it. But I think the No. 1 concern was contamination of the wells or groundwater.

Q. Okay. So it was a pretty big issue at that time?

A. It was. And then the county engineer also had an issue. Because in order to do it they had to

cross the county road and they'd have to bore under it, so that was more a government issue, but that was another one that was raised. Most of it was contamination concerns, I should say.

Q. Just a second. Has any of your discussions today jarred your memory at all with regard to any conversations you may have had with L.W. Matteson or any of its employees about the Shoreland Protection Act?

A. I believe I had a conversation with Mr. Matteson by phone about my opinion that the Shoreland Ordinance would apply even though the dredge spoil was going to be deposited outside the thousand-foot corridor, but the details of that I can't tell you, nor can I tell you when that was.

Q. Okay. And just for the record, the timing is crucial on this. I just want to obviously know the truth about this.

A. Uh-huh.

Q. We have notes from Mr. Tapp saying that you had a conversation with him on the 18th of September of 1996, and he told you to talk to Mr. Matteson. He says he provided you with the telephone number. If at any point today or in the future you have a recollection as to whether you picked up the phone

right after or how many days it was or how many weeks it was, if you can just interject with that.

A. I would. I can't tell you that.

Q. All right.

A. I think it had to be -- it was definitely between then and whenever the hearing was. And I thought the hearing was in October of '96. I do have minutes from that hearing in that other file so we can check that.

Q. I'll go ahead and get a copy of that before you leave. Just the way I do it as an attorney, I do business. I've got a million things going on, like you probably do. I try to knock everything out at once. I don't know if that's the way you tend to do business or not.

A. As far as phone calls are concerned, I return business -- I return phone calls generally in groups of calls. I'll frequently get 40 or 50 calls in a day, and so it's not my practice to call everyone back as they come in. A lot of times I'll spend the last hour or hour and a half returning phone calls.

Q. Right.

A. And it depends upon the day. Presently I'm in court four days a week.

that discusses this particular act?
A. No.
Q. No. Have you ever looked for one?
A. You mean that -- an appellate decision that interprets the ordinance?
Q. I'll take anything, appellate or otherwise.
A. No. There may be, but not in -- I don't think -- in Wabasha County, I don't think anybody's appealed anything that far. But as I said earlier, the ordinance, as I understand it, is virtually identical in every county, because it's mandated by statute and the Department of National Resources is the one who provides the language for the ordinance.
Q. Even though it's county -- each county has one, they're all the same, so it's basically state-wide?
A. Correct. Well, if you have navigable waters.
Q. So any counties along the Mississippi?
A. (Witness nods head.)
Q. Or any other rivers that are navigable?
A. Right. I don't think it applies to shoreland on the lakes, for instance. That would be governed by probably more local ordinances.
MR. EINSTMAN: Okay, 73.

back to her?

A. Correct.

Q. She then contacted you later to discuss incorporating the changes or providing you with more information?

A. Yes, that's correct.

Q. Then based upon that discussion, she sent you a new copy of your Affidavit?

A. Correct.

Q. And then you signed that particular copy and sent it back to her?

A. Correct.

Q. Okay. Looking at Exhibit 73. If you could please go to paragraph 5?

A. (Witness complies.) Okay.

Q. Could you please read that, I guess it's one sentence or two sentences, into the record please, paragraph 5?

A. "I am the author of, and recall sending, a letter dated June 15, 1983 to Col. Rapp at the Corps of Engineers, St. Paul, Minnesota ("the Corps"), regarding the application of the Wabasha Flood Plain and Shoreland Ordinance to the Corps' proposed dredging activity, and advising the Corps that it needed to apply for a permit to dump dredge spoil in

the City of Wabasha. A copy of that letter is attached to this affidavit and speaks for itself."

Q. Just for the record, that letter is not attached to my copy of your Affidavit. Do you have a copy of that with you today?

A. No, I don't. I'm surprised. But I don't. Mr. Metcalf asked me about that yesterday.

Q. Did you send one to Ms. Mills?

A. It was attached to the original. I remember reading it. But for some reason, when my secretary copied the Affidavit I signed, she didn't make a copy of that.

Q. So do you have any copies of that letter in your possession today?

A. No. No, I don't.

MR. EINSTMAN: Mr. Metcalf --

THE WITNESS: Mr. Metcalf might have one.

MR. EINSTMAN: -- do you have a copy of this letter?

MR. METCALF: I do.

MR. EINSTMAN: Could I see it, please?

MR. METCALF: (Handing document.) There's two of them. There's that one and the response.

MR. EINSTMAN: Can we mark this as an exhibit now?

MR. METCALF: Yeah, go ahead.

MR. EINSTMAN: Make this one Exhibit 74.

(Whereupon, Nordstrom Deposition Exhibit No. 74 was marked for identification and a copy has been hereby attached.)

BY MR. EINSTMAN:

Q. Look at your -- do you have a copy? Okay. I got one.

A. That's the response.

Q. If you could just examine Exhibit 74. I've not seen it before today, so I'm going to examine it, too. It's pretty short, though.

A. (Witness complies.)

Q. Exhibit 74 is dated June 15th, 1983; is that correct?

A. Yes.

Q. Okay. And it's addressed to Colonel Rapp of the Corps of Engineers?

A. Yes.

Q. Does this letter discuss anything about a thousand-foot requirement, with regard to the affect of the Wabasha Flood Plain and Shoreland Ordinance, or the Shoreland Protection Act?

A. No, not specifically. No, it does not.

Q. You say "not specifically."

A. Well, I mean, it doesn't reference the thousand feet. It says that dumping of dredge spoil was -- previously was done without obtaining a variance from the City of Wabasha pursuant to the Flood Plain Ordinance, and that the ordinance provided that type of dumping can only be done after applying for and obtaining a variance.

Q. Now, you testified earlier that the ordinance itself has lots of different sections; right?

A. Correct. It has different areas, too. It has flood plain, flood fringe and other areas. And depending upon what area you're going into, different parts of the ordinance apply.

Q. And this letter doesn't specifically mention any thousand-foot requirement?

A. Correct.

Q. Do you know when Colonel Rapp worked for the Corps of Engineers?

A. No.

Q. Do you know if he's still alive today?

A. No. I mean, I don't know.

Q. Do you know whether he was alive in September of 1996?

A. No, I don't. I do not.

correct? I mean, assuming this was sent in the June '83 time frame.

A. The letter that I -- Exhibit 74, that I sent, was as one of the city attorneys for the City of Wabasha, yes.

Q. Do you have any reason to believe that Colonel Rapp passed the information contained within Exhibits 74 and 75 on to the rest of the Corps of Engineers?

A. I would hope that he did, but no, I don't.

Q. So to the best of your knowledge, when Colonel Rapp left, if indeed he did leave, then this information left with him?

MR. METCALF: Objection, calls for speculation.

A. I would have no way of answering that.

BY MR. EINSTMAN:

Q. Well, let's go ahead and read -- if you could read paragraph 9 into the record?

A. "As a result of having dealt with the Corps over a number of years on similar issues, my present understanding of the Corps' official position with regard to local permit requirements is that it is not subject to those requirements based upon its claim of sovereign immunity. The Corps has never