Q. All right.

A. But I think you understand what my intent was now.

Q. I understand. I understand. Okay. Okay. If you could please read paragraph 10 into the record.

A. "In spite of the Corps' claim of sovereign immunity and its position that it is not subject to local permits, it has been my experience that the Corps does apply for those permits."

Q. You just mentioned a minute ago --

A. I don't think that's a correct statement.

Q. Okay. How would you rephrase that?

A. I would rephrase the last -- after the last comma to say, it's been my experience that the Corps cooperates. I don't know. A better way to put that would be, I've seen the Corps say -- a good example is this 1983 project. We're not subject to it, but -- and Colonel Rapp's letter says we'll work with you. I've seen the Corps do that. When pressure has been put on the Corps, then I see the Corps say, well, we don't have to but we'll still work with you.

And in this case, for instance, they agreed to -- see, I don't know if they actually applied for

a permit, but I know they agreed to drill five or six test wells, and they agreed to testing, and they agreed -- and at their expense, as I recall. And they agreed to provide the testing results to the city on a timely basis, so that if there was contamination, and I believe they also -- I don't have a copy of it, but I think they also agreed that in the event there was some contamination, there was some sort of procedure or process that would go into effect to make sure that the people in the city were given potable water.

Q. Okay. And that's on federal land, right, in this 1983 project?

A. No.

Q. It was federally leased land?

A. I don't believe so. I think that land -- I don't know who owned it, but it was privately owned. I think it was owned by the railroad, actually.

Q. Okay.

A. At least a lot of it was. And I don't know if the whole thing was, but I think most of it was owned by one of the railroads. So what I mean by that, and I would change that to say it's been my experience that when the Corps is confronted or asked, if you want to put it more politely, they

have been compliant with -- with the letter or the intent of local ordinances and concerns of local people.

Q. Okay.

A. They may have applied for a permit back then, but I can't tell you that they did.

Q. And what you just said was referring to paragraph 10 of Exhibit 73?

A. Right.

Q. Just looking at -- I know you would change paragraph 10, but just looking at the language that's in the Affidavit itself, again, just so we're not -- I don't want to have this taken out of context, it says here that it is not subject to local permits. Again, my understanding of what you're testifying to is, is that the Corps' official position is that it is not subject to local permits with regard to federal land or federally leased land, but it doesn't --

A. Or to projects that they're doing themselves.

Q. Or to projects they're doing themselves?

A. Right.

Q. Okay. On private land or --

A. Anywhere.

said is true?

A. I think that if somebody who presents themself in an official capacity representing an entity like the Corps, is aware of it, the Corps is aware of it.

Q. Okay. And who would that person be that in your view has specific knowledge of the contents of this act?

A. Well, in your area the guy who we saw over and over again is Dan Krumholz.

Q. So it's -- you believe that Dan Krumholz knew exactly what the -- about the thousand-foot requirement?

A. I think he was very aware that there was a Shoreland Ordinance that very likely impacted projects the Corps did. Whether he knew what -- about the thousand foot or any of the other provisions, I don't know, 'cause I don't know how closely he read it, but I believe he knew it existed and that it may impact their projects.

Q. Okay. How well do you know Dan Krumholz?

A. I don't know him personally. I've been at meetings he's been at.

Q. Do you have any belief that he might be a liar or a dishonest person?

A. No.
Q. So if he were to say that he had no idea about this thousand-foot requirement, would you think he was lying or that he was just -- I mean, what would you think?
MR. METCALF: I'll object to the relevance. Also calls for speculation.
A. I wouldn't think he would be lying, but I would be amazed.
BY MR. EINSTMAN:
Q. And why?
A. Well, because -- I don't know what his title is, but he would frequently appear at these public hearings where the Corps would be talking about projects. He would be -- I saw him at County Board meetings, I believe he was at Planning Commission meetings, and I assume not just in Wabasha County. And so he's in -- and I saw him as a person who was sort of a -- the contact person locally for the Army Corps when they were doing things. And it would just be amazing to me that he wouldn't be aware of ordinances that have to do with where the river meets the shore.
I just -- you know, I mean, the Corps does so much activity in Wabasha County, particularly

because of the Chippewa River. They are dredging, well, probably not every year, because maybe of some water levels, but it seems to me, and I've lived down there since 1976, that the Corps has been dredging in Wabasha -- along Wabasha County virtually every year since then. And so not to be aware of local ordinances or have met local resistance to certain things would be just astounding to me. And like I said, Dan is the guy who wasn't always the only person, but he was almost always at meetings that I was at.

