27 April 1998

CEMVP-CO-E, EASTERN AREA OFFICE

MEMORANDUM FOR GRAND ENCAMPMENT TEAM:

SUBJECT: Grand Encampment Excavation, Disposal Site Issue
RE: DACW37-96-C-0030

1. A meeting with the Contractor, L.W. Matteson is scheduled for April 30, at 10:00 a.m. in the District Office. The following information is provided to bring the new team members up to speed on this issue

2. The contract was awarded on 20 September 1996 in the amount of $1,693,000.00. The required completion date is 25 September 1998. There are two distinct operations, the first, unloading of the Alma Marine Dredged Material Pile Site was performed in fall 1996. At the pre-construction conference the contractor indicated that he intended to perform hydraulic unloading of the Grand Encampment Site during the 1997 season with placement on a contractor obtained disposal site (Saunderson Property) in Wabasha County. On 06 November 1996 the Wabasha County Commissioners denied the contractor's pipeline ROW permit under a shoreline restriction ordinance.

3. During the winter of 1996-1997 the contractor initiated discussions with another Wabasha County property owner John Braun. The Braun property had a higher acquisition cost and required a longer pump distance. In May 1997 the contractor contacted the Winona Office and requested a meeting to discuss the project and specifically the following issues: (1) Corps assistance in acquiring right-of-way, (2) did the Corps recognize the change disposal area to be a change, and would we negotiate an equitable adjustment, and (3) what should the contractor do next? The Winona Office requested clarification from the contractor . By letter dated 23 July 1997 the Contractor submitted an opinion letter from their lawyer (Attachment No. 1) the contractor's letter was forwarded to Office of Counsel for their review. The following comments are provided to the contractor's "opinion" letter.

(a) Regarding pre-bid discussion with Corps of Engineer's personnel. [Not withstanding: 52.214-6 EXPLANATION TO PROSPECTIVE BIDDERS: . . "Oral explanations or instructions given before the award of a contract will not be binding", and 52.236-3 SITE INVESTIGATION AND CONDITIONS AFFECTING THE WORK. . "Nor does the Government assume responsibility for any understanding reached or representation made concerning conditions which can affect the work by any of its officers or agents before the execution of this contract,. .". During the bidding process two contractors, J.F. Brennan and L.W. Matteson (LWM) contacted CO-MR, Waterways Section to look at potential contractor selected disposal sites in the Wabasha/Kellogg Minnesota area. On 5 August 1996 (during the bidding period) an on site meeting was held with LWM , (Steve Tapp's Notes verify this), the group looked at the Brown and Guza properties, note the Saunderson Property was not discussed at this meeting. On 29 August 1996 Larry Matteson Sr. called Dan Krumholz regarding a "wooded site at Teepeeota Point". Dan's notes do not confirm the contractor's statements. The government did not investigate the "Saunderson" property during the bidding period.

(b) The five government furnished potential on-land placement sites were provided with adequate capacity for all existing dredge material from both the Alma and Grand Encampments Stockpiles. These placement sites are all located in Buffalo County, Wisconsin and were accessible through the Alma Marina Site. The restrictions for the government furnished transfer and placement sites were described in the contract documents. Specific restrictions include the City of Alma's $0.15/CY Beach (Harbor) Road Haulage Charges. The contract documents anticipated material to be trucked to the final on-land placement sites. The government estimate was prepared on this basis and a review of the bidder's abstract indicates that 3 of the 6 bidders planned performing the contract by trucking all the material. LWM as well as the second and third low bidders apparently bid the transfer of the Grand Encampment stockpile by hydraulic dredging. This method was not included, discussed, or prohibited in the contract documents. However, utilization of a contractor selected final disposal area was provided for, subject to approval by the Contracting Officer.

DEPOSITION EXHIBIT
Gulan 25
7-23-02

4. Office of Counsel reviewed the preliminary letter submitted by the Contractor's attorney and found their claim of a differing site condition to be without merit. On 31 July 1997 Randy Glaeser and I met with the contractor. The only "new information" that came out of that meeting was the contractor's contention that the optional sites identified in the contract were not approved by the government and still would have required contractor-landowner negotiations and final approval from the Corps.

