**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| L. W. MATTESON, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES ARMY CORPS OF ENGINEERS, | ) | Case No. 01-542C |
| | ) | (Judge Lawrence J. Block) |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF L.W. MATTESON'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT AND PLAINTIFF'S STATEMENT OF DISPUTED ISSUES**

Pursuant to Rule 56(h)(2) of the Court's rules, Plaintiff, L.W. Matteson, Inc., respectfully submits the following Statement[1] of Disputed Issues in response to the Proposed Findings of the Defendant, United States:

1. Undisputed that Plaintiff, L.W. Matteson, Inc. ("Matteson") is an experienced Government contractor and established hydraulic dredging company. (Def. App. 962-63, 989).

2. Undisputed that Matteson seeks a $1.1 million equitable adjustment to the contract with the United States Army Corps of Engineers (the "Corps") to excavate and transport existing dredged material from two specific areas located upstream from Alma, Wisconsin (the "Grand Encampment Excavation"). (First Am. Compl. ¶¶ 1, 15, 22).

3. Undisputed that the contract states that Matteson was "responsible for obtaining any necessary licenses and permits, and for complying with Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work." (Def. App. 88, 1033-35).

[1] The paragraphs set forth herein correspond to the numbered paragraphs in Defendant's Proposed Findings of Uncontroverted Fact. Pursuant to Rule 56(h)(2), Matteson has indicated whether it aggress or disagrees with Defendant's Facts, and has set for the basis for disputing Defendant's Facts, as well as subparagraphs corresponding to Defendant's paragraphs that state any proposed additional facts or proposed revisions to Defendant's Facts.

4. Disputed that, while it is true that prior to bidding on the contract, Matteson requested and was granted permission by the Corps to bid on the project using a hydraulic dredging method and that pursuant to this method of performing the work, Matteson (1) could not, in large part, use the potential disposal sites identified in the Corps' invitation for bids because doing so would not have been feasible with hydraulic dredging; and (2) selected different disposal sites which it disclosed to the Corps and obtained approval concerning from the Corps prior to bidding on and being awarded the contract. (First Am. Compl. ¶¶ 2, 4-10). Matteson was not able to use the disposal sites selected because the County of Wabasha refused to provide to Matteson a permit to any proposed site in the project area. (First Am. Compl. ¶ 16-18).

Matteson disputes any allegation or inference that Matteson's decision not to utilize the disposal sites identified by the Corps was a unilateral business decision made without consultation with or approval from the Corps. (See First Am. Compl. ¶¶ 2, 4-10). In support of this position, Matteson references the following facts:

4.a. The contract stated that contractors could utilize alternative disposal sites. (Spec. 01000-2, ¶ 7.3, Def. App. 149). On this project, the Corps intended for contractors to locate alternative sites and encouraged Matteson to submit a bid based on hydraulic dredging utilizing alternative sites. (Krumholz depo., Pl. App. 0008-0009; Matteson Jr. depo., Pl. App. 0066-0067). With respect to the selection of alternative sites, the contractors were only required to submit for approval a copy of the contractor's agreement with the landowner. (Spec. 01000-2, ¶ 7.3, Def. App. 149). The Government, not the contractor, was to prepare an environmental assessment of the site and identify any additional requirements that might be necessary. (Id.).

4.b. Prior to bidding on the project, Matteson examined the Saunderson[2] site together with other potential disposal sites with Corps officials. (Matteson Jr. depo., Pl. App. 0082-0083).

4.c. The Corps facilitated similar site inspections with other contractors. (Krumholz depo., Pl. App. 0014-0015).

4.d. The Corps selected and invited representatives from other governmental agencies, including local officials from the Minnesota Department of Natural Resources, to also review the sites. (Matteson Jr. depo., Pl. App. 0076-0078). Both the Corps and Matteson understood that the officials present at the disposal site investigations represented all of the agencies that would be involved in the approval process. (Matteson Jr. depo., Pl. App. 000078; Def. App. 1002, 1018-20; Krumholz depo., Pl. App. 0014-0015, noting that the purpose of the meetings was "to put the contractors in touch with the officials that would be involved in reviewing and evaluating and potentially permitting a site.").

4.e. After visiting the proposed sites, Steve Tapp, a Corps official, indicated that one site would be acceptable if a wetland area was avoided and that another site looked to be acceptable. (Matteson Jr., Def. App. 1083). None of the officials present expressed any reason why any of the sites could not be permitted. (Id. at 1083-84).

4.f. Also prior to bidding on the project, Matteson contacted Dan Krumholz, the Corps' Operations Manager for the Channels and Harbors Projects, by telephone and specifically discussed the Saunderson site. (Matteson Sr. depo., Pl. App. 0109; Krumholz Daytimer Excerpt, Def. App. 204). Other than expressing a concern that trees on the

[2] The name of the owner of the property is Sanderson, but the property has been referred to throughout the discovery in this litigation as the Saunderson site. (Nordstrom depo., Pl. App. 145).

property not be cleared solely for the purpose of depositing dredged gravel and sand on the property, Mr. Krumholz indicated that site would be suitable for disposal of dredged material. (Matteson Sr. depo., Pl. App. 0111-0114).

4.g. Matteson believed that the site investigation done prior to the bid date indicated that an environmental assessment would not be necessary as long as Matteson stayed away from the wetland areas. (Matteson Jr. depo., Pl. App. 0079-0080).

4.h. In conducting disposal site investigations prior to bidding, the Corps expected contractors only to have satisfied themselves that "they were going to get approval to use the site." (Krumholz depo., Pl. App. 0022-0023). The Corps did not expect bidders to have actually had the permit and reviews completed and final permits issued prior to bidding. (Krumholz depo., Pl. App. 0023).

