**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| L. W. MATTESON, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| UNITED STATES ARMY CORPS OF ENGINEERS, | ) | Case No. 01-542C |
| | ) | (Judge Lawrence J. Block) |
| Defendant. | ) | |

**PLAINTIFF L.W. MATTESON'S SEPARATE STATEMENT**
**OF PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Federal Claims Court Rule 56(h)(2), Plaintiff, L.W. Matteson, Inc., respectfully submits its Separate Statement of Proposed Findings of Uncontroverted Fact:

**A. The Invitation for Bids.**

1. On July 10, 1996, the Corps issued an invitation for bids for a dredging project generally referred to as the Grand Encampment Excavation. (Def. Proposed Findings of Fact, ¶ 7).

2. The contract included dredging of the Alma Marina in Alma, Wisconsin, and an island in the Mississippi River located upstream from Alma. (Def. Proposed Findings of Fact, ¶ 7).

3. The proposed contract was a fixed unit price contract. The government's estimate for the work was $3,307,700.00. (Matteson Claim, Def. App. 333[1]; November 6, 1996 Memorandum, Def. App. 238-39).

4. The contract included the disposal of the dredged material and the Corps had identified five potential disposal sites, but only required the contractor to utilize one of these sites. (Def. Proposed Findings of Fact, ¶ 11).

[1] References to Defendant's Appendix are denoted "Def. App.," and references to Plaintiff's Appendix are denoted "Pl. App."

5. The contract specifically allowed the contractor to utilize any suitable disposal site. (Spec. 01000-2, Def. App. 149).

6. On this project, the Corps intended for contractors to locate alternative sites and encouraged Matteson to submit a bid based on hydraulic dredging utilizing alternative sites. (Krumholz depo., Pl. App. 0008-0009; Matteson Jr. depo., Pl. App. 0066-0067).

7. The only requirement to obtain approval of an alternative disposal site was that "a copy of each agreement between the landowner(s) and the Contractor is submitted to and approved by the Contracting Officer." (Spec. 01000-2, Def. App. 149). The specification also stated that "no disposal (placement) will be allowed in a wetland or wooded area." (Id.).

8. Use of an alternative site also required the Government to have prepared an environmental assessment (including a cultural resource survey), which could result in the imposition of additional requirements to offset any environmental impacts associated with the use of the area. (Id.).

9. The contractor was required to prepare an Environmental Protection Plan that required the contractor to identify the "[p]rocedures to be implemented to provide the required environmental protection and to comply with applicable laws and regulations." (Spec. 01130-1, Def. App. 165). The contract also required the Corps to notify the contractor of observed non-compliance with Federal, State or local laws, but also stated that the failure of the Corps to notify the Contractor of non-compliance did not relieve the contractor of the obligation to be in conformance "with those requirements." (Spec. 01130-2, Def. App. 166).

10. Matteson submitted its Environmental Protection Plan in accordance with § 01130. (Matteson Jr. depo., Pl. App. 0081). There is no evidence indicating that Matteson's Environmental Protection Plan was inadequate or that Matteson's proposed or actual

operations—including its proposed use of the Saunderson site—did not comply with all applicable environmental laws. (See November 6, 1996 Memorandum, Def. App. 238-39, noting "[t]he resource agencies . . . agree that there is no reason from a resource management perspective that the [Saunderson] site should not be used.")

**B. Matteson's Bid.**

11. In deciding whether to bid on the project, Matteson determined that the utilization of the five disposal sites identified by the Corps would require that the project be completed by mechanical dredging (i.e. backhoes, loaders and trucks). These five sites were not feasible with a hydraulic dredging method because hydraulic dredging required the running of pipes from the dredging site to the disposal sites. (Matteson Sr. depo., Pl. App. 0100; Matteson Jr. depo., Pl. App. 0061-0062, 0067-0068; see also Krumholz depo., Pl. App. 0002-0003, 0005-0006, 0008-0009; Tapp depo., Pl. App. 0129). The five identified disposal sites were too far inland and away from the project for hydraulic dredging to be feasible. (Id.).

