No. 01-542C
(Judge Lawrence J. Block)

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

L. W. MATTESON, INC.,
Plaintiff,

v.

THE UNITED STATES ARMY CORPS OF ENGINEERS,
Defendant.

---

**PLAINTIFF L.W. MATTESON'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

**MILLER LAW FIRM, P.C.**
Stephen R. Miller Mo# 33344
Michael T. Metcalf Mo# 45304
4310 Madison Avenue
Kansas City, Missouri 64111
Telephone (816) 531-0755
Facsimile (816) 561-6361

ATTORNEYS FOR PLAINTIFF

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES ........ iii

INDEX TO PLAINTIFF'S APPENDIX ........ vi

STATEMENT OF THE CASE ........ 1

STATEMENT OF FACTS ........ 1

ARGUMENT ........ 6

I. STANDARD OF REVIEW. ........ 6

II. BREACH OF CONTRACT CLAIMS (COUNTS I, V, VI & VII). ........ 8

A. Count I (Breach of Contract for Failure to Pay). ........ 8

B. Count V (Breach of Implied Duty of Cooperation and Good Faith/Superior Knowledge). ........ 9

1. Factual issues exist as to both the Corps' knowledge and Matteson's knowledge of Wabasha County's intention to apply the Shoreland Protection Act to temporary pipe running across shoreland property to restrict or prohibit the use of any alternative disposal site, and the existence and extent of local opposition to the dredging disposal. ........ 10

2. Factual issues exist as to whether the Corps violated its duty to cooperate and exercise good faith in assisting to secure the availability of the Saunderson site. ........ 16

C. Counts VI and VII (Breach of Warranty and Failure to Disclose). ........ 17

III. DIFFERING SITE CONDITION (COUNT II). ........ 21

IV. CARDINAL CHANGE (COUNT III). ........ 24

V. COMMERCIAL IMPRACTABILITY (COUNT VII). ........ 30

VI. MUTUAL MISTAKE (COUNT IX). ........ 35

CONCLUSION ........ 38

## TABLE OF AUTHORITIES

**Cases**

*Advance Bank, F.S.B. v. U. S.,* 52 Fed. Cl. 286, 287-88 (Fed. Cl., 2002) .................................... 7

*Air-A-Plane Corp. v. United States,* 408 F.2d 1030, 1033 (Ct. Cl. 1969) .................................... 26

*Alliant Techsystems, Inc. v. United States,* 178 F.3d 1260, 1276 (C.A. Fed. 1999) ............... 25, 27

*Allied Materials & Equipment Co. v. U. S.,* 569 F.2d 562, 563-64 (Ct. Cl. 1978) ........... 25, 27, 30

*American Dredging Company,* 72-1 BCA ¶ 9316 ................................................................ 22, 23

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) .. 7, 8

*Barnhart-Morrow Consolidated Mono Belting Div.,* 78-1 BCA ¶12,962 .................................. 31

*Celeron Gathering Corp. v. United States*, 34 Fed.Cl. 745, 753 (Fed. Cl., 1996)........................ 16

*Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ................. 7

*Cities Service Helex, Inc. v. United States,* 543 F.2d 1306, 1313 (Ct.Cl. 1976) .......................... 26

*Contact Intern. Inc. v. Windall,* 106 F.3d 426, 426 (C.A. Fed. 1997) ......................................... 26

*D.L. Auld Co. v. Chroma Graphics Corp.,* 714 F.2d 1144, 1146-47 (Fed. Cir. 1983).................. 7

*Delta Equipment and Const. Co. v. United States*, 122 Ct.Cl. 340, 104 F.Supp. 549, 551-552 (1952) .......................................................................................................... 15

*Design and Production, Inc. v. United States*, 18 ___ 168, 198 (Cl. Ct., 1989).......................... 19

*Discount Co., Inc. v. United States,* 554 F.3d 435, 440 (Ct.Cl. 1977)......................................... 22

*Fehlhaber Corp. v. United States,* 151 F.Supp. 817, 825 (Ct. Cl. 1957 ............................... 17, 21

*Florida Power & Light Co. v. Westinghouse Elec. Corp.,* 826 F.2d 239, 262 (4th Cir. (Va.) 1987) (quoting 6 CORBIN ON CONTRACTS, § 1331)............................................................... 31

*General Dynamics Corp. v. United States,* 585 F.2d 457, 462 (Ct. Cl. 1978)............................. 26

*Giesler v. United States*, 232 F.3d 947 (Fed. Cir. 2000)........................................................... 12

*Guy H. Briscoe v. United States,* 442 F.2d 953 (Ct.Cl. 1971) ............................................... 22, 24

*H.N. Bailey & Assocs. v. United States*, 449 F.2d 376 (Ct. Cl. 1971) ........................................ 12

*Hardeman-Monier-Hutcherson v. United States*, 458 F.2d 1364, at 1371-1372 (Ct. Cl. 1972) ... 9

*Helene Curtis Indus., Inc. v. United States*, 312 F.2d 774, 160 Ct.Cl. 437 (1963)........................ 9

*Hol-Gar Mfg. Corp.,* 360 F.2d 634, 637 (Ct. Cl. 1996).............................................................. 17

*J. A. Jones Constr. Co. v. United States*, 390 F.2d 886, 182 Ct.Cl. 615 (1968)................ 9, 10, 15

*Jay v. Secretary of DHHS,* 998 F.2d 979, 982 (Fed. Cir. 1993) .................................................... 8

*Johns-Manville Corp. v. United States*, 12 Cl. Ct. 1 (1987) ........................................................ 37

*Kansas State Bank in Holton v. Citizens Bank of Windsor*, 737 F.2d 1490, 1497-98 (8th Cir.1984) ........................................................................................................................... 38

*Massman Contracting Co. v. United States*, 23 Cl. Ct. 24 (1991)............................................... 12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ........................................................................................................... 7

*McDowell Stone Co. of Blackwater,* BCA No. 285 (1943) ........................................................ 21

*National Presto Industries, Inc. v. United States*, 338 F.2d 99, 167 Cl. Ct. 749 (1964) ........ 36, 37

*Natus Corp.,* 371 F.2d at 456 ....................................................................................................... 31

*Northrop Grumman Corp. v. United States*, 42 Fed. Cl. 1, 7 (Fed. Cl., 1998)............................ 8

*Raytheon Co. v. White*, 305 F.3d 1354, 1367 (Fed. Cir. 2002)............................................. 35, 36

*Rumsfeld v. Freedom NY, Inc.* , 329 F 3d 1320 (Fed. Cir. 2003) ................................... 26, 27, 30

*Safina Office Products v. General Services Admin.,* 93-1 BCA ¶ 25,485 ............................. 32, 36

*SRI Intern. v. Matsushita Elec. Corp. of America,* 775 F.2d 1107, 1116 (Fed. Cir. 1985) ............ 7

*Stuyvesant Dredging Co. v. United States,* 834 F.2d 1576, 1581 (Fed. Cir. 1987) ...................... 17

*T & M Distributors, Inc. v. U. S.,* 185 F.3d 1279 (Fed. Cir. 1999. ................................................ 7

*T.L. Roff & Associates Construction Co. v. United States*, 52 Fed. Cl. 572, 577-78 (1993)........ 39

*United States v. Shah*, 44 F.3d 285, 292 -293 (5th Cir. 1995) .................... 38

*Western Contracting Corp. v. United States*, 144 Ct. Cl. 318 (Ct. Cl. 1958) .................... 8

**Statutes**

Minn. St. § 103G.005 .................... 11

**Other Authorities**

Corbin On Contracts, § 610 .................... 37

*G.W. Galloway Co.,* 73-2 BCA 48,500 .................... 9

*R.A. Heintz Construction Co.,* 74-1 BCA ¶ 10, 562 .................... 22

Restatement (Second) of Contracts, § 151, Comment b .................... 39

*Sundex, Ltd.,* 93-2 BCA ¶ 25,626 .................... 21

*Thomas S. Rhoades & Stephen L. Schluneger,* 95-1 BCA ¶ 27,375 .................... 9

**Rules**

CFR § 52.236-7 .................... 36

RCFC 56(c) .................... 6, 7

## INDEX TO PLAINTIFF'S APPENDIX


| Document | Pl. App. Pages |
|---|---|
| Deposition of Daniel J. Krumholz (excerpts) | 0001-0059 |
| Deposition of Larry W. Matteson (excerpts) | 0060-0098 |
| Deposition of Lawrence W. Matteson (excerpts) | 0099-0127 |
| Deposition of Steve Tapp (excerpts) | 0128-0132 |
| Deposition of Melissa Gulan (excerpts) | 0133-0136 |
| Deposition of James C. Nordstrom (excerpts) | 0137-0226 |
| Deposition Exhibit 25 – April 27, 1998 memo from CEMVP to Grand Encampment Team re: Disposal Site Issue | 0227-0228 |
| Deposition Exhibit 73 – Affidavit of James C. Nordstrom | 0229-0232 |
| Deposition Exhibit 74 – June 15, 1983 letter from James C. Nordstrom to the Corps of Engineers re: Army Acting Without A Permit | 0233 |
| Deposition Exhibit 84 – August 19, 1987 letter from Peter Ekstrand to the Corps of Engineers re: Concerns and Complaints Regarding Army Dredging | 0234-0235 |
| Wabash County Zoning Ordinances | 0236-0242 |
| Deposition Exhibit 49 – September 24, 1996 letter from Wabasha County to L.W. Matteson re: Land Use Permit | 0243-0244 |
| Deposition of Larry W. Matteson (excerpt) | 0245 |

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| L. W. MATTESON, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| UNITED STATES ARMY CORPS OF ENGINEERS, | ) | Case No. 01-542C |
| | ) | (Judge Lawrence J. Block) |
| Defendant. | ) | |

**PLAINTIFF L.W. MATTESON'S OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## STATEMENT OF THE CASE

The present action arises out of a contract awarded by the Corps of Engineers for the dredging of portions of the Mississippi River. In the action, the contractor, L.W. Matteson, Inc., seeks an equitable adjustment for considerable increased costs incurred by it as a result of being precluded from utilizing alternative dredge disposal sites as represented in the invitation for bids and in statements made by Corps personnel, and instead having to use a disposal site that was much farther away than planned. On July 31, 2000, Matteson submitted its claim for equitable adjustment, seeking a total of $1,111,227.51 in compensation for the additional expenses incurred as the result of its inability to dispose of dredge material in the vicinity of the project. The contracting officer denied Matteson's claim on November 17, 2000.

## STATEMENT OF FACTS[1]

On July 10, 1996, the Corps issued an invitation for bids for a dredging project generally referred to as the Grand Encampment Excavation. (Def. Proposed Facts, ¶ 7). The contract included dredging of the Alma Marina in Alma, Wisconsin, and an island in the Mississippi

[1] Matteson sets forth here a limited statement of the material facts, and refers the Court to its Separate Statement of Undisputed Facts as well as its Response to Defendant's Statement of Facts for a more complete summary of facts relevant to this matter.

River upstream from Alma. (Def. Proposed Facts, ¶ 7). The contract specifically allowed the contractor to utilize any suitable disposal site, except for one site that was identified and required. (Pl. Statement of Facts[2], ¶¶ 4-5).

Because hydraulic dredging was not feasible with the disposal sites identified in the contract, Matteson was not certain whether a bid based on hydraulic dredging would be considered to be responsive to the bid request. (Pl. Statement of Facts, ¶ 12). Matteson contacted the Corps by telephone and asked if the Corps would accept a bid based on hydraulic dredging. (Id.). In response, the Corps not only approved of Matteson's submission of a hydraulic dredging bid, but encouraged Matteson to submit such a bid as that method offered substantial potential savings over mechanical dredging. (Id.). The Corps told Matteson that if it located a disposal site, the Corps would come out and do a pre-bid site inspection. (Id.).

Thereafter, Matteson identified three potential disposal sites: the Saunderson property, the Braun property and the Guza property. (Pl. Statement of Facts, ¶ 14). As a part of its investigation of these sites, Matteson asked the Corps to examine the sites to determine their suitability. (Pl. Statement of Facts, ¶ 15). The Corps had facilitated similar site inspections with other contractors. (Pl. Statement of Facts, ¶ 16). The purpose of these meetings was for the Corps "to put the contractors in touch with the officials that would be involved in reviewing and evaluating and potentially permitting a site." (Id.). Matteson believed that the officials that were invited were the ones required to obtain all necessary permits and that the Corps, which was familiar with the state and local permitting process, would have contacted other officials had they been required. (Pl. Statement of Facts, ¶ 17).

---

[2] References to Plaintiff's Separate Statement of Proposed Findings of Uncontroverted Fact are denoted as "Pl. Statement of Facts."

On August 5, 1996, Corps officials Dan Krumholz, Steve Tapp and Dennis Anderson, together with the Corps' invited representatives from the U. S. Fish and Wildlife Services and the Minnesota Department of Natural Resources, examined two or three sites. (Pl. Statement of Facts, ¶ 18). Matteson informed the Corps of the Saunderson site at the time that they examined the Guza and Braun sites. (Id.).

To further ensure that the Saunderson site was suitable prior to submitting the bid, Matteson contacted Krumholz, the Corps' Operations Manager for the Channels and Harbors Projects, by telephone and specifically discussed the Saunderson site. (Pl. Statement of Facts, ¶ 22). In discussing Matteson's proposed use of that site, Krumholz expressed familiarity with the site. (Id.). Mr. Krumholtz also stated that the Corps would need to perform a "cultural resources investigation" of the site and "obtain water quality certification from the MPCA for the effluent," but otherwise indicated that the site would be suitable for the placement of dredged sand and gravel. (Id.). The Corps later confirmed that the site was suitable and noted in a memorandum that "resource agencies . . . agreed that there is no reason from a resource management perspective that the site should not be used." (Pl. Statement of Facts, ¶ 26).

Matteson's reliance on the Corps' approval of the site was consistent with the Corps' intentions in conducting disposal site investigations prior to bidding because the Corps expected contractors only to have satisfied themselves that "they were going to get approval to use the site." (Pl. Statement of Facts, ¶ 23-24). The Corps did not expect bidders to have actually had the reviews completed and final permits issued prior to bidding. (Pl. Statement of Facts, ¶ 24).

The bids were opened on August 29, 1996. Matteson's bid of $1,693,000 was the lowest bid. ((Def. Proposed Facts, ¶ 29). Matteson's initiative in locating an alternative disposal site

resulting in its bid of $1,693,000 resulted in a savings of $1.6 million over the government's estimate. (Pl. Statement of Facts, ¶ 28).

On September 18, 1996—after Matteson had verified its bid, but prior to the award of the contract—the Corps was informed by Wabasha County "that homeowners downstream of Wabasha [were] concerned about dredged material being placed in the vicinity" and that Wabasha County believed that the local Shoreland Protection Act was applicable to and would prohibit the running of temporary dredge pipe to reach the Saunderson property. (Pl. Statement of Facts, ¶ 32).

The Shoreland Protection Act was widely known in the counties with river shorelines. (Pl. Statement of Facts, ¶ 33-34). Krumholz and other Corps officials had routinely appeared at local meetings at which the Shoreland Protection Act was discussed. (Pl. Statement of Facts, ¶ 35). As far back as 1983, there have been numerous disputes between localities and the Corps as to whether the Corps was required to comply with local permit requirements under the Shoreland Protection Act and other local ordinances. (Pl. Statement of Facts, ¶ 36-37). Matteson was not aware of the degree of community opposition to the Corps' dredging projects. (Pl. Statement of Facts, ¶ 44-50). However, he Corps would have been aware of this opposition by its attendance at numerous meetings and receipt of letters concerning dredging issues over the years. (Pl. Statement of Facts, ¶ 47), and because there was significant community opposition to the Corps' dredging activities dating back at-least to the 1980s. (Id.).

Not only was the Corps aware of the Shoreland Protection Act, in 1987 the Corps had been informed of at least one municipality's opinion that the Shoreland Protection Act applied to the placement of temporary dredge pipes on shoreland areas. (Pl. Statement of Facts, ¶ 38). There is, however, no published decision, that Matteson could have obtained, interpreting the

Act to apply to temporary dredge pipes running across the shoreland protection zone. (Pl. Statement of Facts, ¶ 40).

On September 20, 1996, after having received information from Wabasha County concerning potential problems in utilizing the Saunderson site, but without informing Matteson of this information, the Corps awarded the contract to Matteson. (Def. Proposed Facts, ¶ 31). Although the Corps apparently gave Matteson's telephone number to the Wabasha County Attorney when he called, Matteson received no communication from Wabasha County officials prior to the award of the contract to inform Matteson that the Shoreland Protection Act applied to its running of pipe. (Pl. Statement of Facts, ¶ 42).

Matteson first become aware of Wabasha County's position that it was applying the Shoreland Protection Act to require Matteson to obtain a permit to run temporary pipes across the shoreland protection zone when Matteson received a letter dated September 24, 1996. (Pl. Statement of Facts, ¶ 44). Once Matteson was informed of Wabasha County's position that the Shoreland Protection Act required permission from the County to run temporary dredge pipes across the river shoreline, Matteson submitted an application for a land use permit on October 2, 1996. (Pl. Statement of Facts, ¶ 45). Matteson did not become concerned about obtaining a permit because it was not aware of the intensity and breadth of the community's opposition to the Corps' dredging activities. (Pl. Statement of Facts, ¶ 46).

Not until Matteson personnel began attending meetings concerning its permit application did Matteson discover that the opposition to the Corps' dredging projects was "very violent and very outspoken." (Pl. Statement of Facts, ¶ 50). The opposition of the community in this case did not concern opposition by private landowners concerning the running of temporary pipelines

over their property, but rather was opposition to the disposal of dredged material at all anywhere in the vicinity of the project due to the Corps' prior performance. (Id.).

The County refused to issue a permit for disposal on the Saunderson property. (Pl. Statement of Fact ¶ 51). Once it became apparent that Wabasha County would not approve of any disposal site, Matteson began to attempt locate some site that would not be subject County approval. Matteson located and obtained the rights to utilize a site that was owned by the United States Fish & Wildlife Service that was not subject to Minnesota or Wabasha County jurisdiction. (Pl. Statement of Facts, ¶ 53). The Fish and Wildlife site was not in the vicinity of the project and thus required Matteson to pump dredged material a considerably greater distance. (Pl. Statement of Facts, ¶ 54). Use of the Saunderson property would have required Matteson to pump dredge material only 9,000 feet. (Id.). The U.S. Fish and Wildlife parcel, on the other hand, required Matteson to pump dredge material over 26,000 feet. (Id.). At that distance, Matteson was required to utilize pumps and other additional equipment that would not have been required for the Saunderson property. (Pl. Statement of Facts, ¶ 55). Matteson's production also greatly decreased due to the greater distance. (Id.). In addition, Matteson was required to spend additional sums to acquire other property to trade for the U.S. Fish & Wildlife property. (Id.). Although the Corps did help to secure the Fish and Wildlife site, it did not take action to purchase or lease the property and right of way to be able to utilize the Saunderson site regardless of Wabasha County permitting requirements. (Pl. Statement of Facts, ¶ 52).

## ARGUMENT

### I. STANDARD OF REVIEW

Under Rule 56(c) of the Rules of the United States Court of Federal Claims, a motion for summary judgment will be granted if there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. *T & M Distributors, Inc. v. U. S.,* 185 F.3d 1279 (Fed. Cir. 1999.

However, there are competing considerations: "an improvident grant [of summary judgment] may deny a party a chance to prove a worthy case and an improvident denial may force on a party and the court an unnecessary trial." *D.L. Auld Co. v. Chroma Graphics Corp.,* 714 F.2d 1144, 1146-47 (Fed. Cir. 1983). While courts have held that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action,'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citations omitted), they also have held that a trial court should act cautiously in granting summary judgment and may deny it when there is reason to believe that the better course would be to proceed to trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A more emphatic enunciation of the need for caution in some RCFC 56(c) circumstances appears in a Federal Circuit case, which warns that, although speedy and inexpensive, summary judgment at times may be a "lethal weapon" capable of "overkill." *SRI Intern. v. Matsushita Elec. Corp. of America,* 775 F.2d 1107, 1116 (Fed. Cir. 1985).

It also is established that, in deciding a summary judgment motion, the evidence of the non-movant must be believed and all justifiable inferences drawn in its favor, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Advance Bank, F.S.B. v. U. S.,* 52 Fed. Cl. 286, 287-88 (Fed. Cl., 2002). When resolving a motion for summary judgment, the court may not weigh the

evidence and seek to determine the truth of the matter. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. The court cannot make credibility determinations, *see Jay v. Secretary of DHHS,* 998 F.2d 979, 982 (Fed. Cir. 1993) (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Northrop Grumman Corp. v. United States*, 42 Fed. Cl. 1, 7 (Fed. Cl., 1998).

## II. BREACH OF CONTRACT CLAIMS (COUNTS I, V, VI & VII)

Counts I, V, VI and VII of Matteson's First Amended Complaint set forth, respectively, claims for breach of contract for failure to pay; breach of the implied duty of good faith cooperation for failing to disclose superior knowledge; breach of implied warranty of specifications; and a claim for specific omission. All of these claims are based in contract, and in each of them, Matteson has stated a valid cause of action and the Corps is not entitled to summary judgment.

### A. Count I (Breach of Contract for Failure to Pay).

In Count I, Matteson has stated a valid cause of action for breach of contract for failure to pay. Although the Corps has paid the contract price, Matteson has shown that it is entitled to an adjustment of the contract price. The Corps cannot simply rely on the payment of the contract price as a basis for summary judgment on this particular claim since Defendant has failed to pay additional sums due Matteson as an equitable adjustment. The failure of a contracting agency to pay additional sums due a contractor under a change clause or other provisions of a contract constitutes a breach of the contract. *Western Contracting Corp. v. United States*, 144 Ct. Cl. 318 (Ct. Cl. 1958). Matteson's claim is not for failure to pay the contract price of $1,693,000, nor does Matteson assert a breach of contract for failure to pay based on any of the written modifications to the contract. Rather, as long as Matteson demonstrates entitlement to additional money, the Corps is in breach for failing to pay. Under the Corps' rationale, it could never be

liable for breach of contract for failure to pay as long as it has paid the price stipulated in the contract, even if a basis for an equitable adjustment is demonstrated.

**B. Count V (Breach of Implied Duty of Cooperation and Good Faith/Superior Knowledge).**

Count V sets forth Matteson's claim for breach of the implied covenant of cooperation and good faith for failing to disclose superior knowledge. Implicit in every government contract is the duty to cooperate, which obligates the government to do what is reasonably necessary to enable the contractor to perform as planned. *Thomas S. Rhoades & Stephen L. Schluneger,* 95-1 BCA ¶ 27,375. This is an affirmative obligation, *G.W. Galloway Co.,* 73-2 BCA 48,500, and includes a duty to provide information to each bidder that is reasonably required for the proper and planned performance of the contract. *Thomas S. Rhoades,* 95-1 BCA at 27,375. Courts examine the reasonableness of the government's actions as they relate to the particular facts and circumstances of each case. *Id.* Where the government fails to provide requisite information to the bidders for them to properly submit a bid, the government is responsible for the resultant loss incurred by the contractor not only for a breach of the contract, but may also be found to be negligent in discharging this duty through a lack of action. *Id.*

"It is well settled in this court that where the Government possesses special knowledge, not shared by the contractor, which is vital to the performance of the contract, the Government has an affirmative duty to disclose such knowledge. It cannot remain silent with impunity." *Hardeman-Monier-Hutcherson v. United States*, 458 F.2d 1364, at 1371-1372 (Ct. Cl. 1972) (*citing Helene Curtis Indus., Inc. v. United States*, 312 F.2d 774, 160 Ct.Cl. 437 (1963)); *J. A. Jones Constr. Co. v. United States*, 390 F.2d 886, 182 Ct.Cl. 615 (1968). To establish a breach of contract by the government's failure to disclose superior knowledge, the contractor must establish that (a) the government was aware of information that would have effected the

performance of the contract at the time that it was awarded, (b) that the contractor neither knew nor should have known of the fact, and (c) that the government was or should have been aware of the contractor's ignorance but nevertheless failed to disclose the pertinent information. *J.A. Jones*, 390 F.2d at 890. The facts support as to all of these elements, and summary judgment must be denied.

1. **Factual issues exist as to both the Corps' knowledge and Matteson's knowledge of Wabasha County's intention to apply the Shoreland Protection Act to temporary pipe running across shoreland property to restrict or prohibit the use of any alternative disposal site, and the existence and extent of local opposition to the dredging disposal.**

Contrary to the Corps' argument, Matteson was not aware of the public and Wabasha County's opposition to the disposal of dredge material on Corps projects, nor was Matteson aware of the County's intent to impose a unique application of the Shoreland Protection Act to prohibit the running of temporary dredge pipes across the 1,000 foot shoreland protection area. (See Generally Pl. Statement of Facts, ¶¶31-50). Further, this information was not publicly or reasonably obtainable by Matteson. (Id.).

The Corps seeks to avoid liability by improperly recasting Matteson's claims by arguing that Matteson should have been aware of the existence of the Shoreland Protection Act. However, Matteson's claim actually concerns Matteson's lack of knowledge of and the Corps' failure to disclose facts about the intention or possibility of Wabasha County to utilize the Shoreland Protection Act to preclude Matteson from running dredge piping from the river and thus prohibiting Matteson from depositing dredge material anywhere on private property, even including property that was not included within the 1,000 foot shoreline "protection zone." This knowledge was contrary to representations contained in the contract documents and in discussions with Corps officials that Matteson could utilize its own disposal sites, including potentially the Saunderson or Braun properties. Matteson's claim is also based upon the Corps'

superior knowledge concerning the local opposition to the Corps' dredging activities and disposal of dredged materials.

Even assuming Matteson had a duty to examine the Shoreland Protection Act prior to bidding, nothing in that act would have alerted Matteson to the fact that Wabasha County would come up with a unique application of the Act to restrict or prohibit the placement of temporary dredging pipes across the protected zone of shoreland property, or that the County would not approve permits for such pipes, or for the deposit of dredged gravel on a suitable site. There is nothing in either the authorizing state statute, Minn. St. § 103G.005 *et seq.*, or the Wabasha County Shoreland Regulations, (Wabasha County Ordinance, Art. 13, Sec. 17, Pl. App. 0242), that would have caused any contractor to understand that the County could or intended to use the Shoreland Protection Act to prohibit a contractor on a Corps of Engineers project from running temporary dredging pipe over private property to an inland disposal site, or even that the County would refuse to grant a permit to run pipes carrying dredged gravel to be deposited on a parcel not within the protection zone.

The Corps' assertions that Matteson did not perform an investigation concerning the proposed disposal sites are erroneous. Consistent with the terms of the contract that required the Corps - not the contractor - to conduct an environmental evaluation of contractor selected disposal sites (Contract Spec. § 01000, ¶ 7.3), Matteson contacted Corps officials so that they could examine Matteson's proposed sites. (Pl. Statement of Facts, ¶¶ 15-19, 23-26). Further, the Corps invited local officials—including Officials from the Minnesota Department of Natural Resources("MDNR")—to join with the Corps to view the proposed sites. (Pl. Statement of Facts, ¶¶ 15-19). Because the MDNR maintains oversight over the administration of the Shoreland Protection Act, it was not unreasonable for Matteson to believe that the Corps had discussed any

state and local prohibitions with the appropriate officials. (Pl. Statement of Facts, ¶¶ 16-17; 22-24). Given that the contract specifications placed the duty of performing an environmental evaluation of alternative disposal sites on the Corps, not Matteson, it was not unreasonable for Matteson to believe that the Corps would identify and alert Matteson to any potential restrictions on the use of the property. Id. The Corps took on a duty to so identify and alert Matteson to potential restrictions when it assumed responsibility in its own contract to conduct an environmental evaluation of any proposed sites.

The decisions relied upon by the Corps concern very different factual circumstances and issues than those raised by the Corps' arguments. For instance, in *Giesler v. United States*, 232 F.3d 947 (Fed. Cir. 2000), the court was concerned with a situation where the government, in performing a pre-award survey of a subcontractor failed to detect and notify a bidder that its intended supply of mixed nuts was not in conformity the contract's specifications. The court determined that the superior knowledge doctrine was not applicable because the bidder had ready access to the specifications. *Id*. at 877. In the case of *H.N. Bailey & Assocs. v. United States*, 449 F.2d 376 (Ct. Cl. 1971), the contractor alleged that the government withheld technical information that would have assisted the contractor in producing pole hooks. The court upheld the Board of Contract Appeals factual findings concluding that the government did not possess any superior information and that the information needed to manufacture the hooks was publicly available in textbooks and other scholarly works. *Id*. at 381-383. In *Massman Contracting Co. v. United States*, 23 Cl. Ct. 24 (1991), the government was not liable for the failure to disclose information concerning river flow information because the contract directed the contractor to sources from which such information could have been obtained. *Id*. at 32. None of these decisions concern a circumstance such as the present case in which the government fails to

disclose a local government's unwritten, stated intention to enforce a zoning ordinance and to restrict the temporary use of pipes running <u>over</u> a potential area, or in which the contract placed an affirmative obligation on the government to conduct an environmental evaluation of the proposed site and identify additional requirements that may be imposed on the contractor.

There are clearly issues of facts as to Matteson's knowledge. To the contrary, the Corps appears to concede, for the purpose of its summary judgment motion, that it possessed vital superior knowledge concerning the severe local restrictions that could be imposed on any alternative disposal site. (Defendant's Motion, p. 16, "even assuming, for argument's sake, the Corps was aware of local county laws and ordinances.") However, the Corps then sets forth the erroneous factual assertion in a footnote that "there is no evidence in the record to suggest that the Corps was even aware of the existence of the Shoreland Protection Act prior to Matteson's bid submission." (Def. Mot., p. 16, fn. 1). The Corps also erroneously states that "there is no evidence to support Matteson's claim that the Corps possessed any knowledge of specific opposition to use of Matteson-selected disposal sites." (Def. Mot., p. 16). These self-serving "facts" offered by Corps are belied by the evidence.

At some point in September, 1996, Matteson contacted Wabasha County concerning renewing a permit to continue the ongoing clearance of trees from the Saunderson property. The issue of any permits concerning the Shoreland Protection Act was not raised by the County at that time. The permit for clearing the wood was different from the other permit that the County subsequently required under the Shoreland Protection Act. (Pl. Statement of Facts, ¶ 31). By virtue of the extensive number of dredging projects awarded by the Corps in Wabasha County, one can draw a reasonable inference that the Corps was aware of state and local laws, ordinances and land use practices, including the Shoreland Protection Act. The Shoreland Protection Act is

a statewide act that all counties are required to adopt. The form of the ordinance is mandated by the Minnesota Department of Natural Resources, and its compliance is administered by the Minnesota DNR. (Pl. Statement of Fact, ¶ 33). The Shoreland Protection Act was widely known in the counties with river shorelines. (Pl. Statement of Fact, ¶ 34). Krumholz and other Corps officials routinely appeared at local meetings at which the Shoreland Protection Act was discussed. (Pl. Statement of Fact, ¶ 35). There have been numerous disputes between localities and the Corps as to whether the Corps was required to comply with local permit requirements under the Shoreland Protection Act and other local ordinances. (Pl. Statement of Fact, ¶ 36). As far back as 1983, the Corps has been involved in disputes with local entities concerning the Corps' compliance with the Shoreland Protection Act. (Pl. Statement of Facts, ¶ 37). In fact, correspondence from 1987 alerted the Corps not only to the Shoreland Protection Act, but also to some municipalities' application of that act to apply to the running of temporary dredging pipe over the 1,000 foot shoreland protection zone. (Pl. Statement of Facts, ¶ 38).

Further, it is undisputed that the Wabasha County Attorney contacted the Corps on September 18, 1996 (subsequent to the bid openings but <u>prior</u> to the Corps' award of the contract) and specifically discussed the Shoreland Protection Act in conjunction with Matteson's proposed use of the Saunderson property. (Pl. Statement of Facts, ¶ 32). The attorney also informed the Corps that "homeowners downstream of Wabasha are concerned about dredged material to be placed in the vicinity." (Id.). Rather than informing Matteson of the phone call, the Corps did nothing more than provide Matteson's phone number to the County Attorney. (Def. Statement of Facts, ¶ 54; Pl. Statement of Facts, ¶ 42). Matteson was not contacted by the County Attorney or the Corps prior to the award of the contract. (Pl. Statement of Facts, ¶ 42).

The government's failure to disclose its knowledge of the intentions of other governmental agencies that would impact the performance of a contract is a proper basis for recovery. In *J.A. Jones*, the failure of the Corps' and the Air Force to disclose the Air Force's intention to award numerous construction contracts was a sufficient basis for a contractor to recover its additional labor expenses resulting from the "avalanche" of contracts awarded. 390 F.2d at 886. Further, in *Delta Equipment and Const. Co. v. United States*, 122 Ct.Cl. 340, 104 F.Supp. 549, 551-552 (1952), the Court of Claims noted that the government had a duty to disclose to a contractor the fact that an individual landowner was disputing the government's right of way and appropriation of the land, and that the government was liable for the delays resulting from the landowner's interference with the work.

In addition to its knowledge concerning the Shoreland Protection Act, the Corps was also well aware of the ferocity, breadth and depth of the community's dissatisfaction with and opposition to the Corps' dredging projects in the area. (See Generally Pl. Statement of Facts, ¶¶ 33-39, 47). Matteson was not aware of the degree of community opposition to the Corps' dredging projects, although it was aware of some isolated complaints concerning individuals on previous projects. Although Matteson had worked on two projects in the area, Matteson's work did not cause that opposition and had no way of knowing that there was any particular opposition to its proposed disposal sites. (Pl. Statement of Facts, ¶¶ 48-50). Indeed, even after Matteson became aware of the County's intention to apply the Shoreland Protection Act to require Matteson to obtain a permit to run its dredging pipes, Matteson did not become concerned about obtaining a permit because it was not aware of the intensity and breadth of the community's opposition with the Corps' dredging activities. (Pl. Statement of Facts, ¶ 46). Matteson had no idea of the breadth and degree of community opposition since the few isolated incidents of which

it was aware had been resolved to the satisfaction of the individuals involved. (Pl. Statement of Facts, ¶¶ 48-49). Not until Matteson personnel began attending meetings concerning its permit application did Matteson discover that the opposition to the Corps' dredging projects was "very violent and very outspoken." (Pl. Statement of Facts, ¶ 50). The opposition of the community in this case did not concern opposition by private landowners concerning the running of temporary pipelines over there property, but rather concern of the disposal of dredged material anywhere in the vicinity of the project and this was due to the Corps' prior performance of projects in the area. (Pl. Statement of Facts, ¶ 50). The Corps on the other hand cannot credibly deny that it was aware of the type of opposition that Matteson could encounter. Significant community opposition to the Corps' dredging activities dates back to the 1980s and there were numerous meetings and letters written over the years by which the Corps would have been familiar with the degree of opposition likely to be encountered. (See Pl. Statement of Facts, ¶¶ 33-39, 47).

**2. Factual issues exist as to whether the Corps violated its duty to cooperate and exercise good faith in assisting to secure the availability of the Saunderson site.**

As previously noted, implicit in every government contract is the duty to cooperate. *Celeron Gathering Corp. v. United States*, 34 Fed.Cl. 745, 753 (Fed. Cl., 1996) "A claim under the duty of cooperation concerns the reasonableness of the government's actions after considering the facts and circumstances at the time." *Id*. In the present case, not only did the Corps fail to disclose to Matteson its superior knowledge concerning Wabasha County's position and intentions concerning the application of the Shoreland Protection Act, it also then failed to take action to secure the Saunderson site. All that the Corps had to do was have Matteson transfer its rights to the Saunderson site and the temporary easement to access the site. Had the Corps done this, the site would not have been subject to state and local laws and ordinances (at least according to the Corps), and thus Matteson could have used the site notwithstanding the

Shoreland Protection Act. However, the Corps determined that it would not secure the site, opting instead to have Matteson trade property with and for the benefit of the Fish and Wildlife Service. (Pl. Statement of Facts, ¶¶ 52-54). This lack of good faith and cooperation is an independent basis for Matteson's claim of breach.

