IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------------

L. W. MATTESON, INC.,

Plaintiff,

vs. File No. 01-542C

UNIDED STATES ARMY CORPS OF ENGINEERS,

Defendant.

---------------------------------

Deposition of DANIEL J. KRUMHOLZ, taken pursuant to Notice of Taking Deposition, taken before John A. Dunton, Court Reporter, a Notary Public in and for the County of Dakota, State of Minnesota, on Monday, the 22nd day of July, 2002, at Army Corps of Engineers Centre, in the City of St. Paul, Minnesota, commencing at approximately 11:00 a.m.

* * *

A. Yes.

Q. And it advised the bidders that the removed existing dredge material would be disposed of on various potential on-land placements sites located in Buffalo County, Wisconsin, is that correct?

A. Yes.

Q. That essentially informed the bidders that the Corps envisioned mechanical means being used, is that correct?

MS. McCARTHY: Objection.

BY MR. MILLER:

Q. Is that correct?

A. No. Well, it identifies the sites as being potential sites, the ones in Wisconsin. And further on in the specification we indicate that the contractor can select his or her own site and that they can use the type of equipment they want. I don't know that anywhere we specify the type of equipment or advise the equipment to be used.

Q. Well, the word used is not "may" but "needs to be disposed of on various potential on-land displacement sites." Do you agree with me if you use the "potential on-land placement sites," that you wouldn't be looking at an operation that

would be hydraulic dredging, you would be looking at mechanical dredging for those?

A. In my opinion, mechanical would be the most efficient way of getting it to those sites, yes.

Q. Can you locate for me on Exhibit 1, the solicitation, where it identifies the on-land placement sites in Buffalo County, Wisconsin?

MS. McCARTHY: Objection to the form of the question.

THE WITNESS: It will take some time.

There is a reference to the Buffalo County sites on page 01000-5.

BY MR. MILLER:

Q. I have located that page.

A. The Buffalo County Number 1 placement site is identified at the top of that page.

Is that what your question was?

Q. Yes.

A. Does that answer your question then?

MS. McCARTHY: Is there a question pending?

MR. MILLER: Well, there is not right now.

BY MR. MILLER:

Q. Then and you'll see on page 01000-5 under Subparagraph (a) that it indicates that material fill is mandatory at the Buffalo County 1 placement site?

A. Yes.

Q. Why did the report make that mandatory?

A. That site is the Buffalo County site that we had reached an agreement with Buffalo County that we they would accept some of the material and the agreement was that they would be guaranteed of getting as much material as their site held. So to meet our commitment to Buffalo County, we mandated that in our specifications.

Q. Do you recall being very interested in receiving a bid from the Mattesons to do the excavation work by hydraulic means?

A. I guess I don't know how to respond.

Q. I will rephrase.

In your experience with these excavation projects, were you aware at the time that the solicitation was put out that the work could be done less expensively through hydraulic means?

A. Yes. I was aware of that, provided that an acceptable placement site could be located

within a reasonable distance of the hydraulic dredging.

Q. Okay. You told me that one of the concerns the Corps has in other projects with designated disposal sites was cost?

A. Yes.

Q. And you were the person who was held responsible for the Grand Encampment Project?

A. Ultimately in the district, the responsibilities would have been in our District Commander, who was responsible for it.

Q. And the need that you had identified, you said a year or so earlier, was the need to excavate the Grand Encampment replacement site to provide additional capacities in the future for various dredging operations?

A. That's correct.

Q. That was the primary purpose of the project?

A. Yes.

Q. Do you think that the project could be accomplished more efficiently through hydraulic dredging?

A. Again, if a suitable site could be located within a reasonable distance, that would be

the most economical, yes.

Q. Did the Corps attempt to obtain a suitable site for hydraulic dredging on the Grand Encampment Project?

A. No, we did not.

Q. Was there a reason that the Corps didn't explore another suitable site for hydraulic dredging?

MS. McCARTHY: Objection to the form of the question. Go ahead and answer.

THE WITNESS: Our selected placement plan for that particular dredge cut, Grand Encampment, was to barge the material, take it down to Alma and the Alma site material was not being removed from the Alma site for beneficial use through contractors or the county or whoever takes material from that site, it was not being removed at the same rate that we were producing material through dredging at Grand Encampment. So our long-term plan, in effect, was not working. We decided to put out a contract to tap into contractor's flexibilities or their opportunities or their knowledge of places to put material. So we decided to put this contract out with the contractors having responsibility for finding a

placement site. So we did not investigate the hydraulic options to include in this project.

BY MR. MILLER:

Q. Why do you say your long-term plan was not working?

A. Because the Alma site is very limited capacity and we could only place so much there before it was filled up. And we rely upon -- it's a land accessible site and we rely upon beneficial use for removal from that location. And the removal was not occurring at the same rate that we were producing material from dredging in the channel. So it was not working as planned or envisioned.

