Federal agencies that the Corps believed would be responsible for the permitting and reviews for this project?

A. We contacted the agencies that we know have an interest in dredge material placement and maintenance operations and that, yes, could potentially be involved with a permitting action with the contractor if they selected a site that required a permit.

Q. These meetings that needed to be facilitated involved the Corps, Fish and Wildlife and respective State Departments of Natural Resources and Pollution Control?

A. Correct. And the contractor who is proposing to use that particular site.

Q. What was the Corps' purpose in facilitating these meetings of these agencies with the contractors or potential bidders?

A. Well, it was really just that, to facilitate putting the contractor in touch with the agencies that are going to have an interest in what the contractor is proposing to do. It was to serve as a go-between, I guess.

Q. What did the Corps hope to accomplish by doing that?

A. That the contractor would then have a point of contact to further pursue getting a site approval.

Q. Did the Corps anticipate that the site approval would occur before bid opening?

A. I think we anticipated that the contractor would investigate it to the point where they were, if not assured, that they would be -- that they would have enough information to submit a bid.

Q. Can you explain that more fully, what you mean?

A. Well, we felt that the contractor would pursue a pre-bid pre-advertisement review of a site to a point where they were comfortable that it would be approved.

Q. What point is that?

MS. McCARTHY: Objection.

THE WITNESS: I think that that would be a point where the other agencies would tell them specifically what needs to be done and what their opinion or best judgment was with regard to that site.

BY MR. MILLER:

Q. So the Corps' hope was that contractors

would have some reasonable assurance when they bid the project that the disposal site would be ultimately approved?

MS. McCARTHY: Objection.

THE WITNESS: Before they submitted a bid with a particular site in it?

BY MR. MILLER:

Q. Right.

A. It was our expectation that they would have investigated the site; basically satisfied themselves that they were going to get approval to use the site.

Q. Was it the Corps' expectation that the bidder would actually have the permit and reviews accomplished before bidding?

A. Not the final permit, no.

Q. Why not? Were there any logistical reasons?

A. Yes. Timeframe logistically and normally it just takes a certain time period to go through the process.

Q. Okay. Normally, from your experience, how long does that permitting and review process take for disposal sites?

MS. McCARTHY: Objection. Lack of

foundation.

THE WITNESS: It varies tremendously.

BY MR. MILLER:

Q. Can you give me your best judgment in terms of ranges?

MS. McCARTHY: Objection. Lack of foundation.

THE WITNESS: The minimum is 30 days if everything falls in place.

BY MR. MILLER:

Q. And the maximum?

MS. McCARTHY: Same objection.

THE WITNESS: I'm trying not to confuse the planning process because we involved the other agencies in the planning. They are part of the process that arrives at ultimately a site being selected. So when they get to that point, they have already been involved enough that the permitting process goes fairly smooth, so --

BY MR. MILLER:

Q. You said that in your experience, this permitting and review process can vary depending on the characteristics?

MS. McCARTHY: Objection.

THE WITNESS: It can vary depending on the site, the method of placement, the measures taken to mitigate potential impact. A number of different factors would be involved in how long it would take to get a permit.

BY MR. MILLER:

Q. On the Grand Encampment Project, how long did you anticipate the permitting and review process would take?

MS. McCARTHY: Objection. Vague.

THE WITNESS: We expected it would be less than 90 days.

BY MR. MILLER:

Q. How long did you anticipate the general time period to accomplish it?

A. 30 days. I believe we maybe stated 30 days that we needed in the contract specifications to review a site.

Q. 30 days from what point?

A. From the time the site is proposed, officially proposed, formally proposed.

Q. What did the bidders have to do to formally propose a site?

A. I wasn't the contracting officer in administering the contract. I believe they have to

submit it in writing.

Q. And the formal submission that kind of triggered the 30-day minimum time period, what generally is required in the submission?

MS. McCARTHY: Objection.

