COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**********************************************

L. W. Matteson, Inc.,

Plaintiff,

v. No. 01-5420 (Judge Wilson)

The United States,

Defendant.

**********************************************

**DEPOSITION OF**

**LARRY W. MATTESON**

Taken July 24, 2002
Scheduled for 9:00 a.m.

Reported By: Lori L. Morrow, RPR
PARADIGM REPORTING & CAPTIONING INC.
1400 Rand Tower, 527 Marquette Avenue South
Minneapolis, Minnesota 55402 * (612)339-0545
1(800)545-9668 * Fax (612)337-5575

MR. MILLER: Same objection, vague and ambiguous.

THE WITNESS: This clause had an option. I'm certain of that.

BY MS. MCCARTHY:

Q I think you mentioned in your earlier testimony -- you're pointing to Exhibit 1. Is that right?

A Right.

Q I may be mistaken, but I believe you testified earlier that this project that you received the solicitation that's been marked as Exhibit 1 describes a project that's similar to the two prior projects.

A Yes.

Q In what sense did you mean that they were similar?

A Well, all three of them involve removing material from a temporary island hydraulic dredge disposal sites or mechanical -- channel maintenance disposal sites and transporting that material to its final resting spot.

Q Did you perceive any differences between the project which the solicitation marked as Exhibit 1 described and the prior two contracts that you had?

A Yes.

Q What were the differences that you perceived?

A This particular project was set up much more in line to be a mechanical dredging project given the distance involved and the character of the disposal sites specified or made available to the contract.

Q And what's the basis for your determination that this was set up as a mechanical dredging project?

A Like I said, the size and character and location of the disposal sites.

Q Is there anything else that causes you to conclude that this was a mechanical dredging project?

A I don't know.

Q If I could ask you, Mr. Matteson, if you would turn your attention to Exhibit 1. Now, the beginning of Exhibit 1 has some amendments, does it not, sir?

A Yes.

Q What do you understand these amendments to be?

A After the specifications are delivered to contractors, sometimes there are changes made between the time the specifications are delivered and the time of bid date, and these are the changes that are made.

Q And if I could turn your attention to page 30-105. I believe it's Amendment 4, which it probably should be -- I think they go in reverse order, so it should probably be at the top. Amendment 1, number 4.

Do you see that number in the bottom is 30-105?
A Yes.
Q Could you read the notation that appears in the description, the section 14 description, the bid opening date? Do you see that there, sir?
A The bid opening date for the solicitation remains at 11:00 a.m. 29 August '96.
Q Was that your understanding of the bid opening date?
A Yes.
Q And to your knowledge, did the bid opening date change after this modification?
A Not to my knowledge.
Q Did you in fact make a bid on August 29?
A I believe so.
Q Can you tell me the process by which you made your bid?
A I think I hand delivered it.
Q On what day?
A On August 29.
Q Do you recall the time of day that you --
A Prior to 11 a.m. For some reason, I thought it was an afternoon bid time. But it says 11 a.m., so.
Q If I could turn your attention, sir, to page, if you look at the bottom of this exhibit, 00100-1. If I

could draw your attention to the top. It says, section 00100, Instructions, Conditions and Notices to Bidder. Do you see that there, sir?

A Yes.

Q Now, prior to submitting your bid on August 29, did you read this page in the solicitation?

A Yes, I believe I did.

Q And the first section is 52.252-1, Solicitation Provisions Incorporated by Reference. Do you know what that number 52.252-1 means? Do you know what that refers to?

A No, I do not.

Q Are you familiar with the federal acquisition regulation?

A No.

Q Could you read into the record the first provision that's listed under 52.252-1?

A This paragraph right here?

Q Yes.

A "The solicitation incorporates one or more solicitation provisions by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available."

Q When you read that provision, how did you

interpret that provision?

A That the standard rules in the F.A.R. regulations would apply.

Q So you're familiar with F.A.R. then, the term F.A.R.?

A I'm familiar with the term F.A.R., yes.

