substantiated to me a documented basis for its claim of sovereign immunity."

Q. Just to go through this line-by-line, I guess. You said in -- I'm saying you say, even though I understand that Ms. Mills drafted this, so -- but you signed it so that's --

A. Correct.

Q. -- that's where I'm going when I say you say. What years, in particular, are you talking right here, when you say in the first line, "over a number of years?"

A. Well, I'm referring to the -- the other dredge site we talked about, between the railroad tracks and Highway 61, which would have been in '83, 1983 I think was when they did it, or '84. Before that, I reference in Exhibit 74, the Jolivette pit. That was a flood plain area where the Corps dredged and dumped a lot of spoil without even contacting the City of Wabasha.

There's also another instance that we haven't discussed, where I became aware that the Army Corps of Engineers had given some sort of permit to the same Jolivette, I think his first name is George, to stockpile different fertilizers, coal, salt and that sort of thing, in freestanding piles

within the city limits of Wabasha without contacting the city.

Q. When was that?

A. I don't remember. It was in the '80s. I can't remember if it was before the 1983 project or after that, but it was in the '80s.

Q. Okay.

A. In that case, the Corps had already issued the permits when we became aware that Mr. Jolivette was going to start storing materials in this area, which is actually very close to the one referenced in paragraph 2 of Exhibit 74. We contacted the Corps, and the Corps ultimately reversed or withdrew the permits. But before that they had no contact with the city about issuing the permits.

Q. Any other projects?

A. Well, I -- let's see. I guess I'm probably -- it's not said very well, but I also was referencing something I talked about earlier in my deposition, where it was my opinion, although I don't have any concrete evidence of it, that the Corps frequently declared eminent closure in order to obviate the need for permits, and some of that dredge was transported into Wabasha.

Q. What I'm trying to get at is, it says here

"As a result of having --" in paragraph 9 of Exhibit 73 it says, "As a result of having dealt with the Corps over a number of years on similar issues." And what I'm understanding is, the number of years you're talking about are the early 1980s; is that correct?

A. Well, starting in the '80s, yeah.

Q. Okay. And ending when is my question?

A. Well, I don't think the Corps has ever changed its opinion about whether or not they need to get local permits, so I would say up to the present.

Q. That's not my question. My question is, you say here, "As a result of having dealt with the Corps," meaning that you have dealt with the Corps.

A. Well --

Q. What I'm asking you is -- your answer you just gave me, you reference this Jolivette pit.

A. Jolivette pit.

Q. Jolivette pit that occurred the year before June 15th, 1983. So my question is, the years that you're talking about, are those the early 1980s?

A. And all the way up to 1996, as evidenced by Mr. Rapp's letter where he says, sovereign immunity allows them not to -- or means that they don't have

to apply for local permits.

Q. Okay. My --

A. So that 13 to 15 years I guess is what we're talking about.

Q. We can do this again. It says here, this line that Ms. Mills wrote for you says, "As a result --"

MR. METCALF: Hold on. I'll object to the mischaracterization of that. Go ahead.

MR. EINSTMAN: Is there -- didn't she write this letter, this Affidavit, isn't that on the record?

MR. METCALF: I don't think your characterization was proper, but go ahead with your question.

BY MR. EINSTMAN:

Q. I'll go ahead and say it again. In this line -- and the reason I'm saying -- pointing out that Ms. Mills wrote it is you may not have written it this particular way and I'm trying to understand it. Because this is your Affidavit, you signed it, and if there's got to be changes made then we need to sit here and make the changes now.

A. I'm not changing that, it's true.

Q. I understand that. But you say here, "As a

result of having dealt with the Corps over a number of years on similar issues." My question to you, Mr. Nordstrom, is, what dealings during what years did you have? You've referenced two that occurred in the early 1980s. I need to know --

A. Three.

Q. -- what those dealings are?

A. Three.

Q. Sorry, three, that you had in the early 1980s.

A. I told you what those are. Do you want me to repeat them?

Q. No. My question is, did you have any dealings after 1983, between 1983 and this particular project that occurred in the September time frame of 1996? I'm just asking for the truth. That's all I'm here for.

A. And that's what I'm trying to give you. I guess it depends upon your characterization of "dealings." In my official capacity as County Attorney or City Attorney, it would have been these three in the '80s, probably between eighty -- I'm going to say '82 and '85, and then this one in 1996.

