Ms. Krueger was the first indication you had that there was an intention to use the Saunderson property for this dredge spoil?

A. Yes, I'm sure of that.

Q. Okay. Okay. Flip the page of Exhibit 73. We're on the home stretch.

A. Then we have to go through the other Affidavit.

Q. No, I'm sure on that.

A. Okay.

Q. Please read item 17, paragraph 17 into the record.

A. "I recall speaking with representatives of the Corps about the application of the Wabasha Shoreland Ordinance to the activity referenced in Item #9, although I do not recall the name(s) of the individual(s) with whom I spoke."

Q. Is item 9 paragraph 9 of your Affidavit?

A. Yes.

Q. So could you -- I'm just going to ask you, can you explain to me what paragraph 17 means, 'cause the reference to item 9 is kind of confusing me?

A. Well, it's actually just kind of a repeat of 9, that -- that I've spoken to people or at

meetings with people of the Corps about the application of the ordinance, and -- but I can't -- I think Dan Krumholz was one, but I can't say that for sure. Steve Tapp's diary notes seem to indicate that I talked to him about that.

Q. Okay. Just so I'm clear, item 9 refers to activity, and the activity that we talked about earlier is the railroad project that occurred back in the early 1980s?

A. Right.

Q. And the project that's the subject of your June 15th, 1983 letter, which is Exhibit 74?

A. Well, that's the same thing.

Q. Same thing.

A. Also the Jolivette pit would be another activity --

Q. That's two.

A. -- probably. And, well, this -- the property that's the subject of this action would be another one.

Q. Okay. But paragraph 9 is referring to -- okay. So we'd -- go ahead.

A. It refers to local permit requirements.

Q. Okay. Now, referring to the projects in the 1980s that make up the activity referenced in

item 9, was there ever any reference, to the best of your knowledge, of -- strike that. Did you ever make a reference to the thousand-foot requirement that's in the ordinance back --

A. In those discussions?

Q. In those discussions.

A. No.

Q. So is it fair to say that with regard to this activity, the contract at issue, the contact you had was with Mr. Tapp, is that correct, the first contact?

A. I believe so.

Q. And at that time, do you recall explaining to Mr. Tapp the requirement of the thousand-foot portion of the ordinance?

A. I don't know if I did or not. I -- I would have talked to him about the fact that this project was going to go across the shoreland, but I don't know if I specifically referenced any distance.

MR. EINSTMAN: Okay. Time out? Off the record.

(Recess taken from 12:05 p.m. to 12:10 p.m.)

MR. EINSTMAN: Back on the record.

BY MR. EINSTMAN:

it on a regular basis or they should, they should. I think maybe government agencies are more intuned to laws and ordinances than private citizens, at least that's my experience. But certainly contractors who are in the business ought to be aware of what the legal requirements are for them to do business.

BY MR. EINSTMAN:

Q. Okay.

A. And if they weren't, in my opinion, it's going to be imputed to them anyway.

Q. With regard to paragraph 20 of your Exhibit 73, who in the Corps are you referring to, list the names, please?

A. Colonel Rapp.

Q. And you just testified a new minutes ago you think he may be dead, so who else?

A. I don't know if he is, you implied that.

Q. No, you said that, sir. I can have it read back to you, but you said you think he may be dead.

A. Only because of the questions you asked earlier. Dan Krumholz, and any other of the members, because I don't know their names, of -- of -- Corps representatives that have been at the meetings I've been at. And sometimes there were

five and sometimes there were two. There's been any number of people. I've seen ecologists, civil engineers, people with military titles like colonels, whatever, and I don't recall their names, but they've been at many meetings in Wabasha and Wabasha County, so I think they're aware of it.

Q. Okay. And during these meetings the exact contents of the Shoreland Protection Act were explained to everyone?

A. Some. No. If you're talking about the entire thing. But there would be specific provisions of the ordinance that would be discussed.

Q. Sir, I'm not trying to argue with you, but I'm trying to -- hopefully what I'm hoping is that you'll agree that 20 is exceptionally overbroad and also that it imputes knowledge that folks knew, which you testified earlier you don't like to do that.

