A. -- I believe. Well, maybe I'd left by then. But Mr. Ekstrand was the first to leave the firm and I was the second. So as of August 19th, 1987, I don't think either he nor I was a member of that firm.

Q. Okay. If you'd look at Exhibit 85, please?

A. Okay.

Q. It's a letter to Mr. Ekstrand dated September 11th, 1987, from Daniel Krumholz, Corps of Engineers. Do you recall ever seeing a copy of this letter? I note that it's copied to Gene Stroot, and so I guess I'd like to know if you ever --

A. Boy, I may have seen it, I don't know.

Q. Would you still maintain any files anywhere concerning your representation of Mr. Stroot?

A. Probably.

Q. Where would those be?

A. They could be in the building in Wabasha.

Q. Not the jail?

A. No. The building that I rent. A building in Plainview or a building in Rochester.

Q. You keep files that date back that far?

A. I've never destroyed any files.

Q. Okay. All right. The next document I'd like you to look at was previously marked as Exhibit

56 in another deposition. And I just wanted to ask you about it, because your name appears about halfway down the page.

A. Uh-huh.

Q. It refers to a meeting on October 23rd, but it doesn't give the year. Then it says you were contacted, that you'd said you thought it was too late to have a moratorium. Can you tell me if this -- tell me what was going on here, if you recall?

MR. EINSTMAN: Objection, lack of foundation.

BY MR. METCALF:

Q. Well, first of all, have you ever seen this document before or do you recognize this handwriting?

A. No, I don't.

Q. It's not your writing?

A. It's not my handwriting. I recall a discussion about a moratorium and how that was -- how that related to the Matteson project. This may -- well, this may have been a County Board meeting, because it makes reference to the -- to Harold Hoffman, who at that time was a County Board member.

But one of the citizens' ideas or Board member's ideas to stop the project, Matteson's project, dumping dredge spoil in Wabasha County, was to have the County Board pass an ordinance declaring a moratorium on the deposit of any dredge spoil in Wabasha County. And I believe my opinion, that it was too late, had to do with the fact that Mr. Matteson or somebody in his behalf had already requested a conditional use hearing, or had filed an application, and I told him that that would not be effective or legal, I didn't think, as a way of doing that. They needed to be heard. That the application needed to be heard.

Q. So did the moratorium ever happen then?

A. No.

Q. If you'd just look at the next one real quickly. It's cut off at the bottom. It's Exhibit 51. Fifty-one, my copy is cut off.

A. It's a handwritten letter. It says to David?

Q. Yes.

A. Okay.

Q. And just real quickly, if you can just read it. Let me know if you recognize this at all. It's not addressed to you. It doesn't appear that your

name is on it.

A. (Witness complies.) I'm pretty sure I know who it's from, but I don't know who it's addressed to.

Q. Who do you think it's from?

A. Shar Bisell.

Q. Who is she?

A. She's a resident. She owns -- she and her husband own a residence near the Saunderson property. She's also a realtor. But I don't know if that had anything to do with this.

Q. Was a copy of this ever sent on to you?

A. I don't believe so.

Q. At least that you know of?

A. I don't believe so.

Q. Did you ever have any conversations with Cher was it?

A. Shar.

Q. Shar?

A. I've had conversations with her. I don't -- I don't know that I ever had any conversations with her one-on-one. Like I said, I think she was probably at the conditional use hearing, so --

MR. EINSTMAN: For the record, I think

she's a real estate agent; is that right?

THE WITNESS: Yeah. She's also a private citizen that owns property near the Saunderson property.

MR. EINSTMAN: Okay.

BY MR. METCALF:

Q. Well, did she ever talk to you about your interpretation of the Shoreland Ordinance?

A. I don't recall. She might have, but I don't recall.

Q. The next one is Exhibit 58, which appears to be an Application for a Conditional Use Permit filed by Roland and Sandra Sanderson. Have you seen this before?

A. I think so.

Q. Did this, at some point, get routed to your office?

A. Well, I don't know if it got routed to my office, but I'm sure I saw it when there was a hearing. I can't recall if the Sandersons applied for it first and then Matteson did, or if the arrangement was that Sanderson had to do it basically on Matteson's behalf.

