IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------------

L. W. MATTESON, INC.,

Plaintiff,

vs. File No. 01-542C

UNIDED STATES ARMY CORPS OF ENGINEERS,

Defendant.

---------------------------------

Deposition of DANIEL J. KRUMHOLZ, taken pursuant to Notice of Taking Deposition, taken before John A. Dunton, Court Reporter, a Notary Public in and for the County of Dakota, State of Minnesota, on Monday, the 22nd day of July, 2002, at Army Corps of Engineers Centre, in the City of St. Paul, Minnesota, commencing at approximately 11:00 a.m.

* * *

I N D E X

| EXAMINATION | PAGE |
|---|---|
| By Mr. Miller | 4 |
| By Ms. McCarthy | 142 |

| OBJECTIONS | PAGE |
|---|---|
| By Ms. McCarthy | 28, 36, 43, 45, 52, 53, 55, 59, 60, 61, 62, 63, 68, 70, 71, 72, 73, 79, 80, 81, 82, 83, 84, 86, 87, 89, 90, 92, 94, 95, 96, 99, 101, 102, 106, 116, 117, 121, 127, 138, 139 |
| By Mr. Miller | 142 |

| EXHIBITS | PAGE |
|---|---|
| 1 Solicitation | 8, 38, 39, 40, 100, 136 |
| 2 Daytimer exerpt (8-29) | 77, 110 |
| 3 Fax cover sheet, three-page memorandum for records dated 11-8-00 | 135, 136 |

| REQUEST FOR DOCUMENTS: | 10, 35, 78 |
|---|---|

(See complete word index attached.)



APPEARANCES:

Stephen R. Miller, Esquire, and Diane S. Mills, Esquire of the MILLER LAW FIRM, 4310 Madison Avenue, Kansas City, Missouri, 64111 appeared representing the Plaintiff.

Patricia M. McCarthy, Esquire, Senior Trial Counsel, Department of Justice, Civil Division, Commercial Litigation Branch, 1100 L. Street, N.W., Room 12060, Washington, D.C. 20530; and

Edwin C. Bankston, Esquire, District Counsel, U. S. Army Corps of Engineers, Army Corps of Engineers Centre, 190 East Fifth Street, St. Paul, Minnesota 55101-1638, appeared representing the Defendant.

Also Present: Lawrence and Larry Matteson.

* * *

WHEREUPON, the following proceedings were duly had:

* * *



DANIEL J. KRUMHOLZ,
after having been first duly sworn,
deposes and says under oath as follows:

EXAMINATION:

BY MR. MILLER:
Q. Can you state your name for the record?
A. My name is Daniel Krumholz, K-r-u-m-h-o-l-z.
Q. Mr. Krumholz, where do you live?
A. I live in Winona, Minnesota.
Q. Your address?
A. Route 6, Box 514, Winona. Zip code 55987.
Q. Where do you work?
A. I work for the Corps of Engineers, the Fountain City office.
Q. What is your current position?
A. Operations manager for the Channels and Harbors Projects.
Q. Have you ever had your deposition taken before?
A. In this case, no.



Q. At any time?
A. 20 years ago.
Q. That's the only time?
A. Yes.
Q. Have you had an opportunity to talk to counsel today to have the process explained to you?
A. Yes.
Q. Any questions about the process before we begin?
A. No. Not at this time.
Q. A couple ground rules before we start: One is that the deposition here is to find out what you know, not to trick you. If there are any questions that are asked that you don't understand for any reason and you would like me to rephrase them, I will be happy too do that.
A. Yes.
Q. Also, all of your responses during the deposition will need to be oral so the court reporter can take them down. Will you do that?
A. Sure.
Q. We are going to spend a little bit of time initially learning some background of the project and your personal background. Why don't you start by telling me how long you have worked

