IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| L.W. MATTESON, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 01-542C<br>(Judge Lawrence J. Block) |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'**
**PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(h)(2) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully responds to Plaintiff's Proposed Findings of Uncontroverted Facts, as amended by leave of Court granted October 22, 2003, as follows:

**1. On July 10, 1996, the Corps issued an invitation for bids for a dredging project generally referred to as the Grand Encampment Excavation. (Def. Proposed Findings of Fact, ¶ 7).**

Defendant's Response**:**

Agrees to the extent supported by the referenced invitation for bids, which is the best evidence of its contents.

Revised Finding:

On July 10, 1996, the Corps issued an invitation for bids for a contract whose work would include, without limitation:

> furnishing all plant, labor, material and equipment necessary to excavate and transport existing dredged material from two borrow/stockpile areas: (1) the Alma Marina in Alma, Wisconsin; and (2) an island in the Mississippi River located upstream from Alma, Wisconsin. Such removed existing dredged material is to be disposed of in various potential on-land placement sites located in Buffalo County, Wisconsin.

Dredging was an acceptable, but not required, method of excavation. Def. App 16.

**2. The contract included dredging of the Alma Marina in Alma, Wisconsin, and an island in the Mississippi River located upstream from Alma. (Def. Proposed Findings of Fact, ¶** 7).

Defendant's Response**:**

Disagrees.

Revised Finding:

The contract included excavation of dredged material located near the Alma Marina in Alma, Wisconsin, and excavation of dredged material from an island in the Mississippi River located upstream of Alma. Def. App 16.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**3. The proposed contract was a fixed unit price contract. The government's estimate for the work was $3,307,700.00. (Matteson Claim, Def. App. 333; November 6, 1996 Memorandum, Def. App. 238-39).**

Defendant's Response:

Agrees.

**4. The contract included the disposal of the dredged material and the Corps had identified five potential disposal sites, but only required the contractor to utilize one of these sites. (Def. Proposed Findings of Fact, ¶ 11).**

Defendant's Response:

Agrees.

**5. The contract specifically allowed the contractor to utilize any suitable disposal site. (Spec. 01000-2, Def. App. 149).**

Defendant's Response:

Disagrees.

Revised Finding:

The contract provided that the contractor with an option to propose other disposal sites. However, the contract expressly provided that, prior to making use of any contractor-proposed site for performance of the contract work, the contractor was required to comply with all applicable Federal, State, and municipal laws, codes, and regulations, and to obtain approval of the proposed site by the Contracting Officer. (Spec. 01000-2, clause 7.3, Def. App. 149 & Spec. 00700-29/30, Clause 52.236-7, Def. App. 88-89).

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**6. On this project, the Corps intended for contractors to locate alternative sites and encouraged Matteson to submit a bid based on hydraulic dredging utilizing alternative sites. (Krumholz depo., Pl. App. 0008-0009; Matteson Jr. depo., Pl. App. 0066-0067).**

Defendant's Response:

Disagrees.

No evidence in the record supports this proposed finding. None of the citations provided by plaintiff, L.W. Matteson, Inc. ("Matteson"), supports this proposed finding. Daniel Krumholz did not testify that either he or the Corps encouraged Matteson to submit a bid based on hydraulic dredging. Moreover, the deposition of Larry W. Matteson ("Matteson Jr."), when read in context, does not support the proposition. Mr. Matteson testified that he was not sure who "encouraged us to pursue a disposal site and bid the job hydraulically . . . ," and when asked how the Corps allegedly encouraged Matteson to obtain a site and bid on the project, Mr. Matteson, Jr. replied, "They said locate a disposal site or multiple disposal sites, and they would come out and do prebid site investigations and let us know in their opinion if it would work." Krumholz Dep., Pl.

App. 0008-0009; Matteson Jr. Dep., Pl. App. 0066-0069.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**7. The only requirement to obtain approval of an alternative disposal site was that "a copy of each agreement between the landowner(s) and the Contractor is submitted to and approved by the Contracting Officer." (Spec. 01000-2, Def. App. 149). The specification also stated that "no disposal (placement) will be allowed in a wetland or wooded area." (Id.).**

Defendant's Response:

Disagrees.

The solicitation specifically provided as follows:

> The use of an optional final disposal area (placement site) may require the Government to prepare an environmental assessment (including a cultural resource survey). Preparation of an assessment would entail additional cost to the Government and may result in additional requirements to offset environmental impacts associated with the use of the area (site).

Def. App. 149. Moreover, in addition to approval of the contracting officer, the contractor was "responsible for obtaining any necessary licenses and permits, and for complying with any Federal, State and municipal laws, codes and regulations applicable to the performance of the work. (Spec. 01000-2, clause 7.3, Def. App. 149 & Spec. 00700-29/30, Clause 52.236-7, Def. App. 88-89).

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**8. Use of an alternative site also required the Government to have prepared an environmental assessment (including a cultural resource survey), which could result in the imposition of additional requirements to offset any environmental impacts associated with the use of the area. (Id.).**

Defendant's Response:

Agrees.

**9. The contractor was required to prepare an Environmental Protection Plan that required the contractor to identify the "[p]rocedures to be implemented to provide the required environmental protection and to comply with applicable laws and regulations." (Spec. 01130-1, Def. App. 165). The contract also required the Corps to notify the contractor of observed non-compliance with Federal, State or local laws, but also stated that the failure of the Corps to notify the Contractor of non-compliance did not relieve the contractor of the obligation to be in conformance "with those requirements." (Spec. 01130-2, Def. App. 166).**

Defendant's Response:

Agrees.

