# In The United States Court of Federal Claims

**No: 01-542C**
July 20, 2004

---

**L.W. MATTESON, INC.,**
***Plaintiff*,**

**v.**

**THE UNITED STATES,**
***Defendant*.**

---

Summary Judgment; Breach of Contract; Superior Knowledge Doctrine; Cardinal Change; Commercial Impracticability; Mutual Mistake

*Stephen R. Miller*, Miller Law Firm, Kansas City, Missouri, argued for the plaintiff.

*Patricia M. McCarthy*, Commercial Litigation Branch, Civil Division, United States Department of Justice, argued for the defendant.

## OPINION AND ORDER

**Block, *Judge.***

## I. Introduction

This case involves a breach of a fixed-price dredging contract that required the dredging, transporting, and depositing of material from two stockpile areas located near Alma, Wisconsin. Before this court is the government's motion for summary judgment pursuant to Rule 56 of the Rules of the Court of Federal Claims ("RCFC").

The two parties to the contract are plaintiff, L.W. Matteson, Inc. ("Matteson"), an experienced government contractor and established hydraulic dredging company, and the U.S. Army Corps of Engineers ("the Corps"). The contract required Matteson to deposit fill material in two separate areas, one of which was specified and, thus, mandatory. After filling the mandatory site, the contract provided that Matteson could transport the remaining fill material either to one of the Corps' previously-selected areas or to private property that Matteson selected. Before Matteson could use the private site, however, the Corps needed to approve the site and the requisite permits needed to be obtained. The contract also required the Corps to perform an environmental assessment if Matteson chose private property as a filling site.

In essence, the overarching issue in this case is one of contract interpretation, which requires the court to determine which of the parties bore the burdens and consequent risks of obtaining and complying with permitting requirements. While both sides agree the contract contains clauses that obligate the contractor to comply with all federal, state, and local laws (including, of course,

regulatory requirements), Matteson contends the contract also contains other provisions that conflict with and supersede these clauses. These other provisions, Matteson asserts, resulted in the obligation of the Corps to inform Matteson not only of the existence of the Wabasha County Shoreline Protection Act ("SPA"), but also the vociferous local opposition in the County to any dredging. Matteson argues that the Corps' failure to fulfil these obligations caused Matteson to lose a considerable amount of money while performing the contract because it could not use its proposed site on private property for disposing dredged material.

Before this court are Matteson's multiple claims for relief based on various theories. Their resolutions, however, are all linked to the singular issue of which party under the contract bore the burden of compliance. As the court fully explains below, because the contract is unambiguous in this regard and the burden of compliance clearly fell on Matteson, the court grants summary judgment in favor of the government.

## II. Background

The facts of this case derive from the parties' pleadings and proposed findings of uncontroverted facts ("PFUF").

A. <u>The Grand Encampment Excavation Solicitation</u>.

On July 10, 1996, the Corps issued an invitation for bids for a fixed-price contract to perform the following work:

> [furnish] all plant, labor, material, and equipment necessary to excavate and transport existing dredged material from two stockpile/borrow areas: (1) the Alma Marina in Alma, Wisconsin; and (2) an island in the Mississippi River located upstream from Alma, Wisconsin. Such removed existing dredged material is to be disposed of in various potential on-land placement sites located in Buffalo County [Wisconsin].

Pl.'s First Am. Compl. ¶ 1; Def.'s PFUF ¶ 7 (citing Def.'s App. at 15).

The Corps referred to this project as the "Grand Encampment Excavation," ("GEE") and incorporated various Federal Acquisition Regulation ("FAR") sections into the solicitation.[1] The solicitation also identified sections tailored to the GEE project that addressed topics such as available lands for the contractor's use, contractor-selected disposal areas, construction restrictions and compliance with federal, state, and local environmental protection laws and regulations. Def.'s PFUF ¶ 3 (citing Def.'s App. at 148-51, 166).

---

[1] These FAR sections included 52.252-1, SOLICITATION PROVISIONS INCORPORATED BY REFERENCE; 52.236.2, DIFFERING SITE CONDITIONS; 52.236-3, SITE INVESTIGATIONS AND CONDITIONS AFFECTING THE WORK; 52.214-6 EXPLANATION TO PROSPECTIVE BIDDERS; and 52.236-7, PERMITS AND RESPONSIBILITIES. Def.'s App. at 18-20; 55-60. *See id*. for a complete listing of all sections listed in the GEE solicitation.

The solicitation required the contractor to dispose dredged material in the "Buffalo County No. 1 Placement Site." Def.'s App. at 151-52. After filling the mandatory site, however, the contractor could, if necessary, make use of any one of five other sites the Corps previously selected, or any of the contractor's own selected disposal areas. *Id*. at 149. The solicitation stated plainly, however, that any contractor-selected disposal areas would be subject to the Contracting Officer's approval and may require an environmental assessment. *Id*.

The following provisions give rise to the controversy in this case. One provision required potential contractors to submit an Environmental Protection Plan ("EPP") that outlined the particular contractor's method for reducing pollution, protecting natural resources while performing contracted work, and "[p]rocedures to be implemented to provide the required environmental protection and to comply with the applicable laws and regulations." *Id*. at 165. Another held contractors responsible for their subcontractors' compliance with the overall EPP, as well as federal, state, and local environmental laws and regulations. *Id*. at 166.

Yet another provision expressly placed contractors on notice that they could not rely on the Corps to advise them of any noncompliance with local environmental regulations.[2] Another important provision of the solicitation explicitly warned all contractors that, "[n]ot withstanding [sic] the requirements of this section and not withstanding [sic] approval by the Contracting Officer of the Contractor's Environmental Protection Plan, nothing herein shall be construed as relieving the Contractor of all applicable Federal, State, and local environmental protection laws and regulations." *Id*. Very important to this case, furthermore, is the provision of the solicitation that obligated the contractor, without additional expenses to the government, to obtain all necessary permits and to comply with any federal, state, local laws, codes, and regulations applicable to the performance of the work. *Id*. at 88.

Finally, and perhaps the critical provision, the "Placement Site Paragraph" of the contract – Paragraph 7.3, Section 01000 – provides that the contractor may dispose of dredged material on private property upon approval by the Corps. The Placement Site Paragraph, furthermore, notified the contractor that choosing an optional final disposal area may require the Corps to prepare an environmental assessment. *Id*. at 149. This environmental assessment, in turn, may result in additional requirements to offset any environmental impact from the use of the private disposal area. *Id*.

B. L.W. Matteson, Inc.

L.W. Matteson, Inc. ("Matteson"), an experienced government contractor and established hydraulic dredging company, contacted the Corps during the bid period and inquired as to whether the contract permitted hydraulic dredging. The Corps responded affirmatively to Matteson's inquiry,

---

[2] "The Contracting Officer will notify the Contractor in writing of observed noncompliance with the Federal, State, or local laws, regulations, permits, and elements of the Contractor's Environmental Protection Plan . . . . Failure of the Contracting Officer to notify the Contractor of any noncompliance with Federal, State, or local laws or regulations does not relieve the Contractor of the obligation to be in conformance with those requirements." Def.'s App. at 166, ¶ 5.

and encouraged Matteson to submit a bid incorporating hydraulic dredging. Pl.'s First Am. Compl. at ¶¶ 4-7. While crafting its bid, however, Matteson determined that the Corps' five proposed disposal sites were incompatible with hydraulic dredging. *Id.* As a result, Matteson selected a number of possible disposal or placement sites for the dredged material. *Id.*

On August 5, 1996, prior to submitting its bid, Larry W. Matteson, Jr. ("Matteson, Jr."), Vice President and Secretary of Matteson, met with officials from the Corps, the U.S. Fish and Wildlife Service, and the Minnesota Department of Natural Resources[3] to inspect two potential disposal sites in Wabasha County, Minnesota that Matteson selected for dredging disposal.[4] *Id.* at ¶¶ 7-8. Matteson contends that the Corps invited the other officials as a way to put Matteson in contact with the individuals involved in the approval process of a disposal site. Pl.'s App. at 14-15. After examining both the Guza and Braun properties, the officials indicated that both sites were acceptable from an environmental perspective. Def.'s App. at 207.

During the parties' physical inspection of the Braun property, Matteson Jr. directed the officials' attention to another potential disposal site across the road (the "Saunderson" property). Pl.'s PFUF ¶ 21; Pl.'s App at 83; *see* Def.'s App. at 1082-83. Although they did not physically walk on the Saunderson property, Matteson, Jr. notified the officials that Matteson would consider Saunderson on its list of potential disposal sites. Without an official physical inspection of the property, however, Matteson contacted the Saunderson property owner and negotiated an option to purchase the property, as well as an option for an easement on the adjoining property so Matteson could run its temporary dredging pipes from the nearby river to Saunderson. Pl.'s App. at 103-4, 106.[5]

On August 26, 1996, the Corps opened bids for the GEE project. The Corps notified Matteson that it emerged as the lowest bidder among six total bidders, and asked Matteson to verify the accuracy and completeness of its $1,693,000 bid. Def.'s App. at 329-30. Matteson, Jr. reviewed Matteson's bid and advised the Corps, in a letter dated September 4, 1996, that its bid was accurate and conformed to the terms of the solicitation. Def.'s App. at 331. On September 20, 1996, the Corps awarded the GEE contract to Matteson. Pl.'s First Am. Compl. at 3, ¶ 15.

---

[3] The officials from the Corps included Mr. Dan Krumholz ("Krumholz"), Mr. Steve Tapp ("Tapp"), and Mr. Dennis Anderson ("Anderson"); Mr. Bob Drieslein ("Drieslein") represented the Fish and Wildlife service; and Mr. Nick Gulden ("Gulden") acted on behalf of the Minnesota Department of Natural Resources. Pl.'s First Am. Compl. at ¶¶ 7-8.

[4] Matteson refers to these sites the "Guza" and "Braun" properties. Pl.'s PFUF ¶ 21; Pl.'s App at 83; *see* Def.'s App. at 1082-83.