Q. Do you know if Mr. Krumholz is a lawyer?

A. I don't know that he is. I don't think he is, but I don't know that.

Q. Okay.

A. I think he's an engineer of some type.

Q. If he were under the impression that whenever the Corps does anything it's protected by sovereign immunity, would that be a reasonable explanation as to why he may not know about the specific requirements of the Shoreland Protection Act?

MR. METCALF: Object to the relevance, calls for speculation. It's also an improper hypothetical.

A. Yes, it's possible.

Q. Okay. Can you read paragraph 14 into the record?

A. "Throughout the 1980's and continuing to the present, there has been major local citizen opposition to the Corps with respect to its activities in management of the Mississippi River. I believe that the Corps was and is fully aware of the magnitude of that opposition."

Q. We talked about this before as to the reference to the Mississippi River. Is that overbroad?

A. Well, it talks about major local citizen opposition, so I think that narrows it. But what I'm referring to is in the area of Wabasha and Wabasha County and also on the Wisconsin side of that same area.

Q. You've knowledge about that. It's right across the river; right?

A. Right. And the area directly across the river from Wabasha and down river for a certain extent is part of a National Wildlife Refuge, so there's been a lot of concern about things that are done in the refuge as well. So both sides of the river. But I am referencing Wabasha and the Wabasha

County area.

Q. How many miles would that be of river are you talking about, generally speaking?

A. Twenty-five to 30.

Q. In the second sentence of paragraph 14 you state, "I believe that the Corps was and is fully aware of the magnitude of that opposition." What do you base that statement upon?

A. Well, part of the meetings that I've been at, because I've been to a number of meetings and I've expressed my concern, they know -- I and others have gone through our United States Senator to register complaints, and I know those have been communicated to them, some of the letters that have been written by officials in the City of Wabasha, by county officials in Wabasha County. Just -- I've been at a couple of meetings where a lot -- a lot of people attended and expressed very strong concerns about what was going on, so --

Q. Okay.

A. And those go back to the '80s.

Q. So is it fair to say that, and correct me if I'm wrong or just rephrase what I'm about to say as you see fit, but basically people who live close to the river are concerned about the environment of

the river?
A. Correct.
Q. And you stated previously today that the Corps is concerned about making sure there's a nine-foot passageway through the river?
A. I believe that's their No. 1 concern.
Q. And sometimes those goals come into conflict?
A. Absolutely.
Q. And that would be the basis of the populous's concerns about Corps activities?
A. Yes.
Q. Is that -- can you -- is that a fair characterization?
A. That's a fair statement.
Q. Would you say that's correct, what I just said?
A. Yes.
Q. Since we've been sitting here talking about this for a number of hours, and hopefully your memory has been jarred a little bit, but do you know whether you actually informed L.W. Matteson, and I'm going to say the September '96 time frame after you spoke to Mr. Tapp, about what the requirements of the ordinance were in terms of hydraulic or

mechanical dredging?

A. No. I think what he was told was that because there's the risk of -- of -- of the -- the material that's being transported being deposited in that area, that he needed a Conditional Use Permit.

Q. Okay. Do you recall now, at, you know, 12:00 o'clock today, actually having a conversation with Mr. Matteson about this over the telephone?

A. I believe I either had a telephone conversation or he came -- he was in my office and talked to me about it.

Q. And again, do you have any better idea of how close that time was, where you had the conversation with Mr. Matteson, to the time you spoke to Mr. Tapp?

A. No. But I believe it was -- it would have been before he applied for the Conditional Use Permit, because I think what he was asking was why do I have to do this.

Q. Okay.

A. And I gave him my opinion, and then -- so he applied for it. And I think he, at that time, thought he'd get the permit. So I don't -- I'm just guessing, but I don't think he was that concerned at that point. I don't think he realized the amount of

opposition.