5. An in house meeting was conducted on 07 August 1997 (Gulan, Glaeser, Novak, Bakke, Bankston, Aird, Hoff, Krumholz, Tapp). The opinion of the group was that the contract was sound as written and believed the contractor fully understood the contract when he bid the job. The decision of that group was to direct the Contractor to execute the work as specified in the existing contract. By letter dated 05 September 1997 the COR notified the contractor that it was the government's position that the contract is clear regarding disposal sites and no differing site condition exists. In addition the contractor was informed that the MRPO would continue to facilitate the contractor's permit request, but would not actually obtain permits for the contractor.

6. In February 1998 the Wabasha County Commissioners denied the pipeline ROW permit for the Braun Property. Subsequent to that time the contractor has been negotiating with the USFWS for a disposal site. Use of the USFWS property would not require a permit from Wabasha County. The USFWS has requested that in trade for use of their property, the contractor purchase a nearby tract of land from Mrs. Rose Peterson.

7. By letter dated 22 April 1998 the contractor submitted cost information comparing the Saunderson Property and the Fish & Wildlife Property. The contractor's submitted costs for the original property are inline with the bid prices. The submitted costs for utilizing the Fish & Wildlife Property are approximately double, an additional $1.5 Million. The difference is due to additional equipment and labor for boosters and additional pipeline and additional real estate acquisition cost. The letter and two summary pages are attached; the cost breakdown pages will be available at the 30 April meeting (Attachment No.2).

8. By letter dated 27 April 1998, the contractor resubmitted the July 1997 letter from his lawyer and summarized his position (Attachment No. 3). The contractor has requested this meeting in order to present his position to the Contracting Officer.

Melissa Gulan

Melissa Gulan
Eastern Resident Engineer

Attachments:
1. 23 July 1997 Contractor Letter w/Miller Law Firm Letter
2. 22 April 1998 Contractor Letter
3. 27 April 1998 Contractor Letter

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PENGAD 800-631-6989 DEPOSITION EXHIBIT Nordstrom #73

L. W. MATTESON, INC.,

Plaintiff,

v.

UNITED STATES ARMY CORPS OF ENGINEERS,

Defendant.

Case No. 01-542C

AFFIDAVIT OF JAMES C. NORDSTROM

COMES NOW James C. Nordstrom and, being first duly sworn on his oath, state as follows:

I declare that the following facts are true, to the best of my knowledge, information and belief:

1. I was elected to the position of County Attorney for the County of Wabasha, Minnesota in 1990, and have held that position continuously to this date.

2. Prior to 1990, I was a partner in the firm of Gartner, Burkhardt, Shulman, Ekstrand & Nordstrom, Ltd., and in that capacity, periodically represented the City of Wabasha, Minnesota.

3. Pursuant to M.S.A. § 103F.201, enacted in 1973, every municipality in Minnesota is required to enact a Floodplain and Shoreland Ordinance, drafted by the Minnesota Department of Natural Resources. The MDNR controls the language of the ordinance, and attends hearings and meetings pertaining to the ordinance at the local level.

4. Both the City of Wabasha and the County of Wabasha have Floodplain and Shoreland Ordinances, with identical language drafted by the Minnesota Department of Natural Resources.

5. I am the author of, and recall sending, a letter dated June 15, 1983 to Col. Rapp at the Corps of Engineers, St. Paul, Minnesota ("the Corps"), regarding the application of the Wabasha Flood Plain and Shoreland Ordinance to the Corps' proposed dredging activity, and advising the Corps that it needed to apply for a permit to dump dredge spoil in the City of Wabasha. A copy of that letter is attached to this affidavit and speaks for itself.

6. The primary concern of the local citizens and government entities with regard to the dumping of dredge material was the potential for contamination of water supplies resulting from the contaminants leeching into surrounding wells. The proposed dumping location at that time was a gravel pit directly above City wells.

7. Because of local concern regarding potential well contamination, as well as prior negative experience with Corps activities along the river, I approached the Wabasha City Council about the need to require a permit for the placement of dredge spoil material by the Corps.

8. I was the recipient of, and recall receiving, a letter from Edward G. Rapp, Colonel, Corps of Engineers, District Engineer, in response to my June 15, 1983. A copy of that letter is attached to this affidavit and speaks for itself.

9. As a result of having dealt with the Corps over a number of years on similar issues, my present understanding of the Corps' official position with regard to local permit requirements is that it is not subject to those requirements based upon its claim of sovereign immunity. The Corps has never substantiated to me a documented basis for its claim of sovereign immunity.