4.i. Although the Corps had not completed its environmental evaluation of the site prior to bidding, the Corps did not anticipate that these evaluations would have been completed, that the site would finally approved or that contractors would have obtained final permits prior to submitting bids. (Krumholz depo., Pl. App. 0022-0023).

4.j. Although the Corps did not complete an environmental evaluation of the Saunderson site because Wabasha County had precluded use of the site, the Corps did confirm that the site was suitable and noted in a memorandum that "resource agencies . . . agreed that there is no reason from a resource management perspective that the site should not be used." (November 6, 1996 Memorandum, Def. App. 238-239). The Corps had no reason to believe that Matteson would not have been able to obtain federal and state permits for either the Saunderson site or the Braun site. (Krumholz depo., Pl. App. 0042).

4.k. Matteson understood that a determination was made subsequent to the submission of its bid that an environmental assessment would not be necessary. (Matteson Jr. depo., Pl. App. 0080).

5. Undisputed that the Corps' sites were incompatible with hydraulic dredging, and that the "use of hydraulic dredging would require the contractor to obtain its own disposal site within the vicinity of the two designated areas. . . ." (First Am. Compl ¶¶ 2,4 and 5; see also Krumholz depo., Pl. App. 0002-0003, 0005-0006, 0008-0009 and Tapp depo., Pl. App. 0129).

6. Matteson disputes any allegation or inference that the refusal of the Wabasha County to provide permits necessary for Matteson to use the sites was the result of any failure of Matteson to seek the necessary permits or to propose to perform the work in accordance with all federal, state and local statutes and regulations:

6.a. Once Matteson was informed of Wabasha County's position that the Shoreland Protection Act required permission from the County to run temporary dredge pipes across the river shoreline, Matteson submitted an application for a land use permit on October 2, 1996. (Application for Land Use Permit, Def. App. 230-37).

6.b. According to the Corps, the Saunderson site was suitable and noted in a memorandum that "resource agencies . . . agreed that there is no reason from a resource management perspective that the site should not be used." (November 6, 1996 Memorandum, Def. App. 238-239). The Corps has no reason to believe that Matteson would not have been able to obtain federal and state permits for either the Saunderson or the Braun site. (Krumholz depo., Pl. App. 0042, 0057).

It is undisputed that after state and local officials refused to provide a permit for the disposal sites in the project area, (First Am. Compl., ¶ 18), the Corps assisted Matteson in

locating a disposal site on property owned by the Fish & Wildlife Service. (Id. at ¶ 19). However, Matteson also disputes the contention or inference that the Corps exercised reasonable efforts to assist Matteson in obtaining the rights to utilize the Saunderson, Braun or similarly situated property for the disposal of dredged material:

> 6.c. The Corps has consistently taken the position that it is not subject to local permitting requirements on property owned by or leased by the federal government, or when the work is being performed by the federal government. (Krumholz depo., Pl. App. 0051-0053; Nordstrom depo., Pl. App. 0156-0159, 0165-0169, 0209). James Nordstrom, the Wabasha County Attorney, testified that the Corps has claimed that it is not subject to local permitting requirements even when the site is on private property. (Nordstrom depo., Pl. App. 0169-0170, 0172-0173, 0178-0179). The Corps did not consider purchasing or leasing the property to be able to utilize the Saunderson site regardless of Wabasha County permitting requirements. (Krumholz depo., Pl. App. 0054; Gulan depo., Pl. App. 0134-0135, 0136; April 27, 1998 Memorandum depo., Pl. App. 0227-0228).

7. Undisputed that on July 10, 1996, the Corps issued an invitation for bids for a contract whose work would include, without limitation:

> furnishing all plant, labor, material and equipment necessary to excavate and transport existing dredged material from two borrow/stockpile areas: (1) the Alma Marina in Alma, Wisconsin; and (2) an island in the Mississippi River located upstream from Alma, Wisconsin. Such removed existing dredged material is to be disposed of in various potential on-land placement sites located in Buffalo County, Wisconsin.

(First Am. Compl. ¶1; Spec. 00010-1, Def. App. 15).

8. Disputed. Although certain provisions are referenced, there is no language that specifically incorporates "standard contract clauses" or the specific FAR provisions that are listed in the contract.

9. Undisputed that Federal Acquisition Regulation ("FAR") contract clauses include: 52.233-1, DISPUTES; 52.236-2, DIFFERING SITE CONDITIONS; 52.236-3, SITE INVESTIGATION AND CONDITIONS AFFECTING THE WORK; 52.214-6 EXPLANATION TO PROSPECTIVE BIDDERS; and 52.236-7, PERMITS AND RESPONSIBILITIES. (Id.). However, there is no language that specifically incorporates "standard contract clauses" or the specific FAR provisions that are listed in the contract.

10. Undisputed that the invitation for bids stated that the awarded contract would contain clauses that are specific to the Grand Encampment Excavation contract, including, without limitation, Section 01000, ¶ 6.1.1, Grounds Availability; Section 01000, ¶ 7.3, Contractor Selected Final Disposal Areas (Placement Sites); Section 01000, ¶ 12, CONSTRUCTION RESTRICTIONS; Section 01130, ¶ 2.1(5); Section 01130, ¶ 2.3, Compliance; Section 01130, ¶ 4, SUBCONTRACTORS; and Section 1130; ¶ 5, NOTIFICATION. (Spec. 01000, Def. App. 148-51, 166).

11. Undisputed that the Corps had selected five disposal sites for use in performing the contract work, (First Am. Compl. ¶ 2; April 17, 1996 Letter, Def. App. 296-98), but only one site was to be mandatory. (See Spec. 01000, Def. App. 149, 151-52, "After this mandatory site has been … filled …, the Contractor may utilize one or more of the other indicated non-mandatory final placement sites and/or the Contractor's own selected disposal areas [placement sites], as approved.").