12. Because hydraulic dredging was not feasible with the disposal sites identified in the contract, Matteson considered the contract to call for mechanical dredging and was not certain whether a bid based on hydraulic dredging would be considered to be responsive to the bid request. (Matteson Jr. depo., Pl. App. 0066-0067). Therefore, Matteson contacted the Corps by telephone and asked if the Corps would accept a bid based on hydraulic dredging. (Id.). In response, the Corps not only approved of Matteson's submission of a hydraulic dredging bid, but encouraged Matteson to submit such a bid as that method offered substantial potential savings over mechanical dredging. (Matteson Jr. depo., Pl. App. 0067-0069, 0071). The Corps noted to Matteson that if it located a disposal site, the Corps would come out and do a pre-bid site inspection. (Matteson Jr. depo., Pl. App. 0068-0069).

13. Although the Corps normally secures the best suitable disposal sites, this contract was somewhat unique in that the Corps intended for the bidders to locate potential disposal sites and included the listed sites only as "fallback" sites. (Krumholz depo., Pl. App. 0005-0009).

14. After having been informed that a bid based on hydraulic dredging would be considered responsive, Matteson decided to pursue a potential bid and began looking for disposal sites that would be suitable for hydraulic dredging. In doing so, Matteson identified three potential sites: the Saunderson property, the Braun property and the Guza property. (Matteson Jr. depo., Pl. App. 0082-0084).

15. As a part of its investigation of these sites, Matteson asked the Corps to examine the sites to determine their suitability as disposal sites. (Id.).

16. The Corps had facilitated similar site inspections with other contractors. (Krumholz depo., Pl. App. 0014-0015). The purpose of these meetings was for the Corps "to put the contractors in touch with the officials that would be involved in reviewing and evaluating and potentially permitting a site." (Id.).

17. In inspecting the sites, the Corps selected and invited representatives from other governmental agencies, including local officials from the Minnesota Department of Natural Resources, to also review the sites. (Matteson Jr. depo., Pl. App. 0076-0078). Matteson believed that these officials were the ones required to obtain all necessary permits and that the Corps, which was familiar with the state and local permitting process, would have contacted other officials had that been required. (Matteson Jr. depo., Pl. App. 0076-0078 and Def. App. 1018-1020).

18. On August 5, 1996, Corps' officials, including Dan Krumholz, Steve Tapp and Dennis Anderson, together with the Corps' invited representatives from the U. S. Fish and

Wildlife Services, the Minnesota Department of Natural Resources, and the Minnesota Pollution Control Board examined two or three sites. (Matteson Jr. depo., Pl. App. 0076-0078, 0082-0085, 0245; Matteson Jr. depo, Def. App. 1018, 1080). Matteson informed the Corps of the Saunderson site at the time that they examined the Guza and Braun sites. (Matteson Jr. depo., Pl. App. 0082-0084). The Braun site was not accessible from the roadways, and thus the officials walked on that property. (Matteson Jr. depo., Pl. App. 0084-0085). The Saunderson and Guza sites were visible from the roadway, and thus they were observed from the road. (Matteson Jr. depo., Pl. App. 0082-0086). While examining the sites, the officials indicated that both the Guza and Braun properties were acceptable but that the Braun property had some low lying areas that had to be avoided. (Matteson Jr. depo., Def. App. 1083-84; see also Diary Excerpts, Def. App. 219-22).

19. After visiting the proposed sites, Steve Tapp, a Corps official, indicated that one site would be acceptable if a wetland area was avoided and that another site looked to be acceptable. (Matteson Jr. depo., Def. App. 1083). None of the officials present expressed any reason why any of the potential sites could not be permitted. (Matteson Jr. depo., Def. App. 1083-84).

20. Matteson then obtained an option to purchase the Saunderson property to use it as a disposal site, as well as an option for an easement on the adjoining property so that Matteson could run its temporary pipelines from the river to the Saunderson property. (Matteson Sr. depo., Pl. App. 0103-0104, 0106).

21. Matteson had also begun to acquire the rights necessary to access and utilize the nearby Braun site. (Matteson Sr. depo., Pl. App. 0102-0103).

22. Prior to bidding on the project, Matteson contacted Dan Krumholz, the Corps' Operations Manager for the Channels and Harbors Projects, by telephone and specifically discussed the Saunderson site. (Matteson Sr. depo., Pl. App. 0109; Krumholz Daytimer Excerpt, Def. App. 204). In discussing Matteson's proposed use of the site, Mr. Krumholz expressed familiarity with the site. (Matteson Sr. depo., Pl. App. 0108-0109, 0114). Mr. Matteson Sr. and Mr. Krumholz discussed clearing trees on the property. (Matteson Sr. depo., 0111-0113). Mr. Krumholz noted that the clearing was acceptable so long as it was not being done solely for the purpose of disposing dredged material. (Id.). Mr. Krumholtz also stated that the Corps would need to perform a "cultural resources investigation" of the site and "obtain water quality certification from the MPCA for the effluent," but otherwise indicated that the site would be suitable for the placement of dredged sand and gravel. (Matteson Sr. depo., Pl. App. 0113-0114).