**C. Counts VI and VII (Breach of Warranty and Failure to Disclose).**

Counts VI and VII of Matteson's First Amended Complaint assert causes of action for breach of the implied warranty of the specifications and for a specific omission by failing to set forth the local restrictions that precluded Matteson from utilizing its selected disposal sites. It is settled that a contractor is entitled to an equitable adjustment for increased costs of performance due to defective government specifications. *Hol-Gar Mfg. Corp.,* 360 F.2d 634, 637 (Ct. Cl. 1996). Breach of the implied warranty occurs if the specifications are defective. *Id*. at 638. The government has a duty and legal obligation to furnish the contractor with specifications sufficient for the purpose intended. *Id*. A successful contract bidder has the right to rely on the government's specifications and drawings, and the government is bound by any assertions made therein, notwithstanding its statement that the data was for "information only". *Fehlhaber Corp. v. United States,* 151 F.Supp. 817, 825 (Ct. Cl. 1957. Recovery is warranted where a contractor shows that "it was damaged as a result of the material variation between the expected and encountered conditions." *Stuyvesant Dredging Co. v. United States,* 834 F.2d 1576, 1581 (Fed. Cir. 1987).

In this case, the Corps' specifications contained Section 01130, a provision entitled "Environmental Protection." (Def. App. 165-166). In that section, the Corps stated that "environmental protection shall be as stated herein." The section thus clearly represented to all bidders the requirements for implementing a proper environmental protection plan, approval of which was represented to rest with the Corps. Section 01130 ¶ 2.3. Nothing in the Section alerts

contractors to any provision of the Shoreland Protection Act or any laws or regulations would authorize a local county to block access to a contractor after approval of the contract. Matteson had the right to rely on the specifications as conforming to the government's affirmative duty to provide any information which would impact the feasibility of an approved method of performing the work.

The Corps appears to argue that the contract documents absolve it from liability for failing to disclose applicable restrictions. To make this argument, the Corps provides a warped and incomplete view of Matteson's claims and ignores critical provisions of the contract. First, although the Corps focuses on section 01130 of the Specifications as constituting the basis for Matteson's breach of warranty and omission/misrepresentation claims, section 01130 does not contain provisions disclaiming an warranties or representations made by the Corps. In addition, Matteson's claims in Counts VI and VII are also based on Specification § 01000, ¶ 7.3, in which the Corps represents that the contractor may dispose of dredged material on private property. (Def. App. 149). The only limitations to the disposal of dredged material on private property were: approval by the Corps of the contractor's agreement with the property owner; that no material be disposed of on wetland or wooded areas; and that the contractor comply with any additional requirements to offset environmental impacts identified by the Corps in conducting an environmental assessment of the site. (Id.). The contract also provided that after filling the mandatory Buffalo County No. 1 Placement Site, "the Contractor may utilize one or more of the other indicated non-mandatory final placement sites and/or the Contractor's own selected disposal areas (placement sites), as approved." (Spec. § 01000, ¶ 12.7, Def. App. 152).

Significantly, ¶ 7.3 of § 01000 imposed the duty to perform the environmental evaluation of the proposed disposal site and to identify any "additional requirements" on the Corps, not on

the contractor. (Def. App. 149). Contrary to this specification, the Corps failed to identify the restrictions to the use of the property imposed by the Shoreland Protection Act and the County's particular application of it. By virtue of the application of the Shoreland Protection Act that the County employed (of which there is evidence the Corps' was aware-see Pl. Statement of Facts, ¶¶ 37-38), Matteson effectively could not dispose of dredged material on any private property, even though the property otherwise satisfied the criteria set forth in ¶ 7.3 of § 01000. Because the Corps knew that the Shoreland Protection Act had been applied in this manner, and previously knew about the local opposition and intention to apply the Act notwithstanding the fact that the property otherwise meet the requirements of ¶ 7.3 (See Pl. Statement of Facts, ¶¶ 32-43), the Corps knew that its representations in § 01000, ¶ 73 were not accurate or complete.

Further, the contract enumerated the restrictions and regulations that were applicable to the performance of the contract as follows: ("Contract Restrictions," 01000, ¶ 12; "Special Contract Requirements," § 00800; Compliance Requirements with Numerous Laws, § 07000-11; Special Use Permit for Dredged Material Placement, § 01000-8; attached letters between the Corps and the Department of Fish and Wildlife regarding applicable environmental issues, 01000-9 through 01000-13). The enumerated restrictions included the identification of state and local requirements. For example, the Contract Restrictions notes that the contractor must comply with the requirements of the Wisconsin One Call Excavation Notice System, Wis. Stat. § 182.0175. (Spec. § 01000, ¶ 12.2, Def. App. 150). "It is an established rule of contract interpretation that where several subjects of a class or group are enumerated and there are no general words to show that other subjects or items are included, it may reasonably be inferred that the subjects or items not named were intended to be excluded." *Design and Production, Inc. v. United States*, 18 Cl. Ct. 168, 198 (1989). By identifying particular laws, regulations and

restrictions that were applicable to the contract, the Corps represented that no other restrictions were applicable.

The Corps also seeks to avoid liability by arguing that the provisions pertaining to the contractor's submission of an environmental plan contain exculpatory provisions. Section 01130 requires the contractor to prepare an environmental protection plan. Paragraph 2.3 of that provision states that the Corps' approval of the contractor's plan "shall not be construed as relieving the Contractor of all applicable Federal, state and local environmental protection laws and regulations." Other provisions in this section note that the contractor is required to comply with all appropriate Federal, state and local laws, regulations and requirements. (Section 01130, ¶¶ 2.1(5), 4 and 5).

The provision in paragraph 2.3 of § 01130 is not applicable because Matteson is not claiming entitlement to relief based on the Corps' approval of its Environmental Plan under § 01130. Further, Matteson is not claiming that it was relieved of complying with Federal, state and local environmental protection laws and regulations. On the contrary, Matteson recognizes that it was required to comply with state and local restrictions, including the Shoreland Protection Act. Therefore, the Corps should have identified that Act as a potential restriction, just as it identified other particular restrictions. Language stating that the contractor shall comply with all applicable Federal, state and local restrictions does not exculpate the Corps from its failure to identify what Federal, state and local restrictions are applicable to the project, particularly when the Corps includes sections in the contract identifying certain restrictions but conveniently leaves out other restrictions of which it has knowledge.

The Corps' citation to the Permits and Responsibilities provisions of the contract is similarly inapplicable. This provision states that the contractor is required to perform <u>the task</u> of

obtaining any necessary licenses and permits. (Spec. § 00700-29, ¶ 64). However, requiring Matteson to simply "perform the task of obtaining" necessary permits does not address the Corps' duties to identify what permits, laws and regulations are applicable to the project or to identify that Matteson may not be able to obtain based upon information possessed by the Corps. Nor does the simple requirement that Matteson apply for a permit (which of course Matteson did) mean that Matteson bore the risk that the permit would be denied. As admitted by the contracting officer, Krumholz, it was not the intention of the Corps to ask the contractor to assume the risk that obtaining a permit could not be possible. (Pl. Statement of Facts, ¶ 24).

Furthermore, the Corps' affirmative duty to inform bidders of impediments to performance of which it was aware is not vitiated by its disclaimers. Language purporting to relieve the Corps of its affirmative duty, *see* Section 01130 ¶ 2.3-3.0, is not binding. The contractor is not bound by exculpatory and caveatory provisions in the contract, and the government is not relieved of liability for changed conditions as the language would indicate. *Fehlhaber Corp.,* 151 F.Supp. at 825.

## III. DIFFERING SITE CONDITION (COUNT II)

Matteson has asserted a differing site condition claim in Count II based upon the fact that Matteson's contract called for the use of certain physical locations for disposal of dredged material. As it turned out, the sites selected by Matteson and approved by the Corps were unsuitable and unusable for the project, thus constituting a changed condition under the contract. (First Amended Complaint, ¶ 34.) The changed conditions article of a government contract does not expressly limit the changed conditions only to those caused by nature, but can include those caused by artificial means. *McDowell Stone Co. of Blackwater,* BCA No. 285 (1943). The changed condition must constitute a "materially different and unusual condition from what a reasonable contractor should have anticipated." *Sundex, Ltd.,* 93-2 BCA ¶ 25,626. Furthermore,

exculpatory language in government contract specifications does not negate the remedial provisions of the "Changes" and "Differing Site Conditions" clauses in said contracts. *R.A. Heintz Construction Co.,* 74-1 BCA ¶ 10, 562.

There is considerable authority that the contractor's reliance upon the government-approved use of a particular site which post-bid proves to be unusable for that purpose is the basis for a valid changed condition claim. For instance, the unsuitability of a government-approved borrow site, necessitating use of a different site has been held to constitute a "differing site condition" for purposes of a government contract. *R. A. Heintz Construction Co.,* 74-1 BCA ¶ 10,562. In complying with such a change, and completing the project, the contractor does not waive its right to an equitable adjustment. *Discount Co., Inc. v. United States,* 554 F.3d 435, 440 (Ct.Cl. 1977). In *Guy H. Briscoe v. United States,* 442 F.2d 953 (Ct.Cl. 1971), the contractor relied upon availability of an underground source of water in making his bid, based upon his review of the plans and specifications and inspection of the site. *Id.* at 956. After the award, the landowner denied the contractor use of the water. *Id.* The court found that the landowner's denial of permission to use the water source constituted a 'changed condition' warranting an equitable adjustment to the contractor for the increased cost of obtaining water from an alternative source. *Id.* at 962. Where the contractor reasonably assumes, on the basis of plans and specifications and an inspection of the site, that it will have a particular access to the site, inability to obtain such access constitutes a 'changed condition' within the meaning of the term in standard form government contracts, entitling the contractor to an equitable adjustment. *Id.*

In *American Dredging Company,* 72-1 BCA ¶ 9316, a contractor bid on a channel dredging operation using hydraulic means based upon pre-bid data made available to bidders, as well as its prior experience on a similar earlier job. The Board stated that such reliance on prior

experience is initially reasonable, but required more than just a similarity of general description. *Id.* The Board determined that a contractor had a valid changed condition claim where the pre-bid information "drew a picture from which one could conclude that the job could be economically performed by hydraulic dredging equipment…" *Id.* It stated, "[I]f appellant had been reasonably misled…so that it properly but mistakenly anticipated that the work could be economically performed [hydraulically], we would sustain its major changed condition claim." *Id.* Critical information which could have been given greater stress in the pre-bid data is substantial enough to constitute a changed condition and warrant a contract adjustment. *Id.*

On this project, hydraulic dredging required that the contractor obtain its own disposal site within the vicinity of the two project areas, an option contemplated and unopposed by the Corps. (See Pl. Statement of Facts, ¶¶ 11-14). Matteson reasonably relied upon the Corps' assurances that hydraulic dredging would be feasible and was responsive to the bid solicitation. Upon expending considerable time and resources to identifying potential sites, Matteson again sought the Corps' assurances that the sites were suitable. (Pl. Statement of Facts, ¶¶ 15-26). Krumholz, on behalf of the Corps, assured Matteson that either site could be used. (Pl. Statement of Facts, ¶¶ 18-19, 22-23). Based upon these assurances, the bid specifications, and its prior experience on two very similar jobs in the same vicinity, Matteson proceeded to procure rights to use the sites as disposal areas. (Pl. Statement of Facts, ¶¶ 20-26). Matteson did not have the benefit of critical information, solely available to the Corps, of local opposition based on prior complaints to the Corps or previous attempts to apply the Shoreland Protection Act to prevent the running of pipes across the protected area. (See Generally Pl. Statement of Facts, ¶¶ 31-50).

Once a changed condition is found, the allocation of blame or fault for the changed condition between a contractor and the government is irrelevant. *Briscoe,* 442 F.2d at 963. Upon a finding that the circumstances of its claim constitute a changed condition, Matteson is entitled to an equitable adjustment for its increased costs, regardless of any assertions by the government against Matteson for any alleged failure to search out local opposition on its own.

The Corps argues that Matteson cannot state a claim for a differing site condition because the pertinent clause applies only to "physical" conditions. The Corps does correctly note that the differing site condition clause that is a part of this contract applies to "subsurface or latent physical conditions" or "unknown physical conditions at the site." Even assuming a differing site condition claim in this case is limited to a changed "physical" condition, however, the disposal sites are physical locations and conditions related to the work. Matteson ended up using a different physical location and there was a change as to where and how Matteson could physically place the dredged material. There clearly was a different physical nature of how and where the work could be performed, even though the reason why the physical nature and location of disposal changed was due to other circumstances (i.e. local opposition and enforcement of zoning laws). Matteson should not be precluded from seeking recovery on this theory.

## IV. CARDINAL CHANGE (COUNT III)

In Count III of its First Amended Complaint, Matteson seeks recovery based on a "cardinal change" to the contract because the entire basis of its bid proposal and agreement to do the work rested upon the use of hydraulic dredging in its proposed disposal sites on private property in close proximity to the project, as allowed by and approved by the Corps. Because Matteson was not able to use those private disposal areas in close proximity to the project, and in

fact was forced to dispose of the dredged material on public land at a disposal site that was much further away than anticipated, the nature of the work called for in the contract and for which Matteson agreed to perform was drastically altered and was outside of the anticipated scope of its obligations under the contract and for which Matteson bargained.

The Corps' arguments concerning Matteson's claim based on a cardinal change to the contract do not warrant summary judgment. First, the Corps argues that "Matteson has alleged no change to the terms of the contract" and that none of the "five modifications" to the contract effected the method of performing the work or increase the fixed contract price. Matteson has never contended there were written modifications to the contract that increased the price, nor is Matteson's cardinal change claim based upon a "written change" to the "terms" of the contract. The Corps' suggestion that a cardinal change can only occur based on some written change to the contract terms is misplaced and contrary to the law**.**

A cardinal change to a contract is such a drastic modification that it was not contemplated by the contract, and thereby constitutes a material breach of the contract, since it is not redressable under the contract. *Alliant Techsystems, Inc. v. United States,* 178 F.3d 1260, 1276 (C.A. Fed. 1999). *See also Allied Materials & Equipment Co. v. U. S.,* 569 F.2d 562, 563-64 (Ct. Cl. 1978). A cardinal change is a change so drastically outside the scope of the contract that it is not authorized or contemplated by a change provision. *Contact Intern. Inc. v. Windall,* 106 F.3d 426, 426 (C.A. Fed. 1997); *General Dynamics Corp. v. United States,* 585 F.2d 457, 462 (Ct. Cl. 1978)**.** A cardinal change occurs when the contractor is required to perform duties materially different from those it originally bargained for. *Contact Intern. Inc.,* 106 F.3d at 426. "Generally such a change represents a large increase in the contract burdens." *General Dynamics Corp. v. United States,* 585 F.2d 457, 462 (Ct. Cl. 1978). In determining whether a

cardinal change has occurred, courts look at the totality of the circumstances surrounding the project, which may not be known until the project is completed. *Cities Service Helex, Inc. v. United States,* 543 F.2d 1306, 1313 (Ct.Cl. 1976); *Air-A-Plane Corp. v. United States,* 408 F.2d 1030, 1033 (Ct. Cl. 1969).

The question on a cardinal change theory is not whether the contract's specific written terms are modified, but rather, as articulated in *Rumsfeld v. Freedom NY, Inc.*, 329 F 3d 1320 (Fed. Cir. 2003):

> A cardinal change "occurs when the government effects an alteration in the work so drastic that effectively requires the contractor to perform duties materially different from those bargained for." (emphasis added).

329 F 3d 1332 (quoting *Krygoski Construction Co. v. U.S.*, 94 F 3d 1537, 1543 (Fed Cir. 1996 (other citations omitted.) As the applicable case law makes clear, all that is required to have a cardinal change is that the government, by some means, effects "an alteration in the work." For instance, in the *Rumsfeld* case, there were issues of whether a cardinal change had been effected by the governments alleged improper denial or suspension of progress payments; improper interfering with the contractor's ability to obtain financing; diverting or delaying delivery of menu items that it was contractually obligated to deliver; and improperly imposing inspections and improper testing requirements. 329 F. 3d at 1332–1333. There is no requirement that a cardinal change can only be effected by or occur when written terms of a contract are modified by the government. *See also*, *Alliant Tech Systems, Inc. v. U.S.*, 178 F.3d 1260 (5th Cir. 1999) (contracting officers decision on how to exercise an option under the contract was argued to constitute a cardinal change); *Allied Materials & Equipment Co., Inc. v. U.S.*, 569 F.2d 562 (Ct. Cl. 1978) (cardinal change doctrine should not be restricted to hold that it applies only to deviations which are specifically within the conventional changes clause, and it

applies generally to modifications which are so fundamental that they cannot be redressed within the contract by an equitable adjustment).

The distinction is significant because clearly the government could take actions outside of proposing or forcing written changes to the contracts terms that would effect or cause an alteration in the contractor's work or how the work is performed. The change necessitated in this case by the opposition to Matteson's proposed sites may be properly characterized as a cardinal change, as it materially altered Matteson's obligations under the contract and prevented Matteson from performing as it had planned, and in the manner on which its bid was based. The key is whether the work was altered from how it was anticipated to be performed. Regardless of how such an alteration is forced upon the contractor, if the work is drastically effected so that it necessitates performance that materially differs from those bargained for, a cardinal change may be present.

In this case, the only argument that the Corps advances in support of its summary judgment is that the government must effect the change and that there were no changes made to the "written terms" of the contract. The Corps offers no argument about whether the Corps effected an alteration of the work by other means. Indeed, there are facts, or at the very least disputed issues of fact, concerning the actions that the Corps took and whether those actions did in fact effect an alteration of the work such that Matteson is entitled to argue that a cardinal change occurred. For instance, the Corps effected an alteration of the work by:

1. Inspecting and approving Matteson's proposed disposal sites along with Matteson and officials from state agencies and in compliance with the Corps' obligation to approve the environmental plans for the properties, thus indicating or representing

to Matteson that the disposal sites were approved and that no further impediments would exist (Pl. Statement of Facts, ¶¶ 15-26);

2. Failing to disclose superior knowledge of not only the existence of the Shoreland Protection Act, but more importantly, previous usages of the Shoreland Protection Act and in particular, knowledge of interpretations by local officials that the Shoreland Protection Act could be used to limit or preclude the running of pipes across the shoreline of the 1000' protection zone, even though such an interpretation does not expressly appear in the Shoreland Protection Act, and failing to disclose such information to Matteson (Pl. Statement of Facts, ¶¶ 32-43);

3. By possessing superior knowledge of the amount and degree of local opposition to dredging activities and disposing dredging materials in the Wabasha County area based upon its previous projects and oppositions to the Corps activities and failing to disclose such material information to Matteson (Pl. Statement of Facts, ¶¶ 32-43, 47);

4. By possessing superior knowledge prior to awarding the contract to Matteson that Wabasha intended to attempt to enforce the Shoreland Protection Act in this instance and apply it to the specific properties that Matteson planned to use as disposal sites and that the local public was concerned about and opposed to the use of those sites and failing to pass this information on to Matteson before awarding the contract (Pl. Statement of Facts, ¶¶ 32, 42-43);

5. By failing to assist and cooperate with Matteson by purchasing the disposal sites Matteson had procured and planned to use so that the compliance with the

Shoreland Protection Act could be avoided through the Corps' position that they were exempt from local zoning and permit requirements due to sovereign immunity (Pl. Statement of Facts, ¶¶ 52-53); and

6. By requiring Matteson, after Matteson's proposed sites were blocked, to use a public disposal site miles away from the private sites where Matteson had planned to dispose of the dredged material, thus requiring a drastically longer and less efficient transportation of hydraulically dredged material, which drastically increased Matteson's costs. (Pl. Statement of Facts, ¶¶ 52-55).

In this case, the entire essence of Matteson's bid proposal and contract with the Corps rested upon its use of hydraulic means to dredge the project areas, resulting in significant savings to the Corps. Hydraulic methods were encouraged by the Corps, and indeed a bid by another contractor was based upon such assurance. (Pl. Statement of Facts, ¶¶ 11-12, 27-29). On the basis of the information provided by the Corps, Matteson proceeded at considerable expense and effort to procure rights for disposal on two pieces of property. Had it been given any indication that it might encounter local opposition, rendering the sites unusable, Matteson would have concluded that hydraulic methods were not feasible. The totality of the circumstances, including the subsequent necessity of procuring the Fish & Wildlife site, at a drastically greater expense, constitutes a cardinal change to the essence of the contract that could in no way have been contemplated when Matteson contracted with the Corps, and entitles Matteson to be fully compensated for the loss it sustained.

Finally, summary judgment is not appropriate because it is settled that the existence of a cardinal change is principally a question of fact, requiring that each case be analyzed individually in light of the totality of circumstances. *Allied Materials,* 569 F.2d 564. See also

*Rumsfeld*, 329 F.3d 1332 (finding of cardinal change is principally a question of fact and even where underlying facts are established, the drawing of conclusions is a fact finding function). Because the determination of a cardinal change is factually intensive, and because there are clearly disputed issues of fact in this case as to whether there is a fundamental and drastic change to the work that Matteson bargained for, the Corps request for summary judgment should be denied.

## V. COMMERCIAL IMPRACTABILITY (COUNT VII)

With respect to Count VII, the Corps argues that Matteson completed the dredging of material, and thus the contract was not impossible to perform. Matteson does not dispute that it completed the dredging work, but the doctrine of legal impossibility does not require a showing of actual or literal impossibility. *Natus Corp.,* 371 F.2d at 456 (impossibility includes the concept of 'commercial impracticability.) Commercial impracticability assumes that something can only be done at an excessive or unreasonable cost. *Id.* Relief is granted for impracticability if there is an exorbitant difference in expenses between what was planned and what was required to complete the altered contract. *Id.* at 457. Commercial impracticability excuses performance under a contract because "[t]he parties did not anticipate fully and completely, if at all, or provide for what actually happened." *Florida Power & Light Co. v. Westinghouse Elec. Corp.,* 826 F.2d 239, 262 (4th Cir. (Va.) 1987) (quoting 6 CORBIN ON CONTRACTS, § 1331).

Incompatible requirements of government specifications have also been found to create commercial impracticability. *Barnhart-Morrow Consolidated Mono Belting Div.,* 78-1 BCA ¶12,962. In addition, courts have looked at whether the government had superior knowledge of information required by the contractor, whether it shared its documentation with the contractor, and whether the government realized any benefit from the contract. *Safina Office Products v. General Services Admin.,* 93-1 BCA ¶ 25,485.

Matteson has established a claim for reformation of the contract due to commercial impracticability such that summary judgment is not appropriate on this claim. The Corps' argument that Matteson is not entitled to recover on the basis of impracticability because Matteson is "at fault" incorrectly sets forth the nature of Matteson's duties, the basis of Matteson's claim and the facts in the case. Citing to provisions in the contract that required Matteson to conduct a site investigation, the Corps erroneously states that Matteson failed to conduct an examination of the site and that Matteson could have discovered the nature of the problem. However, Matteson did perform a site investigation that was attended by both Corps officials and representatives from the Minnesota Department of Natural Resources, which is responsible for overseeing the Shoreland Protection Act. (Pl. Statement of Facts, ¶¶ 15-26). As a result of these site examinations, Matteson was informed by the Corps and these representatives that there were no problems with the proposed sites, other than a potential issue with respect to wetlands on a portion of one site. (Id.).

Although the Corps couches Matteson's claims as pertaining to a mistake concerning the existence of the Shoreland Protection Act, the claims actually allege a mistake <u>in fact</u> as to whether Wabasha County officials could or would preclude Matteson from utilizing private property for a disposal site as contemplated under the Contract. At no time did any of the officials that reviewed the sites with Matteson indicate that the Shoreland Protection Act would even be applicable to the mere running of pipelines over the 1,000 foot shoreland protection zone, or that local officials could or would preclude a contractor from placing dredged material on any areas, including those that were not within the shoreland protection zone and that did not otherwise pose any environmental or aesthetic concerns. Nor would a review of the Shoreland

Protection Act or the local Wabasha County Shoreland Zoning ordinances have alerted any reasonable person to these facts. (Pl. Statement of Facts, ¶ 40).

The Corps asserts that the contract provisions placed on Matteson a "risk of noncompliance with local laws." Even assuming that were the case, there is no evidence that there was any noncompliance by Matteson. To the contrary, Matteson applied for all permits for which it was supposed to apply and followed the application process properly. In addition, Matteson did not attempt to violate any local laws by proceeding with the use of any disposal areas without necessary permits.

Assuming that the Corps' is arguing that the mere risk that a permit application would be denied was placed upon Matteson, the plain language of the contract does not support that position. The Corps relies upon CFR § 52.236-7 "Permits and Responsibilities," found at Def. App. 88-89. That provision states nothing more than the contractor is responsible for obtaining any necessary licenses and permits and for complying with any Federal, state, municipal laws or codes and regulations applicable to the performance of the work. As previously noted, there is no evidence or contention that Matteson failed to apply for all necessary licenses and permits or to comply with any Federal, state or municipal laws or regulations. Although Matteson did have the responsibility for obtaining necessary permits, nothing in § 52.236-7 indicates that the contractor must bear the risk that it will be responsible for any damages flowing from any permit that is not obtained it is denied for reasons that are not the fault of the contractor.

The other purported "risk shifting" clause that the Corps relies upon is Section 011130 "Environmental Protection." (Def. App. 165-166.) Presumably, the Corps relies upon the language found in subsection 2.3 stating that "notwithstanding the requirements of this section and notwithstanding approval by the contracting officer of the contractor's environmental

protection plan, nothing herein shall be construed as relieving the contractor of all applicable state and local environmental protection laws and regulations." Again, the plain language in that section indicates only that the contractor was to comply with all applicable Federal, state and local laws and regulations and is not relieved from its obligation to comply by the Corps' approval of the environmental protection plan. Nothing in the provision states that the contractor bears the risk of bearing its own damages if a permit is denied for some reason beyond its control or that is not its fault.

Furthermore, there is certainly nothing in any so-called "risk-shifting" provisions that contemplates that the contractor must bear costs associated with the denial of a permit for reasons that were within the knowledge and contemplation of the Corps but not disclosed to the contractor. Agreeing to comply with local laws and to undertake the administrative task of applying for any required permits does not constitute an agreement to bear the risk that local officials will refuse to grant permission to utilize a site already reviewed and approved by the Corps. In fact, Corps officials have admitted that the intention of these provisions was not to place the risk that a permit would not be granted on the contractor. (Pl. Statement of Facts, ¶ 24). Further, when the Corps possesses superior knowledge, as demonstrated herein, it cannot rely on boilerplate disclaimers and risk-shifting clauses.

The Corps is also not entitled to summary judgment on the basis that Matteson's "cost overrun" was not sufficiently large as to constitute commercial impracticability. As noted in the decision cited by the Corps, *Raytheon Co. v. White*, 305 F.3d 1354, 1367 (Fed. Cir. 2002), "[w]hether performance of a particular contract would be commercially senseless is a question of fact." (emphasis added.) Moreover, the Corps' reliance on the *Raytheon* case is misplaced because the court was merely affirming the factual findings of the Armed Services Board of

Contract Appeals, and did not set forth any "threshold amount" necessary to establish commercial impracticability as a matter of law. In addition, other cases cited by the Corps do not establish legal "thresholds" for commercial impracticability, but rather were decided based upon the facts and circumstances of each case. The Corps' bald assertion that a 70% overrun automatically fails to qualify as commercially impracticable is incorrect.

In this case, the inability of Matteson to utilize its proposed private disposal sites completely altered the nature of the work. As a result, the relief sought by Matteson is not simply based on Matteson's inability to "obtain a productive level that is sufficient to sustain its anticipated profit margin." *Raytheon,* 305 F. 3d 1367 quoting *Natus Corp. v. U.S.*, 371 F. 2d 450, 457 (Ct. Cl. 1967). Not only was any hope of any profit obliterated, Matteson suffered a substantial loss of over $1.1 million on the job and the revenue of the company was severally impacted. (Pl. Statement of Facts, ¶¶ 54-57). Matteson had to utilize additional equipment that would not have been required, and its productivity was substantially reduced. (Pl. Statement of Facts, ¶ 54). The fact that a cardinal change occurred is borne out by the fact that Matteson had to pump and transport the material 26,000 feet as opposed to 9,000 feet. (Pl. Statement of Facts, ¶ 54). Because it is a question of fact based upon all of the circumstances, this court cannot state as a matter of law that Matteson's costs of performance of the contract was not excessive and unreasonable. *Raytheon*, 305 F.3d at 1367.

Finally, the Corps acknowledges that "had Matteson bid the <u>true cost</u>, then the government would have paid them" (Def. Motion, p. 27), clearly acknowledging that the "true costs" of performing the project were indeed substantial and were incurred by Matteson and the only reason the Corps has refused to pay is because Matteson, for reasons not its own fault, did not include those costs in its bid. This comment reveals the extremely inequitable result that has

occurred in this case. As it turned out, the "true costs" were not known nor could they have been known by Matteson.

## VI. MUTUAL MISTAKE (COUNT IX)

In Count IX, Matteson seeks relief based on mutual mistake. A party may seek a reformation of contract and restitution for the additional expenses incurred in completing a contract based upon a mutual mistake when the contract has not allocated the risk to either party. *National Presto Industries, Inc. v. United States*, 338 F.2d 99, 167 Cl. Ct. 749 (1964).

In this case, even if we were to assume, *arguendo,* that the Corps made the complained-of affirmative representations in good faith and did not have superior knowledge of any potential impediments to the use of the Saunderson property or the use of hydraulic dredging on this project, then the resulting changes in the contract constitute a mutual mistake. *See Safina Office Products,* 93-1 BCA ¶ 25, 485; *National Presto Ind., Inc. v. United States,* 333 F. 2d 99 (1964). "[I]f the material mistake of one party was caused by the other, either purposely or innocently, or was known to him, or was of such character and accompanied by such circumstances that he had reason to know of it, the mistaken party ahs a right to rescission." Corbin On Contracts, § 610. In the case where the government has received the benefit from the contract entered into on the basis of mutual mistake, the contractor is entitled to reformation for increased compensation. *National Presto Ind., Inc.* 338 F. 2d at 108. Here, the Corps clearly received the benefit of the contract, that being the successful completion, albeit under completely different circumstances, of the job for which it contracted. If we assume it neglected to inform Matteson of potential obstacles to its performance under the contracted in error, and made material representations in good faith, Matteson is still entitled to the reformation of the contract so as to provide proper compensation.

The Corps does not seem to dispute the claim that both parties were mistaken concerning the availability of the Saunderson, or similarly situated, private disposal site. Rather, the Corps argues that these mistakes are not factual matters. However, contrary to the Corps' position, mistaken beliefs about the suitability and availability of the Saunderson site and other private property do constitute mistakes concerning existing facts.

First, the parties' belief as to the suitability of the site concerned facts existing at the time of the contract. At a minimum, this issue concerned a mixed issue of fact and opinion that would support a claim for reformation based on mutual mistake. *Johns-Manville Corp. v. United States*, 12 Cl. Ct. 1 (1987) ("the issue concerning the parties' assumptions about the level of safe exposure and ignorance about risks of mesothelioma deal with facts existing both at the time of contract formation and future predictions of health consequences," and thus presented a jury question).

Second, even if the mistake is characterized as a mistake concerning Wabasha County's intention to prohibit any dredging disposal on private property, the mistaken belief concerning Wabasha County's intentions do constitute mistakes concerning existing facts. A person's intention of state of mind does constitute a factual matter. *See United States v. Shah*, 44 F.3d 285, 292 -293 (5th Cir. 1995); *Kansas State Bank in Holton v. Citizens Bank of Windsor*, 737 F.2d 1490, 1497-98 (8th Cir.1984). In this case, Matteson reasonably believed that Wabasha County would consider its permit requests to determine whether its proposed disposal posed environmental hazards. Matteson certainly did not know that the County intended to utilize all methods available to it to prohibit the disposal of dredged material anywhere in the County. Arguably, the Corps knew of Wabasha County's intentions prior to awarding the contract. However, if the Corps was truly unaware of the County's intentions, then both the Corps and

Matteson entered into the contract with the mistaken belief that suitable private property in Wabasha County could be utilized as a disposal site. (See Contract Spec., 01000, ¶ 7.3, "Contractor may dispose of the transferred existing dredged material fill upon private property. . .").

Further, to the extent that the mistake may relate to mistakes concerning the applicability of the Shoreland Protection Act to prohibit pipes running mistakes of law may constitute mutual factual mistakes warranting reformation. See, *T.L. Roff & Associates Construction Co. v. United States*, 52 Fed. Cl. 572, 577-78 (1993); Restatement (Second) of Contracts, § 151, Comment b. Thus, the Corps would not be entitled to judgment as a matter of law based upon an argument that there was a mistake of law.

The Corps' argument that the contract placed the risk on Matteson that it would not be allowed to utilize any private property in Wabasha County for the disposal of dredge material incorrectly represents the terms of the contract. In support of this argument, the Corps cites to provisions in the contract relating to the contractor selected disposal areas (Spec. § 01000-2, ¶ 7.3, Def. App. 149), and use of the mandatory disposal areas (Spec. § 01000-4, ¶ 12.7, Def. App. 150). The Corps does not explain how these provisions of the contract place the risk on Matteson that all of the private land in Wabasha County would be off-limits. <u>Indeed, the contract clearly and obviously anticipates that private property could be utilized, and the Corps understood that Matteson's bid utilizing hydraulic dredging depended on the availability of private sites in the vicinity of the project</u>. (Pl. Statement of Facts, ¶¶ 4-13, 24). Nothing in the provisions cited by the Corps—or anywhere else in the contract—would have alerted Matteson to the possibility that private disposal sites would be prohibited. In fact, the contract places the duty and burden of performing a site investigation of alternative disposal sites squarely on the

Corps, not the contractor. (Spec. 01000-2, ¶ 7.3, Def. App. 149 ("The use of an optional final disposal area (placement area) may require the Government to prepare an environmental assessment . . ." (emphasis added)). Further, the Corps' official who oversaw the project, Daniel Krumholz, has admitted that the Corps was not asking the contractor to assume the risk that it would not be possible to secure a private disposal area. (Pl. Statement of Facts, ¶ 24).

## CONCLUSION

For the reasons set forth herein, Plaintiff respectfully requests that the Court deny Defendant's Motion for Summary Judgment in its entirety.

Respectfully submitted,

MILLER LAW FIRM, P.C.

/s/Stephen R. Miller

Stephen R. Miller, Mo. Bar #33344
Michael T. Metcalf, Mo. Bar #45304
4310 Madison Avenue
Kansas City, Missouri 64111
Telephone: (816) 531-0755
Facsimile: (816) 561-6361

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the above and foregoing was served electronically upon the following persons by ECF notification, this 10th day of October, 2003.