Q. What was the beneficial use for the material from Alma that you anticipated?

A. We expected that the county would use some for winter rode maintenance; ice control: We expected the contractors would use it for construction projects. That was all occurring, but it was just not at the rate that we were generating dredge material. So we had to do something more to unload, to get the Grand Encampment site, to get the capacity restored at the site. That's when we decided to put out a contract to excavate it and

again we were looking for contractors to help us out by using some of their resources to find acceptable placement sites.

Q. Had you let a project like that before?

A. Not that I'm aware of.

Q. The previous projects, the Corps had assumed responsibility for finding hydraulic dredging sites or disposal sites?

MS. McCARTHY: Objection.

THE WITNESS: In fact, we accept the responsibility for providing a site. It didn't necessarily have to be done hydraulically. We also, as I indicated earlier, we allow the contractor to select their own site, if they so wish.

BY MR. MILLER:

Q. Again, I want an understanding. How was the solicitation that you put together for Grand Encampment different than what you had done in the past on excavations and disposal facilities?

A. Well, it was different in that we did not provide a site as close by that we were aware of and was able to get landowner agreement or permits from landowners in Wisconsin until we included those sites as fallback sites for the contractor.

But the intent was that the contractor would do some investigation in determining or selecting their own placement site.

Q. I think you told me earlier that on the Grand Encampment Project, the Corps didn't even attempt to find a site closer to Grand Encampment, is that correct?

A. I think the question was in Minnesota, that we didn't find a close by site in Minnesota. As far as I know, we did not -- I can't say that -- we have been involved in dredge material planning for a long time. I can't say that we never looked at potential opportunities or sites in that area, but I don't know that specifically for this project that we tried to find one at that time.

Q. Was there a reason that the Corps didn't attempt to find a closer site for the Grand Encampment Project?

A. Not that I recall other than just that we weren't aware of any. None had been identified to us to investigate.

Q. To your knowledge, had the Corps made any inquiries?

A. Again, specifically for this project, no, I don't believe we did.

Q. Did the Corps make inquiries on the Wisconsin side concerning available disposal sites?

A. We did for the sites that we identified in the contract.

Q. Why did the Corps elect to make inquiries on the Wisconsin side but not on the Minnesota side?

A. Because we were aware of demand or request for the material on Wisconsin side. And on the Minnesota side we were not aware of anyone that wanted material.

Q. How did the Corps become aware of demand for material on the Wisconsin side?

A. For the Buffalo County site, we had interaction with the county. We knew they had a site located several miles from the Alma site that they wanted to stockpile material at. So we were aware of that through their general use of our dredge material for road maintenance purposes. And I believe we were told of several other landowners that had pits in the area, in the Buffalo County area, so we contacted those individuals.

Q. Who was responsible for contracting Buffalo County concerning use of sites within the county?

A. Well, I believe for this job, it would have been Steve Tapp.

Q. Logistically how does that happen? Steve Tapp will write letters to Buffalo County and landowners saying, "This is a project we are thinking of letting. Do you guys have any place we can put it"?

A. I think he probably called them and probably went up to the sites and visited with the point of contact with the city.

Q. Did Steve Tapp or anyone else at the Corps place a similar call to Wabasha County and say, "Hey, we're going to build this project. Does the city or county have a need for it?"

A. We probably did not. We had the Wabasha Gravel Pit which was located already in Wabasha County and the City of Wabasha, so there was an ample supply of material that would satisfy any needs over on that side. Basically there was plenty of material already over on the Minnesota side available to anybody that wanted it at the Wabasha Gravel Pit.

Q. You told me earlier that also you already experienced a situation in Wisconsin where you were generating more dredge material than there was

demand for?

A. At the Alma Marina site, yes. More material was in place there or could be placed there than was being removed.

Q. Did the Corps shy away from Wabasha County because of its prior experience with the county?

A. No, we did not.

Q. Had the county or any private individuals lodged any complaints or concerns with the Corps regarding the Corps' conduct of business with the county?

A. At Wabasha County?

Q. Yes.

A. No. Not that I'm aware of.

Q. To your knowledge, there were no complaints or concerns voiced by any public bodies or any individuals from Wabasha County to the Corps?

A. No. I guess could you be more specific? That's kind of general. With regard to this project, you mean, Grand Encampment?

Q. You told me they weren't notified in advance of this project, right, Grand Encampment?

A. They weren't asked whether they wanted

materials, yes. I believe that was the question.

Q. Were they notified in advance of the solicitation?

A. Notified that we were going to be doing this job?

Q. Correct.

A. I don't recall. I don't recall.

Q. Whose responsibility would it be for interacting with Wabasha County and providing them notice, if any, of a solicitation?

A. For this job, it would have been Steve Tapp.

Q. You are his immediate supervisor?

A. Yes.

Q. Would you have expected him to have alerted Wabasha County in advance of the solicitation going out?

A. For this project, probably not. There were no activities planned in Wabasha County. They were downstream of the City of Wabasha, so I can't envision that we would have wanted to go out of our way to alert them to this, to the work that we had planned.

Q. Did you foresee the possibility that bidders would be investigating disposal sites on

the Minnesota side of the river?

A. I became aware prior to bid opening that they were investigating.

Q. You told me earlier that one of the things the Corps was interested in doing was putting this out for bid and letting contractors use their creativity, do you recall that?