THE WITNESS: We would need to know the boundaries of the site. The method of placement. Whether it was going to be mechanical or hydraulic. If it was going to be hydraulic, how the material and the water would be contained. How the effluent would be returned and where it would be returned. We needed to know what the final configuration of the site was going to be, how it would be left. That would be the basic information to get an evaluation started. Through the evaluation, we would then start looking at what the characteristics of the site are and what the potential impacts are going to be on all the various resources.

Q. So you thought on Grand Encampment it would take a minimum of 30 days from the time that a contractor made a formal writing, a formal submission in writing to the contracting officer with the information concerning the boundaries, method of placement, final configuration, et

cetera?

A. Yes.

Q. Now, were there any contractors besides Mattesons that alerted the Corps to the fact that they wished to bid the project hydraulically?

A. There were other hydraulic dredging contractors that were in touch with us and asked us to facilitate a meeting to review their proposed site.

Q. Who were those contractors?

A. J. F. Brennan Company.

Q. Anyone else?

A. At least one other company contacted us but we didn't -- they were not a hydraulic dredging company so we didn't think that they were going to be doing it that way.

Q. Which company is that?

A. Wilbur Lime out of Arcadia, Wisconsin. They were more of an excavating company, land excavating company.

Q. Was there anything done with Wilbur Lime in terms of any meetings with them?

A. Yes. We reviewed a potential site. I believe a site in Wisconsin that we looked at with them.

Q. And the site in Wisconsin would have required hydraulic dredging?

A. No. It would have required mechanical placement.

Q. Were there any meetings held with the Corps, J. F. Brennan Company and any other permitting agencies to identify their needs?

A. Was there a meeting between J. F. Brennan and other agencies and ourselves?

Q. Yes.

A. Yes, there was.

Q. Was there more than one?

A. I don't think so. I think only one.

Q. Did you participate in that meeting?

A. Yes, I did.

Q. And what was the site or sites that the Corps and the other agencies were reviewing?

A. I don't remember the name of it. It was in the Teepeeota Point area. I don't recall the name of it.

Q. Duga?

A. I just don't recall. That name was one of the sites, I believe, that was considered. I don't know if it was the site looked at with J. F. Brennan.

Q. Can you describe for me, as best you can recall, the dealings that the Corps had with Brennan concerning their anticipated disposal sites?

A. It was typically an on-site review of the sites that they were proposing. We, along with the other agencies, looked at the area that was going to be used and the potential containment of the material and where the effluent would be routed.

Q. I take it that typically before the on-site review occurred, that Brennan would have made the formal submission in writing that you described earlier?

A. Before?

Q. Yes.

A. I think the pre-bid investigations were just done verbally. I don't believe anything in writing was submitted at that point.

Q. Okay. So I can understand the order in which this unfolds, let's use Brennan is an example. The on-site meetings that the Corps would facilitate, would they typically occur before there was a formal written submission to the contracting officer?

A. Before, yes. Prior to bid opening. And

that would typically just involve a verbal contact from the potential contractor saying, "We are considering this site for the Grand Encampment Project. Would you get together with the agencies and we'll take a look at it?" It was that type of thing. The formal meeting, we did not expect that until after the contract award.

Q. So you didn't expect them to --

A. With any contractor.

Q. You didn't expect the formal permitting process until after bid opening?

A. Well, the approval process through our contract, we did not expect that. I think that was my expectation, anyway, that the process, if there was any local requirements, that that would be initiated right away. That we would not be a part of that. The contractor would pursue that local requirement independently and at their own time schedule.

Q. What local requirements were the Corps aware of?

A. We weren't aware of any specific ones, but if there were any, like real estate agreements or any municipal or county requirements to use a particular site, that the contractor would explore

those and pursue those at some point in the process.

Q. You told me earlier that when the Corps is identifying disposal sites in the solicitation as it had on some of these earlier contracts, the Corps had already obtained the necessary Federal and State permits beforehand, is that correct?