Q Do you recall during the course of preparing your bid for this contract ever looking up F.A.R. provisions?

A No.

Q Did you have an understanding of the F.A.R. provisions that were incorporated by reference in the solicitation?

MR. MILLER: Objection to the question as vague and ambiguous, also lack of foundation.

THE WITNESS: Would you repeat that question, please?

BY MS. MCCARTHY:

Q Well, I'll establish the foundation. Do you know if there are any F.A.R. provisions that are incorporated by reference in the solicitation?

A Isn't that what this sentence says?

Q I'm asking you.

A I believe that's what this sentence says, that they are incorporated.

Q Did you have an occasion prior to submitting your bid to go and refer to any F.A.R. provisions that are incorporated by reference in the solicitation?

A No, I did not.

Q Were you familiar with the contents of the F.A.R. provisions that are incorporated by reference?

A I'm not sure I would say I'm familiar, but I -- I guess I would say I'm not familiar with them.

Q But you did in fact read this paragraph that you just read into the record?

A Yes.

Q And did you understand what it meant when you read it?

A Yes.

Q If I could draw your attention down to the bottom half of the page under the heading Inquiries. Subparagraph A says, "Technical questions on plans and specifications should be directed to the St. Paul District to Anthony Foster," and there's a telephone number listed. Did you have any technical questions on plans or specifications?

A Yes.

Q Did you direct them to Mr. Foster?

A Yes.

Q And what were the technical questions that you

had?

A The initial question upon receiving the plans and specifications, I believe it was I who called Anthony and asked him if it would be possible that -- the project appeared to be a distinctly mechanical dredging project or mechanical transfer project and asked him if the Corps would be interested in a hydraulic alternative.

Q And what was Mr. Foster's response, if any?

A Well, Anthony said he would look into it and either he or someone else would get back with us.

Q Did anyone from the Corps ever get back to you?

A Yes.

Q Who got back to you?

A I'm not sure. It was either Anthony or Dan Kromholtz.

Q And when they got back to you, what did they communicate to you?

A They encouraged us to pursue a disposal site and bid the job hydraulically, an alternate disposal site.

Q When you read the solicitation, did you understand there to be any prohibition against the use of hydraulic dredging as the solicitation is written?

A I don't recall whether there were any distinct prohibitions against hydraulic dredging.

Q So what caused you to make the inquiry to

Mr. Foster?

A As I stated earlier, the characteristics of the job as it was initially designed were much more conducive to a mechanical transfer of the material. The number of disposal sites, the location of the disposal sites, the distance of the disposal sites from the Grand Encampment site, you had to go through a lock or dam. There was a dam between the Grand Encampment site and the Alma disposal sites. All of these things were big impediments to a hydraulic dredging site.

Q So in what manner did either Mr. Foster or Mr. Kromholtz encourage you to get a disposal at this site?

A I don't understand that question. I mean, in what manner do you mean?

Q Well, I think you testified that they encouraged you --

A Right.

Q -- when the Corps got back to you that they encouraged you to --

A Right.

Q -- obtain a site and bid on the project. Is that correct?

A Right.

Q And how did they do that?

A They said locate a disposal site or multiple disposal sites, and they would come out and do prebid site investigations and let us know in their opinion if it would work.

Q Now, upon reading the solicitation, did you understand there to be any provision for you to do that, the solicitation as written?

MR. MILLER: Object to the form of the question as vague and ambiguous.

THE WITNESS: If I recall, there was a provision in here for alternative disposal sites.

BY MS. MCCARTHY:

Q If there was a provision for alternative disposal sites, what prompted your call to Mr. Foster?

A As I said, the project was distinctively set up as a mechanical project. I mean, anyone that looked at it that was in the dredging business knew what the project involved. And if they didn't want it to be a hydraulic job and saw some big impediment, the character of the material that was going to be excavated would not lend itself to hydraulic, that type of thing, then I didn't want to pursue it.