Q. Okay. And I'm going to go ahead and just put on the record now, the reason I'm going through

this Affidavit is because it was drafted by somebody else for you, and I need to understand what is actually being said here, because there can be a lot of conclusions being drawn by the exact phraseology that this attorney used when she drafted it.

A. Okay. I'll attempt to clarify it as well as I can.

Q. So is my understanding correct that when you refer to "dealings with the Corps over a number of years on similar issues," you're referring to a few projects, three or four projects that occurred in the early 1980s and this particular project that occurred in 1996?

A. Officially, yes, in my official capacity as either City Attorney or County Attorney.

Q. And have you had any dealings not in an official capacity?

A. Well, I've -- yes, I've attended to -- I've attended hearings that the Corps has had regarding proposed projects with the Upper Mississippi Wildlife Refuge, with eminent closure proceedings, various things like that, but not in an official capacity. I've gone and expressed my concerns as a private citizen.

Q. And which projects were you talking about,

and during what time frames, please?

A. I would say in the mid to late '80s, I was at a few meetings regarding some proposals that the Corps was going to do. One of them had to do with a project in the Weaver Bottoms, which is adjacent to Wabasha County.

Q. What year in particular?

A. Boy, I'd be guessing. I can't tell you.

Q. Is it the mid-'80s, late '80s?

A. That project probably was in the early '90s.

Q. Okay.

A. I was privately objecting to a proposal that the Corps was involved in that area, and I wasn't prophetic, but that area is totally destroyed as a wildlife refuge now, in my opinion, and the opinion of a lot of people. I had conversations privately, I mean, phone call conversations with people from the Corps about their frequent use of eminent closure and doing the double dredging that they were doing in the area of Wabasha, but not in an official capacity as City Attorney or County Attorney. And I'm just going to guess, those would have been in the late '80s, but I'm just guessing. It's a long time ago.

Q. In your official capacity with the project you've mentioned, the Jolivette pit, that's part of paragraph 2 of Exhibit 74?

A. Right.

Q. That one occurred, is it fair to say, in 1982?

A. Yes.

Q. And the project that's the subject of the June 15th, 1983 letter is going on in June of 1983?

A. It was proposed. Like I said, somebody -- either I saw it or somebody brought me the article from the Post Bulletin, and the Corps was proposing starting it in 1983. Because of the bruha that came up from that, I don't remember. They eventually did it, but there were a bunch of wells drilled that -- test wells, and it may not have actually been completed until 1984 or 1985, I don't recall, but they were proposing doing it in 1983.

Q. And the other project you mentioned involving the Jolivette pit, that could have happened before 1983 or after 1983; is that right?

A. You mean the permit for freestanding storage?

Q. Right.

A. That I believe was after 1983, but I can't

tell you the year.

Q. Okay. You mentioned 1985. Was it before 1985, to the best of your recollection?

A. It was when Rudy Boschwitz was Senator. I don't remember what year he was Senator, because I actually met with him on that project. I can't remember. I honestly can't remember.

Q. And then there's the 1986. So you've got -- those four projects are the ones you're talking about in your official capacity; right?

A. 1996 you mean?

Q. Yes, thank you.

A. Right, right.

Q. I apologize.

A. That's all right.

Q. In the second line of paragraph 9 you discuss the Corps' official position with regard to local permit requirements. I guess my question is, who in the Corps provided you with this information, that it's the official position of the Corps?

A. Well, I don't know, maybe "official" is incorrect, but the position of the Corps is expressed in the letter from Colonel Rapp that's in response to -- that's exhibit what, 75? That's in response to my June 15th, 1983 letter. Dan

Krumholz, who's an area -- I don't know what his title is, but he works for the Army Corps out of Fountain City. I've heard him -- he's told me that directly. I've heard him say it at meetings in front of the County Board or the Planning Commission. I don't know if I've seen it elsewhere. But at least those two people have either in person or by letter told me that it's the Corps' position, that because of sovereign immunity, they don't need to apply for local permits.

Q. When is the first time you recall seeing Exhibit 75, which is referenced, the letter that was not signed and not dated, and it's got a signature block for Colonel Rapp?