A. This says what I believe. That's all it says. I believe that.

Q. And what is the basis for your belief? The only name I've heard is Dan Krumholz.

A. The Colonel.

Q. The Colonel. Back in 1983.

A. I told you, I don't know their names. I

know I've seen many of them at meetings.

Q. Okay. Is it your testimony here today that based upon your one-page letter back on June 15th of 1983, that Colonel Rapp became acquainted with all the contents of the Shoreland Protection Act in Wabasha County?

MR. METCALF: Objection.

A. Not that he did, no. He may have totally ignored my letter.

BY MR. EINSTMAN:

Q. Okay. So let's go back to paragraph 20 where you state, "I firmly believe that the Corps was fully aware."

A. Let's put it this way, of the existence of the ordinance.

Q. Okay. So would you change out -- would you get rid of the "and its requirements" portion of that particular statement?

A. No, because I'm talking about the existence of them.

Q. Are you talking about the existence of the ordinance, the fact that there is an ordinance on the books or the contents of that ordinance?

A. That it's on the books. That it exists. That it may well apply to them and their activities.

Q. Okay.

A. It's their responsibility to know the contents.

Q. I understand that, sir. And if your testimony is that because there's an ordinance on the books, that people and organizations are imputed to know what that ordinance states, I can understand that, but that's not what this sentence says. And what I need to find out is what are you trying to express there based upon your personal knowledge?

A. What I'm trying to say is that people who represent themselves as members of the U.S. Army Corps of Engineers, I believe have long known of the existence of the flood plain shoreland ordinances, including the one that was in effect in the City of Wabasha and the County of Wabasha.

Q. Okay. They've known of its existence. Now, they've known of its contents, all the contents of that ordinance?

A. I believe they have.

Q. And who are these people?

A. Anybody who is given the responsibility of doing dredging and depositing dredge spoil along the river in our area. I don't know who they are. The Corps -- how many people are in the Corps? 50,000?

10,000? I have no idea.

Q. Sir, I'm not trying to argue with you, but I'm trying to get you to understand that this sentence here is not reflecting what you're telling me, and I want you to understand that if you need to -- there's no reason to tether yourself to this sentence as Ms. Mills drafted it unless it's what you really want to say.

A. It doesn't say I know. It doesn't say I have proof. It says, I believe. And I added the word existence.

Q. You added the word existence. But the point --

A. I firmly believe that the Corps was fully aware of the existence or was aware of the existence of the Wabasha Flood Plain and Shoreland Ordinance and its requirement prior to and during 1996.

Q. Does "and its requirements" refer to all of its requirements?

A. Well, maybe it should say its contents.

Q. Does it refer to all of its contents or some of its contents?

A. Yes.

Q. How do you know this? Or how do you believe -- why do you believe this?

MR. METCALF: Objection, asked and answered.

A. I believe it because of the numerous contacts they've had with agencies in our area, and all of the opposition they've received to their activities, both on our side of the river and the other side of the river. I mean, it's just the Corps. I don't know how the Corps deals in other parts of this corridor, but there's been constant problems with the Corps in the view of the citizens. And when they have meetings, I think they probably go in with their helmets on. If they're well publicized a lot of people do show up. People object to what's going on.

BY MR. EINSTMAN:

Q. Do all the problems implicate the Shoreland Protection Ordinance?

A. No.

Q. Okay.

A. Some of them have to do with destruction of habitat in the Wisconsin side of the river. Some of them have to do with where they deposit dredge spoil in the river. So not all of them apply.

Q. Could you, sitting here today, tell me all the different provisions of the Shoreland Protection

not an application should be granted or denied. So if a question came up, for instance, does the ordinance really apply here, I would give my opinion about that. But I wouldn't say if I'm -- sometimes I'm asked, do you think we should grant this? My response is always something to the effect that I don't believe my role is to recommend for either approval or denial, that's up to the Board.

Q. But at the meeting of the Commission, though, you would have attended. Did you give an opinion about whether the ordinance applied in this instance?

A. I don't recall if I asked. I would -- I would say it applied.

Q. Based upon what?

A. Based upon the fact that they had to cross over the shoreland area to get to the property. And -- and now that Mr. Einstman mentioned it, apparently part of the property was within the Shoreland Ordinance. And the ordinance required that if you were going to deposit dredge spoil, you would have to do it. And I believe that because of the way that they piped the sand, that there would also be a deposit of dredge spoil in the shoreland area.