Q. Okay. But the Sanderson's application was denied?

A. I believe it was, yes.
Q. You can skip the next one.
A. Skip 57?
Q. Yeah.
A. Okay.
Q. Exhibit 17 refers to a Braun property?
A. Uh-huh. Yes.
Q. Do you know where that property is located?
A. Yes.
Q. Did you have any involvement in, or your giving opinions, about whether that property fell under the Shoreland Ordinance?
A. The property sits -- I don't believe I did. But in order to get to the property, once again, we had a similar issue, where the materials had to be piped across the shoreland areas.
Q. Okay. And you rendered an opinion that that would -- crossing that to get to the Braun property would violate the Shoreland Ordinance?
A. I don't know if I was asked. But I think Judy Krueger interpreted the opinion on the Saunderson property to be -- to apply to this, because you still were going to use the same means and workings to be to the -- from the shore to the Braun property. What I don't recall is whether that

Braun property was within that thousand feet. But I don't think there was, but still there was an effort to transport.

Q. Did you ever attend any meetings relating to the Braun property?

A. No.

Q. Exhibit 16 is minutes from a meeting on December 18th, 1996. Your name does not appear in these minutes. I just wanted to ask you if you recall anything about this meeting or whether you were there?

A. Let me just briefly read it. No, I don't think I was at this meeting. The reason I don't, is because the second to the last paragraph says that she has contacted me and I reaffirmed that a Conditional Use Permit would be required, so I don't think I was at the meeting.

Q. Okay. Do you recall, though, Judy Krueger contacting you again?

A. I don't recall it, but I -- I believe she probably did.

Q. Okay.

A. It was the same issue.

Q. Did you ever do any -- do any research to determine if your opinions that -- that the pipeline

crossing this area would violate the Shoreland Ordinance, any research that would support that opinion?

MR. EINSTMAN: You're referring to the contract, the project, just for the record?

MR. METCALF: Yeah.

A. Which part, across which property, or to the Saunderson property?

BY MR. METCALF:

Q. I mean, it looks like a couple of different times you took the position that the pipeline -- or at least certainly with the Braun property it looks like that was your opinion. I just wanted to know if you'd done any research to validate that opinion?

MR. EINSTMAN: Objection, misstates his testimony.

BY MR. METCALF:

Q. I'm not trying to -- do you understand what I'm asking?

MR. EINSTMAN: Just for the record, I believe he testified that Ms. Krueger thought that the opinion he'd rendered for the Saunderson site applied to the Braun site. That's what he testified to.

BY MR. METCALF:

Q. But that opinion, though -- I'm just -- all I'm wanting to know is whether you did any research to validate that opinion, other than just looking at the ordinance itself?

A. I don't recall if I did or not. It may have been just an interpretation of the ordinance, 'cause as I recall, you had to have a Conditional Use Permit to deposit dredge spoil, and it was my opinion that just the method itself would deposit dredge spoil.

Q. Do you know if anyone has taken that position or made such an interpretation similar to that since this project, any other jurisdiction in your county or any other counties?

A. Well, other than that letter in 1987 indicates that Peter Ekstrand was of that opinion with their ordinance, no, I don't know if anyone else has rendered that opinion.

Q. But have you ever -- if you recall, have you ever discussed that particular issue of an interpretation with Mr. Ekstrand?

A. Oh, I'm sure I have.

Q. Do you recall what specifically the conversations were?

A. No, but I know he was of the same opinion.

MR. METCALF: All right. I don't have anything further. Thank you for your time.

FURTHER EXAMINATION

BY MR. EINSTMAN:

Q. I've just got a couple of follow-up questions. We'll start with that. No, it's dated '87?

A. Which letter?

Q. It's got an exclamation point at the bottom.

A. Second page of that one?

MR. METCALF: Eighty-three?

MR. EINSTMAN: No.

BY MR. EINSTMAN:

Q. It's the one that the '87 -- is this the one you're talking about here?

A. Yep. On the second page, on the top, he makes reference to needing a permit to cross --

MR. METCALF: I'm sorry, it's 84.

BY MR. EINSTMAN:

Q. Okay. You just mentioned, Mr. Nordstrom, Exhibit 84, which was apparently sent in August 19th, 1987, and said that confirms when -- you were asked about whether you'd performed any research and you said this particular letter