A. No. I was never asked.
Q. Were you furnished a copy of Matteson's claim letter which requested additional compensation?
A. I don't recall ever seeing it, no.
Q. Typically how are change order requests from a contractor or I should say change order requests or claims from a contractor processed internally?
A. I'm not involved with the administration of contracts. So I would not be the best one to answer that. My involvement is only whether it impacts what product we are looking for and whether that -- I would only be asked to review from that perspective, that we were getting what we were looking for in terms of the final product.
Q. After a project has been awarded, what further responsibility do you have? What further responsibility, for instance, on the Grand Encampment Project after it was awarded to Matteson?
A. The funding for the work comes out of my budget, so I monitor the expenditures because it impacts my overall budget. I monitor the progress just because of our involvement with the other



agencies; their interest in being kept up to date on what the status is. In general, it's one of monitoring and staying in touch with what is happening, what the status of the project is.
Q. Do you recall what the Corps of Engineers' estimate was for this project?
A. No, I don't.
Q. Who was involved in preparing the estimate?
A. I don't recall. We have a cost engineering office that is responsible for that.
Q. Do you know whether the estimate, whether it was based on mechanical dredging or on hydraulic dredging?
A. I don't know.
Q. Do you know what the budget was for this project?
A. Generally on a project like this, we don't have a fixed budget. So we didn't have a set limit.
Q. For planning purposes, how do you determine what projects you are going to put out for a bid?
A. We look at past experience for similar type work to get an idea what it will cost, what we



can expect we are going to have to set aside for this work.
Q. And do you recall what you had to put aside for this project?
A. No, I don't.
MR. MILLER: Let's take a break for a second.

(Discussion held off the record.)

(A brief recess was taken.)

BY MR. MILLER:
Q. When did you first become aware of Minnesota's Shoreline Protection Act?
A. The specifics, when we encountered it on the project. I first became aware of it after Matteson encountered difficulties and indicated that they needed to get that, go through that process.
Q. Did you tell Matteson that they would have to go through that process?
A. No, I did not. I was not aware until after I became aware that they needed to do that. That's when I became aware that there was this



requirement for a thousand foot -- working in a thousand foot of shoreline. That's when I first became aware of this.
Q. Did you check to see whether that applied to Matteson?
A. No, I did not.
Q. You said that you weren't aware of the specifics until Matteson encountered it. Were you aware generally that Massachusetts had a statute?
MS. McCARTHY: Objection. Massachusetts?
BY MR. MILLER:
Q. Minnesota. I was in Massachusetts last week.
MS. McCARTHY: Objection.
THE WITNESS: I am generally aware that counties have zoning ordinances and shoreline management requirements. But I'm not aware of the specifics. And generally if landowners contact myself about getting dredging material, I tell them to contact the local authorities to find out what those local requirements are. So I don't try and determine those myself.
BY MR. MILLER:
Q. When did you first become aware that

countries in Minnesota had zoning or shoreline protection laws?
A. In general, in the late '70s when I got involved in coordinating dredging operations and projects and got involved in providing dredge material on private property and became aware that those landowners had a requirement to investigate and get any local requirements.
Q. Do you recall the circumstances when you first became aware of that? Either a particular project or particular incident?
A. No. I don't believe there was any one particular incident. I just became aware of it through working with landowners that were asking to get dredge material and I asked them to give us permission to use their property. I became aware that they had to also get local or that they could encounter local requirements.
Q. So the Corps' position with local landowners who approach the Corps about taking fill material was that you would provide the fill material but they need to go and figure out what local requirements there were?
A. That's correct.
Q. And you never informed yourself of what



those local requirements were?
A. No. Simply because of the magnitude of trying to determine that with having 284 miles of river in three states -- I'm not even sure how many counties exist in that jurisdiction -- that we couldn't keep up to date on all the local requirements and it was not our obligation. It was the landowner that was receiving the material.
Q. Well, before the Corps would place material on a private landowner's property, what steps did the Corps take to assure itself that local requirements had been met?
A. We would make them aware that that possibility existed that they would need to get that. And that they give us their assurance that they have satisfied local requirements and that they give us permission to place material on the property. And then we still left the obligation with them. If we placed the material on their property, if they hadn't gotten the local requirements, then it was going to be their problem. But the material then became their property and if there was an issue that existed with them having material on their property without the local requirements, it was their issue, then.