**10. Matteson submitted its Environmental Protection Plan in accordance with § 01130. (Matteson Jr. depo., Pl. App. 0081). There is no evidence indicating that Matteson's Environmental Protection Plan was inadequate or that Matteson's proposed or actual operations—including its proposed use of the Saunderson site—did not comply with all applicable environmental laws. (See November 6, 1996 Memorandum, Def. App. 238-39, noting "[t]he resource agencies . . . agree that there is no reason from a resource management perspective that the [Saunderson] site should not be used.")** .

Defendant's Response:

Disagrees.

Matteson's first Environmental Protection Plan was dated October 4, 1996. Def. Supp. App. 1291. It was reviewed by the Government on October 22, 1996, and was returned with Action Code G and comments. Id. 1291-93. Action Code G required resubmittal. Id. The Plan did not contain any reference to Matteson's proposed use of the

Saunderson Site. Id. 1294-96. Matteson's resubmitted Environmental Protection Plan was dated November 14, 1996 and it did not contain any reference to the Saunderson property. Id. 1286-90. Both Plans contained the statement "Contractor will confine the construction activities to areas defined for work on the plans or specifically assigned for our use." Id. 1289, 1294. On November 19, 2003, the Government again advised Matteson of deficiencies in Matteson's proposed Environmental Protection Plan and requested Matteson to resubmit a revised Plan. Id. 1287.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**11. In deciding whether to bid on the project, Matteson determined that the utilization of the five disposal sites identified by the Corps would require that the project be completed by mechanical dredging (i.e. backhoes, loaders and trucks). These five sites were not feasible with a hydraulic dredging method because hydraulic dredging required the running of pipes from the dredging site to the disposal sites. (Matteson Sr. depo., Pl. App. 0100; Matteson Jr. depo., Pl. App. 0061-0062, 0067-0068; see also Krumholz depo., Pl. App. 0002-0003, 0005-0006, 0008-0009; Tapp depo., Pl. App. 0129). The five identified disposal sites were too far inland and away from the project for hydraulic dredging to be feasible. (Id.).**

Defendant's Response:

Disagrees.

Hydraulic dredging using the five identified disposal sites was technically feasible. However, excavation of the sites with disposal in one or more of the five identified sites using only hydraulic excavating (dredging) techniques would not have been as cost effective as using mechanical means to excavate the sites. Pl. App. 2-3.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**12. Because hydraulic dredging was not feasible with the disposal sites identified in the contract, Matteson considered the contract to call for mechanical dredging and was not certain whether a bid based on hydraulic dredging would be considered to be responsive to the bid request. (Matteson Jr. depo., Pl. App. 0066-0067). Therefore, Matteson contacted the Corps by telephone and asked if the Corps would accept a bid based on hydraulic dredging. (Id.). In response, the Corps not only approved of Matteson's submission of a hydraulic dredging bid, but encouraged Matteson to submit such a bid as that method offered substantial potential savings over mechanical dredging. (Matteson Jr. depo., Pl. App. 0067-0069, 0071). The Corps noted to Matteson that if it located a disposal site, the Corps would come out and do a pre-bid site inspection. (Matteson Jr. depo., Pl. App. 0068-0069).**

Defendant's Response:

Agrees that Matteson contacted the Corps by telephone and asked if the Corps would accept a bid based on hydraulic dredging, that the Corps informed Matteson that the solicitation did not restrict the manner in which the work could be performed, and that the Corps would accept a bid based upon hydraulic dredging. Agrees that, if the contractors were able to locate a suitable disposal site, excavating by hydraulic means could possibly produce cost savings as compared to excavation by mechanical means. Agrees that the Corps agreed to do a pre-bid site inspection.

Disagrees with the remainder of Plaintiff's Proposed Findings of Fact number 12 for reasons stated in defendant's responses to Plaintiffs Proposed Findings of Fact numbers 6 and 11.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**13. Although the Corps normally secures the best suitable disposal sites, this contract was somewhat unique in that the Corps intended for the bidders to locate potential disposal sites and included the listed sites only as "fallback" sites. (Krumholz depo., Pl. App. 0005-0009).**

Defendant's Response:

Agrees that the Corps usually provides the best attainable disposal sites.

Disagrees that the listed sites were included "only as 'fallback' sites". One of the listed sites was a mandatory site. The Government Estimate was based on the use of the listed sites. The contract allowed, but did not require, the contractor to propose alternate disposal sites. Although the Corps hoped that contractors would be able to locate alternate, more cost effective sites, this was not a contractual requirement. The contractor was free to use the listed disposal sites as its primary disposal sites, or was free to propose alternate sites for approval. The contract made no guarantee that alternate sites were available or would be approved. The listed sites were "fallback" sites only if the contractor made a business judgment to propose alternate sites, if those sites were not approved, or otherwise were not available to the contractor, the contractor could always revert to the listed sites. Def. App. 149 & 152, Gulan Deposition, Page 14, lines 1-10, & Page 65, line 9-16.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**14. After having been informed that a bid based on hydraulic dredging would be considered responsive, Matteson decided to pursue a potential bid and began looking for disposal sites that would be suitable for hydraulic dredging. In doing so, Matteson identified three potential sites: the Saunderson property, the Braun property and the Guza property. (Matteson Jr. depo., Pl. App. 0082-0084).**

Defendant's Response:

Agrees that this is Matteson's contention.