[5] Although the parties did not physically inspect Saunderson, Matteson contends it specifically discussed the property with Mr. Krumholz. Mr. Krumholz informed Matteson the Corps would need to perform further environmental investigations and certifications if Matteson wanted to use Saunderson as a disposal site. Pl.'s App. at 113-14.

C. Wabasha County Steps In.

On September 18, 1996, after Matteson verified its bid, but before the Corps awarded the GEE contract, Wabasha County ("County") officials notified the Corps of two important local developments. First, County officials indicated that homeowners downstream of the County expressed concern over Matteson disposing of dredged material in their vicinity. Pl.'s App. at 131. Second, County officials believed the Wabasha SPA[6] applied to Matteson's work under the contract, and would prohibit Matteson from disposing dredged material within 1,000 feet of the Mississippi River. Def.'s App. at 221. With this information in hand, it is uncontroverted that the Corps provided the County with Matteson's phone number so that the County could communicate directly with Matteson regarding these two issues. *Id.*

It was only several days later, on September 24, 1996, that Matteson received a letter from the County informing Matteson that "pursuant to Minn. Stat. § 103G.005 *et seq*. the County controlled the use of any property within a 'shoreland protection zone' which estimates '1,000 feet from the ordinary high water level' of the Mississippi River." Def.'s App. at 334. Approximately 25% of Matteson's proposed work was in this zone. *Id.* The County also informed Matteson that the SPA may apply to the temporary dredging pipes Matteson intended to use to transport dredged material to Saunderson. Pl.'s App. at 243. Nevertheless, Mr. Larry W. Matteson, Sr. ("Matteson, Sr."), President of Matteson, did not view the County's positions as a serious impediment because he felt Matteson could still perform the GEE contract with a conditional use permit. Pl.'s App. at 121-25. As a result, Matteson submitted an application to the County on October 2, 1996 for a land use permit for its temporary dredging pipes. *See* Def.'s App. at 230-37.

Soon after filing this application, Matteson's representatives attended County meetings

---

[6] The Wabasha County Shoreland Protection Act is the local version of Minnesota's statewide waterway protection act, MINN. STAT. ANN. § 103G.005, *et seq*. (West 2004). The County adopted this ordinance "pursuant to the authorization and policies contained in Minnesota Statutes, Chapter 103F.201, Minnesota Regulations, Parts 6120.2500-6120.3900, and the county planning and zoning enabling legislation, Minnesota Statutes, Chapter 394." WABASHA COUNTY, MINN., ZONING ORDINANCE, art.13, § 2 (2001). While Article 13 of the County's Zoning Ordinance lists the regulations governing local uses of shorelands, the County used the following definition of "shoreland" while enforcing its SPA:

> Land located within the following distances from public waters: One thousand (1,000) feet from the ordinary high water level of a lake, pond, or flowage, and three hundred (300) feet from a river or stream or the landward extent of a floodplain designated by Ordinance on a river or stream, whichever is greater.

WABASHA COUNTY, MINN., ZONING ORDINANCE, art.2, subd. 120 (2001).

This definition mirrors the definition of a "shoreland wetland protection zone" found at MINN. STAT. ANN. § 103G.005, Subd. 15b (West 2004).

concerning their request for a conditional use permit. At these meetings, Matteson claims its representatives confronted a tidal wave of community opposition against the GEE project. Pl.'s App. at 90-92; 123-24. While Matteson knew of isolated complaints regarding previous projects and "rumblings" about blowing sand, it maintains it attached little concern to those grievances because they did not relate to the type of work required under the GEE contract. *Id*. at 90-92; 1190-1207. At the County meetings, however, the residents' opposition to Matteson's work was so "violent and outspoken," according to Matteson, that the County considered enacting a moratorium on dredging disposal anywhere in the County. *Id*. at 123-24; 218-19. Matteson claims it was because of this level of community opposition that the County refused to approve Matteson's application for a conditional use permit for its dredging pipes. Def.'s App at 334.

D. Matteson's Alternatives.

After the County denied Matteson's application, Matteson realized it could not use a single piece of County land for any facet of its disposal operations. Matteson then embarked on a search for a disposal site that was both suitable for dredging disposal and not subject to County approval. With the Corps' assistance, Matteson located a piece of land owned by the U.S. Fish and Wildlife Service ("FWS") and suitable for dredge disposal. *Id*. at 335. Matteson, however, did not acquire the FWS property cost-free. The FWS required Matteson to buy another piece of land that the FWS desired and to exchange it for the new disposal area. *Id*. The FWS site's lack of proximity, however, required Matteson to pump dredged material 26,000 feet to the FWS site as opposed to 9,000 feet to the proposed Saunderson site. *Id*.

Matteson contends that moving its operations from Saunderson to the FWS property adversely affected it in two major fashions. First, the move forced Matteson to employ two booster pumps and other equipment that it did not need for Saunderson. *Id*. According to the original plans using Saunderson, Matteson could pump the dredged material over a shorter distance without using any boosters. *Id*. This alleged increase in Matteson's equipment needs caused a corresponding drop in Matteson's production. Matteson claims it spent more time ensuring its dredging pipes remained clear and flowed smoothly instead of concentrating its energies on the GEE excavation. *Id*.

Second, Matteson contends it spent $120,427 more just to purchase the FWS property. *Id*. Prior to the County's actions, Matteson entered into a contract to purchase Saunderson for $78,750. *Id*. Under the contract, Matteson retained both ownership of the property and the right to sell it after completion of the GEE project. *Id*. As a result, Matteson claims it had to lay out $41,677 above its bid just to satisfy the disposal requirement of the GEE contract.

On July 31, 2000, as a consequence, in its view, of these and other added costs, Matteson submitted a certified claim for an equitable adjustment to its expenses to the Contracting Officer. *See id*. at 332-38. Matteson sought a total of $1,111,227.51 for "costs incurred and damages suffered as a result of a cardinal change in Matteson's contract, which required Matteson to obtain an alternative disposal site." *Id*. at 332. Matteson specifically claimed it was entitled to an equitable adjustment because:

> (a) the Corps authorized, invited and encouraged the hydraulic removal of certain stockpiles of dredged materials; (b) the contract documents indicated the absence of

> any shoreland restriction; (c) the Corps represented that certain property in the vicinity of the job site was acceptable for the disposal of dredged materials; and (d) Matteson reasonably relied on the Corps' assurances that Matteson's original disposal site was acceptable.

*Id*.

On September 29, 2000, the Contracting Officer asked Matteson to submit a "legal memorandum" outlining "various legal grounds" that Matteson claims entitled it to an equitable adjustment. *See id*. at 349-57. After reviewing Matteson's various legal arguments, the Contracting Officer, in a letter dated November 17, 2000, denied Matteson's claim. *Id*. at 399-419. Matteson, as a result, commenced this action on September 25, 2001, and set forth in its complaint the following nine grounds for relief:

1. <u>Breach of Contract</u>: Matteson contends the Corps refused to pay Matteson for its work for the GEE project even though "Matteson performed the dredging work, utilizing the property required by the Corps, and despite substantial obstacles which were unknown and unanticipated by Matteson at the time of contracting . . . " Pl.'s First Am. Compl. at ¶ 25. Matteson seeks $1,111,227.51 in damages covering the Corps' refusal to pay Matteson for all of its work.

2. <u>Differing Site Condition</u>: Matteson claims that prior to bidding on the contract, "Matteson sought in good faith and received from the Corps affirmative representations" not only about the viability of the Saunderson and Braun disposal sites, but also concerning the suitability of hydraulic dredging for the project. *Id*. at ¶ 29-30. Matteson asserts that it reasonably relied on the Corps' representations prior to bidding, and suffered harm when the County prevented Matteson from using Saunderson. As a result, argues Matteson, the post-award unsuitability of hydraulic dredging within the County constitutes a changed contract condition that entitles Matteson to an equitable adjustment in its costs. *Id*. at 34. Matteson seeks $1,111,227.51 in damages, which represents the value of Matteson's additional costs due to the allegedly changed conditions of the GEE contract.

3. <u>Cardinal Change in the Contract</u>: Matteson alleges that the entire essence and purpose for its bid relied on its use of hydraulic dredging and its ability to use either Saunderson or Braun as a disposal site. *Id*. at ¶ 36. The County's actions, Matteson contends, to bar any disposal on its lands prevented Matteson from performing the contract according to its bid. *Id*. at ¶ 37. These obstacles to Matteson, therefore, constituted a "drastic modification of its duties under the contract, were outside the anticipated scope of its obligations under the contract, and outside the scope of the work for which Matteson had bargained." *Id*. at ¶ 38. As a result of these "fundamental" and "cardinal" changes in its contract, Matteson requests $1,111,227.51 in additional costs to perform the GEE contract.

4. <u>Breach of Warranty</u>: Matteson claims the Corps' initial solicitation for the GEE project provided specifications to bidders and impliedly warranted that "performance was possible within those specifications." *Id*. at ¶ 42. Matteson claims it not only relied on the Corps' specifications when formulating its bid, but also actively sought out and received the Corps' input regarding the possibility of using hydraulic dredging and the availability of Saunderson and Braun. *Id*. at ¶ 45. Matteson, as a result, argues the Corps breached its implied warranty by making affirmative representations that Matteson could complete its proposal for the GEE project using hydraulic

dredging, and either Saunderson or Braun as disposal areas, without significant delay or obstacle. *Id*. at ¶ 46. Matteson claims damages as a result of the Corps' breach in the amount of $1,111,227.51.