Q. Do you know how -- do you have an independent recollection now that he actually did come to your office? The reason I'm asking is because how would he have gotten there? You probably had to call him first in order to get him there.

A. Well, no, he could have just come. I mean, that happens to me all the time, unfortunately, people walking into my office daily. So he may have just come to our office. I don't recall.

Q. And your file that we can't find, that might have --

A. It might. I might have gotten a letter from him asking for an appointment, but I seem to remember he came to the office. But whether it was by phone or in person, his questions were, why do I -- why do you believe I need to get a permit?

Q. And you explained to him about the thousand-foot requirement?

A. I explained to him that he was transporting -- as I understood it, they were going to use this water slurry or whatever they call it, hydraulic transport through pipes, that the pipes were jointed, that water and dredge spoil would end

up in that shoreland area, so he needed a permit.
Q. Do you know what his reaction was when you informed him of that?
A. I don't think -- no, I don't remember precisely, but I don't think he really argued about it, and he wanted to know how to do it, and so I told him where to go, and he went and made application. And that file that you're copying even has a copy of his application.
Q. Do you recall -- I mean, based upon what I've gleaned from you talking to me today, do you recall what your view at this time was, your personal view, about whether or not this project should be allowed to go forward as proposed?
MR. METCALF: I'm sorry, what was the question?
THE WITNESS: You asked me what my personal view was about whether or not he should be allowed to transport --
BY MR. EINSTMAN:
Q. Exactly.
A. -- into the Saunderson property?
Q. Exactly.
MR. METCALF: Object to it as irrelevant.
A. I wasn't real familiar with exactly -- I

knew the general area, but I wasn't real familiar with where the Saunderson property was. It's, uninterestingly enough, it's in an area called Sand Prairie, which is predominantly sand. So I thought that in some areas it probably wouldn't be a problem. The only concern I would have had was whether or not it could possibly contaminate wells. I read somewhere where there was the -- they estimated 181 million gallons of water would be used for the transport. That's a lot of water. So that -- so personally that would have been my concern, more than depositing the dredge spoil on the shoreland, would be, is this going to cause some problems with our wells. And I was concerned from a legal point of view as well. Because if the county issued the permit and if there was contamination, it raised the possibility that the county would be named in a lawsuit to rectify the contamination problems, which could be a huge expense.

BY MR. EINSTMAN:

Q. So I guess what I'm trying to reconcile, if he didn't seem too concerned about it at the time when you had your discussion with Mr. Matteson, but you obviously at the same time were probably understanding there were a lot of problems and

potential liability, did you communicate your thoughts to him about your concerns?

A. I don't remember. I don't remember.

Q. Do you remember whether you said to him, hey, that is not a good idea, think about all the possible damage it could cause?

A. I don't remember doing that. I don't remember doing that. You know, it's interesting because the ordinance -- the ordinance could stop it, but we didn't have anything in effect if the ordinance didn't apply that would stop it. And so my legal concerns were even heightened, because we didn't have anything in effect to take into account the possibility of contamination.

But I didn't see that as a reason that he could be denied the permit, because that permit had to apply to what's going to happen in the shoreland area. And this land was definitely outside of that. But I don't think I -- I don't think we got real specific. I think I told him that my concern was the water and sand being deposited in the shoreland, and because of that you have to get a permit. We may also have talked about the fact that he was going to have to go to the county engineer's office and get a permit to go over or under the road. I

think he was talking about going under the road.

Q. I'll just proffer to you that part of the land was actually within the thousand square feet, the thousand feet, a very small part of it.

A. Oh, was it?

Q. Part of it indeed was within the thousand feet.

A. Maybe it was.

Q. And from what I've seen, they apparently expected to have five feet of this stuff piled five feet high.

A. Five and a half to six feet. It was going to raise the level.

Q. So my question to you is, would that -- as a concerned citizen, would you be -- would you be for or against it, I guess, especially given your views on the --

MR. METCALF: I'll object again on the relevance, go ahead.

A. If I lived in that area I probably would have been opposed to it primarily because of the contamination concerns. And the ground is so porous there, that water was going to go right into -- into the groundwater. I don't know how much that sand actually filters.

BY MR. EINSTMAN:

Q. So from a personal perspective, is it fair to say that you were sort of -- you would not be in favor of it at that time?