10. In spite of the Corps' claim of sovereign immunity and its position that it is not subject to local permits, it has been my experience that the Corps does apply for those permits.

11. ~~In my experience, the Corps has historically disregarded local citizen and governmental opposition and concerns regarding it activities in managing the Mississippi River.~~ 10/15/02

12. Following the correspondence between myself and the Corps in June, 1983, and the Corps' invocation of its sovereign immunity, the Corps did apply for a permit to dump dredge material in Wabasha. The permit was granted subject to numerous conditions, most importantly that the Corps drill and monitor test wells in the area of the dredge disposal at the Jolivette pit, and to be responsible for maintenance of those wells should contamination occur.

13. Based upon my personal communications with the Corps prior to 1996, it is my belief that the Corps was fully aware of the Wabasha Shoreland Ordinance and its requirement for obtaining a ~~variance~~ conditional local permit for any activity falling within the Shoreland Protection Zone.

14. Throughout the 1980's and continuing to the present, there has been major local citizen opposition to the Corps with respect to its activities in management of the Mississippi River. I believe that the Corps was and is fully aware of the magnitude of that opposition.

15. In 1996, I was contacted by Judy Krueger, Zoning Administrator for Wabasha County, with information that L.W. Matteson, Inc., in its capacity as a dredge contractor to the Corps, intended to pump dredge spoil across the Shoreland Protection Zone to a placement location on private property it intended to purchase from Roland Saunderson. Ms. Krueger lived near the Saunderson property and inquired as to whether a permit would be required for this activity.

16. The issue in that case was potential discharge from the pipeline within the Shoreland Protection Zone.

17. I recall speaking with representatives of the Corps about the application of the Wabasha Shoreland Ordinance to the activity referenced in Item #9, although I do not recall the name(s) of the individual(s) with whom I spoke.

18. I have not JCN reviewed a copy of Steve Tapp's diary notes from September 18, 1996, reflecting that I called him on that date to discuss the application of the Shoreland Ordinance to the planned dredging activity and pumping of dredge spoil material to the Saunderson property. Having reviewed this diary entry, I do not dispute that I made that telephone call and that the notes accurately reflect the content of our communication.

19. Following my conversation with Mr. Tapp on September 18, 1996, either Judy Krueger or I contacted L.W. Matteson, Inc. to advise them that a permit would be necessary. I ~~was not~~ do not recall being JCN 10/15/02 informed by Mr. Tapp on September 18, 1996 of any time limit or time frame that was critical for Matteson to be so advised.

20. I firmly believe that the Corps was fully aware of the Wabasha Floodplain and Shoreland Ordinance and its requirements prior to and during 1996.

[signature]

James C. Nordstrom

STATE OF MINNESOTA )
) ss:
)
COUNTY OF WABASHA )

Subscribed and sworn to before me this 15th day of October, 2002.

[signature]

Notary Public

My Commission Expires:

GARTNER, BURKHARDT, SHULMAN, EKSTRAND & NORDSTROM, LTD.

LAW OFFICES

PHILIP A. GARTNER
PETER H. BURKHARDT
DAVID A. SHULMAN
PETER D. EKSTRAND
JAMES C. NORDSTROM
STEVEN L. ERWIN

REPLY TO
100 WEST MAIN ST.
WABASHA, MINNESOTA 55981
612-565-4548

OFFICES
LAKE CITY, MINN. 55041
PLAINVIEW, MINN. 55964
ROCHESTER, MINN. 55901
WABASHA, MINN. 55981

discuss at 7:00 Tue

June 15, 1983

Col. Rapp
CORPS OF ENGINEERS
1135 U.S. Post Office & Custom House
St. Paul, MN 55101

DEPOSITION EXHIBIT
PENGAD 800-631-6989
Nordstrom #74

Dear Colonel Rapp:

An edition of last week's Rochester Post Bulletin carried an article regarding the Army Corp's plan to dredge the Chippewa River and dump dredge spoil within the City limits of Wabasha sometime during the summer of 1983. The article alluded to two possible area where sand may be dumped. I presume the areas would be the old Chicago, Milwaukee Railroad pit and/or the area presently owned by George Jolivette, Jr.