12. Undisputed that the invitation for bids states that the contractor may dispose of dredged material on private property "provided a copy of each agreement between the landowner(s) and the Contractor is submitted to and approved by the Contracting Officer." (Spec. 01000 ¶ 7.3, Def. App. 149). It is undisputed that the invitation stated that any alternative site "may require the Government to prepare an environmental assessment (including a cultural resource survey), and that preparation of an assessment would entail additional cost to the Government and may result in additional requirements to offset environmental impacts associated with the use of the area (site)." (Spec. 01000 ¶ 7.3, Def. App. 149).

Matteson disputes any allegation or inference that Matteson failed to comply with the cited provisions of the bid and contract documents (i.e. Spec. 01000 ¶ 7.3) or that Matteson was unable to utilize the selected disposal sites within the project area due to inadequacies with its contracts with the private landowners or due to any failure to comply with any additional requirements to offset environmental impacts determined to be necessary by the Government. (See ¶¶ 4.b – 4.k *supra*).

13. Paragraph 13 contains no citation and therefore Matteson cannot respond because it cannot determine what contractual provision is being relied upon by the United States for this assertion. Accordingly, Matteson disputes this contention. Matteson also disputes any allegation or inference that Matteson's proposed use of the disposal sites was contrary to local environmental laws and regulations. (See ¶¶ 4.g, 4.j, 4.k *supra*).

14. Undisputed that Spec. § 01130 notified bidders that the low bidder would be required to prepare an Environmental Protection Plan that set forth, among other things, the "[p]rocedures to be implemented to provide the required environmental protection and to comply with the applicable laws and regulations." (Spec. 01130-1, Def. App. 165, emphasis supplied).

Undisputed that the contract states the Corps' approval of the Environmental Protection Plan would not relieve the contractor of responsibility for compliance with local environmental laws and regulations. (Spec. 01130-2, Def. App. 166).

Matteson disputes any allegation or inference that Matteson failed to comply with the provisions of § 01130, that Matteson did not provide a suitable Environmental Protection Plan, or that Corps did not approve of Matteson's Environmental Protection Plan:

14.a. Matteson submitted its Environmental Protection Plan in accordance with § 01130. (Matteson Jr. depo., Pl. App. 0081). The Corps has presented no indication that Matteson's Environmental Protection Plan was inadequate or that Matteson failed to comply with § 01130.

Matteson disputes any allegation or inference that its proposed use of the alternative disposal sites violated any federal, state or local environmental protection laws or regulations. (See ¶¶ 4.g, 4.j, 4.k *supra*).

15. Undisputed that the invitation for bidders [stated] that the awardee would warrant its subcontractor's compliance with local environmental requirements. (Spec. 01130-2, Def. App. 166, "4. SUBCONTRACTORS").

Matteson disputes any allegation or inference that its proposed use of the alternative disposal sites violated, or would have caused any subcontractor to have violated, any federal, state or local laws or regulations. (See ¶¶ 4.g, 4.j, 4.k, 14.a *supra*).

16. Undisputed that the invitation for bids stated:

> The Contracting Officer will notify the Contractor in writing of observed noncompliance with the Federal, State, or local laws, regulations, permits and elements of the Contractor's Environmental Protection Plan …. Failure for the Contracting Officer to notify the Contractor of any noncompliance with Federal, State, or local laws or regulations does not

> relieve the contractor of the obligation to be in confirmance with those requirements.

(Spec. 01130-2, Def. App. 166).

Matteson disputes any allegation or inference that its proposed use of the alternative disposal sites violated any federal, state or local laws or regulations or that it was ever notified by the Corps of any such violation. (See, ¶¶ 4.g, 4.j, 4.k *supra*).

Matteson disputes any allegation or inference that the contract required the contractor to assume the risk that it would not be possible to obtain a local permit. (Krumholz depo., Pl. App. 0045; but see Krumholz depo., Pl. App. 0058-0059, in which Mr. Krumholz responded differently in response to narrative, argumentative and leading questions from the Corps' attorney).

17. Undisputed that in formulating its bid, Matteson determined that the Corps' proposed disposal sites could not be used if hydraulic dredging was used to perform the work. (First Am. Compl. ¶¶ 4-7; see also Krumholz depo., Pl. App. 0002-0003, 0005-0007 and Tapp depo., Pl. App. 0129).

18. Undisputed that Matteson selected a number of possible disposal or placement sites for the dredged material, which was allowed by the contract. (Id.).

Matteson disputes any allegation or inference that Matteson unilaterally selected possible disposal sites without notification to and approval by the Corps. (See ¶¶ 4.a – 4.k *supra*).

19. Matteson disputes the allegation that it based its bid upon "an assumption" that it would be able to acquire and use the Saunderson property as a dredge disposal or placement site based on the following:

Paragraph 19 contains no citation to competent evidence that supports the allegations made. Paragraphs 8-13 of the First Amended Petition do not allege that Matteson merely