23. Matteson believed that the Corps had approved of the use of any of the three sites, including the Saunderson property, subject to any significant environmental or archeological problems with the site that might be uncovered. (Matteson Jr. depo., Pl. App. 0096-0098). Matteson, therefore, submitted its bid based on the use of the Saunderson site. (Matteson Claim, Def. App. 332; First Am. Compl. ¶¶ 7-11).

24. In conducting disposal site investigations prior to bidding, the Corps expected contractors only to have satisfied themselves that "they were going to get approval to use the site." (Krumholz depo., Pl. App. 0022-0023). The Corps did not expect bidders to have actually had the reviews completed and final permits issued prior to bidding. (Krumholz depo., Pl. App. 0023). The Corps also was not asking the contractor to assume the risk that it would not be possible to secure a private disposal area. (Krumholz depo., Pl. App. 0044-0045).

25. Matteson understood that a determination was made subsequent to the submission of its bid that an environmental assessment would not be necessary. (Matteson Jr. depo., Pl. App. 0080).

26. The Corps later confirmed that the site was suitable and noted in a memorandum that "resource agencies . . . agreed that there is no reason from a resource management perspective that the site should not be used." (November 6, 1996 Memorandum, Def. App. 238-239).

**C. Bid Opening and Award of the Contract.**

27. The bids were opened on August 29, 1996. Matteson's bid of $1,693,000 was the lowest bid. (Def. Proposed Findings of Uncontroverted Fact, ¶ 29).

28. Matteson's initiative in using hydraulic dredging and locating an alternative disposal site resulted in a savings of $1.6 million over the government's estimate. (November 6, 1996 Memorandum, Def. App. 238-239).

29. The next lowest bidder, J.F. Brennan Co., Inc., also bid the project based on utilizing hydraulic dredging and an alternative disposal site. (Matteson Jr. depo., Def. App. 1057). The bids of both Matteson and J. F. Brennan were substantially less than the bids of the contractors that bid the contract based on performing the work with mechanical dredging. (Matteson Jr. depo., Def. App. 1057; see also July 31, 2000 Letter, Def. App. 335).

30. In a letter dated August 29, 1996, the Corps requested Matteson to submit by September 4, 1996, verification that its bid price of $1,693,000 was accurate and complete. (August 29, 1996 Letter, Def. App. 329-330). Larry Matteson Jr. reviewed Matteson's bid and determined that it was similar to the next lowest bid, which had also been submitted on the basis of performing hydraulic dredging rather than mechanical. (Matteson Jr. depo., Def. App. 1057).

As required by the Corps, Matteson verified that its bid was accurate on September 4, 1996. (September 4, 1996 Letter, Def. App. 331).

31. At some point in September, 1996, Matteson contacted Wabasha County concerning renewing a permit to continue the ongoing clearance of trees from the Saunderson property. (Matteson Sr. depo., Pl. App. 0119-0120). The issue of any permits concerning the Shoreland Protection Act was not raised by the County at that time. (Matteson Sr. depo., Pl. App. 0120). The permit for clearing the wood was different from the other permit that the County subsequently required under the Shoreland Protection Act. (Matteson Sr. depo., Pl. App. 0117).

32. On September 18, 1996—after Matteson had verified its bid, but prior to the award of the contract—the Corps was informed by Wabasha County "that homeowners downstream of Wabasha [were] concerned about dredged material being placed in the vicinity" and that Wabasha County believed that the Shoreline Protection Act was applicable to and would prohibit the running of temporary dredge pipes to reach the Saunderson property. (Tapp depo., Pl. App. 0130-0132; Nordstrom depo., Pl. App. 0197-0199; Diary Excerpts, Def. App. 219-22).

33. The Shoreland Protection Act is a statewide act that all counties are required to adopt. (Nordstrom depo., Pl. App. 0151). The form of the ordinance is mandated by the Minnesota Department of Natural Resources, and its compliance is administered by the Minnesota DNR. (Id.; see also Wabasha County Zoning Ordinances, Article 13, Section 17 at Pl. App. 0242)

34. The Shoreland Protection Act was widely known in the counties with river shorelines. (Nordstrom depo., Pl. App. 0144).