Patricia M. McCarthy
Peter D. Keisler
David M. Cohen
Commercial Litigation Branch
Civil Division
U.S. Dept. of Justice
Attention: Classification Unit
8th Floor, 1100 L Street N.W.
Washington, D.C. 20530
Telephone: (202) 307-0164 – P. McCarthy
Facsimile: (202) 514-8624 – P. McCarthy

Edwin C. Bankston
District Counsel
Army Corps of Engineers
Saint Paul, MN 55101

/s/Stephen R. Miller
Attorney for Plaintiff

# INDEX TO PLAINTIFF'S APPENDIX


| **Document** | **Pl. App. Pages** |
|---|---|
| Deposition of Daniel J. Krumholz (excerpts) | 0001-0059 |
| Deposition of Larry W. Matteson (excerpts) | 0060-0098 |
| Deposition of Lawrence W. Matteson (excerpts) | 0099-0127 |
| Deposition of Steve Tapp (excerpts) | 0128-0132 |
| Deposition of Melissa Gulan (excerpts) | 0133-0136 |
| Deposition of James C. Nordstrom (excerpts) | 0137-0226 |
| Deposition Exhibit 25 – April 27, 1998 memo from CEMVP to Grand Encampment Team re: Disposal Site Issue | 0227-0228 |
| Deposition Exhibit 73 – Affidavit of James C. Nordstrom | 0229-0232 |
| Deposition Exhibit 74 – June 15, 1983 letter from James C. Nordstrom to the Corps of Engineers re: Army Acting Without A Permit | 0233 |
| Deposition Exhibit 84 – August 19, 1987 letter from Peter Ekstrand to the Corps of Engineers re: Concerns and Complaints Regarding Army Dredging | 0234-0235 |
| Wabash County Zoning Ordinances | 0236-0242 |
| Deposition Exhibit 49 – September 24, 1996 letter from Wabasha County to L.W. Matteson re: Land Use Permit | 0243-0244 |
| Deposition of Larry W. Matteson (excerpt) | 0245 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

--------------------------------

L. W. MATTESON, INC.,

Plaintiff,

vs. File No. 01-542C

UNIDED STATES ARMY CORPS OF ENGINEERS,

Defendant.

--------------------------------

Deposition of DANIEL J. KRUMHOLZ, taken pursuant to Notice of Taking Deposition, taken before John A. Dunton, Court Reporter, a Notary Public in and for the County of Dakota, State of Minnesota, on Monday, the 22nd day of July, 2002, at Army Corps of Engineers Centre, in the City of St. Paul, Minnesota, commencing at approximately 11:00 a.m.

* * *

A. Yes.

Q. And it advised the bidders that the removed existing dredge material would be disposed of on various potential on-land placements sites located in Buffalo County, Wisconsin, is that correct?

A. Yes.

Q. That essentially informed the bidders that the Corps envisioned mechanical means being used, is that correct?

MS. McCARTHY: Objection.

BY MR. MILLER:

Q. Is that correct?

A. No. Well, it identifies the sites as being potential sites, the ones in Wisconsin. And further on in the specification we indicate that the contractor can select his or her own site and that they can use the type of equipment they want. I don't know that anywhere we specify the type of equipment or advise the equipment to be used.

Q. Well, the word used is not "may" but "needs to be disposed of on various potential on-land displacement sites." Do you agree with me if you use the "potential on-land placement sites," that you wouldn't be looking at an operation that

would be hydraulic dredging, you would be looking at mechanical dredging for those?

A. In my opinion, mechanical would be the most efficient way of getting it to those sites, yes.

Q. Can you locate for me on Exhibit 1, the solicitation, where it identifies the on-land placement sites in Buffalo County, Wisconsin?

MS. McCARTHY: Objection to the form of the question.

THE WITNESS: It will take some time.

There is a reference to the Buffalo County sites on page 01000-5.

BY MR. MILLER:

Q. I have located that page.

A. The Buffalo County Number 1 placement site is identified at the top of that page.

Is that what your question was?

Q. Yes.

A. Does that answer your question then?

MS. McCARTHY: Is there a question pending?

MR. MILLER: Well, there is not right now.

BY MR. MILLER:

Q. Then and you'll see on page 01000-5 under Subparagraph (a) that it indicates that material fill is mandatory at the Buffalo County 1 placement site?

A. Yes.

Q. Why did the report make that mandatory?

A. That site is the Buffalo County site that we had reached an agreement with Buffalo County that we they would accept some of the material and the agreement was that they would be guaranteed of getting as much material as their site held. So to meet our commitment to Buffalo County, we mandated that in our specifications.

Q. Do you recall being very interested in receiving a bid from the Mattesons to do the excavation work by hydraulic means?

A. I guess I don't know how to respond.

Q. I will rephrase.

In your experience with these excavation projects, were you aware at the time that the solicitation was put out that the work could be done less expensively through hydraulic means?

A. Yes. I was aware of that, provided that an acceptable placement site could be located

within a reasonable distance of the hydraulic dredging.

Q. Okay. You told me that one of the concerns the Corps has in other projects with designated disposal sites was cost?

A. Yes.

Q. And you were the person who was held responsible for the Grand Encampment Project?

A. Ultimately in the district, the responsibilities would have been in our District Commander, who was responsible for it.

Q. And the need that you had identified, you said a year or so earlier, was the need to excavate the Grand Encampment replacement site to provide additional capacities in the future for various dredging operations?

A. That's correct.

Q. That was the primary purpose of the project?

A. Yes.

Q. Do you think that the project could be accomplished more efficiently through hydraulic dredging?

A. Again, if a suitable site could be located within a reasonable distance, that would be

the most economical, yes.

Q. Did the Corps attempt to obtain a suitable site for hydraulic dredging on the Grand Encampment Project?

A. No, we did not.

Q. Was there a reason that the Corps didn't explore another suitable site for hydraulic dredging?

MS. McCARTHY: Objection to the form of the question. Go ahead and answer.

THE WITNESS: Our selected placement plan for that particular dredge cut, Grand Encampment, was to barge the material, take it down to Alma and the Alma site material was not being removed from the Alma site for beneficial use through contractors or the county or whoever takes material from that site, it was not being removed at the same rate that we were producing material through dredging at Grand Encampment. So our long-term plan, in effect, was not working. We decided to put out a contract to tap into contractor's flexibilities or their opportunities or their knowledge of places to put material. So we decided to put this contract out with the contractors having responsibility for finding a

placement site. So we did not investigate the hydraulic options to include in this project.

BY MR. MILLER:

Q. Why do you say your long-term plan was not working?

A. Because the Alma site is very limited capacity and we could only place so much there before it was filled up. And we rely upon -- it's a land accessible site and we rely upon beneficial use for removal from that location. And the removal was not occurring at the same rate that we were producing material from dredging in the channel. So it was not working as planned or envisioned.

Q. What was the beneficial use for the material from Alma that you anticipated?

A. We expected that the county would use some for winter rode maintenance; ice control: We expected the contractors would use it for construction projects. That was all occurring, but it was just not at the rate that we were generating dredge material. So we had to do something more to unload, to get the Grand Encampment site, to get the capacity restored at the site. That's when we decided to put out a contract to excavate it and

again we were looking for contractors to help us out by using some of their resources to find acceptable placement sites.

Q. Had you let a project like that before?

A. Not that I'm aware of.

Q. The previous projects, the Corps had assumed responsibility for finding hydraulic dredging sites or disposal sites?

MS. McCARTHY: Objection.

THE WITNESS: In fact, we accept the responsibility for providing a site. It didn't necessarily have to be done hydraulically. We also, as I indicated earlier, we allow the contractor to select their own site, if they so wish.

BY MR. MILLER:

Q. Again, I want an understanding. How was the solicitation that you put together for Grand Encampment different than what you had done in the past on excavations and disposal facilities?

A. Well, it was different in that we did not provide a site as close by that we were aware of and was able to get landowner agreement or permits from landowners in Wisconsin until we included those sites as fallback sites for the contractor.

But the intent was that the contractor would do some investigation in determining or selecting their own placement site.

Q. I think you told me earlier that on the Grand Encampment Project, the Corps didn't even attempt to find a site closer to Grand Encampment, is that correct?

A. I think the question was in Minnesota, that we didn't find a close by site in Minnesota. As far as I know, we did not -- I can't say that -- we have been involved in dredge material planning for a long time. I can't say that we never looked at potential opportunities or sites in that area, but I don't know that specifically for this project that we tried to find one at that time.

Q. Was there a reason that the Corps didn't attempt to find a closer site for the Grand Encampment Project?

A. Not that I recall other than just that we weren't aware of any. None had been identified to us to investigate.

Q. To your knowledge, had the Corps made any inquiries?

A. Again, specifically for this project, no, I don't believe we did.

Q. Did the Corps make inquiries on the Wisconsin side concerning available disposal sites?

A. We did for the sites that we identified in the contract.

Q. Why did the Corps elect to make inquiries on the Wisconsin side but not on the Minnesota side?

A. Because we were aware of demand or request for the material on Wisconsin side. And on the Minnesota side we were not aware of anyone that wanted material.

Q. How did the Corps become aware of demand for material on the Wisconsin side?

A. For the Buffalo County site, we had interaction with the county. We knew they had a site located several miles from the Alma site that they wanted to stockpile material at. So we were aware of that through their general use of our dredge material for road maintenance purposes. And I believe we were told of several other landowners that had pits in the area, in the Buffalo County area, so we contacted those individuals.

Q. Who was responsible for contracting Buffalo County concerning use of sites within the county?

A. Well, I believe for this job, it would have been Steve Tapp.

Q. Logistically how does that happen? Steve Tapp will write letters to Buffalo County and landowners saying, "This is a project we are thinking of letting. Do you guys have any place we can put it"?

A. I think he probably called them and probably went up to the sites and visited with the point of contact with the city.

Q. Did Steve Tapp or anyone else at the Corps place a similar call to Wabasha County and say, "Hey, we're going to build this project. Does the city or county have a need for it?"

A. We probably did not. We had the Wabasha Gravel Pit which was located already in Wabasha County and the City of Wabasha, so there was an ample supply of material that would satisfy any needs over on that side. Basically there was plenty of material already over on the Minnesota side available to anybody that wanted it at the Wabasha Gravel Pit.

Q. You told me earlier that also you already experienced a situation in Wisconsin where you were generating more dredge material than there was

demand for?

A. At the Alma Marina site, yes. More material was in place there or could be placed there than was being removed.

Q. Did the Corps shy away from Wabasha County because of its prior experience with the county?

A. No, we did not.

Q. Had the county or any private individuals lodged any complaints or concerns with the Corps regarding the Corps' conduct of business with the county?

A. At Wabasha County?

Q. Yes.

A. No. Not that I'm aware of.

Q. To your knowledge, there were no complaints or concerns voiced by any public bodies or any individuals from Wabasha County to the Corps?

A. No. I guess could you be more specific? That's kind of general. With regard to this project, you mean, Grand Encampment?

Q. You told me they weren't notified in advance of this project, right, Grand Encampment?

A. They weren't asked whether they wanted

materials, yes. I believe that was the question.

Q. Were they notified in advance of the solicitation?

A. Notified that we were going to be doing this job?

Q. Correct.

A. I don't recall. I don't recall.

Q. Whose responsibility would it be for interacting with Wabasha County and providing them notice, if any, of a solicitation?

A. For this job, it would have been Steve Tapp.

Q. You are his immediate supervisor?

A. Yes.

Q. Would you have expected him to have alerted Wabasha County in advance of the solicitation going out?

A. For this project, probably not. There were no activities planned in Wabasha County. They were downstream of the City of Wabasha, so I can't envision that we would have wanted to go out of our way to alert them to this, to the work that we had planned.

Q. Did you foresee the possibility that bidders would be investigating disposal sites on

the Minnesota side of the river?
A. I became aware prior to bid opening that they were investigating.
Q. You told me earlier that one of the things the Corps was interested in doing was putting this out for bid and letting contractors use their creativity, do you recall that?
A. Yes.
Q. Did you expect that in using their creativity, contractors would be looking at both sides of the river, both Missouri (sic) and Wisconsin?
A. I guess I thought at the time that that would be one of the options that would be considered, trying to find something in both the Minnesota area and Wisconsin -- not Missouri, no -- among a number of other potential options.
Q. Were there any preparations that the Corps made in advance to accommodate inquiries by bidders regarding placement of materials in Minnesota?
A. During the advertisement period, we facilitated several meetings that contractors had asked us to do with the State and Federal agencies that are involved in the dredging activities.

Q. And what was the Corps' reason for facilitating these meetings with the State and Federal agencies?

A. Just to put the contractors in touch with the officials that would be involved in reviewing and evaluating and potentially permitting a site.

Q. Who were the individuals that the Corps put the contractors in touch with at the agencies?

A. It would have been Steve Tapp, but it's possible that I was involved just because it required a timely response. If Steve wasn't available, I might have called it, too. I don't recall who called the meeting, if that's the question is.

Q. Yes.

A. It was probably was Steve Tapp.

Q. What agencies did the Corps put the bidders in contact with?

MS. McCARTHY: I object to the form of the question.

THE WITNESS: The primary agencies would have been Minnesota Department of Natural Resources, Minnesota Pollution Control Agency, the Wisconsin Department of Natural Resources, the Fish and Wildlife Service. Those would be the primary

ones, the ones that would have had the most interest in where dredging material was going to be placed.

Q. Now, prior to the Grand Encampment Project, the Corps had obtained permitting for disposal sites before solicitations had gone out, is that correct?

A. If a State or Federal permit was required, we did obtain those, yes.

Q. On the Grand Encampment Project, what permits did the Corps anticipate would be required?

MS. McCARTHY: Objection. Lack of foundation.

THE WITNESS: We didn't anticipate any. Without knowing where the material was going to be placed or the method, we didn't anticipate, couldn't anticipate, I guess, where permits would be required.

BY MR. MILLER:

Q. From your experience, for the disposal facilities in Minnesota, what permits did the Corps obtain in the past?

MS. McCARTHY: Objection. Lack of foundation.

THE WITNESS: Well, our experience has been they would require a, if it was going to impact wetland, it would require a permit from DNR and probably from the Pollution Control Agency, too. If it was going to require an effluent discharge, it would require a permit from the Pollution Control Agency.

BY MR. MILLER:

Q. Any others?

A. At the Federal level, it would have to comply with the Clean Water Act and go through a 404 evaluation permit process.

Q. Who issued the 404 permits?

A. The Corps of Engineers does and on our projects we do an internal evaluation and issue ourselves a permit after it's gone through the review process.

Q. So those are the permits that the Corps would anticipate obtaining for a disposal facility in Minnesota?

A. Basically, Depending on the conditions and characteristics of a site and the method of placement.

Q. I know it may be less, but any more than that?

A. It could be more involved if the material was considered to be contaminated.

Q. If it were contaminated, what would it require?

A. It could require special handling, more extensive review and additional permit conditions.

Q. The same four that you just described?

A. Probably.

Q. No different permits or different agencies?

A. Not that I can think of.

Q. So have you identified for me now all of the Federal and State permits that would be necessary, as far as the Corps was concerned, to obtain a disposal facility for Minnesota?

MS. McCARTHY: Objection to the use of the word "permits."

THE WITNESS: I believe that's all the permits. But there are other reviews and approvals that are needed.

BY MR. MILLER:

Q. What would those be?

A. Endangered species review, cultural resource investigation and coordination with the State Historic Preservation office.

Off the top of my head, that's all I can think of.

MR. MILLER: Off the record.

(Discussion held off the record.)

(A brief recess was taken.)

BY MR. MILLER:

Q. All right, Mr. Krumholz, I was asking you if there were any -- what the permits were that the Corps would normally obtain for disposal sites in Minnesota. You identified those for me. And you were talking about other reviews might be necessary. You mentioned the endangered species review and cultural resource review. What other reviews may be required?

A. That's all I can think of.

Q. What agency conducts those reviews?

A. We do them internally, but they are reviewed then by other agencies. In the case of endangered species, it may involve the Fish and Wildlife Service. And it's part of our overall evaluation, review and evaluation of the impact of a project. And so that document would be reviewed

by the State agencies, too.

Q. Okay. So it would be the agencies that the Corps was aware of that would be involved in any permitting and review other than the Corps itself?

A. Yes.

Q. The State Department of Natural Resources?

A. In both states where we are working, yes.

Q. And the State Department of Pollution Control?

A. Yes.

Q. And the Federal Fish and Wildlife Department?

A. Yes.

Q. Are there any other agencies?

A. The Environmental Protection Agency might be involved. They do review the documents we produce, but they don't always take a direct involvement unless there is something that would concern them. But in this case I don't believe they were involved.

Q. So you indicated that prior to bidding on the Grand Encampment and letting the bid, the Corps facilitated meetings with all of the State and

Federal agencies that the Corps believed would be responsible for the permitting and reviews for this project?

A. We contacted the agencies that we know have an interest in dredge material placement and maintenance operations and that, yes, could potentially be involved with a permitting action with the contractor if they selected a site that required a permit.

Q. These meetings that needed to be facilitated involved the Corps, Fish and Wildlife and respective State Departments of Natural Resources and Pollution Control?

A. Correct. And the contractor who is proposing to use that particular site.

Q. What was the Corps' purpose in facilitating these meetings of these agencies with the contractors or potential bidders?

A. Well, it was really just that, to facilitate putting the contractor in touch with the agencies that are going to have an interest in what the contractor is proposing to do. It was to serve as a go-between, I guess.

Q. What did the Corps hope to accomplish by doing that?

A. That the contractor would then have a point of contact to further pursue getting a site approval.

Q. Did the Corps anticipate that the site approval would occur before bid opening?

A. I think we anticipated that the contractor would investigate it to the point where they were, if not assured, that they would be -- that they would have enough information to submit a bid.

Q. Can you explain that more fully, what you mean?

A. Well, we felt that the contractor would pursue a pre-bid pre-advertisement review of a site to a point where they were comfortable that it would be approved.

Q. What point is that?

MS. McCARTHY: Objection.

THE WITNESS: I think that that would be a point where the other agencies would tell them specifically what needs to be done and what their opinion or best judgment was with regard to that site.

BY MR. MILLER:

Q. So the Corps' hope was that contractors

would have some reasonable assurance when they bid the project that the disposal site would be ultimately approved?

MS. McCARTHY: Objection.

THE WITNESS: Before they submitted a bid with a particular site in it?

BY MR. MILLER:

Q. Right.

A. It was our expectation that they would have investigated the site; basically satisfied themselves that they were going to get approval to use the site.

Q. Was it the Corps' expectation that the bidder would actually have the permit and reviews accomplished before bidding?

A. Not the final permit, no.

Q. Why not? Were there any logistical reasons?

A. Yes. Timeframe logistically and normally it just takes a certain time period to go through the process.

Q. Okay. Normally, from your experience, how long does that permitting and review process take for disposal sites?

MS. McCARTHY: Objection. Lack of

foundation.

THE WITNESS: It varies tremendously.

BY MR. MILLER:

Q. Can you give me your best judgment in terms of ranges?

MS. McCARTHY: Objection. Lack of foundation.

THE WITNESS: The minimum is 30 days if everything falls in place.

BY MR. MILLER:

Q. And the maximum?

MS. McCARTHY: Same objection.

THE WITNESS: I'm trying not to confuse the planning process because we involved the other agencies in the planning. They are part of the process that arrives at ultimately a site being selected. So when they get to that point, they have already been involved enough that the permitting process goes fairly smooth, so --

BY MR. MILLER:

Q. You said that in your experience, this permitting and review process can vary depending on the characteristics?

MS. McCARTHY: Objection.

THE WITNESS: It can vary depending on the site, the method of placement, the measures taken to mitigate potential impact. A number of different factors would be involved in how long it would take to get a permit.

BY MR. MILLER:

Q. On the Grand Encampment Project, how long did you anticipate the permitting and review process would take?

MS. McCARTHY: Objection. Vague.

THE WITNESS: We expected it would be less than 90 days.

BY MR. MILLER:

Q. How long did you anticipate the general time period to accomplish it?

A. 30 days. I believe we maybe stated 30 days that we needed in the contract specifications to review a site.

Q. 30 days from what point?

A. From the time the site is proposed, officially proposed, formally proposed.

Q. What did the bidders have to do to formally propose a site?

A. I wasn't the contracting officer in administering the contract. I believe they have to

submit it in writing.

Q. And the formal submission that kind of triggered the 30-day minimum time period, what generally is required in the submission?

MS. McCARTHY: Objection.

THE WITNESS: We would need to know the boundaries of the site. The method of placement. Whether it was going to be mechanical or hydraulic. If it was going to be hydraulic, how the material and the water would be contained. How the effluent would be returned and where it would be returned. We needed to know what the final configuration of the site was going to be, how it would be left. That would be the basic information to get an evaluation started. Through the evaluation, we would then start looking at what the characteristics of the site are and what the potential impacts are going to be on all the various resources.

Q. So you thought on Grand Encampment it would take a minimum of 30 days from the time that a contractor made a formal writing, a formal submission in writing to the contracting officer with the information concerning the boundaries, method of placement, final configuration, et

cetera?

A. Yes.

Q. Now, were there any contractors besides Mattesons that alerted the Corps to the fact that they wished to bid the project hydraulically?

A. There were other hydraulic dredging contractors that were in touch with us and asked us to facilitate a meeting to review their proposed site.

Q. Who were those contractors?

A. J. F. Brennan Company.

Q. Anyone else?

A. At least one other company contacted us but we didn't -- they were not a hydraulic dredging company so we didn't think that they were going to be doing it that way.

Q. Which company is that?

A. Wilbur Lime out of Arcadia, Wisconsin. They were more of an excavating company, land excavating company.

Q. Was there anything done with Wilbur Lime in terms of any meetings with them?

A. Yes. We reviewed a potential site. I believe a site in Wisconsin that we looked at with them.

Q. And the site in Wisconsin would have required hydraulic dredging?

A. No. It would have required mechanical placement.

Q. Were there any meetings held with the Corps, J. F. Brennan Company and any other permitting agencies to identify their needs?

A. Was there a meeting between J. F. Brennan and other agencies and ourselves?

Q. Yes.

A. Yes, there was.

Q. Was there more than one?

A. I don't think so. I think only one.

Q. Did you participate in that meeting?

A. Yes, I did.

Q. And what was the site or sites that the Corps and the other agencies were reviewing?

A. I don't remember the name of it. It was in the Teepeeota Point area. I don't recall the name of it.

Q. Duga?

A. I just don't recall. That name was one of the sites, I believe, that was considered. I don't know if it was the site looked at with J. F. Brennan.

Q. Can you describe for me, as best you can recall, the dealings that the Corps had with Brennan concerning their anticipated disposal sites?

A. It was typically an on-site review of the sites that they were proposing. We, along with the other agencies, looked at the area that was going to be used and the potential containment of the material and where the effluent would be routed.

Q. I take it that typically before the on-site review occurred, that Brennan would have made the formal submission in writing that you described earlier?

A. Before?

Q. Yes.

A. I think the pre-bid investigations were just done verbally. I don't believe anything in writing was submitted at that point.

Q. Okay. So I can understand the order in which this unfolds, let's use Brennan is an example. The on-site meetings that the Corps would facilitate, would they typically occur before there was a formal written submission to the contracting officer?

A. Before, yes. Prior to bid opening. And

that would typically just involve a verbal contact from the potential contractor saying, "We are considering this site for the Grand Encampment Project. Would you get together with the agencies and we'll take a look at it?" It was that type of thing. The formal meeting, we did not expect that until after the contract award.

Q. So you didn't expect them to --

A. With any contractor.

Q. You didn't expect the formal permitting process until after bid opening?

A. Well, the approval process through our contract, we did not expect that. I think that was my expectation, anyway, that the process, if there was any local requirements, that that would be initiated right away. That we would not be a part of that. The contractor would pursue that local requirement independently and at their own time schedule.

Q. What local requirements were the Corps aware of?

A. We weren't aware of any specific ones, but if there were any, like real estate agreements or any municipal or county requirements to use a particular site, that the contractor would explore

those and pursue those at some point in the process.

Q. You told me earlier that when the Corps is identifying disposal sites in the solicitation as it had on some of these earlier contracts, the Corps had already obtained the necessary Federal and State permits beforehand, is that correct?

A. Correct.

Q. And that the Corps has, by virtue of its sovereign immunity, no obligation. In fact, it doesn't seek permission from local government agencies for those disposal sites?

A. Correct.

Q. Let me ask about your interaction with J. F. Brennan. You said that you expected the contractor to meet with the State and Federal agencies prior to bid opening, is that correct?

MS. McCARTHY: Objection.

THE WITNESS: We didn't expect --

BY MR. MILLER:

Q. Go ahead.

A. We accepted that and we tried to serve and facilitate it. We didn't really have an expectation that they had to do that.

Q. All right.

A. Of course, they had to do that, I guess, to facilitate it.

Q. I thought you told me earlier that the Corps expected contractors, if they were going to use a disposal facility in Minnesota, that they would take advantage of these facilitated meetings with State and Federal agencies and get themselves to the point where they were relatively assured that they had identified the problems of the permitting process if they were worried that the project would not go through without a problem?

A. Yes, we did expect that they would be in touch with agencies having the jurisdiction over the proposed sites. I thought the last question referred to whether we expected them to use us to facilitate. That wasn't necessarily a requirement or a planned expectation. But our expectation was that they would reasonably look into and investigate what was required for a site before it was submitted.

Q. What was the outcome of the meetings that Corps' facilitated on behalf of J. F. Brennan?

A. Well, the outcome basically was that the meeting was held and the players were put in touch with each other and that the site was reviewed by

agency representatives and up to providing initial thoughts and ideas about using the site and also to alert the contractor of what they might expect in terms of seeking approval; what they might have to do to get approval to use that site.

Q. But in terms of the meeting with Brennan, the purpose was to identify any red flags?

A. I think so, yes.

Q. Do you recall whether there were any red flags identified in the meetings with Brennan?

A. I can't recall specifics. There were concerns with regard to the site they proposed. If there were, I don't recall without further review.

Q. And on these facilitated meetings like the one you were present with J. F. Brennan, typically does the Corps do any more than simply convene the meeting? I mean, does the Corps track and make notations of any concerns that were raised by any of the permitting agencies?

MS. McCARTHY: Objection. Vague. But answer, if you can.

THE WITNESS: I'm not sure in this case how much we documented as far as what the concerns might be and what they might have to do.

Because the contractor was ultimately responsible for this rather than ourselves. I don't know if we did what you said.

BY MR. MILLER:

Q. Well, I'm saying, do you recall if there was -- strike that.

Would you anticipate, for instance, that with these meetings that were held with the other agencies, that there would be a memorandum of record prepared by the Corps?

A. I believe there was, yes.

Q. And the memorandum of record would state in summary fashion any of the concerns that were voiced during the course of the meeting?

A. Probably, yes.

Q. On these pre-bid meetings that occurred outside, was there generally supposed to be any follow-up after that or did the contractor kind of get immediate feedback from the agency where the agency had said, "We have a concern about this or a concern about that"?

MS. McCARTHY: Objection. Foundation.

THE WITNESS: Any follow-up that would have been identified?

BY MR. MILLER:

Q. I'm trying to get some sense of how these meetings were held and whether the contractor's primary source of feedback was oral comments made to them during the meeting rather than any formal written records back and forth?

MS. McCARTHY: Same objection.

THE WITNESS: I believe so, yes. I think there was.

BY MR. MILLER:

Q. Primarily oral?

A. Yes. At the meeting. And I think whatever further investigation they wanted to do they established a contact with somebody that they could follow up with in the future.

Q. And you said that you were at the meeting with J. F. Brennan?

A. Yes.

Q. Did you or could you normally get a sense of whether or not there was going to be a problem with permitting or whether the permitting would go through?

MS. McCARTHY: Objection to form.

THE WITNESS: I think I got a feel for at least what the State and Federal agencies,

what their interests were and what their concerns might be.

BY MR. MILLER:

Q. From the meeting held with J. F. Brennan, did you have any reason to believe that it would not be possible for Brennan to obtain the permitting for that site?

A. I don't know which site --

Q. You said you couldn't recall the name. I'm just asking.

A. Well, actually I think there were several sites that Brennan had proposed.

Q. Okay. As a result of the pre-bid meetings for those sites, did you have any reason to believe that Brennan couldn't obtain permitting for those?

A. I don't recall. You know, if there was a memo of record on that meeting. That might reflect it. I don't recall personally what my thoughts were at the time as to whether they would get the site permitted.

Q. If you believed, for instance, Brennan was unlikely to get the site permit, would you inform the contractor of that?

A. No, probably not.

Q. Not in an official capacity but in terms of getting them heads up so they could look elsewhere?

MS. McCARTHY: Objection.

THE WITNESS: No, I wouldn't. I would probably rely upon the contractor developing their own opinion from what they heard from the other agencies. I wouldn't want to interject my opinion on what they are saying.

BY MR. MILLER:

Q. I take it you were interested in all the bidders being able to successfully identify any disposal sites that could be permitted?

A. That would be in the best interests of us getting a good bid, yes.

Q. And you knew that both J. F. Brennan and Matteson were looking at it hydraulically?

A. Yes.

Q. And you knew that hydraulic dredging was likely to generate the lowest and best price for the Corps?

A. No, I could not be -- I was not sure of that, no.

Q. Let me ask you about the on-site meetings that the Corps facilitated with Matteson. Were you

present at any of those?

A. We had several, and the pre-bid one, I'm not sure if I was part of that.

Q. How many meetings were there pre-bid with Matteson?

A. I don't know.

Q. Do you recall being present at any of those?

A. Well, I recall being present at a meeting. And I'm not sure at the time what chronologically it was, whether it was pre-bid, post award or later on. I don't recall. I believe I was along at the Braun site. And I don't recall what the timing was on that, whether it was pre-bid or post award.

Q. When you looked at the Braun site with the Mattesons, were representatives from other agencies present?

A. No, I don't believe so.

Q. From what you recall, did you have concern about Mattesons' ability to obtain permitting for that Braun site?

A. Was I concerned?

Q. Yes. Did you have any concern about Mattesons' ability to obtain permitting for that

site?

A. I don't know that I was concerned one way or the other. My concern was that it would be required that they would have to do it if that's what it took. I don't know that I had an opinion as to what the likelihood would be.

Q. Would you have told Mattesons if you had a concern about their ability to obtain permits?

A. Again, we are talking State and Federal permitting, the State and Federal permits?

Q. Sure.

A. I think I would have identified my knowledge of what would be required; where the areas of concern would be. If it were a wetland, that was obvious there was going to be a problem. I would have identified that as a concern.

Q. You said that your recollection is that you met with Mattesons on the Braun site without the other agencies present?

A. To the best of my knowledge, yes.

Q. Before you told me that the Corps' role was primarily to be facilitating these meetings. What was the purpose of any private meeting with Mattesons?

A. As I indicated, I don't know when that

occurred because I would not be -- I'm not the primary Corps person that would be coordinating and facilitating these meetings, I don't know what the context was, whether it was for that purpose or just to look at a site more informally prior to submitting or pursuing it.

Q. Would you have kept a record of that meeting in your daytimer?

A. I don't know.

Q. What's your standard practice?

A. At that time my practice was to make a notation in the planner, at least the week, to put it on the calendar so it would be on the calendar that I was visiting a site.

(Deposition Exhibit 2 marked for identification.)

BY MR. MILLER:

Q. Showing you what I have marked as Exhibit 2, can you identify that for me? Is this an exerpt taken from your day planner?

A. Yes. It's an exerpt from my day planner of August 29th, 1996 referencing a conversation with Lawrence Matteson. That would have been

Senior.

Q. Was this conference you had with him in person or over the phone?

A. This was over the telephone.

Q. You made a very detailed entry of a telephone conference. Do you also anticipate at this time that you would have made written notations of any on site-meetings with the Mattesons?

A. If I was the primary point of contact with the Corps. If someone else was actually preparing a memo or documenting a meeting, then I may just have a made a note on my calendar that I was at the meeting.

Q. This is the only page of your daytimer that we have been furnished. Do you still use a daytimer like this? Still maintain one?

A. Do I still --

Q. Do you still have your daytimer from 1996?

A. From 1996 I believe I do, yes.

Q. Could you make that available to us? We'd like it for the duration of this project?

A. Okay. Just entries that would involve this project?

Q. Yes.

MS. McCARTHY: I would ask you to memorialize that.

MR. BANKSTON: Is that the entries pre-bid?

MR. MILLER: Anything that concerned this project; pre, during or post.

BY MR. MILLER:

Q. To your knowledge, did you have any reason to believe that Matteson would be unable to obtain Federal and State permits for the sites they needed to discuss with the Corps?

MS. McCARTHY: Objection.

THE WITNESS: I personally did not have any reason to believe that they would not.

BY MR. MILLER:

Q. I take it from the conversations you and I have already had, that the reason that the Corps went to this effort of facilitating the meetings and being involved, was that it wanted to be able to obtain bids from each contractor?

A. I think that's a fair statement, yes.

Q. And it wanted the contractors to be able to get the permits necessary to do the work?

A. That's correct.

Q. And it wanted to obtain the best pricing possible from the bidders on this project?

A. Yes.

Q. And, from your experience, in order to obtain the best pricing, the Corps was interested in the contractors having feedback as they prepared their bid as to whether or not they could get their disposal site approved?

MS. McCARTHY: Objection. Foundation.

THE WITNESS: Yes. That they could get the State and Federal permits as necessary, yes.

BY MR. MILLER:

Q. I take it, from your experience, you knew when contractors were placed completely at risk that they would bid the job and not be able to get disposal sites, that that would tend to increase the amount of the bid?

MS. McCARTHY: Objection. Calls for speculation.

THE WITNESS: I can't answer it the way you stated it.

BY MR. MILLER:

Q. What part of the question gives you

concern and I'll try to rephrase it.

A. Well, could you just rephrase the whole question then or repeat it?

Q. Has it been your general experience that the greater risk that you thrust on the contractor, the higher the bid might be?

MS. McCARTHY: Objection.

THE WITNESS: I personally don't have enough experience with that that I don't know.

BY MR. MILLER:

Q. Was it the Corps' intent on the Grand Encampment Project to place the risk on the contractors that they would not get approval for their sites?

MS. McCARTHY: Objection.

THE WITNESS: As I stated earlier, it was our intention to place the responsibility of getting a site on them and that they would do that, and that we were interested in tapping into their resources and knowledge of demands for material and use of material.

BY MR. MILLER:

Q. I understand that logistically the contractor was going to have to be the person who

walked through the process. But was it the Corps' intent to place the risk on the contractor that it would not be possible to get a permit?

A. It was our intent to place the obligation of getting the permit on the contractor.

Q. But was the Corps asking the contractor to assume the risk that it could not be possible?

MS. McCARTHY: Objection.

THE WITNESS: No.

BY MR. MILLER:

Q. Was there anything -- are you aware of anything where a local government has blocked the ability of either the Corps or a contractor to obtain a permit for a dredge disposal project?

A. Now or at that time?

Q. Well, that's a good question. Were you at times prior to Grand Encampment aware at any time of that occurring?

A. No, I can't think of any at that time, no. I am not personally knowledgeable of where that occurred.

Q. Since then are you aware of any?

A. No. I'm aware of the instance at the Grand Encampment where the Mattesons were attempting to get a permit from the county and were

not successful.

Q. Tell me from your perspective what happened?

MS. McCARTHY: Objection. Calls for speculation. Answer if you can.

THE WITNESS: I was aware that the Mattesons submitted a request -- and I don't know if it was a variance or whatever was necessary -- to Wabasha County to get the necessary approvals to use a placement site within Wabasha County. I was aware that they were going through a some type of a regulatory process with the County of Wabasha. Whether it was a permit or a variance or waiver, I don't know exactly.

BY MR. MILLER:

Q. Okay. And what happened?

A. Ultimately they were denied that action.

Q. What involvement, if any, did you have with that process?

A. I sat in on a meeting, the review meeting with the county. Or it might have been a subcommittee of the county that reviewed the proposal. I attended the meeting.

Q. How did you happen to attend?

A. I became aware of it either directly from Matteson or the contract administrator at our Winona office.

Q. What was your purpose in attending?

A. General interest to see what the outcome was going to be as it related to the project we had.

Q. Did you participate in the meeting at all?

A. I believe I may have responded to a question addressed to me. It was pretty minimal, my involvement.

Q. Do you recall what it was that you said, what you responded to?

A. I believe it related to the nature of the material, whether it was clean or contaminated material. There was some comments made to that effect. I had to express concern about the nature of the material.