A. Yes.

Q. Did you expect that in using their creativity, contractors would be looking at both sides of the river, both Missouri (sic) and Wisconsin?

A. I guess I thought at the time that that would be one of the options that would be considered, trying to find something in both the Minnesota area and Wisconsin -- not Missouri, no -- among a number of other potential options.

Q. Were there any preparations that the Corps made in advance to accommodate inquiries by bidders regarding placement of materials in Minnesota?

A. During the advertisement period, we facilitated several meetings that contractors had asked us to do with the State and Federal agencies that are involved in the dredging activities.

Q. And what was the Corps' reason for facilitating these meetings with the State and Federal agencies?

A. Just to put the contractors in touch with the officials that would be involved in reviewing and evaluating and potentially permitting a site.

Q. Who were the individuals that the Corps put the contractors in touch with at the agencies?

A. It would have been Steve Tapp, but it's possible that I was involved just because it required a timely response. If Steve wasn't available, I might have called it, too. I don't recall who called the meeting, if that's the question is.

Q. Yes.

A. It was probably was Steve Tapp.

Q. What agencies did the Corps put the bidders in contact with?

MS. McCARTHY: I object to the form of the question.

THE WITNESS: The primary agencies would have been Minnesota Department of Natural Resources, Minnesota Pollution Control Agency, the Wisconsin Department of Natural Resources, the Fish and Wildlife Service. Those would be the primary

ones, the ones that would have had the most interest in where dredging material was going to be placed.

Q. Now, prior to the Grand Encampment Project, the Corps had obtained permitting for disposal sites before solicitations had gone out, is that correct?

A. If a State or Federal permit was required, we did obtain those, yes.

Q. On the Grand Encampment Project, what permits did the Corps anticipate would be required?

MS. McCARTHY: Objection. Lack of foundation.

THE WITNESS: We didn't anticipate any. Without knowing where the material was going to be placed or the method, we didn't anticipate, couldn't anticipate, I guess, where permits would be required.

BY MR. MILLER:

Q. From your experience, for the disposal facilities in Minnesota, what permits did the Corps obtain in the past?

MS. McCARTHY: Objection. Lack of foundation.

THE WITNESS: Well, our experience has been they would require a, if it was going to impact wetland, it would require a permit from DNR and probably from the Pollution Control Agency, too. If it was going to require an effluent discharge, it would require a permit from the Pollution Control Agency.

BY MR. MILLER:

Q. Any others?

A. At the Federal level, it would have to comply with the Clean Water Act and go through a 404 evaluation permit process.

Q. Who issued the 404 permits?

A. The Corps of Engineers does and on our projects we do an internal evaluation and issue ourselves a permit after it's gone through the review process.

Q. So those are the permits that the Corps would anticipate obtaining for a disposal facility in Minnesota?

A. Basically, Depending on the conditions and characteristics of a site and the method of placement.

Q. I know it may be less, but any more than that?

A. It could be more involved if the material was considered to be contaminated.

Q. If it were contaminated, what would it require?

A. It could require special handling, more extensive review and additional permit conditions.

Q. The same four that you just described?

A. Probably.

Q. No different permits or different agencies?

A. Not that I can think of.

Q. So have you identified for me now all of the Federal and State permits that would be necessary, as far as the Corps was concerned, to obtain a disposal facility for Minnesota?

MS. McCARTHY: Objection to the use of the word "permits."

THE WITNESS: I believe that's all the permits. But there are other reviews and approvals that are needed.

BY MR. MILLER:

Q. What would those be?

A. Endangered species review, cultural resource investigation and coordination with the State Historic Preservation office.

Off the top of my head, that's all I can think of.

MR. MILLER: Off the record.

(Discussion held off the record.)

(A brief recess was taken.)

BY MR. MILLER:

Q. All right, Mr. Krumholz, I was asking you if there were any -- what the permits were that the Corps would normally obtain for disposal sites in Minnesota. You identified those for me. And you were talking about other reviews might be necessary. You mentioned the endangered species review and cultural resource review. What other reviews may be required?

A. That's all I can think of.

Q. What agency conducts those reviews?

A. We do them internally, but they are reviewed then by other agencies. In the case of endangered species, it may involve the Fish and Wildlife Service. And it's part of our overall evaluation, review and evaluation of the impact of a project. And so that document would be reviewed

by the State agencies, too.

Q. Okay. So it would be the agencies that the Corps was aware of that would be involved in any permitting and review other than the Corps itself?

A. Yes.

Q. The State Department of Natural Resources?

A. In both states where we are working, yes.

Q. And the State Department of Pollution Control?

A. Yes.

Q. And the Federal Fish and Wildlife Department?

A. Yes.

Q. Are there any other agencies?

A. The Environmental Protection Agency might be involved. They do review the documents we produce, but they don't always take a direct involvement unless there is something that would concern them. But in this case I don't believe they were involved.

Q. So you indicated that prior to bidding on the Grand Encampment and letting the bid, the Corps facilitated meetings with all of the State and