A. Correct.

Q. And that the Corps has, by virtue of its sovereign immunity, no obligation. In fact, it doesn't seek permission from local government agencies for those disposal sites?

A. Correct.

Q. Let me ask about your interaction with J. F. Brennan. You said that you expected the contractor to meet with the State and Federal agencies prior to bid opening, is that correct?

MS. McCARTHY: Objection.

THE WITNESS: We didn't expect --

BY MR. MILLER:

Q. Go ahead.

A. We accepted that and we tried to serve and facilitate it. We didn't really have an expectation that they had to do that.

Q. All right.

A. Of course, they had to do that, I guess, to facilitate it.

Q. I thought you told me earlier that the Corps expected contractors, if they were going to use a disposal facility in Minnesota, that they would take advantage of these facilitated meetings with State and Federal agencies and get themselves to the point where they were relatively assured that they had identified the problems of the permitting process if they were worried that the project would not go through without a problem?

A. Yes, we did expect that they would be in touch with agencies having the jurisdiction over the proposed sites. I thought the last question referred to whether we expected them to use us to facilitate. That wasn't necessarily a requirement or a planned expectation. But our expectation was that they would reasonably look into and investigate what was required for a site before it was submitted.

Q. What was the outcome of the meetings that Corps' facilitated on behalf of J. F. Brennan?

A. Well, the outcome basically was that the meeting was held and the players were put in touch with each other and that the site was reviewed by

agency representatives and up to providing initial thoughts and ideas about using the site and also to alert the contractor of what they might expect in terms of seeking approval; what they might have to do to get approval to use that site.

Q. But in terms of the meeting with Brennan, the purpose was to identify any red flags?

A. I think so, yes.

Q. Do you recall whether there were any red flags identified in the meetings with Brennan?

A. I can't recall specifics. There were concerns with regard to the site they proposed. If there were, I don't recall without further review.

Q. And on these facilitated meetings like the one you were present with J. F. Brennan, typically does the Corps do any more than simply convene the meeting? I mean, does the Corps track and make notations of any concerns that were raised by any of the permitting agencies?

MS. McCARTHY: Objection. Vague. But answer, if you can.

THE WITNESS: I'm not sure in this case how much we documented as far as what the concerns might be and what they might have to do.

Because the contractor was ultimately responsible for this rather than ourselves. I don't know if we did what you said.

BY MR. MILLER:

Q. Well, I'm saying, do you recall if there was -- strike that.

Would you anticipate, for instance, that with these meetings that were held with the other agencies, that there would be a memorandum of record prepared by the Corps?

A. I believe there was, yes.

Q. And the memorandum of record would state in summary fashion any of the concerns that were voiced during the course of the meeting?

A. Probably, yes.

Q. On these pre-bid meetings that occurred outside, was there generally supposed to be any follow-up after that or did the contractor kind of get immediate feedback from the agency where the agency had said, "We have a concern about this or a concern about that"?

MS. McCARTHY: Objection. Foundation.

THE WITNESS: Any follow-up that would have been identified?

BY MR. MILLER:

Q. I'm trying to get some sense of how these meetings were held and whether the contractor's primary source of feedback was oral comments made to them during the meeting rather than any formal written records back and forth?

MS. McCARTHY: Same objection.

THE WITNESS: I believe so, yes. I think there was.

BY MR. MILLER:

Q. Primarily oral?

A. Yes. At the meeting. And I think whatever further investigation they wanted to do they established a contact with somebody that they could follow up with in the future.

Q. And you said that you were at the meeting with J. F. Brennan?

A. Yes.

Q. Did you or could you normally get a sense of whether or not there was going to be a problem with permitting or whether the permitting would go through?

MS. McCARTHY: Objection to form.

THE WITNESS: I think I got a feel for at least what the State and Federal agencies,

what their interests were and what their concerns might be.