Q Were you concerned that if you had bid the project as a hydraulic project without contacting them

that your bid might be potentially unresponsive?
A I'm not sure.
Q When you submitted your bid on August 29, did you regard your bid as nonresponsive?
A No.
Q Were there any modifications made to the solicitation, to your knowledge, following your inquiry to Mr. Foster?
A I don't believe so.
Q How would the character of the material affect whether it could be disposed of hydraulically or mechanically?
A Well, several things. If there were fine grain materials in there, it doesn't lend itself to meeting water quality standards and that type of thing on your affluent coming out of your disposal site. If there's a lot of debris, a lot of rocks. If the Corps had knowledge that the island had not been cleared prior to the placement of the material in that site, then you encounter a lot of roots, stumps, bent over trees, that type of thing that do not lend itself to hydraulic dredging.
Q Did you speak to either Mr. Foster or Mr. Kromholtz about the character of the material?
A No. I was primarily concerned with the disposal

sites.

Q Can you tell me the substance of your communication generally with Mr. Kromholtz or Mr. Foster?

A Well, what I stated when I talked to Dan was, you know, historically, mechanical transfer of these disposal sites is considerably more expensive than hydraulic transfer. We have records to prove it. Dan knew it. And when I talked to Dan, I said, if we can find a disposal site within reasonable proximity of the Grand Encampment site -- the Alma site, that was going to be mechanically -- there was no way to deal with that on a hydraulic basis -- that we could save the government money.

Q And what was Mr. Kromholtz's response to this --

A He encouraged that. I mean, his goal was to do it in the most efficient manner and the least expensive manner possible.

Q Did Mr. Kromholtz express any concern about having to modify the solicitation in order to accommodate that?

A No.

Q In your experience as a federal government contractor, had you ever submitted a bid in which you have proposed disposal sites?

A I don't believe so.

MR. MILLER: Objection, misstates his testimony.

THE WITNESS: No. I believe that there was an indication given by the people on site that, in their experience, the site would be acceptable to all the necessary permittable agencies, permit agencies.

BY MS. MCCARTHY:

Q But did you understand that their oral explanations or instructions would not be binding?

A No, I did not understand that their opinions would not be binding.

Q How could you reconcile that understanding with your general familiarity in the context of 52.214-6?

A Because I was aware that there was another contractor doing the same thing we were doing and that the Corps was encouraging us to do so.

Q And by doing that, that made the oral explanations binding under 52.214-6?

A I believe so, yes.

Q Can you tell me the thought process that you underwent to reach that conclusion?

A Let's just say that there have been a lot of questions over the years asked prior to bid date and answered orally, that answering questions in writing to

all prospective bidders is not the standard operating procedure regardless of what that F.A.R. regulation says. Those prebid meetings, site investigations, mandatory site investigations are made all the time, and oral instructions are made to prospective bidders at those site investigations. And written detail of those explanations are not issued.

Q If I understand your testimony, the historical course of dealing in practice has rendered this provision inoperative, 52.214-6, in your view?

A I'm saying that it's common practice that that paragraph is ignored, yes, in the bidding process.

Q In submitting your bid, did you factor in any risk for the possibility that this provision would not be ignored at some future point, perhaps in litigation?

A Well, the only way to factor in that provision is not to have bid on it. I mean, you either take the people that came out and made the site visit and encouraged you to bid on it at their word, at their -- or you don't bid on it. There's no middle ground here, in my opinion.

Q Was your decision to bid, would you characterize that as a business judgment?

A No.

Q What kind of judgment would you characterize it

as?

A I'm not sure I understand the different kinds of judgments that you're referring to.

Q Well, why did you submit a bid on the contract?

A We bid on the contract because we're a hydraulic dredger, and it was presented to us that hydraulic dredging was a viable alternative to the original plan.

Q Did you perceive that bidding on the contract would benefit your business?

A Yes.

Q You weren't compelled to submit a bid, were you?

A No.

Q You made a decision to submit a bid on your own free will. Is that correct?

A Yes.

Q Did you make a judgment to submit a bid in the course of your business?

A We made a decision to bid, yes.

Q So how is your judgment to submit a bid not a business judgment?