A. When it was -- that I recall for sure seeing it?

Q. Yes.

A. When it was sent to me attached to that Affidavit from Diane Mills.

Q. So Ms. Mills sent it to you in preparation for your Affidavit that we're now discussing here in Exhibit 76?

A. No, wait a minute. She sent me this letter (indicating).

Q. That's Exhibit 74 you just pointed to?

A. Right.

Q. Okay. Who sent you this letter, Exhibit 75?

A. I assume Mr. Rapp did, but I don't recall. I think the first time I can actually say that I've seen it, although I remember that being told to me before, is when you handed it to me. I don't think Diane Mills sent me that. I think she just sent me a copy of my letter that I wrote to Colonel Rapp.

Q. So before today's deposition you have no independent recollection of ever having seen Exhibit 75?

A. No. It's 19 years ago, and it wasn't written by me, so I can't tell you that I've never seen it before.

Q. And you didn't see this letter before you drafted Exhibit 73 or before Ms. Mills drafted 73 for you?

A. I may have. I just can't tell you that I definitely did.

Q. So I just asked you for your explanation of what the Corps' official opinion is, who's espoused that, and you mentioned Colonel Rapp and Mr. Krumholz. I guess my question is, prior to -- at the time you drafted exhibit -- or at the time

Exhibit 73 was drafted for you, did you base this Corps' official position only on Mr. Krumholz's statements?

A. I know I've heard it from more than Mr. Krumholz. Because when the Army Corps has meetings, they always bring a number of people.

Q. Right.

A. I believe Colonel Rapp was at meetings with the county, and I believe he was at meetings -- or with the city, I mean. I don't know if he was ever at meetings with the county. But I know that he was -- I'm almost positive he was at meetings with the city. And I don't remember who espoused it, but I've heard it a number of times, that sovereign immunity allows you to do this. We don't need your local permits.

Q. Okay.

A. And then they turn around and say, but we'll work with you.

Q. Okay. Before we go any further, I want to make sure you understand what I'm doing here. I'm not trying to attack you. What I'm trying to do is -- if you'll let me finish, this Affidavit, I know you didn't draft it. If you had drafted it, you might have phrased it differently. You signed

it. I understand you've testified what your position was in this litigation. You didn't seem to want to get too involved in it at the time. What we have to do now is go through this and make sure, with a fine tune comb, and make sure that not only that the records in here are correct, but that any conclusions that might be drawn based upon this Exhibit 73 are the correct conclusions. And that's why I'm going through this. I'm not trying to crucify you here.

A. I don't think you are, and I'm trying to honestly respond.

Q. 'Cause you said before that everything in here is correct. And I -- maybe I shouldn't have asked you that question, because I want to make sure it's correct, not having authored it.

A. Okay.

Q. Okay. Okay. In paragraph 9 of Exhibit 73, the third line says, it is not subject to those requirements based upon its, the Corps', claim of sovereign immunity. Does that refer to the government's claim of sovereign immunity only over federal land or the government's claim of sovereign immunity over private lands?

A. Over private lands.

Q. So you're saying here that the government has a policy of asserting sovereign immunity over private lands?

A. I'm saying that the government takes the position that they can. And we're talking about dredge spoil. They don't need to apply for and obtain any local permits to deposit dredge spoil as long as they have permission on the site they're going to deposit it. So in other words, if they buy land from me, they don't need to get a permit from the county or the city to transport it onto my land, as long as I've given them consent, because of sovereign immunity.

Q. You made a distinction from the government and you as a private citizen. I'm not sure if you're aware of if the government buys land --

A. Or leases it or gets permission.

Q. Okay. So it's -- do you know --

A. Has consent, let's put it that way.

Q. Do you know what actually happened in this case, in regard to the Saunderson property?

A. What I was told by Judy Krueger was that Matteson had negotiated a Purchase Agreement to buy the land for purposes of depositing dredge spoil from this project. That's what I was told. I never

saw a Purchase Agreement.

Q. Do you know what actually happened with whether or not dredge spoil wound up on the Saunderson property?

A. It didn't.

Q. I guess my question is, doesn't what actually happened in this particular case contradict what you're saying here in the third line of paragraph 9 of Exhibit 73?

A. No. Because in that case -- well, I'm not sure what you're saying here. But what I'm saying, you're asking is in that case Mr. Matteson or his company, which is not a government agency, had to apply for the permit, 'cause he was the one who was actually do the transporting and disposal.

Q. Okay.

A. So I don't think that contradicts it.

Q. So your understanding is that the government's official position is that it is not subject to the requirements of the ordinance in Wabasha County?