Q. Had you ever -- prior to that time, had you ever made any interpretation of the ordinance, such that a pipeline, dredging pipeline crossing this area would be subject to the ordinance?

A. No, I'd never been asked to do that.

Q. This was the first time that had ever come up?

A. Yeah. It was the first time, if ever, it came up, in my opinion. At any rate, I don't know if the Zoning Department -- they do issue permits for a lot of permits without ever conferring with us. To my knowledge, that's the first time that issue had come up.

Q. So you don't recall then that issue ever coming up with any previous contractors that had done dredging work in the Wabasha area?

A. Not in my experience. It may have, but not that that was a part of it.

Q. I take it then that interpretation of the ordinance had never been used to stop that procedure of pumping -- hydraulically pumping the dredge across this area?

A. Not -- not to my knowledge. You mean in the Wabasha area?

Q. Yes.

citizens or attorneys representing them or people in that department. Well -- and the County Board. When things come up, they'll ask questions. But otherwise, I don't deal with many other departments about it.

Q. Are there any other private citizens or attorneys representing private citizens, that you're aware of, who haven't been mentioned today, that were ever involved in any disputes with the Corps of Engineers, that you know?

A. Well, I can tell you that a number of people were real outspoken. I don't know if they've ever been involved with any litigation with them. One is a guy by the name of Ed Passe, P-a-s-s-e, he's Vice President of the First State Bank in Wabasha. He's an avid outdoorsman that had some issues with the Corps. And another -- another guy is Peter Ochner, O-c-h-n-e-r. He used to own a company in Wabasha. I don't know where he is anymore. He retired. He and I were the ones that went to Senator Boschwitz regarding the Jolivette permit.

Q. Are there other attorneys in the Wabasha area, that you know of, that have taken on the -- taken on the Corps on various -- or any disputes?

the first sentence there?

A. Are you talking about the first page?

Q. The first page.

A. "The fact that the United States does not apply for local land use permits should not be interpreted as an unwillingness on the part of the St. Paul District to provide information concerning this project and the groundwater monitoring program."

Q. Is that consistent with what you've testified about today, concerning your view of the Corps' position on their need to apply for local permits?

MR. EINSTMAN: Objection, lack of foundation.

A. Well, I have -- you know, yes. I'd been told before that the Corps did not have to apply for land -- local land use permits. But as I said, they -- they were, when pressured, or when asked to, they had -- they had met with and at least discussed concerns that the local government had.

BY MR. METCALF:

Q. Okay. It's copied to Mayor John Meisch and also to Bill Holmes, Zoning Administrator. Was Mr. Holmes, did he work for the city?

A. No, he worked -- well, you know, he may have. He actually was both Zoning Administrator for the city and the county at the same time. But I think this was sent to him probably as Zoning Administrator for the City of Wabasha.

Q. Is he still around?

A. Yes. He lives in Lake City.

Q. Is he retired or does he still work?

A. He's retired.

Q. Do you recall ever discussing the Shoreland Ordinance with him?

A. I'm sure I did. I don't know if it was specifically with this case, but I'm sure I did.

Q. Well, this communication between Mr. Ekstrand and Colonel Rapp and Mr. Krumholz is occurring in three letters here that are part of Exhibit 81. Were you involved at all in this, with this communication back and forth?

A. No.

Q. Or was that solely Mr. Ekstrand?

A. That was solely Mr. Ekstrand.

Q. Okay. If you'd look at the next one, it's Exhibit 82, I believe?

A. Okay.

Q. At the bottom there's a number, it

indicates that this came out of the Corps of Engineers' files that were produced to us. Do you recall ever seeing anything like this document before?

A. No.

Q. It refers to a -- if you go about two-thirds of the way down the page, it refers to a public meeting held in Wabasha in July of 1982. I just want to ask you if you recall anything about that meeting or whether you attended it?

A. July 22nd, that one?

Q. Yes.

A. I don't believe I attended it.

Q. Okay. Is there anything in this Exhibit 82, as you're reading through it, that refreshes your recollection or reminds you about any conversations or meetings you had with Mr. Krumholz, Colonel Rapp, or anyone else at the Corps, about permitting issues back in this time frame?