We did not verify or confirm that they had satisfied all local requirements.
Q. I want to go back and ask you some questions about the other excavation projects. You and I spoke a little bit about Read's Landing. You also mentioned that there was a Crat's Island excavation and fill contract that occurred in 1987?
A. Yes, there was.
Q. And was that also in Wabasha County?
A. Yes, it was. The placement was in Wabasha County.
Q. The disposal site?
A. Yes.
Q. Did the Corps obtain that disposal site?
A. Yes, we did.
Q. And did the contractor use the disposal site obtained by the Corps?
A. Yes, they did. And we furnished two sites. They used both those sites and I believe they also provided or put material on a third site that they furnished, I believe; a small quantity on another site.
Q. Do you know what the sites were that the Corps furnished?
A. One site was the Wabasha Harbor site



owned by the owner of Wabasha Harbor at the time. And I don't recall his name now. The other site was Wabasha Sand and Gravel Company Site. And that was a large pit that was the primary placement site for that job.
Q. What, if any, meetings did the Corps have with Wabasha County with respect to that project and those disposal sites?
A. I recollect that we met with the county engineer to review the project and the access that we were providing to get the pipeline to the primary placement site. And we went over this route with the county engineer.
Q. Did you meet with the county engineer before issuing the solicitation?
A. Yes. To the best of my knowledge, we did, yes.
Q. And what was the purpose for meeting with the county engineer?
A. To coordinate that activity and running the pipeline through that access route and I'm sure to get their input and recommendation as to how they felt it should be done.
Q. Did the Corps obtain all the necessary State and Federal permits for those sites before

## TRANSMITTAL OF SHOP DRAWINGS, EQUIPMENT DATA, MATERIAL SAMPLES, OR MANUFACTURER'S CERTIFICATES OF COMPLIANCE

*(Read instructions on the reverse side prior to initiating this form)*

DATE: 8-12-98

TRANSMITTAL NO.: 9630-016

### SECTION I - REQUEST FOR APPROVAL OF THE FOLLOWING ITEMS *(This section will be initiated by the contractor)*

TO: Melissa Gulan
U.S. Army COE - Eastern Area Office
111 Riverfront, Suite 300
Winona, MN 55987-3456

FROM: Larry W. Matteson
L.W. Matteson, Inc.
P.O. Box 667
Burlington, IA 52601-0667

CONTRACT NO.: DACW37-96-C-0030

CHECK ONE:
☐ THIS IS A NEW TRANSMITTAL
☒ THIS IS A RESUBMITTAL OF TRANSMITTAL 9630-008

SPECIFICATION SEC. NO. (Cover only one section with each transmittal): 01130

PROJECT TITLE AND LOCATION: Grand Encampment Excavation, Mississippi River

| ITEM NO. a. | DESCRIPTION OF ITEM SUBMITTED (Type size, model number/etc.) b. | MFG OR CONTR. CAT., CURVE DRAWING OR BROCHURE NO. (See instruction no. 8) c. | NO. OF COPIES d. | CONTRACT REFERENCE DOCUMENT: SPEC. PARA. NO. e. | CONTRACT REFERENCE DOCUMENT: DRAWING SHEET NO. f. | FOR CONTRACTOR USE CODE g. | VARIATION (See instruction No. 6) h. | FOR CE USE CODE i. |
|---|---|---|---|---|---|---|---|---|
| 6 | Environmental Protection Plan | | 3 | 01130-2.1 | | A | | F |

RECEIVED
AUG 12 1998
U.S. ARMY ENGINEER DISTRICT - ST. PAUL
EASTERN AREA OFFICE

REMARKS: Acceptance is based upon satisfactory implementation in the field.

I certify that the above submitted items have been reviewed in detail and are correct and in strict conformance with the contract drawings and specifications except as other wise stated.

Larry W. Matteson, Vice President
NAME AND SIGNATURE OF CONTRACTOR

### SECTION II - APPROVAL ACTION

ENCLOSURES RETURNED (List by Item No.):
1-CO-E, 1-CO-EAO, O-PT-M (Dennis Anderson)
1-Contractor

NAME, TITLE AND SIGNATURE OF APPROVING AUTHORITY: Steven J. Brossart, Contracting Officer's Rep.