**15. As a part of its investigation of these sites, Matteson asked the Corps to examine the sites to determine their suitability as disposal sites. (Id.).**

Defendant's Response:

Disagrees. Matteson's request for a site visit was limited to two sites, the Braun and Guza properties. Moreover, the purpose of the meeting was to allow Matteson the opportunity to have the two sites reviewed by state and Federal resource agencies to provide Matteson with a better understanding of the state and Federal approval process, as well as to provide Matteson with state and Federal agencies' preliminary concerns regarding the two sites. "It was made clear at this meeting that sites were only being inspected as a courtesy to the contractor and that no sites were approved based on this review. Def. App. 206-07, Krumholz Dep., Page 58, line 4 thru Page 60 line 12.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**16. The Corps had facilitated similar site inspections with other contractors. (Krumholz depo., Pl. App. 0014-0015). The purpose of these meetings was for the Corps "to put the contractors in touch with the officials that would be involved in reviewing and evaluating and potentially permitting a site." (Id.).**

Defendant's Response:

Agrees.

**17. In inspecting the sites, the Corps selected and invited representatives from other governmental agencies, including local officials from the Minnesota Department of Natural Resources, to also review the sites. (Matteson Jr. depo., Pl. App. 0076-0078). Matteson believed that these officials were the ones required to obtain all necessary permits and that the Corps, which was familiar with the state**

**and local permitting process, would have contacted other officials had that been required. (Matteson Jr. depo., Pl. App. 0076-0078 and Def. App. 1018-1020)**

Defendant's Response:

Agrees that the Corps invited representatives from state agencies, including a representative from the Minnesota Department of Natural Resources. Disagrees that there was any justification for the assertion that "Matteson believed that these officials were the ones required to obtain all necessary permits and that the Corps, which was familiar with state and local permitting process, would have contacted other officials had that been required." Def. App. 206-07.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**18. On August 5, 1996, Corps' officials, including Dan Krumholz, Steve Tapp and Dennis Anderson, together with the Corps' invited representatives from the U. S. Fish and Wildlife Services, the Minnesota Department of Natural Resources, and the Minnesota Pollution Control Board examined two or three sites. (Matteson Jr. depo., Pl. App. 0076-0078, 0082-0085, 0245; Matteson Jr. depo, Def. App. 1018, 1080). Matteson informed the Corps of the Saunderson site at the time that they examined the Guza and Braun sites. (Matteson Jr. depo., Pl. App. 0082-0084). The Braun site was not accessible from the roadways, and thus the officials walked on that property. (Matteson Jr. depo., Pl. App. 0084-0085). The Saunderson and Guza sites were visible from the roadway, and thus they were observed from the road. (Matteson Jr. depo., Pl. App. 0082-0086). While examining the sites, the officials indicated that both the Guza and Braun properties were acceptable but that the Braun property had some low lying areas that had to be avoided. (Matteson Jr. depo., Def. App. 1083-84; see also Diary Excerpts, Def. App. 219-22).**

Defendant's Response:

Agrees that, on August 5, 1996, Corps' officials, including Dan Krumholz, Steve Tapp and Dennis Anderson, together with the Corps' invited representatives from the U. S. Fish and Wildlife Services, the Minnesota Department of Natural Resources inspected two sites, the Braun and Guza properties. Further agrees that, while examining the sites, the officials indicated that both the Guza and Braun properties appeared to be acceptable from their viewpoints.

Disagrees with this proposed finding to the extent that a member of the Minnesota Pollution Control Board was not present. Matteson did not inform the Corps of the Saunderson site at that time, and the Saunderson site was not observed at that time. The officials did not indicate that both the Guza and Braun properties were acceptable; rather, they indicated only that from an environmental perspective the Braun and Guza sites appeared to be acceptable. In fact "[I]t was made clear at this meeting that the sites were only being inspected informally as a courtesy to the contractor and that no sites were approved based on this review. Def. App. 207; Tapp Dep. Page 49, Line 5 thru Page 50, Line 22 and Page 52, Line 14 thru Page 53, Line 16.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**19. After visiting the proposed sites, Steve Tapp, a Corps official, indicated that one site would be acceptable if a wetland area was avoided and that another site looked to be acceptable. (Matteson Jr. depo., Def. App. 1083). None of the officials present expressed any reason why any of the potential sites could not be permitted. (Matteson Jr. depo., Def. App. 1083-84).**

Defendant's Response:

Agrees that "[n]one of the officials present expressed any reason why any of the potential sites could not be permitted." However, we disagree that Steve Tapp indicated

that one site would be acceptable from the Corps' perspective if a wetland area was avoided. Mr. Tapp indicated only that the site appeared to be acceptable from an environmental perspective. Tapp Deposition Page 50, lines 14 thru 22; Def. App. 207.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**20. Matteson then obtained an option to purchase the Saunderson property to use it as a disposal site, as well as an option for an easement on the adjoining property so that Matteson could run its temporary pipelines from the river to the Saunderson property. (Matteson Sr. depo., Pl. App. 0103-0104, 0106).**

Defendant's Response:

Agrees that this is Matteson's contention.

**21. Matteson had also begun to acquire the rights necessary to access and utilize the nearby Braun site. (Matteson Sr. depo., Pl. App. 0102-0103).**

Defendant's Response:

Agrees that this is Matteson's contention.