5. Breach of Implied Duty of Cooperation: Matteson argues the contract imposed the following duties on the Corps: (1) to cooperate with Matteson; (2) to do what was reasonably necessary to enable Matteson to perform according to its bid; (3) to alert bidders to the likelihood of opposition and obstacles that could be anticipated to the GEE project; and (4) in response to Matteson's inquiries, to share its superior knowledge of potential obstacles to Matteson's proposed methods of performance under the contract. *Id*. at ¶¶ 53-56. According to Matteson, the Corps breached these implied duties when it did not alert Matteson to the level of the County's opposition to the GEE project. *Id*. at ¶ 57. Matteson, as a factual predicate, contends that the Corps knew about this opposition because of the residents' complaints about the Corps' previous performance on projects in the County. *Id*. Matteson alleges that while the existence of the County's opposition to the GEE project was known to the Corps, it was unknown to and not reasonably available to Matteson. *Id*. at ¶ 59. The Corps' breach, Matteson claims, caused damages in the amount of $1,111, 227.51.

6. Breach of Implied Warranty of Specifications: Matteson claims the Corps possessed a duty under the contract to furnish Matteson with sufficient plans and specifications to enable Matteson's performance of its project as bid. *Id*. at ¶¶ 62-63. Matteson asserts the Corps omitted from the solicitation specific information about the County's SPA or its previous applications on other Corps projects in the County. *Id*. at ¶ 64. Matteson argues it reasonably relied on the terms of the solicitation as offered, and suffered harm when the County imposed a ban on all dredging operations within its boundaries. Matteson alleges the Corps omitted information about the County's hostility towards dredging and, therefore, caused defects in the original plans and specifications for the GEE project. *Id*. at ¶ 66-67. As a result, Matteson asks for $1,111,227.51 in damages as a measure of its increased costs due to the Corps' defective specifications.

7. Specific Omission: Matteson contends the Corps carefully considered the possible environmental assessments and requirements in the original contract documents and post-award letters to Matteson. *Id*. at 70-71. The Corps, however, failed to include in the contract documents any reference to the County's SPA or its previous applications to other Corps projects in the area. *Id*. at ¶¶ 70-73. Matteson argues it reasonably relied on the Corps' original solicitation, and suffered harm when the County prevented it from using either Saunderson or Braun as a disposal site. *Id*. at ¶¶ 73-75. Matteson alleges the Corps' specific omission of the County's SOA in the original contract documents caused $1,111,227.51 in increased costs and expenses.

8. Commercial Impracticability: Matteson asserts that its proposed use of hydraulic dredging and disposal at either Saunderson or Braun pursuant to the solicitation were both viable and necessary elements of Matteson's performance. *Id*. at ¶ 77. Matteson thus contends that the Corps' failure to warn of the County's hostility towards hydraulic dredging seriously impeded its performance of the GEE project. *Id*. at ¶ 79. Matteson claims that "[t]he absence of such information and specifications, which were necessary elements of the contract, rendered the contract commercially impracticable because it result of [sic] a difference in the cost to perform the contract in the amount of $1,111,227.51." *Id*. at ¶ 80. Matteson argues the actual cost of performing the

contract not only dwarfed the amount the Corps paid Matteson, but also resulted in a substantial savings to the Corps. *Id*. at ¶ 81.

9. Mutual Mistake: As an alternative argument**,** Matteson claims that even if the Corps acted in good faith in withholding its knowledge of both the County's regulatory obstacle and the public's opposition to hydraulic dredging, then at a minimum the Corps should have known that these problems would pose serious impediments to Matteson's performance. *Id*. at ¶ 85. According to Matteson, the Corps' failure to provide this crucial information at the time of the contract, albeit in good faith, constituted a mutual mistake of fact. *Id*. at ¶ 86. Matteson thus requests $1,111,227.51 as a measure of Matteson's increased costs and the value of the benefits the Corps received by virtue of Matteson's full performance under the contract. *Id*. at ¶ 87.

On July 16, 2003, the government filed its Motion for Summary Judgment. Matteson filed its response on October 16, 2003, to which the government replied on November 13, 2003. On March 9, 2004, this court conducted an oral argument to consider the government's motion for summary judgement.

## III. Jurisdiction and Standard of Review

The Tucker Act, 28 U.S.C. § 1491(a)(1),[7] operates as a waiver of sovereign immunity for non-tort suits against the United States premised on the Constitution, a statute or regulation, or either an express or implied contract with the United States*. See* 28 U.S.C. § 1491(a)(1); *United States v. Testan*, 424 U.S. 392, 397 (1976). Nevertheless, the Tucker Act does not create a substantive right enforceable against the United States for money damages; it merely confers jurisdiction on this court whenever that substantive right exists. *Testan*, 424 U.S. at 398 (*citing Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007-1009 (1967)). Consequently, a plaintiff must premise its claim on a separate statute or regulation permitting recovery. *Id*.; *Rinner v. United States*, 50 Fed. Cl. 333, 335 (2001). In this case, Matteson claims it suffered damages as a result of the Corps' breach of their contract to dredge fill material from the upper portion of the Mississippi River in Wabasha County, Wisconsin. Matteson premises its claims for relief expressly on its fixed-price contract with an agency of the Federal government. Clearly then, this court possesses jurisdiction to hear Matteson's claims.

RCFC 56 provides the standard of review in this case and is the functional equivalent of Rule 56 of the Federal Rules of Civil Procedure. This court may grant summary judgment when "there is no genuine issue as to any material fact," thus entitling the moving party to judgment as a matter of law. RCFC 56(c). When considering a summary judgment motion, the court neither weighs the evidence nor makes credibility determinations as to the case presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The court must, however, resolve all reasonable inferences in favor

[7] "The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1).

of the nonmoving party and determines whether there is a genuine issue for trial. *Id.*; *Standard Federal Bank v. United States*, 51 Fed. Cl. 695, 702 (2002). An issue is genuine if a reasonable jury could resolve a factual matter in favor of the nonmoving party after a review of the entire record. *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1359 (Fed. Cir. 1998). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . " *Anderson*, 477 U.S. at 247; *see also Dart Advantage Warehousing, Inc. v. United States*, 52 Fed. Cl. 694, 697 (2002). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. at 248.

A moving party is entitled to summary judgment if it can show "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1985). To carry its burden under Rule 56(c), the moving party need only "point out" a lack of evidence supporting an essential element of the nonmoving party's case. *Id*. at 325. The moving party, therefore, may succeed whether or not it relies "on the pleadings, depositions, answers to interrogatories, and admissions on file." RCFC 56(c); *Celotex*, 477 U.S. at 323. In cases, like this one, where the nonmoving party bears the burden of proof at trial on various dispositive issues, a party may move for summary judgement based solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." *Id*. at 324.

After this initial claim, the burden then shifts to the nonmoving party to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. The nonmoving party, however, cannot rely on conclusory statements or assertions. *See id*. at 324. Opposing a motion for summary judgment, therefore, requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Id*. This showing is critical under Rule 56(c) because unless it is made "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id*. at 323 (quoting FED. R. CIV. P. 56(c)).

## IV. Discussion

A. The Central Issue: Contract Interpretation.

This case is uniquely situated for summary judgment for, at its heart, it turns on the burden Matteson must bear under Rule 56. Most, if not all, of Matteson's claims for relief necessarily rise or fall on its contention that the contract assigned the Corps the burden of notifying Matteson of all applicable environmental regulations and statutes prior to Matteson's performance. If this is a reasonable interpretation of the GEE contract, then the Corps' pre-bid withholding of its knowledge of the existence of the County's regulatory burden and the level of local hostility to prior Corps dredging projects becomes an issue of material fact that would defeat summary judgment. If this is not a reasonable interpretation, then the court must render summary judgment in favor of the government because, as a matter of law, the terms of the GEE contract assigned Matteson the burden of complying with federal, state, and local environmental laws and regulations. Such compliance,

furthermore, would require Matteson's reasonable due diligence to ascertain the existence of the County's regulatory requirements such as its Shoreline Protection Act.

As an initial matter, this court notes that contract interpretation is certainly an appropriate predicate for summary judgment. *Gov. Sys. Advisors, Inc. v. United States*, 847 F.2d 811, 812 n.1 (Fed. Cir 1988). This court, therefore, must commence its analysis by first construing the plain language of the contract. *Hunt Const. Group, Inc. v. U.S.*, 281 F.3d 1369, 1372 (Fed. Cir. 2002) (*citing McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996)). There are two primary rules of interpretation stemming from the ancient wisdom of the common law that must guide the court's endeavor in this case. One, an external structural rule, looks at a contract as an edifice and determines if it is sturdy and sound. This rule is premised on common sense and holds that a court must consider the contract as a whole and interpret it to effectuate its spirit and purpose, giving reasonable meaning to all parts in context and without contradiction. *Id*. (*citing Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991)). History demonstrates that the best way to effectuate the parties' intentions is to assume that all clauses have independent meaning and are put there for a purpose. Consequently, this court must favor an interpretation that gives a reasonable meaning to all parts of the contract over one that leaves portions of the contract meaningless. *Overstreet Electric Co., Inc. v. United States*, 59 Fed. Cl. 99, 112 (2003).

It is possible, of course, that two or more clauses conflict in meaning. In this case, the court must look to the scope of the conflicting clauses. It is settled law that where an agreement contains general and specific provisions that conflict, "the provision directed to a particular matter controls over the provision which is general in its terms." *Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972, 980 (Fed Cir. 1965). *See also Dalton v. Cessna Aircraft Co. v. United States*, 98 F.3d 1298, 1305 (Fed. Cir. 1996); *Daff v. United States*, 78 F.3d 1566, 1574 (Fed. Cir. 1996); *Hills Materials Co. v. Rice*, 982 F.2d 514, 517 (Fed. Cir. 1992); *Farnsworth on Contracts* § 7.11 (3d ed. 2004); RESTATEMENT (SECOND) OF CONTRACTS § 203(c) (1981). But it is important to note that this in effect is a corollary, only a rebuttable presumption, of the general rule of a harmonized reading of all parts of a contract. *See Air-Sea Forwarders, Inc. v. United States*, 166 F.3d 1170, 1172 (Fed. Cir. 1999) ("an agreement is not to be read in a way that places its provisions in conflict, when it is reasonable to read its provisions in harmony").