MR. METCALF: Same objection.

A. Yes.

BY MR. EINSTMAN:

Q. And from a professional standpoint, you were concerned with keeping -- making sure that your county was not subject to any liability it didn't have to go through; right?

A. Right.

Q. And so the two kind of flowed together?

A. I try to keep my personal -- when I'm asked for a legal opinion, hopefully I keep my personal views out of it. I know that can be impossible. But in this instance I thought there was significant concerns regarding the ordinance and other legal concerns that justified the requirement that they get a Conditional Use permit.

Q. Okay. Okay. Could you please read paragraph 15 into the record?

A. "In 1996, I was contacted by Judy Krueger, Zoning Administrator for Wabasha County, with information that L.W. Matteson, Inc., in its

capacity as a dredge contractor to the Corps, intended to dump(sic) dredge spoil across the Shoreland Protection Zone to a placement location on private property it intended to purchase from Roland Saunderson." That name is incorrect, by the way. "Ms. Krueger lived near the Saunderson property and inquired as to whether a permit would be required for this activity."

Q. Okay. Just for the record, it was pump dredge spoil, not dump.

A. Oh, I'm sorry.

Q. That's okay.

A. Pump dredge spoil, that's correct.

Q. What's the incorrect statement with regard to Mr. Saunderson?

A. His name is Ronald Sanderson, S-a-n-d-e-r-s-o-n.

Q. Was it referred to as the Saunderson property or the Sanderson property?

A. Well, it should be referred to as the Sanderson property, because that's who owned it, and I should have made that change because I knew that.

Q. Do you know when this conversation took place in 1996, the contact by Ms. Krueger?

A. Probably late summer, August or early

September, probably August.

Q. Why do you say probably August?

A. Well, that would be a guess. I don't know when -- when Mr. Matteson -- she became aware of it. But he applied for the Conditional Use Permit in September, so it was sometime before that. Sometime in the summer of 1996, I would say.

Q. In the second sentence it indicates that "Ms. Krueger lived near the Saunderson property and inquired as to whether a permit would be required for this activity." Sitting here today, do you have any recollection as to whether that prompted her to contact you, the fact that she lived close by?

A. I don't think that did. That may have been a concern of her's, but I think she contacted me as Zoning Administrator.

Q. So is that misleading there, having that sentence, I mean?

A. Well, it could be. I mean, well, it's true that she lives near there.

Q. Right.

A. Probably within a mile. She did ask me whether a permit -- whether I'd give an opinion as to whether or not a permit would be required for the activity. But I took her inquiry to be in the

capacity as a Zoning Administrator, but I can't read her mind.

Q. Okay. So if that sentence implies that her living near the Saunderson property was what caused her to inquire as to whether a permit would be required, that's incorrect?

A. Well, I can't tell you if it's correct or incorrect, only Ms. Krueger can tell you about that.

Q. But the fact that it's in your Affidavit means that you're not saying that?

A. No, I'm not saying that. I'm not saying that. Maybe if she wanted to point out that she lives near that property, that's true.

Q. Right.

A. And she did inquire. Putting it in one sentence may be an implication.

Q. Which is why we're here today.

A. Sure. You've taught me my lesson.

MR. METCALF: So you have to give the deposition anyway.

THE WITNESS: Should have just refused to do everything.

BY MR. EINSTMAN:

Q. Do you know whether Ms. Krueger is responsible for actually administrating the Zoning

Protection Act?

A. She was at that time.

Q. I'm sorry, administrating the Shoreland Protection Ordinance?

A. She was at that time. She's no longer working for the County.

Q. Okay. So at this time she would call you up for a legal opinion, say, hey, what do I do here, lawyer, tell me what my obligations are or what my responsibilities are?

A. From time to time, yes.

Q. So would you characterize the Shoreland Protection Act as a zoning ordinance or how would you characterize it?

A. Yeah, I think it's a form of zoning, because it deals with all sorts of things; lot size, setback requirements, sightline requirements, that sort of thing.

Q. Okay.

A. At that time it was the only thing that we had that was zoning. Now we have county zoning as well.

Q. And I think I've asked you this and I think you've already answer it but I'll ask you again just to make sure it's on the record. This contact by