You will recall that last year the Army Corps dredged and dumped dredge spoil in the Jolivette pit. That dumping of dredge spoil was done without obtaining a variance from the City of Wabasha pursuant to the Wabasha Flood Plain and Shoreland Ordinance. That ordinance specifically provides that the type of dumping done by the Corps can only be done after applying for and obtaining a variance.

I know of no Federal or State law which allows the U.S. Army Corps of Engineers to act without seeking such a permit. If the Corps intends to dump dredge spoil in the City of Wabasha limits this year, or any year in the future, we will assume that the Corps will follow the required process and obtain the proper variances.

Very truly yours,

James C. Nordstrom, City Attorney
for the City of Wabasha

JCN:mms

Peter Ekstrand
ATTORNEY AT LAW

100 MAIN STREET WEST • POST OFFICE BOX 190 • WABASHA, MINNESOTA 55981 • TELEPHONE 612/565-4548

August 19, 1987

Mr. Dan Krumholtz
U.S. ARMY CORPS OF ENGINEERS
U.S. Army Boatyard
Fountain City, WI 54629

DEPOSITION EXHIBIT
Nordstrom #84

Dear Mr. Krumholtz:

At the City Council meeting on August 18, 1987, numerous complaints were made to the Council relative to the dredge spoil dumping in the Kohner pit in the City of Wabasha. The Council is very concerned as to what the final appearance of this sandpile will be as far as the elevations are concerned and are requesting that the Corps review this matter seriously with the hope of revising the elevations downward so that we don't have a situation that is unsightly from an esthetic standpoint. The neighbors surrounding the pit are very disturbed about this matter and the Council has requested that members of the Corps, the contractor, and the owner of the pit come to the next council meeting on September 1, 1987 to discuss the matter.

The City is also extremely concerned about the City wells and the private wells lying adjacent to this project. A discussion relative to the well monitoring took place at the meeting and both Mr. Passe and Mr. Stroot, two of the neighbors having private wells, have indicated that to their knowledge there has been no well monitoring done of their private wells. In discussing the matter with the City Street Superintendent and the Utilities Superintendent, they have not seen anyone from the Corps, or anyone else, actually do any monitoring of any of the City wells or of the private wells involved. The Council would like you to discuss and clarify at the next council meeting what is actually being done. The City is requesting, furthermore, that the monitoring take place on a weekly basis, with turnaround results within one week thereafter. In the event some contamination does show from any of the tests, it may be necessary to take immediate action, and having a turnaround on the testing results of more than one week could be disastrous to the City. The City has been informed by officials that Winona State University does do well testing and has done so in the past, with a turnaround time of approximately three days.

The fact that the City has not received any test results relative to this project is upsetting indeed! Jim Nordstrom, an attorney representing Eugene Stroot, appeared before the Council and indicated that in his discussions with you, you were unaware whether any of the testing had actually been done and that you had received no written results from any of the tests.

As you know, the contractor in this case never did obtain a conditional use permit for the laying of the pipe in the flood-plain zone and although this is a temporary structure, I am sure you are aware that Wabasha's Flood Plain Management Ordinance requires a conditional use permit for such placement. This ordinance is mandated by the Federal Government for flood insurance purposes and although the City does not wish to take any action at this time to stop the project from going forward, if the groundwater monitoring program is not handled in a way satisfactory to the City as indicated above, we may be left with no other alternative but to do so. Furthermore, the Federal Clean Water Act does give the City certain rights relative to their wells and an injunctive proceeding may be in order if this well monitoring program does not go forward expeditiously and in a manner that will safeguard the City and private wells in an adequate manner. We, of course, hope that this will not be necessary and that the Corps will stay on top of this matter and expedite all testing and test results, keeping the City informed accordingly.

For the above reasons, I hope there is no problem in your having the necessary people attend the next Council meeting to discuss the alternatives available and the procedures that are being followed at this time with regard to the well monitoring program.

If you have any questions regarding this, please feel free to contact me.

Very truly yours,

Peter D. Ekstrand,
City Attorney for the City of Wabasha

P.S. Please also provide to me prior to the meeting the proposed monitoring program, which I assume is in writing, similar to what you did back in March of 1984 on the railroad pit.

PDE:mms

cc Mayor Dan Losinski
Virginia Fosmo, City Clerk