"assumed" that it would be able to utilize the Saunderson property. Rather, Matteson alleges that it believed that it would be able to use the Saunderson property based on bid and contract documents and representations made by the Corps. (First Am. Compl. ¶¶ 8-13). The United States also has made no showing that the other documents relied upon by it are competent evidence. In particular, the November 8, 2000, self-serving Corps memorandum cited by the United States (Def. App. 206-208) is incompetent hearsay. The other documents, consisting of what appear to be journal entries by Corps personnel (Def. App., 204, 219, 221-22) and Matteson's application to Wabasha County (Def. App. 230-239) does not support the United State's contentions. The first journal entry notes that the Corps spoke with Lawrence Matteson prior to bidding and indicated that the potential problems with the disposal site might be that it was heavily wooded, and that the Corps would need to perform a cultural resource investigation and obtain a water quality certification from the MPCA for the effluent. (Def. App. 204). The second journal entry notes that Corps personnel examined potential sites and that "both looked good." (Def. App. 219). The third journal entry documents a call received by the Corps prior to the award of the contract in which an attorney for Wabasha County was informing the Corps that the homeowners downstream were concerned about the disposal anywhere in the vicinity and that the attorney believed that the disposal would fall under the "Shoreline Ordinance." (Def. App. 221). The application submitted by Matteson to Wabash County for a land use permit contains a memorandum from the Corps in which the Corps stated that they have reviewed the site and Matteson's plans and that "there is no reason from a resource management perspective that the site should not be used[, and that] the Corps will support the use of the Sanderson property by L.W. Matteson, Inc. for placement of dredged material to satisfy their obligation to

the contract to excavate material from the Grand Encampment placement site." (Def. App., 238-239).

Paragraph 19 is also disputed because:

19.a. Matteson's belief that it could utilize the Saunderson property was based on representations contained in the contract, its own site investigations and statements and conduct of the Corps. (First. Am. Compl. ¶¶ 8-13; see also ¶¶ 4.a – 4.k *supra*).

19.b. The contract stated that contractors could utilize alternative disposal sites. (Spec. 01000-2 ¶ 7.3, Def. App. 149). On this project, the Corps intended for contractors to locate alternative sites and encouraged Matteson to submit a bid based on hydraulic dredging utilizing alternative sites. (Krumholz depo., Pl. App. 0008-0009; Matteson Jr. depo., Pl. App. 0066-0067). Matteson obtained approval from the Corps to utilize the Saunderson and Braun sites as anticipated by the Corps. (See ¶¶ 4.a. - 4.k *supra*).

19.c. With respect to the selection of alternative sites, the contractors were only required to submit for approval a copy of the contractor's agreement with the landowner. (Spec. 01000-2 ¶ 7.3, Def. App. 149). An environmental assessment of the site was to be prepared by the Government, not the contractor, and the assessment was to identify any additional requirements that might be necessary. (Id.).

19.d. Matteson had obtained options from the property owners to purchase the proposed sites. (First Am. Compl. ¶ 11; Matteson Sr. depo., Pl. App. 0103-0104). Matteson also had obtained the rights to run the pipeline across the adjoining property to reach the Saunderson property from the river. (Matteson Sr. depo., Pl. App. 0106). Matteson had also begun to obtain the rights to necessary to utilize the nearby Braun property. (Matteson Sr. depo., Pl. App. 0103-0104).

20. Undisputed that, prior to bid submission, on August 5, 1996, Larry W. Matteson ("Matteson Jr.") met with Dan Krumholz, Steve Tapp, and Dennis Anderson, all of the Corps, Bob Drieslein of the Fish & Wildlife Service, and Nick Gulden of the Minnesota Department of Natural Resources, to inspect "two potential disposal sites" Matteson had proposed for permanent placement of dredge material. (First Am. Compl. ¶¶ 7-8; see also ¶¶ 4.b - 4.e *supra*).

21. Undisputed that Larry Matteson Jr. and various Government officials physically inspected the Braun and the Guza properties. (Krumholz Daytimer Excerpt, Def. App. 204; November 8, 2000 Memorandum, Def. App. 206-07; and Tapp Diary Excerpts, Def. App. 219-20).

22. Undisputed that Mr. Krumholz and other Corps officials present also could see the adjacent Saunderson property. (Plaintiff's Answers to Defendant's First Set of Interrogatories, Def. App. 377, 381, 384; Matteson Jr., Def. App. 1079-84).

Matteson disputes the allegation or inference that Mr. Krumholz and other officials present at the inspection of the Braun and Guza properties did not also view, inspect and evaluate the Sanderson property:

> 22.a. Larry Matteson testified that Matteson informed the Corps of the Saunderson site at the time that they examined the Guza and Braun sites. (Matteson Jr. depo., Pl. App. 0082-0084). Although Krumholz and other officials did not physically walk on either the Guza or Saunderson sites, both were fairly flat areas that were clearly visible from the roadway. (Matteson, Jr., Def. App. 1079-81).

23. Undisputed that in exploring the possibility of acquiring the Saunderson property, Matteson learned from its realtor that the Saundersons were using the property to harvest pulp wood and that related permits were required. (Guillot, Def. App. 907-10).

Matteson disputes any allegation or inference that it was not able to utilize the Saunderson property due to any potential issue with respect to any permits required to harvest trees:

23.a. The issue concerning the permit to clear the timber was a separate issue from the permit required by the Wabasha County Shoreland Protection Act. (Matteson Sr. depo., Pl. App. 0117).

24. Undisputed that, at some point, Matteson learned that it would be required to obtain a conditional use permit if it were to use the Saunderson property as a disposal site. (Guillot, Def. App. 914). However, this occurred after the award of the contract:

24.a. Matteson, on approximately September 26, 1996, determined that it was required to obtain a conditional use permit to run temporary dredging pipe and to deposit dredged sand and gravel on a portion of the Saunderson property. (Matteson Sr. depo., Pl. App. 0116-0118).

25. Undisputed that, prior to submitting its bid, Matteson was not aware that Wabasha County construed and applied the Shoreland Protection Act to prohibit not only the disposal of gravel and other dredged material within 1,000 feet of the river but also to preclude the laying of pipe across the 1,000 foot zone so that Matteson could not dispose of hydraulically dredged material anywhere near the project site. (First Am. Compl. ¶ 16; Guillot, Def. App. 928-29; Larry W. Matteson, Def. App. 1005).