35. Krumholz and other Corps officials routinely appeared at local meetings at which the Shoreland Protection Act was discussed. (Nordstrom depo., Pl. App. 0180-0182, 0200-0201).

36. There have been numerous disputes between localities and the Corps as to whether the Corps was required to comply with local permit requirements under the Shoreland Protection Act and other local ordinances. (Nordstrom depo., Pl. App. 0152-0155, 0156-0159, 0165-0170, 0172-0173, 0209, 0213-0215, 0226).

37. As far back as 1983, the Corps has been involved in disputes with local entities concerning the Corps' compliance with the Shoreland Protection Act. (Nordstrom depo., Pl. App. 0138, 0152-0155, 0156-0159; June 15, 1983 Letter at Pl. App. 0233).

38. In 1987, the Corps was informed of one municipality's opinion that the Shoreland Protection Act applied to the placement of temporary dredge pipes on shoreland areas. (Nordstrom depo., Pl. App. 0213-0215, 0225-0226; August 19, 1987 Letter, Pl. App. 0234).

39. The Corps has consistently taken the position that it is not subject to local permitting requirements on property owned by or leased by the Federal government, or when the work is being performed by the Federal government. (Krumholz depo., Pl. App. 0052-0053; Nordstrom depo., Pl. App. 0156-0159, 0165-0169, 0209).

40. Although the Shoreland Protection Act and related local ordinances are published, there is no published decision interpreting the Act to apply to temporary dredge pipes running across the shoreland protection zone. (Nordstrom depo., Pl. App. 0151, 0206-0207).

41. By using the Shoreland Protection Act, Wabasha County could effectively prohibit dredge disposal anywhere—even on inland sites beyond the 1,000 foot protection zone—by prohibiting the running of the temporary pipes from the river. The County's position

also would have precluded Matteson from use of the alternative Braun property or any other site that had to be accessed over private property. (Matteson Sr. depo., Pl. App. 0126-0127; Nordstrom depo., Pl. App. 0222).

42. Although the Corps gave Matteson's telephone number to the Wabasha County Attorney, Matteson received no communication from Wabasha County officials prior to the award of the contract. (Matteson Sr. depo., Pl. App. 0116).

43. On September 20, 1996, <u>after</u> having received information from Wabasha County concerning potential problems in utilizing the Saunderson site, including opposition to the use of the site, the Corps awarded the contract to Matteson. (Pl. Response to Def. Proposed Findings of Uncontroverted Facts and Statement of Disputed Issues, ¶ 31; Def. Proposed Findings of Uncontroverted Fact, ¶ 31).

**D. Refusal to Provide a Permit for Disposal of Dredged Material.**

44. After the contract was awarded, Matteson first became aware of Wabasha County's position that it was applying the Shoreland Protection Act to require Matteson to obtain a permit to run temporary pipes across the shoreland protection zone when Matteson received a letter from the County dated September 24, 1996. (Matteson Sr. depo., Pl. App. 0117-0118; September 24, 1996 Letter, Pl. App. 0242-0243).

45. On October 2, 1996, after Matteson was informed of Wabasha County's position that the Shoreland Protection Act required permission from the County to run temporary dredge pipes across the river shoreline, Matteson submitted an application for a land use permit. (Application for Land Use Permit, Def. App. 230-37).

46. Even after Matteson became aware of the County's intention to apply the Shoreland Protection Act to require Matteson to obtain a permit to run its dredging pipes,

Matteson did not become concerned about obtaining a permit because it was not aware of the intensity and breadth of the community's opposition to the Corps' dredging activities. (Matteson Sr. depo., Pl. App. 0121-0125; see also Nordstrom depo., Pl. App. 0186-0187).

47. Significant community opposition to the Corps' dredging activities dates back to the 1980s. (Nordstrom depo., Pl. App. 0141-0143, 0162-0163, 0183-0184, 0204-0205, 0208). There had been numerous meetings and letters written, by which the Corps would have been familiar with the degree of opposition. (Nordstrom depo., Pl. App. 0184, 0204-0205).

48. Matteson was not aware of the degree of community opposition to the Corps' dredging projects. (Matteson Jr. depo., Pl. App. 0091-0092).