Q. How did you respond to that question?

A. That it was considered to be clean sand and that we did not have concerns related to contamination. And related to that, that it would not require a special handling of the material.

Q. What did you observe during the course of

this meeting?

A. As I recall, there were a number of people that were opposed to it; local residents who had opposed it.

Q. And do you recall the reason for their opposition?

A. I think it varied. They were concerned about the aesthetics, the appearance; what the site would like look like after. How it would be placed. Again some of the concerns about noise levels. You know, I'm recalling some of the general things. I don't recall the real specifics.

Q. Were there any concerns about the wells? You mentioned earlier with the City of Wabasha that you had to address that concern.

A. I don't know if any came up at that meeting.

Q. Did it come up at any other time?

A. Well, it came up later on in the project when the actual site that was used, when that was being reviewed, that became a significant concern.

Q. We'll talk about that a little bit later. I want to focus on this review meeting that you said you attended. What else may have happened at the review meeting?

A. J. F. Brennan Company had a representative there. He spoke in favor of the project. He was at least one supporter for it.

Q. Was this review meeting before or after the bid opening?

A. After bid opening. After contract award.

Q. Do you know why J. F. Brennan was there and why they were speaking on behalf of the project?

A. I think it was just that they -- I can't speak to the why they were there. I think they just supported, they were trying to support a colleague and a fellow contractor.

Q. What else happened at the meeting?

A. I don't recall if the decision was made to deny the action at that meeting or if it came later on. I don't recall. But in general just --

Q. When you left that meeting, did you have any doubt as to the outcome?

A. I probably had some doubts. I don't think it was unequivocally stated that they weren't going to get the permit. It seemed like the county officials that were representing the county, that they were open minded; were considering the action.

Q. Was there anything else that the Corps

should have done to facilitate the process of the permit or review or waiver?

MS. McCARTHY: Objection. Lack of foundation.

THE WITNESS: I don't believe so.

BY MR. MILLER:

Q. Anything else that the Corps could have done?

MS. McCARTHY: Same objection.

THE WITNESS: I don't think so, no. Contractually I think it was clearly a contractor requirement that we were not directly involved in it.

BY MR. MILLER:

Q. Was there, from your knowledge of the situation, was there anything else that the Mattesons at that review meeting could have done?

MS. McCARTHY: Objection. No foundation.

THE WITNESS: Nothing that I'm aware of, no.

BY MR. MILLER:

Q. You were ultimately involved in providing assistance to facilitate the Mattesons to obtain disposal sites with the Fish and Wildlife, is that

correct?

A. Correct.

Q. Prior to exploring that option, did you believe that Matteson had exhausted the measures to get these privately owned properties at Braun and Sanderson through the county?

A. I don't know what legal avenues were available to them.

Q. Are you aware of anything else that Matteson could have done?

A. I have no other ideas or suggestions for them, no.

Q. From your review, were Lawrence and Larry Matteson diligent about trying to get the disposal sites approved by the county?

A. I guess I can't comment on whether -- if you are asking whether they did everything they could do, I don't know. I can't say.

Q. But asking it in reverse, you are not aware of anything else that they should have done?

A. Not specifically, no. I don't know if they had any other legal avenues to pursue. I don't know.

Q. Since the Grand Encampment Project, has the Corps attempted to obtain any disposal

facilities in Wabasha County?

A. New sites, we are in the process right now of doing a dredge material management plan for the Lower Pool 4 Region. And that includes evaluating sites. I believe there are some sites that have been identified in Wabasha County, so we are investigating alternatives at this time.

Q. Do you have a dredge material placement plan prepared?

A. It's in the process now.

Q. Who is responsible for that?

A. Steve Tapp.

Q. Do you know when he expects to have it finished?

A. It's probably about a year from completion.

Q. All right. In the situations where the Corps is obtaining the disposal site, is it the Corps' position -- does the Corps have a position as to whether or not the Corps has to go through the local waiver or approval or permitting process?

MS. McCARTHY: Objection. Foundation. Answer the question, if you can.

THE WITNESS: It's our legal

position that we do not have to obtain local approval. We do involve locals in the process. And the players obviously participate in the process.

BY MR. MILLER:

Q. For disposal purposes, does the Corps lease or purchase private land for disposal sites?

A. Yes, we do.

Q. So the Corps, for instance, could lease or purchase the Sanderson or Braun properties for purposes of disposing of materials?

MS. McCARTHY: Objection.

THE WITNESS: Theoretically.

BY MR. MILLER:

Q. And the Corps' position is that if it's the Corps, as opposed to the contractor, if it's the Corps that is leasing or purchasing the Sanderson or Braun properties, as an example, that the Corps does not have to go through local approval process?

MS. McCARTHY: Objection.

THE WITNESS: With respect to our legal position, we would involve locals in the process and we would consider their concerns in any ultimate decision in whether to use a site and that

would be factored into the decision.

BY MR. MILLER:

Q. I take it during the Grand Encampment Project, Matteson -- and you are probably aware by them alerting you and you are aware by attending the meetings -- that it did not get approval by the county?

A. I became aware of that at some point after the meeting.

Q. After that, did you give consideration to other alternatives or to assisting the contractor with other alternatives?

A. We gave consideration to again becoming a facilitator and in this case we facilitated a get-together between Matteson and Fish and Wildlife Service. But I don't know that we looked at other options besides that one.

Q. Did the Corps give any consideration to issuing a changeover order in the contract whereby it would purchase or lease the Sanderson or Braun properties?

A. Not that I'm aware of, no.

Q. And did the Corps advise Matteson at the time that it was the Corps' position that it was not bound by local laws or ordinances?

A. I don't recall advising them of that, no.

Q. Did the Corps give any suggestions or give any ideas to Matteson in terms of ways to deal with the problem regarding the approval of the disposal site?

MS. McCARTHY: Objection. Vague.

THE WITNESS: Local approval?

BY MR. MILLER:

Q. Yes. They couldn't get a disposal site; the Corps wanted the project to go forward. Did the Corps in cooperation throw out any ideas?

MS. McCARTHY: Same objection.

THE WITNESS: I don't think we -- we didn't advise them how to go about getting approval.

BY MR. MILLER:

Q. I understand that. I'm asking did you throw out any ideas?

MS. McCARTHY: Objection. Lack of foundation.

THE WITNESS: Ideas of how to get approval or ideas of how to pursue other sites?

BY MR. MILLER:

Q. Either of those?

MS. McCARTHY: Same objection.

THE WITNESS: We did not provide any ideas for how to go about obtaining local approval, that I'm aware of. At least I did not.

BY MR. MILLER:

Q. Okay.

A. And then our involvement as far as trying to locate other acceptable sites was to facilitate a get-together with the Fish and Wildlife Service and met. I'm not aware that we, the Corps of Engineers employees, suggesting any other sites.

Q. Do you know whose idea it was to approach Fish and Wildlife?

A. I'm not sure if that was initiated by the Fish and Wildlife or ourselves and myself. I was in touch with the district refuge manager and I don't know who initiated it, myself or him, but anyway, together we discussed the ultimate site and decided that that would be a potential option that we would toss out to the contractor and see if they were interested in pursuing it.

Q. The contractor explored both the Sanderson property first with the county and then later the Braun property, is that your understanding?

A. I'm not sure of the sequence.

Q. Do you recall that the contractor attempted to gain approval for both of those sites?

A. I'm aware that -- well, I believe that it was the Sanderson site that they actually submitted requests for the county approval.

Q. Okay. And did you -- what was the status of the Federal and State permits on the Sanderson property?

A. As far as I know, they were not being pursued. I don't know if they had officially been submitted to us for further review process.

Q. Did you have any reason to believe that it would not be possible to obtain State and Federal permits for Sanderson absent the issue with the county?

MS. McCARTHY: Objection to the form of the question. Go ahead and answer, if you can.

THE WITNESS: I had no specific reason to believe that they would not meet State and Federal requirements.

BY MR. MILLER:

Q. So, in your mind, the only thing that prevented the Sanderson property from being a disposal site was the opposition from the county?

some wildlife habitat similar to the way Grand Encampment was left, then we are considering that strongly on future jobs.

(Discussion held off the record.)

MR. MILLER: Give me a second. I want to look to see if I have anything else.

I will follow up with requests for things that we do not have. We will confirm that in writing. We would ask for those things and confirm it in writing.

I don't have any other questions at this time.

MS. McCARTHY: I have a few questions to clarify a point.

EXAMINATION:

BY MS. McCARTHY:

Q. Regarding the Corps' contention during the Grand Encampment Project, upon which party, the Corps or the eventual contractor did the Corps intend to place responsibility for finding or obtaining permits and all required approvals

disposal sites?

MR. MILLER: I object to the form of the question.

THE WITNESS: The contractor.

BY MS. McCARTHY:

Q. And in the event that the contractor was unable to obtain any necessary permits or approvals for the use of the site, which party did the Corps intend to bear the risk of that not being approved?

MR. MILLER: Objection to the form of the question.

THE WITNESS: The contractor.

MS. McCARTHY: Thank you, Mr. Krumholz.

MR. MILLER: I don't have any other follow-up at this time.

(Deposition concluded at approximately 5:00 p.m.)

COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**************************************************

L. W. Matteson, Inc.,

Plaintiff,

v. No. 01-5420
(Judge Wilson)

The United States,

Defendant.

**************************************************

**DEPOSITION OF**

**LARRY W. MATTESON**

Taken July 24, 2002
Scheduled for 9:00 a.m.

Reported By: Lori L. Morrow, RPR
PARADIGM REPORTING & CAPTIONING INC.
1400 Rand Tower, 527 Marquette Avenue South
Minneapolis, Minnesota 55402 * (612)339-0545
1(800)545-9668 * Fax (612)337-5575

MR. MILLER: Same objection, vague and ambiguous.

THE WITNESS: This clause had an option. I'm certain of that.

BY MS. MCCARTHY:

Q I think you mentioned in your earlier testimony -- you're pointing to Exhibit 1. Is that right?

A Right.

Q I may be mistaken, but I believe you testified earlier that this project that you received the solicitation that's been marked as Exhibit 1 describes a project that's similar to the two prior projects.

A Yes.

Q In what sense did you mean that they were similar?

A Well, all three of them involve removing material from a temporary island hydraulic dredge disposal sites or mechanical -- channel maintenance disposal sites and transporting that material to its final resting spot.

Q Did you perceive any differences between the project which the solicitation marked as Exhibit 1 described and the prior two contracts that you had?

A Yes.

Q What were the differences that you perceived?
A This particular project was set up much more in line to be a mechanical dredging project given the distance involved and the character of the disposal sites specified or made available to the contract.
Q And what's the basis for your determination that this was set up as a mechanical dredging project?
A Like I said, the size and character and location of the disposal sites.
Q Is there anything else that causes you to conclude that this was a mechanical dredging project?
A I don't know.
Q If I could ask you, Mr. Matteson, if you would turn your attention to Exhibit 1. Now, the beginning of Exhibit 1 has some amendments, does it not, sir?
A Yes.
Q What do you understand these amendments to be?
A After the specifications are delivered to contractors, sometimes there are changes made between the time the specifications are delivered and the time of bid date, and these are the changes that are made.
Q And if I could turn your attention to page 30-105. I believe it's Amendment 4, which it probably should be -- I think they go in reverse order, so it should probably be at the top. Amendment 1, number 4.

Do you see that number in the bottom is 30-105?

A Yes.

Q Could you read the notation that appears in the description, the section 14 description, the bid opening date? Do you see that there, sir?

A The bid opening date for the solicitation remains at 11:00 a.m. 29 August '96.

Q Was that your understanding of the bid opening date?

A Yes.

Q And to your knowledge, did the bid opening date change after this modification?

A Not to my knowledge.

Q Did you in fact make a bid on August 29?

A I believe so.

Q Can you tell me the process by which you made your bid?

A I think I hand delivered it.

Q On what day?

A On August 29.

Q Do you recall the time of day that you --

A Prior to 11 a.m. For some reason, I thought it was an afternoon bid time. But it says 11 a.m., so.

Q If I could turn your attention, sir, to page, if you look at the bottom of this exhibit, 00100-1. If I

could draw your attention to the top. It says, section 00100, Instructions, Conditions and Notices to Bidder. Do you see that there, sir?

A Yes.

Q Now, prior to submitting your bid on August 29, did you read this page in the solicitation?

A Yes, I believe I did.

Q And the first section is 52.252-1, Solicitation Provisions Incorporated by Reference. Do you know what that number 52.252-1 means? Do you know what that refers to?

A No, I do not.

Q Are you familiar with the federal acquisition regulation?

A No.

Q Could you read into the record the first provision that's listed under 52.252-1?

A This paragraph right here?

Q Yes.

A "The solicitation incorporates one or more solicitation provisions by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available."

Q When you read that provision, how did you

interpret that provision?

A That the standard rules in the F.A.R. regulations would apply.

Q So you're familiar with F.A.R. then, the term F.A.R.?

A I'm familiar with the term F.A.R., yes.

Q Do you recall during the course of preparing your bid for this contract ever looking up F.A.R. provisions?

A No.

Q Did you have an understanding of the F.A.R. provisions that were incorporated by reference in the solicitation?

MR. MILLER: Objection to the question as vague and ambiguous, also lack of foundation.

THE WITNESS: Would you repeat that question, please?

BY MS. MCCARTHY:

Q Well, I'll establish the foundation. Do you know if there are any F.A.R. provisions that are incorporated by reference in the solicitation?

A Isn't that what this sentence says?

Q I'm asking you.

A I believe that's what this sentence says, that they are incorporated.

Q Did you have an occasion prior to submitting your bid to go and refer to any F.A.R. provisions that are incorporated by reference in the solicitation?
A No, I did not.
Q Were you familiar with the contents of the F.A.R. provisions that are incorporated by reference?
A I'm not sure I would say I'm familiar, but I -- I guess I would say I'm not familiar with them.
Q But you did in fact read this paragraph that you just read into the record?
A Yes.
Q And did you understand what it meant when you read it?
A Yes.
Q If I could draw your attention down to the bottom half of the page under the heading Inquiries. Subparagraph A says, "Technical questions on plans and specifications should be directed to the St. Paul District to Anthony Foster," and there's a telephone number listed. Did you have any technical questions on plans or specifications?
A Yes.
Q Did you direct them to Mr. Foster?
A Yes.
Q And what were the technical questions that you

had?

A The initial question upon receiving the plans and specifications, I believe it was I who called Anthony and asked him if it would be possible that -- the project appeared to be a distinctly mechanical dredging project or mechanical transfer project and asked him if the Corps would be interested in a hydraulic alternative.

Q And what was Mr. Foster's response, if any?

A Well, Anthony said he would look into it and either he or someone else would get back with us.

Q Did anyone from the Corps ever get back to you?

A Yes.

Q Who got back to you?

A I'm not sure. It was either Anthony or Dan Kromholtz.

Q And when they got back to you, what did they communicate to you?

A They encouraged us to pursue a disposal site and bid the job hydraulically, an alternate disposal site.

Q When you read the solicitation, did you understand there to be any prohibition against the use of hydraulic dredging as the solicitation is written?

A I don't recall whether there were any distinct prohibitions against hydraulic dredging.

Q So what caused you to make the inquiry to

Mr. Foster?

A As I stated earlier, the characteristics of the job as it was initially designed were much more conducive to a mechanical transfer of the material. The number of disposal sites, the location of the disposal sites, the distance of the disposal sites from the Grand Encampment site, you had to go through a lock or dam. There was a dam between the Grand Encampment site and the Alma disposal sites. All of these things were big impediments to a hydraulic dredging site.

Q So in what manner did either Mr. Foster or Mr. Kromholtz encourage you to get a disposal at this site?

A I don't understand that question. I mean, in what manner do you mean?

Q Well, I think you testified that they encouraged you --

A Right.

Q -- when the Corps got back to you that they encouraged you to --

A Right.

Q -- obtain a site and bid on the project. Is that correct?

A Right.

Q And how did they do that?

A They said locate a disposal site or multiple disposal sites, and they would come out and do prebid site investigations and let us know in their opinion if it would work.

Q Now, upon reading the solicitation, did you understand there to be any provision for you to do that, the solicitation as written?

MR. MILLER: Object to the form of the question as vague and ambiguous.

THE WITNESS: If I recall, there was a provision in here for alternative disposal sites.

BY MS. MCCARTHY:

Q If there was a provision for alternative disposal sites, what prompted your call to Mr. Foster?

A As I said, the project was distinctively set up as a mechanical project. I mean, anyone that looked at it that was in the dredging business knew what the project involved. And if they didn't want it to be a hydraulic job and saw some big impediment, the character of the material that was going to be excavated would not lend itself to hydraulic, that type of thing, then I didn't want to pursue it.

Q Were you concerned that if you had bid the project as a hydraulic project without contacting them

that your bid might be potentially unresponsive?
A I'm not sure.
Q When you submitted your bid on August 29, did you regard your bid as nonresponsive?
A No.
Q Were there any modifications made to the solicitation, to your knowledge, following your inquiry to Mr. Foster?
A I don't believe so.
Q How would the character of the material affect whether it could be disposed of hydraulically or mechanically?
A Well, several things. If there were fine grain materials in there, it doesn't lend itself to meeting water quality standards and that type of thing on your affluent coming out of your disposal site. If there's a lot of debris, a lot of rocks. If the Corps had knowledge that the island had not been cleared prior to the placement of the material in that site, then you encounter a lot of roots, stumps, bent over trees, that type of thing that do not lend itself to hydraulic dredging.
Q Did you speak to either Mr. Foster or Mr. Kromholtz about the character of the material?
A No. I was primarily concerned with the disposal

sites.
Q Can you tell me the substance of your communication generally with Mr. Kromholtz or Mr. Foster?
A Well, what I stated when I talked to Dan was, you know, historically, mechanical transfer of these disposal sites is considerably more expensive than hydraulic transfer. We have records to prove it. Dan knew it. And when I talked to Dan, I said, if we can find a disposal site within reasonable proximity of the Grand Encampment site -- the Alma site, that was going to be mechanically -- there was no way to deal with that on a hydraulic basis -- that we could save the government money.
Q And what was Mr. Kromholtz's response to this --
A He encouraged that. I mean, his goal was to do it in the most efficient manner and the least expensive manner possible.
Q Did Mr. Kromholtz express any concern about having to modify the solicitation in order to accommodate that?
A No.
Q In your experience as a federal government contractor, had you ever submitted a bid in which you have proposed disposal sites?
A I don't believe so.

MR. MILLER: Objection, misstates his testimony.

THE WITNESS: No. I believe that there was an indication given by the people on site that, in their experience, the site would be acceptable to all the necessary permittable agencies, permit agencies.

BY MS. MCCARTHY:

Q But did you understand that their oral explanations or instructions would not be binding?

A No, I did not understand that their opinions would not be binding.

Q How could you reconcile that understanding with your general familiarity in the context of 52.214-6?

A Because I was aware that there was another contractor doing the same thing we were doing and that the Corps was encouraging us to do so.

Q And by doing that, that made the oral explanations binding under 52.214-6?

A I believe so, yes.

Q Can you tell me the thought process that you underwent to reach that conclusion?

A Let's just say that there have been a lot of questions over the years asked prior to bid date and answered orally, that answering questions in writing to

all prospective bidders is not the standard operating procedure regardless of what that F.A.R. regulation says. Those prebid meetings, site investigations, mandatory site investigations are made all the time, and oral instructions are made to prospective bidders at those site investigations. And written detail of those explanations are not issued.

Q If I understand your testimony, the historical course of dealing in practice has rendered this provision inoperative, 52.214-6, in your view?

A I'm saying that it's common practice that that paragraph is ignored, yes, in the bidding process.

Q In submitting your bid, did you factor in any risk for the possibility that this provision would not be ignored at some future point, perhaps in litigation?

A Well, the only way to factor in that provision is not to have bid on it. I mean, you either take the people that came out and made the site visit and encouraged you to bid on it at their word, at their -- or you don't bid on it. There's no middle ground here, in my opinion.

Q Was your decision to bid, would you characterize that as a business judgment?

A No.

Q What kind of judgment would you characterize it

as?

A I'm not sure I understand the different kinds of judgments that you're referring to.

Q Well, why did you submit a bid on the contract?

A We bid on the contract because we're a hydraulic dredger, and it was presented to us that hydraulic dredging was a viable alternative to the original plan.

Q Did you perceive that bidding on the contract would benefit your business?

A Yes.

Q You weren't compelled to submit a bid, were you?

A No.

Q You made a decision to submit a bid on your own free will. Is that correct?

A Yes.

Q Did you make a judgment to submit a bid in the course of your business?

A We made a decision to bid, yes.

Q So how is your judgment to submit a bid not a business judgment?

MR. MILLER: Objection, argumentative. Also, the question is vague and ambiguous.

THE WITNESS: I'm not sure how it's not a business judgment.

BY MS. MCCARTHY:

Q You don't like the term business judgment?
A I'm ambivalent about that term.
Q Now, Mr. Matteson, you previously testified that the fact that other bidders were bidding for the contract affected your interpretation of 52.214-6. Could you explain that, how the presence of other bidders affected your interpretation?
A I was aware that the Corps made site investigations on behalf of another contractor that intended to bid the job hydraulically as well.
Q And how did you become aware of that information?
A The landowner of that particular site, I believe, informed us of that.
Q And how specifically did that affect your interpretation of this provision?
A Of which provision?
Q 52.214-6.
A How did it change my interpretation of it?
Q Yes.
A I don't think it changed my interpretation.
Q Okay. Just wanted to clarify that. This provision 52.214-6 goes on to state, "Any information given any prospective bidder concerning a solicitation will be furnished promptly to all other prospective

You mentioned that you had some experience in assisting the customer. What did you do --
A No, I didn't say assisting. But I'm aware of customers getting permits, yes.
Q And by customers, you mean the Corps?
A No. Private customers.
Q Okay. And none of those private customers ever obtained a local permit?
A I know that the timetable involved was -- I know that some of them had achieved them in 90 days or less. We were discussing the timetable at that time.
Q Right. Do you know if there's any specific timetable for local permitting processes?
A No.
Q And did you factor a time factor for local permitting issues when you factored your bid in this contract?
A I'm not quite clear on what you mean by local permitting.
Q Well, I think you testified previously you had federal and state agencies visit the site?
A Right.
Q Did you have any local agencies visit the site?
A I interpreted those people as being the local agencies.

Q What caused you to interpret the federal and state agents --
A Because they're local. They're the Minnesota and the, you know, they're local area people.
Q Did you invite any county officials to visit the site?
A No.
Q Did you invite any --
A I didn't do the inviting.
Q Did you contemplate inviting any county officials to visit the site?
A When the site visits were set up, the Corps of Engineers representative, in my opinion, brought the people with him that were necessary to get the necessary permits to do the project.
Q Did you ask him if he had brought everyone necessary to --
A No, I did not.
Q Did he ever tell you he had brought everyone necessary?
A I'm not sure.
Q Did you ever invite any officials from any municipality to visit the site?
A No.
Q Is there any reason why you did not?

A Again, I thought the people necessary to get permits for this project were on-site at those site investigations.

Q And can you describe for me every single basis for that belief that you had?

A Because the Corps of Engineers brought them. They are the people that are involved in these projects on a daily -- the people that came to that project, Dan Kromholtz and Steve Tapp, are people that make arrangements for the dredge disposal sites. That's their business. And I assume that when they brought a team out to investigate a site that that team would consist of the people necessary to get a site approved.

Q Were you concerned that when selecting a site that you were dissimilarly situated from a governmental agency?

MR. MILLER: I don't understand the question.

THE WITNESS: I don't understand the question.

BY MS. MCCARTHY:

Q Well, was L. W. Matteson a governmental agency?

A No.

Q Were you concerned that maybe rules and regulations might apply to governmental agencies that

A That's correct.

Q It says, "The use of an optional final disposal area (placement site) may require the Government to prepare an environmental assessment (including a cultural resource survey)." Do you know if that determination had been made by the time you submitted a bid as to whether the Government had to prepare an environmental assessment for any proposed site by Matteson?

A I believe the site investigations done prior to bid date indicated to me that environmental assessment would not be necessary on the two sites that were investigated as long as we stayed out of the wetland areas that were involved.

Q And you understood that a cultural resource survey would not be necessary at the time you submitted your bid?

A The investigation of the Guza site -- define cultural resource investigation. Will you please?

Q I meant to say cultural resource survey.

A Is that like an archaeological study?

Q Did you understand what it meant when you read the --

A I believe it to be an archaeological study. And it was my understanding that the investigation of two sites, there were no known archaeological significant

areas within those two sites.

Q Now, to what two sites are you referring?

A The Braun and the Guza site.

Q What about the Saunderson site? Had there been a determination that an environmental assessment would not be necessary for the Saunderson site?

A At some point in time, there was a determination to that effect, yes.

Q Was that determination made before you submitted your bid or after you submitted your bid?

A I believe that may have been made after we submitted our bid.

Q If I could draw your attention, sir, to page 01000-4, please, the section of paragraph 12.5, "Special Use Permit." It states, "The Contractor shall comply with the requirements of the "permit for dredge material placement" included at the end of this section regarding the Contractor's final disposal (placement) and transfer of dredge film material to the identified sites owned by Buffalo County, Wisconsin." Did you read that provision at the time that you submitted your bid?

A I believe so, yes.

Q What did you understand the permit for dredge material placement to be?

A I don't recall.

this section of the contract?

A I'm aware of its existence.

Q Did you read this provision of the contract before you submitted your bid?

A I've read -- this is a standard section in most contracts of the government, and I've read these before, yes.

Q Did Matteson prepare an environmental protection plan for this contract?

A I believe so.

Q Before the time it submitted its bid, did Matteson undertake any efforts to prepare a tentative environmental protection plan?

A Prior to placing this bid you say?

Q Yes.

A Typically, we do not write down an environmental plan prior to bid. We look at the conditions that exist and try to establish what meeting environmental requirements of the project will entail.

Q Prior to submitting your bid, did you undertake to familiarize yourself with procedures to be implemented to provide the required environmental protection and to comply with applicable laws and regulations?

A I believe so.

Q And what did you do?

A Yes.
Q If I could turn your attention to page two of the statement of facts. It says, "By an invitation dated July 10, 1996, Matteson was invited to competitively bid a dredging job on the Mississippi River with the St. Paul, Minnesota District of the U.S. Army Corps of Engineers for a fixed-price contract to furnish all labor, material and equipment necessary to excavate and transport existing dredged material from two areas." Were you invited in writing to submit a bid for this project?
A That's a common terminology that -- yes. I mean, the Corps sends out invitations for bid. I mean, they send out a notice for bid. And that's what it's referred to. It's not like an invitation like you and I might normally think of an invitation. It's nothing special. If you're registered as a dredging contractor, you get one. We're not selected -- it doesn't make us special.
Q Was the extent of your invitation the written invitation?
A Yes.
Q If I could draw your attention to the third paragraph, it states, "Following its communications with the Corps, Matteson devoted significant time to locating

potential disposal sites in the Wabasha area. Matteson was able to locate two viable disposal sites. One was the "Saunderson" Property and the other was the "Braun" Property." Now, are these the two sites that you contend that the Corps visited prior to the bid?

A Actually, after listening to the testimony of Dan Kromholtz and Steve Tapp, I believe there were three sites involved at that time. And their testimony states that they only visited -- they meaning Steve Tapp and Dan Kromholtz and others, Dennis Anderson, the list -- the Guza site and the Braun site were visited, and the Saunderson site -- I still contend that the Saunderson site was if you're standing on, I believe it's I-24 or Highway 24 looking at the Guza site, the Saunderson site is like to your back. And I contend that they were informed of that site as well. But I may be wrong. So the answer to the question at that time, I believe there were three sites involved. But if there were two sites involved, it would have probably been the Guza site and the Braun site.

Q There's no mention made to the Guza site in this paragraph. Do you know why?

A Because at the time, I believe that they had -- that I had taken them to the Saunderson site, that they were talking about the Saunderson site and the Braun

site.

Q So at the time you submitted this claim, your recollection was that you had taken them to the Saunderson site and the Braun site?

A Yes. I knew that we had taken them to the Guza site, too.

Q So at the time, why didn't you mention the Guza site?

A I don't know.

Q Do you have a specific recollection sitting here today of actually physically walking on the Saunderson property with any representatives of the Corps or any other federal agency prior to the submission of the bid?

A What I recall is that we didn't walk on the Guza site, nor did we walk on the Saunderson site. The only site that we actually physically walked on was the Braun site. The Guza site and the Saunderson site were clearly visible from the roadway.

Q Was there any reason why you did not walk the Saunderson property and the Guza property when you brought the Corps folks out to the Braun property?

A Say that again.

Q Was there any reason why you didn't walk the Saunderson site and the Guza site with the Corps officials?

A Yes, because they were very visible from the roadway, and I guess they -- I wasn't the one determining whether they walked or didn't walk. It wasn't like, okay, I didn't take -- the reason we walked the Braun site is that the area for disposal was some distance from the highway or from the -- not the highway, but a county road. So we had to drive back in there and actually get into the site to see the site. The Saunderson site and the Guza site were both fairly flat areas that were visible from the roadways.

Q The paragraph continues, "At the request of Matteson and prior to the bid date, the Corps, the Minnesota Department of Natural Resources and the U.S. Fish & Wildlife walked both of Matteson's sites." So is it your testimony that that statement is inaccurate?

A It is my testimony that the only site that they actually walked prior to bid date would have been the Braun site.

Q So to the extent that this statement in the claim says that they walked both of Matteson's sites, that statement is inaccurate. Is that correct?

A That's correct.

Q Was the Saunderson site wooded at the time that you brought the --

A It was partially wooded, yes.

Q Was there a way that the Corps officials visibly standing in the road could ascertain that there were no wetlands on the Saunderson site without walking it given the fact that it was wooded?

A The Saunderson site was accessible both on the east side, you could drive by the east side, so it was kind of a corner lot if I remember right, so you could drive on two sides of it and see what it was. You could see what kind of vegetation it was. And it would be my opinion that someone familiar with the area could tell by looking at the type of vegetation that was growing on it from the road if there would be likely any wetlands on-site, yes.

Q Do you know whether the Corps officials drove on both sides to ascertain whether there were wetlands?

A They would have driven on both sides. When we came from the Braun side, they would have driven up the east side and then turned, and we parked on the north side.

Q Did you advise them that they should be looking to see if there are any wetlands on the Saunderson property while they're driving to the Braun site?

A No, I did not.

Q So you don't know for a fact whether they made an effort to ascertain whether there were wetlands --

option of rejecting your responsive low bid?"

THE WITNESS: Could you read that for me just slowly, please?

COURT REPORTER: "I gather then you're unable to certify the statement in your claim and marked in Exhibit 34 that the Corps had the option of rejecting your responsive low bid?"

THE WITNESS: I believe I've answered that question to the best of my ability already.

BY MS. MCCARTHY:

Q It's a yes or no question.

A I don't see where I stated in this that the Corps had the option of rejecting my bid.

Q So you don't believe that to be the case then?

A Yes, I do.

Q You do believe that the Corps had the option of rejecting your responsive low bid?

A Yes, I do.

Q Okay. If we could continue further on paragraph three -- I'm sorry, paragraph -- well, I guess it's the second paragraph. "After bidding the Project and before starting the work, the County of Waubasha [sic] advised Matteson that pursuant to Minnesota Statutes Section 103G.005 et seq. the County controlled the use of any property within a "shoreland protection zone" which

emanates "1,000 feet from the ordinary high water level" of the Mississippi River." Could you tell me, Mr. Matteson, the circumstances under which the county of Wabasha advised you of this?

A I believe it was either by fax or by phone.

Q And do you know what precipitated the fax or the phone call?

A I think it was some kind of zoning permit that we had applied for, or a land use permit.

Q And when did you apply for the land use permit?

A I would assume sometime in September of '96.

Q And who was the individual at the county who advised you of this matter?

A I believe it would have been Judy Kruger.

Q And what did Ms. Kruger advise you?

A She advised us of the existence of the shoreland protection zone. That's my recollection of the situation.

Q And what caused you to make a filing with the county?

A Judy Kruger instructed us that we needed to do so.

Q When did Mr. Kruger instruct you that you needed to file something with the county?

A Sometime in September --

Q And how were the --
A -- I believe.
Q How were the circumstances that Ms. Kruger came to advise you that you needed to make a filing with the county?
A I don't recall.
Q Do you know how you came into contact with Ms. Kruger?
A No, I don't.
Q Did Ms. Kruger contact you, or did you contact Ms. Kruger?
A I don't recall.
Q What was your reaction when Ms. Kruger told you you needed to file something with the county?
A I don't recall.
Q Were you surprised that you needed to file something with the county?
A I would suspect that I was.
Q Why would you suspect that you were surprised?
A I'm not used to dealing with the county, so I don't know. I just assume that I would have been surprised.
Q Do you know if you had contact with Ms. Kruger prior to submitting your bid?
A I guess I don't believe I had contact with her

prior to submitting my bid.

Q And as you sit here today, you have no recollection as to how you came into contact with Ms. Kruger, whether she initiated contact with you or you initiated contact with her?

A That's correct.

Q Were you surprised to be dealing with county officials in any way in connection with this proposed disposal site?

MR. MILLER: Object to the form of the question as vague and ambiguous.

THE WITNESS: I suspect that I was, yes.

BY MS. MCCARTHY:

Q Did someone advise you of the need to contact the county in connection with your proposed disposal sites?

A I don't recall.

Q Is there anyone at Matteson who would recall how the relationship with the county commenced in connection with the proposed disposal site?

A At the time, I think David Guillot was an employee of ours that was -- and I believe he'll be deposed later on this week. He would have been more involved with that situation at the time than I was.

Q The next paragraph begins, "Only after award of

the contract did Matteson learn that the local citizens were opposed to Matteson's use of the Saunderson property. During a series of public and private meetings attended by Matteson, the citizenry and the public officials indicated that the source of their discontent was treatment they had received from the Corps on two prior projects." What are those two prior projects?

A I believe those projects are the Read's Island and the Crat's Island projects.

Q Now, Mr. Matteson, you've testified that L. W. Matteson had contracts with the Corps in connection with Read's Island and with Crat's Island. Are those the projects which had provided the local community with a source of discontent?

A Yes.

Q At the time that you were the contractor on those projects, were you aware of the public discontent?

A I was aware that Cliff Wilson had a problem with the Crat's Island project. It's my understanding that that was subsequently resolved when we gave him -- or when the Corps agreed to give him some sand.

Q That was the only source of discontent you had understanding of?

A There had been rumblings at, you know, cafes, and I was not directly aware of them, no. But I had

heard that some people had expressed concern about some blowing sand.

Q Had you heard of the rumblings about the blowing sand prior to the submission of your bid?

A Yes.

Q Did you take those rumblings into consideration when you proposed your disposal sites in connection with the bid?

A I don't believe so.

Q Why did you not take those rumblings into consideration?

A I mean, somebody always has a complaint about something, you know, I mean, in that situation, and I didn't believe that the discontent was that wide or that powerful, widespread, widely spread.

Q At the time you submitted your bid, do you have any reason to believe that anybody at the Corps had a different understanding as to the breadth and nature of the public opposition than you did at the time?

A Yes, I do.

Q And what's the basis for your understanding?

A Well, I had subsequently after getting involved in this situation become aware that the Corps had stated, I believe, in Steve Tapp's testimony, there was some perceived well contamination on the Read's Landing job

that I was not aware of. I believe that the Corps had also addressed some issues regarding the Read's Landing job as far as doing some plantings. See, on the Read's Landing job that we were involved in, the Corps instructed us to cut down and remove the only viable windbreak on the west side of the disposal area. And subsequently, after we had left, I guess, I heard some testimony that they had instructed someone to do some plantings.

Q When the Corps instructed you to remove the only viable windbreak, did you have any understanding as to what the consequences of that might be at the time?