BY MR. MILLER:

Q. From the meeting held with J. F. Brennan, did you have any reason to believe that it would not be possible for Brennan to obtain the permitting for that site?

A. I don't know which site --

Q. You said you couldn't recall the name. I'm just asking.

A. Well, actually I think there were several sites that Brennan had proposed.

Q. Okay. As a result of the pre-bid meetings for those sites, did you have any reason to believe that Brennan couldn't obtain permitting for those?

A. I don't recall. You know, if there was a memo of record on that meeting. That might reflect it. I don't recall personally what my thoughts were at the time as to whether they would get the site permitted.

Q. If you believed, for instance, Brennan was unlikely to get the site permit, would you inform the contractor of that?

A. No, probably not.

Q. Not in an official capacity but in terms of getting them heads up so they could look elsewhere?

MS. McCARTHY: Objection.

THE WITNESS: No, I wouldn't. I would probably rely upon the contractor developing their own opinion from what they heard from the other agencies. I wouldn't want to interject my opinion on what they are saying.

BY MR. MILLER:

Q. I take it you were interested in all the bidders being able to successfully identify any disposal sites that could be permitted?

A. That would be in the best interests of us getting a good bid, yes.

Q. And you knew that both J. F. Brennan and Matteson were looking at it hydraulically?

A. Yes.

Q. And you knew that hydraulic dredging was likely to generate the lowest and best price for the Corps?

A. No, I could not be -- I was not sure of that, no.

Q. Let me ask you about the on-site meetings that the Corps facilitated with Matteson. Were you

present at any of those?

A. We had several, and the pre-bid one, I'm not sure if I was part of that.

Q. How many meetings were there pre-bid with Matteson?

A. I don't know.

Q. Do you recall being present at any of those?

A. Well, I recall being present at a meeting. And I'm not sure at the time what chronologically it was, whether it was pre-bid, post award or later on. I don't recall. I believe I was along at the Braun site. And I don't recall what the timing was on that, whether it was pre-bid or post award.

Q. When you looked at the Braun site with the Mattesons, were representatives from other agencies present?

A. No, I don't believe so.

Q. From what you recall, did you have concern about Mattesons' ability to obtain permitting for that Braun site?

A. Was I concerned?

Q. Yes. Did you have any concern about Mattesons' ability to obtain permitting for that

site?

A. I don't know that I was concerned one way or the other. My concern was that it would be required that they would have to do it if that's what it took. I don't know that I had an opinion as to what the likelihood would be.

Q. Would you have told Mattesons if you had a concern about their ability to obtain permits?

A. Again, we are talking State and Federal permitting, the State and Federal permits?

Q. Sure.

A. I think I would have identified my knowledge of what would be required; where the areas of concern would be. If it were a wetland, that was obvious there was going to be a problem. I would have identified that as a concern.

Q. You said that your recollection is that you met with Mattesons on the Braun site without the other agencies present?

A. To the best of my knowledge, yes.

Q. Before you told me that the Corps' role was primarily to be facilitating these meetings. What was the purpose of any private meeting with Mattesons?

A. As I indicated, I don't know when that

occurred because I would not be -- I'm not the primary Corps person that would be coordinating and facilitating these meetings, I don't know what the context was, whether it was for that purpose or just to look at a site more informally prior to submitting or pursuing it.

Q. Would you have kept a record of that meeting in your daytimer?

A. I don't know.

Q. What's your standard practice?

A. At that time my practice was to make a notation in the planner, at least the week, to put it on the calendar so it would be on the calendar that I was visiting a site.

(Deposition Exhibit 2 marked for identification.)

BY MR. MILLER:

Q. Showing you what I have marked as Exhibit 2, can you identify that for me? Is this an exerpt taken from your day planner?

A. Yes. It's an exerpt from my day planner of August 29th, 1996 referencing a conversation with Lawrence Matteson. That would have been