MR. MILLER: Objection, argumentative. Also, the question is vague and ambiguous.

THE WITNESS: I'm not sure how it's not a business judgment.

BY MS. MCCARTHY:

Q You don't like the term business judgment?
A I'm ambivalent about that term.
Q Now, Mr. Matteson, you previously testified that the fact that other bidders were bidding for the contract affected your interpretation of 52.214-6. Could you explain that, how the presence of other bidders affected your interpretation?
A I was aware that the Corps made site investigations on behalf of another contractor that intended to bid the job hydraulically as well.
Q And how did you become aware of that information?
A The landowner of that particular site, I believe, informed us of that.
Q And how specifically did that affect your interpretation of this provision?
A Of which provision?
Q 52.214-6.
A How did it change my interpretation of it?
Q Yes.
A I don't think it changed my interpretation.
Q Okay. Just wanted to clarify that. This provision 52.214-6 goes on to state, "Any information given any prospective bidder concerning a solicitation will be furnished promptly to all other prospective

You mentioned that you had some experience in assisting the customer. What did you do --
A No, I didn't say assisting. But I'm aware of customers getting permits, yes.
Q And by customers, you mean the Corps?
A No. Private customers.
Q Okay. And none of those private customers ever obtained a local permit?
A I know that the timetable involved was -- I know that some of them had achieved them in 90 days or less. We were discussing the timetable at that time.
Q Right. Do you know if there's any specific timetable for local permitting processes?
A No.
Q And did you factor a time factor for local permitting issues when you factored your bid in this contract?
A I'm not quite clear on what you mean by local permitting.
Q Well, I think you testified previously you had federal and state agencies visit the site?
A Right.
Q Did you have any local agencies visit the site?
A I interpreted those people as being the local agencies.

Q What caused you to interpret the federal and state agents --
A Because they're local. They're the Minnesota and the, you know, they're local area people.
Q Did you invite any county officials to visit the site?
A No.
Q Did you invite any --
A I didn't do the inviting.
Q Did you contemplate inviting any county officials to visit the site?
A When the site visits were set up, the Corps of Engineers representative, in my opinion, brought the people with him that were necessary to get the necessary permits to do the project.
Q Did you ask him if he had brought everyone necessary to --
A No, I did not.
Q Did he ever tell you he had brought everyone necessary?
A I'm not sure.
Q Did you ever invite any officials from any municipality to visit the site?
A No.
Q Is there any reason why you did not?

A Again, I thought the people necessary to get permits for this project were on-site at those site investigations.

Q And can you describe for me every single basis for that belief that you had?

A Because the Corps of Engineers brought them. They are the people that are involved in these projects on a daily -- the people that came to that project, Dan Kromholtz and Steve Tapp, are people that make arrangements for the dredge disposal sites. That's their business. And I assume that when they brought a team out to investigate a site that that team would consist of the people necessary to get a site approved.

Q Were you concerned that when selecting a site that you were dissimilarly situated from a governmental agency?

MR. MILLER: I don't understand the question.

THE WITNESS: I don't understand the question.

BY MS. MCCARTHY:

Q Well, was L. W. Matteson a governmental agency?

A No.

Q Were you concerned that maybe rules and regulations might apply to governmental agencies that

A That's correct.

Q It says, "The use of an optional final disposal area (placement site) may require the Government to prepare an environmental assessment (including a cultural resource survey)." Do you know if that determination had been made by the time you submitted a bid as to whether the Government had to prepare an environmental assessment for any proposed site by Matteson?

A I believe the site investigations done prior to bid date indicated to me that environmental assessment would not be necessary on the two sites that were investigated as long as we stayed out of the wetland areas that were involved.

Q And you understood that a cultural resource survey would not be necessary at the time you submitted your bid?

A The investigation of the Guza site -- define cultural resource investigation. Will you please?

Q I meant to say cultural resource survey.

A Is that like an archaeological study?

Q Did you understand what it meant when you read the --

A I believe it to be an archaeological study. And it was my understanding that the investigation of two sites, there were no known archaeological significant