A. Right.

Q. Over federal land or federally leased land?

A. Over -- correct, correct. If they had to go across private land to get to federal land, then

I believe their position is they don't need local permits. Our position is, they do.

Q. Okay. So in this particular case, when you had -- I'm talking about the contract at issue in this particular case, because there was a pipeline that was going to go across non-federal land, and go into non-federal land, then your position is that sovereign immunity did not attach?

A. It didn't attach. But in this case, it doesn't apply, because the person -- the independent person that was going to do it was not a governmental agency anyway.

Q. So do you think that the government asserts sovereign immunity in cases such as what happened in this case, where you have a private contract for putting dredge spoil on private land? What I'm trying to do is clarify what -- if you look at the sentence now, you can see that -- as, you know, you read this sentence and it says that the Corps' official position is that sovereign immunity attaches to situations where a private contractor is pumping dredge spoil?

A. No. I think the Corps' position is, they're doing it. They don't need to comply with local requirements because of sovereign immunity.

But the sovereign immunity does not extend to individuals or corporations that they have contracts with.

Q. And that's the Corps' official position?

A. I believe that's right, yeah.

Q. Okay. To the best of your knowledge?

A. Yeah.

Q. Okay.

A. Because they -- in this case, the Corps didn't -- didn't assert that Mr. Matteson didn't have to get a permit. At least I don't ever recall seeing him do it.

Q. Do you see how you can read paragraph 9 to say something that it doesn't really say with the questions I just asked you?

A. Well, I guess you can. But this is all referencing the Corps. It's not referencing private contractors.

Q. Just so you know, this is going to be discussed in our Motion for Summary Judgment. I need to get the background. That's why I really need to get the background from you.

A. I understand.

Q. The last sentence of paragraph 9 of Exhibit 73 states, "The Corps has never substantiated to me

a documented basis for its claim of sovereign immunity." And that only applies to what you previously stated as the Corps' official position, which is government owned lands or government leased lands?

A. Well, actually, government -- well, no. It refers to the Corps' position, that they don't have -- if they're doing the project, regardless of where it's going, they don't have to comply with local permitting.

Q. If the Corps is doing the project?

A. Yes. It does not refer to contractors doing it, doing their work for them.

Q. So if the Corps issues a solicitation for a contract and someone is the lowest bid on that contract, they don't get the sovereign immunity protection; is that correct?

A. I don't recall the Corps ever saying that, and I don't recall them ever asserting it. I think the project that we talked about before, my understanding was that Thompson did the dredging and the Corps did the hydraulic pumping.

Q. Okay. That's the difference between that project and this particular project?

A. Correct.

Q. And it's also verified by your July, I believe, 8th letter, where you explain to Ms. Krumholz that the new site with the federal land, because it was all federal land, that the Corps -- that sovereign immunity did protect the Corps and it wasn't subject to your ordinance?

A. The letter was to Ms. Krueger and not Ms. Krumholz.

Q. Keep doing that, because I hate reading the record and seeing that I called Mr. Krumholz Ms. Krueger and vice versa. To the best of your knowledge, did the Corps ever seek to invoke sovereign immunity in this case dealing with the Saunderson site?

A. No.

Q. And that's in line with your view of what the Corps' official position is regarding sovereign -- when it can exert sovereign immunity or invoke sovereign immunity?

A. Well, I believe that --

MR. METCALF: I'll object to the form of the question, it's vague and confusing.

THE WITNESS: I'm a little bit confused. What I believe is that -- or I believe the Corps didn't assert that -- didn't think it could assert

it because it didn't, but I don't know why they didn't. I mean, maybe their position is that they can do that in cases of private contractors. But I've never seen them do that, and they don't do that in this case.

BY MR. EINSTMAN:

Q. I guess I asked a bad question. I'll try to rephrase it. Is the fact that they didn't seek sovereign immunity in this case in line with your opinion about what the Corps' official position is regarding when it can invoke sovereign immunity or does it contradict that?

A. It doesn't contradict it. They may have had other reasons, you know. We'll get to paragraph 10, I'm sure. That's one I will change, but I can discuss that more when we get into that.

Q. Okay. Just so I'm clear, looking at paragraph 9, is it possible that you can read that paragraph in a -- so that it doesn't mean what it actually says? It's kind of misleading in some respects from the way it was drafted?

A. Well, you did.

Q. Do I get a --

A. I guess it -- sure, people can read things a lot of different ways.