A. No. I think the main reason for that, other than the length of time, is that most of the meetings that would have been attended by someone from our office would have been attended by Peter Ekstrand, because he was providing most, if not all, of the civil counsel to the city at that time.

Q. If you'd just look quickly at the next one, that's Exhibit --
A. 83.
Q. -- 83, please. Do you recognize this letter? Do you recall ever seeing it, a copy of it?
A. No.
Q. There's a reference in this letter to a Stroot, to Mr. Stroot?
A. Gene Stroot, yes.
Q. At some point in time did you represent Mr. Stroot?
A. I believe I did.
Q. Do you recall what the -- why you were representing him, what that was about?
A. I probably represented him on a number of matters.
Q. Did any of those matters concern the Corps of Engineers?
A. Boy, not that I recall, perhaps, but not that I recall. I think I drafted his will. I think I probably represented him on a real estate matter. I don't remember if he had any issues with the Corps or not. Not that I recall, anyway.
Q. If you'd look at the next one, Exhibit No. 84. That's another letter to Mr. Krumholz from Mr.

Ekstrand. It's dated August 19th, 1987. I'll refer you to the bottom of the first page, your name appears there.

A. Oh, okay.

Q. Does that refresh your recollection about the -- what the issues were involving Mr. Stroot?

A. Yes.

Q. And was that a dispute that Mr. Stroot had with the Corps of Engineers?

MR. EINSTMAN: I'm just, sorry to interrupt, going to object. There's been no foundation laid to use this document. But you can answer the question, Mr. Nordstrom.

A. Yes, it does refresh my memory. He was concerned about the water contamination. As I recall, the Corps, as part of its agreement, had agreed to test and provide regular results of the tests, and no results had been -- or at least they hadn't been timely in Mr. Stroot's opinion. And so he asked me to express, on his behalf, his concerns about the possibility that the water was contaminated. He was angry with the city and the Corps for not providing that information on a regular basis.

BY MR. METCALF:

Q. Do you recall who the contractor was?
A. I think it was Robers Construction. I saw a reference to them.
Q. Are they a local contractor or are they based in the Wabasha area?
A. No.
Q. On the top of the second page of this letter, could you just read that first sentence there?
A. "As you know, the contractor in this case never did obtain a conditional use permit for the laying of the pipe in the floodplain zone and although this is a temporary structure, I am sure you are aware that Wabasha's Flood Plain Management Ordinance requires a conditional use permit for such placement."
Q. Now, you're referring to -- or Mr. Ekstrand is referring to the Flood Plain Management Ordinance?
A. Uh-huh.
Q. Do you know if that is the Shoreland Ordinance that --
A. I believe it's the same.
Q. It's the same thing?
A. This is their title to it. But I believe

it's the same. It's the city's version of the state mandated ordinance.

Q. Does the city have their own version of it then?

A. Yes. But I believe it's virtually identical, if it isn't identical. The Minnesota Department of Resources actually gives you the draft of the ordinance if you're a municipality, and there's very little, if any, change you can make to it.

Q. And every municipality and county has to enact it?

A. If they have navigable waters either adjacent to or passing through the county, that's my understanding.

Q. Okay.

A. And whether the city is right on the river, so they have to have one.

Q. Just to make sure I have a clear understanding of this, the city had its own Shoreland Ordinance, but they may have called it something slightly different, but it was, as far as you know, it was identical or very similar to the county's ordinance?

A. Yes. Back at this time, yes. Still would

be, as a matter of fact.

Q. Now, at the time you sent this letter, it appears that Mr. Ekstrand is on his own?

MR. EINSTMAN: Objection, referring to the time you sent this letter.

MR. METCALF: I'm sorry?

MR. EINSTMAN: You said you sent this letter.

MR. METCALF: I'm sorry if I misspoke.

BY MR. METCALF:

Q. At the time Mr. Ekstrand sent this letter, was he practicing on his own?

A. Yes.

Q. But he was still the City Attorney?

A. Yes.

Q. And were you -- were you involved at all in -- well, you were involved with representing Mr. Stroot?

A. Well, I was no longer -- I wasn't a City Attorney in any capacity in Wabasha at that time.

Q. Okay. So you were just in private practice?

A. I was still with the remaining members of that firm --

Q. I see.