DATE: 13 Aug-98

ENG FORM 4025, May 91 (ER 415-1-10) EDITION OF AUG 89 IS OBSOLETE. SHEET 1 OF 1 (Proponent: CEMP-CE)



11/12/2003 13:23 6512905758 CEMVP OC PAGE 13/20


N
WELL #3
P.L.
FIELD OFF.
SAN.
GATE
PIPELINE
TREES
CLEAR LAKE
TEMPORARY PIPE STORAGE
RETURN WATER
WEIR
DETENTION BASIN
BORING
WELL #1
WELL #2

1285

M

# TRANSMITTAL OF SHOP DRAWINGS, EQUIPMENT DATA, MATERIAL SAMPLES, OR MANUFACTURER'S CERTIFICATES OF COMPLIANCE

(Read instructions on the reverse side prior to initiating this form)

DATE: 11-14-96

TRANSMITTAL NO.: 9630-008

## SECTION I - REQUEST FOR APPROVAL OF THE FOLLOWING ITEMS (This section will be initiated by the contractor)

TO: Melissa Gulan
U.S. Army COE - Eastern Area Office
111 Riverfront, Suite 300
Winona, MN 55987-3456

FROM: Larry W. Matteson
L.W. Matteson, Inc.
P.O. Box 667
Burlington, IA 52601-0667

CONTRACT NO.: DACW37-96-C-0030

CHECK ONE:
☐ THIS IS A NEW TRANSMITTAL
☒ THIS IS A RESUBMITTAL OF TRANSMITTAL 9630-002

SPECIFICATION SEC. NO. (Cover only one section with each transmittal): 01130

PROJECT TITLE AND LOCATION: Grand Encampment Excavation, Mississippi River

| ITEM NO. a. | DESCRIPTION OF ITEM SUBMITTED (Type size, model number/etc.) b. | MFG OR CONTR. CAT., CURVE DRAWING OR BROCHURE NO. (See instruction no. 8) c. | NO. OF COPIES d. | CONTRACT REFERENCE DOCUMENT SPEC. PARA. NO. e. | CONTRACT REFERENCE DOCUMENT DRAWING SHEET NO. f. | FOR CONTRACTOR USE CODE g. | VARIATION (See instruction No. 6) h. | FOR CE USE CODE i. |
|---|---|---|---|---|---|---|---|---|
| 6. | Environmental Protection Plan | | 3 | 01130-2.1 | | | | FX* |

RECEIVED
NOV 15 1996
U.S. ARMY ENGINEER DISTRICT-ST. PAUL
EASTERN AREA OFFICE

REMARKS

* See attached comments. Resubmission required.

I certify that the above submitted items have been reviewed in detail and are correct and in strict conformance with the contract drawings and specifications except as other wise stated.

Larry W. Matteson, Vice President
NAME AND SIGNATURE OF CONTRACTOR

## SECTION II - APPROVAL ACTION

ENCLOSURES RETURNED (List by Item No.): 1-CO-E 1-Project Engineer 1-Contractor

NAME, TITLE AND SIGNATURE OF APPROVING AUTHORITY: Steven J. Brossart, Contracting Officer's Representative

DATE: 19 November 1996

**DEPARTMENT OF THE ARMY**
ST. PAUL DISTRICT, CORPS OF ENGINEERS
ARMY CORPS OF ENGINEERS CENTRE
190 FIFTH STREET EAST
ST. PAUL, MN 55101-1638

REPLY TO ATTENTION OF

Steven J. Brossart
US Army Corps of Engineers
Eastern Area Office
111 Riverfront, Room 300
Winona, MN 55987

19 November 1996

L.W. Matteson, Inc.
P.O. Box 667
Burlington, Iowa 52601-0667

SUBJECT: Grand Encampment Excavation
Contract # DACW37-96-C-0030
Transmittal #8, Environmental Protection Plan

Dear Sir:

We have reviewed Transmittal #8, Environmental Protection Plan, for the subject project and provide the following comments:

1. Comments 5, 6, 7, 8, and 9, from the letter dated 21 October 1996 from this office were not addressed.

2. On submittal Form 4025, please fill in the contractor use code (column g).

Please address the following comments and resubmit. If you have any questions, please give me a call at (507) 454-6150.