**22. Prior to bidding on the project, Matteson contacted Dan Krumholz, the Corps' Operations Manager for the Channels and Harbors Projects, by telephone and specifically discussed the Saunderson site. (Matteson Sr. depo., Pl. App. 0109; Krumholz Daytimer Excerpt, Def. App. 204). In discussing Matteson's proposed use of the site, Mr. Krumholz expressed familiarity with the site. (Matteson Sr. depo., Pl. App. 0108-0109, 0114). Mr. Matteson Sr. and Mr. Krumholz discussed clearing trees on the property. (Matteson Sr. depo., 0111-0113). Mr. Krumholz noted that the clearing was acceptable so long as it was not being done solely for the purpose of disposing dredged material. (Id.). Mr. Krumholtz also stated that the Corps would need to perform a "cultural resources investigation" of the site and "obtain water quality certification from the MPCA for the effluent," but**

**otherwise indicated that the site would be suitable for the placement of dredged sand and gravel. (Matteson Sr. depo., Pl. App. 0113-0114).**

Defendant's Response:

Agrees that, prior to bidding on the project, Matteson contacted Dan Krumholz, the Corps' Operations Manager for the Channels and Harbors Projects, by telephone and specifically discussed the Saunderson site. (Matteson Sr. Dep., Pl. App. 0109; Krumholz Daytimer Excerpt, Def. App. 204). In discussing Matteson's proposed use of the site, Mr. Krumholz expressed familiarity with the site. (Matteson Sr. depo., Pl. App. 0108-0109, 0114). Mr. Matteson Sr. and Mr. Krumholz discussed clearing trees on the property. (Matteson Sr. depo., 0111-0113). Mr. Krumholz noted that the clearing was acceptable so long as it was not being done solely for the purpose of disposing dredged material. Id. Mr. Krumholtz also stated that the Corps would need to perform a "cultural resources investigation" of the site and "obtain water quality certification from the MPCA for the effluent."

Disagrees that Mr. Krumholz "otherwise indicated that the site would be suitable for the placement of dredged sand and gravel." Mr. Krumholz merely advised "that further evaluation would be necessary before the Corps could approve use of this site or any other contractor furnished site." Def. App. 204, 206.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**23. Matteson believed that the Corps had approved of the use of any of the three sites, including the Saunderson property, subject to any significant environmental or archeological problems with the site that might be uncovered. (Matteson Jr. depo., Pl. App. 0096-0098). Matteson, therefore, submitted its bid based on the use of the Saunderson site. (Matteson Claim, Def. App. 332; First Am. Compl. ¶¶ 7-11).**

Defendant's Response:

Agrees that Matteson contends that it based its bid upon use of the Saunderson site. Disagrees that Matteson could have reasonably believed that the Corps had approved the use of any of the three sites, particularly if Matteson had read the solicitation. Section 01000-2, Clause 7.3 of the contract specifically notified Matteson that any approval would be by the Contracting Officer, that "[a]pproval or disapproval of each proposed final disposal area (placement site) will require a minimum of 30 calendar days for review." Def. App. 149. Moreover, the Corps told Matteson "that further evaluation would be necessary before the Corps could approve use of this site or any other contractor furnished site." Def. App. 204, 206.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**24. In conducting disposal site investigations prior to bidding, the Corps expected contractors only to have satisfied themselves that "they were going to get approval to use the site." (Krumholz depo., Pl. App. 0022-0023). The Corps did not expect bidders to have actually had the reviews completed and final permits issued prior to bidding. (Krumholz depo., Pl. App. 0023). The Corps also was not asking the contractor to assume the risk that it would not be possible to secure a private disposal area. (Krumholz depo., Pl. App. 0044-0045).**

Defendant's Response:

Agrees that the Corps did not expect bidders to have the reviews completed and final permits issued prior to bidding. Disagrees with the suggestion that the purpose of conducting the site visits was to enable contractors to satisfy themselves that "they were going to get approval to use the site." To the contrary, the purpose was "to facilitate putting the contractor in touch with the agencies that are going to have an interest in what the contractor is proposing to do." Pl. App. 21-23.

We further disagree with the suggestion that, if a contractor makes a business judgment that it could secure and use a private disposal area, then the contractor would not have assumed the risk associated with that business judgment. The contract did not require the contractor to secure a private disposal area, nor did the Corps ask the contractor to secure a site. The Corps never asked the contractor to assume the risk that it would not be possible to secure a private disposal area. However, if the contractor should exercise its business judgment to attempt to secure a private disposal area, the Corps intended the contractor assume the risk of any inability to obtain any necessary permits or approvals. Pl. App. 44, 45, 59.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**25. Matteson understood that a determination was made subsequent to the submission of its bid that an environmental assessment would not be necessary. (Matteson Jr. dep., Pl. App. 0080).**

Defendant's Response:

Agrees that Mr. Matteson, Jr. made this contention as to Matteson's understanding. Disagrees that the Corps had made any determination as to whether an environmental assessment would be necessary.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**26. The Corps later confirmed that the site was suitable and noted in a memorandum that "resource agencies . . . agreed that there is no reason from a resource management perspective that the site should not be used." (November 6, 1996 Memorandum, Def. App. 238-239).**

Defendant's Response:

Agrees that the Corps "noted in a memorandum that "resource agencies . . . agreed that there is no reason from a resource management perspective that the site should not be used." Disagrees that the Corps confirmed that the site was suitable, or that the site was ever submitted for approval by the Contracting officer or had been approved by the Corps.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**27. The bids were opened on August 29, 1996. Matteson's bid of $1,693,000 was the lowest bid. (Def. Proposed Findings of Uncontroverted Fact, ¶ 29).**

Defendant's Response:

Agrees.