The second general rule of interpretation implicated in this case is internal to the contract and involves the contract's words and phrases. These bits and pieces of the clauses themselves act as a kind of mortar that supports the contract's overall structure. The general rule of interpretation here is the rule relating to ambiguity. Whether a contract's provisions are ambiguous is a question of law. *NVT Technologies, Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). A contract is ambiguous when it is susceptible to more than one reasonable interpretation. *Jowett, Inc. v. United States*, 234 F.3d 1365, 1368 n.2 (Fed. Cir. 2000). If the provisions are clear and unambiguous, this court must use their plain and ordinary meaning and may not resort to extrinsic evidence to interpret the contract. *McAbee Constr., Inc.*, 97 F.3d at 1435; *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir. 1988) ("[E]xtrinsic evidence will not be received to change the terms of a contract that is clear on its face."). A contract is ambiguous *only* if the competing interpretations are *each* reasonable and consistent with the contract language. *HPI/GSA 3C, LLC v. Perry*, 364 F.3d 1327, 1334 (Fed. Cir. 2004) (*citing Hills Materials Co. v. Rice*, 982 F.2d 514, 516 (Fed. Cir. 1992)); *Jowett*, 234 F.3d at 1368 n.2.

In applying these two categories of general rules of contract interpretation, a good place to start is the partes' competing interpretations of the "Placement Site Paragraph" of the contract – Paragraph 7.3, Section 01000. This paragraph reads in its entirety:

> The Contractor may dispose the transferred existing dredged material fill upon private property provided a copy of each agreement between the landowner(s) and the Contractor is submitted to and approved by the Contracting Officer. The agreement shall give the Contractor explicit permission for such disposal and shall clearly define the terms under which disposal is allowed such as types of material, site grading, and drainage provisions. No disposal (placement) will be allowed in a wetland or wooded area. Approval or disapproval of each proposed final disposal area (placement site) will require a minimum of 30 calendar days for review. The use of an optional final disposal area (placement site) may require the Government to prepare and environmental assessment (including a cultural resource survey). Preparation of an assessment would entail additional cost to the Government and may result in additional requirements to offset environmental impacts associated with the use of the area (site).

Def's. App. at 149.

Specifically, the disagreement between Matteson and the government arises from their competing interpretations of the last sentence of the Placement Site Paragraph: "*Preparation of an assessment would entail additional cost to the Government and may result in additional requirements to offset environmental impacts associated with the use of the area (site)*." *Id*. (Emphasis added).

The government's position is that the Placement Site Paragraph grants Matteson the contractual right to dispose dredged material on private property upon approval by the Corps' Contracting Officer. The disputed clause plainly means, from the government's perspective, that because the Corps was required by federal law to comply with federal environmental standards, it may have to expend additional costs to prepare an environmental assessment. This environmental assessment, in turn, might lead to additional regulatory hurdles the contractor must cross before using its proposed dredging area. Tr. of Oral Arg. at 14:22-25; 15:1-12; 18:11-23. The government maintains that other general provisions of the GEE contract buttress this interpretation and place on Matteson the burden of complying with federal, state, and local law. *See* Def.'s Mot. for Summ. J. at 17-20; Tr. of Oral Arg. at 18:24-25; 19:1-25; 20:1-25; 21:1-25: 22:1-12.

Matteson contends the Placement Site Paragraph not only allows Matteson to dump dredging material onto private property with the Corps' approval, but also specifically obligates the Corps to inform Matteson about all regulatory requirements applicable to Matteson's discretionary disposal area. Tr. of Oral Arg. at 51:8-19; 54:8-25; 56:3-11. This interpretation stems from Matteson's overall view that the contract contains specific provisions that conflict with and trump other general provisions of the contract, which admittedly place on Matteson the burden to comply with federal, state, and local law. *Id*. at 32:11-23.

In support of this proposition, Matteson argues the incorporated FAR provisions listed in Section 00700 of the contract amount to nothing more than "general boilerplate-type provision[s] that

[are] found in virtually all government construction contracts." Tr. of Oral Arg. at 32:16-18. For example, Paragraph 64, Section 00700 (the "Permits and Responsibilities Paragraph")[8] explicitly assigns Matteson the burden of obtaining any necessary licenses and permits. Matteson, however, maintains that Paragraph 3, Section 01130 (the "Environmental Protection Permits Paragraph")[9] trumps the "general" Permits and Responsibilities Paragraph because the Environmental Protection Permits Paragraph specifically provides that "the permits are being obtained by the contracting officer in this particular instance." *Id*. at 33:10-11.

Matteson construes the Placement Site Paragraph as the prime support for this specific-trumps-general construction. Matteson claims the Placement Site Paragraph indicates the Corps' willing departure from normal conventions related to fixed-price contracts. Normally, fixed-price contracts list a detailed set of specifications from which a contractor may not depart. *See* 48 C.F.R. § 16.202-1. On this contract, however, Matteson claims the government invited contractors to "come up with other options" to the pre-selected disposal areas, which "change[d] the contractual relationship." *Id*. at 39:1-2. From this platform, Matteson dives into its argument that the Placement Site Paragraph departs from the Permits and Responsibilities Paragraph to Matteson's benefit.

> Page 149 [of the government's appendix] finds [the Placement Site Provision]. This is what I pointed out to the court earlier, again, was a specific deviation in the specific provisions of this contract from the general FARs, in which, if you look at the very last sentence, it says basically that the government is going to prepare an assessment and that it may entail an environmental assessment; and if it does, the assessment would entail additional costs to the government, not to the contractor, and may result in additional costs, et cetera. In essence, although this is a fixed-price contract, the government is inviting the contractor to bring proposals, as it were, for other sites. And the government is taking on the affirmative obligation to evaluate those proposals; and, as a further inducement to the contractor, they're saying: We will pay for it. That's very unusual.

*Id* at 39:14-25; 40:1-5.

In other words, Matteson trumpets the Placement Site Paragraph as a specific provision that

---

[8] The Permits and Responsibilities Paragraph incorporates FAR 56.236-7, and reads in pertinent part:

> The Contractor shall, without additional expense to the Government, be responsible for obtaining any necessary licenses and permits, and for complying with any Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work.

Def.'s App. at 88.

[9] The Environmental Protection Permits Paragraph provides that "[t]he Contractor shall comply with all requirements under the terms and conditions set out in permits obtained by the Contracting Officer for this contract." Def.'s App. at 166.

supersedes Matteson's general duties of compliance listed in the Permits and Responsibilities Paragraph. Matteson claims this interpretation is the logical result of the contract's provisions that permit contractors to select their own disposal sites in lieu of the Corps' pre-selected areas. By inviting contractors to "bring proposals," as well as assigning the Corps the obligation of conducting an environmental assessment on these proposals, Matteson argues the contract necessarily shifts the financial costs of compliance to the government. *Id*. at 41:4-9.

In addition to bearing the financial costs of compliance, Matteson claims the Placement Site Paragraph also assigned the Corps the specific duty of identifying any applicable local permitting statutes or regulations affecting Matteson's selected disposal area. *Id*. at 54:20-24. Matteson argues the contract specifically shifted to the Corps two affirmative duties based on the Corps' prior experience in conducting dredging operations in Wabasha County, and in dealing with the Wabasha County SPA on these operations: paying for the environmental review of Matteson's proposed disposal area, and notifying Matteson of both the SPA and the level of local opposition to hydraulic dredging. *Id*. at 54:24-25; 56:3-11. Although the general provisions of the contract such as the Placement Site Paragraph required Matteson to *obtain* local permits, Matteson argues the plain language of the Placement Site Paragraph imposed on the Corps the obligation to *inform* Matteson which permits may be required and the potential difficulty in obtaining them. *Id*. at 51:17-19; 54:20-25. In other words, because the Corps had the ultimate responsibility to approve whether a contractor could use an alternative private site, the Corps assumed an implied good faith duty to ascertain what local laws apply and inform its contractors of these laws to assure prompt and legitimate approval. *Id*. at 54:8-25.

In support of this particular argument, even though it is extrinsic to the contract itself, Matteson evokes Paragraph 8.0, "Applicable Environmental Laws and Regulations," of the Corps' environmental assessment. This "Applicable Laws" paragraph begins with the following sentence: "This assessment was prepared and the proposed work designed to comply with *all applicable* environmental laws and regulations, including the following . . ." Def.'s App. at 286 (emphasis added). It then lists ten federal environmental statutes, including the National Environmental Policy Act of 1969 ("NEPA"), the Clean Air Act of 1977, the Clean Water Act of 1977, and the Endangered Species Act of 1973. *Id*. Matteson contends that the Applicable Laws paragraph constitutes the definitive list of applicable laws and permitting requirements relating to the GEE project. "[T]he assessment that's going to be done – it doesn't say without qualification. It says that it's designed to comply with all applicable laws and regulations. It does not except local, state – it doesn't limit it to just federal." Tr. of Oral Arg. at 45:2-7. In effect, Matteson maintains that by *not* listing the Wabasha County SPA in the Applicable Laws paragraph, the Corps excluded it from consideration and placed Matteson on notice that it need not concern itself with abiding by the SPA's provisions.

There is much truth to the logic of Occam's Razor that, all things being equal, the simpler explanation is probably true.[10] This maxim is certainly dead-on-target in this case because Matteson's

---

[10] William of Occam (1285?-1347?) is said to have remarked that "*entiata non sunt multiplicanda preater necessitatem*," or "entities should not be multiplied more than necessary." As such, where there are two competing theories or explanations, all other things being equal, the simpler one is probably correct. *See generally* Michael Shermer, *Why People Believe Weird Things:*

labyrinthine contentions are at best a strained reading of the contract. As the parties contend, the crux of the dispute in this case is the meaning of the Placement Site Paragraph.