Matteson disputes the contention that it did not investigate potential local restrictions of the Saunderson property. (See ¶ 4.d *supra*):

25.a. Matteson believed that the officials present at the site inspection included local officials who would have been responsible for monitoring local compliance. (Matteson Jr. depo., Pl. App. 0076-0077).

26. Undisputed that, immediately before bid submission, on either August 29 or August 30, 1996, Lawrence Matteson ("Matteson Sr.") telephoned Mr. Krumholz to discuss use of the Saunderson property as a potential disposal site. (First Am. Compl. ¶ 10; Krumholz Daytimer Excerpt, Def. App. 204, Plaintiff's Answers to Defendant's First Set of Interrogatories, Def. App. 381).

Matteson disputes any allegation or inference that Matteson had not previously discussed its proposed use of the Saunderson property with Mr. Krumholz or other Corps officials:

26.a. On August 5, 1996, Larry Matteson, Jr., met with Mr. Krumholz and other Corps officials and viewed and discussed the suitability of the Saunderson site. (See ¶¶ 4.b - 4.f, 22.a *supra*).

26.b. When contacted prior to bidding, Mr. Krumholz was sufficiently familiar with the site to discuss potential problems with it. (Krumholz depo., Pl. App. 0040-0041; Matteson Sr. depo., Pl. App. 0107-0113; Krumholz Daytime Excerpt, Def. App. 204).

27. Undisputed that a facsimile cover letter dated March 17, 1997 (approximately 3 1/2 months after the contract had been awarded), indicates that Matteson understood that any alleged Corps "approval" of its proposed disposal sites owned by John Braun was "tentative." (Def. App. 398, "We are presently negotiating with John Brown [sic] to get permission to place sand on his property. This property has already had tentative approval from the Corps prior to the bid date. Once an agreement has been made with Mr. & Mrs. Brown, we will endeavor to

get a pipeline right-of-way and approval from the local board. I should know something from the Brown's this week.").

Matteson disputes any allegation or inference that Matteson understood that its use of an alternative disposal site near the project could be rejected even though the disposal site otherwise met all federal, state and local archeological and environmental laws and regulations:

27.a. Larry Matteson, Jr., reasonably understood that the individuals present at the site for the inspection were those who were necessary to approve the site. (See ¶ 4.d *supra*)

27.b. Larry Matteson, Jr., understood the term "tentative approval" to mean that the property was acceptable subject to "not finding anything significantly wrong environmentally or archaeologically with the site." (Matteson Jr. depo., Pl. App. 0096-0098).

27.c. There were no environmental reasons for not utilizing the Saunderson site. (See ¶¶ 4.e, 4.g, 4.i, 4.j, 4.k *supra*).

28. Undisputed that Matteson did not build into its bid any factor for the risk that it ultimately might not be able to obtain all necessary permits for its proposed alternative disposal sites. (Matteson Jr., Def. App. 982).

29. Undisputed that on August 29, 1996, the Corps notified Matteson that Matteson had emerged as the apparent low bidder following bid opening and requested that Matteson verify that its bid price was accurate and complete. (Def. App. 329-30; Matteson Jr., Def. App. 1055-57). However, Matteson understood that the bid verification was to check the bid for mathematical errors. (Id.).

29.a Larry Matteson Jr. reviewed the bid and determined that its bid was similar to the next lowest bid, which had also been submitted on the basis of performing hydraulic dredging rather than mechanical. (Id. at 1057).

30. Undisputed that by letter dated September 4, 1996, Matteson advised the Corps that it had reviewed the requirements of the invitation for bids, as amended, and had determined that its “bid price of $1,693,000 to be accurate.” (Def. App. 331; Matteson Jr., Def. App. 1058; but see ¶ 29 *supra*).

31. Undisputed that on September 20, 1996, the Corps awarded Contract No. DACW37-96-C-0030 to Matteson in the approximate amount of $1,693,000 (the “contract”). (First Am. Compl. ¶ 15).

32. Undisputed that the County of Wabasha, Minnesota subsequently notified Matteson that the disposal sites were subject to the Shoreland Protection Act, pursuant to which the county exercised control over areas within 1,000 feet of the river. (First Am. Compl. ¶ 16; see also ¶ 24.a *supra*).

33. Undisputed that prior to submitting its bid Matteson was not aware of the Shoreland Protection Act, or that Wabasha County interpreted this Act to apply to the running of temporary piping across the 1,000 foot shoreland zone. (First Am. Compl., ¶ 16; Matteson Jr. depo., Pl. App. 0087-0089, 0094-0095).

Matteson disputes any contention that it failed to investigate potential local restrictions on the use of the Saunderson property. (See ¶¶ 4.a – 4.k *supra*).

Matteson disputes any contention or inference that Wabasha County’s interpretation of the Shoreland Protection Act to include the running of temporary dredging pipe was publicly available or equally available or known to Matteson.

33.a. Although the Shoreland Protection Act, and related local ordinances, are published, there is no published decision interpreting the Act to apply to temporary dredge pipes running across the shoreland protection zone. (Nordstrom depo., Pl. App. 0151, 0206-0207).

33.b. Although Matteson was not aware of the potential application of the Shoreland Protection Act to pipelines, the Corps had been on notice that the Shoreland Protection Act might apply to temporary dredging pipes. (Nordstrom depo., Pl. App. 0152-0155, 0212-0214, 0225-0226; Affidavit of James C. Nordstrom depo., Pl. App. 0229-0232; June 15, 1983 Letter depo., Pl. App. 0233; August 19, 1987 Letter depo., Pl. App. 0234-0235).

34. Undisputed that Matteson alleges it did not discover "significant local opposition to its use of the proposed sites" until after the contract was awarded. (First Am. Comp., ¶ 17).