49. Although Matteson had been aware of some isolated complaints concerning individuals on previous projects, and was aware of some "rumblings" about blowing sand, Matteson was not aware of the breadth and degree of community opposition to the Corps' dredging projects. (Matteson Jr. depo., Pl. App. 0090-0092). The issue concerning blowing sand did not concern Matteson's work. (Matteson Sr., Def. App. 1199-1200). Matteson also had some discussions concerning wells and septic tanks, but understood that monitoring on previous projects indicated no impact. (Matteson Sr., Def. App. 1198-99). There was an isolated complaint made concerning a noise from a booster station and a dispute with a landowner concerning temporary pipes running across his property. (Matteson Sr., Def. App. 1200-07). These isolated complaints were resolved to the satisfaction of the individuals involved. (Id.)

50. Not until Matteson personnel began attending meetings concerning its permit application did Matteson discover that the opposition to the Corps' dredging projects was "very violent and very outspoken." (Matteson Sr. depo., Pl. App. 0123-0124). The opposition of the community in this case did not concern opposition by private landowners concerning the running

of temporary pipelines over their property. Rather, the opposition was to the disposal of dredged material anywhere in the vicinity of the project and was due to the Corps' prior performance. (Matteson Sr. depo., Pl. App. 0123-0125; Matteson Jr. depo., Pl. App. 0090-0092; see also Nordstrom depo., Pl. App. 0141-0143, 0162-0163, 0183-0184, 0204-0205, 0208). Community opposition to disposal of any dredged material was so significant that the County even considered enacting a moratorium on the disposal of any dredged material anywhere in Wabasha County. (Nordstrom depo., Pl. App. 0218-0219).

51. Due to community opposition based on complaints concerning the Corps' performance on other projects, Wabasha County refused to issue a permit for disposal on the Saunderson property. (Matteson's Claim, Def. App. 334; First Am. Compl. ¶¶ 17).

52. The Corps did not consider purchasing or leasing the property to be able to utilize the Saunderson site and circumvent Wabasha County permitting requirements based on its sovereign immunity. (Krumholz depo., Pl. App. 0054; Gulan depo., Pl. App. 0134-0135, 0136; April 27, 1998 Memorandum at Pl. App. 0227-0228).

53. Once it became apparent that Wabasha County would not approve of any disposal site, Matteson attempted to locate another site that would not be subject to County approval. Matteson located and obtained the rights to utilize a site that was owned by the United States Fish & Wildlife Services that was not subject to Minnesota or Wabasha County jurisdiction. (Matteson Claim, Def. App. 335).

54. The Fish & Wildlife Services' site, however, was not in the vicinity of the project and thus required Matteson to pump dredged material a considerably greater distance. (Matteson Claim, Def. App. 335). Use of the Saunderson property would have required Matteson to pump

dredge material 9,000 feet. (Id.). The U.S. Fish and Wildlife Services' parcel required Matteson to pump dredge material over 26,000 feet. (Id.).

55. At this distance, Matteson was required to utilize pumps and other additional equipment that would not have been required for the Saunderson property. (Matteson Claim, Def. App. 335). Matteson's production also decreased due to the greater distance. (Id.). In addition, Matteson was required to spend additional sums to acquire other property to trade for the U.S. Fish & Wildlife Services' property. (Id.).

**E. Matteson's Claim**

56. On July 31, 2000, Matteson submitted its certified claim for equitable adjustment. (Matteson Claim, Def. App. 332-38). Matteson sought a total of $1,111,227.51 in additional compensation for the extra expenses incurred as the result of its inability to dispose of dredge material in the vicinity of the project, as it had bid the work. (Matteson Claim, Def. App. 338).

57. The contracting officer denied Matteson's claim on November 17, 2000. (November 17, 2000 Letter, Def. App. 399-419).

Respectfully submitted,

MILLER LAW FIRM, P.C.

______________________________

Stephen R. Miller, Mo. Bar #33344
Michael T. Metcalf, Mo. Bar #45304
4310 Madison Avenue
Kansas City, Missouri 64111
Telephone: (816) 531-0755
Facsimile: (816) 561-6361

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the above and foregoing was served electronically upon the following persons by ECF notification, this 10th day of October, 2003.

Patricia M. McCarthy
Peter D. Keisler
David M. Cohen
Commercial Litigation Branch
Civil Division
U.S. Dept. of Justice
Attention: Classification Unit
8th Floor, 1100 L Street N.W.
Washington, D.C. 20530
Telephone: (202) 307-0164 – P. McCarthy
Facsimile: (202) 514-8624 – P. McCarthy

Edwin C. Bankston
District Counsel
Army Corps of Engineers
Saint Paul, MN 55101

________________________________
Attorney for Plaintiff