A Well, it wouldn't have been something I would have done.

Q So you understood there were possibly negative repercussions from removing the only viable windbreak?

A Yes.

Q Was there any way that you believe you could have learned about these complaints about the Corps' performance in these projects prior to submitting your bid?

A Maybe through the Freedom of Information Act, the Corps documents.

Q What about the local community members? Could you have spoken with local community members?

THE WITNESS: Well, if I would have wanted to ascertain existence of the shoreland protections, that means I would have known about it. And if I had known about it, well, then we wouldn't be here.

BY MS. MCCARTHY:

Q The next paragraph on page four continues, in the first full paragraph, "Matteson had no way to anticipate or predict that the local governing authorities would take steps to prohibit the placement of dredging pipe across the shoreland protection zone to areas outside the zone." What is the basis for the statement that Matteson had no way to anticipate or predict that the local governing authorities would take steps to prohibit the placement of the dredging pipe across the shoreland protection zone to areas outside the zone?

A Well, I interpret this sentence to indicate that if Mattesons didn't know about a shoreland protection zone, then we would have no way of knowing that enforcement of that zone would prohibit us from placing dredge pipe across it.

Q But the existence of the shoreland protection zone wasn't a secret, was it?

A I don't think it was a well-known situation. I

think, in my opinion, the shoreland protection zone law came about as a last ditch effort for those in the county opposed to the project, because there's a letter like around to some effect that states that they didn't see how they could keep us from going forth with the project without that.

Q But prior to submitting the bid, could you have made inquiries to county officials and ascertained the existence of the shoreland protection zone?

A Again, if I inquired about the existence of the shoreland protection zone, that indicates that I would have already known about the shoreland protection zone.

Q Could you have made inquiries to county officials?

A I could have made inquiries to county officials.

Q And you could have made inquiries to county officials prior to submission of the bid?

A That's correct.

Q Did you in fact make any inquiries to county officials about any applicable regulations that might apply to the sites that you were proposing to use?

A No.

Q The next paragraph of your claim reads, "As a result of the action taken by the local authorities, it has made it economically infeasible and virtually

attached herewith.)

BY MS. MCCARTHY:

Q Mr. Matteson, we've marked as Exhibit 44 a fax cover letter from Larry Matteson to Melissa Gulan, and it's dated March 17, 1997. And the text of the fax reads, "We are presently negotiating with John Brown to get permission to place sand on his property." Is John Brown John Braun?

A Yes.

Q Saunderson, Sanderson, Brown, Braun. It's very confusing.

A Yes.

Q First of all, is this a fax that you sent to Ms. Gulan?

MR. MILLER: He personally or his company?

THE WITNESS: I believe our company sent this fax, yes.

BY MS. MCCARTHY:

Q It says it's from Larry Matteson. Is that --

A Yeah, that would be --

Q Is that you or your father?

A Yeah, that would be me.

Q Do you have any recollection of this fax?

A Some.

Q The fax continues, "This property has already

had tentative approval from the Corps prior to the bid date." This tentative approval, is that your term?

A I'm not sure.

Q Do you know who else at Matteson would have used the term tentative approval in connection with the Braun site?

A I do not.

Q What does tentative approval mean to you?

A Approval based on not finding anything significantly wrong environmentally or archaeologically with the site.

Q Why did you choose to use the modifier tentative? Why didn't you say the property already has had approval from the Corps prior to the bid date?

A I'm not sure.

Q In your view as you sit here today, is there any difference in the nature of the approval that the Corps gave to the Braun site prior to the bid date or the approval that you believe the Corps gave to the Saunderson site prior to the bid date?

A No.

Q As you sit here today, do you still regard the approval that you received from the Corps prior to the bid date for the Braun property as tentative?

A Using my definition of tentative, yes.

Q And as you sit here today, do you still regard the approval that you believe you received from the Corps prior to the bid date for use of the Saunderson property as tentative?

A Yes. I believe if we would have found an archaeologically significant site on the Saunderson property or a buried oil field or something like that that would have been environmentally objectionable, we would not have been able to use the site.

Q If I could turn your attention back to Tapp Exhibit 10, if I can turn your attention, Mr. Matteson, to the entry that Mr. Tapp put in for September 18 of his daily record of events, it says September 18, 1996 up at the top of Mr. Tapp's daily record of events. There's an entry that says, "(1) Grand E. - I spoke to Jim Nordstrom (Wabasha County attorney) at (612) 565-2487, and he said homeowners downstream of Wabasha are concerned about dredged material to be placed in the vicinity. I explained our contract and that it was not awarded yet, but low bidder wants to use a site downstream from Teepeeota Point. I also said his use (not sure of contract award) is contingent upon him getting all permits and approvals. Jim thinks it falls under their shoreline ordinance. I gave Jim Larry Matteson's phone number and told him to call me if he had further

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

*****************************************************

L. W. Matteson, Inc.,

Plaintiff,

v.

No. 01-5420
(Judge Wilson)

The United States,

Defendant.

*****************************************************

**DEPOSITION OF**

**LAWRENCE W. MATTESON**

Taken July 25, 2002
Scheduled for 9:00 a.m.

Reported By: Lori L. Morrow, RPR
PARADIGM REPORTING & CAPTIONING INC.
1400 Rand Tower, 527 Marquette Avenue South
Minneapolis, Minnesota 55402 * (612)339-0545
1(800)545-9668 * Fax (612)337-5575

in potentially using the Martin site in connection with this --

A I think this letter was written before we looked at the sites. These sites were listed in your solicitation as possible sites. And when we looked at it, we were wondering -- listed as trucking sites. We were wondering if they would change them and let us pump hydraulic fill into those sites.

Q How were the sites that were set forth in the Corps' solicitation listed as trucking sites?

A I think that's what it was stated in there. Now I can't remember the exact wording, but maybe the job was set up pretty much strictly for a mechanical dredging type job.

Q And how, in your view, was the job set up for mechanical dredging? What about the --

A Because, actually, when we looked at these jobs, when we finally went and looked at these sites, there was no method for getting the water back to the river, as I recall. I don't remember ever getting a response to this letter back from the Corps of Engineers.

Q You're ahead of me, Mr. Matteson. I was going to ask you that. Do you know why at this particular stage Matteson, Inc., was singling out the Martin placement site versus the other sites that were set forth

in the solicitation?

A Which other sites are you referring to?

Q Well, how many sites do you recall being set forth in the solicitation?

A Either three or -- there were two real small trucking sites, half acre or something like that, which we had ended up trucking material to, and then there was this Martin site and a Regman [phonetic] site. Now, which of these two sites I'm visualizing that I went and looked at I don't know. And as I recall, when we visited with the owner, the Corps did not have any permit or any agreement with him to let material be put on the site, which surprised us.

Q But in particular, in terms of this fax of July 18, do you know why Matteson just singled out one site among other potential sites?

A No. Of course, I'm sure where I looked, the half acre sites would not be dredge sites. They were clear up in the hills.

Q And did you determine that the other sites were half acre sites based on the solicitation or based on your physical observation of the sites?

A You have that statement right in the solicitation.

Q So it's based on your reading of the

solicitation?
A (Nods head.)
Q And was it based on your reading of the solicitation that the Martin site might at least potentially be a site that could be used for hydraulic dredging?
A You state in the solicitation that it would hold all the material that needs to be moved, right?
Q The letter asked that the plans and specs be changed to allow direct placement of material on the Martin site using a hydraulic pipeline dredge. And I'll give you an opportunity, sir, if you want to look through the solicitation. But what in your view at this point in time needed to be changed in the plans and specs to allow the use of the hydraulic pipeline dredge?
A I don't know what that would entail.
Q So you don't know specifically what would need to be changed in the plans and specs to permit use of the Martin site as a hydraulic --
A No. That's correct.
Q -- site? I'll also ask you, Mr. Matteson, if you would pull out Exhibit 37. Now, Exhibit 37 appears to be a purchase agreement dated August 16, 1996, involving L. W. Matteson and a piece of property located at 53 Pioneer Drive in Wabasha, Minnesota. Do you

recognize this purchase agreement?

A Yes.

Q What property does this purchase agreement pertain to?

A It's a piece of property that we got an option on to run a pipeline across to get to the Braun property down in that area.

Q So this piece of property was not for the Saunderson property. It was for the Braun property?

A Yeah. This isn't the address of the Saunderson property.

Q And at some point, did Matteson enter into a purchase agreement for the Saunderson property?

A Yes.

Q Do you know if the terms and conditions of that purchase agreement were different than the terms and conditions of the purchase agreement set forth in Exhibit 37 but for perhaps the location and the amount of the sale price?

MR. MILLER: This might be helpful to you. And I told you before we went on the record that with Mr. Guillot no longer employed by Matteson, we were trying to find some files that he may have kept. And we found a couple of those files; and we did locate the

Saunderson purchase agreement in there, and I think I can lay my hands on that for you.

MS. MCCARTHY: Okay. Can we put an exhibit sticker -- we don't have any copies of this. If we can mark this as Exhibit 48.

(Deposition Exhibit Number 48 was marked for identification and is attached herewith.)

BY MS. MCCARTHY:

Q Mr. Matteson, we've handed you what's been marked as Exhibit 48, which your counsel just provided to us, which we're appreciative for, and ask you if you recognize what's been marked as Exhibit 48.

A Do I recognize it?

Q Yeah. Do you recognize it?

A That is the purchase agreement we had for the Saunderson property.

Q And what is the purchase price listed?

A It started out at $78,750 and then at some point during that period of time increased to 90,000.

Q Okay. Do you know at what point in time -- strike that. What's the date of this purchase agreement?

A August the 23rd of '96.

Q Okay. And what point in time, to your knowledge, did the purchase price increase to 90,000 from

78,750?
A I don't think that's apparent.
Q Do you know independent of this document?
A I'm sorry?
Q Do you know independent of the document when that change occurred?
A I have no idea.
Q If I could just draw your attention to the middle of this agreement, it states, "Subject to performance by the buyer the seller agrees to execute and deliver a General Warranty Deed (to be joined in by spouse, if any) conveying marketable title to said property subject only to the following exceptions:" "Building and zoning laws, ordinances, State and Federal regulations." "Restrictions relating to use or improvement of property without effective forfeiture provision." "Reservation of any minerals or mineral rights to the State of Minnesota." And "Utility and drainage easements which do not interfere with improvements." And "Rights of tenants as follows: (unless specified, notsubject to tenancies)." Were you familiar that that provision pertained to the purchase agreement of the Saunderson property?
A Pretty much standard, yeah.
Q And it's pretty much standard to have a

reference to building and zoning laws, ordinances and state and federal regulations and conveying a general warranty deed?

A Yes, I believe so.

Q Is the issue of a right-of-way to the Saunderson property reflected in this purchase agreement? Do you know?

A Well, that was a separate -- will you run that by me again?

Q Was the right-of-way for the Saunderson property, was that reflected in this purchase agreement?

A No.

Q Was there a separate agreement for the right-of-way?

A We had an option with an individual right across the road from here, Wooldridge or something like that was the name, to run the pipeline across their property.

Q And was that reflected in a written agreement as well?

A I haven't been able to find it yet, and I'm not sure whether we had a written agreement or just a verbal.

Q And what was the option price for that, if you recall?

A As near as I can figure it out, it looks like it was $20,000.

Q Okay. Mr. Matteson, if I could turn your attention to Exhibit 2, which are notes Mr. Kromholtz took on August 29, 1996. Do you recall having a conversation with Mr. Kromholtz on August 29, 1996?

A Yes.

Q What do you recall about that conversation?

A My son was up here waiting to turn the bid in, and he called me, and I was in the Atlanta airport, and we had put the bid together over the telephone, finalized it and stuff. And I called Dan Kromholtz to get a little more assurance or -- I have a lot of respect for Dan Kromholtz, and I feel that he has respect for me, and I respect his opinion, and I called him to ask him about this site.

Q And when your son was waiting up here, does that mean your son was in St. Paul?

A Yes. He was sitting outside here waiting. This phone call happened about two hours before bid opening, I think.

Q And to clarify, you were in an airport in Atlanta?

A I'm sorry?

Q On August 29 --

A I was in Atlanta airport.

Q -- you were in Atlanta airport? Had you visited

the Saunderson property prior to making this telephone call to Mr. Kromholtz?

A Yes.

Q How many occasions had you visited the Saunderson property?

A I think I had been there a couple of times.

Q Who if anyone else was with you when you visited the sites prior to August -- strike that.

Who if anyone was with you when you visited the Saunderson property prior to August 29, 1996?

A I'm not sure anyone was there with me when I visited.

Q Do you know if you visited the site with any officials from the Corps?

A As I just stated, I don't think anybody was there with me when I visited the site.

Q I'm sorry. I didn't hear you. Prior to making this telephone call, what was your understanding as to the contact, if any, that the Corps had had with the Saunderson property?

A I was not there when they made the site visit with my son and drove around the property and looked at the Braun property and the Guza property. As far as we were concerned, all three properties were usable and permittable from what the observation of the site visit

had been that day that my son drove around there with them.

Q Okay. If you could turn to Exhibit 2, Mr. Kromholtz' notes, it states, "Lawrence Matteson. He asked about use of a wooded site at Teepeeota Point." When you spoke with Mr. Kromholtz, did you specifically use the term Saunderson property, or did you refer to a wooded site at Teepeeota Point? Do you recall?

A I was talking about -- I'm sure I said the Saunderson area and then described to him that it was the wooded area and where it's located at.

Q And at this time that you made the telephone call on August 29, was the Saunderson property a wooded site?

A Yes. That's what I was talking -- that was the Saunderson site here that I'm talking about here in the conversation that I had with him.

Q Now, Mr. Matteson, if I could turn your attention briefly to Exhibit 1, which is the solicitation. I make you juggle exhibits. I apologize.

A Okay.

Q If you could turn to page 01000-2, which is section 7.3 in the solicitation.

A 0001 what?

Q It's 1000-2, if you prefer to do it that way.

It's towards the end. It's more towards the end of the solicitation. It's solicitation 01000. Okay. Do you see 7.3 on the top half of the page?

A Okay.

Q Prior to this phone call to Mr. Kromholtz, did you know if you had read this particular provision of the solicitation, 7.3?

A I'm familiar with the section.

Q And this section pertains to contractor's selected final disposal areas and placement sites. Is that correct?

A I'm sorry?

Q This particular provision, 7.3, this pertains to contractor's selected final disposal areas and placement sites. Is that correct?

A Yes.

Q And if I could just draw your attention to, I believe it's the third sentence. It reads, "No disposal (placement) will be allowed in a wetland or wooded area."

A Correct.

Q Now, at the time you had the telephone conference with Mr. Kromholtz, were you aware of this provision in the solicitation?

A Yes. The landowner was already cutting the wood off. He was harvesting the pulp wood off of it.

Q Do you know at what point in time the landowner had started that process of clearing the land?

A It was an ongoing process for -- he worked someplace and just did this as a part-time job.

Q Like a weekend activity or --

A Yeah.

Q So Mr. Kromholtz's notes reflect you as indicating that the site was being cleared by the landowner. Is that accurate?

A Yeah. That's right.

Q I'm sorry.

A Yeah.

Q I don't want to confuse you. I want to direct you back to Exhibit 2. You can put the solicitation aside, if you wish. Then the notes continue, "I told him that we could not control what the landowner did." Now, do you recall Mr. Kromholtz making a statement to that effect?

A I don't remember the exact wording that was used. That's when I assured him that the landowner was already in the process. And from what I had talked to him, he was going to continue cutting down. I didn't think that that would be an issue.

Q Then the notes continue, "We did not want heavily wooded areas cleared just to dispose of dredged

material." Do you recall Mr. Kromholtz making a statement to that effect in this conversation?

A No. I don't remember -- like I say, I don't remember the exact wording that was said, but the trees were not a problem because they were going to be cut anyway. And they were not being cut for the purpose of putting the sand on. They were being cut for the landowner's use of selling the pulp wood off of them.

Q But would it be fair to say that you recall that there generally was a discussion with Mr. Kromholtz about the fact that the site was wooded and that it was in the process of being cleared and that the landowner was clearing it for a purpose unrelated to this project?

A Right. And that was one of the positive aspects of this property was the fact that it was wooded, and we were planning on leaving, and this is reflected in the Corps' letters later on in this whole process was the leaving that 40 or 50, 60-foot trees around the outside would limit the visibility of it and also limit the sand blowing or the noise when we were placing it on that stuff, so the trees were a positive aspect as far as we were concerned.

Q The notes continue, "From talking to Mr. Matteson, it sounded like that was not the case." So would it be fair to say that you gave the impression to

Mr. Kromholtz during this conversation that the wooded area was not being cleared just to dispose of the dredged material; that you had given him that impression?

A That's right.

Q The notes continue, "I told him that we would need to do a cultural resources investigation of the site and that we would obtain water quality certification from the MPCA for the effluent." Do you recall Mr. Kromholtz making a statement to that effect?

A This would be the general things that we would be talking about in this conversation, yes.

Q And it was your understanding from this conversation that the cultural resources investigation would occur after the telephone conversation, would occur in the future?

A Yes.

Q And also you understood that as of August 29, the water quality certification had not yet been obtained from the MPCA for the effluent?

A Yes.

Q Was there anything else that you can recall regarding this conversation with Mr. Kromholtz that is not reflected in these notes?

A No. Like I say, I just called him up to get a positive feeling or a negative feeling from him as to

whether the site could be used or not.

Q And what was your impression after speaking to Mr. Kromholtz? How did you feel?

A I felt that he felt that it was a site that could be used for this purpose.

Q Did he express any specific familiarity with the site during this conversation?

A He knew the site that I was talking about.

Q And how --

A I mean, you know, it's very obvious when you drive around the area out there. It's the site right across the road from the Guza property, and, like I say, it's no secret. When he drove around out there he knew what site. It's right next to the site that he had looked at with J. F. Brennan. This site is right next to that.

Q Before you had placed a phone call to Mr. Kromholtz, what concerns, if any, did you have about the site that prompted this phone call?

A Same concerns a person always has when you submit a bid of that size and agree to do a job.

Q And what concerns were those?

A Just trying to be real sure that you can pull it off.

Q Did you have any specific concerns about the

site though?

A Just the general concerns that a contractor in our position when you're submitting a bid on a job of that size would have.

Q And, Mr. Matteson, you brought your phone records or some records here?

A Yes.

Q Do you have any memorialization of this particular --

A I don't know whether that phone call was listed in there or not. I don't think it is.

Q I understand, sir, that you were calling presumably from a pay phone or a cellular phone at the airport and that --

A Yes. I was calling from a pay phone.

Q -- you weren't sitting at your desk.

A I don't think I opened my briefcase. I think we found the phone record of that call being made. There was a charge to my credit card.

Q Right. We have the billing records. I was just wondering if you had any notes --

A No.

Q -- or a record of the conversation --

A No.

Q -- other than obviously the mechanical fact that

it occurred.

A No.

Q I think there's no dispute that the call occurred. If I can turn your attention, sir, to Exhibit 10. I'll give you a few minutes if you want to put those documents back. Exhibit 10, now, these are notes that were used during Mr. Tapp's deposition. And the entry for September 18, 1996, reflects a conversation, a telephone call that Mr. Tapp received from Jim Nordstrom, the Wabasha County Attorney. Do you recall ever receiving a phone call from Mr. Nordstrom regarding the shoreline ordinance?

A No.

Q Have you had any dealings with Mr. Nordstrom?

MR. MILLER: I didn't hear. What was your answer?

THE WITNESS: No.

BY MS. MCCARTHY:

Q Have you had any dealings with Mr. Nordstrom?

A The name doesn't ring a bell with me.

Q So as you sit here today, you don't recall ever meeting with Mr. Nordstrom or speaking with him on the telephone?

A What's his position?

Q It appears that he's the Wabasha County

attorney.

A No. That isn't the guy I talked to.

Q Now, at some point in time, did you become aware of the issue of a shoreline ordinance and its potential effect upon the Saunderson property?

A Sometime after award we became aware that there was a shoreline protection issue. I don't know exactly what it's called.

Q Do you recall how long after award you became aware of the shoreline protection issue?

A As near as I can find out, it was a letter that I received from Judy Kruger. The exact date I can't -- I looked at this morning, and I can't remember what the exact date was. But it was sometime after we had been in the process of getting a permit for the Saunderson's -- we were getting a permit for continued clearing and stuff on their land, and that's where the land use permit we were aware of just shortly after the, I guess shortly after the award and then after the land use permit. The land use permit did not cover the shoreline. It was a separate thing.

MR. MILLER: You mentioned earlier that you located Mr. Guillot's file. The letter that he's referring to -- a copy of that is located in that file. You're welcome to look

at the file any time.

MS. MCCARTHY: Oh, thank you. That will speed things along. Thank you.

THE WITNESS: This conversation here on the 18th --

MR. MILLER: Just for the record, I handed counsel a September 24, 1996, letter from Judy Kruger that apparently was faxed to Matteson's office on September 26.

THE WITNESS: I think you were asking me about this conversation here with Steve Tapp -- or about his conversation with Mr. Nordstrom, I guess.

BY MS. MCCARTHY:

Q Right.

A This letter here would indicate that the Corps of Engineers knew about the problem here before the award, right?

MS. MCCARTHY: It suggests what it suggests. If we could mark this as Exhibit 49.

(Deposition Exhibit Number 49 was marked for identification and is attached herewith.)

BY MS. MCCARTHY:

Q Now, Mr. Matteson, is this the letter to which

you're referring, the letter from Ms. Kruger?

A Correct.

Q The letter from Ms. Kruger refers to a recent conversation.

A Correct.

Q What prompted that? Do you know what she's referring to in that recent conversation?

A At that time, I was talking to her, you know, off and on about what was going on up there and about us putting the sand on the property and getting the land use permit papers and stuff through.

Q When did you first have contact with Ms. Kruger?

A It looks like 9/12 is the first entry I have in here on County Permit, Wabasha Zoning Administration, Judy Kruger, (612) 565-3242. All I say is that she will send permit app.

Q And this is on September 12, 1996?

A Yes.

Q And do your notes indicate that you contacted her or she contacted you?

A Doesn't say.

Q What caused you to get in contact with Ms. Kruger?

A The Saundersons were getting a permit renewed or something on the land use permit, and they asked me to

call her, and I called her or something. Like I say, I was talking to her at that time after the bid opening.

Q Were you aware that the Saundersons had a land use permit at the time you submitted your bid?

A I'm not sure that we -- we just had an option on the land is all we had at that time.

Q Were you aware at the time you submitted your bid that you might be required to obtain a land use permit?

A I don't think that had come up at that time.

Q Upon receiving Ms. Kruger's letter dated September 24 -- I guess, it looks like you received it perhaps the 26th. But upon receipt of Ms. Kruger's letter sometime in September, do you recall what your reaction was to the letter?

A I don't think we -- at that time we still did not have any real big concerns that we couldn't get the necessary permits to get to the land.

Q Ms. Kruger refers to the shoreland and the shoreland management ordinance in this letter.

A Uh-huh.

Q Did you know what she was talking about when you received this letter?

A I'm not sure. I knew that at that time when she called me, and I think we had discussed it some to some

extent. But at that time, I don't think Judy felt that it was going to be all that big a problem.

Q Did you have any communications with the Corps about this shoreland ordinance after you received this letter from Ms. Kruger?

A I think that it was being discussed both between us and the Corps, yes. Exactly when exact dates are I don't know.

Q In terms your knowledge of the ordinance, what -- strike that.

Upon learning of the existence of this ordinance sometime in September 1996, what did you do after that in connection with the ordinance?

A Well, there was continuous conversations back and forth. We were trying to find out what it consisted of, and, like I say, when we first heard about it, I thought that it still could be dealt with.

MR. MILLER: I want to interpose an objection. I don't want the question where counsel said that Matteson learned sometime in September to suggest anything contrary to the witness' testimony, which was that he did not become aware of it until sometime after September 26 when he received Judy Kruger's letter. I don't know that it was intentional.

I don't want the question to be mischaracterized as the witness is in agreement, which was sometime in September.

BY MS. MCCARTHY:

Q And when you say you had continuous conversations, who were the parties to these continuous conversations?

A Other than Judy, I don't know who -- at that time, I don't know who we were talking to other than Judy.

Q When did you first have discussions with anyone from the Corps regarding the county shoreline ordinance?

A That I don't know. I have --

Q At some point --

A Go ahead.

Q I'm sorry. Did you have --

A See, I have just telephone numbers of Melissa and another party here. But I don't say that I called or anything. I just have their phone numbers down and stuff here.

Q At some point, did you become concerned about the shoreline ordinance?

A I guess our concerns started when we started having the public meetings, and they were so violent.

Q I don't want to mischaracterize your testimony,

Mr. Matteson, but if I understand your testimony, learning of the simple fact of the existence of the shoreline ordinance did not cause you any particular concern?

A You know, any of these things cause you concern. That's why we're pursuing it. It had to be dealt with.

Q But the simple existence of the shoreland protection ordinance did not cause you to believe that you wouldn't be able to use the property?

A As I previously stated, when we first found out about it, I thought it was something that we could live with and something we could work with.

Q When was the first public meeting? When did that occur, to your knowledge?

A Exact date I do not know.

Q Do you have an approximate understanding when it occurred in relationship to this letter that you received from Ms. Kruger?

A I did not attend the first public meeting they had up there. I think the Corps' testimony indicated that they were there. Exactly what the date was, I don't know what the date was on it. I can't --

Q Did you have any information as to what occurred at the first meeting that caused you increased concern?

A Yes. It was the local opposition due to Corps

performance in the past was, I guess you would call them very violent and very outspoken.

Q How did you learn about the local opposition expressed at the meeting? Just tell me mechanically.

A We had a representative at that meeting.

Q And who was the representative?

A David Guillot. And I can't remember. I think my son was at that meeting, too. I can't remember for sure.

Q And Mr. Guillot and maybe your son told you about what occurred at the meeting?

A Yes.

Q And was that the first time that you became concerned that you might not be able to use the Saunderson property as a disposal site?

A That was the start of it, yes.

Q At any time prior to this first public meeting, were you concerned that you may not be able to use the Saunderson property as a disposal site?

A We were getting feedback from different conversations and stuff that it was from Judy Kruger and from other people that the opposition was building, yes.

Q Do you recall when Ms. Kruger first advised you of the opposition?

A Exactly, I can't remember the days and the dates

that many years back. My memory is not that good anymore.

Q Did Ms. Kruger advise you that opposition was building at the time she sent you this letter enclosing copies of the ordinance?

A My conversations with Judy at that time, I don't think she was that concerned. Judy is also a landowner in that vicinity, lives out in that vicinity. She had the same concerns that everybody else does. But she had an office here, and she was fulfilling her office duties for the most part when she was talking to me.

Q Based on your conversations with Mr. Guillot about what happened at the first public meeting, did you have an understanding as to what prior Corps projects the local concern was being expressed?

A The placement of sand in the county there. All the projects where they had placed sand in the --

Q Do you know specifically where?

A The Read's and Crat's placement sites.

Q Okay. Mr. Matteson, if I could turn your attention to Exhibit 39. Could we go off the record for a second?

(Discussion off the record)

(REPORTER'S NOTE: At this time, 10:30 a.m., we recessed Mr. Matteson's

property. We had to go across several other properties to get to his.

Q Were you able to get all the rights-of-way that were necessary for the Braun property?

A I believe that we could have gotten all the -- we were coming up the county road ditches, and I think we might have had one other property to go across. Whether we had them all in place or not at that time --

Q And if I could refer you back to Exhibit 46 from yesterday, this is a letter dated May 8, 1997, from your son to Captain Glaeser. And he indicates, "My father and I met with Mr. and Mrs. Brown yesterday, May 7th. We have reached an agreement with them to use their property to dispose of the sand for the above referenced project. We still need to acquire right-of-way and permits for a pipeline route to their property. We were unable to pursue those issues yesterday, but will be addressing them as our schedule allows." Do you recall that as of May 1997 that the Braun property was still a possibility?

A Yes, I think we were still working on trying to work something out there.

Q And then the letter concludes, "I would like to suggest a meeting between the Corps of Engineers and L. W. Matteson, Inc. to discuss this project, the difficulties we have encountered and what, if any,

direction the Corps of Engineers feels we should take." Why at this point did L. W. Matteson feel the need to obtain direction from the Corps of Engineers?

A We were trying to get a right-of-way into the property. And at that point, I would think that it was a good assumption that we were not going to be able to use the right-of-way that we were planning on using because it was on county roads and that had blocked us from getting to the Saunderson property. And at that time, we were talking to the Fish & Wildlife and the Corps of Engineers about first coming off the end of the dam and trying to get across to another property there off the end of the dam and getting to the Braun property. And that didn't work. And then they were talking about coming up to that one slough there and across the Fish & Wildlife property. But we still had to either cross a county road or some private property, and we were trying to get those things worked out.

MS. MCCARTHY: If I could just mark this as Exhibit 67.

(Deposition Exhibit Number 67 was marked for identification and is attached herewith.)

BY MS. MCCARTHY:

Q Mr. Matteson, I've marked as Exhibit 67 a letter

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - - - - - - -

L.W. MATTESON, INC.,

Plaintiff,

vs. Case No. 01-542C

UNITED STATES ARMY CORPS OF ENGINEERS,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF: **STEVE TAPP**

DATE: July 23, 2002

PLACE: Army Corps of Engineers Centre
190 Fifth Street East
St. Paul, MN

TIME: 9:00 a.m.

COPY

Teresa M. Schafer
Registered Merit Reporter
LOGAN AND STYRBICKI COURT REPORTERS
300 Degree of Honor Building
325 Cedar Street
St. Paul, Minnesota 55101
(651) 291-1095 FAX (651) 297-6884

regarding whether the designation of these sites would be done by most likely by mechanical or by hydraulic removal?

A. We didn't specify whether it was either hydraulic or mechanical in those.

Q. My question wasn't addressed to what you specified in the document, I'm talking now in a time frame when you're going through the planning stage of identifying disposal sites, do you understand that?

A. Yes.

Q. Okay. And my question was whether you had any discussion during that time period regarding whether designating these disposal sites would most likely result in mechanical removal of the material?

A. I think for most of these sites we probably did have a discussion on that they were likely to be used mechanically, but could be used hydraulic.

Q. Why were these sites likely to be used mechanically?

A. It was basically based on the distance away from the site the excavation sites.

Q. What was the distance from the site?

A. I don't recall specifically on all these.

Q. And what consideration did you give to that, I mean what discussion did you have regarding the

A. As a result of the follow-up we just indicated that that was, you know, to Matteson that it was a preliminary investigation for the cultural resources and that's what all that correspondence stated.

Q. If you would turn in your diary excerpts to the entry for October 9 about a third of the way down you see an entry there can you tell me when the contract on this project was awarded?

A. My notes indicate award was on 20 September of 96.

Q. What's the act that actually constitutes award?

A. I don't know.

Q. If you could turn back to the entry for September 18th, 1996, you see at the top of the page there's a reference to again Grand Encampment project?

A. Yes.

Q. And you've noted in your entry there that you spoke with Jim Nordstrom at the Wabasha County Attorney on that date?

A. Yes.

Q. Who initiated that conversation?

A. I was called by Mr. Nordstrom.

Q. Did he say what had prompted his call?

A. As the notes indicate there was some homeowners downstream of Wabasha that were concerned about the dredge material being placed in the area there.
Q. And did he give you any more details?
A. Nothing more than that, I mean, just that they were -- there was a concern from the landowners.
Q. Okay, what would -- and I can see what's written in your notes here but I'm trying to find out what else you can recollect of that conversation. Did he tell you specifically what the concerns were?
A. I don't recall.
Q. Did he say how he had found out about the project?
A. I don't recall whether he did or not.
Q. Did he tell you how many homeowners were concerned?
A. Not that I can remember.
Q. Did he indicate that the -- strike that.
Anything else that you can recall from his conversation with you?
A. Not other than what's in the notes.
Q. Go ahead and tell me what else you discussed with Mr. Nordstrom?
A. Do you want me to read the notes?

Q. You can read the notes or if you have any independent recollection you can give me your independent recollection.

A. As I said I don't recall anything other than what I've got in the notes here basically that there was concerned homeowners with placement of material in the vicinity there and I explained our contract and that it was -- hadn't been awarded yet but the low bidder wanted to use a site downstream of Teepeeota Point.

Q. And what property does that refer to?

A. I believe that was referring to the Saunderson site.

Q. And when you state in your notes that you explained our contract, what specifically about the contract did you explain?

A. I can't recall exactly what I explained to him.

Q. Was there anything about the contract that required explanation, you know, in the context of this conversation what was it that you anticipate you were explaining to?

A. Probably what I mentioned before to you just the scope of work, you know, that we were excavating material from the Grand Encampment site.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - - - - - - -

L.W. MATTESON, INC.,

Plaintiff,

vs. Case No. 01-542C

UNITED STATES ARMY CORPS OF ENGINEERS,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF: **MELISSA GULAN**

DATE: July 23, 2002

PLACE: Army Corps of Engineers Centre
190 Fifth Street East
St. Paul, MN

TIME: 2:43 p.m.

ORIGINAL

Teresa M. Schafer
Registered Merit Reporter
LOGAN AND STYRBICKI COURT REPORTERS
300 Degree of Honor Building
325 Cedar Street
St. Paul, Minnesota 55101
(651) 291-1095 FAX (651) 297-6884

August 8th?
A. Well, from this I'm guessing there was but --
Q. Do you have any recollection what occurred with that meeting?
A. No, I would have to review files.
(Whereupon, Deposition Exhibit No. 25 was marked for identification.)
BY MR. MILLER:
Q. Handing you Exhibit 25.
A. I hope there wasn't a smart alec in this one.
Q. It's a copy of an internal memorandum dated April 27th, 1998 that you prepared, is that correct?
A. Yes.
Q. What was your purpose in preparing this memorandum?
A. Give me a minute.
Q. Sure.
A. Okay, we had a meeting coming up and it was just to let the team know, give them my version of the background. There was a meeting on the 7th of August.
Q. I'm sorry, what are you referring to?
A. Oh, on the second page paragraph 5 going back to the previous exhibit.
A. Now I can answer your questions from the previous exhibit.

Q. Okay.
A. Was there a meeting, yes.
Q. Meeting was held on August 7th?
A. And was I there, yes. And as far as the determined that the Corps of Engineers wishing that it would not aid L.W. Matteson actually what it was that we would continue to facilitate the contractor's permit request but would not actually obtain permits for the contractor.
Q. Are you aware that it's the apparently the Corps's position that it had sovereign immunity and that it does not have to concern itself with local government laws, agencies, approvals?
A. Well, I've only had three credits of business law but the way I understand it the government has sovereign immunity and that's really as far as I know about that.
Q. Do you understand that the Corps is an agency of the federal government, at least some individuals at the St. Paul District have taken the position that sovereign immunity that the Corps enjoys and they do not have to concern themselves with such issues such as the shoreland ordinance in Wabasha County?
A. Well, that's not the way I understand it.
Q. Well, did the Corps when it did the Read's

Q. You're entitled not to like my questions.

A. I didn't say I didn't like your questions, I just said didn't make sense to me.

Q. Well, what steps did the Corps take to obtain authorization for the dredging pipe through the first thousand feet of shoreline for the Read's Landing?

A. I don't know.

MS. McCARTHY: Objection, asked and answered.

BY MR. MILLER:

Q. Is there any reason the same steps couldn't have been taken at Grand Encampment project which was only a year later?

MS. McCARTHY: Objection.

BY MR. MILLER:

Q. Go ahead.

A. Well, what she's saying is I don't really know.

MS. McCARTHY: No, no, no, no, I'm just making objection for the record. Answer to the best you can.