Sincerely,

Steven J. Brossart
Contracting Officer's Representative

Printed on Recycled Paper

# L.W. MATTESON, INC.

# ENVIRONMENTAL PROTECTION PLAN

# CONTRACT NO. DACW37-96-C-0030

## GENERAL

L.W. Matteson, Inc. will perform all work in such manner as to prevent adding pollution to the air, water or land, and will within reasonable limits, control noise and the disposal of solid waste materials, as well as other pollutants.

## IMPLEMENTATION

James Alber will be responsible for implementation of the Environmental Protection Plan and for training of the Contractor's environmental protection personnel. He will also meet with representatives of the Contracting Officer to review and alter his proposal as needed for compliance with the environmental pollution control program.

## TRAINING

The training shall include methods of detecting and avoiding pollution, familiarization with pollution standards, both statutory and contractual, and installation and care of facilities (vegetative covers, and instruments required for monitoring purposes) to ensure adequate and continuous environmental pollution control.

## PRECONSTRUCTION SURVEY

Prior to the start of any on-site construction activities, the Contractor and the Contracting Officer will make a joint condition survey after which the Contractor will prepare a brief report indicating on a layout plan the condition of trees, shrubs and grassed areas immediately adjacent to the site of the work and adjacent to his assigned storage area and access routes as applicable. This report will be signed by both the Contracting Officer and the Contractor upon mutual agreement as to its accuracy and completeness.

## PROTECTION OF CULTURAL RESOURCES

If during construction activities the Contractor observes unusual items that might have historical or archaeological value, such observations shall be reported as soon as practible to the Contracting Officer. The contractor shall stop all activities in such areas until notified in writing by the Contracting Officer to continue performance.

## PROTECTION OF LAND AREAS

Except for any work or storage area, and access routes specifically assigned for the use of the Contractor under this contract, the land areas outside the limits of permanent work performed under this contract will (in accordance with Section 1130, Paragraph 6.1) be preserved in their present condition. Contractor will confine the construction activities to areas defined for work on the plans or specifically assigned for our use. In accordance with Section 1130, Paragraph 6.1.6, storage and other related areas and access routes required temporarily by the Contractor in performance of the work will be assigned by the Contracting Officer. No other areas on Government premises will be used by this Contractor without written consent of the Contracting Officer.

## PROTECTION OF TREES AND SHRUBS

The Contractor will not deface, injure or destroy trees or shrubs, nor remove or cut them without special authority. No ropes, cables, or guys will be fastened to or attached to any existing trees for anchorages.

## TREE PROTECTIVE STRUCTURES

In accordance with Section 1A, Paragraph 10.1.2, where, in the opinion of the Contracting Officer, trees may possibly be defaced, bruised, injured, or otherwise damaged by the Contractor's equipment or by our other operations, he may direct the Contractor to provide temporary protection of such trees by placing boards, planks, or poles around them.

## RESTORATION OF DAMAGED TREES

Any trees scarred or damaged by the Contractor's equipment or operations will be restored as nearly as possible to their original condition at the Contractor's expense. All scars made on trees not designated on the plans to be removed by construction operations will be coated as soon as possible with an approved tree wound dressing. Trees are to remain, either within or outside established clearing limits, that are damaged by the Contractor so as to be beyond saving in the opinion of the Contracting Officer, will be immediately removed if so directed and replaced with a nursery grown tree of the same species and size.

## PROTECTION OF WATER RESOURCES

The Contractor will control the disposal of fuels, oils, bitumens, calcium chloride, acids or harmful materials, both of and off the Government premises and will comply with applicable Federal, State, County, and Municipal laws concerning pollution of rivers and streams while performing work under this contract. Special measures will be taken to prevent chemicals, fuels, oils, greases and surface drainage from entering public waters. Water used in on-site material processing, concrete curing, foundation

and concrete cleanup, and other waste waters shall not be allowed to re-enter a stream if an increase in the turbidity of the stream could result therefrom.

**WASTE DISPOSAL**

As part of our proposed implementation under Paragraph 2, and prior to on-site construction, the Contractor will submit a description of our scheme for disposing of waste materials resulting from the work under this contract. If any waste material is dumped in unauthorized areas, the Contractor will remove the material and restore the area to the condition of the adjacent undisturbed areas. Where directed, contaminated ground shall be excavated, disposed of as approved, and replaced with suitable fill materials, all at the expense of the Contractor.