**28. Matteson's initiative in using hydraulic dredging and locating an alternative disposal site resulted in a savings of $1.6 million over the government's estimate. (November 6, 1996 Memorandum, Def. App. 238-239).**

Defendant's Response:

Disagrees. That Matteson's bid was approximately $1.6 million less than the Government's estimate does not produce a "savings" to the Government. The difference between Matteson's bid and the second lowest bid was $ 502,000, and the difference between Matteson's bid and the third lowest bid was $1,126,000. Def. App. 334.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**29. The next lowest bidder, J.F. Brennan Co., Inc., also bid the project based on utilizing hydraulic dredging and an alternative disposal site. (Matteson Jr. dep., Def. App. 1057). The bids of both Matteson and J. F. Brennan were**

**substantially less than the bids of the contractors that bid the contract based on performing the work with mechanical dredging. (Matteson Jr. depo., Def. App. 1057; see also July 31, 2000 Letter, Def. App. 335).**

Defendant's Response:

Agrees that J.F. Brennan Co., Inc. was the next lowest bidder. Disagrees with the remainder of this proposed finding for lack of support. The deposition testimony of Mr. Matteson Jr. and Matteson's certified claim are both inadmissible hearsay for purposes of this proposed finding.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**30. In a letter dated August 29, 1996, the Corps requested Matteson to submit by September 4, 1996, verification that its bid price of $1,693,000 was accurate and complete. (August 29, 1996 Letter, Def. App. 329-330). Larry Matteson Jr. reviewed Matteson's bid and determined that it was similar to the next lowest bid, which had also been submitted on the basis of performing hydraulic dredging rather than mechanical. (Matteson Jr. depo., Def. App. 1057) As required by the Corps, Matteson verified that its bid was accurate on September 4, 1996. (September 4, 1996 Letter, Def. App. 331).**

Defendant's Response:

Agrees that, in a letter dated August 29, 1996, the Corps requested Matteson to submit, by September 4, 1996, verification that its bid price of $1,693,000 was accurate and complete. (August 29, 1996 letter, Def. App. 329-330). Further agrees that Mr. Matteson Jr. reviewed Matteson's bid and that he contends that he determined that it was similar to the next lowest bid.

Disagrees that the Corps required Matteson to verify its bid. After reviewing the bid as requested by the Corps, Matteson could have alleged a mistake in its bid. (August

29, 1996 Letter, Def. App.329, 330).

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**31. At some point in September, 1996, Matteson contacted Wabasha County concerning renewing a permit to continue the ongoing clearance of trees from the Saunderson property. (Matteson Sr. depo., Pl. App. 0119-0120). The issue of any permits concerning the Shoreland Protection Act was not raised by the County at that time. (Matteson Sr. depo., Pl. App. 0120). The permit for clearing the wood was different from the other permit that the County subsequently required under the Shoreland Protection Act. (Matteson Sr. depo., Pl. App. 0117).**

Defendant's Response:

Agrees that this is Matteson's contention.

**32. On September 18, 1996—after Matteson had verified its bid, but prior to the award of the contract—the Corps was informed by Wabasha County "that homeowners downstream of Wabasha [were] concerned about dredged material being placed in the vicinity" and that Wabasha County believed that the Shoreline Protection Act was applicable to and would prohibit the running of temporary dredge pipes to reach the Saunderson property. (Tapp depo., Pl. App. 0130-0132; Nordstrom depo., Pl. App. 0197-0199; Diary Excerpts, Def. App. 219-22).**

Defendant's Response:

Agrees that Wabasha County informed the Corps on September 18, 1996 "that homeowners downstream of Wabasha [were] concerned about dredged material being placed in the vicinity and that" Jim Nordstrom indicated "that the Shoreline Protection Act was applicable to . . . the Saunderson property." Disagrees that: "Wabasha County believed that the Shoreline Protection Act ... would prohibit the running of temporary dredge pipes to reach the Saunderson property." Def. App. 221.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**33. The Shoreland Protection Act is a statewide act that all counties are required to adopt. (Nordstrom depo., Pl. App. 0151). The form of the ordinance is mandated by the Minnesota Department of Natural Resources, and its compliance is administered by the Minnesota DNR. (Id.; see also Wabasha County Zoning Ordinances, Article 13, Section 17 at Pl. App. 0242**)

Defendant's Response:

Agrees that "[t]he Shoreland Protection Act is a statewide act."

Revised Finding:

The Shoreland Protection Act states, among other things: "The commissioner shall adapt the model ordinance to a county if, after notice and hearing as provided in section 103G.311, the commissioner finds that a county has failed to adopt a shoreland conservation ordinance or that a county has adopted a shoreland conservation ordinance that fails to meet the minimum standards established under section 103F.211." (The term commissioner refers to the commissioner of natural resource.) Minn. Stat. § 103F.211.