In order to slice the Gordian Knot of interpretation it is helpful to read this disputed paragraph in context with other provisions, starting with Paragraph 12.7, Section 01000, "Use of Mandatory Existing Borrow Stockpile and Final Disposal Areas (Placement Sites)."[11] The import of the "Final Disposal Areas" paragraph is that the contractor must first use the mandatory site until the contractor fills it to capacity. Only after completely filling the mandatory site may the contractor use an additional, discretionary site. A problem arises, however, if the contractor exercises its discretion. How can the Corps – a federal agency required by law to ensure compliance with federal environmental standards on all of its projects – assure such compliance in the GEE project? This is where the Placement Site Paragraph takes effect because it grants the Corps contractual authority to approve or reject any contractor-selected disposal areas prior to performance. Thus, the Placement Site Paragraph acts merely as a means of ensuring that contractors comply with federal environmental laws. Otherwise, a contractor could dump dredged waste onto ecologically sensitive areas with impunity.

Indeed, as further support of this interpretation, Paragraph 61, Section 00700, the "Site Investigation" clause,[12] and Paragraph 64, Section 00700, the "Permits and Responsibilities" clause,[13]

---

*Pseudoscience, Superstition, and other Confusions of Our Time* (1998), at 1-10.

**11** Paragraph 12.7 reads in pertinent part:

> Unless directed otherwise, the Contractor shall remove borrow/stockpile fill material in accordance with the priority and other requirements . . . .
>
> (a) The Contractor shall continue disposing of transferred dredged material fill at the mandatory 'Buffalo County No.1 Placement Site' until the required capacity (volume) of fill for this site has been achieved as determined by the Contracting Officer . . . . After this mandatory site has been determined (by the Contracting Officer) filled to the . . . maximum capacity, the Contractor may utilize one or more of the other indicated non-mandatory final placement sites and/or the Contractor's own selected disposal areas (placement sites), as approved.

Def.'s App. at 151-52.

**12** Paragraph 61 is actually the incorporated FAR 56.236-3, and reads in pertinent part:

> (a) The Contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost . . .
>
> (b) The Government assumes no responsibility for any conclusions or interpretations

clearly and unambiguously assign to the contractor the burden of obtaining any local permits associated with using its disposal sites while performing the contract work. Read in conjunction with the Placement Site Paragraph, the plain language of the Permits and Responsibilities clause clearly assigns the contractor the burden of complying with all applicable environmental regulations after the Corps approves the contractor-selected disposal area.

The Placement Site Paragraph, therefore, comes into play once the contractor exercises its discretion under the Final Disposal Area paragraph and selects its own disposal area. The Placement Site Paragraph thus serves a twofold purpose: (1), it puts the contractor on notice of the Corps' oversight authority over contractor-selected disposal areas; and (2), it grants the contractor the right to use its proposed disposal site subject to the Corps' approval. Thus, a far more cogent interpretation of the disputed Placement Site Paragraph would be that it simply acts as notice to Matteson that if it selected a discretionary disposal area, then the Corps may uncover additional compliance requirements for Matteson in the course of the environmental assessment.

Various other provisions of the contract also support the proposition that the contractor assumes the burden of obtaining the necessary permitting. For instance, Paragraph 2.3, Section 01130,"Compliance," provides that:

> Not withstanding [sic] the requirements of this section and not withstanding [sic] approval by the Contracting Officer of the Contractor's Environmental Protection Plan, nothing herein shall be construed as relieving the Contractor of all applicable Federal, State, and local environmental protection laws and regulations.

In this paragraph, the contract makes crystal clear that the contractor has a duty to comply with all applicable environmental statutes and regulations. To be sure, the solicitation for the GEE project required all contractors to comply with all applicable laws and regulations designed to protect the environment and to submit as a part of their bids a plan demonstrating such compliance during the

---

> made by the Contractor based on the information made available to the Government. Nor does the Government assume responsibility for any understanding reached or representation made concerning conditions which can affect the work by any of its officers or agents before the execution of this contract, unless that understanding or representation is expressly stated in this contract.

Def.'s App. at 86.

[13] Paragraph 64 incorporates FAR 56.236-7, and reads in pertinent part:

> The Contractor shall, without additional expense to the Government, be responsible for obtaining any necessary licenses and permits, and for complying with any Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work.

Def.'s App. at 88.

course of their performance. *See also* Def.'s App. at 165 (Paragraph 2.1(5), Section 01130).

In a similar fashion, Paragraph 4, Section 01130, "SUBCONTRACTORS," requires the contractor to ensure that any of its subcontractors comply with the requirements of this section along with all appropriate Federal, State, and local laws, regulations, and other requirements.[14] Likewise, Paragraph 5, Section 01130, "NOTIFICATION," requires the Contracting Officer to notify the contractor of any observed noncompliance with the Federal, State, or local laws. It is highly significant, however, that this provision expressly states that any failure of the Contracting Officer to notify the contractor of any observed noncompliance "does not relieve the Contractor of the obligation to be in conformance with those requirements." *Id.* at 166. In light of all these provisions, it is apparent that the contract assigns the burden of complying with all applicable laws to the contractor .

It can hardly be denied that the contract clearly and unequivocally assigned to Matteson the burden of complying with *all* applicable federal, state, and local laws, including those of Wabasha County. It therefore follows – in the absence of express provisions to the contrary – that the burden of complying with all applicable laws must include the inchoate obligation to research relevant local legal requirements, as well as any attending problems (such as local opposition) that may hinder the contractor's compliance. Compliance becomes meaningless without the necessary and understood requirement of due diligence. The practical effect of this contractual duty, consequently, is that the contractor bears the risk that local authorities would deny the necessary permission needed to dump on an alternative private property site. The court reiterates that Matteson is a sophisticated contractor.

Finally, the court rejects Matteson's argument based on analysis of the "Applicable Laws" paragraph of the environmental assessment. First, Matteson's use of this paragraph as a Rosetta Stone of contract interpretation is misplaced given that it is extrinsic to the contract and such use would violate the long-standing prohibition against the use of parol evidence when the terms of the contract are unambiguous.[15] Second, and perhaps just as significant, the statutory obligations specified in the

---

**14** The Subcontractor Compliance Paragraph requires the contractor to "insure [sic] that its subcontractor's [sic] comply with the requirements of this section along with all appropriate Federal, State, and local laws, regulations, and requirements." Def.'s App. at 166.

**15** The parol evidence rule "prohibits the use of external evidence to add or otherwise modify the terms of a written agreement in instances where the written agreement has been adopted by the parties as an expression of their final understanding." *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375 (Fed. Cir. 2004) (internal quotation marks omitted). The rule, therefore, renders inadmissible evidence used to "modify, supplement, or interpret the terms of an integrated agreement." *Id*. (*citing McAbee Constr., Inc.*, 97 F.3d at 1435). Furthermore, if the terms of a contract are clear and unambiguous, then parol evidence may not be used, such as is the case here, to vary the unambiguous terms of a contract. *Id.*; *W & F Building Maintenance Company, Inc. v. United States*, 56 Fed. Cl. 62, 68 (2003); *A Olympic Forwarder, Inc. v. United States,* 33 Fed. Cl. 514, 524 (1995). This is true whether the contract contains an integration clause or not. *Id*. When asked by the court whether the contract did indeed contain such a clause, the government counsel responded in the affirmative and gave examples. *See* Tr. of Oral Arg. at 23:14-25; 24:1-17. This

Corps' environmental assessment did not in any way alleviate Matteson's general duty of compliance.

In analyzing the Corps' statutory obligations specified in the environmental assessment, this court turns to the introductory paragraph of that document. The last sentence of the introductory paragraph reads: "This assessment was completed to satisfy the requirements of [NEPA],[16] Council on Environmental Quality Regulations (40 C.F.R. §§ 1500-1508),[17] and [Corps of Engineers]

---

assertion was not contradicted by plaintiff's counsel. Regardless, the court considers the applicable provisions of the contract to be unambiguous and, therefore, applies the parol evidence rule.

[16] Congress codified NEPA at 42 U.S.C. § 4321 *et seq*. NEPA requires all agencies of the Federal Government, as a part of any "Federal actions significantly affecting the quality of the human environment," to include a "detailed statement" addressing:

> (I) the environmental impact of the proposed action,
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
> (iii) alternatives to the proposed action,
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
>
> Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the documents of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved.

42 U.S.C. § 4332 (C)(i)-(v).

The stated purpose of the GEE project was to "restore the capacity of the Grand Encampment rehandling placement site and the Alma Marina beneficial use stockpile site for normal channel maintenance dredging." Def.'s App. at 279, ¶ 2.0. As the Federal agency with jurisdiction over this project, therefore, the Corps bore the statutory burden of detailing any adverse impacts on the environment, including Matteson's proposed use of private property pursuant to the GEE contract.

[17] 40 C.F.R. § 1501.3 provides guidance on when federal agencies should prepare an environmental assessment.

> (a) Agencies shall prepare an environmental assessment . . . when necessary under the procedures adopted by individual agencies to supplement these regulations as described in § 1507.3. An assessment is not necessary if the agency has decided to prepare an environmental impact statement.
>
> (b) Agencies may prepare an environmental assessment on any action at any time in order to assist agency planning and decisionmaking.

regulations (ER 200-2-2)."[18] Def.'s App. at 279. These requirements make clear that the Corps' purpose in preparing the environmental assessment was to comply with the listed *federal* environmental laws.

This bears little relevance to the contract requirement to comply with federal, state, and local law, which in this case means fulfilling applicable permitting requirements. It has something to do with the contract, of course, because a contractor's use of private property as an alternative site for dredged material triggers the duty of the supervising federal agency under the contract – the Corps – to assure that any adverse impact to the environment is revealed to the public. The contract also grants the Corps the right to refuse the contractor to use the private property as an alternative site if the Corps finds its use would be harmful. It would also allow the Corps to suggest possible remediation for its use, of which the contractor must bear the cost as a condition of that use.

Matteson's argument essentially confuses these two obligations. But there are clear differences. One *directly* arises from the contract. It is a term of the contract and requires the contractor to comply with all federal, state, and local law when attempting to use private property as an alternative site. In practice this means determining what permits to obtain and what other regulatory burdens exist. It also means that these must be followed.