Matteson disputes the contention or inference that it "failed" to discover local opposition, or could have discovered the extent of the opposition, as there is no evidence that the opposition was capable of ascertainment or should have been known by Matteson. (See ¶¶ 37.a – 37.d *infra*).

35. Undisputed that Matteson was aware of a conflict between the Corps and a property owner concerning the Corps pipeline route on or adjacent to the property owner's land. (Matteson Jr., Def. App. 967-68, 970).

Matteson disputes any allegation or inference that this dispute was similar to the opposition encountered on the previous project:

35.a. The dispute on the previous project concerned a single landowner and a claim for some type of compensation for running pipelines over the landowner's

property. (Id.). In the present case, Matteson had secured all rights necessary to run pipelines to and utilize the Saunderson property. (Matteson Sr. depo., Pl. App. 0103-0104, 0106).

35.b. Matteson had no involvement with obtaining any permits on that particular project and there is no indication that the dispute concerning the pipeline route was based on or had anything to do with the Shoreland Protection Act. (Matteson, Jr. depo., Def. App. 967-68).

35.c. The opposition of the community in this case did not concern opposition by private landowners concerning the running of temporary pipelines over their property, but rather was opposition to the disposal of dredged material at all anywhere in the vicinity of the project due to the Corps' prior performance. (Matteson Sr. depo., Pl. App. 0123-0125; Matteson Jr. depo., Pl. App. 0090-0093, emphasis added).

Matteson disputes any allegation or inference that it could have anticipated the level of opposition that was encountered. (Id.).

36. Undisputed that Matteson's realtor had sent a facsimile to Matteson on September 16, 1996, in which the realtor told Matteson that "of course the neighbors are upset," (Def. App. 431; Guillot, Def. App. 919, 922). It is undisputed that Matteson was "shocked at the strength … and the volume of" the local opposition to Matteson's use of the Saunderson property as an alternative disposal site in performing the contract work. (Guillot, Def. App. 927).

37. Undisputed that Matteson understood that issues such as groundwater would be discussed on a Corps project. (Guillot at Def. App. 930-31).

Undisputed that Matteson's contract for the use of the Saunderson property dated September 3, 1996, included a contingency that "the permits were granted by local and federal agencies." (Guillot, Def. App. 932).

Matteson disputes any allegation or inference that Matteson was aware that such permits would not be granted or of the degree of the public opposition to the Corps' project prior to bidding. (Matteson Jr. depo., Pl. App. 0090-0093).

Matteson also disputes any allegation or inference that Matteson had knowledge equal to that of the Corps concerning the degree of public opposition to the Corps' dredging projects:

37.a. As far back as 1983, the Corps has been involved in disputes with local entities in the Wabasha area concerning the Corps' compliance with the Shoreland Protection Act. (Nordstrom depo., Pl. App. 0138, 0152-0155, 0156-0159).

37.b. Significant community opposition to the Corps' dredging activities dates back to the 1980s. (Nordstrom depo., Pl. App. 0141-0143, 0162-0163, 0183-0184, 0204-0205, 0208). There had been numerous meetings and letters written by which the Corps would have been familiar with the degree of opposition. (Nordstrom depo., Pl. App. 0184, 0204-0205).

37.c. Matteson was not aware of the degree of community opposition to the Corps' dredging projects and had no way of knowing unless the Corps told them. (Matteson Jr. depo., Pl. App. 0091-0092).

37.d. Even after Matteson became aware of the County's intention to apply the Shoreland Protection Act to require Matteson to obtain a permit to run its dredging pipes, Matteson was not concerned about obtaining a permit because it was not aware of the

intensity and breadth of the community's opposition to the Corps' dredging activities. (Matteson Sr. depo., Pl. App. 0121-0125; see also Nordstrom depo., Pl. App. 0186-0187).

38. Undisputed that on July 31, 2000, Matteson submitted a certified claim to the contracting officer. (Claim, Def. App. 332-38).

39. Undisputed that Matteson alleged in its claim that it was entitled to an equitable adjustment of $1,111,227.51 as follows:

> for costs incurred and damages suffered as a result of a cardinal change in Matteson's contract, which required Matteson to obtain an alternative disposal site. Matteson is entitled to an equitable adjustment because (a) the Corps authorized, invited and encouraged the hydraulic removal of certain stockpiles of dredged materials; (b) the contract documents indicated the absence of any shoreland restriction; (c) the Corps represented that certain property in the vicinity of the job site was acceptable for the disposal of dredge materials; and (d) Matteson reasonably relied on the Corps' assurances that Matteson's original disposal site was acceptable.

(Claim, Def. App. 332).

40. Undisputed that on September 29, 2000, in response to a request by the contracting officer, Matteson submitted additional information in the form of a legal memorandum from its counsel that outlined various legal grounds that entitle Matteson to an equitable adjustment. (Claim, Def. App. 349-57).

41. Undisputed that by letter dated November 17, 2000, the contracting officer denied Matteson's claim, (Def. App. 399-419), and that Matteson commenced the lawsuit on September 25, 2001.

42. Undisputed that Matteson bid an estimated price of $1,693,000 for the projected contract quantities (which bid price was subject to change based upon actual quantities). (Claim, Def. App. 331).

43. Undisputed that the contract was for a fixed price (except that the price could change based on actual quantities). (Spec. 00100-4, Def. App. 24; Matteson Jr., Def. App. 994-95).