THE WITNESS: I would have no way to know if, you know, it wasn't just one year ahead it was probably three years ahead it was bid. It was -- and it wasn't the first time that pipeline route was used at Read's Landing. It had been used in 86-87 by

COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - -

L.W. MATTESON, INC.,

Plaintiff,

v. No. 01-542C

THE UNITED STATES,

Defendant.

- - - - - - - - - - - - - - - - - -

DEPOSITION OF

JAMES C. NORDSTROM

Taken February 20th, 2003

Commencing at 9:00 a.m.

REPORTED BY: Kay Lynn Hinsch, RPR
PARADIGM REPORTING & CAPTIONING INC.
1400 RAND TOWER
527 MARQUETTE AVENUE SOUTH
MINNEAPOLIS, MINNESOTA 55402
(612) 339-0545

other one -- the other dealing I had -- and that would have been as City Attorney, for the City of Wabasha, and I don't remember the sequence.

Q. In '83?

A. Well, that one was in '83.

Q. And that was as City Attorney?

A. Right. That was the reason -- the reason I got involved as City Attorney was because there were some questions about whether or not the Army Corps had to comply with the Shoreland Ordinance, which was in effect in Wabasha, in order to be able to deposit the dredge spoil there.

Q. Okay. We'll go back to the second one in a minute, but -- so you'd just become a partner in Gartner in 1983; correct?

A. '82 or '83 I said, I believe.

Q. But in '83, when you had this interaction with the Corps, you were a partner at this time?

A. I believe I was, yes.

Q. And I guess I don't understand how you could be a partner in a law firm and also doing City Attorney work?

A. Let me explain that. Most small municipalities in Minnesota retain law firms to handle their City Attorney work, both criminal

prosecution and any civil work that's done for the City. And when I worked for that firm, we were city attorneys for the City of Lake City, City of Wabasha, City of Plainview, and a small town that's also in Wabasha County called Mazeppa, M-a-z-e-p-p-a, so we -- we provided advice to the City of Wabasha in reference to the proposed project that the Corps had, to put the dredge spoil within the City limits.

Q. So the City of Wabasha went from contracting the work out to having a part-time job to having a full-time job, is that how that worked?

A. No, I worked for the County of Wabasha.

Q. The County of Wabasha, I'm sorry.

A. The City of Wabasha still has a private attorney, in fact, it's Peter Ekstrand, who provides City Attorney services to them by contract, just as we did back when I was doing it.

Q. Okay. During what period were you acting as City Attorney for Wabasha as opposed to County Attorney of Wabasha County?

A. Well, I would have been -- the other unique thing about it was, various members of our firm would operate in City Attorney capacity. For instance, I did all of the prosecution for those

four cities. Peter Ekstrand did -- primarily was the City Attorney for the City of Wabasha. Phil Gartner did most of the civil work for Lake City. Peter Burkhardt did most of the civil work for Plainview. And I also did civil work for Mazeppa. So we sort of transferred our responsibilities.

Q. And during what period of time were you talking about here where you had --

A. Well, from the time I began working for that firm, which was in '78 or '79, until I went to the Klampe firm in, I believe it was '86, I would have worked as City Attorney for all of those communities from time to time.

Q. Okay.

A. Those contracts were continuous through that time period.

Q. And you just said that you would handle most of the prosecution, if not all of the prosecution, for all of the four cities; is that correct?

A. Right.

Q. So how did you get involved in this particular dispute involving dredge material over -- being hydraulically removed?

A. You know, I don't recall. I would say -- I

also did civil work. If there were some specific projects, for instance, I might -- I might be involved in a contract the city was entering into with somebody providing services. I might take a particular civil case. And I don't know if Peter Ekstrand, who normally did it, may have been on vacation or something, but it just came up and I was asked to -- to contact the Corps.

Q. I guess I got to ask you, June of '87 was almost 20 years ago. You seem to have a pretty good recollection of what happened 20 years ago. I'm just curious as to why?

A. Well, in some respects I do. I have a particular interest about what the Corps does in the river in our area, personally. I'm a real active outdoors person. I use the river a lot for fishing and hunting. And so I have a particular interest in that. But that project that the Corps was doing at that time, and I don't remember if they were using a private contractor or not, was of particular interest to everybody in the community. Because they were talking about bringing in millions of yards of dredge spoil, depositing it in an area which was close to city wells. And there was concern, whether it was legitimate or not, that

there could be possible contamination of the groundwater in that area. So that's why I remember that project. The specific details, I can't tell you I remember all the details.

Q. So just to follow up on that. What's your, if you have one, what's your opinion about how the Corps handles its business in the Mississippi?

A. It's negative.

Q. I guess on a scale of 1 to 10, if 10 is they do the best job possible and 1 is the worst job possible, where are you on that scale?

A. Three.

Q. And why do you say that?

A. Well, a couple of reasons. No. 1, I think that the Corps does a terrible job of keeping people informed in the area. They meet -- they have always met the requirements of posting meetings and giving notice, but they do it minimally, in my opinion. I and others have always questioned their frequent use of eminent closure declarations, because that allows them to, as I understand it, get around some permitting requirements. I think that many more resources should be used to attack the source of sedimentation in the river, rather than just continually removing it. And I think the Corps has

some responsibility in that. So for those reasons, I've always felt that the Corps had one goal and that was to keep the channel open no matter what.

Q. Do you know who Steve Tapp is?

A. I believe he's someone that worked for the Army Corps. I think he was a Colonel. He called himself a Colonel. I don't know if that's a civilian title or a military title. Worked for the Corps back in the 1980s anyway. I don't know if he still works there.

Q. That was, I think, Colonel Rapp.

A. Oh, I'm sorry. I thought that was who you were talking about.

Q. Steve Tapp had some -- I'll just go ahead and proffer that Steve Tapp worked on this particular contract.

A. Which one, the Matteson contract?

Q. The contract we're talking about here today, the contract with L.W. Matteson.

A. Oh, no, I don't believe I ever met him.

Q. Have you spoken to him on the telephone? You can go ahead and refer to your Affidavit.

A. Maybe I'm getting him confused.

Q. Take your time. I'm not trying to trick you here.

Q. Okay. I'll go back to my question, and Mr. Metcalf's objection is noted, but do you know how widely known this is? Is this -- you know, is it as widely known as Dunken Donuts or is it sort of a --

A. It would probably -- I'm sorry, go ahead.

Q. Yeah.

A. It depends upon what part of the county you're talking about. I would say that it's very well-known in the area of Wabasha, Lake City, and what's called Greenfield Township, and those are all communities or areas that are adjacent to the Mississippi River. As you go inland, then I don't think it's as widely known.

Q. Okay. By letter dated July 9th, '98, did you ultimately inform Ms. Krueger that in your opinion the Shoreland Protection Act could not prevent the Corps from using federal land to deposit this material, the dredge material?

A. I'd have to see the letter. I do recall writing her a letter, and I've seen it recently, but I don't remember the date, where ultimately it was my understanding the Army Corps, U.S. Fish & Wildlife Service, and Mr. Matteson, or some combination of those three entities, had reached

some sort of an agreement which allowed for the dredge spoil to be transported out of the river, across federal land, and deposited on federal land. And based on that, it was my opinion that the Flood Plain Shoreland Ordinance, that was in effect at that time, could not prevent that and really had no jurisdiction over it.

Q. And why is that?

A. We don't have -- it's my opinion that we don't have any jurisdiction over federal land in Wabasha County.

Q. And what's the basis of that? What's the grounds for you saying that? Is it sovereign immunity?

A. Yeah, I believe that's it.

Q. Okay. So you believe that the Federal Government does possess sovereign immunity over federal lands?

A. Yes.

Q. Do you know who Dennis Anderson is?

A. I know of a Dennis Anderson -- know of a Dennis Anderson that writes a column for the Minneapolis Star Tribune. Is that who you're referencing?

Q. No. He's a Corps fisheries biologist.

A. No.
Q. Okay.
A. He may have been in a meeting I've been at, but I don't know him.
Q. Do you know who David Guillot, G-u-i-l-l-o-t, is?
A. No.
Q. Do you recall -- when was the first -- I'll back up a second. We're talking about the September time frame is when you had the conversation with Mr. Tapp that you don't really recall. So just to get you oriented in terms of time.
A. September of -- what year was that?
Q. '96.
A. Okay.
Q. Do you know when the first time you heard of this actual contract and the fact that a contractor planned to hydraulically transport dredge material onto the Saunderson property?
A. No. It would have been close to that time, but I can't tell you when.
Q. Do you know how you first heard about it? Was it Ms. Krueger bringing it to your attention?
A. That would -- normally, when anything came up that she had issues about, she would come to see

me or call me on an interoffice phone, but I believe that would probably be how I became aware of it.

Q. Do you know where the Saunderson property is?

A. Yes.

Q. Is it safe to say she lives right next door to it?

A. I know she lives near there. I don't know how close. But I know generally where it is. And I know generally where she lives. But I've never been to her house.

Q. Okay.

A. It's down on an area called Sand Prairie, which is down below the Wabasha/Kellogg area.

Q. But it's pretty close; right?

A. To where she lives?

Q. Yeah.

A. I think so. I think so. Within a mile, for sure.

Q. And folks are pretty -- if you're going to have tons and tons of sludge being pumped onto land next to you, you might be a little more concerned about it than other folks down --

A. There were -- sure. And there were a lot of people that were concerned. And I think most of

them either owned land in that area or lived in that area.

Q. Why were they concerned, to the best of your knowledge?

A. Well, there was a number of different issues raised. The one I recall, probably the strongest, was concern about contamination of water. The wells down there are very shallow, apparently some of them are 60 to 80 feet. A lot of them are sand point wells, they're not cased wells. That was one concern.

There was another concern that there would be blowing sand. I don't know how strong that was. There were concerns about dredge spoil being deposited on land as it was being transported from the water, because they -- well, I've seen the pipes they use, and for some reason, I don't know, they're not very tight, so the hydraulically -- the sand is being moved with water, tends to shoot out along it. But I think the No. 1 concern was contamination of the wells or groundwater.

Q. Okay. So it was a pretty big issue at that time?

A. It was. And then the county engineer also had an issue. Because in order to do it they had to

cross the county road and they'd have to bore under it, so that was more a government issue, but that was another one that was raised. Most of it was contamination concerns, I should say.

Q. Just a second. Has any of your discussions today jarred your memory at all with regard to any conversations you may have had with L.W. Matteson or any of its employees about the Shoreland Protection Act?

A. I believe I had a conversation with Mr. Matteson by phone about my opinion that the Shoreland Ordinance would apply even though the dredge spoil was going to be deposited outside the thousand-foot corridor, but the details of that I can't tell you, nor can I tell you when that was.

Q. Okay. And just for the record, the timing is crucial on this. I just want to obviously know the truth about this.

A. Uh-huh.

Q. We have notes from Mr. Tapp saying that you had a conversation with him on the 18th of September of 1996, and he told you to talk to Mr. Matteson. He says he provided you with the telephone number. If at any point today or in the future you have a recollection as to whether you picked up the phone

right after or how many days it was or how many weeks it was, if you can just interject with that.
A. I would. I can't tell you that.
Q. All right.
A. I think it had to be -- it was definitely between then and whenever the hearing was. And I thought the hearing was in October of '96. I do have minutes from that hearing in that other file so we can check that.
Q. I'll go ahead and get a copy of that before you leave. Just the way I do it as an attorney, I do business. I've got a million things going on, like you probably do. I try to knock everything out at once. I don't know if that's the way you tend to do business or not.
A. As far as phone calls are concerned, I return business -- I return phone calls generally in groups of calls. I'll frequently get 40 or 50 calls in a day, and so it's not my practice to call everyone back as they come in. A lot of times I'll spend the last hour or hour and a half returning phone calls.
Q. Right.
A. And it depends upon the day. Presently I'm in court four days a week.

that discusses this particular act?
A. No.
Q. No. Have you ever looked for one?
A. You mean that -- an appellate decision that interprets the ordinance?
Q. I'll take anything, appellate or otherwise.
A. No. There may be, but not in -- I don't think -- in Wabasha County, I don't think anybody's appealed anything that far. But as I said earlier, the ordinance, as I understand it, is virtually identical in every county, because it's mandated by statute and the Department of National Resources is the one who provides the language for the ordinance.
Q. Even though it's county -- each county has one, they're all the same, so it's basically state-wide?
A. Correct. Well, if you have navigable waters.
Q. So any counties along the Mississippi?
A. (Witness nods head.)
Q. Or any other rivers that are navigable?
A. Right. I don't think it applies to shoreland on the lakes, for instance. That would be governed by probably more local ordinances.
MR. EINSTMAN: Okay, 73.

back to her?

A. Correct.

Q. She then contacted you later to discuss incorporating the changes or providing you with more information?

A. Yes, that's correct.

Q. Then based upon that discussion, she sent you a new copy of your Affidavit?

A. Correct.

Q. And then you signed that particular copy and sent it back to her?

A. Correct.

Q. Okay. Looking at Exhibit 73. If you could please go to paragraph 5?

A. (Witness complies.) Okay.

Q. Could you please read that, I guess it's one sentence or two sentences, into the record please, paragraph 5?

A. "I am the author of, and recall sending, a letter dated June 15, 1983 to Col. Rapp at the Corps of Engineers, St. Paul, Minnesota ("the Corps"), regarding the application of the Wabasha Flood Plain and Shoreland Ordinance to the Corps' proposed dredging activity, and advising the Corps that it needed to apply for a permit to dump dredge spoil in

the City of Wabasha. A copy of that letter is attached to this affidavit and speaks for itself."

Q. Just for the record, that letter is not attached to my copy of your Affidavit. Do you have a copy of that with you today?

A. No, I don't. I'm surprised. But I don't. Mr. Metcalf asked me about that yesterday.

Q. Did you send one to Ms. Mills?

A. It was attached to the original. I remember reading it. But for some reason, when my secretary copied the Affidavit I signed, she didn't make a copy of that.

Q. So do you have any copies of that letter in your possession today?

A. No. No, I don't.

MR. EINSTMAN: Mr. Metcalf --

THE WITNESS: Mr. Metcalf might have one.

MR. EINSTMAN: -- do you have a copy of this letter?

MR. METCALF: I do.

MR. EINSTMAN: Could I see it, please?

MR. METCALF: (Handing document.) There's two of them. There's that one and the response.

MR. EINSTMAN: Can we mark this as an exhibit now?

MR. METCALF: Yeah, go ahead.
MR. EINSTMAN: Make this one Exhibit 74.
(Whereupon, Nordstrom Deposition Exhibit No. 74 was marked for identification and a copy has been hereby attached.)
BY MR. EINSTMAN:
Q. Look at your -- do you have a copy? Okay. I got one.
A. That's the response.
Q. If you could just examine Exhibit 74. I've not seen it before today, so I'm going to examine it, too. It's pretty short, though.
A. (Witness complies.)
Q. Exhibit 74 is dated June 15th, 1983; is that correct?
A. Yes.
Q. Okay. And it's addressed to Colonel Rapp of the Corps of Engineers?
A. Yes.
Q. Does this letter discuss anything about a thousand-foot requirement, with regard to the affect of the Wabasha Flood Plain and Shoreland Ordinance, or the Shoreland Protection Act?
A. No, not specifically. No, it does not.
Q. You say "not specifically."

A. Well, I mean, it doesn't reference the thousand feet. It says that dumping of dredge spoil was -- previously was done without obtaining a variance from the City of Wabasha pursuant to the Flood Plain Ordinance, and that the ordinance provided that type of dumping can only be done after applying for and obtaining a variance.

Q. Now, you testified earlier that the ordinance itself has lots of different sections; right?

A. Correct. It has different areas, too. It has flood plain, flood fringe and other areas. And depending upon what area you're going into, different parts of the ordinance apply.

Q. And this letter doesn't specifically mention any thousand-foot requirement?

A. Correct.

Q. Do you know when Colonel Rapp worked for the Corps of Engineers?

A. No.

Q. Do you know if he's still alive today?

A. No. I mean, I don't know.

Q. Do you know whether he was alive in September of 1996?

A. No, I don't. I do not.

correct? I mean, assuming this was sent in the June '83 time frame.

A. The letter that I -- Exhibit 74, that I sent, was as one of the city attorneys for the City of Wabasha, yes.

Q. Do you have any reason to believe that Colonel Rapp passed the information contained within Exhibits 74 and 75 on to the rest of the Corps of Engineers?

A. I would hope that he did, but no, I don't.

Q. So to the best of your knowledge, when Colonel Rapp left, if indeed he did leave, then this information left with him?

MR. METCALF: Objection, calls for speculation.

A. I would have no way of answering that.

BY MR. EINSTMAN:

Q. Well, let's go ahead and read -- if you could read paragraph 9 into the record?

A. "As a result of having dealt with the Corps over a number of years on similar issues, my present understanding of the Corps' official position with regard to local permit requirements is that it is not subject to those requirements based upon its claim of sovereign immunity. The Corps has never

substantiated to me a documented basis for its claim of sovereign immunity."

Q. Just to go through this line-by-line, I guess. You said in -- I'm saying you say, even though I understand that Ms. Mills drafted this, so -- but you signed it so that's --

A. Correct.

Q. -- that's where I'm going when I say you say. What years, in particular, are you talking right here, when you say in the first line, "over a number of years?"

A. Well, I'm referring to the -- the other dredge site we talked about, between the railroad tracks and Highway 61, which would have been in '83, 1983 I think was when they did it, or '84. Before that, I reference in Exhibit 74, the Jolivette pit. That was a flood plain area where the Corps dredged and dumped a lot of spoil without even contacting the City of Wabasha.

There's also another instance that we haven't discussed, where I became aware that the Army Corps of Engineers had given some sort of permit to the same Jolivette, I think his first name is George, to stockpile different fertilizers, coal, salt and that sort of thing, in freestanding piles

within the city limits of Wabasha without contacting the city.

Q. When was that?

A. I don't remember. It was in the '80s. I can't remember if it was before the 1983 project or after that, but it was in the '80s.

Q. Okay.

A. In that case, the Corps had already issued the permits when we became aware that Mr. Jolivette was going to start storing materials in this area, which is actually very close to the one referenced in paragraph 2 of Exhibit 74. We contacted the Corps, and the Corps ultimately reversed or withdrew the permits. But before that they had no contact with the city about issuing the permits.

Q. Any other projects?

A. Well, I -- let's see. I guess I'm probably -- it's not said very well, but I also was referencing something I talked about earlier in my deposition, where it was my opinion, although I don't have any concrete evidence of it, that the Corps frequently declared eminent closure in order to obviate the need for permits, and some of that dredge was transported into Wabasha.

Q. What I'm trying to get at is, it says here

"As a result of having --" in paragraph 9 of Exhibit 73 it says, "As a result of having dealt with the Corps over a number of years on similar issues." And what I'm understanding is, the number of years you're talking about are the early 1980s; is that correct?

A. Well, starting in the '80s, yeah.

Q. Okay. And ending when is my question?

A. Well, I don't think the Corps has ever changed its opinion about whether or not they need to get local permits, so I would say up to the present.

Q. That's not my question. My question is, you say here, "As a result of having dealt with the Corps," meaning that you have dealt with the Corps.

A. Well --

Q. What I'm asking you is -- your answer you just gave me, you reference this Jolivette pit.

A. Jolivette pit.

Q. Jolivette pit that occurred the year before June 15th, 1983. So my question is, the years that you're talking about, are those the early 1980s?

A. And all the way up to 1996, as evidenced by Mr. Rapp's letter where he says, sovereign immunity allows them not to -- or means that they don't have

to apply for local permits.

Q. Okay. My --

A. So that 13 to 15 years I guess is what we're talking about.

Q. We can do this again. It says here, this line that Ms. Mills wrote for you says, "As a result --"

MR. METCALF: Hold on. I'll object to the mischaracterization of that. Go ahead.

MR. EINSTMAN: Is there -- didn't she write this letter, this Affidavit, isn't that on the record?

MR. METCALF: I don't think your characterization was proper, but go ahead with your question.

BY MR. EINSTMAN:

Q. I'll go ahead and say it again. In this line -- and the reason I'm saying -- pointing out that Ms. Mills wrote it is you may not have written it this particular way and I'm trying to understand it. Because this is your Affidavit, you signed it, and if there's got to be changes made then we need to sit here and make the changes now.

A. I'm not changing that, it's true.

Q. I understand that. But you say here, "As a

result of having dealt with the Corps over a number of years on similar issues." My question to you, Mr. Nordstrom, is, what dealings during what years did you have? You've referenced two that occurred in the early 1980s. I need to know --

A. Three.

Q. -- what those dealings are?

A. Three.

Q. Sorry, three, that you had in the early 1980s.

A. I told you what those are. Do you want me to repeat them?

Q. No. My question is, did you have any dealings after 1983, between 1983 and this particular project that occurred in the September time frame of 1996? I'm just asking for the truth. That's all I'm here for.

A. And that's what I'm trying to give you. I guess it depends upon your characterization of "dealings." In my official capacity as County Attorney or City Attorney, it would have been these three in the '80s, probably between eighty -- I'm going to say '82 and '85, and then this one in 1996.

Q. Okay. And I'm going to go ahead and just put on the record now, the reason I'm going through

this Affidavit is because it was drafted by somebody else for you, and I need to understand what is actually being said here, because there can be a lot of conclusions being drawn by the exact phraseology that this attorney used when she drafted it.

A. Okay. I'll attempt to clarify it as well as I can.

Q. So is my understanding correct that when you refer to "dealings with the Corps over a number of years on similar issues," you're referring to a few projects, three or four projects that occurred in the early 1980s and this particular project that occurred in 1996?

A. Officially, yes, in my official capacity as either City Attorney or County Attorney.

Q. And have you had any dealings not in an official capacity?

A. Well, I've -- yes, I've attended to -- I've attended hearings that the Corps has had regarding proposed projects with the Upper Mississippi Wildlife Refuge, with eminent closure proceedings, various things like that, but not in an official capacity. I've gone and expressed my concerns as a private citizen.

Q. And which projects were you talking about,

and during what time frames, please?

A. I would say in the mid to late '80s, I was at a few meetings regarding some proposals that the Corps was going to do. One of them had to do with a project in the Weaver Bottoms, which is adjacent to Wabasha County.

Q. What year in particular?

A. Boy, I'd be guessing. I can't tell you.

Q. Is it the mid-'80s, late '80s?

A. That project probably was in the early '90s.

Q. Okay.

A. I was privately objecting to a proposal that the Corps was involved in that area, and I wasn't prophetic, but that area is totally destroyed as a wildlife refuge now, in my opinion, and the opinion of a lot of people. I had conversations privately, I mean, phone call conversations with people from the Corps about their frequent use of eminent closure and doing the double dredging that they were doing in the area of Wabasha, but not in an official capacity as City Attorney or County Attorney. And I'm just going to guess, those would have been in the late '80s, but I'm just guessing. It's a long time ago.

Q. In your official capacity with the project you've mentioned, the Jolivette pit, that's part of paragraph 2 of Exhibit 74?
A. Right.
Q. That one occurred, is it fair to say, in 1982?
A. Yes.
Q. And the project that's the subject of the June 15th, 1983 letter is going on in June of 1983?
A. It was proposed. Like I said, somebody -- either I saw it or somebody brought me the article from the Post Bulletin, and the Corps was proposing starting it in 1983. Because of the bruha that came up from that, I don't remember. They eventually did it, but there were a bunch of wells drilled that -- test wells, and it may not have actually been completed until 1984 or 1985, I don't recall, but they were proposing doing it in 1983.
Q. And the other project you mentioned involving the Jolivette pit, that could have happened before 1983 or after 1983; is that right?
A. You mean the permit for freestanding storage?
Q. Right.
A. That I believe was after 1983, but I can't

tell you the year.

Q. Okay. You mentioned 1985. Was it before 1985, to the best of your recollection?

A. It was when Rudy Boschwitz was Senator. I don't remember what year he was Senator, because I actually met with him on that project. I can't remember. I honestly can't remember.

Q. And then there's the 1986. So you've got -- those four projects are the ones you're talking about in your official capacity; right?

A. 1996 you mean?

Q. Yes, thank you.

A. Right, right.

Q. I apologize.

A. That's all right.

Q. In the second line of paragraph 9 you discuss the Corps' official position with regard to local permit requirements. I guess my question is, who in the Corps provided you with this information, that it's the official position of the Corps?

A. Well, I don't know, maybe "official" is incorrect, but the position of the Corps is expressed in the letter from Colonel Rapp that's in response to -- that's exhibit what, 75? That's in response to my June 15th, 1983 letter. Dan

Krumholz, who's an area -- I don't know what his title is, but he works for the Army Corps out of Fountain City. I've heard him -- he's told me that directly. I've heard him say it at meetings in front of the County Board or the Planning Commission. I don't know if I've seen it elsewhere. But at least those two people have either in person or by letter told me that it's the Corps' position, that because of sovereign immunity, they don't need to apply for local permits.

Q. When is the first time you recall seeing Exhibit 75, which is referenced, the letter that was not signed and not dated, and it's got a signature block for Colonel Rapp?

A. When it was -- that I recall for sure seeing it?

Q. Yes.

A. When it was sent to me attached to that Affidavit from Diane Mills.

Q. So Ms. Mills sent it to you in preparation for your Affidavit that we're now discussing here in Exhibit 76?

A. No, wait a minute. She sent me this letter (indicating).

Q. That's Exhibit 74 you just pointed to?

A. Right.
Q. Okay. Who sent you this letter, Exhibit 75?
A. I assume Mr. Rapp did, but I don't recall. I think the first time I can actually say that I've seen it, although I remember that being told to me before, is when you handed it to me. I don't think Diane Mills sent me that. I think she just sent me a copy of my letter that I wrote to Colonel Rapp.
Q. So before today's deposition you have no independent recollection of ever having seen Exhibit 75?
A. No. It's 19 years ago, and it wasn't written by me, so I can't tell you that I've never seen it before.
Q. And you didn't see this letter before you drafted Exhibit 73 or before Ms. Mills drafted 73 for you?
A. I may have. I just can't tell you that I definitely did.
Q. So I just asked you for your explanation of what the Corps' official opinion is, who's espoused that, and you mentioned Colonel Rapp and Mr. Krumholz. I guess my question is, prior to -- at the time you drafted exhibit -- or at the time

Exhibit 73 was drafted for you, did you base this Corps' official position only on Mr. Krumholz's statements?

A. I know I've heard it from more than Mr. Krumholz. Because when the Army Corps has meetings, they always bring a number of people.

Q. Right.

A. I believe Colonel Rapp was at meetings with the county, and I believe he was at meetings -- or with the city, I mean. I don't know if he was ever at meetings with the county. But I know that he was -- I'm almost positive he was at meetings with the city. And I don't remember who espoused it, but I've heard it a number of times, that sovereign immunity allows you to do this. We don't need your local permits.

Q. Okay.

A. And then they turn around and say, but we'll work with you.

Q. Okay. Before we go any further, I want to make sure you understand what I'm doing here. I'm not trying to attack you. What I'm trying to do is -- if you'll let me finish, this Affidavit, I know you didn't draft it. If you had drafted it, you might have phrased it differently. You signed

it. I understand you've testified what your position was in this litigation. You didn't seem to want to get too involved in it at the time. What we have to do now is go through this and make sure, with a fine tune comb, and make sure that not only that the records in here are correct, but that any conclusions that might be drawn based upon this Exhibit 73 are the correct conclusions. And that's why I'm going through this. I'm not trying to crucify you here.

A. I don't think you are, and I'm trying to honestly respond.

Q. 'Cause you said before that everything in here is correct. And I -- maybe I shouldn't have asked you that question, because I want to make sure it's correct, not having authored it.

A. Okay.

Q. Okay. Okay. In paragraph 9 of Exhibit 73, the third line says, it is not subject to those requirements based upon its, the Corps', claim of sovereign immunity. Does that refer to the government's claim of sovereign immunity only over federal land or the government's claim of sovereign immunity over private lands?

A. Over private lands.

Q. So you're saying here that the government has a policy of asserting sovereign immunity over private lands?

A. I'm saying that the government takes the position that they can. And we're talking about dredge spoil. They don't need to apply for and obtain any local permits to deposit dredge spoil as long as they have permission on the site they're going to deposit it. So in other words, if they buy land from me, they don't need to get a permit from the county or the city to transport it onto my land, as long as I've given them consent, because of sovereign immunity.

Q. You made a distinction from the government and you as a private citizen. I'm not sure if you're aware of if the government buys land --

A. Or leases it or gets permission.

Q. Okay. So it's -- do you know --

A. Has consent, let's put it that way.

Q. Do you know what actually happened in this case, in regard to the Saunderson property?

A. What I was told by Judy Krueger was that Matteson had negotiated a Purchase Agreement to buy the land for purposes of depositing dredge spoil from this project. That's what I was told. I never

saw a Purchase Agreement.

Q. Do you know what actually happened with whether or not dredge spoil wound up on the Saunderson property?

A. It didn't.

Q. I guess my question is, doesn't what actually happened in this particular case contradict what you're saying here in the third line of paragraph 9 of Exhibit 73?

A. No. Because in that case -- well, I'm not sure what you're saying here. But what I'm saying, you're asking is in that case Mr. Matteson or his company, which is not a government agency, had to apply for the permit, 'cause he was the one who was actually do the transporting and disposal.

Q. Okay.

A. So I don't think that contradicts it.

Q. So your understanding is that the government's official position is that it is not subject to the requirements of the ordinance in Wabasha County?

A. Right.

Q. Over federal land or federally leased land?

A. Over -- correct, correct. If they had to go across private land to get to federal land, then

I believe their position is they don't need local permits. Our position is, they do.

Q. Okay. So in this particular case, when you had -- I'm talking about the contract at issue in this particular case, because there was a pipeline that was going to go across non-federal land, and go into non-federal land, then your position is that sovereign immunity did not attach?

A. It didn't attach. But in this case, it doesn't apply, because the person -- the independent person that was going to do it was not a governmental agency anyway.

Q. So do you think that the government asserts sovereign immunity in cases such as what happened in this case, where you have a private contract for putting dredge spoil on private land? What I'm trying to do is clarify what -- if you look at the sentence now, you can see that -- as, you know, you read this sentence and it says that the Corps' official position is that sovereign immunity attaches to situations where a private contractor is pumping dredge spoil?

A. No. I think the Corps' position is, they're doing it. They don't need to comply with local requirements because of sovereign immunity.

But the sovereign immunity does not extend to individuals or corporations that they have contracts with.

Q. And that's the Corps' official position?

A. I believe that's right, yeah.

Q. Okay. To the best of your knowledge?

A. Yeah.

Q. Okay.

A. Because they -- in this case, the Corps didn't -- didn't assert that Mr. Matteson didn't have to get a permit. At least I don't ever recall seeing him do it.

Q. Do you see how you can read paragraph 9 to say something that it doesn't really say with the questions I just asked you?

A. Well, I guess you can. But this is all referencing the Corps. It's not referencing private contractors.

Q. Just so you know, this is going to be discussed in our Motion for Summary Judgment. I need to get the background. That's why I really need to get the background from you.

A. I understand.

Q. The last sentence of paragraph 9 of Exhibit 73 states, "The Corps has never substantiated to me

a documented basis for its claim of sovereign immunity." And that only applies to what you previously stated as the Corps' official position, which is government owned lands or government leased lands?

A. Well, actually, government -- well, no. It refers to the Corps' position, that they don't have -- if they're doing the project, regardless of where it's going, they don't have to comply with local permitting.

Q. If the Corps is doing the project?

A. Yes. It does not refer to contractors doing it, doing their work for them.

Q. So if the Corps issues a solicitation for a contract and someone is the lowest bid on that contract, they don't get the sovereign immunity protection; is that correct?

A. I don't recall the Corps ever saying that, and I don't recall them ever asserting it. I think the project that we talked about before, my understanding was that Thompson did the dredging and the Corps did the hydraulic pumping.

Q. Okay. That's the difference between that project and this particular project?

A. Correct.

Q. And it's also verified by your July, I believe, 8th letter, where you explain to Ms. Krumholz that the new site with the federal land, because it was all federal land, that the Corps -- that sovereign immunity did protect the Corps and it wasn't subject to your ordinance?

A. The letter was to Ms. Krueger and not Ms. Krumholz.

Q. Keep doing that, because I hate reading the record and seeing that I called Mr. Krumholz Ms. Krueger and vice versa. To the best of your knowledge, did the Corps ever seek to invoke sovereign immunity in this case dealing with the Saunderson site?

A. No.

Q. And that's in line with your view of what the Corps' official position is regarding sovereign -- when it can exert sovereign immunity or invoke sovereign immunity?

A. Well, I believe that --

MR. METCALF: I'll object to the form of the question, it's vague and confusing.

THE WITNESS: I'm a little bit confused. What I believe is that -- or I believe the Corps didn't assert that -- didn't think it could assert

it because it didn't, but I don't know why they didn't. I mean, maybe their position is that they can do that in cases of private contractors. But I've never seen them do that, and they don't do that in this case.

BY MR. EINSTMAN:

Q. I guess I asked a bad question. I'll try to rephrase it. Is the fact that they didn't seek sovereign immunity in this case in line with your opinion about what the Corps' official position is regarding when it can invoke sovereign immunity or does it contradict that?

A. It doesn't contradict it. They may have had other reasons, you know. We'll get to paragraph 10, I'm sure. That's one I will change, but I can discuss that more when we get into that.

Q. Okay. Just so I'm clear, looking at paragraph 9, is it possible that you can read that paragraph in a -- so that it doesn't mean what it actually says? It's kind of misleading in some respects from the way it was drafted?

A. Well, you did.

Q. Do I get a --

A. I guess it -- sure, people can read things a lot of different ways.

Q. All right.

A. But I think you understand what my intent was now.

Q. I understand. I understand. Okay. Okay. If you could please read paragraph 10 into the record.

A. "In spite of the Corps' claim of sovereign immunity and its position that it is not subject to local permits, it has been my experience that the Corps does apply for those permits."

Q. You just mentioned a minute ago --

A. I don't think that's a correct statement.

Q. Okay. How would you rephrase that?

A. I would rephrase the last -- after the last comma to say, it's been my experience that the Corps cooperates. I don't know. A better way to put that would be, I've seen the Corps say -- a good example is this 1983 project. We're not subject to it, but -- and Colonel Rapp's letter says we'll work with you. I've seen the Corps do that. When pressure has been put on the Corps, then I see the Corps say, well, we don't have to but we'll still work with you.

And in this case, for instance, they agreed to -- see, I don't know if they actually applied for

a permit, but I know they agreed to drill five or six test wells, and they agreed to testing, and they agreed -- and at their expense, as I recall. And they agreed to provide the testing results to the city on a timely basis, so that if there was contamination, and I believe they also -- I don't have a copy of it, but I think they also agreed that in the event there was some contamination, there was some sort of procedure or process that would go into effect to make sure that the people in the city were given potable water.

Q. Okay. And that's on federal land, right, in this 1983 project?

A. No.

Q. It was federally leased land?

A. I don't believe so. I think that land -- I don't know who owned it, but it was privately owned. I think it was owned by the railroad, actually.

Q. Okay.

A. At least a lot of it was. And I don't know if the whole thing was, but I think most of it was owned by one of the railroads. So what I mean by that, and I would change that to say it's been my experience that when the Corps is confronted or asked, if you want to put it more politely, they

have been compliant with -- with the letter or the intent of local ordinances and concerns of local people.

Q. Okay.

A. They may have applied for a permit back then, but I can't tell you that they did.

Q. And what you just said was referring to paragraph 10 of Exhibit 73?

A. Right.

Q. Just looking at -- I know you would change paragraph 10, but just looking at the language that's in the Affidavit itself, again, just so we're not -- I don't want to have this taken out of context, it says here that it is not subject to local permits. Again, my understanding of what you're testifying to is, is that the Corps' official position is that it is not subject to local permits with regard to federal land or federally leased land, but it doesn't --

A. Or to projects that they're doing themselves.

Q. Or to projects they're doing themselves?

A. Right.

Q. Okay. On private land or --

A. Anywhere.

said is true?