**PROTECTION OF AIR RESOURCES**

The Contractor shall keep construction activities under surveillance, management, and control to minimize pollution of air resources. All activities, equipment, processes, and work operated or performed by the Contractor in accomplishing the specified construction shall be in strict accordance with State air pollution statutes, rules, and regulations and all Federal emission and performance laws and standards. Ambient Air Quality Standards set by the U.S. Environmental Protection Agency shall be maintained for the construction operations and activities specified in accordance with Section 1A.

**PARTICULATES CONTROL**

The Contractor will maintain all excavations, stockpiles, haul roads, permanent and temporary access roads, plant sites spoil areas, borrow areas, and all other work areas free from particulates which would cause the air pollution standards to be exceeded or which would cause a hazard or nuisance to others. Sprinkling, chemical treatment of and approved type, light bituminous treatment, baghouses, scrubbers, electrostatic precipitators or other methods will be used to control particulates in the work area. Particulates Control will be performed as the work proceeds and whenever a particulate nuisance or hazard occurs.

**NOISE CONTROL**

The Contractor shall keep construction activities under surveillance and control to minimize damage to the environment by noise. The Contractor shall use methods and devices to control noise emitted by equipment to within the levels required in the "Safety and Health Requirements Manual".

# TRANSMITTAL OF SHOP DRAWINGS, EQUIPMENT DATA, MATERIAL SAMPLES, OR MANUFACTURER'S CERTIFICATES OF COMPLIANCE

*(Read instructions on the reverse side prior to initiating this form)*

DATE: 10-4-96

TRANSMITTAL NO.: 9630-002

## SECTION I - REQUEST FOR APPROVAL OF THE FOLLOWING ITEMS *(This section will be initiated by the contractor)*

TO: Melissa Gulan
U.S. Army COE - Eastern Area Office
111 Riverfront, Suite 300
Winona, MN 55987-3456

FROM: Larry W. Matteson
L.W. Matteson, Inc.
P.O. Box 667
Burlington, IA 52601-0667

CONTRACT NO.: DACW37-96-C-0030

CHECK ONE:
☒ THIS IS A NEW TRANSMITTAL
☐ THIS IS A RESUBMITTAL OF TRANSMITTAL ______

SPECIFICATION SEC. NO. (Cover only one section with each transmittal): 01130

PROJECT TITLE AND LOCATION: Grand Encampment Excavation, Mississippi River

| ITEM NO. a. | DESCRIPTION OF ITEM SUBMITTED (Type size, model number/etc.) b. | MFG OR CONTR. CAT., CURVE DRAWING OR BROCHURE NO. (See instruction no. 8) c. | NO. OF COPIES d. | CONTRACT REFERENCE DOCUMENT: SPEC. PARA. NO. e. | CONTRACT REFERENCE DOCUMENT: DRAWING SHEET NO. f. | FOR CONTRACTOR USE CODE g. | VARIATION (See instruction No. 6) h. | FOR CE USE CODE i. |
|---|---|---|---|---|---|---|---|---|
| 6 | Environmental Protection Plan | | 3 | 01130-2.1 | | | | G* |

RECEIVED
OCT 07 1996
U.S. ARMY ENGINEER DISTRICT-ST. PAUL
EASTERN AREA OFFICE

REMARKS

* Code G - Other. See attached letter dated 21 October 1996. Please resubmit this plan to this office no later than 31 October 1996.

I certify that the above submitted items have been reviewed in detail and are correct and in strict conformance with the contract drawings and specifications except as other wise stated.