**34. The Shoreland Protection Act was widely known in the counties with river shorelines. (Nordstrom depo., Pl. App. 0144).**

Defendant's Response:

Disagrees for lack of support. Mr. Nordstrom is only one person. His testimony -- "I would say that it's very well-known in the area of Wabasha, Lake City, and what's called Greenfield Township, and those are all communities or areas that are adjacent to the Mississippi River" -- lacks any probative value, as it constitutes inadmissible opinion testimony and inadmissible hearsay.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**35. Krumholz and other Corps officials routinely appeared at local meetings at which the Shoreland Protection Act was discussed. (Nordstrom depo., Pl. App. 0180-0182, 0200-0201).**

Defendant's Response:

Disagrees. Mr. Nordstrom's testimony constitutes inadmissible hearsay. See also Krumholz Dep. Page 120, Line 14 thru Page 122, Line 18, Def. Supp. App. 1280-83.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**36. There have been numerous disputes between localities and the Corps as to whether the Corps was required to comply with local permit requirements under the Shoreland Protection Act and other local ordinances. (Nordstrom depo., Pl. App. 0152-0155, 0156-0159, 0165-0170, 0172-0173, 0209, 0213-0215, 0226).**

Defendant's Response:

Disagrees. To the extent, if any, that Mr. Nordstrom's testimony would be admissible, he in fact testified as follows:

> Q: So is my understanding correct that when you refer to 'dealings with the Corps over a number of years on similar issues,' you're referring to a few projects, three or four projects that occurred in the early 1980's and this particular project that occurred in 1996?
>
> A: Officially, yes, in my official capacity as either City Attorney or County Attorney.

Pl. App. 162. Moreover there were no disputes. Once the local authorities were informed that the United States had not waived its sovereign immunity with respect to the ordinance the local authorities concurred. Pl.App. 145.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**37. As far back as 1983, the Corps has been involved in disputes with local entities concerning the Corps' compliance with the Shoreland Protection Act. (Nordstrom depo., Pl. App. 0138, 0152-0155, 0156-0159; June 15, 1983 Letter at Pl. App. 0233).**

Defendant's Response:

Disagrees. To the extent, if any, that Mr. Nordstrom's testimony would be admissible, he, in fact, testified that, after the Corps advised local authorities that the United States had not waived its sovereign immunity with respect to the ordinance at issue, the local authorities concurred. Pl. App. 145.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**38. In 1987, the Corps was informed of one municipality's opinion that the Shoreland Protection Act applied to the placement of temporary dredge pipes on shoreland areas. (Nordstrom depo., Pl. App. 0213-0215, 0225-0226; August 19, 1987 Letter, Pl. App. 0234).**

Defendant's Response:

Agrees.

**39. The Corps has consistently taken the position that it is not subject to local permitting requirements on property owned by or leased by the Federal government, or when the work is being performed by the Federal government. (Krumholz depo., Pl. App. 0052-0053; Nordstrom depo., Pl. App. 0156-0159, 0165-0169, 0209).**

Defendant's Response:

Disagrees. The Corps' position is that, absent a waiver of sovereign immunity (by an Act of Congress), it is not subject to local permitting requirements regarding property

owned by or leased by the Federal Government, or when the work is being performed by the Federal Government.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**40. Although the Shoreland Protection Act and related local ordinances are published, there is no published decision interpreting the Act to apply to temporary dredge pipes running across the shoreland protection zone. (Nordstrom depo., Pl. App. 0151, 0206-0207).**

Defendant's Response:

Agrees that, at all times, the Corps was unaware of any "published decision" as described in this proposed finding. However, this proposed finding is irrelevant to any matter at issue in this litigation.

**41. By using the Shoreland Protection Act, Wabasha County could effectively prohibit dredge disposal anywhere—even on inland sites beyond the 1,000 foot protection zone—by prohibiting the running of the temporary pipes from the river. The County's position also would have precluded Matteson from use of the alternative Braun property or any other site that had to be accessed over private property. (Matteson Sr. depo., Pl. App. 0126-0127; Nordstrom depo., Pl. App. 0222).**

Defendant's Response:

Disagrees. Nothing in the Shoreland Protection Act prohibits mechanical deposition of dredge material on inland sites (for example, by trucks). The County's position with respect to the use of the alternative Braun property or any other site that had to be accessed over private property, other than the Saunderson property, is unknown because Matteson did not file permit applications for those properties.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**42. Although the Corps gave Matteson's telephone number to the Wabasha County Attorney, Matteson received no communication from Wabasha County officials prior to the award of the contract. (Matteson Sr. depo., Pl. App. 0116).**

Defendant's Response:

Disagrees for lack of support in the record. No evidence in the record suggests that Matteson had not communicated with any Wabasha County official at any time prior to award of the contract. However, we currently do not contend that Mr. Nordstrom communicated with Matteson during the period September 18, 1996 thru September 20, 1996. Further, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**43. On September 20, 1996, after having received information from Wabasha County concerning potential problems in utilizing the Saunderson site, including opposition to the use of the site, the Corps awarded the contract to Matteson. (Pl. Response to Def. Proposed Findings of Uncontroverted Facts and Statement of Disputed Issues, ¶ 31; Def. Proposed Findings of Uncontroverted Fact, ¶ 31).**

Defendant's Response:

Agrees that the contract was awarded on September 20, 1996, after the County Attorney had advised Mr. Krumholz that "homeowners downstream of Wabasha are concerned about dredged material to be placed in the vicinity" and that the County Attorney "thinks it falls under their Shoreline ordinance."

Disagrees that Wabasha County informed Mr. Krumholz that there were" potential problems in utilizing the Saunderson site, including opposition to the use of the site." Def. App. 221.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**44. After the contract was awarded, Matteson first became aware of Wabasha County's position that it was applying the Shoreland Protection Act to require Matteson to obtain a permit to run temporary pipes across the shoreland protection zone when Matteson received a letter from the County dated September 24, 1996. (Matteson Sr. depo., Pl. App. 0117-0118; September 24, 1996 Letter, Pl. App. 0242-0243).**

Defendant's Response:

Agrees that this is Matteson's contention.