The other obligation is *indirectly* related to the contact. It is thus not a term of the contract. Although Matteson is correct in that the Corps must also comply with environmental law, such a requirement arises from statutory law and primarily requires the assessment of environmental harm the federally-funded project might engender, and the notification to the public of the result of the assessment. The very fact that this federal statutory obligation exists and the contract bows to this reality by including a provision allowing the Corps a veto over a contractor's use of private property as an alternative site (or places conditions on the use of the site) does not work a metamorphosis by which the Corps must in essence comply with state and local permitting requirements, as Matteson suggests.

Such a reading of the contract not only is contrary to a common sense reading of the contract, it would render the applicable clauses *ultra vires* because it would turn the Supremacy Clause of the Constitution on its head. *See United States v. Allegheny County*, 322 U.S. 174, 183 (1944) ("The purpose of the Supremacy Clause was to avoid the introduction of disparities, confusions and conflicts which would follow if the Government's general authority were subject to local controls. The validity and construction of contracts through which the United States is exercising its constitutional functions, their consequences on the rights and obligations of the parties, the titles or

---

**18** ER 200-2-2, ""Procedures for Implementing NEPA," provides "guidance for implementation of the procedural provisions of [NEPA] for the Civil Works Program of the U.S. Army Corps of Engineers." ER 200-2-2 at 1. According to these regulations, an environmental assessment "provides sufficient information to the district commander on potential environmental effects of [a] proposed action and, if appropriate, its alternatives, for determining whether to prepare an [Environmental Impact Statement] or a [Finding Of No Significant Impact]." *Id*. at 5. The Corps, furthermore, must prepare an environmental assessment for all "authorized projects," *Id*. at 2, ¶ 7b., such as the GEE project in this case.

liens which they create or permit, all present questions of federal law not controlled by the law of any state."), *rev'd on other grounds in U.S. v. City of Detroit*, 355 U.S. 466 (1958). A locality, simply put, may not regulate a federal agency. *See generally McCulloch v. Maryland*, 17 U.S. 316, 327 (1819) (a state may not tax a federal instrumentality).

To summarize, the court's interpretation that the contract places the burden on Matteson avoids the many difficulties discussed above. For the court to adopt Matteson's reasoning would not only distort the plain language of various provisions in the contract, but would make the contract internally contradictory. This, a court may not do. *See Hughes Communications Galaxy, Inc. v. United States*, 998 F.2d 953, 958 (Fed. Cir 1993). The GEE contract allowed contractors like Matteson to select their own disposal area on private property, yet notified them that such a choice would not remain without consequence. Selecting an alternative site triggers both the requirement of Corps approval, the need for Matteson to comply with federal, state, and local law, as well as to inform the Corps of these requirements so that the Corps can comply with federal law, such as NEPA.

This is consistent with the plain meaning of the aforementioned provisions and does not work a convoluted and strained reading – such as Matteson proposes. *See Air-Sea Forwarders, Inc.*, 166 F.3d at 1172 (a court cannot read a contract in such a way that places its provisions in conflict "when it is reasonable to read its provisions in harmony"). Indeed, the general law of contract construction mandates that a court first seeking to harmonize differing clauses and, if that fails, enforce "specific" clauses over conflicting "general" one. *See Hol-Gar Mfg. Corp.*, 351 F.2d at 980. Matteson would have the court do just the reverse – first label certain clauses as contrary specific and general provisions, and then pronounce the search for accord impossible. Naturally, such impossibility is foreordained by this topsy-turvy and arbitrary approach to contract interpretation.

B. <u>Can Matteson's Various Claims Survive Summary Judgment</u>?

Given that the GEE contract places the burden on Matteson to comply with federal, state, and local law, which subsumes the obligation to obtain the requisite permitting, it is rather easy to resolve the summary judgment claims. First, the court grants summary judgment in favor of the government on Matteson's claim for Specific Omission in which Matteson contends it reasonably relied on the government's exclusion of the County's SPA in the contract. This claim directly conflicts with the plain language of the contract and Matteson's attendant duties under it. The court also notes that Matteson conceded at oral argument its claim for Breach of Warranty because it amounted to a claim for impossibility of performance for which Matteson proffered no factual basis. *See* Tr. of Oral Arg. at 74:23-25; 75:1-10. This court now addresses Matteson's remaining substantive claims.

1. <u>Breach of Contract</u>.

At the outset, the government argues this court must dismiss this count on its face because

> [t]here is no dispute that Matteson bid an estimated price of $1,692,000 for the projected contract quantities . . . that the contract was fixed price . . . and that the Corps paid Matteson in full for the final contract price of $1,581,067.41, which is based upon the actual contract work performed.

Def.'s Mot. for Summ. J. at 13.

The government also contends that the parties modified the contract five times.[19] None of these modifications, argues the government, affected Matteson's performance and its choice of "non-mandatory disposal sites," or increased the total fixed contract price. *Id*. at 13-14. The government asserts this court must grant summary judgment because no factual dispute exists as to whether Matteson received the full contract price for its performance. Def.'s Reply at 6.

Matteson, on the other hand, argues that a factual issue exists as to whether the contract binds the government to pay for an equitable adjustment. Pl.'s Opp. to Def.'s Mot. for Summ. J. at 8. Matteson contends that the government cannot premise its claim for summary judgment solely on the Corps' payment under the contract since "[the Corps] has failed to pay additional sums due Matteson as an equitable adjustment." *Id*. Matteson specifically maintains that its claim for breach is "not for failure to pay the contract price . . . nor . . . for failure to pay based on any of the written modifications to the contract." *Id*. Instead, Matteson argues the Corps continues its breach for failing to pay "as long as Matteson demonstrates entitlement to additional money . . . ." *Id*.

The court holds that the government satisfied its burden as the moving party under Rule 56 by "pointing out" the lack of a genuine issue of material fact as to the essential elements of Matteson's claim for breach. *Celotex*, 477 U.S. at 325. The burden now shifts to Matteson to proffer enough evidence creating a genuine issue of fact as to whether the Corps breached its contract by refusing to honor Matteson' claim for an equitable adjustment. *Id.*; *Liberty Lobby* at 248.

An analysis of this issue involves nothing more than a review of basic principles of contract law. Parties entering into a bilateral contract retain a choice: "when the time comes they can perform, and accept whatever benefits and losses the contract gives them, or they can refuse to perform and pay the consequences." *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1379 (Fed. Cir. 2001). A party breaches the contract by choosing not to perform at the time the contract calls for that party's performance. *Kasarsky v. Merit Systems Protection Bd.*, 296 F.3d 1331, 1336 (Fed. Cir. 2002) (citing *Franconia Assocs. v. United States*, 536 U.S. __, 122 S.Ct. 1993, 2002, 153 L.Ed.2d 132 (2002) (citing RESTATEMENT (SECOND) OF CONTRACTS § 235(2) (1979)); *Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588, 596-97 (2001); RESTATEMENT (SECOND) OF

---

[19] The five modifications included:

(a) Modification P00001 which extended the time "to complete disposing of transferred dredge material at the mandatory 'Buffalo County No. 1 Placement Site;'"

(b) Modification P00002 which changed Block #24 of the standard form solicitation sheet to read "Contracting Officer's Representative" and Block # 27 to read "USACE, Finance Center, Millington, Tennessee;"

(c) Modifications P00003 and P00004 which "obligated some additional funds;" and

(d) Modification P00005 which "deobligated some excess funds."

Def.'s App. to Def.'s Mot. for Summ. J. at 408, para. 14.

CONTRACTS § 235(2), Comment b (1981)). Here, the parties agree that the Corps paid Matteson the adjusted amount called for in the GEE contract after Matteson's full performance. The dispute, therefore, centers around whether the government breached its duty under the contract by not paying an additional $1,111, 227.51.

Matteson cites *Western Contracting Corp. v. United States*, 144 Ct. Cl. 318 (Ct. Cl. 1958) as authority for this court to find a factual issue as to whether the government breached the GEE contract. Matteson's reliance on *Western Contracting* is misplaced because this case addresses a breach in the context of a contractual "changed conditions" clause. *See Western Contracting Corp. v. United States*, 144 Ct. Cl. 318 (Ct. Cl. 1958). Matteson also asserts this type of claim as a separate, enumerated ground for relief. Matteson, therefore, wants two bites at the apple by characterizing the present claim for an equitable adjustment as both a general breach of contract claim and a "changed condition" claim. The court will address Matteson's changed condition theory claim later in the opinion.

As to the general breach of contract claim, the uncontested facts indicate the Corps entered into a fixed-price contract with Matteson to perform a dredging operation at two points along the Mississippi River. As a party to a fixed-price contract, moreover, Matteson assumed the risk of any cost overruns during the term of performance. *See* 48 C.F.R. § 16.202-1 ("A firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. This contract type places upon the contractor *maximum risk and full responsibility for all costs and resulting profit or loss*.") (emphasis added); *Franklin Pavkov Const. Co. v. Roche*, 279 F.3d 989, 995 (Fed. Cir. 2002) (contractors bidding for fixed-price work assume a "certain amount of risk by submitting a bid and ultimately entering into the contract on the basis of the information before it."); *American Tel. & Tel. Co. v. United States*, 177 F.3d 1368, 1383-84 (Fed. Cir. 1999) ("[O]ur precedents are unequivocal that full payment under a valid fixed price-type contract is all to which a contracting party is entitled. The risk of loss for misjudging what it takes to perform, or for deliberately underbidding, is on the contractor, not the Government.") (citations omitted).

The Corps agreed to pay Matteson $1,693,000 for its services under the contract. Matteson, in turn dredged the specified waterway, albeit with some difficulty and added expense. The government paid Matteson $1,581,067.41 for its full performance after all applicable adjustments. Def.'s App. to Mot. for Summ. J. at 337. Both parties agreed to perform a duty, and both parties performed timely. These facts are not in dispute, and Matteson's claim for breach is contrary to settled law.