44. Undisputed that the Corps paid Matteson sums $1,581,067.41 for contract work performed. (Claim, Def. App. at 337).

Matteson disputes that this sum is "full payment" or represents a "final contract price" to which Matteson is entitled. (See First Amended Complaint ¶ 22)

45. Undisputed that Matteson is an experienced Government contractor. Although Matteson would have notice of the provisions of the Federal Acquisition Regulations (FAR) incorporated into the contract, the cited testimony indicates that the deponent, Larry W. Matteson Jr., was not personally "familiar with" all of the FAR provisions incorporated into the contract. (Matteson Jr., Def. App. 974-75, 983-84).

46. Undisputed that the contract had only five written modifications. (Corps' Denial of Claim, Def. App. 408). However, although this contention is not disputed, the supporting citation to the self-serving letter written by the Corps rejecting Matteson's claim is incompetent hearsay.

47. Undisputed that Modification P00001 extended the time "to complete disposing of transferred dredge material at the mandatory 'Buffalo County No. 1 Placement Six.'" (Id.). However, although this contention is not disputed, the supporting citation to the self-serving letter written by the Corps rejecting Matteson's claim is incompetent hearsay.

48. Undisputed that Modification P00002 changed Block #24 of the SF 1442 to read "Contracting Officer's Representative" and changed Block 27 of the SF 1442 to read "USACE, Finance Center, Millington, Tennessee." (Id.). However, although this contention is not

disputed, the supporting citation to the self-serving letter written by the Corps rejecting Matteson's claim is incompetent hearsay.

49. Undisputed that Modification P00003 and P00004 obligated additional funds and Modification P0005 deobligated *[sic]* some excess funds. (Id.). However, although this contention is not disputed, the supporting citation to the self-serving letter written by the Corps rejecting Matteson's claim is incompetent hearsay.

50. Undisputed that none of the written modifications to the contract affected either the method of performing the work or non-mandatory disposal sites, and none increased the fixed contract price. (Id.). However, although this contention is not disputed, the supporting citation to the self-serving letter written by the Corps rejecting Matteson's claim is incompetent hearsay.

51. Undisputed that no Wabasha County officials were present at Matteson's meetings with state and Federal officials to discuss Matteson's proposed sites. (Matteson Jr., Def. App. 1001-02, 1018-19).

Matteson disputes the allegation that there were no "local" officials present:

51.a. Officials from the Minnesota Department of Natural Resources, the U.S. Fish and Wildlife Service, and the Minnesota Pollution Control Board are local agencies and were present. (Matteson Jr. depo., Pl. App. 0076-0077, 0245 and Def. App. 1018, 1080). Matteson believed that these officials were the ones required to obtain all necessary permits and that the Corps officials, who were familiar with the state and local permitting process, would have contacted other officials had they been required. (Matteson Jr. depo., Pl. App. 0076-0078 and Def. App. 1019-20).

51.b. The Shoreland Protection Act is a statewide act that all counties are required to adopt. (Nordstrom depo., Pl. App. 0151). The form of the ordinance is mandated by the Minnesota Department of Natural Resources, and its compliance is administered by the Minnesota DNR. (Nordstrom depo., Pl. App. 0151; see also Wabasha County Zoning Ordinance, Art. 13, Sec. 17 depo., Pl. App. 0242). The Minnesota Department of Natural Resources, the U.S. Fish and Wildlife Service, and the Minnesota Pollution Control Board had personnel present at the meetings to discuss the proposed disposal sites. (Matteson Jr., Def. App. 1018, 1080; Matteson Jr. depo., Pl. App. 0076-0078, 0245).

52. Undisputed that Larry Matteson, Jr., noted that the Corps never mentioned local authorities to him while examining the proposed disposal sites. (Matteson Jr., Def. App. 1004).

53. Matteson disputes the contention that the Corps did not become aware of any shoreline ordinance that would potentially affect Matteson's use of its proposed sites until September 18, 1996, when a Wabasha County attorney called a Corps official:

53.a. The Corps was informed on September 18, 1996, that the Shoreland Protection Act would apply to Matteson's use of its proposed sites prior to awarding the contract. (Tapp depo., Pl. App. 0135-0136; Nordstrom depo., Pl. App. 0197-0198).

53.b. The Corps had been engaged in disputes with localities concerning the application of the Shoreland Protection Act to Corps projects dating back, at least, to 1983. (Nordstrom depo., Pl. App. 0152-0155; Affidavit of James C. Nordstrom depo., Pl. App. 0229-0232; June 15, 1983 Letter depo., Pl. App. 0233).

53.c. The Shoreland Protection Act was widely known in the counties with river shorelines. (Nordstrom depo., Pl. App. 0144).

53.d. There have been numerous disputes between Wabasha localities and the Corps as to whether the Corps was required to comply with local permit requirements under the Shoreland Protection Act and other local ordinances. (Nordstrom depo., Pl. App. 0152-0155, 0156-0159, 0165-0170, 0172-0173, 0209, 0213-0215, 0226). In 1987, the Corps was informed of one municipality's opinion that the Shoreland Protection Act applied to the placement of temporary dredge pipes on shoreland areas. (Nordstrom depo., Pl. App. 0213-0215, 0226; August 19, 1987 Letter depo., Pl. App. 0234-0235).

53.e. Krumholz and other Corps officials routinely appeared at local meetings at which the Shoreland Protection Act was discussed. (Nordstrom depo., Pl. App. 0180-0182, 0200-0201).

54. Undisputed that Steve Tapp's diary notes indicate that he gave the county attorney Matteson's telephone number. (Def. App. 204).

Matteson disputes any allegation or inference that Matteson was contacted by the Wabasha County attorney or any other person concerning the application of the Shoreland Protection Act to the Matteson proposed use of the Saunderson site:

54.a. The Wabasha County attorney cannot recall whether he contacted Matteson concerning the Shoreland Protection Act prior to the award of the contract. (Nordstrom depo., Pl. App. 0149-0150, 0186-0187).