A. I think that if somebody who presents themself in an official capacity representing an entity like the Corps, is aware of it, the Corps is aware of it.

Q. Okay. And who would that person be that in your view has specific knowledge of the contents of this act?

A. Well, in your area the guy who we saw over and over again is Dan Krumholz.

Q. So it's -- you believe that Dan Krumholz knew exactly what the -- about the thousand-foot requirement?

A. I think he was very aware that there was a Shoreland Ordinance that very likely impacted projects the Corps did. Whether he knew what -- about the thousand foot or any of the other provisions, I don't know, 'cause I don't know how closely he read it, but I believe he knew it existed and that it may impact their projects.

Q. Okay. How well do you know Dan Krumholz?

A. I don't know him personally. I've been at meetings he's been at.

Q. Do you have any belief that he might be a liar or a dishonest person?

A. No.
Q. So if he were to say that he had no idea about this thousand-foot requirement, would you think he was lying or that he was just -- I mean, what would you think?
MR. METCALF: I'll object to the relevance. Also calls for speculation.
A. I wouldn't think he would be lying, but I would be amazed.
BY MR. EINSTMAN:
Q. And why?
A. Well, because -- I don't know what his title is, but he would frequently appear at these public hearings where the Corps would be talking about projects. He would be -- I saw him at County Board meetings, I believe he was at Planning Commission meetings, and I assume not just in Wabasha County. And so he's in -- and I saw him as a person who was sort of a -- the contact person locally for the Army Corps when they were doing things. And it would just be amazing to me that he wouldn't be aware of ordinances that have to do with where the river meets the shore.
I just -- you know, I mean, the Corps does so much activity in Wabasha County, particularly

because of the Chippewa River. They are dredging, well, probably not every year, because maybe of some water levels, but it seems to me, and I've lived down there since 1976, that the Corps has been dredging in Wabasha -- along Wabasha County virtually every year since then. And so not to be aware of local ordinances or have met local resistance to certain things would be just astounding to me. And like I said, Dan is the guy who wasn't always the only person, but he was almost always at meetings that I was at.

Q. Do you know if Mr. Krumholz is a lawyer?

A. I don't know that he is. I don't think he is, but I don't know that.

Q. Okay.

A. I think he's an engineer of some type.

Q. If he were under the impression that whenever the Corps does anything it's protected by sovereign immunity, would that be a reasonable explanation as to why he may not know about the specific requirements of the Shoreland Protection Act?

MR. METCALF: Object to the relevance, calls for speculation. It's also an improper hypothetical.

A. Yes, it's possible.
Q. Okay. Can you read paragraph 14 into the record?
A. "Throughout the 1980's and continuing to the present, there has been major local citizen opposition to the Corps with respect to its activities in management of the Mississippi River. I believe that the Corps was and is fully aware of the magnitude of that opposition."
Q. We talked about this before as to the reference to the Mississippi River. Is that overbroad?
A. Well, it talks about major local citizen opposition, so I think that narrows it. But what I'm referring to is in the area of Wabasha and Wabasha County and also on the Wisconsin side of that same area.
Q. You've knowledge about that. It's right across the river; right?
A. Right. And the area directly across the river from Wabasha and down river for a certain extent is part of a National Wildlife Refuge, so there's been a lot of concern about things that are done in the refuge as well. So both sides of the river. But I am referencing Wabasha and the Wabasha

County area.

Q. How many miles would that be of river are you talking about, generally speaking?

A. Twenty-five to 30.

Q. In the second sentence of paragraph 14 you state, "I believe that the Corps was and is fully aware of the magnitude of that opposition." What do you base that statement upon?

A. Well, part of the meetings that I've been at, because I've been to a number of meetings and I've expressed my concern, they know -- I and others have gone through our United States Senator to register complaints, and I know those have been communicated to them, some of the letters that have been written by officials in the City of Wabasha, by county officials in Wabasha County. Just -- I've been at a couple of meetings where a lot -- a lot of people attended and expressed very strong concerns about what was going on, so --

Q. Okay.

A. And those go back to the '80s.

Q. So is it fair to say that, and correct me if I'm wrong or just rephrase what I'm about to say as you see fit, but basically people who live close to the river are concerned about the environment of

the river?

A. Correct.

Q. And you stated previously today that the Corps is concerned about making sure there's a nine-foot passageway through the river?

A. I believe that's their No. 1 concern.

Q. And sometimes those goals come into conflict?

A. Absolutely.

Q. And that would be the basis of the populous's concerns about Corps activities?

A. Yes.

Q. Is that -- can you -- is that a fair characterization?

A. That's a fair statement.

Q. Would you say that's correct, what I just said?

A. Yes.

Q. Since we've been sitting here talking about this for a number of hours, and hopefully your memory has been jarred a little bit, but do you know whether you actually informed L.W. Matteson, and I'm going to say the September '96 time frame after you spoke to Mr. Tapp, about what the requirements of the ordinance were in terms of hydraulic or

mechanical dredging?
A. No. I think what he was told was that because there's the risk of -- of -- of the -- the material that's being transported being deposited in that area, that he needed a Conditional Use Permit.
Q. Okay. Do you recall now, at, you know, 12:00 o'clock today, actually having a conversation with Mr. Matteson about this over the telephone?
A. I believe I either had a telephone conversation or he came -- he was in my office and talked to me about it.
Q. And again, do you have any better idea of how close that time was, where you had the conversation with Mr. Matteson, to the time you spoke to Mr. Tapp?
A. No. But I believe it was -- it would have been before he applied for the Conditional Use Permit, because I think what he was asking was why do I have to do this.
Q. Okay.
A. And I gave him my opinion, and then -- so he applied for it. And I think he, at that time, thought he'd get the permit. So I don't -- I'm just guessing, but I don't think he was that concerned at that point. I don't think he realized the amount of

opposition.
Q. Do you know how -- do you have an independent recollection now that he actually did come to your office? The reason I'm asking is because how would he have gotten there? You probably had to call him first in order to get him there.
A. Well, no, he could have just come. I mean, that happens to me all the time, unfortunately, people walking into my office daily. So he may have just come to our office. I don't recall.
Q. And your file that we can't find, that might have --
A. It might. I might have gotten a letter from him asking for an appointment, but I seem to remember he came to the office. But whether it was by phone or in person, his questions were, why do I -- why do you believe I need to get a permit?
Q. And you explained to him about the thousand-foot requirement?
A. I explained to him that he was transporting -- as I understood it, they were going to use this water slurry or whatever they call it, hydraulic transport through pipes, that the pipes were jointed, that water and dredge spoil would end

up in that shoreland area, so he needed a permit.

Q. Do you know what his reaction was when you informed him of that?

A. I don't think -- no, I don't remember precisely, but I don't think he really argued about it, and he wanted to know how to do it, and so I told him where to go, and he went and made application. And that file that you're copying even has a copy of his application.

Q. Do you recall -- I mean, based upon what I've gleaned from you talking to me today, do you recall what your view at this time was, your personal view, about whether or not this project should be allowed to go forward as proposed?

MR. METCALF: I'm sorry, what was the question?

THE WITNESS: You asked me what my personal view was about whether or not he should be allowed to transport --

BY MR. EINSTMAN:

Q. Exactly.

A. -- into the Saunderson property?

Q. Exactly.

MR. METCALF: Object to it as irrelevant.

A. I wasn't real familiar with exactly -- I

knew the general area, but I wasn't real familiar with where the Saunderson property was. It's, uninterestingly enough, it's in an area called Sand Prairie, which is predominantly sand. So I thought that in some areas it probably wouldn't be a problem. The only concern I would have had was whether or not it could possibly contaminate wells. I read somewhere where there was the -- they estimated 181 million gallons of water would be used for the transport. That's a lot of water. So that -- so personally that would have been my concern, more than depositing the dredge spoil on the shoreland, would be, is this going to cause some problems with our wells. And I was concerned from a legal point of view as well. Because if the county issued the permit and if there was contamination, it raised the possibility that the county would be named in a lawsuit to rectify the contamination problems, which could be a huge expense.

BY MR. EINSTMAN:

Q. So I guess what I'm trying to reconcile, if he didn't seem too concerned about it at the time when you had your discussion with Mr. Matteson, but you obviously at the same time were probably understanding there were a lot of problems and

potential liability, did you communicate your thoughts to him about your concerns?

A. I don't remember. I don't remember.

Q. Do you remember whether you said to him, hey, that is not a good idea, think about all the possible damage it could cause?

A. I don't remember doing that. I don't remember doing that. You know, it's interesting because the ordinance -- the ordinance could stop it, but we didn't have anything in effect if the ordinance didn't apply that would stop it. And so my legal concerns were even heightened, because we didn't have anything in effect to take into account the possibility of contamination.

But I didn't see that as a reason that he could be denied the permit, because that permit had to apply to what's going to happen in the shoreland area. And this land was definitely outside of that. But I don't think I -- I don't think we got real specific. I think I told him that my concern was the water and sand being deposited in the shoreland, and because of that you have to get a permit. We may also have talked about the fact that he was going to have to go to the county engineer's office and get a permit to go over or under the road. I

think he was talking about going under the road.

Q. I'll just proffer to you that part of the land was actually within the thousand square feet, the thousand feet, a very small part of it.

A. Oh, was it?

Q. Part of it indeed was within the thousand feet.

A. Maybe it was.

Q. And from what I've seen, they apparently expected to have five feet of this stuff piled five feet high.

A. Five and a half to six feet. It was going to raise the level.

Q. So my question to you is, would that -- as a concerned citizen, would you be -- would you be for or against it, I guess, especially given your views on the --

MR. METCALF: I'll object again on the relevance, go ahead.

A. If I lived in that area I probably would have been opposed to it primarily because of the contamination concerns. And the ground is so porous there, that water was going to go right into -- into the groundwater. I don't know how much that sand actually filters.

BY MR. EINSTMAN:

Q. So from a personal perspective, is it fair to say that you were sort of -- you would not be in favor of it at that time?

MR. METCALF: Same objection.

A. Yes.

BY MR. EINSTMAN:

Q. And from a professional standpoint, you were concerned with keeping -- making sure that your county was not subject to any liability it didn't have to go through; right?

A. Right.

Q. And so the two kind of flowed together?

A. I try to keep my personal -- when I'm asked for a legal opinion, hopefully I keep my personal views out of it. I know that can be impossible. But in this instance I thought there was significant concerns regarding the ordinance and other legal concerns that justified the requirement that they get a Conditional Use permit.

Q. Okay. Okay. Could you please read paragraph 15 into the record?

A. "In 1996, I was contacted by Judy Krueger, Zoning Administrator for Wabasha County, with information that L.W. Matteson, Inc., in its

capacity as a dredge contractor to the Corps, intended to dump(sic) dredge spoil across the Shoreland Protection Zone to a placement location on private property it intended to purchase from Roland Saunderson." That name is incorrect, by the way. "Ms. Krueger lived near the Saunderson property and inquired as to whether a permit would be required for this activity."

Q. Okay. Just for the record, it was pump dredge spoil, not dump.

A. Oh, I'm sorry.

Q. That's okay.

A. Pump dredge spoil, that's correct.

Q. What's the incorrect statement with regard to Mr. Saunderson?

A. His name is Ronald Sanderson, S-a-n-d-e-r-s-o-n.

Q. Was it referred to as the Saunderson property or the Sanderson property?

A. Well, it should be referred to as the Sanderson property, because that's who owned it, and I should have made that change because I knew that.

Q. Do you know when this conversation took place in 1996, the contact by Ms. Krueger?

A. Probably late summer, August or early

September, probably August.

Q. Why do you say probably August?

A. Well, that would be a guess. I don't know when -- when Mr. Matteson -- she became aware of it. But he applied for the Conditional Use Permit in September, so it was sometime before that. Sometime in the summer of 1996, I would say.

Q. In the second sentence it indicates that "Ms. Krueger lived near the Saunderson property and inquired as to whether a permit would be required for this activity." Sitting here today, do you have any recollection as to whether that prompted her to contact you, the fact that she lived close by?

A. I don't think that did. That may have been a concern of her's, but I think she contacted me as Zoning Administrator.

Q. So is that misleading there, having that sentence, I mean?

A. Well, it could be. I mean, well, it's true that she lives near there.

Q. Right.

A. Probably within a mile. She did ask me whether a permit -- whether I'd give an opinion as to whether or not a permit would be required for the activity. But I took her inquiry to be in the

capacity as a Zoning Administrator, but I can't read her mind.

Q. Okay. So if that sentence implies that her living near the Saunderson property was what caused her to inquire as to whether a permit would be required, that's incorrect?

A. Well, I can't tell you if it's correct or incorrect, only Ms. Krueger can tell you about that.

Q. But the fact that it's in your Affidavit means that you're not saying that?

A. No, I'm not saying that. I'm not saying that. Maybe if she wanted to point out that she lives near that property, that's true.

Q. Right.

A. And she did inquire. Putting it in one sentence may be an implication.

Q. Which is why we're here today.

A. Sure. You've taught me my lesson.

MR. METCALF: So you have to give the deposition anyway.

THE WITNESS: Should have just refused to do everything.

BY MR. EINSTMAN:

Q. Do you know whether Ms. Krueger is responsible for actually administrating the Zoning

Protection Act?

A. She was at that time.

Q. I'm sorry, administrating the Shoreland Protection Ordinance?

A. She was at that time. She's no longer working for the County.

Q. Okay. So at this time she would call you up for a legal opinion, say, hey, what do I do here, lawyer, tell me what my obligations are or what my responsibilities are?

A. From time to time, yes.

Q. So would you characterize the Shoreland Protection Act as a zoning ordinance or how would you characterize it?

A. Yeah, I think it's a form of zoning, because it deals with all sorts of things; lot size, setback requirements, sightline requirements, that sort of thing.

Q. Okay.

A. At that time it was the only thing that we had that was zoning. Now we have county zoning as well.

Q. And I think I've asked you this and I think you've already answer it but I'll ask you again just to make sure it's on the record. This contact by

Ms. Krueger was the first indication you had that there was an intention to use the Saunderson property for this dredge spoil?

A. Yes, I'm sure of that.

Q. Okay. Okay. Flip the page of Exhibit 73. We're on the home stretch.

A. Then we have to go through the other Affidavit.

Q. No, I'm sure on that.

A. Okay.

Q. Please read item 17, paragraph 17 into the record.

A. "I recall speaking with representatives of the Corps about the application of the Wabasha Shoreland Ordinance to the activity referenced in Item #9, although I do not recall the name(s) of the individual(s) with whom I spoke."

Q. Is item 9 paragraph 9 of your Affidavit?

A. Yes.

Q. So could you -- I'm just going to ask you, can you explain to me what paragraph 17 means, 'cause the reference to item 9 is kind of confusing me?

A. Well, it's actually just kind of a repeat of 9, that -- that I've spoken to people or at

meetings with people of the Corps about the application of the ordinance, and -- but I can't -- I think Dan Krumholz was one, but I can't say that for sure. Steve Tapp's diary notes seem to indicate that I talked to him about that.

Q. Okay. Just so I'm clear, item 9 refers to activity, and the activity that we talked about earlier is the railroad project that occurred back in the early 1980s?

A. Right.

Q. And the project that's the subject of your June 15th, 1983 letter, which is Exhibit 74?

A. Well, that's the same thing.

Q. Same thing.

A. Also the Jolivette pit would be another activity --

Q. That's two.

A. -- probably. And, well, this -- the property that's the subject of this action would be another one.

Q. Okay. But paragraph 9 is referring to -- okay. So we'd -- go ahead.

A. It refers to local permit requirements.

Q. Okay. Now, referring to the projects in the 1980s that make up the activity referenced in

item 9, was there ever any reference, to the best of your knowledge, of -- strike that. Did you ever make a reference to the thousand-foot requirement that's in the ordinance back --

A. In those discussions?

Q. In those discussions.

A. No.

Q. So is it fair to say that with regard to this activity, the contract at issue, the contact you had was with Mr. Tapp, is that correct, the first contact?

A. I believe so.

Q. And at that time, do you recall explaining to Mr. Tapp the requirement of the thousand-foot portion of the ordinance?

A. I don't know if I did or not. I -- I would have talked to him about the fact that this project was going to go across the shoreland, but I don't know if I specifically referenced any distance.

MR. EINSTMAN: Okay. Time out? Off the record.

(Recess taken from 12:05 p.m. to 12:10 p.m.)

MR. EINSTMAN: Back on the record.

BY MR. EINSTMAN:

it on a regular basis or they should, they should. I think maybe government agencies are more intuned to laws and ordinances than private citizens, at least that's my experience. But certainly contractors who are in the business ought to be aware of what the legal requirements are for them to do business.

BY MR. EINSTMAN:

Q. Okay.

A. And if they weren't, in my opinion, it's going to be imputed to them anyway.

Q. With regard to paragraph 20 of your Exhibit 73, who in the Corps are you referring to, list the names, please?

A. Colonel Rapp.

Q. And you just testified a new minutes ago you think he may be dead, so who else?

A. I don't know if he is, you implied that.

Q. No, you said that, sir. I can have it read back to you, but you said you think he may be dead.

A. Only because of the questions you asked earlier. Dan Krumholz, and any other of the members, because I don't know their names, of -- of -- Corps representatives that have been at the meetings I've been at. And sometimes there were

five and sometimes there were two. There's been any number of people. I've seen ecologists, civil engineers, people with military titles like colonels, whatever, and I don't recall their names, but they've been at many meetings in Wabasha and Wabasha County, so I think they're aware of it.

Q. Okay. And during these meetings the exact contents of the Shoreland Protection Act were explained to everyone?

A. Some. No. If you're talking about the entire thing. But there would be specific provisions of the ordinance that would be discussed.

Q. Sir, I'm not trying to argue with you, but I'm trying to -- hopefully what I'm hoping is that you'll agree that 20 is exceptionally overbroad and also that it imputes knowledge that folks knew, which you testified earlier you don't like to do that.

A. This says what I believe. That's all it says. I believe that.

Q. And what is the basis for your belief? The only name I've heard is Dan Krumholz.

A. The Colonel.

Q. The Colonel. Back in 1983.

A. I told you, I don't know their names. I

know I've seen many of them at meetings.

Q. Okay. Is it your testimony here today that based upon your one-page letter back on June 15th of 1983, that Colonel Rapp became acquainted with all the contents of the Shoreland Protection Act in Wabasha County?

MR. METCALF: Objection.

A. Not that he did, no. He may have totally ignored my letter.

BY MR. EINSTMAN:

Q. Okay. So let's go back to paragraph 20 where you state, "I firmly believe that the Corps was fully aware."

A. Let's put it this way, of the existence of the ordinance.

Q. Okay. So would you change out -- would you get rid of the "and its requirements" portion of that particular statement?

A. No, because I'm talking about the existence of them.

Q. Are you talking about the existence of the ordinance, the fact that there is an ordinance on the books or the contents of that ordinance?

A. That it's on the books. That it exists. That it may well apply to them and their activities.

Q. Okay.
A. It's their responsibility to know the contents.
Q. I understand that, sir. And if your testimony is that because there's an ordinance on the books, that people and organizations are imputed to know what that ordinance states, I can understand that, but that's not what this sentence says. And what I need to find out is what are you trying to express there based upon your personal knowledge?
A. What I'm trying to say is that people who represent themselves as members of the U.S. Army Corps of Engineers, I believe have long known of the existence of the flood plain shoreland ordinances, including the one that was in effect in the City of Wabasha and the County of Wabasha.
Q. Okay. They've known of its existence. Now, they've known of its contents, all the contents of that ordinance?
A. I believe they have.
Q. And who are these people?
A. Anybody who is given the responsibility of doing dredging and depositing dredge spoil along the river in our area. I don't know who they are. The Corps -- how many people are in the Corps? 50,000?

10,000? I have no idea.

Q. Sir, I'm not trying to argue with you, but I'm trying to get you to understand that this sentence here is not reflecting what you're telling me, and I want you to understand that if you need to -- there's no reason to tether yourself to this sentence as Ms. Mills drafted it unless it's what you really want to say.

A. It doesn't say I know. It doesn't say I have proof. It says, I believe. And I added the word existence.

Q. You added the word existence. But the point --

A. I firmly believe that the Corps was fully aware of the existence or was aware of the existence of the Wabasha Flood Plain and Shoreland Ordinance and its requirement prior to and during 1996.

Q. Does "and its requirements" refer to all of its requirements?

A. Well, maybe it should say its contents.

Q. Does it refer to all of its contents or some of its contents?

A. Yes.

Q. How do you know this? Or how do you believe -- why do you believe this?

MR. METCALF: Objection, asked and answered.

A. I believe it because of the numerous contacts they've had with agencies in our area, and all of the opposition they've received to their activities, both on our side of the river and the other side of the river. I mean, it's just the Corps. I don't know how the Corps deals in other parts of this corridor, but there's been constant problems with the Corps in the view of the citizens. And when they have meetings, I think they probably go in with their helmets on. If they're well publicized a lot of people do show up. People object to what's going on.

BY MR. EINSTMAN:

Q. Do all the problems implicate the Shoreland Protection Ordinance?

A. No.

Q. Okay.

A. Some of them have to do with destruction of habitat in the Wisconsin side of the river. Some of them have to do with where they deposit dredge spoil in the river. So not all of them apply.

Q. Could you, sitting here today, tell me all the different provisions of the Shoreland Protection

not an application should be granted or denied. So if a question came up, for instance, does the ordinance really apply here, I would give my opinion about that. But I wouldn't say if I'm -- sometimes I'm asked, do you think we should grant this? My response is always something to the effect that I don't believe my role is to recommend for either approval or denial, that's up to the Board.

Q. But at the meeting of the Commission, though, you would have attended. Did you give an opinion about whether the ordinance applied in this instance?

A. I don't recall if I asked. I would -- I would say it applied.

Q. Based upon what?

A. Based upon the fact that they had to cross over the shoreland area to get to the property. And -- and now that Mr. Einstman mentioned it, apparently part of the property was within the Shoreland Ordinance. And the ordinance required that if you were going to deposit dredge spoil, you would have to do it. And I believe that because of the way that they piped the sand, that there would also be a deposit of dredge spoil in the shoreland area.

Q. Had you ever -- prior to that time, had you ever made any interpretation of the ordinance, such that a pipeline, dredging pipeline crossing this area would be subject to the ordinance?
A. No, I'd never been asked to do that.
Q. This was the first time that had ever come up?
A. Yeah. It was the first time, if ever, it came up, in my opinion. At any rate, I don't know if the Zoning Department -- they do issue permits for a lot of permits without ever conferring with us. To my knowledge, that's the first time that issue had come up.
Q. So you don't recall then that issue ever coming up with any previous contractors that had done dredging work in the Wabasha area?
A. Not in my experience. It may have, but not that that was a part of it.
Q. I take it then that interpretation of the ordinance had never been used to stop that procedure of pumping -- hydraulically pumping the dredge across this area?
A. Not -- not to my knowledge. You mean in the Wabasha area?
Q. Yes.

citizens or attorneys representing them or people in that department. Well -- and the County Board. When things come up, they'll ask questions. But otherwise, I don't deal with many other departments about it.

Q. Are there any other private citizens or attorneys representing private citizens, that you're aware of, who haven't been mentioned today, that were ever involved in any disputes with the Corps of Engineers, that you know?

A. Well, I can tell you that a number of people were real outspoken. I don't know if they've ever been involved with any litigation with them. One is a guy by the name of Ed Passe, P-a-s-s-e, he's Vice President of the First State Bank in Wabasha. He's an avid outdoorsman that had some issues with the Corps. And another -- another guy is Peter Ochner, O-c-h-n-e-r. He used to own a company in Wabasha. I don't know where he is anymore. He retired. He and I were the ones that went to Senator Boschwitz regarding the Jolivette permit.

Q. Are there other attorneys in the Wabasha area, that you know of, that have taken on the -- taken on the Corps on various -- or any disputes?

the first sentence there?

A. Are you talking about the first page?

Q. The first page.

A. "The fact that the United States does not apply for local land use permits should not be interpreted as an unwillingness on the part of the St. Paul District to provide information concerning this project and the groundwater monitoring program."

Q. Is that consistent with what you've testified about today, concerning your view of the Corps' position on their need to apply for local permits?

MR. EINSTMAN: Objection, lack of foundation.

A. Well, I have -- you know, yes. I'd been told before that the Corps did not have to apply for land -- local land use permits. But as I said, they -- they were, when pressured, or when asked to, they had -- they had met with and at least discussed concerns that the local government had.

BY MR. METCALF:

Q. Okay. It's copied to Mayor John Meisch and also to Bill Holmes, Zoning Administrator. Was Mr. Holmes, did he work for the city?

A. No, he worked -- well, you know, he may have. He actually was both Zoning Administrator for the city and the county at the same time. But I think this was sent to him probably as Zoning Administrator for the City of Wabasha.

Q. Is he still around?

A. Yes. He lives in Lake City.

Q. Is he retired or does he still work?

A. He's retired.

Q. Do you recall ever discussing the Shoreland Ordinance with him?

A. I'm sure I did. I don't know if it was specifically with this case, but I'm sure I did.

Q. Well, this communication between Mr. Ekstrand and Colonel Rapp and Mr. Krumholz is occurring in three letters here that are part of Exhibit 81. Were you involved at all in this, with this communication back and forth?

A. No.

Q. Or was that solely Mr. Ekstrand?

A. That was solely Mr. Ekstrand.

Q. Okay. If you'd look at the next one, it's Exhibit 82, I believe?

A. Okay.

Q. At the bottom there's a number, it

indicates that this came out of the Corps of Engineers' files that were produced to us. Do you recall ever seeing anything like this document before?

A. No.

Q. It refers to a -- if you go about two-thirds of the way down the page, it refers to a public meeting held in Wabasha in July of 1982. I just want to ask you if you recall anything about that meeting or whether you attended it?

A. July 22nd, that one?

Q. Yes.

A. I don't believe I attended it.

Q. Okay. Is there anything in this Exhibit 82, as you're reading through it, that refreshes your recollection or reminds you about any conversations or meetings you had with Mr. Krumholz, Colonel Rapp, or anyone else at the Corps, about permitting issues back in this time frame?

A. No. I think the main reason for that, other than the length of time, is that most of the meetings that would have been attended by someone from our office would have been attended by Peter Ekstrand, because he was providing most, if not all, of the civil counsel to the city at that time.

Q. If you'd just look quickly at the next one, that's Exhibit --
A. 83.
Q. -- 83, please. Do you recognize this letter? Do you recall ever seeing it, a copy of it?
A. No.
Q. There's a reference in this letter to a Stroot, to Mr. Stroot?
A. Gene Stroot, yes.
Q. At some point in time did you represent Mr. Stroot?
A. I believe I did.
Q. Do you recall what the -- why you were representing him, what that was about?
A. I probably represented him on a number of matters.
Q. Did any of those matters concern the Corps of Engineers?
A. Boy, not that I recall, perhaps, but not that I recall. I think I drafted his will. I think I probably represented him on a real estate matter. I don't remember if he had any issues with the Corps or not. Not that I recall, anyway.
Q. If you'd look at the next one, Exhibit No. 84. That's another letter to Mr. Krumholz from Mr.

Ekstrand. It's dated August 19th, 1987. I'll refer you to the bottom of the first page, your name appears there.

A. Oh, okay.

Q. Does that refresh your recollection about the -- what the issues were involving Mr. Stroot?

A. Yes.

Q. And was that a dispute that Mr. Stroot had with the Corps of Engineers?

MR. EINSTMAN: I'm just, sorry to interrupt, going to object. There's been no foundation laid to use this document. But you can answer the question, Mr. Nordstrom.

A. Yes, it does refresh my memory. He was concerned about the water contamination. As I recall, the Corps, as part of its agreement, had agreed to test and provide regular results of the tests, and no results had been -- or at least they hadn't been timely in Mr. Stroot's opinion. And so he asked me to express, on his behalf, his concerns about the possibility that the water was contaminated. He was angry with the city and the Corps for not providing that information on a regular basis.

BY MR. METCALF:

Q. Do you recall who the contractor was?
A. I think it was Robers Construction. I saw a reference to them.
Q. Are they a local contractor or are they based in the Wabasha area?
A. No.
Q. On the top of the second page of this letter, could you just read that first sentence there?
A. "As you know, the contractor in this case never did obtain a conditional use permit for the laying of the pipe in the floodplain zone and although this is a temporary structure, I am sure you are aware that Wabasha's Flood Plain Management Ordinance requires a conditional use permit for such placement."
Q. Now, you're referring to -- or Mr. Ekstrand is referring to the Flood Plain Management Ordinance?
A. Uh-huh.
Q. Do you know if that is the Shoreland Ordinance that --
A. I believe it's the same.
Q. It's the same thing?
A. This is their title to it. But I believe

it's the same. It's the city's version of the state mandated ordinance.

Q. Does the city have their own version of it then?

A. Yes. But I believe it's virtually identical, if it isn't identical. The Minnesota Department of Resources actually gives you the draft of the ordinance if you're a municipality, and there's very little, if any, change you can make to it.

Q. And every municipality and county has to enact it?

A. If they have navigable waters either adjacent to or passing through the county, that's my understanding.

Q. Okay.

A. And whether the city is right on the river, so they have to have one.

Q. Just to make sure I have a clear understanding of this, the city had its own Shoreland Ordinance, but they may have called it something slightly different, but it was, as far as you know, it was identical or very similar to the county's ordinance?

A. Yes. Back at this time, yes. Still would

be, as a matter of fact.

Q. Now, at the time you sent this letter, it appears that Mr. Ekstrand is on his own?

MR. EINSTMAN: Objection, referring to the time you sent this letter.

MR. METCALF: I'm sorry?

MR. EINSTMAN: You said you sent this letter.

MR. METCALF: I'm sorry if I misspoke.

BY MR. METCALF:

Q. At the time Mr. Ekstrand sent this letter, was he practicing on his own?

A. Yes.

Q. But he was still the City Attorney?

A. Yes.

Q. And were you -- were you involved at all in -- well, you were involved with representing Mr. Stroot?

A. Well, I was no longer -- I wasn't a City Attorney in any capacity in Wabasha at that time.

Q. Okay. So you were just in private practice?

A. I was still with the remaining members of that firm --

Q. I see.

A. -- I believe. Well, maybe I'd left by then. But Mr. Ekstrand was the first to leave the firm and I was the second. So as of August 19th, 1987, I don't think either he nor I was a member of that firm.

Q. Okay. If you'd look at Exhibit 85, please?

A. Okay.

Q. It's a letter to Mr. Ekstrand dated September 11th, 1987, from Daniel Krumholz, Corps of Engineers. Do you recall ever seeing a copy of this letter? I note that it's copied to Gene Stroot, and so I guess I'd like to know if you ever --

A. Boy, I may have seen it, I don't know.

Q. Would you still maintain any files anywhere concerning your representation of Mr. Stroot?

A. Probably.

Q. Where would those be?

A. They could be in the building in Wabasha.

Q. Not the jail?

A. No. The building that I rent. A building in Plainview or a building in Rochester.

Q. You keep files that date back that far?

A. I've never destroyed any files.

Q. Okay. All right. The next document I'd like you to look at was previously marked as Exhibit

56 in another deposition. And I just wanted to ask you about it, because your name appears about halfway down the page.

A. Uh-huh.

Q. It refers to a meeting on October 23rd, but it doesn't give the year. Then it says you were contacted, that you'd said you thought it was too late to have a moratorium. Can you tell me if this -- tell me what was going on here, if you recall?

MR. EINSTMAN: Objection, lack of foundation.

BY MR. METCALF:

Q. Well, first of all, have you ever seen this document before or do you recognize this handwriting?

A. No, I don't.

Q. It's not your writing?

A. It's not my handwriting. I recall a discussion about a moratorium and how that was -- how that related to the Matteson project. This may -- well, this may have been a County Board meeting, because it makes reference to the -- to Harold Hoffman, who at that time was a County Board member.

But one of the citizens' ideas or Board member's ideas to stop the project, Matteson's project, dumping dredge spoil in Wabasha County, was to have the County Board pass an ordinance declaring a moratorium on the deposit of any dredge spoil in Wabasha County. And I believe my opinion, that it was too late, had to do with the fact that Mr. Matteson or somebody in his behalf had already requested a conditional use hearing, or had filed an application, and I told him that that would not be effective or legal, I didn't think, as a way of doing that. They needed to be heard. That the application needed to be heard.

Q. So did the moratorium ever happen then?

A. No.

Q. If you'd just look at the next one real quickly. It's cut off at the bottom. It's Exhibit 51. Fifty-one, my copy is cut off.

A. It's a handwritten letter. It says to David?

Q. Yes.

A. Okay.

Q. And just real quickly, if you can just read it. Let me know if you recognize this at all. It's not addressed to you. It doesn't appear that your

name is on it.

A. (Witness complies.) I'm pretty sure I know who it's from, but I don't know who it's addressed to.

Q. Who do you think it's from?

A. Shar Bisell.

Q. Who is she?

A. She's a resident. She owns -- she and her husband own a residence near the Saunderson property. She's also a realtor. But I don't know if that had anything to do with this.

Q. Was a copy of this ever sent on to you?

A. I don't believe so.

Q. At least that you know of?

A. I don't believe so.

Q. Did you ever have any conversations with Cher was it?

A. Shar.

Q. Shar?

A. I've had conversations with her. I don't -- I don't know that I ever had any conversations with her one-on-one. Like I said, I think she was probably at the conditional use hearing, so --

MR. EINSTMAN: For the record, I think

she's a real estate agent; is that right?

THE WITNESS: Yeah. She's also a private citizen that owns property near the Saunderson property.

MR. EINSTMAN: Okay.

BY MR. METCALF:

Q. Well, did she ever talk to you about your interpretation of the Shoreland Ordinance?

A. I don't recall. She might have, but I don't recall.

Q. The next one is Exhibit 58, which appears to be an Application for a Conditional Use Permit filed by Roland and Sandra Sanderson. Have you seen this before?

A. I think so.

Q. Did this, at some point, get routed to your office?

A. Well, I don't know if it got routed to my office, but I'm sure I saw it when there was a hearing. I can't recall if the Sandersons applied for it first and then Matteson did, or if the arrangement was that Sanderson had to do it basically on Matteson's behalf.

Q. Okay. But the Sanderson's application was denied?

A. I believe it was, yes.
Q. You can skip the next one.
A. Skip 57?
Q. Yeah.
A. Okay.
Q. Exhibit 17 refers to a Braun property?
A. Uh-huh. Yes.
Q. Do you know where that property is located?
A. Yes.
Q. Did you have any involvement in, or your giving opinions, about whether that property fell under the Shoreland Ordinance?
A. The property sits -- I don't believe I did. But in order to get to the property, once again, we had a similar issue, where the materials had to be piped across the shoreland areas.
Q. Okay. And you rendered an opinion that that would -- crossing that to get to the Braun property would violate the Shoreland Ordinance?
A. I don't know if I was asked. But I think Judy Krueger interpreted the opinion on the Saunderson property to be -- to apply to this, because you still were going to use the same means and workings to be to the -- from the shore to the Braun property. What I don't recall is whether that

Braun property was within that thousand feet. But I don't think there was, but still there was an effort to transport.

Q. Did you ever attend any meetings relating to the Braun property?

A. No.

Q. Exhibit 16 is minutes from a meeting on December 18th, 1996. Your name does not appear in these minutes. I just wanted to ask you if you recall anything about this meeting or whether you were there?

A. Let me just briefly read it. No, I don't think I was at this meeting. The reason I don't, is because the second to the last paragraph says that she has contacted me and I reaffirmed that a Conditional Use Permit would be required, so I don't think I was at the meeting.