[signature]
Larry W. Matteson, Vice President
NAME AND SIGNATURE OF CONTRACTOR

## SECTION II - APPROVAL ACTION

ENCLOSURES RETURNED (List by Item No.): 1-CO-E 1-Project Engineer 1-Contractor

NAME, TITLE AND SIGNATURE OF APPROVING AUTHORITY: [signature] Sharonne N. Baylor, Contracting Officer's Representative (Alternate)

DATE: 22Oct96

ENG FORM 4025, May 91 (ER 415-1-10) EDITION OF AUG 89 IS OBSOLETE. SHEET 1 OF 1 (Proponent: CEMP-CE)

1291

US ARMY CORPS OF ENGINEERS
Eastern Area Office
111 Riverfront Suite 300
Winona, Minnesota 55987

21 October 1996

L.W. Matteson, Inc.
P.O. Box 667
Burlington, Iowa 52601-0667

**Reference:** Contract # DACW37-95-C-0030
(Grand Encampment Excavation)

Dear Sir,

We have reviewed transmittal #2, Environmental Protection Plan, (EPP) for the subject project and provide the following comments:

1. The name of the person responsible for ensuring that the EPP is adhered to needs to be stated in the plan.

2. The name of the person responsible for training the contractor's environmental protection personnel needs to be stated in the plan.

3. A description of the environmental protection training program for the contractor's employees needs to outlined in the plan.

4. The EPP provides no provisions for protection of cultural resources. What procedures would the contractor follow if cultural resources are found during construction? If historical or archaeological materials are encountered, the contracting officer should be notified and all operations cease until an assessment of the resources encountered is completed.

5. A site plan or map of the project vicinity identifying the contractor's proposed access routes to the site, staging areas, storage areas, sanitary facilities, and the like was not provided in the EPP. In addition to the above required items, this map should identify any important wetland, aquatic, or terrestrial areas which are potentially affected by the contractor's facilities. Descriptions of the specific land, water, wetland, fish and wildlife, and cultural resource features (if any) requiring protection should be provided. Without this site plan, an adequate review of the EPP cannot be completed.

6. Under "Protection of Water Resources", the contractor needs to identify the specific "special measures" he will implement to prevent chemicals, fuels, oil, greases, and other surface drainage from entering public waters. If a spill occurs, what resources are available to respond and what response does the contractor propose? The EPP needs to be specific in

identifying the equipment and resources available for spill control including a description of spill response materials (absorbent pads, blankets, booms, etc.) which will be on site, and how the contractor would respond to a spill (containment and cleanup measures). Will the contractor's employees be trained in the deployment and use of spill response materials? If a spill does occur, in addition to taking appropriate containment and response measures, the contractor should immediately notify the contracting officer and the National Spill Response Center at 800-424-8802. The National Spill Response Center number should be included in the plan and readily available on-site should a spill occur. The following number should also be contacted in the event of an environmental emergency:
Minnesota Emergency Management Duty Officer 800-422-0798

7. How does the contractor propose to control effluent water generated during his hydraulic transfer operation? The EPP is lacking concerning the need for or use of drop structures, ponding areas, etc. needed to ensure turbidity standards are not violated. Will the contractor's effluent return be monitored to ensure state standards are not violated?

8. The EPP states "If any waste material is dumped in unauthorized areas, the contractor will remove the material and restore the area to the condition of the adjacent undisturbed areas". The EPP should state that the contractor will not dump in unauthorized areas. A specific landfill for disposal of unsatisfactory debris, wastes, etc. generated during construction should be identified.

9. Chemical treatment is not an environmentally acceptable method for dust control and has not been approved or permitted. Water sprinkling is the only acceptable method of dust control.

10. What procedures will be implemented to monitor and control noise? The EPP should indicate the methods which will be used to monitor noise levels emitted by construction equipment, and ensure that noise levels remain at the limits specified in EM 385-1-1, U.S. Army Corps of Engineers Safety and Health Requirements Manual.

11. On submittal form 4025, please fill in the contractor use code (column g).

Please address these comments and resubmit to this office.

Sincerely,

Sharonne N. Baylor, P.E.
Contracting Officer's
Representative (Alternate)

# L.W. MATTESON, INC.

# ENVIRONMENTAL PROTECTION PLAN

# CONTRACT NO. DACW37-96-C-0030

## GENERAL

L.W. Matteson, Inc. will perform all work in such manner as to prevent adding pollution to the air, water or land, and will within reasonable limits, control noise and the disposal of solid waste materials, as well as other pollutants.

## IMPLEMENTATION

The Contractor's Representative will be responsible for implementation of the Environmental Protection Plan and for training of the Contractor's environmental protection personnel. He will also meet with representatives of the Contracting Officer to review and alter his proposal as needed for compliance with the environmental pollution control program.