**45. On October 2, 1996, after Matteson was informed of Wabasha County's position that the Shoreland Protection Act required permission from the County to run temporary dredge pipes across the river shoreline, Matteson submitted an application for a land use permit. (Application for Land Use Permit, Def. App. 230-37).**

Defendant's Response:

Agrees that this is Matteson's contention.

**46. Even after Matteson became aware of the County's intention to apply the Shoreland Protection Act to require Matteson to obtain a permit to run its dredging pipes, Matteson did not become concerned about obtaining a permit because it was not aware of the intensity and breadth of the community's opposition to the Corps' dredging activities. (Matteson Sr. depo., Pl. App. 0121-0125; see also Nordstrom depo., Pl. App. 0186-0187).**

Defendant's Response:

Agrees that Matteson concedes, in a binding admission against interest, that "[e]ven after Matteson became aware of the County's intention to apply the Shoreland

Protection Act to require Matteson to obtain a permit to run its dredging pipes, Matteson did not become concerned about obtaining a permit."

Disagrees that Matteson "was not aware of the intensity and breadth of the community's opposition to the Corps' dredging activities." Matteson was aware of local opposition before bidding on the contract. Although local opposition was sufficient to prevent Matteson from obtaining a permit for the Saunderson site, the record is devoid of any evidence whether the opposition of which Matteson admits it was aware would have been sufficient to prevent Matteson from obtaining the permit. Matteson may well have been aware of the level of opposition, but underestimated the effectiveness of that level of opposition. Def. App. 1197-201.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**47. Significant community opposition to the Corps' dredging activities dates back to the 1980s. (Nordstrom depo., Pl. App. 0141-0143, 0162-0163, 0183-0184, 0204-0205, 0208). There had been numerous meetings and letters written, by which the Corps would have been familiar with the degree of opposition. (Nordstrom depo., Pl. App. 0184, 0204-0205).**

Defendant's Response:

Disagrees. There is no admissible evidence in the record to support a contention that the Corps had "prior knowledge of strong local opposition to dredge material placement." Def. App. 207.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**48. Matteson was not aware of the degree of community opposition to the Corps' dredging projects. (Matteson Jr. depo., Pl. App. 0091-0092).**

Defendant's Response:

Disagrees. Matteson was aware of local opposition before bidding on the contract. Although local opposition was sufficient to prevent Matteson from obtaining a permit for the Saunderson site, the record is devoid of any evidence whether the opposition of which Matteson admits it was aware would have been sufficient to prevent Matteson from obtaining the permit. Matteson may well have been aware of the level of opposition, but underestimated the effectiveness of that level of opposition. Def. App. 1197-201.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**49. Although Matteson had been aware of some isolated complaints concerning individuals on previous projects, and was aware of some "rumblings" about blowing sand, Matteson was not aware of the breadth and degree of community opposition to the Corps' dredging projects. (Matteson Jr. depo., Pl. App. 0090-0092). The issue concerning blowing sand did not concern Matteson's work. (Matteson Sr., Def. App. 1199-1200). Matteson also had some discussions concerning wells and septic tanks, but understood that monitoring on previous projects indicated no impact. (Matteson Sr., Def. App. 1198-99). There was an isolated complaint made concerning a noise from a booster station and a dispute with a landowner concerning temporary pipes running across his property. (Matteson Sr., Def. App. 1200-07). These isolated complaints were resolved to the satisfaction of the individuals involved. (Id.)**

Defendant's Response:

Agrees that "Matteson had been aware of . . . complaints concerning individuals on previous projects, and was aware of some "rumblings" about blowing sand, . . . ." Further agrees that "Matteson also had some discussions concerning wells and septic

tanks, but understood that monitoring on previous projects indicated no impact. . . .," and that Matteson was aware that "[t]here was an isolated complaint made concerning a noise from a booster station and a dispute with a landowner concerning temporary pipes running across his property."

Disagrees that "Matteson was not aware of the breadth and degree of community opposition to the Corps' dredging projects." Matteson was aware of local opposition before bidding on the contract. Although local opposition was sufficient to prevent Matteson from obtaining a permit for the Saunderson site, the record is devoid of any evidence whether the opposition of which Matteson admits it was aware would have been sufficient to prevent Matteson from obtaining the permit. Matteson may well have been aware of the level of opposition, but underestimated the effectiveness of that level of opposition. Def. App. 1197-201.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**50. Not until Matteson personnel began attending meetings concerning its permit application did Matteson discover that the opposition to the Corps' dredging projects was "very violent and very outspoken." (Matteson Sr. depo., Pl. App. 0123-0124). The opposition of the community in this case did not concern opposition by private landowners concerning the running of temporary pipelines over their property. Rather, the opposition was to the disposal of dredged material anywhere in the vicinity of the project and was due to the Corps' prior performance. (Matteson Sr. depo., Pl. App. 0123-0125; Matteson Jr. depo., Pl. App. 0090-0092; see also Nordstrom depo., Pl. App. 0141-0143, 0162-0163, 0183-0184, 0204-0205, 0208). Community opposition to disposal of any dredged material was so significant that the County even considered enacting a moratorium on the disposal of any dredged material anywhere in Wabasha County. (Nordstrom depo., Pl. App. 0218-0219).**

Defendant's Response:

Agrees that community opposition to disposal of any dredged material was significant and that the County considered enacting a moratorium upon the disposal of any dredged material anywhere in Wabasha County. Disagrees with the remainder of the proposed finding. Matteson was aware of local opposition before bidding on the contract. Although local opposition was sufficient to prevent Matteson from obtaining a permit for the Saunderson site, the record is devoid of any evidence whether the opposition of which Matteson admits it was aware would have been sufficient to prevent Matteson from obtaining the permit. Matteson may well have been aware of the level of opposition, but underestimated the effectiveness of that level of opposition. Def. App. 1197-201.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**51. Due to community opposition based on complaints concerning the Corps' performance on other projects, Wabasha County refused to issue a permit for disposal on the Saunderson property. (Matteson's Claim, Def. App. 334; First Am. Compl. ¶¶ 17).**

Defendant's Response:

Agrees that Wabasha County refused to issue a permit for disposal on the Saunderson property. There is no probative evidence in the record to establish that complaints were the result of (poor) performance by the Corps on other projects.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**52. The Corps did not consider purchasing or leasing the property to be able to utilize the Saunderson site and circumvent Wabasha County permitting requirements based on its sovereign immunity. (Krumholz depo., Pl. App. 0054;**

**Gulan depo., Pl. App. 0134-0135, 0136; April 27, 1998 Memorandum at Pl. App. 0227-0228).**

Defendant's Response:

Agrees.

**53. Once it became apparent that Wabasha County would not approve of any disposal site, Matteson attempted to locate another site that would not be subject to County approval. Matteson located and obtained the rights to utilize a site that was owned by the United States Fish & Wildlife Services that was not subject to Minnesota or Wabasha County jurisdiction. (Matteson Claim, Def. App. 335).**

Defendant's Response:

Agrees.

**54. The Fish & Wildlife Services' site, however, was not in the vicinity of the project and thus required Matteson to pump dredged material a considerably greater distance. (Matteson Claim, Def. App. 335). Use of the Saunderson property would have required Matteson to pump dredge material 9,000 feet. (Id.). The U.S. Fish and Wildlife Services' parcel required Matteson to pump dredge material over 26,000 feet. (Id.).**

Defendant's Response:

Agrees that the Fish & Wildlife Services' site was farther from the excavation site than the Saunderson property and that, based upon Matteson's considered business judgment to use hydraulic dredging as its means of excavating, use of the Fish & Wildlife versus the Saunderson site meant that Matteson pumped dredged material a greater distance. Def. App. 335. We further agree that, based upon Matteson's considered business judgment to use hydraulic dredging as its means of excavating, use of the Saunderson property involved pumping dredge material 9,000 feet. Id. Because Matteson made a considered business decision to use hydraulic dredging as its means of excavating,

use of the Fish and Wildlife Service's parcel involved pumping dredge material over 26,000 feet.

Disagrees with any suggestion that Matteson was in any way required to employ hydraulic dredging techniques to excavate the project sites.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**55. At this distance, Matteson was required to utilize pumps and other additional equipment that would not have been required for the Saunderson property. (Matteson Claim, Def. App. 335). Matteson's production also decreased due to the greater distance. (Id.). In addition, Matteson was required to spend additional sums to acquire other property to trade for the U.S. Fish & Wildlife Services' property. (Id.).**

Defendant's Response:

Agrees that, based upon Matteson's considered business judgment to use hydraulic dredging as its means of excavating and to use the Fish & Wildlife site, it chose to use pumps and other additional equipment that it might not have used had it not failed to obtain local approval to use the Saunderson property. Further agrees that Matteson spent sums to acquire other property to trade for the Fish & Wildlife Service's property. We disagree that Matteson was required to use the Fish & Wildlife property, or that it was required to spend additional sums to acquire other property. Rather, the Fish & Wildlife Service, as a condition for use of its property as a disposal site, required Matteson to provide it with additional property. There is no evidence in the record as to what Matteson's production would have been at the Saunderson site as opposed to the Fish & Wildlife site.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**56. On July 31, 2000, Matteson submitted its certified claim for equitable adjustment. (Matteson Claim, Def. App. 332-38). Matteson sought a total of $1,111,227.51 in additional compensation for the extra expenses incurred as the result of its inability to dispose of dredge material in the vicinity of the project, as it had bid the work. (Matteson Claim, Def. App. 338).**

Defendant's Response:

Agrees that, on July 31, 2000, Matteson submitted its certified claim for equitable adjustment. (Matteson Claim, Def. App. 332-38). Matteson sought a total of $1,111,227.51 in compensation for allegedly extra expenses incurred as the result of its failure to dispose of dredge material in the vicinity of the project.

Disagrees with any suggestion that Matteson's bid was in any way conditioned upon use of the Saunderson site as a disposal area, or upon being able to perform the work via hydraulic dredging means.

However, to the extent that we disagree with this proposed finding, our disagreement does not give rise to a genuine issue of fact for purposes of RCFC 56.

**57. The contracting officer denied Matteson's claim on November 17, 2000. (November 17, 2000 Letter, Def. App. 399-419).**

Defendant's Response:

Agrees.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/David M. Cohen
DAVID M. COHEN
Director

s/Patricia M. McCarthy
PATRICIA M. McCARTHY
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 307–0164
Fax: (202) 514-8640

OF COUNSEL:
EDWIN C. BANKSTON
District Counsel
Army Corps of Engineers
Saint Paul, MN 55101

NOVEMBER 14, 2003

Attorneys for Defendant