2. Superior Knowledge.

The court will address Matteson's two separate claims, one for breach of the Implied Duty of Cooperation , the other under a theory of "Superior Knowledge," under the general heading of superior knowledge because Matteson premises each of these claims on the same premise – the Corps' failure to reveal its alleged prior knowledge of the Wabasha County Shoreline Protection Act ("SPA") and the level of local hostility in Wabasha County towards dredging operations. Matteson argues summary judgment is inappropriate because factual issues exist as to both the Corps[2] and

Matteson's knowledge of the County's restrictive application of its SPA, as well as the local hostility towards dredging operations. Pl.'s Opp. to Def.'s Mot. for Summ. J. at 10. Matteson contends that in all of its pre-bid discussions with the Corps, as well as in its evaluation of the contract documents, it never knew of the level of local opposition to hydraulic dredging and the County's intention to apply its SPA to include temporary dredging pipes in the protection zone. *Id*. According to Matteson, the Corps knew about both of these facts yet willingly concealed them presumably to secure Matteson's performance at a comparatively low cost. *See id*. at 10-11.

The court rejects Matteson's argument. According to the superior knowledge doctrine, a contracting agency possesses an implied affirmative duty to a contractor to disclose otherwise unavailable information regarding some novel matter affecting the contract that is vital to its performance. *Giesler v. United States*, 232 F.3d 864, 876 (Fed. Cir. 2000); *So. Cal. Edison v. United States*, 58 Fed. Cl. 313, 325 (2003). A contractor, therefore, has a viable claim for breach under the doctrine of superior knowledge where the government fails to provide a contractor with vital knowledge in the government's possession which bears upon the contractor's performance costs under the contract at issue. *Hercules, Inc. v. United States*, 24 F.3d 188, 196 (Fed. Cir. 1994) *aff'd*, 516 U.S. 417 (1996). To prevail on its claim for breach due to superior knowledge, a contractor must produce specific evidence that it:

> (1) undertook to perform without vital knowledge of a fact that affects performance costs or direction,
>
> (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information,
>
> (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire, and
>
> (4) the government failed to provide the relevant information.

*AT&T Communications, Inc. .v Perry*, 296 F.3d 1307 (Fed. Cir. 2002) (*quoting GAF Corp. v. United States*, 932 F.2d 947, 949 (Fed. Cir. 1991) (internal quotation marks omitted)).

The court, therefore, must focus its inquiry on the government's knowledge at the time of contracting and its relationship to the contractor's lack of knowledge. *So. Cal. Edison*, 58 Fed. Cl. at 325 (*citing Max Jordan Bauunteernehmung v. United States*, 10 Cl. Ct. 672, 679 (1986) ("The government's liability for failure to provide information arises from *a conscious omission* to share superior knowledge it possesses it circumstances where it permits a contractor to pursue a course of action *known to be defective*.") (emphasis added)).

Nevertheless, and this is key here, while the superior knowledge doctrine imposes an affirmative duty on the government, the government is under no obligation to "volunteer information in its files if the contractor can reasonably be expected to seek and obtain the facts elsewhere." *See Geisler*, 232 F.3d at 877 (*citing H.N. Bailey & Assocs. V. United States*, 196 Ct. Cl. 166, 178 449 F.2d 376, 383 (1971)). In fact, a contractor will fail in a claim for breach under superior knowledge unless

it can prove that the government's withholding information, in fact, misled the contractor. *Manuel Bros., Inc. v. United States*, 55 Fed. Cl. 8, 34-35 (2002) (*citing McCormick Constr. Co., Inc. v. United States*, 18 Cl. Ct. 259, 266 (1989) (citations omitted)). A contractor cannot claim it was misled if the contractor knew or should have known that it would encounter such a condition. *Id*.

Clearly, the contract here placed an affirmative duty on Matteson to comply with all federal, state, and local laws. This duty, as explained above, includes an obligation to both inquire about and obtain local permission to carry out its dredging operations in Wabasha County. This also means that it was incumbent upon Matteson to uncover the extent of any difficulties, including possible local opposition, prior to its seeking to use private property as an alternative site for dredged material. Matteson proffers no evidence that such diligence would have been impracticable, as is its burden as a respondent in a motion for summary judgment. *Celotex*, 477 U.S. at 324.

The contractual obligation to uncover potential roadblocks was on the contractor, not the Corps. Under these circumstances, particularly where there is absolutely no evidence in the record that the Corps affirmatively misled Matteson, whether or not the Corps possessed and withheld knowledge of public opposition to hydraulic dredging or of the County's willingness to enforce its SPA is immaterial. *See Manuel Bros., Inc.*, 55 Fed. Cl. at 34-35.

3. <u>Differing Site Condition</u>.

Matteson asserts a differing site condition claim based on the particular sections of the contract that identified specific locations for dredging disposal. While the Corps selected five conditions available to Matteson, these did not include Matteson's use of hydraulic dredging for the GEE project. As a result, Matteson assumed the responsibility of selecting its own disposal areas, presumably under the Corps' guidance. *See* Pl.'s Opp. to Def.'s Mot. for Summ. J. at 23. Matteson emphasizes how important it considered the Corps' input while it surveyed Braun and Saunderson as possible disposal areas. *See id*. ("Matteson reasonably relied upon the Corps' assurances that hydraulic dredging would be feasible and was responsive to the bid solicitation. Upon expending considerable time and resources to identifying potential sites, Matteson again sought the Corps' assurances that the site was suitable.").

Matteson submitted its bid without, in its opinion, "the benefit of critical information, solely available to the Corps, of local opposition based on prior complaints to the Corps or previous attempts to apply the Shoreland Protection Act to prevent the running of pipes across the protected area." *Id*. The County's aggressive application of its SPA, allegedly known by the Corps yet unknown by Matteson, forced Matteson, it claims, to use a different physical location for disposing dredged material. As a result, Matteson contends its lack of information concerning the County's SPA and its eventual application, combined with Matteson's purchase and use of the FWS property, constitutes a "material difference" in Saunderson's "physical condition." *Id*. at 24.

Again, the court rejects Matteson's argument. To prevail on a differing site condition claim the contract must contain a clause or provision indicating "what that condition would be." *Comtrol, Inc. v. United States*, 294 F.3d 1357, 1363 (Fed. Cir. 2002) (*citing P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed. Cir. 1984)). While the contract "indication" does not need

to be explicit or specific, the contract documents must "provide sufficient grounds to justify a bidder's expectation of latent conditions materially different from those actually encountered." *P.J. Maffei*, 732 F.2d at 916. In this case, the only provision in the contract dealing with differing site conditions is Paragraph 60, Section 00700, which incorporates 48 C.F.R. § 52.236-2.

In *Olympus Corp. v. United States*, 98 F.3d 1314 (Fed. Cir. 1996), the Federal Circuit specifically addressed the effect of 48 C.F.R. § 52.236-2 on a claim for an equitable adjustment due to a differing site condition. *Olympus* involved a government contractor that entered into a fixed-price construction contract with the United States to pave various plant yards on an engine plant in Connecticut. And like the contract *sub judice*, the contract in *Olympus* incorporated 48 C.F.R. § 52.236-2 as a differing site condition clause. *Id*. at 1315. In *Olympus*, one month after the government awarded the contract to the plaintiff, however, the employees operating the engine plant went on strike and denied the plaintiff physical access to the plant yards. After the strike ended, the plaintiff completed its performance under the contract and submitted a request for an equitable adjustment to the Contracting Officer that reflected the plaintiff's costs of delay during the strike. *Id*. After the Contracting Officer rejected the plaintiff's claim, the plaintiff filed suit in the Court of Federal Claims seeking to recover all of its additional costs.

The Court of Federal Claims granted the government's summary judgment motion and dismissed the plaintiff's complaint. *Id*. at 1316. In reaching its decision, the court found that the contract's differing site conditions clause addressed only conditions exiting at the time of the contract. *Id*. The plaintiff, therefore, could not recover under the clause because the engine plant's employees were not on strike at the time the plaintiff entered into the contract with the government. *Id*.

On appeal, the Federal Circuit affirmed the lower court's judgment, yet offered its own interpretation of a differing site condition clause that incorporated 48 C.F.R. § 52.236-2. The Federal Circuit stated:

> [I]t is also clear that the Differing Site Conditions Clause applies *only to 'physical' conditions* at the work site, *not to actions of third-parties* that deny the contractor access to the work site . . . . While interference by the government with a contractor's access to the work site may constitute a breach of the government's duty to cooperate, *the government is not responsible for third-party actions . . . that delay a contractor's performance, absent a specific contractual provision*.

*Id*. at 1318. (Emphasis added).

Matteson's claim here fails for the same reason as the one rejected by the Federal Circuit in *Olympus*. Its claim for equitable adjustment is, at its heart, not one based on "'physical conditions' at the work site," but instead on the "actions of a third party" – in this case, Wabasha County denying Matteson the requisite conditional-use permit. *See Olympus Corp.*, 98 F.3d at 1318. Furthermore, Matteson's differing site condition claim is deficient in that the GEE contract contains no specific provisions providing Matteson relief in the event it could not obtain a conditional-use permit from Wabasha County. *Cf. Comtrol, Inc.,* 294 F.3d at 1363 (to prevail on a differing site condition claim, the contract must contain a specific clause indicating the condition at the site). Quite the contrary,

the plain language of the contract specifically assigned to Matteson the risk of the County's adverse action.

4. Cardinal Change.

Matteson premises its claim for recovery as a result of a cardinal change in the GEE contract on the fundamental characteristics of its bid. Specifically, Matteson claims the combination of using hydraulic dredging and a private disposal area in the vicinity of the job site constituted the primary reasons for submitting its bid for the GEE project. Pl.'s Opp. to Def.'s Mot. for Summ. J. at 24. Matteson argues it prepared its bid and made purchase offers on Braun and Saunderson principally because of the Corps' approval of hydraulic dredging and alleged approval of the feasibility of Braun and Saunderson as disposal sites. *Id*. at 29. After the County denied Matteson's application for a conditional use permit, Matteson claims "the nature of the work called for in the contract and for which Matteson agreed to perform was drastically altered and was outside the anticipated scope of its obligations under the contract for which Matteson bargained." *Id*. at 25.