54.b. Matteson did not become aware of Wabasha County's position that it was applying the Shoreland Protection Act to require Matteson to obtain a permit to run temporary pipes across the shoreland protection zone when Matteson received a letter dated September 24, 1996 from Judy Krueger, the Wabasha County Zoning Officer. (Matteson Sr. depo., Pl. App. 0117-0118).

55. Matteson disputes the allegation that "Matteson itself was well aware of local opposition to prior Corps projects when it submitted its bid for the Grand Encampment Excavation contract. The citation to Def. App. 1198-1207 does not support the Corps' contention, and the Corps misconstrues the deposition testimony relied upon:

55.a. The cited deposition excerpts refer to incidents that did not directly involve Matteson or that pertained to unique issues with individual landowners. First, Lawrence W. Matteson, Sr., talked about some discussions he had with people in the community concerning wells, septic tanks and monitoring done on other projects. (Matteson Sr., Def. App. 1198-1199). The monitoring on previous projects revealed no impact to the water. (Id.). Additionally, Matteson was aware of an issue concerning blowing sand on the Read's Landing project, but that issue did not concern work being performed by Matteson. (Id., Def. App. 1199-2000). Third was an issue concerning a complaint made by a nearby motel concerning the noise from a booster station on the Crat's Island project. (Id., Def. App. 1200-1202). Finally, Mr. Matteson, Sr., stated that Matteson had to resolve a problem with a landowner who objected to pipes running over the landowner's property. (Id., Def. App. 1203-07). None of this discloses knowledge of the widespread and vehement community wide opposition encountered on the current project. (Matteson Sr. depo., Pl. App. 0120-0124; see also ¶¶ 37.c – 37.d *supra*).

56. Matteson disputes the erroneous impression given by the Corps that the quoted language was "specifically" set forth in the Bid Solicitation:

56.a. The Explanation to Prospective Bidders in the Bid Solicitation stated:

> ANY PROSPECTIVE BIDDER, DESIRING AN EXPLANATION OR INTERPRETATION OF THE SOLICITATION, DRAWINGS, SPECIFICATIONS, ETC., MUST REQUEST IT IN WRITING IN ACCORDANCE WITH SECTION 00100, CONTRACT CLAUSE

> "EXPLANATION TO PROSPECTIVE BIDDERS" NOT LATER THAN 10 CALENDER DAYS BEFORE BID OPENING. QUESTIONS CAN BE FAXED TO (612) 290-5706, ATTENTION: TONY FOSTER.

Section 00100 does make reference to F.A.R. 52.214-6, EXPLANATION TO PROSPECTIVE BIDDERS, (Def. App. 23), but the text of F.A.R. 52.214-6 is not set forth in the Explanation to Prospective Bidders. Only by referring to F.A.R. 52.214-6 within the Federal Acquisition Regulations does one find the statement that the Government is to include the phrase that "[o]ral explanations or instructions given before the award of a contract will not be binding" in certain contracts.

57. Matteson disputes the allegation that "Matteson admits that it rejected this plain language.":

57.a. Larry W. Matteson did not state that he rejected the language, but rather stated that he believed that the Corps' oral representations concerning the disposal sites were binding and that the practice and pattern on this and previous jobs had been for the Corps to make binding oral representations. (Matteson, Jr., Def. App. 987).

57.b. The Corps had facilitated similar site inspections with other contractors. (Krumholz depo., Pl. App. 0014-0015).

57.c. Matteson's conduct in obtaining preliminary approval of the site was consistent with the Corps' expectations of bidders in that the Corps expected contractors only to have satisfied themselves that "they were going to get approval to use the site." (Krumholz depo., Pl. App. 0022-0023). The Corps did not expect bidders to have actually had the permit and reviews completed and final permits issued prior to bidding. (Krumholz depo., Pl. App. 0023).

58. Undisputed that F.A.R. 52.236-3 states that the "Government assumes no responsibility for any conclusions or interpretations made by the Contractor based on the information made available by the Government."

Matteson disputes the contention that Matteson "rejected" an express provision of the contract or regarded the language to be "inoperative." Once again, the Corps misconstrues the testimony:

> 58.a. When Larry W. Matteson, Jr., met the Corps officials and they represented to him that the proposed disposal sites would be permittable, this provision of the contract did not come to mind." (Matteson, Jr., Def. App. 1020-1021). Matteson relied on the verbal statements made by the Corps officials based on a prior and current course of dealing and practice with the Corps. (Matteson, Jr. depo., Pl. App. 0072-0073, 0075). Mr. Matteson did not provide his opinion concerning the applicability of the provision to this lawsuit other than to state that he believed that the Corps would stand by its representations and that he would be treated fairly. (Matteson, Jr., Def. App. 1026). This is hardly a "rejection" of the language or an assertion that it was inoperable.

Respectfully submitted,

MILLER LAW FIRM, P.C.

__s/Stephen R. Miller________

Stephen R. Miller, Mo. Bar #33344
Michael T. Metcalf, Mo. Bar #45304
4310 Madison Avenue
Kansas City, Missouri 64111
Telephone: (816) 531-0755
Facsimile: (816) 561-6361

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the above and foregoing was served electronically upon the following persons by ECF notification, this 10th day of October, 2003.

Patricia M. McCarthy
Peter D. Keisler
David M. Cohen
Commercial Litigation Branch
Civil Division
U.S. Dept. of Justice
Attention: Classification Unit
8th Floor, 1100 L Street N.W.
Washington, D.C. 20530
Telephone: (202) 307-0164 – P. McCarthy
Facsimile: (202) 514-8624 – P. McCarthy

Edwin C. Bankston
District Counsel
Army Corps of Engineers
Saint Paul, MN 55101

________________________________
Attorney for Plaintiff