Q. Okay. Do you recall, though, Judy Krueger contacting you again?

A. I don't recall it, but I -- I believe she probably did.

Q. Okay.

A. It was the same issue.

Q. Did you ever do any -- do any research to determine if your opinions that -- that the pipeline

crossing this area would violate the Shoreland Ordinance, any research that would support that opinion?

MR. EINSTMAN: You're referring to the contract, the project, just for the record?

MR. METCALF: Yeah.

A. Which part, across which property, or to the Saunderson property?

BY MR. METCALF:

Q. I mean, it looks like a couple of different times you took the position that the pipeline -- or at least certainly with the Braun property it looks like that was your opinion. I just wanted to know if you'd done any research to validate that opinion?

MR. EINSTMAN: Objection, misstates his testimony.

BY MR. METCALF:

Q. I'm not trying to -- do you understand what I'm asking?

MR. EINSTMAN: Just for the record, I believe he testified that Ms. Krueger thought that the opinion he'd rendered for the Saunderson site applied to the Braun site. That's what he testified to.

BY MR. METCALF:

Q. But that opinion, though -- I'm just -- all I'm wanting to know is whether you did any research to validate that opinion, other than just looking at the ordinance itself?

A. I don't recall if I did or not. It may have been just an interpretation of the ordinance, 'cause as I recall, you had to have a Conditional Use Permit to deposit dredge spoil, and it was my opinion that just the method itself would deposit dredge spoil.

Q. Do you know if anyone has taken that position or made such an interpretation similar to that since this project, any other jurisdiction in your county or any other counties?

A. Well, other than that letter in 1987 indicates that Peter Ekstrand was of that opinion with their ordinance, no, I don't know if anyone else has rendered that opinion.

Q. But have you ever -- if you recall, have you ever discussed that particular issue of an interpretation with Mr. Ekstrand?

A. Oh, I'm sure I have.

Q. Do you recall what specifically the conversations were?

A. No, but I know he was of the same opinion.

MR. METCALF: All right. I don't have anything further. Thank you for your time.

FURTHER EXAMINATION

BY MR. EINSTMAN:

Q. I've just got a couple of follow-up questions. We'll start with that. No, it's dated '87?

A. Which letter?

Q. It's got an exclamation point at the bottom.

A. Second page of that one?

MR. METCALF: Eighty-three?

MR. EINSTMAN: No.

BY MR. EINSTMAN:

Q. It's the one that the '87 -- is this the one you're talking about here?

A. Yep. On the second page, on the top, he makes reference to needing a permit to cross --

MR. METCALF: I'm sorry, it's 84.

BY MR. EINSTMAN:

Q. Okay. You just mentioned, Mr. Nordstrom, Exhibit 84, which was apparently sent in August 19th, 1987, and said that confirms when -- you were asked about whether you'd performed any research and you said this particular letter

27 April 1998

CEMVP-CO-E, EASTERN AREA OFFICE

MEMORANDUM FOR GRAND ENCAMPMENT TEAM:

SUBJECT: Grand Encampment Excavation, Disposal Site Issue
RE: DACW37-96-C-0030

1. A meeting with the Contractor, L.W. Matteson is scheduled for April 30, at 10:00 a.m. in the District Office. The following information is provided to bring the new team members up to speed on this issue

2. The contract was awarded on 20 September 1996 in the amount of $1,693,000.00. The required completion date is 25 September 1998. There are two distinct operations, the first, unloading of the Alma Marine Dredged Material Pile Site was performed in fall 1996. At the pre-construction conference the contractor indicated that he intended to perform hydraulic unloading of the Grand Encampment Site during the 1997 season with placement on a contractor obtained disposal site (Saunderson Property) in Wabasha County. On 06 November 1996 the Wabasha County Commissioners denied the contractor's pipeline ROW permit under a shoreline restriction ordinance.

3. During the winter of 1996-1997 the contractor initiated discussions with another Wabasha County property owner John Braun. The Braun property had a higher acquisition cost and required a longer pump distance. In May 1997 the contractor contacted the Winona Office and requested a meeting to discuss the project and specifically the following issues: (1) Corps assistance in acquiring right-of-way, (2) did the Corps recognize the change disposal area to be a change, and would we negotiate an equitable adjustment, and (3) what should the contractor do next? The Winona Office requested clarification from the contractor . By letter dated 23 July 1997 the Contractor submitted an opinion letter from their lawyer (Attachment No. 1) the contractor's letter was forwarded to Office of Counsel for their review. The following comments are provided to the contractor's "opinion" letter.

(a) Regarding pre-bid discussion with Corps of Engineer's personnel. [Not withstanding: 52.214-6 EXPLANATION TO PROSPECTIVE BIDDERS: .. "Oral explanations or instructions given before the award of a contract will not be binding", and 52.236-3 SITE INVESTIGATION AND CONDITIONS AFFECTING THE WORK. . "Nor does the Government assume responsibility for any understanding reached or representation made concerning conditions which can affect the work by any of its officers or agents before the execution of this contract,. .". During the bidding process two contractors, J.F. Brennan and L.W. Matteson (LWM) contacted CO-MR, Waterways Section to look at potential contractor selected disposal sites in the Wabasha/Kellogg Minnesota area. On 5 August 1996 (during the bidding period) an on site meeting was held with LWM, (Steve Tapp's Notes verify this), the group looked at the Brown and Guza properties, note the Saunderson Property was not discussed at this meeting. On 29 August 1996 Larry Matteson Sr. called Dan Krumholz regarding a "wooded site at Teepeeota Point". Dan's notes do not confirm the contractor's statements. The government did not investigate the "Saunderson" property during the bidding period.

(b) The five government furnished potential on-land placement sites were provided with adequate capacity for all existing dredge material from both the Alma and Grand Encampments Stockpiles. These placement sites are all located in Buffalo County, Wisconsin and were accessible through the Alma Marina Site. The restrictions for the government furnished transfer and placement sites were described in the contract documents. Specific restrictions include the City of Alma's $0.15/CY Beach (Harbor) Road Haulage Charges. The contract documents anticipated material to be trucked to the final on-land placement sites. The government estimate was prepared on this basis and a review of the bidder's abstract indicates that 3 of the 6 bidders planned performing the contract by trucking all the material. LWM as well as the second and third low bidders apparently bid the transfer of the Grand Encampment stockpile by hydraulic dredging. This method was not included, discussed, or prohibited in the contract documents. However, utilization of a contractor selected final disposal area was provided for, subject to approval by the Contracting Officer.

DEPOSITION EXHIBIT
Gulan 25
7-23-02

4. Office of Counsel reviewed the preliminary letter submitted by the Contractor's attorney and found their claim of a differing site condition to be without merit. On 31 July 1997 Randy Glaeser and I met with the contractor. The only "new information" that came out of that meeting was the contractor's contention that the optional sites identified in the contract were not approved by the government and still would have required contractor-landowner negotiations and final approval from the Corps.

5. An in house meeting was conducted on 07 August 1997 (Gulan, Glaeser, Novak, Bakke, Bankston, Aird, Hoff, Krumholz, Tapp). The opinion of the group was that the contract was sound as written and believed the contractor fully understood the contract when he bid the job. The decision of that group was to direct the Contractor to execute the work as specified in the existing contract. By letter dated 05 September 1997 the COR notified the contractor that it was the government's position that the contract is clear regarding disposal sites and no differing site condition exists. In addition the contractor was informed that the MRPO would continue to facilitate the contractor's permit request, but would not actually obtain permits for the contractor.

6. In February 1998 the Wabasha County Commissioners denied the pipeline ROW permit for the Braun Property. Subsequent to that time the contractor has been negotiating with the USFWS for a disposal site. Use of the USFWS property would not require a permit from Wabasha County. The USFWS has requested that in trade for use of their property, the contractor purchase a nearby tract of land from Mrs. Rose Peterson.

7. By letter dated 22 April 1998 the contractor submitted cost information comparing the Saunderson Property and the Fish & Wildlife Property. The contractor's submitted costs for the original property are inline with the bid prices. The submitted costs for utilizing the Fish & Wildlife Property are approximately double, an additional $1.5 Million. The difference is due to additional equipment and labor for boosters and additional pipeline and additional real estate acquisition cost. The letter and two summary pages are attached; the cost breakdown pages will be available at the 30 April meeting (Attachment No.2).

8. By letter dated 27 April 1998, the contractor resubmitted the July 1997 letter from his lawyer and summarized his position (Attachment No. 3). The contractor has requested this meeting in order to present his position to the Contracting Officer.

Melissa Gulan

Melissa Gulan
Eastern Resident Engineer

Attachments:
1. 23 July 1997 Contractor Letter w/Miller Law Firm Letter
2. 22 April 1998 Contractor Letter
3. 27 April 1998 Contractor Letter

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DEPOSITION EXHIBIT
PENGAD 800-631-6989
Nordstrom #73

L. W. MATTESON, INC.,

Plaintiff,

v.

UNITED STATES ARMY CORPS OF ENGINEERS,

Defendant.

Case No. 01-542C

AFFIDAVIT OF JAMES C. NORDSTROM

COMES NOW James C. Nordstrom and, being first duly sworn on his oath, state as follows:

I declare that the following facts are true, to the best of my knowledge, information and belief:

1. I was elected to the position of County Attorney for the County of Wabasha, Minnesota in 1990, and have held that position continuously to this date.

2. Prior to 1990, I was a partner in the firm of Gartner, Burkhardt, Shulman, Ekstrand & Nordstrom, Ltd., and in that capacity, periodically represented the City of Wabasha, Minnesota.

3. Pursuant to M.S.A. § 103F.201, enacted in 1973, every municipality in Minnesota is required to enact a Floodplain and Shoreland Ordinance, drafted by the Minnesota Department of Natural Resources. The MDNR controls the language of the ordinance, and attends hearings and meetings pertaining to the ordinance at the local level.

4. Both the City of Wabasha and the County of Wabasha have Floodplain and Shoreland Ordinances, with identical language drafted by the Minnesota Department of Natural Resources.

5. I am the author of, and recall sending, a letter dated June 15, 1983 to Col. Rapp at the Corps of Engineers, St. Paul, Minnesota ("the Corps"), regarding the application of the Wabasha Flood Plain and Shoreland Ordinance to the Corps' proposed dredging activity, and advising the Corps that it needed to apply for a permit to dump dredge spoil in the City of Wabasha. A copy of that letter is attached to this affidavit and speaks for itself.

6. The primary concern of the local citizens and government entities with regard to the dumping of dredge material was the potential for contamination of water supplies resulting from the contaminants leeching into surrounding wells. The proposed dumping location at that time was a gravel pit directly above City wells.

7. Because of local concern regarding potential well contamination, as well as prior negative experience with Corps activities along the river, I approached the Wabasha City Council about the need to require a permit for the placement of dredge spoil material by the Corps.

8. I was the recipient of, and recall receiving, a letter from Edward G. Rapp, Colonel, Corps of Engineers, District Engineer, in response to my June 15, 1983. A copy of that letter is attached to this affidavit and speaks for itself.

9. As a result of having dealt with the Corps over a number of years on similar issues, my present understanding of the Corps' official position with regard to local permit requirements is that it is not subject to those requirements based upon its claim of sovereign immunity. The Corps has never substantiated to me a documented basis for its claim of sovereign immunity.

10. In spite of the Corps' claim of sovereign immunity and its position that it is not subject to local permits, it has been my experience that the Corps does apply for those permits.

11. ~~In my experience, the Corps has historically disregarded local citizen and governmental opposition and concerns regarding it activities in managing the Mississippi River.~~ [handwritten initials] 10/15/02

12. Following the correspondence between myself and the Corps in June, 1983, and the Corps' invocation of its sovereign immunity, the Corps did apply for a permit to dump dredge material in Wabasha. The permit was granted subject to numerous conditions, most importantly that the Corps drill and monitor test wells in the area of the dredge disposal at the Jolivette pit, and to be responsible for maintenance of those wells should contamination occur.

13. Based upon my personal communications with the Corps prior to 1996, it is my belief that the Corps was fully aware of the Wabasha Shoreland Ordinance and its requirement for obtaining a ~~variance~~ conditional local permit for any activity falling within the Shoreland Protection Zone.

14. Throughout the 1980's and continuing to the present, there has been major local citizen opposition to the Corps with respect to its activities in management of the Mississippi River. I believe that the Corps was and is fully aware of the magnitude of that opposition.

15. In 1996, I was contacted by Judy Krueger, Zoning Administrator for Wabasha County, with information that L.W. Matteson, Inc., in its capacity as a dredge contractor to the Corps, intended to pump dredge spoil across the Shoreland Protection Zone to a placement location on private property it intended to purchase from Roland Saunderson. Ms. Krueger lived near the Saunderson property and inquired as to whether a permit would be required for this activity.

16. The issue in that case was potential discharge from the pipeline within the Shoreland Protection Zone.

17. I recall speaking with representatives of the Corps about the application of the Wabasha Shoreland Ordinance to the activity referenced in Item #9, although I do not recall the name(s) of the individual(s) with whom I spoke.

18. I have not reviewed a copy of Steve Tapp's diary notes from September 18, 1996, reflecting that I called him on that date to discuss the application of the Shoreland Ordinance to the planned dredging activity and pumping of dredge spoil material to the Saunderson property. Having reviewed this diary entry, I do not dispute that I made that telephone call and that the notes accurately reflect the content of our communication.

19. Following my conversation with Mr. Tapp on September 18, 1996, either Judy Krueger or I contacted L.W. Matteson, Inc. to advise them that a permit would be necessary. I ~~was not~~ do not recall being informed by Mr. Tapp on September 18, 1996 of any time limit or time frame that was critical for Matteson to be so advised.

20. I firmly believe that the Corps was fully aware of the Wabasha Floodplain and Shoreland Ordinance and its requirements prior to and during 1996.

James C. Nordstrom

STATE OF MINNESOTA )
) ss:
)
COUNTY OF WABASHA )

Subscribed and sworn to before me this 15th day of October, 2002.

Notary Public

My Commission Expires:

GARTNER, BURKHARDT, SHULMAN, EKSTRAND & NORDSTROM, LTD.
LAW OFFICES

PHILIP A. GARTNER
PETER H. BURKHARDT
DAVID A. SHULMAN
PETER D. EKSTRAND
JAMES C. NORDSTROM
STEVEN L. ERWIN

REPLY TO
100 WEST MAIN ST.
WABASHA, MINNESOTA 55981
612-565-4548

OFFICES
LAKE CITY, MINN. 55041
PLAINVIEW, MINN. 55964
ROCHESTER, MINN. 55901
WABASHA, MINN. 55981

discuss at 8:00 Tue

DEPOSITION EXHIBIT
PENGAD 800-631-6989
Nordstrom #74

June 15, 1983

Col. Rapp
CORPS OF ENGINEERS
1135 U.S. Post Office & Custom House
St. Paul, MN 55101

Dear Colonel Rapp:

An edition of last week's Rochester Post Bulletin carried an article regarding the Army Corp's plan to dredge the Chippewa River and dump dredge spoil within the City limits of Wabasha sometime during the summer of 1983. The article alluded to two possible area where sand may be dumped. I presume the areas would be the old Chicago, Milwaukee Railroad pit and/or the area presently owned by George Jolivette, Jr.

You will recall that last year the Army Corps dredged and dumped dredge spoil in the Jolivette pit. That dumping of dredge spoil was done without obtaining a variance from the City of Wabasha pursuant to the Wabasha Flood Plain and Shoreland Ordinance. That ordinance specifically provides that the type of dumping done by the Corps can only be done after applying for and obtaining a variance.

I know of no Federal or State law which allows the U.S. Army Corps of Engineers to act without seeking such a permit. If the Corps intends to dump dredge spoil in the City of Wabasha limits this year, or any year in the future, we will assume that the Corps will follow the required process and obtain the proper variances.

Very truly yours,

James C. Nordstrom, City Attorney
for the City of Wabasha

JCN:mms

Peter Ekstrand
ATTORNEY AT LAW

100 MAIN STREET WEST • POST OFFICE BOX 190 • WABASHA, MINNESOTA 55981 • TELEPHONE 612/565-4548

August 19, 1987

Mr. Dan Krumholtz
U.S. ARMY CORPS OF ENGINEERS
U.S. Army Boatyard
Fountain City, WI 54629

DEPOSITION EXHIBIT
Nordstrom #84

Dear Mr. Krumholtz:

At the City Council meeting on August 18, 1987, numerous complaints were made to the Council relative to the dredge spoil dumping in the Kohner pit in the City of Wabasha. The Council is very concerned as to what the final appearance of this sandpile will be as far as the elevations are concerned and are requesting that the Corps review this matter seriously with the hope of revising the elevations downward so that we don't have a situation that is unsightly from an esthetic standpoint. The neighbors surrounding the pit are very disturbed about this matter and the Council has requested that members of the Corps, the contractor, and the owner of the pit come to the next council meeting on September 1, 1987 to discuss the matter.

The City is also extremely concerned about the City wells and the private wells lying adjacent to this project. A discussion relative to the well monitoring took place at the meeting and both Mr. Passe and Mr. Stroot, two of the neighbors having private wells, have indicated that to their knowledge there has been no well monitoring done of their private wells. In discussing the matter with the City Street Superintendent and the Utilities Superintendent, they have not seen anyone from the Corps, or anyone else, actually do any monitoring of any of the City wells or of the private wells involved. The Council would like you to discuss and clarify at the next council meeting what is actually being done. The City is requesting, furthermore, that the monitoring take place on a weekly basis, with turnaround results within one week thereafter. In the event some contamination does show from any of the tests, it may be necessary to take immediate action, and having a turnaround on the testing results of more than one week could be disastrous to the City. The City has been informed by officials that Winona State University does do well testing and has done so in the past, with a turnaround time of approximately three days.

The fact that the City has not received any test results relative to this project is upsetting indeed! Jim Nordstrom, an attorney representing Eugene Stroot, appeared before the Council and indicated that in his discussions with you, you were unaware whether any of the testing had actually been done and that you had received no written results from any of the tests.

As you know, the contractor in this case never did obtain a conditional use permit for the laying of the pipe in the flood-plain zone and although this is a temporary structure, I am sure you are aware that Wabasha's Flood Plain Management Ordinance requires a conditional use permit for such placement. This ordinance is mandated by the Federal Government for flood insurance purposes and although the City does not wish to take any action at this time to stop the project from going forward, if the groundwater monitoring program is not handled in a way satisfactory to the City as indicated above, we may be left with no other alternative but to do so. Furthermore, the Federal Clean Water Act does give the City certain rights relative to their wells and an injunctive proceeding may be in order if this well monitoring program does not go forward expeditiously and in a manner that will safeguard the City and private wells in an adequate manner. We, of course, hope that this will not be necessary and that the Corps will stay on top of this matter and expedite all testing and test results, keeping the City informed accordingly.

For the above reasons, I hope there is no problem in your having the necessary people attend the next Council meeting to discuss the alternatives available and the procedures that are being followed at this time with regard to the well monitoring program.

If you have any questions regarding this, please feel free to contact me.

Very truly yours,

Peter D. Ekstrand,
City Attorney for the City of Wabasha

P.S. Please also provide to me prior to the meeting the proposed monitoring program, which I assume is in writing, similar to what you did back in March of 1984 on the railroad pit.

PDE:mms

cc Mayor Dan Losinski
Virginia Fosmo, City Clerk

# Wabasha County Zoning Ordinance

Adopted July 17, 2001
Effective September 1, 2001

## TABLE OF CONTENTS


| | | Page |
|---|---|---|
| ARTICLE 1 | GENERAL PROVISIONS | 1-1 |
| Section 1. | Title | 1-1 |
| Section 2. | Purpose | 1-2 |
| Section 3. | Jurisdiction | 1-2 |
| Section 4. | Scope | 1-2 |
| Section 5. | Interpretation | 1-2 |
| Section 6. | Severability | 1-2 |
| ARTICLE 2 | RULES AND DEFINITIONS | 2-1 |
| Section 1. | Rules | 2-1 |
| Section 2. | Definitions | 2-1 |
| ARTICLE 3 | PERFORMANCE STANDARDS | 3-1 |
| Section 1. | Purpose and Intent | 3-1 |
| Section 2. | Nuisance Standards | 3-1 |
| Section 3. | Building Regulations | 3-2 |
| Section 4. | Lot Area Requirements | 3-2 |
| Section 5. | Temporary Dwellings | 3-2 |
| Section 6. | Accessory Buildings | 3-2 |
| Section 7. | Access Drives and Access | 3-3 |
| Section 8. | Sewage Treatment Provisions | 3-3 |
| Section 9. | Dumping and Disposal of Rubbish | 3-4 |
| Section 10. | Junk and/or Salvage Reclamation Yard | 3-4 |
| Section 11. | Environmental Hazard Abatement | 3-6 |
| Section 12. | Commercial Recreational Facilities, Indoor or Outdoor | 3-6 |
| Section 13. | Communication Towers | 3-7 |
| Section 14. | Adult Uses | 3-10 |
| Section 15. | Off-Street Loading and Unloading Requirements | 3-13 |
| Section 16. | Off-Street Parking Requirements | 3-13 |
| Section 17. | Advertising Devices | 3-14 |
| Section 18. | Additional Requirements, Exceptions, and Modifications | 3-16 |
| ARTICLE 4 | BLUFFLAND AREA PROTECTION | 4-1 |
| Section 1. | Intent and Purpose | 4-1 |
| Section 2. | Scope | 4-1 |
| Section 3. | General Regulations | 4-1 |
| ARTICLE 5 | CONFINED FEEDLOT REGULATIONS | 5-1 |
| Section 1. | Intent | 5-1 |
| Section 2. | Adoption by Reference of State Regulations | 5-1 |

| | | |
|---|---|---|
| Section 3. | Exempt From Regulation | 5-1 |
| Section 4. | Application Procedure | 5-1 |
| Section 5. | Required Setbacks for New Feedlots | 5-2 |
| Section 6. | Required Setbacks for New Residences from Existing Feedlots | 5-2 |
| ARTICLE 6 | EXCAVATION OF MINERAL MATERIALS | 6-1 |
| Section 1. | Purpose | 6-1 |
| Section 2. | Definition | 6-1 |
| Section 3. | Permit Required | 6-1 |
| Section 4. | Application | 6-2 |
| Section 5. | Performance Standards | 6-2 |
| Section 6. | Reclamation | 6-4 |
| Section 7. | Financial Guarantees, Fees & Inspections | 6-5 |
| ARTICLE 7 | ESSENTIAL SERVICES | 7-1 |
| Section 1. | Purpose and Intent | 7-1 |
| Section 2. | Scope of Regulations | 7-1 |
| Section 3. | Exempt From Regulations | 7-1 |
| Section 4. | Essential Service Facilities Procedure | 7-1 |
| ARTICLE 8 | ZONING DISTRICTS AND DISTRICT PROVISIONS | 8-1 |
| Section 1. | Zoning Districts | 8-1 |
| Section 2. | Zoning Map | 8-1 |
| Section 3. | District Boundaries | 8-1 |
| Section 4. | Zoning Boundary Interpretation | 8-1 |
| Section 5. | Permitted Uses | 8-2 |
| Section 6. | Uses Not Provided for in Zoning District | 8-2 |
| ARTICLE 9 | A-1, AGRICULTURAL PROTECTION DISTRICT | 9-1 |
| Section 1. | Purpose | 9-1 |
| Section 2. | Permitted Uses | 9-1 |
| Section 3. | Conditional Uses | 9-2 |
| Section 4. | General District Regulations | 9-4 |
| Section 5. | Farm Density Entitlements | 9-7 |
| Section 6. | Conditional Use – 2 or more Residential Lots | 9-7 |
| Section 7. | Non-conforming Residences | 9-8 |

| | | |
|---|---|---|
| ARTICLE 10 A-2, AGRICULTURE/URBAN FRINGE DISTRICT | | 10-1 |
| Section 1. | Purpose | 10-1 |
| Section 2. | Permitted Uses | 10-1 |
| Section 3. | Conditional Uses | 10-2 |
| Section 4. | General District Regulations | 10-4 |
| Section 5. | Orderly Redevelopment | 10-7 |
| Section 6. | Farm Density Entitlements | 10-7 |
| Section 7. | Conditional Use – Cluster Developments | 10-8 |
| Section 8. | Joint Review By Affected Public Entities | 10-9 |
| Section 9. | Non-conforming Residences | 10-9 |
| ARTICLE 11 A-3, AGRICULTURE/LOW-DENSITY DISTRICT | | 11-1 |
| Section 1. | Purpose | 11-1 |
| Section 2. | Permitted Uses | 11-1 |
| Section 3. | Conditional Uses | 11-2 |
| Section 4. | General District Regulations | 11-3 |
| Section 5. | Minimum Criteria And Findings For Rezoning Land To A-3 | 11-6 |
| Section 6. | Farm Density Entitlements | 11-7 |
| Section 7. | Conditional Use - Cluster Developments | 11-8 |
| Section 8. | Non-conforming Residences | 11-9 |
| ARTICLE 12 R-1, RURAL RESIDENTIAL | | 12-1 |
| Section 1. | Purpose | 12-1 |
| Section 2. | Permitted Uses | 12-1 |
| Section 3. | Conditional Uses | 12-1 |
| Section 4. | Minimum Criteria And Findings For Rezoning Land To R-1 | 12-2 |
| Section 5. | General District Regulations | 12-3 |
| Section 6. | Non-Conforming Residences | 12-4 |
| ARTICLE 13 SHORELAND REGULATIONS | | 13-1 |
| Section 1. | Purpose | 13-1 |
| Section 2. | Statutory Authorization | 13-1 |
| Section 3. | Policy | 13-1 |
| Section 4. | Definitions | 13-1 |
| Section 5. | Shoreland Districts | 13-3 |
| Section 6. | District Applications | 13-3 |
| Section 7. | Shoreland and Classification System and Land Use Districts | 13-3 |
| Section 8. | Zoning Provisions | 13-5 |
| Section 9. | Shoreland Alterations | 13-11 |
| Section 10. | Other Provisions for Various Uses | 13-15 |
| Section 11. | Conditional Uses | 13-17 |
| Section 13. | Variances | 13-17 |
| Section 13. | Nonconformities | 13-18 |

| | | |
|---|---|---|
| Section 14. | Water Supply and Sewage Treatment | 13-19 |
| Section 15. | Subdivision/Platting Provisions | 13-20 |
| Section 16. | Planned Unit Developments (PUDs) | 13-21 |
| Section 17. | Notification to the Department of Natural Resources | 13-27 |
| ARTICLE 14 | FLOODPLAIN MANAGEMENT REGULATIONS | 14-1 |
| Section 1. | Statutory Authorization, Findings of Fact and Purpose | 14-1 |
| Section 2. | General Provisions | 14-1 |
| Section 3. | Establishment of Zoning District | 14-2 |
| Section 4. | Floodway Area (FW) | 14-3 |
| Section 5. | Flood Fringe Area (FF) | 14-6 |
| Section 6. | General Floodplain Area | 14-10 |
| Section 7. | West Newton Special Use District | 14-12 |
| Section 8. | Subdivisions | 14-13 |
| Section 9. | Public Utilities, Railroads, Roads and Bridges | 14-13 |
| Section 10. | Manufactured Homes, Manufactured Home Parks and Placement of Travel Trailers and Travel Vehicles | 14-14 |
| Section 11. | Administration | 14-16 |
| Section 12. | Amendments | 14-18 |
| ARTICLE 15 | RIGHT TO FARM | 15-1 |
| Section 1. | Intent and Purpose | 15-1 |
| Section 2. | Definitions | 15-1 |
| Section 3. | Agricultural Operation Not a Nuisance | 15-2 |
| ARTICLE 16 | FUNCTIONS OF THE ZONING ADMINISTRATOR, PLANNING COMMISSION, AND BOARD OF ADJUSTMENT | 16-1 |
| Section 1. | Enforcement | 16-1 |
| Section 2. | Duties & Powers of the Office of Zoning Administrator | 16-1 |
| Section 3. | Permit Required | 16-1 |
| Section 4. | Planning Commission | 16-3 |
| Section 5. | Board of Adjustment | 16-4 |
| ARTICLE 17 | ZONING AMENDMENTS/REZONINGS | 17-1 |
| Section 1. | Zoning Amendments | 17-1 |
| Section 2. | Application | 17-1 |
| Section 3. | Procedure | 17-2 |
| Section 4. | Action and Authorization | 17-3 |
| Section 6. | Recording | 17-3 |
| Section 7. | Effective Date | 17-3 |
| ARTICLE 18 | CONDITIONAL USES | 18-1 |
| Section 1. | Conditional Uses | 18-1 |

| | | |
|---|---|---|
| Section 2. | Application | 18-1 |
| Section 3. | Notification and Public Hearing | 18-1 |
| Section 4. | Approval, Disapproval or Modification | 18-2 |
| Section 5.F | indings | 18-2 |
| Section 6. | Conditional Use Permits Within Floodplains and Shoreland Areas | 18-3 |
| Section 7. | Compliance | 18-6 |
| Section 8. | Review | 18-6 |
| Section 9. | Revocation | 18-6 |
| Section 10. | Discontinuance | 18-7 |
| Section 11. | Recording | 18-7 |
| ARTICLE 19 | VARIANCES | 19-1 |
| Section 1. | Variances | 19-1 |
| Section 2. | Procedure | 19-1 |
| Section 3. | Findings | 19-2 |
| Section 4. | Variances Within Shoreland and Floodplain Districts | 19-3 |
| Section 5. | Recording | 19-3 |
| ARTICLE 20 | NON-CONFORMING USES | 20-1 |
| Section 1. | Non-Conforming Buildings and Uses | 20-1 |
| Section 2. | Floodplain Structural Alterations | 20-2 |
| Section 3. | Nonconforming Sewage Treatment Systems | 20-2 |
| ARTICLE 21 | VIOLATIONS AND PENALTIES | 21-1 |
| Section 1. | Criminal Violations and Penalties | 21-1 |
| Section 2. | Relief From Personal Responsibility | 21-1 |
| Section 3. | Violations in a Floodplain District | 21-1 |
| ARTICLE 22 | FEES | 22-1 |
| Section 1. | Required Fees | 22-1 |
| Section 2. | Exemptions | 22-1 |
| ARTICLE 23 | VALIDITY | 23-1 |
| Section 1. | Validity | 23-1 |
| Section 2. | Adoption | 23-1 |
| Section 3. | Repeal of Previous Ordinance | 23-1 |
| Section 4 | Date of Effect | 23-1 |

2. *PUDs shall be designed and constructed to effectively manage reasonably expected quantities and qualities of stormwater runoff. Impervious surface coverage within any tier shall not exceed 25 percent of the tier area, except that for commercial PUDs 35 percent impervious surface coverage may be allowed in the first tier of general development lakes with an approved stormwater management plan and consistency with Section 9 of this Article.*

F. *Centralization and Design of Facilities. Centralization and design of facilities and structures shall be done according to the following standards:*

1. *Planned unit developments shall be connected to publicly owned water supply and sewer systems, if available. On-site water supply and sewage treatment systems shall be centralized and designed and installed to meet or exceed applicable standards or rules of the Minnesota Department of Health and Sections 8 and 14 of this Article. On-site sewage treatment systems shall be located on the most suitable areas of the development, and sufficient law area free of limiting factors shall be provided for a replacement soil treatment system for each sewage system;*

2. *Dwelling units or sites shall be clustered into one or more groups and located on suitable areas of the development. They shall be designed and located to meet or exceed the following dimensional standards for the relevant shoreland classification; setback from the ordinary high water level, elevation above the surface water features, and maximum height. Setbacks from the ordinary high water level shall be increased in accordance with Section 16 Subd. 4 of this Article for developments with density increases.*

## *SECTION 17. NOTIFICATION TO THE DEPARTMENT OF NATURAL RESOURCES*

*Subd. 1.* *Copies of all notices of any public hearings to consider variances, amendments, or conditional uses resulting from controls of Articles 18, 19, 20, and 21 shall be sent to the Commissioner or the Commissioner's designated representative and postmarked at least ten (10) days before the hearings. Notices of hearings to consider proposed subdivisions/plans shall include copies of the subdivision/plat.*

*Subd. 2.* *A copy of approved amendments and subdivisions/plats, and final decisions granting variances or conditional uses under this Shoreland Article shall be sent to the Commissioner or the Commissioner's designated representative and postmarked within ten (10) days of final action.*

David
COPY

WABASHA COUNTY
ZONING ADMINISTRATOR
COURTHOUSE - 625 JEFFERSON AVENUE
WABASHA, MN 55981
Judy Krueger - (612) 565-3242

September 24, 1996

Lawrence Matteson
L.W. Matteson, Inc.
#1 South Point
Burlington, Ia 52601

Re: Parcel #05-00090-03
52.50 Acres
Section 12, Greenfield Twp.
Wabasha County, MN

Dear Mr. Matteson:

As a follow-up of our recent conversation enclosed please find an application for a Land Use/Land Alteration Permit. This is a necessary permit whenever there is activity within the Wabasha County Shoreland District.

Shoreland means land located within 1,000 feet of the ordinary high water level of a lake, pond or flowage. The area in question is designated as U.S. Lock & Dam #4 Pool, General Development Lake.

I am also enclosing copies of several sections of our Wabasha County Shoreland Management Ordinance that apply to this area.

If you have any questions please contact me.

Sincerely,

Judy Krueger

Judy Krueger
Zoning Administrator

encl.

WED - THURS

Copy of Example

MATTESON SR
EXHIBIT
7/25/02 49 um

APPLICATION FOR A LAND USE/LAND ALTERATION PERMIT

SHORELAND MANAGEMENT DISTRICT TWP. NAME________________

DATE RECEIVED BY
WABASHA COUNTY________________ FEE: $60.00

Parcel #________________

Name________________

Address________________

________________

Phone Number to call to pick up permit________________(Can be mailed)

Legal Description of property________________

________________Twp. Section #________

Nearest County Road________________ Township Road________________

Grading/Filling______

Alterations: Riverbank/Wall______ Topographic______ Vegetation________

Comments________________

________________

You must attach: A free-hand sketch showing land dimensions, building locations and distances in relation to other buildings, lot lines, roads, road right-of-ways, ordinary high water levels of rivers, lakes, streams, septic & well locations plus neighboring septics & wells if located in a subdivision or a small acreage in a developed area. Set-backs apply. Designate North. Township approval may be needed in some areas. Variances & Conditional Use Permits may also be needed. The Dept. of Natural Resources may become involved on an active basis. If there is an existing sanitary system it must be approved by the Wabasha Co. Environmental Health Dept. (800-950-2142) before any type of permit can be issued by the Wabasha Co. Zoning Office (612-565-3242), Monday-Friday, 8:30-4:00 p.m. Wells must meet required distance from septic systems. A penalty can, and will be assessed, if activity is started prior to obtaining a building permit.

If this application is incomplete it will be returned to the Applicant

Signature________________ Date________________

TO BE COMPLETED BY WABASHA COUNTY ZONING OFFICE:

Approvals needed: City/Township No____ Yes____ Date Received________________
Septic System No____ Yes____ Date Received________________

Q So this was the first time Matteson had ever submitted a bid in which there was proposal of disposal sites?

A I believe so.

Q The fact that you were proposing disposal sites for the first time, did that cause you to have any sort of apprehension?

A Once we had the Corps come out and inspect the sites, yeah. I mean, you have apprehension every time -- I mean, any time you -- yes, it did.

Q What did you do to address your apprehension?

A We had the Corps of Engineers come out and inspect the sites along with various agencies that they brought with them. U.S. Fish & Wildlife, I believe was there. The Minnesota DNR was there. The typical agencies that are involved in a permit of this type.

Q Did you, after having these meetings with the Corps, did you perceive any risks associated with submitting a bid in which you were proposing disposal sites?

A At that time, we thought we had all our bases covered as far as the permitting process.

Q So could you describe the level of risk, if any, that you ascribed to the disposal sites that you were proposing?