## PRECONSTRUCTION SURVEY

Prior to the start of any on-site construction activities, the Contractor and the Contracting Officer will make a joint condition survey after which the Contractor will prepare a brief report indicating on a layout plan the condition of trees, shrubs and grassed areas immediately adjacent to the site of the work and adjacent to his assigned storage area and access routes as applicable. This report will be signed by both the Contracting Officer and the Contractor upon mutual agreement as to its accuracy and completeness.

## PROTECTION OF LAND AREAS

Except for any work or storage area, and access routes specifically assigned for the use of the Contractor under this contract, the land areas outside the limits of permanent work performed under this contract will (in accordance with Section 1130, Paragraph 6.1) be preserved in their present condition. Contractor will confine the construction activities to areas defined for work on the plans or specifically assigned for our use. In accordance with Section 1130, Paragraph 6.1.6, storage and other related areas and access routes required temporarily by the Contractor in performance of the work will be assigned by the Contracting Officer. No other areas on Government premises will be used by this Contractor without written consent of the Contracting Officer.

## PROTECTION OF TREES AND SHRUBS

The Contractor will not deface, injure or destroy trees or shrubs, nor remove or cut them without special authority. No ropes, cables, or guys will be fastened to or attached to any existing trees for anchorages.

## TREE PROTECTIVE STRUCTURES

In accordance with Section ~~1A~~ 01120, Paragraph 10.1.2 7, where, in the opinion of the Contracting Officer, trees may possibly be defaced, bruised, injured, or otherwise damaged by the Contractor's equipment or by our other operations, he may direct the Contractor to provide temporary protection of such trees by placing boards, planks, or poles around them.

## RESTORATION OF DAMAGED TREES

Any trees scarred or damaged by the Contractor's equipment or operations will be restored as nearly as possible to their original condition at the Contractor's expense. All scars made on trees not designated on the plans to be removed by construction operations will be coated as soon as possible with an approved tree wound dressing. Trees are to remain, either within or outside established clearing limits, that are damaged by the Contractor so as to be beyond saving in the opinion of the Contracting Officer, will be immediately removed if so directed and replaced with a nursery grown tree of the same species and size.

## PROTECTION OF WATER RESOURCES

The Contractor will control the disposal of fuels, oils, bitumens, calcium chloride, acids or harmful materials, both of and off the Government premises and will comply with applicable Federal, State, County, and Municipal laws concerning pollution of rivers and streams while performing work under this contract. Special measures will be taken to prevent chemicals, fuels, oils, greases and surface drainage from entering public waters. Water used in on-site material processing, concrete curing, foundation and concrete cleanup, and other waste waters shall not be allowed to re-enter a stream if an increase in the turbidity of the stream could result therefrom.

## WASTE DISPOSAL

As part of our proposed implementation under Paragraph 2, and prior to on-site construction, the Contractor will submit a description of our scheme for disposing of waste materials resulting from the work under this contract. If any waste material is dumped in unauthorized areas, the Contractor will remove the material and restore the area to the condition of the adjacent undisturbed areas. Where directed, contaminated ground shall be excavated, disposed of as approved, and replaced with suitable fill materials, all at the expense of the Contractor.

## PROTECTION OF AIR RESOURCES

The Contractor shall keep construction activities under surveillance, management, and control to minimize pollution of air resources. All activities, equipment, processes, and work operated or performed by the Contractor in accomplishing the specified construction shall be in strict accordance with State air pollution statutes, rules, and regulations and all Federal emission and performance laws and standards. Ambient Air Quality Standards set by the U.S. Environmental Protection Agency shall be maintained for the construction operations and activities specified in accordance with Section 1A.

## PARTICULATES CONTROL

The Contractor will maintain all excavations, stockpiles, haul roads, permanent and temporary access roads, plant sites spoil areas, borrow areas, and all other work areas free from particulates which would cause the air pollution standards to be exceededor which would cause a hazard or nuisance to others. Approved temporary methods consisting of sprinkling, chemical treatment or similar methods will be permitted to control particulates in the work area. Particulates Control will be performed as the work proceeds and whenever a particulate nuisance or hazard occurs.