Summary judgment, Matteson argues, is inappropriate here because "there are facts, or at the least disputed issues of fact, concerning the actions that the Corps took and whether those actions did in fact effect an alteration of the work such that Matteson is entitled to argue a cardinal change occurred." Pl.'s Opp. to Def.'s Mot. for Summ. J. at 27. According to Matteson, the key to its claim of cardinal change centers on changes to Matteson's bargained-for performance as opposed to who or what instituted such changes. *Id*. In support of this argument, Matteson offers six different factual scenarios by which the Corps effected a cardinal change.[20] Matteson documents these occurrences

[20] In short order, Matteson's scenarios include:

(1) The Corps' inspection and alleged approval of Braun and Saunderson while Matteson and officials from FWS and the Minnesota Department of Natural Resources attended to fulfill the Crops' obligation of approving the environmental plans for the properties;

(2) The Corps' failure to disclose its allegedly superior knowledge of the County's SPA, its previous enforcement on other Corps' projects, and its application to temporary dredging pipes running across shoreline within 1000 feet of the Mississippi River;

(3) The Corps' allegedly superior knowledge of the amount and severity of local opposition to dredging projects in the County based on previous Corps projects and complaints;

(4) The Corps' superior knowledge of the County's intention to enforce its SPA against Saunderson and Braun in response to local opposition, and failing to disclose this info to Matteson prior to awarding the contract.

(5) The Corps' failure to assist and cooperate with Matteson by refusing to purchase Saunderson and Braun, thereby shielding the properties from the SPA because of sovereign immunity;

with letters and considerable deposition testimony. *See* Pl.'s PFUF ¶¶ 15-56. Matteson submitted this evidence to buttress its argument that Matteson's entire bid rested on the Corps' encouragement and representations concerning hydraulic dredging. According to Matteson, furthermore, it never would have submitted a bid if the Corps shared its alleged knowledge about the local hostility towards hydraulic dredging, as well as the County's previous and intended enforcement of its Shoreline Protection Act.

The court cannot concur. A cardinal change occurs when "the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for." *Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320, 1332 (Fed. Cir. 2003) (citing *Krygoski Constr. Co. v. United States*, 94 F.3d 1537, 1543 (Fed. Cir.1996) (citations omitted); *AT&T Communications, Inc. v. Wiltel, Inc.*, 1 F.3d 1201, 1205 (Fed. Cir.1993); *Allied Materials & Equip. Co. v. United States*, 215 Ct.Cl. 406, 569 F.2d 562, 563-64 (1978)). The change must be so profound that "it is not redressable under the contract, and thus renders the government in breach." *AT&T Communications, Inc.*, 1 F.3d at 1205 (citing *Allied Materials*, 569 F.2d at 563-64 (Ct. Cl. 1978)). In this case, however, it is not the government (*i.e.*, the Corps) that hypothetically caused the change to the contract.

In truth, Matteson premises its factual scenarios in this claim on the government's alleged superior knowledge of both the County's SPA and the level of the County's opposition to dredging operations. In this respect, Matteson's claim based on cardinal change is the functional equivalent of its claim for superior knowledge, a claim this court rejects essentially because the contract clearly assigned the duty and risk of compliance to Matteson.

5. <u>Commercial Impracticability</u>.[21]

This commercial impracticality claim is once again based on Matteson's erroneous assertion that the Corps *unlawfully* withheld information concerning the County's desire to enforce the Shoreline Protection Act and the local community's hostility towards dredging projects. Simply put, the court rejects this claim because any significant impediment or severe obstacle to Matteson's performance resulted from its own behavior – not the Corps'. The language of the contract, as demonstrated in the prior section of this opinion, repeatedly and plainly allocated the risk of non-compliance with local laws to Matteson.

Commercial impracticability, a subset of the doctrine of legal impossibility, excuses a party's

---

(6) The Corps' insistence that Matteson use the FWS property, some 16,000 feet further from the job site than Saunderson, to carry out its duties under the contract.

Pl.'s Opp. to Def.'s Mot. for Summ. J. at 27-29.

**21** At oral argument, Matteson conceded that its claim for Breach of the Implied Warranty of Specifications is substantively similar to its Commercial Impracticability claim. *See* Tr. of Oral Arg. at 89:18-25; 90-1-4. This court, consequently, addresses both claims under the general heading of "Commercial Impracticability."

delay in performing or nonperformance when the attendant costs become excessive and unreasonable "by an unforeseen supervening event not within the contemplation of the parties at the time the contract was formed." *Hercules, Inc. v. United States*, 24 F.3d 188, 204 (Fed. Cir. 1994); *Int'l Elecs. Corp. v. United States*, 227 Ct. Cl. 208, 646 F.2d 496, 510 (1981). A court may treat its finding of impracticability as a constructive change to the contract. *Raytheon*, 305 F.3d at 1367. Parties may not avoid performance and claim commercial impracticability because their actual costs exceed their forecasted expenses. *Jennie-O Foods, Inc. v. United States*, 217 Ct. Cl. 314, 580 F.2d 400, 409 (1978).

Whether performance according to a particular contract would be commercially impracticable is a question of fact. *Raytheon*, 305 F.3d at 1367. The party asserting the impracticability defense, moreover, bears the burden of showing "that it explored and exhausted alternatives before concluding that the contract was . . . commercially impracticable to perform." *Mass. Bay Transp. Auth. v. United States*, 254 F.3d 1367, 1373 (Fed. Cir. 2001) (citing *Blount Bros. Corp. v. United States*, 872 F2d 1003, 1007 (Fed. Cir. 1989). To prevail on a defense of commercial impracticability, a party must show (I) a supervening event, either an "act of God" or an act of a third party, made performance impracticable; (ii) the non-occurrence of the event was a basic assumption upon which the contract was based; (iii) the occurrence of the event was not the party's fault; and (iv) the party did not assume the risk of the event's occurrence. *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1295 (citing *United States v. Winstar Corp.*, 518 U.S. 839, 904-10 (1996)); RESTATEMENT (SECOND) OF CONTRACTS § 261, Comment d. An impracticability defense, furthermore, will not succeed if the contract's language allocates the risk of the supervening event to the party seeking an excuse from performance. *Seaboard*, 308 F.3d at 1295; *see* Corbin, CORBIN ON CONTRACTS § 1333 ("[T]he court must be alert to weigh any evidence to show a custom throwing the risk upon one party rather than the other, or to show that there was a mutual contemplation of its being borne by one of them.").

Here, the court must reject Matteson's commercial impracticality claim because Matteson fails to allege facts legally sufficient to demonstrate either that the obstruction to the performance of the contract was the cause of the defendant, or that the contract placed the risk the of the supervening event on the Corps and not Matteson. To be sure, this claim is deficient because as the court previously held, it was Matteson that bore the risk of the County's denial of a conditional-use permit under the contract.

6. Mutual Mistake.

Finally, the court rejects Matteson's request for reformation of its contract based on mutual mistake. Matteson asserts the Corps knew or should have known that its affirmative representations about the viability of the Saunderson site, as well as the County's environmental permit requirements, "would result in obstacles to Matteson's performance according to its bid and contract that the Corps erroneously failed to identify and acknowledge." Pl.'s First Am. Compl. at 12, ¶ 85. Matteson argues that its reliance on the Corps' information concerning the availability of the Saunderson site constituted a mutual mistake of fact because the Corps' affirmative representations and specific omissions, while made in good faith, obstructed and ultimately prevented Matteson from performing the contract as bid. *Id*. at 13, ¶ 86. Matteson requests reformation of the contract "so as to provide proper compensation" in the amount of $1,111,227.51. Pl.'s Opp. to Def.'s Mot. for Summ. J. at 35.

That figure, according to Matteson, accurately reflects Matteson's full performance under the contract due to its increased costs and expenses. Pl.'s First Am. Compl. at 12, ¶ 86.

While the law of contracts supports the finality of transactions between parties, it also allows reformation and restitution when the contracting parties are both mistaken as to existing facts underlying their agreement. *Roseburg Lumber Co. v. Madigan*, 978 F.2d 660, 665 (Fed. Cir. 1992); *see* RESTATEMENT (SECOND) OF CONTRACTS Introductory Note, § 152(2) (1981). To prevail on its claim for mutual mistake, Matteson must prove the following elements: (1) the parties to the contract *sub judice* held an erroneous belief as to an existing fact *at the time of the contract*; (2) that erroneous belief constituted a basic assumption underlying the contract; (3) the mistake had a material effect on the bargain; and (4) the contract did not put the risk of the mistake on Matteson. *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1203 (Fed. Cir. 1994) (citing *Atlas Corp. v. United States*, 895 F.2d 745, 750 (Fed. Cir. 1990) (emphasis added).

In this case, the alleged existing fact at the time of the contract is Matteson's ability to obtain local permission to conduct its dredging operations within Wabasha County. Yet, there exists no mutual mistake as to this or any other fact. Matteson proffers no proof showing the Corps knew, at the time of the contract, that Matteson would face difficulty obtaining the required permits. This it must do to meet its burden under Rule 56. *Celotex*, 477 U.S. at 325; *Anderson v. Liberty Lobby*, 477 U.S. at 248. Furthermore, and consistent with the common theme throughout this opinion, the contract clearly and expressly assigned to Matteson the risk of obtaining local compliance. With this, the government clearly agrees. *See* Def.'s Mot. for Summ. J. at 28. Consequently, this court finds no mutual mistake and rejects Matteson's last claim.

## IV. Conclusion

For the foregoing reasons, this court GRANTS the government's motion for summary judgment against ALL COUNTS in Matteson's First Amended Complaint. As a result, this court directs the Clerk of the Court to enter judgment in favor of the United States in accordance with this opinion. No costs.

**IT IS SO ORDERED.**

s/ *Lawrence J. Block*

**Lawrence J. Block**
**Judge**